## UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

MALIBU MEDIA, LLC,

Plaintiff,

vs.

JOHN DOE,

Defendant.

CIVIL ACTION NO.  5-19-CV-00834-DAE

## APPENDIX TO DEFENDANT JOHN DOE'S RENEWED MOTION FOR PARTIAL SUMMARY JUDGMENT

1. December 18, 2020 Declaration of Glenn K. Bard…………………………App. 1-237

    a. August 28, 2020 Expert Report of Glenn K. Bard……………………App. 2-9

    b. Ex. 1 to Bard Report: Bard Curriculum Vitae………………………App. 10-17

    c. Ex. 2 to Bard Report: Malibu Media, LLC's Original Complaint…..App. 18-28

    d. Ex. 3 to Bard Report: Malibu Media LLC's Motion for Leave to Serve a Third Party Subpoena Prior to a Rule 26(f) Conference and Appendix…...App. 29-79

    e. Ex. 4 to Bard Report: Declaration of John Doe……………………..App. 80-81

    f. Ex. 5 to Bard Report: Hearing transcript in *Malibu Media, LLC v. Doe*, CV-15-3505 (E.D.N.Y.)…………………………………………………...App. 82-226

    g. Ex. 6 to Bard Report: *Malibu Media*, *v. Doe*, No. 13 C 6312, 2016 U.S. Dist. LEXIS 14798 (N.D. Ill. Feb. 8, 2016)……………………………App. 227-237

2. Excerpts from October 20, 2020 Deposition of Collette Pelisser…………App. 238-256

3. Excerpts from December 9, 2020 Deposition of John Doe[1]…………...App. 257-268

---

[1] Doe's real name is redacted from these excerpts to comply with the Stipulated Protective Order [Dkt. 10].

4. Malibu Media's Responses and Objections to Defendant's First Set of Interrogatories……………………………………………………………App. 269-276

5. Malibu Media's Supplemental Responses and Objections to Defendant's First Set of Interrogatories……………………………………………………App. 277-282

6. Defendant John Doe's Objections and Responses to Plaintiff's First Set of Requests for Admission…………………………………………………………………..App. 283-291

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| MALIBU MEDIA, LLC, | |
| Plaintiff, | |
| vs. | CIVIL ACTION NO.  5-19-CV-00834-DAE |
| JOHN DOE, | |
| Defendant. | |

## DECLARATION OF GLENN K. BARD

1.      I am over the age of eighteen, have never been convicted of a felony, and I am of sound mind.

2.      I have reviewed my August 28, 2020 expert report, which I understand was served on Plaintiff Malibu Media on September 2, 2020. My report is attached.  This report accurately describes my knowledge, opinions, and conclusions, and I adopt it in full as my testimony.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on: 12/18/2020

_____
Glenn K. Bard

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

MALIBU MEDIA, LLC,

Plaintiff,

vs.                                                    CIVIL ACTION NO. 5-19-CV-00834-DAE

JOHN DOE,                                              **JURY TRIAL DEMANDED**

Defendant.

## EXPERT REPORT OF GLENN K. BARD

1. My name is Glenn K. Bard. Currently I serve as the Senior Forensic Examiner for Flashback Data, LLC. My duties at Flashback Data, LLC include conducting forensic examinations of computers, laptops, servers, mobile devices, flash drives, and other digital storage devices.

2. Flashback Data, LLC is ISO/IEC 17025:2017 compliant accredited by the ANSI Accreditation Board. To maintain this accreditation, Flashback Data, LLC adheres to standards related to the handling and analysis of digital evidence to include proper chain of custody, acquisition of digital devices, validation of forensic software, internal and external proficiency testing, and peer review of forensic analysis.

3. I earned my Associates Degree from the Community College of Beaver County.

4. Prior to my work at Flashback Data, LLC I was a Pennsylvania State Trooper assigned to the computer crime unit until retiring in 2010. During my career with the Pennsylvania State Police I was also sworn as a US Marshal and FBI agent, tasked with conducting computer and cellular forensics. I am also a Veteran of the US Army, completed a tour in support of Operation Desert Storm, and was a faculty instructor at a college in Pennsylvania from 2003 to 2010.

App. 002

5. During my tenure as a Pennsylvania State Trooper I was tasked with conducting investigating crimes ranging from child pornography to Criminal Homicide.

6. Some of the cases I have worked on involved the impeachment of the Deputy Prime Minister of Albania, examinations of numerous devices of persons attempting to disrupt the G20 summit in 2009, persons involved in plots to commit terroristic attacks against the United States,and more.

7. I have examined over 15 thousand different types of digital evidence ranging from cellular devices to RAID arrays, servers, gaming systems, NVR / DVR systems and more.

8. One of my functions at the Pennsylvania State Police was conducting online P2P (Peer to Peer) child pornography investigations.

9. I have taken part in over 500 search warrants for a wide range of crimes. Additionally, I have testified as an expert in numerous states and Federal court as well as the US Virgin Islands for crimes involving Criminal Homicide, Child Pornography, Kidnapping, and more.

10. I have volunteered for the National Center for Missing and Exploited Children as a member of Project Alert, and additionally I have instructed members of NCMEC on digital technology.

11. I have taught hundreds of classes to Law Enforcement since 2007. During that time I have taught thousands of investigators.

12. I have developed two forensic certifications obtained by hundreds of members of Law Enforcement in the United States. Additionally, I have been contracted to develop and teach the certifications for the forensic software programs SecureView and Passware.

13. During my career I have attended training from various organizations including the Computer Science and Artificial Intelligence Laboratories (CSAIL) and the Massachusetts

Institute of Technology (MIT), the University of Washington, and I am currently enrolled in a professional education course at Curtin University.

14. My work has often involved the study and evaluation of evidence involving the use of file sharing networks, including BitTorrent. I am experienced with the BitTorrrent network and how it works, if called upon to explain the operation of the BitTorrent network in the context of this case at trial, I expect to do so.

15. I have also obtained numerous certifications during my career to include the CISSP, CFCE, CHFI, A+, Network+, Security+ and more.

16. I have been retained as a technical expert by JT Morris Law, PLLCon behalf of the defendant in this case, who I understand remains anonymous to the public in this litigation and is referred to as "John Doe," to provide my expert opinion regarding Malibu Media's allegations of copyright infringement. I have attached a current copy of my curriculum vitae as Exhibit 1. My employer is being compensated at the rate of $350 per hour for my services related to this report. My compensation does not depend on the outcome of this litigation. I have no personal interest in the outcome of this litigation.

17. In forming the opinions presented in this report, I have reviewed and relied upon, among other things, the following documents:

      a. The Complaint from Malibu Media in this matter, attached as Exhibit 2.

      b. Malibu Media's Motion for Leave to File Third Party Subpoena, attached as Exhibit 3.

      c. Declaration of John Doe, which I understand had been submitted to the Court in this case, attached as Exhibit 4.

      d. The transcript of a Court Hearing involving Malibu Media before Hon.

Steven I. Locke in the United States District Court for the Eastern District of New York, in Case No. CV-15-3504, attached as Exhibit 5.

e. A copy of a Court opinion in which Malibu was involved, *Malibu Media LLC v. Doe*, No. 13 C 6312, 2016 U.S. Dist. LEXIS 14798, at *8 (N.D. Ill. Feb. 8, 2016), attached as Exhibit 6.

18. Upon reviewing Exhibit 3, I focused on the technological aspects of the incidents described in the Motion and its attachments.

19. In reviewing Exhibit 3, I found that the document made statements concerning the IP address identifying a person. To the extent that Malibu Media or its consultant state or imply that identification of an IP address alone can identify a specific person, this statement or implication is false.

20. When an ISP (Internet Service Provider) identifies a person's name in response to legal process supplied, that name is merely the subscriber information for the account, and not necessarily the person conducting activity on the network, or not even necessarily a person at the location.

21. What the IP address truly identifies is that of the gateway of the network to the internet. That gateway acts as the bridge between the internet and the internal network, and that gateway is the single device that is assigned both an external and internal IP address.

22. Behind that gateway can be numerous devices accessed by many people. In some cases, the network can be a small residential system, or it can be a large network such as ones used at hospitals, airports, universities and so on.

23. Assuming, for the moment, that the declarations submitted by Malibu Media are true,

the IP address those declarations claim was captured during this incident was the IP address of the gateway, and not an individual computer system within the network.

24. Anyone within that network would be sharing the same external IP address of the gateway, therefore the identity of the subscriber cannot simply be used as the person responsible for this event.

25. This is highly relevant since more modern routers have capabilities to have both a secured private internal network and an open guest network. This is a very common occurrence seen every day in locations such as restaurants, coffee shops, doctors' offices and so on. There will be one secured private internal network for employees and a second guest network for customers to access.

26. It would not be unlikely, therefore, for the information packets described in the declarations to have come from someone other than John Doe. Given that there are usually several potential users of the gateway IP address, without additional information, it is not unreasonable to assume that John Doe is likely not the user that Malibu Media's consultants say uploaded a piece or pieces of data. In other words, one cannot say with any confidence that John Doe is associated with those information packets. In addition, if John Doe were to have kept any portion of his network open during the relevant times, without password protection, then it is additionally likely that Doe was not the accused user, and, as a matter of logic and in my investigative experience, significantly more likely, particularly given the nature of the materials that Malibu Media has listed and the ready availability of such materials elsewhere.

27. A typical household will have several potential users of the gateway IP address. In addition, the potential users are not limited to members of the household.

28. I have personally conducted investigations involving P2P child pornography

App. 006

downloads where the suspect was not the subscriber name associated with the ISP, and was instead, for example, a neighbor using the subscriber's open WiFi. This happens so often there are tools for tracking such "moochers," such as the tool named "moocher hunter."

29. Additionally, the external (Public) IP address is generally assigned using a lease. This means that the IP address will be the same for a specific time period established by the ISP, and when that lease expires, a new IP address is assigned. As I reviewed the contents of the document, I noticed a discrepancy between the years listed for this event. In one instance it was listed as 2016 and in another it was listed at 2019. If such an error occurred during the course of the download of the pieces of information, then the wrong IP address could have been identified, and the wrong subscriber information obtained.

30. I also reviewed a case in which Malibu Media was a Plaintiff, in which the Court examined the same methodology Malibu Media claims to have used in this case (Exhibit 6). This case is instructive, in my opinion, because it involved testimony from the same Declarants from whom Malibu has submitted testimony in this case, involving the same packet capture methodology in accusing the subscriber corresponding to an IP address from which a piece or pieces of data were said to have been downloaded. The Court states:

> Malibu's proof that Doe copied its works relies, then, on the evidence it tenders to show that a computer linked to Doe's IP address distributed one or more bits of each of the works. Even if that disputed evidence were accepted, the IP address alone is not enough to impose liability on Doe. An IP address discloses the location of the internet line used for the transaction (*see, e.g., TCYK, LLC v. Does 1-87*, No 13 C 3845, 2013 U.S. Dist. LEXIS 95817, 2013 WL 3465186, at *2 (N.D. Ill. July 10, 2013)), but it does not identify the individual person who engaged in the transaction. 'An IP address provides only the location at which one of any number of computer devices may be deployed, much like a telephone number can be used for any number of telephones.' *In re BitTorrent Adult Film Copyright Infringement Cases*, 296 F. R. D. 80, 84 (E.D.N.Y. 2012)

31. The Court goes on to state:

> Malibu contends that this court previously held that Malibu need only prove that Doe's IP address was used in order to prove Doe's liability. [Dkt 147 at 1.] That is not correct…. Evidence of a link between an IP address and Malibu's movies … is not enough to prove liability…. Malibu has no evidence suggesting that an IP address used by Doe's work computer was in any way involved with Malibu's works. The court concluded that Malibu's effort to take discovery about Doe's work computer without even a link to the IP address used by those computers was 'just fishing.'

32. I agree with the Court's conclusions.  Specifically, I agree that "Evidence of a link between an IP address and Malibu's movies … is not enough to prove liability." I also agree that Malibu's Packet Capture methodology constitutes "no evidence" that any end computer (and, thus, even further, that any user) "was in any way involved with Malibu's works."

33. In addition, according to the Declaration of Tobias Fieser submitted by Malibu Media in this case as the evidence of copyright infringement by Doe, he downloaded multiple pieces of data from IP address 70.121.72.191.  He claims that the pieces where identified by a cryptographic hash corresponding to a Malibu Media copyrighted movie.  His declaration does not explain the precise nature of these pieces, but based on my experience with the BitTorrent network and review of the documents and testimony from Malibu Media, should any such pieces have been transferred, they would likely have been extremely small in relation to the data file for any of the films in this case—likely 16 Kb. But thousands of times this volume of additional data from other sources are needed to constitute an entire film.  I also noticed that nowhere in the declaration is there conclusive evidence that an entire film was ever downloaded, displayed, or distributed as part of this exercise.

34. It is my opinion that the neither the declarations and other materials submitted by Malibu Media in this case and provided to me in the attached exhibits, nor the methodology used,

App. 008

is, or could be, sufficient to show that John Doe distributed, displayed, or otherwise interacted with the films for which Malibu Media states that it owns the copyrights.

35. My opinions are based upon my education, training, and experience in addition to the information reviewed and my analysis in this case and are stated to a reasonable degree of certainty in my field of expertise.

36. I reserve the right to supplement my opinions upon future findings of the Court or receipt of additional information.

August 28, 2020

Glenn K. Bard

App. 009

# GLENN BARD

**SENIOR FORENSIC EXAMINER | FLASHBACK DATA, LLC**
**4029 SOUTH CAPITAL OF TEXAS HIGHWAY, SUITE 224**
**AUSTIN, TEXAS 78704 | 512.301.5700**


flashback data®

## EMPLOYMENT EXPERIENCE

**FLASHBACK DATA, LLC**
*Senior Forensic Examiner*                                                                        *2019 - Present*
- o   Digital forensics evidence collection and handling
- o   Conduct forensic examinations of digital evidence
- o   Development of forensic case reports
- o   Search warrant and affidavit development for digital evidence

**Public Agency Training Council / PATCtech**
*Computer Crime Instructor / Chief Technical Officer*                                             *2007 - Present*
- o   Designed and implemented a computer crime class for investigators
- o   Designed numerous other classes ranging from network intrusion, memory analysis, and mobile forensics

**Westmoreland County Community College**
*Faculty Instructor*                                                                             *2003 - 2010*
- o   Tasked with planning and developing courses of instruction in the Computer Information Security division
- o   Designed and implemented three classes focusing on computer forensics taught at the college level
- o   Taught a network intrusion detection course focusing on many aspects of network and data security

**Pennsylvania State Police**
*Computer Crime Investigator / Computer Forensics Examiner*                                        *2000 - 2010*
- Conducted computer crime investigations
- Conducted computer forensic examinations
- Handled microcomputer systems and storage media
- Provided technical assistance to law enforcement agencies
- Prepared and served search warrants and arrest warrants
- Prepared court orders and other legal processes
- Prepared written and web based technical reports
- Tested and validated software tools and utilities
- Developed and provided courses to law enforcement
- Trained to conduct hacking and intrusion investigations
- Investigated Human Trafficking, Solicitation, Murder
- Internal Investigation, Fraud, Identity Theft, and
- Internet Crimes Against Children (ICAC) cases
- Conducted research and experimentation
- Developed and implemented training programs

**Pennsylvania State Police**
*Pennsylvania Law Enforcement Officer*                                                            *1995 - 2000*
- Conducted patrol duties
- Conducted traffic enforcement duties
- Investigated traffic crashes including fatalities and homicide
- Investigated and made arrests for various crimes

**United States Army**
*Military Police Officer*                                                                         *1988 - 1992*
- Managed movement and well-being of security team
- Maintained 100% security readiness
- Created and executed various training programs
- Managed $1 million dollar equipment budget

## LICENSES AND CERTIFICATIONS

**Class "A" Wiretap Certification**
Pennsylvania State Police and Pennsylvania Office of Attorney General

**A+ Certification**
CompTIA

**Network+ Certification**
CompTIA

**Security+ Certification**
CompTIA

**Certified Electronic Evidence Collection Specialist (CEECS)**
The International Association of Computer Investigative Specialists (IACIS)

**Certified Forensic Computer Examiner (CFCE)**
The International Association of Computer Investigative Specialists (IACIS)

App. 010

# GLENN BARD

**SENIOR FORENSIC EXAMINER | FLASHBACK DATA, LLC**
**4029 SOUTH CAPITAL OF TEXAS HIGHWAY, SUITE 224**
**AUSTIN, TEXAS 78704 | 512.301.5700**



**Computer Hacking Forensic Investigator (CHFI)**
 International Council of E-Commerce Consultants (EC-Council)

**EnCase Certified Examiner (EnCE)**
 Guidance Software

**Access Data Certified Examiner (ACE)**
 Access Data

**Access Data Mobile Examiner (AME)**
 Access Data

**Certified Information Systems Security Professional (CISSP)**
 The International Information Systems Security Certification Consortium, Inc. (ISC)[2]

## EDUCATION AND TRAINING

### *COMMUNITY COLLEGE OF BEAVER COUNTY*                                        1992 - 1994
 Obtained an A.A.S. in Criminal Justice. Named to the Dean's List (twice) and the President's List (twice). Identified by the college as an "Outstanding Student". Graduated with a final GPA of 3.78

### *TECHNOLOGY-BASED TRAINING:*

 1994 Pennsylvania State Police Academy – Pennsylvania State Police
 1996 Operation Whiteline – Pennsylvania State Police
 1998 Traffic Institute of Police Services Annual Conference
 1998 Cognitive Interviewing – Pennsylvania State Police
 1998 Hidden Compartment Investigation – Traffic Institute of Police Services
 1998 Tracking Missing Persons – Traffic Institute of Police Services
 1999 Testifying in Court – Pennsylvania State Police
 1999 Wireless Fraud Training – Aerial Communications and System Link
 1999 Introduction to the Internet – Municipal Police Officers Education and Training Commission
 1999 Web Page Design – Municipal Police Officers Education and Training Commission
 1999 Internet Crime – Municipal Police Officers Education and Training Commission
 1999 Statement Analysis – Pennsylvania State Police
 1999 Basic Homicide Investigation – Pennsylvania State Police
 2000 Financial Crimes Investigation – International Association of Financial Crimes Investigators
 2000 Class "A" Wiretap Certification – Pennsylvania State Police
 2001 Basic Data Recovery and Analysis – National Cybercrime Training Partnership
 2001 Responding to Cyber Crime – Mid Atlantic Great Lakes Organized Crime Law Enforcement Network
 2001 Protecting Children Online for Unit Commanders – National Center for Missing and Exploited Children
 2001 Regional Computer and Forensics Group – George Mason University
 2001 Advanced Data Recovery and Analysis – National Cybercrime Training Partnership
 2002 Basic Computer Forensics – International Association of Computer Investigative Specialists
 2002 ILOOK Forensics - Mid Atlantic Great Lakes Organized Crime Law Enforcement Network
 2002 Inet computer forensics - National Cybercrime Training Partnership
 2003 Institute for Law Enforcement Education Annual Conference
 2003 Protecting Children Onlline - National Center for Missing and Exploited Children
 2003 Computer Crime Investigation – Internet Crimes
 2003 Digital Crime Scene Awareness – Internet Crimes
 2003 Basic Computer Forensics – Edinboro University
 2003 Child Sexual Exploitation - Center for Missing and Exploited Children
 2003 ADRA for NT/2000/XP - National Cybercrime Training Partnership
 2003 ILOOK forensics - National Cybercrime Training Partnership
 2004 Basic Online Technical Skills - National Cybercrime Training Partnership
 2004 Introduction to Computer Crimes – Pennsylvania State Police

App. 011

# GLENN BARD

**SENIOR FORENSIC EXAMINER | FLASHBACK DATA, LLC**
**4029 SOUTH CAPITAL OF TEXAS HIGHWAY, SUITE 224**
**AUSTIN, TEXAS 78704 | 512.301.5700**



2004 Institute for Law Enforcement Education Annual Conference
2005 Inside a Meth Lab – Pennsylvania Narcotics Officer's Association
2005 Basic Computer Forensics – International Association of Computer Investigative Specialists
2005 CompTIA A+ Hardware – New Horizons
2005 CompTIA A+ Operating Systems – New Horizons
2005 Regional Computer and Forensics Group – George Mason University
2005 CompTIA Network+ - New Horizons
2005 Institute for Law Enforcement Education Annual Conference
2006 Windows Forensic – Access Data
2006 Regional Computer and Forensics Group – George Mason University
2006 Institute for Law Enforcement Education Annual Conference
2006 ICAC Peer Precision
2006 Computer Hacking Forensic Investigator – New Horizons
2007 Core Skills for the Investigation of Cellular Telephones - Search
2008 Mobile Forensics 101 – Mobile Forensics Inc
2008 Mac Forensics – Cranston Consulting
2008 SOHO (Small Office Home Office) network investigations - Search
2009 Basic Cellular Phone Investigation – National Cybercrime Training Partnership
2009 ICAC Peer to Peer Investigations – Internet Crimes Against Children
2011 ISC2 – Using Advanced Authentication Methods to Mitigate Data Leakage
2011 ISC2 – Fortifying your defense: Using Encryption to Defend and Protect Critical Comm. and Trans.
2011 ISC2 – Borderless: Why Insecure Software is a concern to Everyone, Everywhere
2011 ISC2 – Pound of Prevention for an ounce of Cure? – What is the true cost of Malware protection
2011 ISC2 – The Fractured Datacenter – Defense Moves Closer to the Data
2011 ISC2 – Computers Don't Commit Crimes, People Do – Cybercrime Today
2011 ISC2 – Pay Now, Pay Later or Just Keep Paying, The Real Cost of Staying Compliant
2011 ISC2 – Ubiquitous Computing, Pervasive Risk: Coping with the Proliferation of Mobile Devices
2011 ISC2 – Pathway to the Clouds
2011 ISC2 – Deter. Detect. Defend. Protecting Against Data Loss
2011 ISC2 – Lessons Learned – Critical Success Factors from Government Identity Management Deployments
2011 ISC2 – Dealing with Risk and Vulnerabilities in the Enterprise
2011 ISC2 – At Rest, In Transit, In Use: Data Security in the Dynamic Enterprise
2012 ISC2 – Groundswell – Managing the Bottom-Up Emergence of Social Media
2012 ISC2 – A Perfect Storm for IT Security
2012 ISC2 – Managing the Fractured Datacenter: The Cloud and Unifying Identities
2012 ISC2 – Cybercrime – Stopping the profit motive
2012 ISC2 – Back to Basics: IT Service Management as a Security Enabler
2012 ISC2 – Demystifying and Improving your Application Security Program
2012 ISC2 – Using Authentication to Support Information Protection
2012 ISC2 – BYOD Recipe for Disaster?
2012 ISC2 – Mining Security Intelligence for Threat Indicators
2012 ISC2 – Cradle to Grave: Managing the Software Assurance Lifecycle
2013 ISC2 - Critical Infrastructure: Untangling System Dependencies and Recovery
2013 Paraben – Paraben Forensic Innovations Conference (Speaker and attendee)
2014 ISC2 - Security Congress (Speaker and attendee)
2014 Paraben – Paraben Forensic Innovations Conference (Speaker and attendee)
2015 MIT – Cybersecurity: Technology, Application and Policy
2016 MIT – Tackling the Challenges of Big Data
2017 MIT – Internet of Things: Roadmap to a Connected World
2017 ISC2 – Insider Threats – The greatest risk to your data
2017 ISC2 – Cyber Security Starts with Awareness
2017 ISC2 – Managing Shadow Data: The growing challenge to safe cloud adoption

App. 012

# GLENN BARD

**SENIOR FORENSIC EXAMINER | FLASHBACK DATA, LLC**
**4029 SOUTH CAPITAL OF TEXAS HIGHWAY, SUITE 224**
**AUSTIN, TEXAS 78704 | 512.301.5700**



2018 University of Washington – Introduction to CyberSecurity
2018 ISC2 - Identity Assurance for a Connected World
2018 ISC2 - Infrastructure Protection for Better Application and Service Availability
2018 ISC2 - Operationalizing Threat Intelligence
2018 ISC2 - Prepping for the Worst - Plans and Programs for Incident Response, Vulnerability Management and Phishing
2018 ISC2 - GDPR – Now's the Time to Plan for Compliance
2018 ISC2 - Getting to know you Consumers and their identities
2018 ISC2 - Office 365 Security & Performance – Proven Deployment Strategy Combining CASB + SWG
2018 ISC2 - Reimagine Your Identity Strategy

## Speaking Engagements:

Pennsylvania State Police
Edinboro University of Pennsylvania
Indiana University of Pennsylvania
National District Attorneys Association
Westmoreland Bar Association
Duquesne Law School – Wecht Institute
Pennsylvania State Fraternal Order of Police
Illinois Fraternal Order of Police
New Jersey Fraternal Order of Police
Pennsylvania Game Commission
Federal Fraternal Order of Police
DEA – Phoenix
HIDTA - Phoenix
Hi Technology Criminal Investigators Association (Pittsburgh Chapter)
OPDAT / DOJ – Tirana Albania
HIDTA – Houston
HIDTA – El Paso
Paraben Forensic Innovations Conference (PFIC)
ISC2 Security Congress
RCFL – St. Louis
Idaho POST
International Association of Arson Investigators
Association of Certified Fraud Examiners
National Transportation Safety Board
Conducted training in over 30 states
2014 World Security Congress
2019 American Academy of Forensic Science
And many more.

Selected to speak at trainings all over the world, including representing the United States at the 2010 OPDAT training in Tirana Albania, 2014 World Security Congress, 2019 American Academy of Forensic Sciences and hundreds of other trainings for local, state and federal agencies, law firms, insurance companies, and other professional organizations, too numerous to list.

## Certifications courses created:

Created the CTF (Cellular Technology and Forensics) and +Smart (Forensic and Technology Certification focused on Smartphone devices). The certifications are issued by PATCtech and have been obtained by hundreds of people in the last decade.

Contracted to develop and teach the SecureView cellular forensic software certification for Susteen and the Passware Kit password and decryption certification for Passware.

## Other notable Honors:

App. 013

# GLENN BARD
## SENIOR FORENSIC EXAMINER | FLASHBACK DATA, LLC
### 4029 SOUTH CAPITAL OF TEXAS HIGHWAY, SUITE 224
### AUSTIN, TEXAS 78704 | 512.301.5700



Certified as an expert in Commonwealth of Pennsylvania, State of Tennessee, State of Connecticut, State of Texas, United State Virgin Islands and the United States Federal Court System in the areas of Digital Forensics, Cellular forensics, Cellular Communications and Computer Technology.

Certified as an Expert Instructor in the State of Maryland, certification number 176999.

Certified Law Enforcement Instructor – State of Arkansas

Selected by the US Attorney's office in Pittsburgh and OPDAT to teach computer crime investigations and computer forensics in Tirana Albania, May 2010.

Articles concerning cases I have worked on have been noted on Fox News, Dateline, the Associated Press, Playboy, Yahoo!, the New York Times, Pittsburgh Post-Gazette, Pittsburgh Tribune Review, and many more.

Project Alert team member for the National Center for Missing and Exploited Children.

Selected to supply cellular forensic and records analysis training for a 5 year period for the NTSB.

Interviewed on Good Morning America.

Asked to create a course on the Dark Web, TOR, Onion Routing and Cryptocurrency for the state of Idaho. The course was originally taught online and has since been turned into a classroom instruction course that teaches investigators when to detect that the Dark Web / TOR were used to commit a crime. The course then covers how to properly seize the computers / smartphones used to access the Dark Web, and ultimately conduct forensic analysis of those devices to identify the artifacts.

Guest lecturer at the 2019 AAFS (American Academy of Forensic Sciences) Annual conference in Baltimore, Maryland.

## PROFESSIONAL MEMBERSHIPS
**Information Systems Security Certification Consortium, Inc. (ISC)$^2$**
*Active Member*
**International Association of Computer Investigative Specialists (IACIS)**
*Former Member*

## PUBLICATIONS:
Co-authored *"Crime Scene Investigation in the 21st Century Digital Evidence Edition"*
Contributor "Long-term missing child guide for law enforcement: Strategies for finding long term missing children"

## EXPERT TESTIMONY
**United States vs Christopher Beardsley** (Child Pornography)

**United States vs Daniel Diyn** (Child Pornography)

**United States vs Michael Karrer** (Child Pornography)

**United States vs Ed Northup** (Child Pornography)

**United States vs Douglas Cook** (Child Pornography)

**United States vs Kristian Heller** (Child Pornography)

**Pennsylvania vs Ian Bishop** (Murder)

**Pennsylvania vs Ian Finlay** (Criminal Attempt – Sexual Assault)

App. 014

# GLENN BARD
**SENIOR FORENSIC EXAMINER | FLASHBACK DATA, LLC**
**4029 SOUTH CAPITAL OF TEXAS HIGHWAY, SUITE 224**
**AUSTIN, TEXAS 78704 | 512.301.5700**



**Pennsylvania vs Kenneth Jones** (Murder)

**Pennsylvania vs Stephen Rugh** (Indecent Sexual Assault)

**Pennsylvania vs Daniel Segen** (Sexual Assault)

**Tennessee vs Wade** (Murder)

**Pennsylvania vs Tyler Hess** (Peer to Peer technology and Child Pornography)

**Pennsylvania vs Bracken** (Child pornography – Sexual Assault)

**Pennsylvania vs Eric Hall** (Double Murder)

**Pennsylvania vs Michael Martin** (Murder)

**Pennsylvania vs Greg Howard** (Robbery)

**Pennsylvania vs Earl Pinkney** (Murder)

**ANPAC vs Stuttes** – Recorded testimony (Civil – Arson)

**Pennsylvania vs Michael Peterson** (Drug delivery resulting in death)

**Kozel vs Kozel** (Divorce)

**Pennsylvania vs Paul Sieminkewicz** (Perjury)

**Pennsylvania vs David Johnson** (Murder)

**Pennsylvania vs Barshay Dunbar** (Human Trafficking)

**Indiana vs Emmanuel Arrington** (Attempted Homicide)

**Texas vs Aniseto Alejandro Jr.** (Capital Murder)

**Pennsylvania vs Savoy Jennings** (Drug Delivery Resulting in Death)

**Pennsylvania vs Rahmael Holt** (Murder of a Police Officer)

## <u>Significant Investigations / Examinations</u>

Investigation into the disappearance of Morgan Johnson
(Johnson disappeared in May 2011 and was not located for over 2 years. In July of 2013 I was supplied his cellular records and asked for an estimate of where he may be located. After reviewing the records, and opinion was supplied, and Johnson was found within days, in the area identified.)

Albania vs. Former Deputy Prime Minister Ilir Meta
(Examined several digital devices.)

US. Vs. Nathan Wedgeworth
(Tracked Wedgeworth using cellular phones to locate the young girl he kidnapped. The exam of the victim's computer also resulted in dozens of arrests nationwide for Unlawful Contact with a Minor.)

The murder of Dr. Andrew Bagby
(Examined the victims computer and found evidence it was being used the day of his murder, while he was at work. Then tracked Dr. Shirley Turner's phone placing her near the murder scene.)

G-20 Summit Elliot Madison Investigation
(Seized and examined a makeshift communication center including computers and cellular phones, all which were being used to aid protesters.)

PA Vs. Boob / Heichel
(Examined cellular records and prepared a report identifying suspect location at the time of the murder.)

PA. Vs. Anthony McWhite
(Examined cellular records and prepared a report identifying suspect location at the time of the murder.)

App. 015

# GLENN BARD

**SENIOR FORENSIC EXAMINER | FLASHBACK DATA, LLC**
**4029 SOUTH CAPITAL OF TEXAS HIGHWAY, SUITE 224**
**AUSTIN, TEXAS 78704 | 512.301.5700**


flashback data®

PA Vs. Bret Thompson
(Examined cellular phones and recovered deleted communication from an app that revealed a relationship between Thompson and a juvenile victim.)

PA Vs. Christopher Marsh
(Forensically examined a phone used by Marsh to film other men in a WalMart restroom.)

PA Vs. Eric Hall
(Conducted cellular mapping and records analysis and was able to provide expert opinion of the defendant turning his phone off on the way to the murder scene.)

TN Vs. Marcus Wade
(Conducted cellular records mapping that placed the suspect at the scene of the incident. Then conducted records analysis that showed after the murder, prior to the victim being discovered, Marcus Wade quit calling the victim and fled the area of the crime.)

PA Vs. Michael Martin
(Conducted cellular records analysis and placed the defendant within a half mile of the victim at the time of the murder using RTT data. Additionally, was able to use previous days records to discredit the defendant's alibi and show a pattern of going to the victim's residence days prior to the incident.)

PA Vs. David Stahl
 (Conducted forensic analysis to show the victim's phone was still being used after her death. And that the phone was in close proximity to the defendant's phone while the two phones were texting each other. Also placed the defendant's phone within .3 miles away from the victim's body near an airport runway.)

PA Vs. Greg Howard
(Conducted cellular record analysis to show locations of the suspect at the time of a robbery. Additionally, analyzed records to show call patterns and frequency or calls as well as identified when the suspect's phone was forwarding calls to another cellular device.)

PA Vs. Earl Pinkney.
(Conducted cellular record analysis of several phones to identify locations of several suspects at the time of the murder. Additionally, conducted forensics on cellular devices and recovered SMS messages from a locked iOS device that included a conversation about what type of bullets to purchase.)

ANPAC Vs. Stuttes
(Conducted cellular analysis and mapping of 2 individuals to determine if they were in the area of an arson at their residence. ANPAC expert report refuted their statements of being in Nashville at the time of the incident. Several errors were found in the ANPAC expert report and the victims were subsequently placed in the area they stated. US Cellular confirmed the findings, and the ANPAC expert and ANPAC attorneys conceded that their expert report was incorrect.)

PA Vs. Michael Peterson
(Conducted cellular analysis of the defendant and victim to show movements prior to, at the time of, and after a drug delivery that resulted in the overdose death of the victim.)

Kozel Vs Kozel
(Conducted forensic examinations to locate SMS messages from over 5 years ago. The messages could not be located on the devices but were located in iOS backups of office computer systems. Expert Testimony was given concerning the source of the SMS messages.)

PA Vs Sieminkewicz
(Conducted forensic examination on several devices to identify if the defendant had sent threatening Unverified Vtext messages to the victim, as well as applied for a Discover Card in her name. Evidence of both was located on computer systems, and expert testimony was given concerning the evidence.)

PA Vs David Johnson
(Conducted forensic examination of numerous devices for a criminal homicide investigation. Several of the items had been

App. 016

# GLENN BARD

**SENIOR FORENSIC EXAMINER | FLASHBACK DATA, LLC**
**4029 SOUTH CAPITAL OF TEXAS HIGHWAY, SUITE 224**
**AUSTIN, TEXAS 78704 | 512.301.5700**



attempted to be examined by another lab but were unsuccessful. My examination revealed a large amount of data that was able to show communications and a timeline of the incident. Expert Testimony was given regarding the evidence.)

PA Vs Brian Isbell
(Conducted forensic examination of cellular devices and extracted SMS messages that provided evidence supporting the charges of IDSI, Aggravated Indecent Assault and Endangering the welfare of Children. The case went to trial and defense stipulated to my examination. The defendant was found guilty of charges.)

PA Vs Barshay Dunbar
(Conducted forensic examination on a cellular device and extract user accounts, SMS / MMS contents, Test Free application messages and pictures to support the charges that the defendant was running a prostitution ring and human trafficking. The defendant was found guilty.)

IN Vs Emmanuel Arrington
(Conducted cellular analysis of the defendant, a co-defendant and victim to show movements prior to, at the time of, and after an attempted homicide. The defendant was found guilty.)

TX Vs Aniseto Alejandro Jr.
(Conducted forensic examination on a cellular device to locate relevant data on the device, and cellular analysis of cellular records to show movements prior to, at the time of, and after a double homicide. The defendant was found guilty.)

PA Vs Savoy Jennings
(Conducted forensic examination on a cellular device, as well as analysis on cellular records, as well as Facebook server data to place the victim and defendant in the same area and to show movements prior to, at the time of, and after the incident. The defendant was found guilty of Drug Delivery and Possession with intent to deliver.)

PA Vs Rahmael Holt
(Conducted forensic examination on a cell phone found near the scene of murder and identified ownership information. Also examined numerous DVR's, cellular devices and cellular records to show location information, communications, and clean DVR video of the incident. The defendant was found guilty of Murder and sentenced to death.)

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS

| | |
|---|---|
| MALIBU MEDIA, LLC, | ) |
| | ) |
| Plaintiff, | )   Civil Action Case No._____ |
| | ) |
| v. | ) |
| | ) |
| JOHN DOE infringer using | ) |
| IP address 70.121.72.191, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## MALIBU MEDIA, LLC ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiff, Malibu Media, LLC, files this Original Complaint and sues Defendant John Doe using IP address 70.121.72.191, and alleges:

### Introduction

1.      This matter arises under the United States Copyright Act of 1976, as amended, 17 U.S.C. §§ 101 et seq. (the "Copyright Act").

2.      Defendant is a persistent online infringer of Plaintiff's copyrights.   Indeed, Defendant used the IP address as set forth on Exhibit A to illegally distribute each of the copyrighted movies set forth on Exhibit B.

3.      Plaintiff is the registered owner of the copyrights set forth on Exhibit B (the "Copyrights-in-Suit").

### Jurisdiction And Venue

4.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question); and 28 U.S.C. § 1338 (patents, copyrights, trademarks and unfair competition).

App. 018

5.     Plaintiff used proven IP address geolocation technology which has consistently worked in similar cases to ensure that the Defendant's acts of copyright infringement occurred using an Internet Protocol address ("IP address") traced to a physical address located within this District, and therefore this Court has personal jurisdiction over the Defendant because (i) Defendant committed the tortious conduct alleged in this Complaint in this State, and (ii) Defendant resides in this State and/or (iii) Defendant has engaged in substantial and not isolated business activity in this State.

6.     Based upon experience filing over 1,000 cases the geolocation technology used by Plaintiff has proven to be accurate to the District level in over 99% of the cases.

7.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c), because: (i) a substantial part of the events or omissions giving rise to the claims occurred in this District; and, (ii) the Defendant resides (and therefore can be found) in this District and resides in this State; additionally, venue is proper in this District pursuant 28 U.S.C. § 1400(a) (venue for copyright cases) because Defendant or Defendant's agent resides or may be found in this District.

**Parties**

8.     Plaintiff, Malibu Media, LLC, (d/b/a "X-Art.com") is a limited liability company organized and existing under the laws of the State of California and has its principal place of business located at 30700 Russell Ranch Road, Suite 250, Westlake Village, CA 91362.

9.     Plaintiff only knows Defendant by the IP Address he or she used to commit the complained of infringement (the "Subject IP Address"). The Subject IP Address is set forth on Exhibit A.

10.     The Internet Service Provider can identify the account holder of the Subject IP Address, an individual who may be the complained of infringer, or who may reasonably have

ORIGINAL COMPLAINT

App. 019

information calculated to lead to the discovery of the Defendant.

## Factual Background

I.  *Defendant Used the BitTorrent File Distribution Network To Infringe Plaintiff's Copyrights*

11.  The BitTorrent file distribution network ("BitTorrent") is one of the most common peer-to-peer file sharing systems used for distributing large amounts of data, including, but not limited to, digital movie files.

12.  BitTorrent's popularity stems from the ability of users to directly interact with each other in order to distribute a large file without creating a heavy load on any individual source computer and/or network. The methodology of BitTorrent allows users to interact directly with each other, thus avoiding the need for intermediary host websites which are subject to DMCA take down notices and potential regulatory enforcement actions.

13.  In order to distribute a large file, the BitTorrent protocol breaks a file into many small pieces.  Users then exchange these small pieces among each other instead of attempting to distribute a much larger digital file.

14.  After the infringer receives all of the pieces of a digital media file, the infringer's BitTorrent client software reassembles the pieces so that the file may be opened and utilized.

15.  Each piece of a BitTorrent file is assigned a unique cryptographic hash value.

16.  The cryptographic hash value of the piece ("piece hash") acts as that piece's unique digital fingerprint.  Every digital file has one single possible cryptographic hash value correlating to it.  The BitTorrent protocol utilizes cryptographic hash values to ensure each piece is properly routed amongst BitTorrent users as they engage in file sharing.

17.  The entirety of the digital media file also has a unique cryptographic hash value

ORIGINAL COMPLAINT

3

App. 020

("file hash"), which acts as a digital fingerprint identifying the digital media file (e.g. a movie). Once infringers complete downloading all pieces which comprise a digital media file, the BitTorrent software uses the file hash to determine that the file is complete and accurate.

18.     Plaintiff's consulting expert, IPP International UG ("IPP") established a direct TCP/IP connection with the Defendant who was using the Subject IP Address as set forth on Exhibit A.

19.     IPP downloaded from Defendant one or more pieces of each of the digital media files, as identified by the file hashes listed on Exhibit A.

20.     Each digital media file as identified by the file hash listed on Exhibit A correlates to a copyrighted film owned by Plaintiff, as set forth on Exhibit B.

21.     A full copy of each digital media file was downloaded from the BitTorrent file distribution network, and it was confirmed through independent calculation that the file hash correlating to each file matched what is listed on Exhibit A.  At no point was Plaintiff's copyrighted content uploaded to any other BitTorrent user.

22.     Each digital media file as identified by the file hash listed on Exhibit A has been verified to be a copy that is identical (or alternatively, strikingly similar or substantially similar) to Plaintiff's corresponding original work.

23.     Plaintiff owns the copyrights to the original works (the "Copyrights-in-Suit").  An overview of the Copyrights-in-Suit, including each hit date, date of first publication, effective date of registration as assigned by the United States Copyright Office, and registration number issued by the United States Copyright Office is set forth on Exhibit B.

24.     Defendant downloaded, copied, and distributed a complete copy of Plaintiff's works without authorization as enumerated on Exhibit A.

ORIGINAL COMPLAINT

App. 021

25.     IPP connected, over a course of time, with Defendant who was using the Subject IP Address for each digital media file identified by the hash value as listed on Exhibit A. The most recent TCP/IP connection between IPP and the Defendant using the Subject IP Address for each file hash value listed on Exhibit A is included within the column labeled Hit Date UTC. UTC refers to Universal Time which is utilized for air traffic control as well as for computer forensic purposes.

26.     Plaintiff's evidence establishes that Defendant is a habitual and persistent BitTorrent user and copyright infringer.

**Miscellaneous**

27.     All conditions precedent to bringing this action have occurred or been waived.

28.     Plaintiff has retained counsel and is obligated to pay said counsel a reasonable fee for their services.

**COUNT I**
**Direct Infringement Against Defendant**

29.     The allegations contained in paragraphs 1-28 are hereby re-alleged as if fully set forth herein.

30.     Plaintiff is the owner of the Copyrights-in-Suit, as outlined in Exhibit B, each of which covers an original work of authorship.

31.     By using BitTorrent, Defendant copied and distributed the constituent elements of each of the original works covered by the Copyrights-in-Suit.

32.     Plaintiff did not authorize, permit or consent to Defendant's distribution of its works.

33.     As a result of the foregoing, Defendant violated Plaintiff's exclusive right to:

(A)     Reproduce the works in copies, in violation of 17 U.S.C. §§ 106(1) and 501;

5

ORIGINAL COMPLAINT

(B)     Redistribute copies of the works to the public by sale or other transfer of ownership, or by rental, lease or lending, in violation of 17 U.S.C. §§ 106(3) and 501;

(C)     Perform the copyrighted works, in violation of 17 U.S.C. §§ 106(4) and 501, by showing the works' images in any sequence and/or by making the sounds accompanying the works audible and transmitting said performance of the works, by means of a device or process, to members of the public capable of receiving the display (as set forth in 17 U.S.C. § 101's definitions of "perform" and "publicly" perform); and

(D)     Display the copyrighted works, in violation of 17 U.S.C. §§ 106(5) and 501, by showing individual images of the works nonsequentially and transmitting said display of the works by means of a device or process to members of the public capable of receiving the display (as set forth in 17 U.S.C. § 101's definition of "publicly" display).

34.     Defendant's infringements were committed "willfully" within the meaning of 17 U.S.C. § 504(c)(2).

WHEREFORE, Plaintiff respectfully requests that the Court:

(A)     Permanently enjoin Defendant and all other persons who are in active concert or participation with Defendant from continuing to infringe Plaintiff's copyrighted works;

(B)     Order that Defendant delete and permanently remove the digital media files relating to Plaintiff's works from each of the computers under Defendant's possession, custody or control;

(C)     Order that Defendant delete and permanently remove the infringing copies of the works Defendant has on computers under Defendant's possession, custody or control;

(D)     Award Plaintiff statutory damages per infringed work pursuant to 17 U.S.C. § 504 (a) and (c);

(E)     Award Plaintiff its reasonable attorneys' fees and costs pursuant to 17 U.S.C. §

6

505;

(F)     Award Plaintiff pre-judgment and post-judgment interest at the maximum legal

rate; and

(G)     Grant Plaintiff any other and further relief this Court deems just and proper.

### <u>DEMAND FOR A JURY TRIAL</u>

Plaintiff hereby demands a trial by jury on all issues so triable.

<div align="center">

Respectfully submitted,

By: /s/ Paul S. Beik
Paul S. Beik
Texas Bar No. 24054444
BEIK LAW FIRM, PLLC
8100 Washington Ave., Suite 1000
Houston, TX 77007
T: 713-869-6975
F: 713-868-2262
E-mail: paul@beiklaw.com
**ATTORNEY FOR PLAINTIFF**

</div>

ORIGINAL COMPLAINT

**IPP International U.G. Declaration Exhibit A**
**File Hashes for IP Address 70.121.72.191**

**ISP:** Spectrum
**Physical Location:** Cedar Park, TX

| Hit Date UTC | File Hash | Title |
|---|---|---|
| 05/05/2019 07:59:08 | 1B2CFE6B8C36391FC2B1F53792A5D35DD87AF510 | Kaisa Slippery and Wet |
| 12/30/2018 14:34:28 | 7B75F1D13DEA537ABF60DA52AABD5912921142AD | XXX Threeway Games |
| 12/25/2018 18:28:33 | E0F5AE588A3EB396863483FB8FD6AF8B15C29723 | Cum In For An Orgy |
| 07/29/2018 10:33:31 | 98227DC95A345136FB9445BE90BBB26249126C99 | Threeway Strip Poker |
| 07/24/2018 03:28:17 | 643BB7988E08D4713FEEF47A46F77D4A315A9F6A | Moving Day Sex |
| 07/07/2018 14:13:48 | 0294BB72CCDC51CD5DCE35057907DAA15DA461A6 | Supermodel Sex |
| 07/06/2018 20:56:58 | 418612CDA063819CF12372355DCD2C2573FD0337 | Truth or Dare |
| 07/26/2017 23:07:35 | E3B203419FB0600C8FEDA0E9A4EECBB9E77576D8 | Want To Fuck My Wife |
| 07/26/2017 14:23:53 | 29F22087D08778A5F07FA7D88C9F1B70E27DA387 | A Fucking Hot Threesome |

**Total Statutory Claims Against Defendant: 9**

App. 025

**Copyrights-In-Suit for IP Address 70.121.72.191**

**ISP:** Spectrum
**Location:** Cedar Park, TX

| Title | Registration Number | Date of First Publication | Effective Date of Registration | Most Recent Hit UTC |
|---|---|---|---|---|
| Kaisa Slippery and Wet | PA0002173482 | 05/03/2019 | 05/13/2019 | 05/05/2019 |
| XXX Threeway Games | PA0002078584 | 06/30/2017 | 08/30/2017 | 12/30/2018 |
| Cum In For An Orgy | PA0002139295 | 08/11/2018 | 08/27/2018 | 12/25/2018 |
| Threeway Strip Poker | PA0002133715 | 07/27/2018 | 08/02/2018 | 07/29/2018 |
| Moving Day Sex | PA0002133713 | 07/21/2018 | 08/02/2018 | 07/24/2018 |
| Supermodel Sex | PA0001967075 | 09/02/2015 | 09/07/2015 | 07/07/2018 |
| Truth or Dare | PA0001846099 | 05/16/2013 | 06/30/2013 | 07/06/2018 |
| Want To Fuck My Wife | PA0002042072 | 02/10/2017 | 03/25/2017 | 07/26/2017 |
| A Fucking Hot Threesome | PA0001957700 | 08/07/2015 | 08/17/2015 | 07/26/2017 |

**Total Malibu Media, LLC Copyrights Infringed:  9**

EXHIBIT B

JS 44 (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| MALIBU MEDIA, LLC | JOHN DOE infringer using IP address 70.121.72.191 |

**(b)** County of Residence of First Listed Plaintiff    Los Angeles County
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Williamson
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Paul S. Beik, Beik Law Firm, PLLC.
8100 Washington Avenue, Ste. 1000
Houston, TX. 77007 - Tel: (713) 869-6975

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1   U.S. Government   Plaintiff

☒ 3   Federal Question
     *(U.S. Government Not a Party)*

☐ 2   U.S. Government   Defendant

☐ 4   Diversity
     *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*      *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & | Pharmaceutical Personal Injury | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | Slander | Product Liability | | ☒ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 340 Marine | **PERSONAL PROPERTY** | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| | | | ☐ 791 Employee Retirement Income Security Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1   Original Proceeding

☐ 2   Removed from State Court

☐ 3   Remanded from Appellate Court

☐ 4   Reinstated or Reopened

☐ 5   Transferred from Another District *(specify)*

☐ 6   Multidistrict Litigation - Transfer

☐ 8   Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
17 U.S.C.§ 101
Brief description of cause:
Copyright Infringement

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

**DEMAND $**   150000.00

CHECK YES only if demanded in complaint:
**JURY DEMAND:**   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*    JUDGE        DOCKET NUMBER

DATE   July 15, 2019

SIGNATURE OF ATTORNEY OF RECORD   /s/ Paul S. Beik

**FOR OFFICE USE ONLY**

RECEIPT #      AMOUNT      APPLYING IFP      JUDGE      MAG. JUDGE

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)**   **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

   **(b)**   **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

   **(c)**   **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**   **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
   United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
   United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
   Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
   Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.**   **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.**   **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.**   **Origin.** Place an "X" in one of the seven boxes.
   Original Proceedings. (1) Cases which originate in the United States district courts.
   Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.
   Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
   Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
   Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
   Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
   Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
   **PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI.**   **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service

**VII.**   **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
   Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
   Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.**   **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| MALIBU MEDIA, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Case No. 5:19-cv-00834-DAE |
| | ) | |
| v. | ) | |
| | ) | |
| JOHN DOE infringer using | ) | |
| IP address 70.121.72.191, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MOTION FOR LEAVE TO SERVE A THIRD PARTY SUBPOENA PRIOR TO A RULE 26(f) CONFERENCE AND INCORPORATED MEMORANDUM OF LAW

[Remainder of page intentionally left blank]

App. 029

# <u>TABLE OF CONTENTS</u>

**Statement of the Nature and Stage of the Proceedings** ................................................... 1

**Statement of the Issues and Standard of Review** ........................................................ 1

**I.      INTRODUCTION** ........................................................................................ 3

**II.     FACTS** .......................................................................................................... 4

   A.   Online Copyright Infringement Through the BitTorrent Protocol is a Serious and Significant Threat to Plaintiff's Business ............................................................. 4

   B.   Courts throughout the Country Have Expressly Found that Malibu Media Litigates in Good Faith ........................................................................................................ 6

   C.   Plaintiff Does Not Solicit Settlements Prior to Serving a Defendant and Always Consents to Allowing a John Doe Defendant to Proceed Anonymously ............. 7

   D.   The Infringer ......................................................................................................... 8

**III.    ARGUMENT** ................................................................................................ 8

   A.   Legal Standard Governing Expedited Discovery Requests To Identify An Anonymous Defendant ........................................................................................ 8

   B.   Good Cause Exists to Grant the Motion ............................................................ 10

     1.   Plaintiff Has Alleged a Prima Facie Claim for Copyright Infringement .......... 10

      *a.Plaintiff Sufficiently and Plausibly Connects Defendant To The Infringement* .... 13

     2.   Plaintiff Has Clearly Identified Specific Information It Seeks Through Discovery ...................................................................................................... 14

     3.   No Alternative Means Exist to Obtain Defendant's True Identity .................. 14

     4.   Plaintiff Needs the Subpoenaed Information to Advance the Asserted Claims 17

     5.   Plaintiff's Interest in Knowing Defendant's True Identity Outweighs Defendant's Interest in Remaining Anonymous .............................................. 18

   C.   Plaintiff Used Geolocation Technology to Make a Prima Facie Case of Personal Jurisdiction ........................................................................................................ 19

**IV.     CONCLUSION** .......................................................................................... 20

App. 030

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Arista Records, LLC v. Doe*, 604 F.3d 110, 115 (2d Cir. 2010)....................................9, 18

*Arista Records, L.L.C. v. Tschirhart*, No. SA-05-CA-372-OG, 2006 U.S. Dist. LEXIS 101688 at * 8 (W.D. Tex. May 24, 2006) ....................................................18

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)........................................................10

*Blakeslee v. Clinton Cnty*, 336 Fed. Appx. 248, 250 (3d Cir. 2009)................................10

*Brown v. Owens Corning Inv. Review Comm.*, 622 F.3d 564, 572 (6th Cir. 2010)..........10

*Clear Skies Nev., LLC v. Doe*, No. 16-1511, 2016 U.S. Dist. LEXIS 36187 (E.D. La. Mar. 18, 2016)..........................................................................................14

*Colle v. Brazos County, Tex.*, 981 F.2d 237, 243 n.20 (5th Cir. 1993)............................10

*Columbia Pictures, Inc. v. Bunnell*, 245 F.R.D. 443, 452 (C.D. Cal. 2007).....................18

*Combat Zone Corp. v. Does*, No. 3:12-CV-3927-B, 2013 U.S. Dist. LEXIS 8522 (N.D. Tex. Jan. 22, 2013) .........................................................................2, 9

*Davis v. Kelly*, 160 F.3d 917, 921 (2d Cir. 1998)...................................................9

*Dean v. Barber*, 951 F.2d 1210, 1215 (11th Cir. 1992) .........................................10

*Deniece Design, LLC v. Braun*, 953 F. Supp. 2d 765, 769 (S.D. Tex. 2013) ...................13

*Digital Sins, Inc. v. John Does 1-245*, No. 11 CIV. 8170 CM, 2012 WL 1744838 (S.D.N.Y. May 15, 2012)...........................................................................19

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991)............................10

*Green v. Doe*, 260 Fed. Appx. 717, 719 (5th Cir. 2007)...........................................10

*In re Aimster Copyright Litig.*, 334 F.3d 643, 645 (7th Cir. 2003) ...............................11

*K-Beech, Inc. v. Does 1-41*, 2012 U.S. Dist. LEXIS 31803 (S.D. Tex. Mar. 8, 2012).....19

*Krueger v. Doe*, 162 F.3d 1173 (10th Cir. 1998) ................................................10

*Lennar Homes of Tex. Sales & Mktg. v. Perry Homes, LLC*, 117 F. Supp. 3d 913, 922 (S.D. Tex. 2015)....................................................................................12

*Maclin v. Paulson*, 627 F.2d 83, 87 (7th Cir. 1980).............................................10

*Malibu Media LLC v. Doe*, No. 12-1342, 2012 U.S. Dist. LEXIS 167001 (C.D. Ill. Nov. 26, 2012).............................................................................................16

*Malibu Media v. John Doe*, 15-cv-3504 (E.D.N.Y August 23, 2016) .............................13

*Malibu Media, LLC v. Doe*, 2013 U.S. Dist. LEXIS 99332 (S.D.N.Y. July 16, 2013) ...11, 13

*Malibu Media, LLC v. Doe*, 2015 U.S. Dist. LEXIS 94054 (S.D.N.Y. July 20, 2015) ....16

*Malibu Media, LLC v. Doe,* Civil Action No. 12-cv-02598-REB-MEH, 2013 U.S. Dist. LEXIS 59277 (D. Colo. Feb. 12, 2013) ...........................................................6

*Malibu Media, LLC v. Doe*, Civil Action No. 15-8252 (FLW), 2016 U.S. Dist. LEXIS 92069 (D.N.J. July 14, 2016) ........................................................................ 17

*Malibu Media, LLC v. Doe*, No. 1:12-CV-263, 2012 U.S. Dist. LEXIS 170987 (N.D. Ind. Dec. 3, 2012) ................................................................................................ 18

*Malibu Media, LLC v. Doe*, No. 1:15-cv-00366 (E.D. Va. July 23, 2015) ...................... 13

*Malibu Media, LLC v. Doe*, No. 14-cv-00223-MJG, 2014 U.S. Dist. LEXIS 130914 (D. Md. Sep. 18, 2014) ........................................................................................ 7

*Malibu Media, LLC v. Does,* 950 F. Supp. 2d 779, 788 (E.D. Pa. 2013) .......................... 6

*Malibu Media, LLC v. Harris*, No. 1:12-cv-1117-WTL-MJD, 2013 U.S. Dist. LEXIS 100350 (S.D. Ind. July 18, 2013) ................................................................... 13

*Malibu Media, LLC v. John Does 1, 6, 13, 14*, 950 F. Supp. 2d 779, 782 (E.D. Pa. 2013) ........................................................................................................................ 12

*Malibu Media, LLC v. John Does 1-5*, 285 F.R.D. 273, 278 (S.D.N.Y. 2012) ................. 6

*Malibu Media, LLC v. John Does 1-9*, 8:12-cv-00669-SDM-AEP (M.D. Fla. July 6, 2012) ........................................................................................................................ 7

*Malibu Media, LLC v. Pelizzo*, 604 F. App'x 879, 881 (11th Cir. 2015) ......................... 10

*Montoya v. FedEx Ground Package System, Inc.*, 614 F.3d 145, 148 (5th Cir. 2010) ..... 13

*Munz v. Parr*, 758 F.2d 1254, 1257 (8th Cir. 1985) ......................................................... 10

*Paramount Pictures Corp. v. Davis*, 234 F.R.D. 102, 104 (E.D. Pa. 2005) ..................... 14

*Penalbert-Rosa v. Fortuno-Burset*, 631 F.3d 592 (1st Cir. 2011) ..................................... 10

*Raw Films, Ltd. v. Does*, No. 11-7248, 2012 U.S. Dist. LEXIS 41645 (E.D. Pa. Mar. 23, 2012) ........................................................................................................................ 18

*Ryland Grp., Inc. v. Travelers Indem. Co.*, CIVIL NO. A-00-CA-233 JRN, 2000 U.S. Dist. LEXIS 21412 (W.D. Tex. Oct. 25, 2000) ............................................ 13

*Sony BMG Music Entm't v. Tenenbaum*, 660 F.3d 487, 492 (1st Cir. 2011) ................... 14

*Spectrum Creations, Inc. v. Catalina Lighting, Inc.*, CIVIL ACTION NO. SA-00-CA-875-FB, 2001 U.S. Dist. LEXIS 11861 (W.D. Tex. July 31, 2001) .......................... 12

*St. Louis Group, Inc. v. Metals & Additives Corp.*, 275 F.R.D. 236, 239 (S.D. Tex. 2011) ................................................................................................................. 9, 10, 17

*UMG Recordings, Inc. v. Grande Communs. Networks, LLC*, No. A-17-CA-365-LY, 2018 U.S. Dist. LEXIS 32275 at *17 (W.D. Tex. Feb. 28, 2018) ................................ 11

*United States v. Allen*, 625 F.3d 830, 841 (5th Cir. 2010) ................................................ 15

*United States v. Baker,* 538 F.3d 324, 326 (5th Cir. 2008) ............................................... 15

*United States v. Orisakwe,* 624 F. App'x 149, 152 (5th Cir. 2015) .................................. 15

*United States v. Richardson,* No. 4:11CR3116, 2012 U.S. Dist. LEXIS 454 (D. Neb. Jan. 3, 2012)* .................................................................................................................. 19

*United States v. Roetcisoender*, 792 F.3d 547, 549 (5th Cir. 2015) ................................. 15

App. 032

*United States v. Tillotson*, 2:08-CR-33, 2008 WL 5140773 (E.D. Tenn. Dec. 2, 2008) .. 19

*Voltage Pictures, LLC v. Doe,* Civil Action No. 13-cv-01121-WYD-MEH, 2013 U.S.
Dist. LEXIS 111132 (D. Colo. Aug. 7, 2013) ............................................................ 16

*Well Go USA, Inc. v. Unknown Participants Participants in Filesharing Swarm
Identified*, 2012 U.S. Dist. LEXIS 137272 (S.D. Tex. Sept. 24, 2012) ...................... 2, 9

*Young v. Transp. Deputy Sheriff I*, 340 Fed. Appx. 368 (9th Cir. 2009) ........................ 10

**Statutes**

17 U.S.C. § 410(c) ............................................................................................................ 11

17 U.S.C. §106 ................................................................................................................. 11

**Rules**

Fed. R. Civ. P. 26(d)(1) ................................................................................................. 3, 8

MOTION FOR LEAVE                    v

**Statement of the Nature and Stage of the Proceedings**

This is a copyright infringement action brought against a John Doe Defendant known to Plaintiff only by the Internet Protocol ("IP") address he/she used to complete the infringement of Plaintiff's works (the "Subject IP Address"). Defendant is a long-term copyright infringer and was recorded infringing Plaintiff's content through the BitTorrent protocol. Because Plaintiff knows Defendant only by the IP address used to complete infringement, Plaintiff seeks leave to serve a subpoena on the Internet Service Provider ("ISP") that administers that IP address, so that it may learn the ISP account subscriber's name and address, and complete investigation into whether the subscriber is the infringer, or whether the subscriber has information calculated to lead to the discovery of the infringer, so that a Defendant may be particularly named and served with an Amended Complaint in this action.

**Statement of the Issues and Standard of Review**

<u>Issue 1</u>: Should Plaintiff be granted leave to serve a subpoena on Defendant's ISP so that it may identify a Defendant with particularity?

<u>Standard of Review</u>: Plaintiff must demonstrate that it has "good cause" to serve a subpoena prior to a Rule 26(f) conference. To satisfy this standard, a plaintiff need only (1) make a *prima facie* showing of a claim of copyright infringement; (2) submit a specific discovery request; (3) credibly allege an absence of alternative means to obtain the requested discovery; (4) sufficiently articulate a central need for the subpoenaed information; and (5) viably show that the defendant has a minimal expectation of privacy. *See Well Go USA, Inc. v. Unknown Participants Participants in Filesharing Swarm*

MOTION FOR LEAVE                    1

*Identified*, 2012 U.S. Dist. LEXIS 137272, *3 (S.D. Tex. Sept. 24, 2012) (citing *Arista Records*, 604 F.3d at 114); *Combat Zone Corp. v. Does*, No. 3:12-CV-3927-B, 2013 U.S. Dist. LEXIS 8522, at *12 (N.D. Tex. Jan. 22, 2013) (same).

## MOTION FOR LEAVE TO SERVE A THIRD PARTY SUBPOENA PRIOR TO A RULE 26(f) CONFERENCE AND INCORPORATED MEMORANDUM OF LAW

Pursuant to Fed. R. Civ. P. 26(d)(1), and upon the attached: (1) Declaration of Colette Pelissier in support of this motion; (2) Declaration of Patrick Paige in support of this motion; and (3) Declaration of Tobias Fieser in support of this motion, Malibu Media, LLC ("Plaintiff"), respectfully moves for entry of an order granting it leave to serve a third party subpoena on Spectrum, prior to a Rule 26(f) conference (the "Motion"). A proposed order is attached for the Court's convenience.

## I.     INTRODUCTION

Plaintiff, Malibu Media, (d/b/a "X-art.com") operates a popular subscription-based website.[1]  Plaintiff creates its own content which is being infringed on a massive scale. The Subject  IP address has been habitually used to infringe Plaintiff's copyrighted works. Accordingly, Plaintiff seeks leave to serve limited, immediate discovery on the Subject IP Address's ISP, Spectrum ,so that Plaintiff may complete investigation that might lead to Defendant's true identity.  Plaintiff is suing Defendant for using the Internet, specifically the BitTorrent file distribution network, to commit direct copyright infringement.

Because Defendant used the Internet to commit this infringement, Plaintiff only knows Defendant by the IP address used to complete the infringement.  The Subject IP address is assigned by the ISP.  Accordingly, the ISP can use the Subject IP address to identify the subscriber to the ISP account to which the Subject IP address is assigned.[2]

---

[1] *See, e.g.*, Declaration of Colette Pelissier, Appendix pp. 2-8.
[2] *See, e.g.*, Declaration of Patrick Paige, attached hereto as Appendix pp. 9-19.

MOTION FOR LEAVE                    3

Indeed, ISPs maintain internal logs, which record the date, time, and customer identity for each IP address assignment made by that ISP. Significantly, ISPs may maintain these logs for only a short period of time.[3]

Plaintiff seeks leave of Court to serve a Rule 45 subpoena on the ISP that assigned the Subject IP address. This subpoena will demand the true name and address of the subscriber to that ISP account. Plaintiff will only use this information to investigate and prosecute the claims made in its Complaint. Without this information, Plaintiff cannot investigation to determine the natural person responsible for the infringing behavior, nor can Defendant pursue this lawsuit to protect its valuable copyrights.

## II.    FACTS

### A.    Online Copyright Infringement Through the BitTorrent Protocol is a Serious and Significant Threat to Plaintiff's Business

Colette Pelissier is the owner of Malibu Media. *See* Appendix p. 3 at ¶ 3. Ms. Pelissier developed the X-Art.com business plan in 2010 while still working full time as a realtor in the Los Angeles market. *Id*. at ¶ 4. X-Art.com was created to address the lack of artistically produced adult oriented content suitable for upscale women and couples. *Id*. Ms. Pelissier chose the name 'X-Art' to reflect her artistic aspirations, and began investing all of her available money and resources into the production of content – particularly erotic

---

[3] *See, e.g.*, Statement Of Jason Weinstein Deputy Assistant Attorney General Criminal Division Before The Committee On Judiciary Subcommittee On Crime, Terrorism, And Homeland Security United States House Of Representatives, (January 2011) at http://www.justice.gov/sites/default/files/testimonies/witnesses/attachments/01/25/11//01-25-11-crm-weinstein-testimony-re-data-retention-as-a-tool-for-investigating-internet-child-pornography-and-other-internet-crimes.pdf, stating: "Some [ISP] records are kept for weeks or months; others are stored very briefly before being purged."

MOTION FOR LEAVE                    4

movies with high production value and a cinematic quality. *Id.* at ¶ 8. She knew that the adult content industry was in financial crisis, and the odds of success for a new adult website were low. *Id.*

Despite the odds, her vision has come to fruition. Currently X-Art.com has tens of thousands of paying subscribers, but Malibu Media is finding it hard to grow and maintain the memberships when so many of the movies are being distributed for free, without authorization, by users of the Bittorrent Network. *See generally id.* As X-Art's subscriber base has grown, production expenditures have also grown. *Id.* at ¶ 9. Plaintiff spends over two million dollars a year producing content, and millions more each year to run the business. *Id.* For the first several years of operation, X-Art did not have significant issues with piracy. *Id.* at ¶ 10. However, once Plaintiff's content became well known and highly desirable, X-Art movies started ranking as the most downloaded adult content on several of the most popular torrent websites. *Id.* Malibu Media invests significant resources into pursuing all types of anti-piracy enforcement, such as Digital Millennium Copyright Act ("DMCA") takedown notices and direct efforts aimed at infringing websites. *Id.* at ¶ 21. Malibu Media is even working with law enforcement to stop the piracy of its movies. *Id.* Despite sending thousands of DMCA notices per week, the infringement continues. *Id.* at ¶ 22. And, if one searches for "X-Art" on a torrent website, the site will reveal thousands of unauthorized torrents available for free. *Id.* Plaintiff Malibu Media has filed suit in this judicial district and in judicial districts across the country seeking to deter and stop the infringement.

App. 038

Plaintiff won the first ever BitTorrent copyright infringement lawsuit to reach trial. *Malibu Media, LLC v. Does,* 950 F. Supp. 2d 779, 788 (E.D. Pa. 2013). In his Memorandum Report after the conclusion of the trial, the Honorable Judge Baylson made a number of significant findings. Importantly, Judge Baylson found "Malibu has satisfied its burden of proof with substantial evidence and deserves a large award." *Id.*

B. <u>Courts throughout the Country Have Expressly Found that Malibu Media Litigates in Good Faith</u>

Judge Baylson expressly emphasized that "Malibu is *not* what has been referred to in the media and legal publications, and in the internet blogosphere, as a 'copyright troll' . . . . Rather, Malibu is an actual producer of adult films and owns valid copyrights, registered with the United States Copyright Office, in its works." *Id.* (emphasis in original). The Honorable Judge Hegarty of the District of Colorado has also acknowledged Plaintiff's good faith and stated: "the Court has . . . witnessed firsthand the Plaintiff's willingness to resolve cases without any monetary payment when a Defendant credibly denies infringement." *E.g.*, *Malibu Media, LLC v. Doe,* Civil Action No. 12-cv-02598-REB-MEH, 2013 U.S. Dist. LEXIS 59277, at *22 n.3 (D. Colo. Feb. 12, 2013).

Other courts have opined that the criticism often attributed to filers of BitTorrent lawsuits is unwarranted when directed at Plaintiff. "[N]one of the instances of improper litigation tactics that have been brought to our attention involve plaintiff or plaintiff's counsel. We are reluctant to prevent plaintiff from proceeding with its case based only on a 'guilt-by-association' rationale." *Malibu Media, LLC v. John Does 1-5*, 285 F.R.D. 273, 278 (S.D.N.Y. 2012). "[Defendant] has not presented any evidence that Malibu has

engaged in harassing behavior for the Court to consider, nor has the Court observed bad faith behavior or the use of improper tactics on its part thus far." *Malibu Media, LLC v. Doe, 291 F.R.D. 191, 208 (N.D. Ill. 2013); Malibu Media, LLC v. John Does 1-9*, 8:12-cv-00669-SDM-AEP [CM/ECF 25] *7 (M.D. Fla. July 6, 2012) (same); *Malibu Media, LLC v. Doe,* No. 14-cv-00223-MJG, 2014 U.S. Dist. LEXIS 130914, at *3 (D. Md. Sep. 18, 2014) ("Malibu has complied with these procedures and this Court is unaware of *any* allegations of abuse.").

C.  <u>Plaintiff Does Not Solicit Settlements Prior to Serving a Defendant and Always Consents to Allowing a John Doe Defendant to Proceed Anonymously</u>

Plaintiff has filed this suit for the sole purpose of protecting and enforcing its copyrights.

> We do not seek to use the Court system to profit from the infringement, the way some people suggest. As previously stated, revenues from subscriptions to X-Art.com are by far and away the dominant driver of Malibu Media's business. We want the infringement to stop. The purpose of these lawsuits is to motivate people to pay for subscriptions by deterring infringement and seek some reasonable compensation for the massive amount of infringement of our copyrights.

Appendix p.7 at ¶ 25. Plaintiff has no intention of embarrassing a defendant because of the content of the works at issue and has instructed all of its counsel to always consent to allowing defendants to proceed anonymously through discovery. Further, Plaintiff does not extend settlement offers prior to serving a defendant with the complaint and in all of its individual suits against a defendant, has only settled prior to serving when the defendant has initiated the request. Should the Court wish to include language in its Order preventing Plaintiff from initiating settlements with Defendant and allowing Defendant to proceed

MOTION FOR LEAVE                    7

anonymously, Plaintiff will not object.

D.    The Infringer

The Subject IP address was used to infringe 9 of Plaintiff's copyrighted movies between 07/26/2017 and 05/05/2019. *See* Exhibit A to Complaint. By downloading each of these movies through the BitTorrent protocol, Defendant simultaneously distributes these movies to others, allowing other people to also steal Plaintiff's movies. *See* Complaint, at ¶¶ 11–25.

The length of time which Plaintiff's investigator recorded Defendant utilizing the BitTorrent protocol to download and distribute works on the Internet demonstrates that the Infringer was not a mere guest or passerby. It was someone with access to the Subject IP address for a long period of time, consistently. Therefore, in many cases the subscriber to the ISP account may himself/herself be the infringer; or, in other cases, the subscriber to the ISP account is reasonably calculated to have information leading to the discovery of the infringer's identity. In all cases, without the discovery of the contact information for the ISP subscriber no good faith investigation may be undertaken by Plaintiff, and there would be no way for Plaintiff to enforce its copyrights against the rampant infringement occurring on BitTorrent.

## III.    ARGUMENT

A.    Legal Standard Governing Expedited Discovery Requests To Identify An Anonymous Defendant

Except for circumstances not applicable here, a party may not propound discovery in advance of a Rule 26(f) conference absent court order. *See* FED. R. CIV. P. 26(d)(1).

Since the identification of the infringer is "*indispensable* for the vindication of [a] plaintiff's copyright rights," courts readily authorize expedited discovery in online copyright infringement cases. *Arista Records, LLC v. Doe*, 604 F.3d 110, 115 (2d Cir. 2010). Indeed, this district has adopted the "good cause" standard for expedited discovery, which, in essence, is "akin to a broader and more flexible totality of the circumstances analysis." *St. Louis Group, Inc. v. Metals & Additives Corp.*, 275 F.R.D. 236, 239 (S.D. Tex. 2011). *See also id.* at 240 (citing several cases throughout the Fifth Circuit that have also adopted this good cause approach).

To satisfy this standard, a plaintiff need only (1) make a *prima facie* showing of a claim of copyright infringement; (2) submit a specific discovery request; (3) credibly allege an absence of alternative means to obtain the requested discovery; (4) sufficiently articulate a central need for the subpoenaed information; and (5) viably show that the defendant has a minimal expectation of privacy. *See Well Go USA, Inc. v. Unknown Participants Participants in Filesharing Swarm Identified*, 2012 U.S. Dist. LEXIS 137272, *3 (S.D. Tex. Sept. 24, 2012) (citing *Arista Records*, 604 F.3d at 114); *Combat Zone Corp. v. Does*, No. 3:12-CV-3927-B, 2013 U.S. Dist. LEXIS 8522, at *12 (N.D. Tex. Jan. 22, 2013) (same).

Federal Circuit Courts have consistently approved of this procedure of using expedited discovery to identify anonymous defendants. For example, the Second Circuit stated in *Davis v. Kelly* that "courts have rejected the dismissal of suits against unnamed defendants . . . identified only as 'John Doe's . . . until the plaintiff has had some opportunity for discovery to learn the identities." 160 F.3d 917, 921 (2d Cir. 1998)*; see*

*Green v. Doe*, 260 Fed. Appx. 717, 719 (5th Cir. 2007) *(*"Although the use of a "John Doe" is disfavored, it serves the legitimate function of giving a plaintiff the opportunity to identify, through discovery, unknown defendants.") (citing *Colle v. Brazos County, Tex.*, 981 F.2d 237, 243 n.20 (5th Cir. 1993)). *See also*, *Penalbert-Rosa v. Fortuno-Burset*, 631 F.3d 592 (1st Cir. 2011) ("A plaintiff who is unaware of the identity of the person who wronged her can . . . proceed against a 'John Doe' . . . when discovery is likely to reveal the identity of the correct defendant."). *Accord Blakeslee v. Clinton Cnty*, 336 Fed. Appx. 248, 250 (3d Cir. 2009) (same); *Brown v. Owens Corning Inv. Review Comm.*, 622 F.3d 564, 572 (6th Cir. 2010) (same); *Maclin v. Paulson*, 627 F.2d 83, 87 (7th Cir. 1980) (same); *Munz v. Parr*, 758 F.2d 1254, 1257 (8th Cir. 1985) (same); *Young v. Transp. Deputy Sheriff I*, 340 Fed. Appx. 368 (9th Cir. 2009) (same); *Krueger v. Doe*, 162 F.3d 1173 (10th Cir. 1998) (same); *Dean v. Barber*, 951 F.2d 1210, 1215 (11th Cir. 1992) (same). Courts have "routinely" granted expedited discovery requests in infringement cases so long as the moving party can show good cause. *St. Louis Group, Inc.*, 275 F.R.D. at 241. Moreover, the Eleventh Circuit found that Malibu Media's lawsuits "properly served the purposes of the Copyright Act." *Malibu Media, LLC v. Pelizzo*, 604 F. App'x 879, 881 (11th Cir. 2015).

**B.**  Good Cause Exists to Grant the Motion

*1.*  *Plaintiff Has Alleged a Prima Facie Claim for Copyright Infringement*

To sufficiently state a *prima facie* claim of infringement, Plaintiff must merely plausibly allege: (1) ownership of a valid copyright and (2) unauthorized copying of original elements of the copyrighted work. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). Plaintiff's Complaint

meets these requirements:

30. Plaintiff is the owner of the Copyrights-in-Suit, as outlined in Exhibit B, each of which covers an original work of authorship.

31. By using BitTorrent, Defendant copied and distributed the constituent elements of each of the original works covered by the Copyrights-in-Suit.

32. Plaintiff did not authorize, permit or consent to Defendant's distribution of its works.

Complaint at ¶¶ 30–32. *See* 17 U.S.C. §106; *UMG Recordings, Inc. v. Grande Communs. Networks, LLC*, No. A-17-CA-365-LY, 2018 U.S. Dist. LEXIS 32275 at *17 (W.D. Tex. Feb. 28, 2018) (finding that the Plaintiff "pled enough facts to make a plausible claim that [the Defendant's] subscribers are infringing on its copyrights and distributing copies of works to others through use of the BitTorrent protocol."); *In re Aimster Copyright Litig.*, 334 F.3d 643, 645 (7th Cir. 2003), *cert. denied*, 124 S. Ct. 1069 (2004) ("Teenagers and young adults who have access to the Internet like to swap computer files containing popular music. If the music is copyrighted, such swapping, which involves making and transmitting a digital copy of the music, infringes copyright."); *Malibu Media, LLC v. Doe*, 2013 U.S. Dist. LEXIS 99332, at *15 (S.D.N.Y. July 16, 2013) ("Plaintiff has made a concrete, prima facie case of copyright infringement by alleging ownership of the registered copyright and alleging unlawful downloading, copying, and distribution of this work by specifying the type of technology used, the IP address from which the file was accessed and shared, and the date and time of the infringement.").

Since Plaintiff obtained copyrights for its works from the United States Register of Copyrights, *see* CM/ECF 1-2 (providing registration numbers), it establishes *prima facie* evidence that its works are copyrightable and validly copyrighted. *See* 17 U.S.C. § 410(c);

MOTION FOR LEAVE                                      11

"Copyright certificates of registration 'constitute prima facie evidence of the validity of the copyright[s].'" *Spectrum Creations, Inc. v. Catalina Lighting, Inc.*, CIVIL ACTION NO. SA-00-CA-875-FB, 2001 U.S. Dist. LEXIS 11861, at *21 (W.D. Tex. July 31, 2001).[4] Further, Plaintiff's *prima facie* allegations of infringement are attested to by Plaintiff's investigator, IPP International UG employee, Tobias Fieser. *See* Declaration of Tobias Fieser in Support of Plaintiff's Motion for Leave to Serve Third Party Subpoenas Prior to a Rule 26(f) Conference ("Fieser Declaration"), at ¶¶ 9-14, attached hereto as Appendix pp. 22-23. And, each digital file, as identified by a unique cryptographic file hash value, has been verified to be a copy or contain copies of one of Plaintiff's copyrighted works.

Indeed, the infringement detection system Plaintiff uses to identify infringers has been tested and deemed valid. *See generally* Declaration of Patrick Paige Appendix pp.9-19. During the first ever BitTorrent copyright lawsuit to reach trial, Judge Baylson likewise concluded Plaintiff's technology was valid. *See Malibu Media, LLC v. John Does 1, 6, 13, 14*, 950 F. Supp. 2d 779, 782 (E.D. Pa. 2013) ("I concluded that Malibu had expended considerable effort and expense to determine the IP addresses of the infringing parties, and the technology employed by its consultants—both of whom were located in Germany and who testified at the trial of June 10, 2013—was valid."). Recently, the Eastern District of

---

[4] "The effect of such a certificate is to place the **burden** of proof on the alleged infringer to disprove the validity of the copyright." *Lennar Homes of Tex. Sales & Mktg. v. Perry Homes, LLC*, 117 F. Supp. 3d 913, 922 (S.D. Tex. 2015). *See also Spectrum Creations, Inc. v. Catalina Lighting, Inc.* at *21 ("Once the plaintiff has shown a certificate of copyright registration, the burden of proof shifts to the defendant to show copyright invalidity.")

New York held an evidentiary hearing evaluating technology used by Plaintiff and found "[Plaintiff's expert] offered credible testimony regarding the methods … used on behalf of Malibu Media in identifying the Doe Defendant's IP address as an infringer of its copyrighted material. Accordingly, Plaintiff's allegations and evidence submitted in support thereof are sufficient at this juncture to establish a prima facie claim for copyright infringement against Defendant." *Malibu Media v. John Doe*, 15-cv-3504 (E.D.N.Y August 23, 2016).

a. *Plaintiff Sufficiently and Plausibly Connects Defendant To The Infringement*

Since plausibility is the standard, "proof is not required to properly plead a claim for copyright infringement," and Plaintiff does not need to establish with 100% certainty that the individual assigned the infringing IP address, is the infringer. *Malibu Media, LLC v. Harris,* No. 1:12-cv-1117-WTL-MJD, 2013 U.S. Dist. LEXIS 100350, at *7 (S.D. Ind. July 18, 2013). Plaintiff must only plead enough factual content "that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *see Deniece Design, LLC v. Braun*, 953 F. Supp. 2d 765, 769 (S.D. Tex. 2013) (citing *Montoya v. FedEx Ground Package System, Inc*., 614 F.3d 145, 148 (5th Cir. 2010)). "The copyright owner, therefore, need not prove knowledge or intent on the part of the defendant to establish liability for direct copyright infringement." *Ryland Grp., Inc. v. Travelers Indem. Co.*, CIVIL NO. A-00-CA-233 JRN, 2000 U.S. Dist. LEXIS 21412 at *36 (W.D. Tex. Oct. 25, 2000). Consequently, Plaintiff's well-pled allegations constitute "a concrete, *prima facie* case of copyright infringement." *Malibu Media, LLC v. Doe*, 2013 U.S. Dist. LEXIS

99332, at *15 (S.D.N.Y. July 16, 2013); *see also, e.g.*, *Malibu Media, LLC v. Doe*, No. 1:15-cv-00366, CM/ECF 16 (E.D. Va. July 23, 2015) ("It is reasonable to draw the inference that the party responsible for downloading . . . was the party responsible for the internet connection. Malibu Media is not required to prove its case at the pleading stage").

2. *Plaintiff Has Clearly Identified Specific Information It Seeks Through Discovery*

Plaintiff seeks to discover from the ISP the true name and address of the subscriber to the ISP account that was assigned the Subject IP address during the period of recorded infringement. This is all specific information in the possession of the ISP that will enable Plaintiff to investigate the identity of the proper Defendant and serve process on the proper Defendant. This limited and specific request satisfies the second good cause factor because it only seeks that which is necessary to enable Plaintiff to effectuate service on a proper Defendant and proceed with this lawsuit. "Given the allegedly high level of BitTorrent activity associated with [defendant], the Court is persuaded that although it is possible that "the infringer might be someone other than the subscriber," that is not the most likely scenario." *Clear Skies Nev., LLC v. Doe*, No. 16-1511, 2016 U.S. Dist. LEXIS 36187, at *10-11 (E.D. La. Mar. 18, 2016).

3. *No Alternative Means Exist to Obtain Defendant's True Identity*

There are no publicly-available databases or "yellow pages" that can identify an individual by an IP address; Plaintiff knows Defendant only by the IP address he or she used to complete the infringement. The government, law enforcement officials, criminal and civil judges, and ISPs alike all acknowledge that subpoenaing an ISP is the only way

to identify an internet subscriber.  Congress has also so found, and has expressly created this system for copyright holders to subpoena ISPs in order to identify copyright infringers.[5]

People using the Internet are anonymous to the public, but the ISPs responsible for assigning any given IP address "know who an address is assigned to and how to get in contact with them."[6]  ISPs' records "are the **only available evidence** that allows us to investigate who committed crimes on the Internet.  They may be the **only way to learn, for example, that a certain Internet address was used by a particular human being** to engage in or facilitate a criminal offense."[7]

The Government—and law enforcement in particular—also acknowledges that issuing a subpoena to the responsible ISP is the only way to identify the subscriber of an IP address.  Plaintiff's forensics expert has affirmed that during the eleven years he spent investigating computer crimes, the government ***always*** had to obtain subscribers' identifying information from ISPs.  *See* Appendix p. 13 at ¶¶ 13–16.  And, every single case that Plaintiff has reviewed supports this conclusion.  *See, e.g.*, *United States v. Baker*, 538 F.3d 324, 326 (5th Cir. 2008) (subpoenaing an ISP to identify IP address subscriber); *United States v. Orisakwe*, 624 F. App'x 149, 152 (5th Cir. 2015) (same); *United States v.*

---

[5] Major record labels and film studios also enforce their copyrights against piracy in the federal court system in this way.  *See, e.g.*, *Sony BMG Music Entm't v. Tenenbaum*, 660 F.3d 487, 492 (1st Cir. 2011) ("Shortly after peer-to-peer networks first appeared, plaintiffs acknowledged the threat they posed to their industry and initiated a broad campaign to address the illegal infringement of copyrighted materials."); *Paramount Pictures Corp. v. Davis*, 234 F.R.D. 102, 104 (E.D. Pa. 2005) ("With the aid of other technological developments, the internet also has afforded users with opportunities to infringe on the rights of owners of copyrighted works, including motion pictures.").

[6] *Beginner's Guide to Internet Protocol (IP) Addresses* at p. 4, available at https://www.icann.org/en/system/files/files/ip-addresses-beginners-guide-04mar11-en.pdf.; *American Registry for Internet Numbers Number Resource Policy Manual* at 4.2, available at https://www.arin.net/policy/nrpm.html#four2.

[7] Statement from Jason Weinstein, n.3, *supra*.

MOTION FOR LEAVE                              15

*Wyss*, 542 F. App'x 401, 403 (5th Cir. 2013) (same); *United States v. Allen*, 625 F.3d 830, 841 (5th Cir. 2010) (same); *United States v. Roetcisoender*, 792 F.3d 547, 549 (5th Cir. 2015) (same). District courts across the country likewise recognize this, routinely explaining "the Court can think of no other reasonable way of discovering the infringer than by permitting Plaintiff discovery into the identity of Doe." *Voltage Pictures, LLC v. Doe,* Civil Action No. 13-cv-01121-WYD-MEH, 2013 U.S. Dist. LEXIS 111132, at *9 (D. Colo. Aug. 7, 2013). In fact, a court very recently reaffirmed this point in the context of one of Plaintiff's cases, denying a motion to quash and explaining that "subpoenaing the ISP . . . is the *only* means to obtain identifying information" *Malibu Media, LLC v. Doe,* 2015 U.S. Dist. LEXIS 94054, at *4 (S.D.N.Y. July 20, 2015). *See also John Wiley & Sons, Inc.,* 284 F.R.D. at 190 ("[Plaintiff] has explained that the use of the BitTorrent software is 'largely anonymous' except insofar as it requires a user to broadcast the user's IP address . . . . [Plaintiff] has established that it lacks the means to obtain the subscriber's identifying information, other than by subpoena."); *Sony Music Ent., Inc.,* 326 F. Supp. 2d at 566 (finding no other method to obtain information than by subpoena under similar circumstances); *Malibu Media LLC v. Doe,* No. 12-1342, 2012 U.S. Dist. LEXIS 167001, at *4 (C.D. Ill. Nov. 26, 2012) ("Because of the very nature of internet infringement, it is often the case that a plaintiff cannot identify an infringer in any way other than by IP number. Given the substantial federal policy underlying copyright law, it would be a travesty to let technology overtake the legal protection of that policy.").

Prior to seeking leave to subpoena Spectrum, Plaintiff searched for the Subject IP address on various web search tools, including basic search engines like

http://www.google.com.  Plaintiff further conducted its own research on its ability to identify a Defendant by reviewing numerous sources of authority, most of which have been discussed above (*e.g.*, legislative reports, agency websites, informational technology guides, governing case law, etc.).  Plaintiff also discussed the issue at length with its computer forensics investigator—an individual who was tasked with the responsibility of investigating and identifying cybercriminals for over ten years.  *See generally* Declaration of Patrick Paige, Appendix pp. 9-19.  And, Plaintiff discussed these issues with at least two different ISPs.[8]  In short, there is no way to obtain the identity of an Internet subscriber except from investigation through the IP address subscriber's ISP.

    4.    *Plaintiff Needs the Subpoenaed Information to Advance the Asserted Claims*

Without learning the Defendant's true identity, Plaintiff will not be able to serve the Defendant with process and proceed with this case.  Plaintiff's important statutorily protected property rights are at issue in this suit and, therefore, the equities weigh heavily in favor of preserving Plaintiff's rights.  That is, "[w]ithout Defendant's identifying information, Plaintiff would be unable to enforce its rights over the named copyrighted works." *Malibu Media, LLC v. Doe*, Civil Action No. 15-8252 (FLW), 2016 U.S. Dist. LEXIS 92069, at *11 (D.N.J. July 14, 2016).  Indeed, as set forth above, Plaintiff has chosen to file suit only against the worst of the worst infringers – *i.e.* those that have repeatedly stolen Plaintiff's content over a long period of time.

---

[8] The ISPs with whom Plaintiff consulted confirmed their unique ability to identify their Internet subscribers, but neither were willing to provide an affidavit absent court order.  Should these communications be pertinent to the Court's analysis, Plaintiff can supply them upon request.

Because identifying Defendant by name is necessary for Plaintiff to advance the asserted claims, Plaintiff has established the fourth good cause factor.  *See St. Louis Group, Inc.*, 275 F.R.D. at 241 (noting "some courts have allowed limited, expedited discovery when failing to do so would have substantially impacted the case from progressing on the court's docket).

     5.   *Plaintiff's Interest in Knowing Defendant's True Identity Outweighs Defendant's Interest in Remaining Anonymous*

Finally, Plaintiff satisfies the fifth good cause factor because Plaintiff has a strong, legitimate, and Constitutionally-protected interest in protecting its copyrights.  Defendant, on the other hand, is a systematic copyright infringer—who may only be discovered through the subscriber to an IP address that is being used to infringe copyrights.  As a matter of law, Internet subscribers do not have a legitimate expectation of privacy in allowing their wireless Internet connections to be used to anonymously and illegally distribute copyrighted content.  *See, e.g. Arista Records, L.L.C. v. Tschirhart*, No. SA-05-CA-372-OG, 2006 U.S. Dist. LEXIS 101688 at * 8 (W.D. Tex. May 24, 2006) ("A user of a P2P file-sharing network has little or no expectation of privacy in the files he or she offers to others for downloading."); *Raw Films, Ltd. v. Does*, No. 11-7248, 2012 U.S. Dist. LEXIS 41645, at *15 (E.D. Pa. Mar. 23, 2012); *Columbia Pictures, Inc. v. Bunnell*, 245 F.R.D. 443, 452 (C.D. Cal. 2007).  Nor does Defendant or the subscriber to the Subject IP address have an expectation of privacy in his/her identifying information "because [that information] has already been exposed to a third party, the Internet Service Provider." *Malibu Media, LLC v. Doe*, No. 1:12-CV-263, 2012 U.S. Dist. LEXIS 170987, at *1 (N.D.

MOTION FOR LEAVE           18

Ind. Dec. 3, 2012). Defendant's desire to remain anonymous is necessarily outweighed by Plaintiff's legal rights, so too is the ISP subscriber's right to remain anonymous while investigation of this claim is ongoing. *See Arista Records, LLC*, 604 F.3d at 117, 124 ("[T]o the extent that anonymity is used to mask copyright infringement or to facilitate such infringement by other persons, it is unprotected"); *John Wiley & Sons*, 284 F.R.D. at 191 ("ISP subscribers have a minimal expectation of privacy in the transmission or distribution of copyrighted material.").

C. <u>Plaintiff Used Geolocation Technology to Make a Prima Facie Case of Personal Jurisdiction</u>

As set forth in Plaintiff's Complaint, "Plaintiff used proven IP address geolocation technology which has consistently worked in similar cases to ensure that the Defendant's acts of copyright infringement occurred using an Internet Protocol address ("IP address") traced to a physical address located within this District". *See* Complaint at ¶ 5. Specifically, Plaintiff used Maxmind® Premium's IP geolocation database to determine that Defendant properly resided in a location both within the state of Texas and this district.

Other courts have recognized that "[w]hile such publicly available IP locators are not 100% accurate, they have been accepted as making out a prima facie case of personal jurisdiction." *Digital Sins, Inc. v. John Does 1-245*, No. 11 CIV. 8170 CM, 2012 WL 1744838, at *4 (S.D.N.Y. May 15, 2012). *Cf. K-Beech, Inc. v. Does 1-41*, 2012 U.S. Dist. LEXIS 31803, *4 (S.D. Tex. Mar. 8, 2012) (accepting IP address methodology as a means to identify infringers, but denying joinder of defendants). From Plaintiff's experience, Maxmind's Geolocation database has consistently predicted the location of the Defendant

99% of the time.  Indeed, this exact geolocation technology has also been relied upon by federal law enforcement.  *See United States v. Tillotson,* No. 2:08-CR-33, 2008 U.S. Dist. LEXIS 120701, at *5 (E.D. Tenn. Nov. 13, 2008) (E.D. Tenn. Dec. 2, 2008) (noting that Maxmind's database correctly identified the Defendant and is sufficient to establish probable cause); *United States v. Richardson,* No. 4:11CR3116, 2012 U.S. Dist. LEXIS 454, at *4 (D. Neb. Jan. 3, 2012*)* (used by Homeland Security to identify the defendant).

## IV.    CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests this Court grant leave to Plaintiff to issue a Rule 45 subpoena to the ISP that assigned the Subject IP Address.

Respectfully submitted,


By: /s/ Paul S. Beik
Paul S. Beik
Texas Bar No. 24054444
BEIK LAW FIRM, PLLC
8100 Washington Ave., Suite 1000
Houston, TX 77007
T: 713-869-6975
F: 713-868-2262
E-mail: paul@beiklaw.com
**ATTORNEY FOR PLAINTIFF**


## CERTIFICATE OF CONFERENCE

I hereby certify that I was unable to confer with Defendant because he or she has not yet been identified by investigation following the release by the Internet Service Provider of the Subject IP address.

By: /s/*Paul S. Beik*

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| MALIBU MEDIA, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action Case No. 5:19-cv-00834-DAE |
| | ) | |
| v. | ) | |
| | ) | |
| JOHN DOE infringer using | ) | |
| IP address 70.121.72.191, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## APPENDIX TO PLAINTIFF'S MOTION FOR LEAVE TO TAKE DISCOVERY PRIOR TO A RULE 26(f) CONFERENCE AND ITS ACCOMPANYING MEMORANDUM OF POINTS AND AUTHORITIES

Pursuant to Rule CV-7, Malibu Media, LLC, in support of its Motion for Leave and its accompanying Memorandum of Points and Authorities, submits the following declarations:

Exhibit A: Declaration of Colette Pelissier ...................................................... 2

Exhibit B: Declaration of Patrick Paige ........................................................... 9

Exhibit C: Declaration of Tobias Fieser .......................................................... 20

Respectfully submitted,


By: /s/ Paul S. Beik
Paul S. Beik
Texas Bar No. 24054444
BEIK LAW FIRM, PLLC
8100 Washington Ave., Suite 1000
Houston, TX 77007
T: 713-869-6975
F: 713-868-2262
E-mail: paul@beiklaw.com
**ATTORNEY FOR PLAINTIFF**

APPENDIX

App. 054

## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| MALIBU MEDIA, LLC, | ) | |
| | ) | |
|     Plaintiff, | ) | Civil Action Case No. 5:19-cv-00834- |
| DAE | | |
| | ) | |
| v. | ) | |
| | ) | |
| JOHN DOE infringer using | ) | |
| IP address 70.121.72.191, | ) | |
| | ) | |
|     Defendant. | ) | |
| | ) | |

### DECLARATION OF COLETTE PELISSIER IN SUPPORT OF PLAINTIFF'S MOTION FOR LEAVE TO TAKE DISCOVERY PRIOR TO A RULE 26(f) CONFERENCE

[Remainder of page intentionally left blank]

**Exhibit A**

## DECLARATION OF COLETTE PELISSIER IN SUPPORT OF PLAINTIFF'S MOTION FOR LEAVE TO SERVE A THIRD PARTY SUBPOENA PRIOR TO A RULE 26(f) CONFERENCE

### I, COLETTE PELISSIER, DO HEREBY DECLARE:

1. I am over the age of eighteen (18) and otherwise competent to make this declaration.

2. The facts stated in this declaration are based upon my personal knowledge and, if called upon to do so, I will testify that the facts stated herein are true and accurate.

3. I own Malibu Media d/b/a as X-Art.com. No other person or entity has or can claim an ownership interest in the X-Art.com movie copyrights.

4. I developed the X-Art.com business plan in 2010 while still working full time as a realtor in the Los Angeles market. X-Art.com was created to address the lack of artistically produced adult oriented content suitable for upscale women and couples.

5. I invested significant time, along with all of my available financial resources, into the production of content for the new X-Art.com website. I knew that the adult content industry was in financial crisis, and the odds of success for a new adult website were low.

1



Exhibit A

Page 3

App. 056

6.After a difficult start, and with much effort, I was able to perfect the X-Art genre thus propelling the X-Art.com website into one of the top websites of its kind worldwide.

7.X-Art.com customers can pay a monthly recurring subscription fee of $29.95, or an annual subscription fee of $99.95 to access our entire library of HD Video content.

8.Internet subscription sales are and have always been by far X-Art.com's primary source of revenue, however, recent additional revenue streams have been created through the licensing of X-Art content to Fortune 500 companies operating within the hospitality industry.

9.As X-Art's subscriber base has grown, our production expenditures have also grown. We spend over two million dollars a year producing content, and millions more each year to run our business.

10.For the first several years of operation, X-Art did not have significant issues with piracy. However, once our content became well known and highly desirable, X-Art movies started ranking as the most downloaded adult content on several of the most popular torrent websites.

11.Currently we have tens of thousands of paying subscribers, but we are finding it hard to grow and maintain our subscriber base as so many of our movies are distributed for free, without authorization, by users of the Bittorrent



Network.   X-Art must protect its copyrights in order to survive and for any hope for future revenue growth.

12. The only redress against Bittorrent based piracy is to initiate lawsuits against the Bittorrent users responsible for these unauthorized distributions.

13. These lawsuits must be filed as "John Doe" lawsuits because the identity of the infringer is initially unknown to us.  From my experience filing similar cases against other defendants throughout the country, once provided with the IP Address, plus the date and time of the detected and documented infringing activity, ISPs can use their subscriber logs to identify the name, address, email address and phone number of the applicable subscriber in control of that IP address at the stipulated date and time.

14. The proper forum for these lawsuits is determined by using Maxmind Premium Geolocation services.  Founded in 2002, Maxmind's website cites it as an industry-leading provider of geolocation databases[1].  It is also used by state and federal law enforcement in the prosecution of computer and cybercrimes.

15. Since January 2013, Malibu Media has used this geolocation procedure to determine the proper District for filing in 5,349 cases.   Out of these 5,349 total cases, 5,334 have accurately traced to the District Court in which the case was filed.   This translates to a 99.99% chance of proper personal jurisdiction and venue pursuant to the Maxmind Geolocation trace.

---

[1] www.maxmind.com



App. 058

16. Over the past several years, Malibu Media has employed two experts to track and scan the infringement of its movies - Excipio GmbH ("Excipio") and IPP International U.G. ("IPP").

17. Investigators from both companies have testified in court and have attested to the reliability of the applicable forensic technology.   Malibu Media has also independently tested each system to ensure the highest level of accuracy.

18. Each recorded infringement enumerated on Exhibit A to the Complaint in this lawsuit was documented by either IPP or Excipio.   In many instances, infringing transactions were documented by both entities.   Each Single Movie Hash on Exhibit A was fully downloaded and compared side by side to a control copy supplied to the applicable investigator by Malibu Media.

19. Malibu Media's intention in bringing these lawsuits is not to cause financial hardship but instead to deter infringement and be compensated for the intentional theft of its videos.

20. I have consistently instructed all attorneys representing Malibu Media in these lawsuits to seek and be open to exculpatory evidence and to be cautiously prudent when pursuing these claims.    We do not pursue our claims against all Doe Defendants.   For example, once receiving discovery, we may learn that a Defendant is on active duty in the military and we will dismiss that case.   Also, we may learn a Defendant is possibly a coffee shop with open wireless, or some other circumstance that would prevent us from pursuing our claims. When

4

discovery indicates that pursuing the case will present for undue hardship for the Defendant, my instructions to my lawyers are to dismiss the case.

21. We invest significant resources into pursuing all types of anti-piracy enforcement, such as Digital Millennium Copyright Act ("DMCA") takedown notices and direct efforts aimed at infringing websites. We are even working with law enforcement to stop the piracy of our movies.

22. Despite sending thousands of DMCA notices per week, the infringement continues. And, if one searches for "X-Art" on a torrent website, the site will reveal thousands of unauthorized torrents available for free.

23. I have never authorized anyone to put our works on a torrent website.

24. I firmly believe that we must exercise our rights under the Copyright Act to prevent infringement. Otherwise, we face an immediate and serious risk. It is simply impossible to compete with free.

25. We do not seek to use the Court system to profit from the infringement like some have suggested. As previously stated, revenues from subscriptions to X-Art.com are by far and away the dominant driver of Malibu Media's business. We want the infringement to stop. The purpose of these lawsuits is to motivate people to pay for subscriptions by deterring infringement and seek some reasonable compensation for the massive amount of infringement of our copyrights.



App. 060

26. It is my hope that by upholding the law, the courts will protect our ability to continue with our dream and allow all creative people the ability to make a living by distributing their work in this fast-paced digital age.

27. In conclusion, we want the courts to know that we are a small business and we need the law to be enforced to ensure our survival. It is getting more difficult for us every day and we hope that in the future there will be a better way to protect our copyrights.

28. Thank you in advance for your time and consideration of this matter, please do not hesitate to ask if we can clarify any further questions.

## **DECLARATION**

**PURSUANT TO 28 U.S.C. § 1746**, I hereby declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

By: _____

COLETTE PELISSIER

6

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| MALIBU MEDIA, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action Case No. 5:19-cv-00834- |
| DAE | | |
| | ) | |
| v. | ) | |
| | ) | |
| JOHN DOE infringer using | ) | |
| IP address 70.121.72.191, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**DECLARATION OF PATRICK PAIGE IN SUPPORT OF PLAINTIFF'S MOTION FOR**
**LEAVE TO TAKE DISCOVERY PRIOR TO A RULE 26(f) CONFERENCE**

[Remainder of page intentionally left blank]

**Exhibit B**



Computer Forensics, LLC
1880 N. Congress Ave Suite 333
Boynton Beach, FL 33426
Main: 561.404.3074
www.ComputerForensicsLLC.com

## EXPERT REPORT REGARDING TESTING OF IPP INTERNATIONAL UG'S INFRINGEMENT DETECTION SYSTEM

Prepared By:        Patrick Paige, EnCE SCERS
                    Managing Member
                    Computer Forensics, LLC

1

### DECLARATION OF PATRICK PAIGE

**I, PATRICK PAIGE, DO HEREBY DECLARE:**

1.      I am over the age of eighteen (18) and otherwise competent to make this declaration. The facts stated in this declaration are based upon my personal knowledge.

2.      I was a police officer from 1989 until 2011 for the Palm Beach County Sherriff's Office. And, from 2000-2011, I was a detective in the Computer Crimes Unit. After leaving the Palm Beach County Sherriff's Office, I founded Computer Forensics, LLC, where I am currently employed.

3.      I have taken over 400 hours of courses designed to teach people how to conduct computer forensic examinations.

4.      Also, while working from 2003-2011 for Guidance Software, the makers of EnCase, I taught over 375 hours of courses in computer forensics ranging from beginner to advanced levels.

5.      As a computer crimes detective for the Palm Beach County Sheriff's Office, I have conducted forensic computer examinations for:

   (a)      Broward County Sheriff's Office (BSO);

   (b)      Federal Bureau of Investigation (FBI);

   (c)      U.S. Customs and Border Protection (CBP);

   (d)      Florida Department of Law Enforcement (FDLE);

   (e)      U.S. Secret Service;

   (f)      Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF); and

   (g)      Various municipalities in the jurisdiction of Palm Beach County.

2

6.    I have had students in my courses from various government branches, including: (a) sheriff's offices; (b) FBI agents; (c) ATF agents; (d) agents from the Central Intelligence Agency; and (e) individuals from other branches of government and the private sector.

7.    I have received the following awards and commendations:

(a)    1991 – Deputy of the Year, awarded by the 100 Men's Club of Boca Raton & Rotary Club.

(b)    1997 – Deputy of the Month for June.

(c)    2001 – Detective of the Month for October.

(d)    2002 – Outstanding Law Enforcement Officer of the Year, awarded by the United States Justice Department for work in the *U.S. vs. Jerrold Levy* case.

(e)    2003 – U.S. Customs Service Unit Commendation Citation Award for computer forensic work in Operation Hamlet. Operation Hamlet was one of the largest rings in the history of U.S. Customs of individuals who were molesting their own children, and transmitting the images and video via the Internet.

(f)    2005 – Detective of the Month for December.

(g)    2006 – Letter of Commendation issued by the FBI for outstanding computer forensic work in the *U.S. vs. Frank Grasso* case.

(h)    2007 – Outstanding Law Enforcement Officer of the Year, awarded by the United States Justice Department for work in the *U.S. vs. Jimmy Oliver* case.

8.    I have testified as a fact and expert witness on numerous occasions in the field of computer forensics in both trial-level and appellate proceedings before state, federal, and military courts in California, Florida, Indiana, New Jersey, New York, and Pennsylvania.

9.    No court has ever refused to accept my testimony on the basis that I was not an expert in computer forensics. My skill set and my reputation are my most important assets in my current position with Computer Forensics, LLC.

3

10.     As part of my duties within the Computer Crimes Unit at the Palm Beach County Sheriff's Office, I investigated cases involving the use of the Internet, including cases involving peer-to-peer file sharing networks. In this role, I also investigated Internet child pornography and computer crime cases.

11.     I was assigned to the Computer Crimes Unit that worked in conjunction with a private company called TLO Corp.

12.     When I worked with TLO Corp., I supervised the other detectives assigned to the unit, which consisted of six online investigators and two computer forensic examiners.

13.     In my experience, during the initial phase of Internet based investigations, the offender is only known to law enforcement by an IP address.

14.     The only entity able to correlate an IP address to a specific individual at a given date and time is the Internet Service Provider ("ISP").

15.     Once provided with the IP Address, plus the date and time of the detected and documented activity, ISP's can use their subscriber logs to identify the name, address, email address and phone number of the applicable subscriber in control of that IP address at the stipulated date and time.

16.     With regard to my experience investigating child pornography cases, I supervised police officers whose responsibility it was to establish a successful TCP/IP connection with persons who were sending pornographic images of children or other illegal content over the Internet using peer-to-peer file sharing programs.

17.     The offenders' IP addresses, as well as the dates and times of the illegal transmission were recorded.

4

18. An officer would then request that the assistant state attorney subpoena the corresponding ISPs for the purpose of identifying the subscribers that were transmitting the illegal content.

19. In these cases, the subscribers were not notified by the ISPs that their identity was being subpoenaed because they could have deleted the images and destroyed the data.

20. After receiving the subscribers' identities, we would prepare a search warrant that would authorize us to enter the subscribers' dwelling and seize all of their computer devices.

21. I was directly involved in approximately 200 search warrants either by way of managing the process or performing it personally while at the Computer Crimes Unit.

22. From my experience, Plaintiff is likely to identify the infringer. Indeed, during my time in the Computer Crimes Unit, I can recall only one instance in all the times that we executed a search warrant and seized computers, where we did not find the alleged illegal activity at the dwelling identified in the search warrant.

23. In that one instance, the Wi-Fi connection was not password protected, and the offender was a neighbor behind the residence.

24. I never came across a Wi-Fi hacker situation.

25. In my opinion, a child pornographer has a greater incentive to hack someone's Wi-Fi connection than a BitTorrent user because transmission of child pornography is a very serious crime with heavy criminal penalties, and many offenders can face life sentences if convicted.

26. The process used by law enforcement mirrors the process used by Malibu Media and IPP to correlate an IP address to an individual.

5

27.     In order to ascertain the identity of the infringer, just as with law enforcement, Malibu Media must subpoena the ISP to learn the subscriber's true identity.

28.     I tested IPP International U.G.'s ("IPP") infringement detection system. The infringement detection system is named "Observer." It is owned and used by IPP to identify individuals who are illegally downloading and distributing content via BitTorrent. This technology and similar investigative methods are used by law enforcement officials when tracking individuals who transmit contraband files such as child pornography via the Internet.

29.     I tested IPP's infringement detection system for its accuracy in detecting and recording infringement via BitTorrent, ascertaining an infringing IP address[1], and identifying the "test" files being distributed on BitTorrent.

30.     To conduct this test, I first downloaded four public domain movies from the national archive.

31.     I then encoded text into each video. The purpose of this encoding was to ensure that when the file is located and download by IPP, it could be easily identified as the videos I personally encoded and seeded.

32.     I then setup and configured four computers, each of which was connected to the Internet and each computer was configured with its own unique static IP address.

33.     I then configured three computers with a Windows 7 operating system, and the fourth computer was a MacBook Pro configured with OS X El Capitan version 10.11.4. I installed a different BitTorrent client[2] onto each computer system as listed below:

---

[1] An IP address is a numerical value assigned to a computer or device that transmits and receives data via the Internet. When a computer user accesses the Internet, their Internet Service Provider assigns them a unique IP address for that session. In order to identify a computer user who is downloading files via the Internet, one must be able to identify the IP address the user was using at that exact time and date of downloading.

[2] A BitTorrent client is software that enables the BitTorrent protocol to work.

6

App. 068

| Computer | Operating System | BitTorrent Client |
|---|---|---|
| Dell Laptop | Windows 7 | uTorrent Version 3.4.7 |
| Dell Laptop | Windows 7 | qBittorrent Version 3.3.4 |
| Dell Laptop | Windows 7 | Transmission Version 2.84 |
| MacBook Pro Laptop | OS X El Capitan 10.11.4 | uTorrent Version 1.8.7 |

34.     After installing the BitTorrent clients, I also installed Wireshark and WinDump onto each computer. Wireshark and WinDump are programs that capture network traffic and create PCAP files. PCAP stands for "packet capture." PCAPs are akin to videotapes. Indeed, a PCAP is like a video recording of all the incoming and outgoing transactions of a computer. I have used Wireshark and WinDump software while in law enforcement to examine network traffic while investigating P2P cases.

35.     After installing Wireshark and WinDump onto each of the computers, I transferred the movie files that I created for the test to each of the four computers.

36.     I then used one of the BitTorrent clients on the test computers to make .torrent files. I then seeded the four test movies.

37.     On June 3, 2016 the test was conducted. Given only the torrent files, IPP was able to correctly identify all four static IP addresses for each of the test computers that were seeding the movies within minutes of starting the test. Soon after the test, IPP sent me the PCAP files they recorded during the test for each one of my static IP addresses.

38.     I reviewed IPP's PCAPs vis-à-vis the PCAP log files created by each of my test computers, and determined that IPP's PCAPs match my PCAPs. This could not have happened unless IPP's server was connected to the test computers because the transactions would not match.

39.     I also conducted an examination of IPP's PCAPs to determine if the detection software can accurately identify the BitTorrent clients I used during the test. Using Wireshark

software I loaded IPP's PCAPs recorded on the day of the test. IPP's system was able to accurately record the names and version numbers of all four BitTorrent client's software I used on each of the test computers.

40.     When a BitTorrent client is installed onto a computer, the computer randomly selects a port number for its network communication. A port number is an integer ranging from 0 to 65535. The following is a chart listing the port number assigned to each of the test computers:

| Computer | BitTorrent Client | Port |
|---|---|---|
| Dell Laptop | uTorrent Version 3.4.7 | 51892 |
| Dell Laptop | qBittorrent Version 3.3.4 | 8999 |
| Dell Laptop | Transmission  Version 2.84 | 51413 |
| MacBook Pro Laptop | uTorrent  Version 1.8.7 | 10088 |

41.     Examination of IPP's PCAP revealed that the port numbers recorded by IPP's system matched the port numbers from the test computers used for BitTorrent communications. Accordingly, my analysis confirmed that IPP was able to accurately identify the port number assigned to each test computer's BitTorrent client.

42.     From this test, I concluded that IPP's infringement detection system worked, and had a subpoena been issued for my IP addresses, it would have revealed my identity. I also concluded that IPP's infringement detection system accurately identifies the BitTorrent clients as well as the BitTorrent client's port number.

43.     In the past, Malibu has also retained Excipio GmbH's ("Excipio") to track infringement of Malibu's copyrighted works. In June 2013, in anticipation of the Bellwether trial in the Eastern District of Pennsylvania, I conducted a test of Excipio's infringement detection system. After performing the test, I concluded that Excipio's infringement detection system works. Specifically, the system accurately records the IP address of a person using

8

BitTorrent to transmit data to Excipio's computer servers. Excipio's system operates nearly the same fashion as IPP's system.

44.     In addition to testing Malibu's investigators' systems, I have also conducted computer forensic examinations for Malibu in their copyright infringement cases throughout the country.

45.     Indeed, in my role as an expert for Plaintiff, I have examined countless computer hard drives for evidence of: (a) the use of BitTorrent; (b) infringement of the copyrighted "X-Art" works owned by Plaintiff; (c) spoliation of evidence; and (d) suppression of evidence. These examinations have revealed either: (1) evidence of copyright infringement of Malibu Media, LLC's works; or (2) evidence of suppression and spoliation. Sometimes I have found both. By way of illustration, below are examples where Malibu obtained a Defendant's hard drive and discovered evidence of its movies, spoliation, and/or defendants' failures to disclose all hard drives.

    a. *Malibu Media, LLC v. Weaver*, No. 8:14-cv-01580-VMC-TBM (M.D. Fla. 2015): In *Weaver*, the Court ordered production of the hard drives, and my forensic examination revealed evidence which irrefutably demonstrated: (a) Defendant's BitTorrent use; (b) the prior existence of numerous X-Art titles; (c) the deletion of BitTorrent files and uninstallation of a BitTorrent client; and (d) the existence of other computer devices that have not been produced. Because of this examination, Malibu was able to successfully disprove Defendant's denial of infringement.

    b. *Malibu Media, LLC v. Huseman*, No. 1:13-cv-02695-WYD-MEH (D. Colo. 2014): In the *Huseman* case, I discovered evidence of: (a) BitTorrent use; (b) the prior existence of numerous X-Art titles; (c) the deletion of BitTorrent files and uninstallation of a BitTorrent client; and (d) the existence of other computer devices that had not been produced to me for examination, one of which *contained* titles of Plaintiff's copyrighted works. Ultimately, the parties stipulated to a final judgment in favor of Malibu Media, LLC.

    c. *Malibu Media, LLC v. John Doe*, No. 1:14-cv-10155-KBF (S.D.N.Y. 2015): My forensic examination revealed that defendant had over eleven different file destruction software programs on his hard drive – each with the capability of destroying substantial amounts of data. He used several of the software programs

just days before turning it over for imaging and examination. I also detected that prior to defendant's use of the file destruction software, the defendant connected another undisclosed external storage device to his hard drive. This suggested that defendant was storing data which he wanted to retain prior to using the file destruction software programs on his hard drive. Ultimately, the defendant admitted to his infringement and apologized to Malibu.

d. *Malibu Media, LLC v. Tashiro*, No. 1:13-cv-00205-WTL-MJD (S.D. Ind. 2014): My examination revealed that defendants deleted thousands of BitTorrent files the night before producing the hard drives for imaging. My examination also revealed that defendants possessed and used other hard drives which were never disclosed or produced during discovery. Ultimately, the court imposed terminating sanctions against defendants for failure to disclose documents, spoliation, and perjury.

e. *Malibu Media, LLC v. John Doe*, No. 12-2078 (E.D. Pa. 2013): In this "Bellwether" case, my examination of defendant's hard drive revealed that he installed a Windows operating system three (3) days after being served with a subpoena for production of his computer device. This installation resulted in the complete destruction of all files contained within the hard drive prior to the Windows installation. After falsely testifying, Defendant admitted that he had downloaded Plaintiff's copyrighted works and had wiped his desktop computer (by installing a new Windows operating system) to conceal the infringements. In the end, the Court entered a substantial judgment in favor of Malibu.

46.    I am paid on an hourly basis by Malibu Media, LLC, at the rate of $325.00 per hour for pre-trial investigative work, although the fee increases if I am required to testify at trial.

**FURTHER DECLARANT SAYETH NAUGHT.**

**DECLARATION**

**PURSUANT TO 28 U.S.C. § 1746**, I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed on this 19th day of August, 2016.

By: _____

**PATRICK PAIGE**

10

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| MALIBU MEDIA, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action Case No. 5:19-cv-00834- |
| DAE | | |
| | ) | |
| v. | ) | |
| | ) | |
| JOHN DOE infringer using | ) | |
| IP address 70.121.72.191, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DECLARATION OF TOBIAS FIESER IN SUPPORT OF PLAINTIFF'S MOTION FOR LEAVE TO TAKE DISCOVERY PRIOR TO A RULE 26(f) CONFERENCE

[Remainder of page intentionally left blank]

**Exhibit C**

**DECLARATION OF TOBIAS FIESER IN SUPPORT OF PLAINTIFF'S MOTION FOR LEAVE TO TAKE DISCOVERY PRIOR TO A RULE 26(f) CONFERENCE**

**I, TOBIAS FIESER, HEREBY DECLARE:**

1.      My name is Tobias Fieser.

2.      I am over the age of 18 and am otherwise competent to make this declaration.

3.      This declaration is based on my personal knowledge and, if called upon to do so, I will testify that the facts stated herein are true and accurate.

4.      I am employed by IPP International UG ("IPP"), a company organized and existing under the laws of Germany, in its litigation support department.

5.      Among other things, IPP is in the business of providing forensic investigation services to copyright owners.

6.      IPP's system has been monitoring the BitTorrent file distribution network for the presence of Malibu Media's copyrighted works since 2011.  IPP's forensic software identifies Internet Protocol ("IP") addresses that are being used by infringers to distribute Malibu Media's copyrighted works within the Bittorrent File Distribution Network.

7.      IPP tasked me with effectuating, analyzing, reviewing and attesting to the results of this investigation.  I have previously provided the same support for Malibu Media in thousands of lawsuits across the United States, and I gave full and complete testimony about the workings of IPP's forensic scan during the "Bittorrent Bellwether Trial" (*Malibu Media v. John Does*, 12-cv-2078, (E.D. Pa.)).

8.      Infringement of Malibu Media's movies occurs within two formats.  The first entails distribution of a specific single movie file correlating to a copyrighted Malibu Media movie.  The second involves large scale distribution utilizing "Unauthorized Packs" (commonly referred to as 'siterips').

1

WTX40                                  Exhibit C

App. 074

9.     Upon review of IPP's forensic activity logs, I determined that IPP's forensic servers connected to an electronic device using IP Address 70.121.72.191.  Consequent to this connection, the IP Address used by Defendant of 70.121.72.191 was documented distributing to IPP's servers multiple pieces of Malibu Media's copyrighted movie titled Kaisa Slippery and Wet at exactly 5/5/2019 7:59:08 AM.  This time is quoted in Universal Time which correlates to the assignment logs kept by US ISPs tracking which IP Address is assigned to which customer at a given point in time.

10.     A digital file can be identified by what is called a "Cryptographic Hash Value." This concept was developed by the United States National Security Agency.  IPP's software determined that the file being distributed by Defendant using the IP Address of 70.121.72.191 at 5/5/2019 7:59:08 AM has a unique identifier of the Cryptographic Hash of 1B2CFE6B8C36391FC2B1F53792A5D35DD87AF510.

11.     A full copy of the digital file identified by the Hash of 1B2CFE6B8C36391FC2B1F53792A5D35DD87AF510 was downloaded by IPP's software, and I confirmed this file is a digital movie file.  I further viewed this file and determined it was substantially similar to Malibu Media's copyrighted movie titled Kaisa Slippery and Wet.

12.     IPP's software is unable to distribute content; it is programmed to only allow it to download files from the Bittorrent Network.  At no point did IPP distribute any part of Plaintiff's copyrighted movies at any time.

13.     It is theoretically possible to "spoof" an IP Address on the Internet.  However, it is not possible to spoof an IP Address within the context of a TCP/IP connection.  I verified that a TCP/IP connection was made between IPP's investigative servers and the electronic device using IP Address 70.121.72.191 and that multiple bits were conveyed over this connection.

2

WTX40                              Exhibit C

App. 075

Consequently, it is impossible that another party was "spoofing" the IP Address used by Defendant.

14.     IPP additionally confirmed through its ancillary worldwide BitTorrent surveillance program that IP address 70.121.72.191 is associated with significant long term BitTorrent use.

### FURTHER DECLARANT SAYETH NAUGHT.

### DECLARATION

**PURSUANT TO 28 U.S.C. § 1746**, I hereby declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this _461_ day of _July_, 201_5_.

**TOBIAS FIESER**

By: _____

WTX40                          Exhibit C

## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| MALIBU MEDIA, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Case No. 5:19-cv-00834-DAE |
| | ) | |
| v. | ) | |
| | ) | |
| JOHN DOE infringer using | ) | |
| IP address 70.121.72.191, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## ORDER ON MOTION FOR LEAVE TO SERVE
## THIRD PARTY SUBPOENA PRIOR TO A RULE 26(f) CONFERENCE

**THIS CAUSE** came before the Court upon Plaintiff's Motion for Leave to Serve a

Third Party Subpoena Prior to a Rule 26(f) Conference (the "Motion"), and the Court being

duly advised in the premises does hereby:

### FIND, ORDER AND ADJUDGE:

1. Plaintiff established that "good cause" exists for it to serve a third-party

subpoena on Spectrum (hereinafter the "ISP"). *See e.g. EElargo Holdings LLC v. Doe*,

No. 1:16-CV-0480, 2016 U.S. Dist. LEXIS 57641, at *5 (W.D. La. Apr. 28, 2016); *Dall.*

*Buyers Club, LLC v. Ripple*, No. H-14-3393, 2015 U.S. Dist. LEXIS 35613, at *1 (S.D.

Tex. Mar. 23, 2015); *Clear Skies Nev., LLC v. Doe*, No. 16-1511, 2016 U.S. Dist. LEXIS

36187, at *10 (E.D. La. Mar. 18, 2016).

2. Plaintiff may serve the ISP with a Rule 45 subpoena commanding the ISP to

provide Plaintiff with the true name and address of the subscriber to whom the ISP assigned

[PROPOSED] ORDER

an IP address as set forth on Exhibit A to the Complaint.  Plaintiff shall attach to any such subpoena a copy of this Order.

     3.     Plaintiff may also serve a Rule 45 subpoena in the same manner as above on any service provider that is identified in response to a subpoena as a provider of Internet services the subscriber of the ISP account.

     4.     If the ISP qualifies as a "cable operator," as defined by 47 U.S.C. § 522(5), which states:

> the term "cable operator" means any person or group of persons
>
> (A)  who provides cable service over a cable system and directly or through one or more affiliates owns a significant interest in such cable system, or
>
> (B)  who otherwise controls or is responsible for, through any arrangement, the management and operation of such a cable system.

it shall comply with 47 U.S.C. § 551(c)(2)(B), which states:

> A cable operator may disclose such [personal identifying] information if the disclosure is . . . made pursuant to a court order authorizing such disclosure, if the subscriber is notified of such order by the person to whom the order is directed.

by sending a copy of this Order to the Defendant.

     5.     Plaintiff may only use the information disclosed in response to a Rule 45 subpoena served on the ISP for the purpose of protecting and enforcing Plaintiff's rights as set forth in its Complaint.

2

[PROPOSED] ORDER

It is so ORDERED.

_____        _____
Date                                    The Honorable David A. Ezra
                                        United States District Judge

3

**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

MALIBU MEDIA, LLC,

     Plaintiff,

vs.

                             CIVIL ACTION NO. 5-19-CV-00834-DAE

JOHN DOE,

     Defendant.

## DECLARATION OF ▮▮▮▮▮▮

I, ▮▮▮▮▮▮ declare pursuant to 28 U.S.C. § 1746 that the following statements are

true and correct based on my personal knowledge:

1. I am over the age of 18, have never been convicted of a felony, and I am of sound mind.

2. I have read and am familiar with Malibu Media's complaint filed in this case. I
   understand from the complaint that Malibu Media is claiming someone infringed
   copyrights they have in the pornographic films listed in Exhibit A and B of the complaint,
   by sharing those films using BitTorrent.

3. I understand from the complaint that Malibu Media claims the BitTorrent sharing of
   those films occurred between 2017 and 2019.

4. I understand that Malibu believes I am the infringer because I am the subscriber
   associated the internet account linked to IP address 70.121.72.191.

5. I am not the person who Malibu claims shared the films described in the complaint. Nor
   do I know any person who shared the films described in the complaint.

6. I never used BitTorrent or installed it on any of my electronic devices for sharing films or
   any other purpose between 2017 and 2019.

App. 080

7. I never viewed any of the films listed in Malibu Media's complaint. I never stored, copied, accessed, or distributed any of those films.

8. At no time have I ever given Malibu Media or IPP International UG consent to connect to or interact with any network or computer system I maintain.

9. To date, Malibu Media has not served me with any discovery requests, asked to inspect any of my computers or other electronic devices, or asked to take my deposition.

10. Malibu Media also has not served me or my counsel with an expert report or other information identifying experts that might testify in this case.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on:

7/17/2020

2

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------X

MALIBU MEDIA, LLC,

                          :  CV-15-3504

        Plaintiff,

                          :  US Courthouse
   -against-                 Central Islip, NY

                          :

JOHN DOE, subscriber assigned IP
address 98.116.160.61,        :

                            April 20, 2016
        Defendant.          9:30 a.m.

---------------------------------X


TRANSCRIPT OF HEARING
BEFORE THE HONORABLE STEVEN I. LOCKE
UNITED STATES MAGISTRATE JUDGE


APPEARANCES:

For the Plaintiff:        THE JAMES LAW FIRM
                          445 Hamilton Avenue, Suite 1102
                          White Plains, New York 10601
                          BY:  JACQUELINE M. JAMES, ESQ.


For the Defendant:        LAW OFFICES OF CHEJIN PARK, PC
                          3520 147th Street, 2C
                          Flushing, New York 11354
                          BY:  CHEJIN PARK, ESQ.


Official Court Reporter:   Ellen S. Combs, CSR
                          Paul Lombardi, CR
                          100 Federal Plaza - Suite 1180
                          Central Islip, New York 11722
                          (631) 712-6107


Proceedings recorded by mechanical stenography
Transcript produced by CAT

2

1        (The following took place at 9:32 a.m.)

2        THE CLERK:  Calling case CV-15-3504, Malibu

3   Media, LLC vs John Doe.

4        Counsel, state your appearances on the record.

5        MS. JAMES:  Good morning, your Honor.  My name

6   is Jacqueline M. James, and I'm here on behalf of the

7   plaintiff Malibu Media.

8        MR. PARK:  Good morning, your Honor.  My name is

9   Chejin Park and I'm the attorney for the defendant, John

10  Doe defendant.

11       THE COURT:  Good morning.  Please be seated.

12       We are here finally for a motion hearing, trying

13  to moving things along again.

14       Before we get to that I have a motion in limine,

15  a letter motion from the defendant dated April 18.

16       I also have a response from the plaintiff,

17  docket entry 29.

18       I understand the basis for the motion.

19  Mr. Park, do you want to add anything or just go on the

20  paper?

21       MR. PARK:  Go on the paper.

22       THE COURT:  Same?

23       MS. JAMES:  Same, your Honor.

24       THE COURT:  All right.  Here is where we are on

25  this.

Case 1:19-cv-03826-DAE   Document 54   Filed 10/06/23   Page 2 of 145   PageID 298

1          It was the Court's intention that you

2   communicate something to the defendant, even if it was

3   that we are going with the experts's declarations that we

4   submitted.  And then I recall that I said, if you're going

5   to substitute one of the persons from Germany for another

6   one of the people who gave a declaration, but they would

7   stay within the parameters of the declaration, that is

8   fine, but you needed to tell Mr. Park that.

9          It appears that you did not.  However, I don't

10  think that is a basis to bar the testimony.  The sum and

11  substance of it is I think the plaintiff is going to

12  essentially prove what was submitted on the papers with

13  clarification.

14          Is that correct, Ms. James?

15          MS. JAMES:  It is, your Honor.

16          And we apologize.  We think that we docked that,

17  that we submitted that written statement to Mr. Park

18  identifying the witnesses.  And that was a misreading or a

19  mis-docketing on our part and we apologize.

20          THE COURT:  Okay, that is fine.  I just wanted

21  Mr. Park to have enough notice so he can conduct effective

22  cross-examination.

23          What I am prepared to do, Mr. Park, is one of

24  the clarifications being you only received it yesterday on

25  the 18th, is we're going to go ahead with the hearing.  If

**4**

1    you need a break to sort of go over that declaration and

2    continue this tomorrow so that you can have an evening to

3    do that, to prepare, I will allow that.  All right?  But

4    let's go and see how far we get.

5              Does that make sense?

6              MR. PARK:  Yes, your Honor.

7              But you know, I don't need that.  I have

8    reviewed that declaration last night.

9              THE COURT:  Okay.  I thought you might say

10   something like that.  That's fine.  But let's just move

11   along.

12             Also, what we're going to do is, we have a court

13   reporter here, so it is my suggestion that you get the

14   transcript when we're done.  I'm going to ask you to

15   submit; it could be a letter, it could be a memo, whatever

16   you think is appropriate.  We'll talk about that a little

17   more at the end.

18             The reason I say that is, you're free to, to

19   make an opening statement.  You don't have to.  There is

20   no jury here.  And we can go straight to the witnesses.

21   But I'll let you do whatever you want.

22             So we're all good to go, Ms. James?

23             MS. JAMES:  Yes.

24             THE COURT:  Mr. Park?

25             MR. PARK:  Yes.

1          THE COURT:  All right.

2          MS. JAMES:  Your Honor?

3          THE COURT:  Yes.

4          MS. JAMES:  I don't believe we need to do an

5     opening statement.  I think that we have all had a chance

6     to review your transcript from our hearing on this matter.

7     And now you have asked the plaintiff to bring witnesses to

8     discuss the technology used in the monitoring, and also to

9     address the University of Washington 2008 paper that was

10    cited today in Mr. Park's paper.

11         And unless you would like me to give you more --

12    would you like me to talk about the details of the actual

13    --

14         THE COURT:  No, you can't put the witnesses on.

15         MS. JAMES:  I wanted to make sure if there was

16    anything you wanted in the way of background.

17         The plaintiff would like to call Michael Patzer

18    to the stand.

19    **MICHAEL PATZER**

20         called as a witness, having been first duly sworn,

21         was examined and testified as follows:

22         THE CLERK:  Please state your named for the

23    record.

24         THE WITNESS:  Michael Patzer, PA-T-Z-E-R.

25         THE COURT:  Be seated.

Case 2:19-cr-00877-DAF Document 454 Filed 10/08/15 Page 89 of 145 Page ID: 301

6

1    Mr. Patzer, I'm just going to ask you to keep

2    your voice up and use the microphone.  The acoustics here

3    are terrible.  Okay?

4         THE WITNESS:  Better now?

5         THE COURT:  All right, Ms. James?

6         MS. JAMES:  Thank you.

7    DIRECT EXAMINATION

8    BY MS. JAMES:

9    Q    Can you hear me?

10        THE COURT:  If you want you can walk around, but

11   keep your voice up.  And you can also use the lectern.

12        MS. JAMES:  Okay.

13   BY MS. JAMES:

14   Q    Good afternoon.

15        May I ask you your educational background,

16   please?

17   A    I graduated high school in 1999.

18        THE COURT:  A little louder, Mr. Patzer.

19   A    I graduated high school in 1999.

20   Q    And what is your profession since 1999?

21   A    I'm working in the IT business.  And I'm a senior

22   assistant architect.

23   Q    And who are you a senior assistant architect for, the

24   name of the company?

25   A    Excipio.

Patzer - Direct/James

7

```
 1    Q    And do you have any formal training for this
 2  position?
 3    A    When I first started I'm self-employed and I had no
 4  training at all, just teaching myself.
 5    Q    And did you use publicly available information?  How
 6  did you go about training yourself?
 7    A    I used the Internet books, and just experience.
 8    Q    And how long have you worked in the IT business?
 9    A    After I graduated high school, so it's about 17 years
10  now.
11    Q    And are you still currently working for Excipio?
12    A    Yes.
13    Q    Can you please tell me your involvement in designing
14  the monitoring system used in this case?
15    A    I planned, designed, implemented and all-around
16  monitored the software which was used for the for this
17  case.
18    Q    And how long ago did you design that software?
19    A    It took about one year to design it, and program it.
20  And I was not the programmer, I just I did the planning
21  and maintenance and did various programs working on it.
22    Q    And do you remember the year, would that be about
23  2008?
24    A    Yes.  Well we started developing it around 2008.
25    Q    And is Malibu the client?
```

Case 1:13-cv-06312-DAE Document 52 Filed 10/08/13 Page 91 of 293 PageID: 303

8

```
 1   A    Yes.  It's indirect client because IPP is the client,
 2   and Malibu Media is the client of IPP.  I'm not involved
 3   in contractor anything like that.  I'm just engineer
 4   background.
 5   Q    But do you provide monitoring services for Malibu?
 6   A    Yes.
 7   Q    And can you describe how your monitoring software
 8   works?
 9   A    Yes.
10        Starts out with a list of titles, of movie
11   titles the client gives us.
12   Q    So is it accurate that each client provides you with
13   a list of their copyrighted materials to monitor?
14   A    Yes, that's correct, yes.
15   Q    And tell me what the next step is in the monitoring?
16   A    The next step is that we crawl the Internet for the
17   titles on the well-known BitTorrent sites.
18   Q    And sir, you used the word, crawl.  Could you
19   describe that for us?
20   A    It's a search of the Internet on well-known
21   BitTorrent pages and for torrent files which match to the
22   titles of the works of the clients.
23   Q    And can you please explain the term BitTorrent sites?
24   A    Sites like Pirate Bay.
25   Q    Hold up.  I think for the court reporter, could you
```

Case 2:18-cv-03029-DRH-AKT Document 454 Filed 10/04/19 Page 3 of 145 PageID #: 304

9

1   spell Pirate Bay?

2   A    It's like P-I-R-A-T-E, B-A-Y.

3   Q    And can you describe to the best of your

4   understanding the purpose of BitTorrent sites like Pirate

5   Bay?

6   A    Yes.

7        A list of mainly illegal copyrights, protected

8   material.  And the reason for the pages is to just share

9   it and to just provide service that they can easily

10  download copyright protected material from the network.

11  Q    And when you say the purpose of the site is to allow

12  the sharing of, do you mean the copyright protected

13  material hosted on the site?

14  A    No.  It's just BitTorrent files, and the torrent

15  files refer to the content and unique torrent file to

16  download the related content which is actually the movie

17  or the music or just the CD music.

18  Q    We know that normal conversation is a little faster,

19  but just so you know the court reporter is charged with

20  the duty of taking down every one of our words

21  simultaneously.  So we have to ask you to slow down if

22  it's okay with you.

23  A    Okay.

24  Q    Thank you.

25       And when you receive a list of Malibu Media's

App. 090

1  copyrighted material, do you monitor BitTorrent sites to

2  see where they are available?

3  A    Yes.

4  Q    And then tell me the next step after that

5  identification process.

6  A    After that we download the related content of the

7  torrent files, and there are always two independent

8  persons who view or listen to the content of the torrent

9  file and compare it to the original work we get provided

10  from the client.

11        So there are two independent persons working

12  separately.  And they verify initially that's the same

13  content our client has provided to us.

14  Q    Sir, if I may ask you to just break that down a

15  little bit.

16        So is it accurate that you first identify by,

17  let's say Malibu Media's individual movie title, the

18  actual BitTorrent information.

19        Is that correct?

20  A    Yes, that's correct.

21  Q    And then you download it, download that BitTorrent

22  information.

23        Is that correct?

24  A    Yes.

25  Q    And do you somehow save or preserve that information?

Patzer - Direct/James

1   A    Yes.  We always store it on YORM files.

2   Q    And if you don't mind, can I please ask you to

3   explain to us what a YORM file is?

4   A    It's, it means a YORM reads many, and it means the

5   data cannot be modified after it has written to that

6   volume.  So it's basically like a DVD.  You can just write

7   it once.  But we can do it as much as we want.  And the

8   reason for doing that is to prove that the data has not

9   been modified as it has been written.

10  Q    So is it accurate that once the data is collected

11  into the YORM file --

12  A    It's a tape.  It's like a video.

13  Q    So, I'm sorry, a YORK drive.

14       Is that correct?

15  A    Yes.

16  Q    Is it true that that information is preserved and

17  it's not offered or modified in any way?

18  A    That's correct.

19  Q    And is there any kind of verification with that drive

20  when that information is collected and preserved?  Is

21  there any date or time?

22  A    Sorry.  Can you just repeat the question?

23  Q    Yes, I apologize.

24       After that information is preserved, is there a

25  way to look at that information and determine when it was

Case 1:18-cv-09936 Document 140 Filed 10/30/19 Page 1 of 145 PageID 307

1  preserved?

2  A    Yes.  You can always read from the tape drive.  And

3  there is also government issued time stamp by software.

4  It's not like a real stamp.  And it proves that the data

5  has actually been written at that time when it was

6  written.

7  Q    And when you say the government date stamp, can you

8  elaborate?  Could you explain how that is?

9  A    It's issued by the German government D-TRUST.  It's

10  like D and then trust.  And you can always get in contact

11  with them and show them the time stamp file, and they will

12  say, yes, it has been written at the time indicated.

13  Q    So is it accurate that you, neither you or anybody

14  working with your company is the one that actually stamped

15  that?

16           Is that correct?

17  A    It's the software that stamps it.

18  Q    And that's regulated and operated by the German

19  government, not your individual corporation, correct?

20  A    Yes, that's correct.

21  Q    And you use that in order to verify for third parties

22  that it was actually collected on a date and time.

23           Is that correct?

24  A    Yes, that's correct.

25  Q    Sir, after that file is preserved and collected, you

13

1    mentioned a secondary verification process.

2          Is that correct?

3    A    Yes, that's correct.

4    Q    Can you describe how many individuals are involved in

5    that verification process?

6    A    Two individuals.

7    Q    And can you physically describe where they are

8    located?

9    A    They are sitting in different offices so they don't

10   talk to each other about verification.

11   Q    Do they do that on purpose?

12   A    Yes.

13   Q    What is the purpose of that segregation or

14   segregation of the verification?

15   A    That they look at the content and don't talk to each

16   other about how they verified the contact.

17   Q    And if you don't mind, can you physically describe

18   how they go about the verification process?

19   A    They play the, if it's a video file they play the

20   video file next to the original content provided by the

21   client.

22   Q    So in this particular case, would the verifier have a

23   copy of the Malibu Media copyright protected movie?

24   A    Yes.

25   Q    And would they have some sort of ability to view it

Case Case a:18-cv-09376-DAE-Co-1-b1 Filed: 10/b8/18 P31/2D4 Fct4 5872ge392 #86
App. 309

1    on a screen?

2    A    Yes.

3    Q    And would they be able to compare it?

4    A    Yes.

5    Q    And they would be comparing it to the information

6    that was downloaded from the BitTorrent site, correct?

7    A    Yes, that's correct.

8    Q    And the objection, or their job assignment is to

9    visually and also I guess orally verify that the

10   information is the same.

11        Is that correct?

12   A    That's correct.

13   Q    And then at a different place and location there is a

14   second individual who goes into that verification process?

15   A    That's correct.

16   Q    And when they complete their work is there any way

17   to, I mean how do they communicate that it has been

18   verified?

19   A    They click on a button and then sign an affidavit

20   that they have been verified the contents of it.  Also

21   have to sign a document, a verification of a successful

22   verification.

23        THE COURT:  Mr. Patzer, excuse me.

24        When you compare the files is it, I assume that

25   it's a complete video.  Is the BitTorrent file also a

Case 2:18-cr-00025-DAE Document 142 Filed 10/09/19 Page 15 of 45 PageID 310

15

1    complete video, or is it a segment of a video?

2          THE WITNESS:  In this case it's a, we talk about

3    a complete video.  And the information has not downloaded

4    from some specific client.  The information has just

5    downloaded from pictorial network.

6          THE COURT:  Right.  From a BitTorrent in a

7    complete video?

8          THE WITNESS:  Yes.

9          THE COURT:  So if the video is an hour

10   and-a-half they are verifying, a person will sit for an

11   hour and-a-half with the two videos?

12         THE WITNESS:  They just jump through because

13   they don't watch it the whole time.

14         THE COURT:  So randomly they just fast forward

15   through it?

16         THE WITNESS:  Yes.  I never done it in person.

17   So, yes.  But I expect that because it takes a lot of

18   time?

19         THE COURT:  Okay.

20   BY MS. JAMES:

21   Q    But when they do that, are they comparing similar

22   frames, if that is the appropriate word?

23   A    Yes.

24   Q    So they might randomly go through and pick a frame

25   and verify it.

16

1          Is that correct?

2      A    They go around to each video and compare it.  So I

3      don't know how long they look at each video, because I'm

4      not involved in this process personally.  But yes, they

5      just go through those videos.

6      Q    But the intent is to go through it and take random

7      selections to make sure that the content in the entirety

8      is the same.

9              Is that correct?

10     A    That's correct.  It has always to be entirely, the

11     whole.

12     Q    So, I'm sorry.  I want to make sure I understand

13     this.  But the goal is to always have them verify the

14     entire video.

15              Is that correct?

16     A    That's correct, yes.

17     Q    And after they sign this affidavit and have completed

18     this check, is this information stored anywhere?

19     A    Yes.

20     Q    Can you explain that storage process?

21     A    Like I said, on the tape drive.  But not the

22     verification documents, you mean or what?  What do you

23     mean?

24     Q    The verification, number 1, the verification

25     affidavit, is that stored somewhere?

Case 1:19-cv-03309-DAF Document 14-4 Filed 10/06/19 Page 1 of 45 PageID 312

17

```
 1   A    Yes, I think in the office.  I'm sorry, I'm not
 2   involved if that so I don't know where it's stored, the
 3   documents.
 4   Q    If in an individual case there became a dispute,
 5   let's say a trial about whether or not there was, a
 6   verification was accurate, could that affidavit and
 7   supporting information be supplied?
 8   A    Yes.
 9   Q    Yes?
10   A    Yes.
11   Q    So it's stored for later use if necessary, correct?
12   A    Yes, correct.
13   Q    Would you describe the process that you just
14   described as indirect monitoring or direct monitoring?
15   A    The monitoring starts after that process.  The
16   process we talked about is just the verification.  We also
17   start the downloading of that particular target.
18   Q    So that means that after you have identified the
19   copyrighted material, that is the verification process?
20   A    Yes.  That's the verification before we start the
21   logging of that particular file.
22   Q    Can I ask you, can I ask you if you if he ever
23   uploaded any of the data?
24   A    No.  That's not possible because we developed our own
25   software ourselves, and our software is not able to do
```

App. 098

Case 1:13-cv-09239-PDA-EorDT 0-1341 F58114 TU0d8721/2023th14 F51 01 o45 P341 86
Case 1:13 12580-03-02 03 Document 144-1 Filed-11/08/03 Page 1 of-245 Page 1 D 27: 313

18

1  that.  There is no function in it.  And it is completely

2  written by ourselves.

3  Q    And so what was the purpose of making sure that you

4  couldn't upload the data?

5  A    Because uploaded would be illegal, sharing data

6  copyrighted materials.

7  Q    So if you uploaded it, it would be, is it correct

8  that it would be available to other BitTorrent users?

9  A    Yes.

10  Q    And the purpose of prohibiting the uploading

11  mechanism in the software was to make sure that you were

12  not ever sharing copyrighted material?

13  A    That's correct, yes.

14  Q    Is it true that the software is constantly joining

15  numerous swarms?

16  A    Yes.

17  Q    Can you describe what a swarm is?

18  A    Can I have the question?

19  Q    Can you tell us what a swarm is?

20  A    Yes.  A swarm is a group of BitTorrent clients or

21  BitTorrent notes sharing the same content or same torrent

22  files.

23  Q    And when you say BitTorrent clients, would that be

24  the same as peer-to-peer sharing?

25  A    Yes.  That is what is described.  The word is used

Case 1:19-cv-00089-DAD Document 142 Filed 11/06/18 Page 1 of 145 PageID 314

1    for BitTorrent peer-to-peer, because one peer connects to

2    another peer.

3    Q    And once they connect do they share the information

4    and copyrighted material?

5    A    Yes.

6    Q    And how does that occur?

7    A    When they connect they do a handshake to see if they

8    both talk about the same torrent, they both have the same

9    data and to exchange.  So there is a hash value.  It's

10   like a secret they both need to know to do this handshake.

11   And after that handshake they exchange various data about,

12   which is the content of the torrent file.

13   Q    I'm just going to ask you to break down some of those

14   terms of art.

15         When you refer to the handshake, that is the two

16   peers connecting electronically.

17         Is that correct?

18   A    That's correct.

19   Q    And when you refer to torrent, does that mean the

20   actual sought after information?

21   A    The what?  I'm sorry, again?

22   Q    The sought after information, sought after data or

23   sought after movie?  The movie they're trying to retrieve?

24   A    Yes.

25   Q    Would you refer to that as the torrent information?

20

1    A    I only prefer the torrent content.

2    Q    The torrent content.

3         So in our case that would be one individual

4    handshaking with another individual to see if they also

5    had Malibu Media torrent content.

6         Is that correct?

7    A    That's correct.

8    Q    And then you said in order for them to communicate

9    they have to share a hash.  Hash?

10   A    A hash means, it's a lot of digits, various digits.

11   And it's actually the fingerprint of the content of the

12   torrent file.  It's like an imprint.

13   Q    So like what they do is, they select the torrent

14   content they want.  And then they have to verify amongst

15   each other that they both contain the information by

16   verifying that they each have the correct hash?

17   A    That's correct.

18   Q    Is it hash code, is that correct?  Should I use the

19   word, code?

20   A    Yes.

21   Q    And so this exchange of hash codes, they open up the

22   content to each other.

23        Is that correct?

24   A    Yes.  After the handshake they confirmed that both

25   sides are talking about the same data.

**21**

1  Q    And that is important because the intent is to get

2  more of the torrent content that has been identified?

3  A    Yes.

4  Q    And they want to make sure that they're getting the

5  correct Malibu Media movie for example?

6  A    Yes.

7  Q    And then after that happens, how do they exchange

8  their information?

9  A    One side requests data from the other side and also

10 vice versa.

11 Q    And is it a give-and-take relationship?

12 A    Yes, many that don't have to because there are many

13 peers out there.  So that is not only one talking to one.

14 It's one talking to many, and many talking to many others.

15 So everybody is giving a little bit and getting a little

16 bit.  And again has to hold torrent content.

17 Q    And after this exchange, the torrent content between

18 the peers, the main peers, how does the actual movie

19 download in a way that you can read it in the proper form,

20 the proper sequence?

21 A    The software places all the data in a proper

22 sequence.  The BitTorrent software does that.

23 Q    So the software actually puts together the puzzle?

24 A    That's correct.

25 Q    So ultimately, an accurately and successful download

Patzer - Direct/James

22

1   of a full movie is accurate so that a peer would be able

2   to watch the movie in its total?

3   A    Yes.

4   Q    And that is the intent?

5   A    Yes.

6   Q    And is it accurate that sharing information between

7   peers in a swarm -- let me ask you a question.

8          A swarm is many peers sharing information.  Is

9   that correct?

10  A    Yes.

11  Q    And is it accurate that the more people that are

12  sharing an individual, for example Malibu Media title,

13  would that increase the speed of the downloading ability?

14  A    Yes.

15  Q    And is it generally true that more people join swarms

16  for more popular torrent content?

17  A    Yes.

18  Q    So for example, next week when Game of Thrones comes

19  out there will be big swarms trying to exchange that

20  information?

21  A    Yes.

22  Q    And once your software detects Malibu Media torrent

23  content being downloaded, how do you log that transaction?

24  A    Can you just rephrase the question, what exactly you

25  mean?

Case 1:13-cv-02088-DJC Document 142 Filed 10/06/15 Page 2 of 346 PageID 318

23

1    Q    Yes.

2         Once you identify peers sharing Malibu Media

3    torrent content, and do you request that they also share

4    with you?

5    A    Yes.  We establish a connection to them.  We do the

6    mentioned handshake.

7    Q    And then?

8    A    And after that handshake we request data from them.

9    And it's actually 16 kilobytes of data we download.  And

10   we verify the content of this 16 kilobytes to verify what

11   we talked about before.

12   Q    And you said once you establish a handshake, correct?

13   A    Yes.

14   Q    Then do you also exchange the hash code verification?

15   A    Yes.  We have to do this to successfully do the

16   handshake.  It's part of the handshake.

17   Q    It's part of the handshake?

18   A    Yes.

19   Q    Is it true that all BitTorrent content has a unique

20   and individual hash code?

21   A    That's correct.

22   Q    And is it also true that for a particular torrent

23   content or movie you will never, for different torrent

24   content or movie, you will never hear the same hash tag?

25   A    That's correct.

Case 1:13-cv-06009-DLC Document 112 Filed 11/06/15 Page 2 of 145 Page ID 319

24

1   Q    So they're individual identifications for the actual

2   content?

3   A    That's correct.  It's like an individual fingerprint

4   per person.

5   Q    And can that be changed or in any way be modified?

6   A    No, if you modify the data the fingerprint changes.

7   Q    So if you modify the, in this case the Malibu Media

8   movie, it would generate a new hash code.

9        Is that correct?

10  A    That's correct.

11  Q    And how is that determined?

12  A    A hash code, it's generated by the software.  It's

13  algorithm, it's a mathematical algorithm which is

14  generated based on the content of the torrent file.

15  Q    And it's not anything that you generate?

16  A    No.

17  Q    And it's not anything that an individual peer or

18  multiple peers can generate.

19        Is that correct?

20  A    It's generated to create a torrent file from a video.

21  Q    But I guess what I'm trying to ask is, once it is

22  created, this hash code, how can we be confident that

23  we're trading the same information once the hash codes are

24  verified?

25  A    It's the reason of the hash code.  If you modify

Case 1:13-cv-06682-PKC-DLI Document 142 Filed 11/06/18 Page 25 of 45 PageID #: 320

25

1   data, that is a different hash code.

2   Q    So any time you change any of the data you will

3   generate a new hash code?

4   A    Yes.

5   Q    Can you please describe to me how much information is

6   in 16 kilobytes?

7   A    If you compare it with zeros, it's about 131,000 ones

8   and zeros in a fixed order.  So it can be somewhere just

9   by luck.  It's like that, 131,000 zeros and ones in a

10  fixed order.

11  Q    And that is the amount of information that you

12  download before you start your verification process for

13  each one of the Malibu Media files?

14  A    That's correct.  That is the part of data we use for

15  verifying that it belongs to the torrent file verified

16  before.

17  Q    And for an individual Malibu Media title, do you do

18  that, do you that 16 kilobytes download once or multiple

19  times?

20  A    We do this every time we establish a connection to

21  the peer or to the infringer.  And it's always randomly,

22  so it's not just always the same, but different parts in

23  random we pick from.

24  Q    And when you say different parts, you mean different

25  parts of content?

26

1   A    That's correct.

2   Q    And do you do it multiple times for a title?

3   A    That's correct, yes.

4   Q    And do you keep a record of how many times you're

5   able to download portions, 16 kilobyte portions of an

6   individual Malibu Media title?

7   A    Yes.

8        We have to record it for that, and we also have

9   always the 16 kilobytes start on the previous mentioned

10  YORM tape drives.

11  Q    So you can access that for an individual, yes?

12  A    Yes.

13  Q    And I won't do it now, but in this particular lawsuit

14  for each one of the infringements alleged you would have

15  that data to back up that?

16  A    Yes.

17  Q    That download of individual titles involved in this

18  case, correct?

19  A    Yes.

20  Q    Have you ever testified before in court proceedings

21  in the United States?

22  A    Yes.

23  Q    And where was that?

24  A    It was in Philadelphia.

25  Q    And do you remember the date?

Patzer - Direct/James

27

1    A    Pardon?  I'm sorry.

2    Q    The date or generally?

3    A    The date?

4    Q    Yes, when that occurred?

5    A    I think about three years or four years ago.  I don't

6    remember the exact date.

7    Q    And what was the subject matter of your testimony?

8    A    Similar to here, to describe how our software works.

9    Q    And your software works for Malibu Media, correct?

10   A    Yes.

11   Q    Can I ask you to explain what a PTAP file is?

12   A    A PTAP file is actually a recording of the network

13   transaction.  It's some kind of standard.

14   Q    Can I ask you, in the beginning of your answer I

15   didn't hear you.  You said it's a recording of the?

16   A    Network transaction.  So it's a communication between

17   both peers.  It's comparable with a video recording of

18   both peers meeting, shaking hands, exchanging the data.

19   Q    So when you actually go through that process on

20   behalf of Malibu Media with other peers to download part

21   of the Malibu Media torrent content, does that make a

22   PTAP?

23   A    Yes.  One PTAP contains many transactions.  A PTAP is

24   just a format of how we store.  And like I said PTAP is

25   standard in the network business.

Patzer - Direct/James

1   Q    And is it the purpose of PTAP to verify that this

2   exchange has happened?

3   A    Yes.

4   Q    And does it literally videotape the exchange?

5   A    Videotape is just like a sample.  It's just a data

6   recording.  You can't watch it like videotape.  We need a

7   special program for it but any expert can open it in a

8   PTAP file and see the communication.

9   Q    And once there is the creation of the PTAP file, do

10  you design that software, the PTAP?

11  A    No.  It's a standard software used in the IT

12  business.

13  Q    So you purchase it, the standard software, and you

14  use it, correct?

15  A    It's for the industry.

16  Q    And if you gave it to an independent IT expert he

17  would be able to open this PTAP file and understand the

18  data in there.

19          Is that correct?

20  A    Yes, that's correct.

21  Q    And you maintain the files for your work on behalf of

22  Malibu Media to verify the monitoring process, correct?

23  A    That's correct, yes.

24  Q    And you recall the use of individual cases.  You

25  could produce these PTAPS to an IT expert or opposing

Case 1:12-cv-02083-TCB Document 144-2 Filed 11/07/08 Page 2 of 145 PageID 324

29

1  counsel if it was requested?

2  A    Yes.

3  Q    Sir, do you know what the term UTC time relates to?

4  A    Yes.  It stands for Universal Time -- what is the C

5  for?  It's just an international time standard.  I'm

6  sorry, I forgot about the last letter.

7  Q    Okay.  And I think I have it somewhere.

8        But do you find that it is internationally used

9  to have a consistent time stamp?

10  A    That's correct.  It's the zero time zone.  All of the

11  time zones are based on the UTC time.

12  Q    And when you generate your report to Malibu Media, do

13  you stamp the time and the date when the information,

14  their content was downloaded?

15  A    Yes.  We always use the UTC time mentioned.

16  Q    And is it accurate, in other words is there any way

17  of verifying the downloading of the information and the

18  time stamping?

19  A    Yes.  We verify the time.  We use information, log in

20  information by running two independent hardware time

21  servers.  And they are using the GPS time.  They have

22  antenna on the roof and they connect to GPS satellites to

23  verify the time is accurate.  And if the time is off for a

24  hundred of a second, we just disregard the log and don't

25  use the log information.

Patzer - Direct/James

30

1   Q    And you don't provide it to Malibu Media?

2   A    No.

3   Q    And you would not provide it to the customer?

4   A    No, just drop off or discard it

5   Q    Disregard it.

6        Sir, in preparation for today's hearing, did you

7   have a chance to read a University of Washington report by

8   a number of different authors?

9   A    Yes.

10       MS. JAMES:  And your Honor, this is the report

11  that was brought up in Mr. Park's motion and also

12  discussed at the last hearing.  And I would like to hand

13  up a copy or it and ask him a couple of questions.

14       THE COURT:  Sure.  Show it to Mr. Park first.

15       MS. JAMES:  Sure.  I have extra copies if the

16  Court would like one.

17       THE COURT:  I would like one, and give Mr. Park

18  one of whatever it is.

19       What is the number?

20       MS. JAMES:  Plaintiff's Exhibit Number 1.

21       THE COURT:  Okay.

22  BY MS. JAMES:

23  Q    Do you have in front of you what has been marked as

24  Plaintiff's Exhibit Number 1?

25  A    Yes.

Case 1:19-03088 Doc Nos. 104 ... Filed 10/08/18 Page 1 of 145 PageID #: 326

1  Q    And can you please read the title of this article?

2  A    It's called Challenges and Directions for Monitoring

3  peer-to-peer File Sharing Networks.  Or, Why My Printer

4  Received a DMCA Takedown Notice.

5  Q    And sir, from reading the article, is it accurate

6  that the article is reporting all the experiments that

7  were done in May of 2008?

8  A    Yes.

9  Q    But the article itself is not dated.

10        Is that correct?

11 A    Sorry?

12 Q    The article itself is not individually dated,

13 correct?

14 A    No.

15 Q    And can you explain for us the concept of indirect

16 detection?

17 A    Yes.

18        Indirect detection means you can compare it to

19 the yellow pages.  You just go out there, get the yellow

20 pages, and have all of the phone numbers.

21        Indirect detection is similar they use for

22 torrent.  They get the yellow pages for a specific torrent

23 and get all the IP addresses for that specific torrent.

24 Q    Okay.  So let me ask you this question.

25        Is this article discussing the use of indirect

Patzer - Direct/James

1    monitoring systems?

2    A    Yes.

3    Q    And is it your understanding that the University of

4    Washington used an indirect monitoring system?

5    A    Yes.

6    Q    And as a result did they receive the, did they

7    receive DMCA notices?

8    A    They said that, yes.

9    Q    And can you tell us what the acronym DMCA is?

10   A    I don't know what the D stands for.

11        THE COURT:  Do you know what it means though?

12   What does it refer to?

13        THE WITNESS:  It's a copyright infringement

14   takedown code.  So you get a note that you have infringed

15   copyrighted material and you need to stop doing it.

16        THE COURT:  Okay.  Indirect monitoring is akin

17   to a yellow pages search.  Would you explain that a little

18   more?  I didn't understand what you said.

19        THE WITNESS:  Indirect means they go out

20   trackers --

21        THE COURT:  -- the data that goes out.

22        THE WITNESS:  It investigates on that case, goes

23   out to a so-called trackers.  And they are surfing the

24   Internet.  And they ask them to give a list of IP address.

25   So possible persons who infringed the copyrighted material

33

1   for specific torrent.

2          THE COURT:  Okay.  So the investigator, you're

3   saying has a torrent file that they're interested in

4   protecting?

5          THE WITNESS:  Yes.

6          THE COURT:  And they also have a yellow pages of

7   some kind.

8          What is the yellow pages?  What, in your own

9   words?  You said a server.  You get a list of who used the

10   server.  Where that server or the BitTorrent file was

11   located, or --

12          THE WITNESS:  No.  Inside the BitTorrent file

13   there is an address.  They go there.  There are multiple

14   addresses where you can go and ask them for a list of IP

15   addresses you can establish the connection to.

16          THE COURT:  So a BitTorrent file you said, let's

17   just say is one IP address for ease of understanding.

18          THE WITNESS:  Yes.

19          THE COURT:  Would that IP address the

20   investigator goes to what?

21          THE WITNESS:  The investigator decides this IP

22   address is sharing the content.  He never talks to the IP

23   address.

24          THE COURT:  And the investigator knows that

25   because of the BitTorrent file itself.  Is that right?

Patzer - Direct/James

34

1    THE WITNESS:  The torrent file refers to some

2    kind of index where he can get a list of IP addresses.

3        THE COURT:  Okay, so the BitTorrent file is not

4    a specific IP address?

5        THE WITNESS:  It refers to a server on the

6    Internet.

7        THE COURT:  A server, it refers to a server?

8        THE WITNESS:  Server, or a list of servers.  And

9    they ask any of that servers if it's still available and

10   can contact them and they will provide you a list of the

11   IP addresses sharing the content --

12       THE COURT:  Through that server.

13       THE WITNESS:  Through that server, yes.

14       THE COURT:  So the BitTorrent file is by a

15   server or multiple servers that has been located, and each

16   of those servers will have IP addresses contained in that.

17   And then the investigator can go from that list to the

18   server.

19       Is that right?

20       THE WITNESS:  Yes, that is.

21       THE COURT:  And that is what is called indirect

22   investigation?

23       THE WITNESS:  Yes.

24       THE COURT:  Okay.

25

Patzer - Direct/James

35

1   BY MS. JAMES:

2   Q    And it's accurate from this article that we're

3   discussing here, University of Washington, that those,

4   that in this particular experiment that list of IP

5   addresses, that list in and of itself would result in a

6   DMCA takedown notification?

7   A    Yes.  In this scenario it resulted in a DMCA

8   takedown.

9   Q    And I believe if I'm answering your Honor's question,

10  you said there was no exchange in the monitoring, the

11  indirect monitoring discussed in this article, other than

12  asking the server to provide the IP addresses.  Is there

13  any other exchange or verification process?

14  A    No.

15  Q    So somebody in the indirect monitoring system, those

16  would takedown, once the servers provided them with the IP

17  address?

18  A    They just get a list of possible sharing clients.

19  But it's not verified that any of the clients are sharing

20  the content.  The tracker software is supposed to generate

21  random numbers just for the reason that you can't use the

22  list of IP addresses in court, because they use random

23  generated list to fake some result, and make a list of IP

24  addresses not reliable.

25  Q    So in your opinion indirect monitoring physically

Patzer - Direct/James

36

1   that is being, as being used in the experiment discussed

2   in this article would not be reliable?

3   A    No.

4   Q    And that is because of the fact that the IP addresses

5   are not verified?

6   A    That's correct.

7   Q    And when you say not verified, you mean there is no

8   verification that those IP addresses engaged in

9   downloading of the copyrighted material in question.

10          Is that correct?

11  A    That's correct.

12  Q    And is there existing in software monitoring a system

13  that you use?

14  A    No.  This is basically where our software starts.

15  Q    What do you mean by that?

16  A    When we have collected IP addresses we will connect

17  to every single IP address in the list.  And we don't even

18  use this old tracker technology.

19  Q    Did you say old tracker technology?

20  A    Old tracker technology.

21  Q    And if you don't mind, can you tell us what the old

22  tracking technology is?  Are you referring to technology

23  they're discussing in this article?

24  A    Yes.

25          It's described technology where fixed mentioned

Patzer - Direct/James

37

```
 1   server in the torrent files, and they have to connect to

 2   single servers out there and get the list -- of IP

 3   addresses.  That is what I would refer to as tracker

 4   technology.

 5   Q    And you're saying this is old.  And when you say old,

 6   do you mean obsolete?

 7   A    It's still used, but we don't rely on that

 8   technology.  We don't use that.

 9   Q    And why don't you rely on that technology?

10   A    Because it's containing a lot of false positive IP

11   addresses.  And it's also quite slow because it's single

12   servers on the Internet, and they often just get taken

13   down by copyright holders to prevent copyright infringing.

14   Q    So it's not accurate, and it's not an, it's also not

15   economical.  In other words it doesn't work efficiently?

16   A    Yes.  It has to be replaced with newer technologies.

17   This article is eight years old.

18   Q    And I'm going ask you to describe the difference

19   between your detection in a minute.

20          But in the article, when they talk about false

21   positives with indirect detection, can you describe what

22   they're referring to?

23   A    They're referring to IP addresses appearing on the

24   lists which are not sharing content.

25   Q    So although they somehow got on the list, they have
```

Patzer - Direct/James

38

1    not engaged in peer-to-peer BitTorrent sharing?

2    A    That's correct.

3    Q    And there is a discussion in the article about

4    reporting mis-reporting by trackers on behalf of malicious

5    users to frame an innocent IP address, correct?

6    A    That's correct.

7    Q    And you're free to look at it.  I'm not expecting you

8    to memorize it, and free to reference at least my note ON

9    4.2 of the article.  There's not a page number there?

10            Can you explain to me how a tracker using this

11   indirect monitoring system might be able to maliciously

12   frame an arbitrary IP address.

13   A    Yes.

14            It's possible to register an IP addresses there

15   and pretend that this IP address is sharing content.  To

16   compare it with yellow pages, I can call yellow pages and

17   tell them that some specific numbers, for example --

18   services.

19   Q    And just to be clear, sir, when you're referring to

20   the yellow pages you're using that as an analogy.

21            Is that correct?

22   A    Yes, that's correct.

23   Q    You are not actually looking at a yellow book in this

24   particular instance?

25   A    No.

Patzer - Direct/James

39

1  Q    So explain to me why the technology that you used

2  could never result in such a falsified registration of

3  another person's IP address?

4  A    Because we do a real connection.  We do a handshake,

5  and we actually exchange data.  We download data from

6  them.  And so we can be sure that person or that IP

7  address has really shared that content we were looking

8  for.

9  Q    And do you consider that method a direct monitoring

10 method?

11 A    That's correct.

12 Q    And sir, in the same subparagraph, 1.2, before it

13 talked about mistimed reports.

14       And can you explain to me why your software and

15 the storing of the information does not compose mistimed

16 reports?

17 A    I mentioned before if you use the GPS time and verify

18 that the time is one hundred percent accurate with the GPS

19 time, and if the GPS time would be not accurate there

20 would be no indication.

21 Q    So in a hypothetical, on that last page, the next

22 page about one individual going into the university coffee

23 shop and starting a BitTorn download, leaving and a

24 subsequent customer coming in, and having the date stamp

25 being erroneous because of a delay in the second IP

1    address.

2          Could that hypothetical happen with the

3    technology that you use?

4    A    No.  Because it's accurate to a hundredth of a

5    second.  So in this particular scenario you're talking

6    about 30 minutes.

7    Q    So it would not be?

8    A    It would not, cannot be happening with our software,

9    our technology.

10   Q    And this concept discussed in the article, and is

11   that also the result of known connections between

12   monitoring servers and the alleged infringement?

13   A    Yes.

14          That just talks about the use of IP addresses.

15   The list of IP addresses they get can be fake or spoof.

16   And since we don't rely on the list of IP address, we do a

17   connection, it's not possible to do a man-in-the-middle

18   there.

19   Q    And when you use the word fake and spoofed in this

20   content, could you elaborate what those terms mean?

21   A    It means just a fake IP address, somebody sends an IP

22   address which are not actually shared content.

23   Q    And they would send it into the servers?

24   A    Yes.

25   Q    And are there mandates that peer-to-peer infringers

Patzer - Direct/James

41

1    and steps they take to try to avoid detection of the

2    infringement, of their infringement?

3    A    Regarding this article they talk about blacklists.

4    So there are lists of potential copyright infringing

5    detection companies like Excipio.  And they try to put

6    them on blacklists so that there is no direct connection

7    possible.  So that we cannot do the direct connection and

8    get the data we need to prove it.

9    Q    So in those cases the infringers, peer-to-peer

10   infringers are aware of the monitoring?

11   A    That's correct, yes.

12   Q    From your company?

13   A    Yes.

14   Q    And they try to evade detection.

15        Is that correct?

16   A    Yes, correct.

17   Q    And sir, under the section 6 of the article, Lessons

18   and Challenges, they talk about a more accurate approach,

19   correct?

20   A    Correct.

21   Q    And they talk about it as an industry standard

22   practice for monitoring suspected infringement by

23   downloading data directly from the suspected user and

24   verifying its content.

25        This is under paragraph 6.1, enforcement

Case 1:18-cv-02099-DkC Document 142 Filed 11/06/18 Page 2 of 146 PageID# 337

42

1  agencies?

2  A    Yes.

3  Q    Can you explain to me how you understand their

4  recommended procedure?

5  A    That is actually what we are doing.  We establish a

6  connection to the infringer and download some of the data

7  and verify that the data is actually the content of our

8  client.

9  Q    So is it your understanding, or is it accurate that

10 this article eight years ago was recommending direct

11 monitoring and verification, correct?

12 A    Correct.

13 Q    And it's true that you have actually adopted this

14 exact procedure --

15 A    That's correct.

16 Q    Just let me finish, I'm sorry -- for direct

17 monitoring and directly verifying?

18 A    Yes.

19 Q    So is it fair to say or accurate to say that the ills

20 that were discussed, and the problems of false positives

21 that were discussed in the article, are related to the

22 indirect monitoring?

23 A    That's correct.

24 Q    And these issues are not something that present

25 themselves in the method that you use to directly monitor

43

1    and verify?

2    A    Correct.

3    Q    Can you talk about, as the article does, again under

4    the 6.1 subtitle, the cost of direct identification.  And

5    they also talk about the increased costs associated with

6    adopting a direct monitoring system.

7              Can you elaborate on some of those thoughts?

8    A    That's correct.

9              It's very high costs compared to the indirect

10   monitoring.  We run about 150 servers just to do the

11   log-in process for our client.

12   Q    And so you don't actually have that many servers.

13             Is that correct?

14   A    More than that.  But just for that proposed we run

15   about 150.

16   Q    And then there is the individual PTAPS that are

17   captured, correct?

18   A    That's correct.

19   Q    And then there is the two individual employees that

20   are assigned to the task of individually verifying each,

21   all of the titles and the cross-reference to the content,

22   correct?

23   A    Correct.

24   Q    And then there is also the collection and

25   preservation of all of the 16 kilobyte downloads, correct?

Patzer - Direct/James

44

1    A    Correct.

2    Q    And these numbers are preserved for each time they're

3    downloaded?

4    A    Yes.

5    Q    And it is indicated, the article is saying that while

6    monitors might not want to spend these extra expenses to

7    do it properly, that that is the safest way to move

8    forward?

9    A    Yes.

10   Q    Then is it true that -- then to cut off those safety

11   protocols?

12   A    Yes.

13   Q    And also to eliminate the false positives, the

14   spoofs, and you know, fake identities that were discussed

15   in the article relating to indirect monitoring?

16   A    That's correct.  We never have or had a false

17   positive.

18   Q    Can you elaborate on that?

19   A    We have been in many cases worldwide and with

20   customers worldwide, and there was never been proof of

21   false positives.

22        Also by individual software programs verifying

23   the actions each other software programs does.  And thus

24   all of the PTAP recordings would depend on any from our

25   software programs, and always proof of our software is

1    safe.  And there was never an IP address in our list that

2    had not shared the content.

3    Q    So you're saying at no time worldwide has it ever

4    been proven that any of the IP addresses that you have

5    indicated shared the content that the client asked you to

6    verify as being inaccurate?

7    A    Yes.

8    Q    Zero times?

9    A    Correct.

10   Q    And out of roughly how many?

11   A    Hundreds.

12   Q    Hundreds, must be more than hundreds?

13   A    Cases at court.

14   Q    Cases, okay hundreds of case at court?

15   A    Yes.

16   Q    And what is your estimate of how many IP addresses

17   have been collected and verified as downloading protected

18   material?

19   A    Random numbers.  I know we store about 200 million IP

20   addresses a day.  So I don't know how many verified for

21   multimedia content.

22   Q    But it is true that not in Malibu Media's case or in

23   other cases has it ever been proven or shown that your IP

24   addresses are incorrect?

25   A    Correct.

Case 1:12-cv-02088-JKB Document 144 Filed 10/08/14 Page 46 of 96 Page 341

46

1  Q     And when you say correct, you mean did not download

2  the relevant content being discussed in those proceedings?

3  A     Yes.

4  Q     Is that correct?

5  A     That's correct, yes.

6  Q     Can I ask you, why is it -- is it true that your

7  direct monitoring system would not misidentify somebody

8  using a hot spot or communal WiFi space?

9  A     Sorry, the question?

10 Q     Yes.  Assume that somebody is in a WiFi hot spot.

11 A     Yes.

12 Q     And using a publicly available access to the

13 Internet.

14 A     Yes.

15 Q     How do we know that in the IP address that is

16 captured for your work on behalf of Malibu Media, that

17 those individual downloads are not happening in those

18 common spaces?

19 A     It can happen in such spaces.  But if you have a lot

20 of information, for example if we have a lot of loss of a

21 long time of peer talking about three or four months, it's

22 very unlikely that it's a person going to the same WiFi

23 spot and doing it there.

24 Q     So what you're saying is, in an individual case, and

25 maybe I'll give you the case in a minute -- but that there

Case 1:13-cv-03005-DJE-AFS Document 145 Filed 10/08/15 Page 4 of 145 PageID 342

47

```
1   is, it is not just one individual downloading that is
2   captured.  It's over a certain duration of time and
3   multiple times.
4              Is that correct?
5   A   That's correct.
6   Q   And is there any other indication that the same IP
7   address or the same user, in other words that there is a
8   port or any other identifying factors that you could use?
9   A   Yes.  Various details like TCP ports and software
10  using or the software version of the software, or the
11  computer is using.
12  Q   So when you talk about software users, do you mean
13  BitTorn software that they're using?
14  A   Yes, there are various BitTorrent software out there.
15  Q   So when you're tracking, downloading, you're able to
16  monitor and preserve a record of what BitTorrent software
17  is being used to do that download.
18             Is that correct?
19  A   That's correct.
20  Q   And can I ask you, do you understand that BitTorrent
21  software must be downloaded to an individual computer?
22  A   Yes.
23  Q   And it must be used in other words you have use the
24  BitTorrent software to get the contents, correct?
25  A   Yes.  You need to go to a web page, find a specific
```

48

1    content you want to, click on it and start it in the

2    BitTorrent software to initiate the downloads and uploads

3    process.

4    Q    And once you initiate that process, the download and

5    upload process, and I don't know if this is the proper

6    words -- is it fair to say that you opened your computer

7    to the monitoring?

8    A    Yes, you joined the swarm.

9    Q    Is that correct?  I don't want to -- did you say,

10   yes, you joined the swarm?

11   A    Yes.

12   Q    And sir, when you join the swarm, is it accurate to

13   say that at that point you are, it is true that monitors

14   can see what information you're sharing?

15   A    Yes.

16        MS. JAMES:  And your Honor, may I show him a

17   second exhibit?

18        THE COURT:  Sure.

19        MS. JAMES:  And I'll show everybody else the

20   transcript.

21        THE COURT:  Do you want first the exhibit in

22   evidence?

23        Mr. Park, any objection to placing in Exhibit 1?

24        MR. PARK:  No.

25        THE COURT:  All right, Exhibit 1 is in evidence.

Case 1:13-cv-0000 Document Filed 11/08/13 Page of Page 344

49

1          (Plaintiff Exhibit 1 in evidence.)

2          MS. JAMES:  All right, this is Plaintiff's

3  Exhibit Number 2.  Your Honor, I have handed the witness

4  Plaintiff's Exhibit Number 2, which is a printout of

5  Verizon's user guide and copyright alert program and

6  copyright statement.

7          THE COURT:  Any objection, Mr. Park?

8          MR. PARK:  No, your Honor.

9          THE COURT:  All right, it will be in evidence.

10          (Plaintiff Exhibit 2 in evidence.)

11          THE COURT:  Go ahead.

12  BY MS. JAMES:

13  Q    Sir, you prepared for this particular case by

14  reviewing the court documents and specifically the

15  complaint in this case.  And here the ISP provider was

16  Verizon, correct?

17  A    Correct.

18  Q    And I have shown you what is publicly available and

19  was drafted by Verizon.  And does it discuss the different

20  user's notice, the prohibition against using it's servers

21  for peer-to-peer copyright infringement?

22  A    Yes.

23  Q    And what is that?

24  A    It says it's illegal to share copyright material.

25  Q    And does it also talk about the Digital Millennium

50

1   Act and DMCA notification?

2   A    Yes.

3   Q    Protocol?

4   A    Yes.

5   Q    And does it give users notice that if infringement is

6   detected they may receive DMCA notices?

7   A    Yes.

8   Q    And with an accumulation of multiple DMCA notices

9   there might be steps taken against that individual

10  subscriber?

11  A    That's correct.

12  Q    Maybe slowing down and even actually terminating

13  their server, correct?

14  A    Correct.

15  Q    And if you go to the third page, there is a subject

16  title, Civil Subpoena Policy.  And is Verizon giving

17  notice to its subscribers that it will not turn over their

18  identity unless there is a court order?

19  A    Yes.

20  Q    And does it actually instruct civil litigants that it

21  must have a court order before they will respond to a

22  subpoena, that it has to be a court-ordered subpoena?

23  A    Yes.

24  Q    And in your understanding, Verizon therefore has

25  given a subscriber public notice and prohibited them under

51

1    their use, their permissible use contract, to engage in

2    peer-to-peer infringement on their network?

3    A    That's correct.

4              MR. PARK:  Objection.

5              Your Honor, Verizon, I think the witness is not

6    specialized in Verizon.  He is not working for Verizon.

7    He has nothing to do with Verizon.

8              THE COURT:  Sustained.

9              MS. JAMES:  I'm using it as notice, your Honor.

10   Not for the truth of the matters asserted, but for notice

11   to subscribers of the procedure.

12             THE COURT:  If that is the case then I think the

13   document speaks for itself.  I don't think you need him to

14   read it to me.

15             MS. JAMES:  Okay.

16             THE COURT:  Is there a question?  Ask the

17   question again.

18   BY MS. JAMES:

19   Q    Is it your understanding from your professional

20   experience that subscribers are given notice by their

21   Internet service providers outlining what is a permissible

22   and impermissible use?

23   A    Yes.

24   Q    And is it your understanding that they're also

25   providing information and warning, and notice that

Case 1:19-cv-03809-DLF Document 44-2 Filed 10/06/03 Page 52 of 145 PageID 347

1  copyright infringement through the Internet is not

2  permissible?

3  A    Yes.

4  Q    And to your knowledge are they also giving

5  information about procedures regarding copyright

6  infringement procedures?

7  A    That's correct.

8        MS. JAMES:  Your Honor, I understand the nature

9  of his objection.  I don't know if he can speak more to

10 that.

11       THE COURT:  That question was more.  I think

12 Mr. Park's objection was to your question, was what

13 Verizon's practices were.  He is not qualified to know

14 other than your document that you're showing him.

15       MS. JAMES:  Hopefully that last line of

16 questioning is correct.  Is that?

17       THE COURT:  Well, Mr. Park didn't object, so --

18       MS. JAMES:  Okay.  And then I would ask if it's

19 appropriate, your Honor, to admit that?

20       THE COURT:  Well, it is already admitted into

21 evidence.  That is why, and he didn't object to that.

22       MS. JAMES:  Okay.  I don't have multiple copies

23 of docket entry number 1, which is the complaint in this

24 matter.  I apologize for that.

25       But may I show the witness the complaint?

Patzer - Direct/James

53

1      THE COURT:  You can show it to him.

2      Mr. Park, do you have a copy?  Just so you can

3  follow along.

4      MS. JAMES:  Your Honor, Mr. Park does have a

5  copy, but I don't have one for the Court.

6      THE COURT:  All right.

7      MS. JAMES:  I apologize.

8      Your Honor, I'm going to show the witness the

9  actual complaint with the exhibits in this case that was

10  filed in this case, docket entry number 1, filed on

11  6/16/2015, 15-CV-3504.

12      THE COURT:  Any objection, Mr. Park?

13      MR. PARK:  No, your Honor.

14      THE COURT:  All right, Plaintiff's 3 in

15  evidence.

16      MS. JAMES:  And for the record, that document

17  has been filed and is Plaintiff's Exhibit Number 5.

18      THE COURT:  That is 5?

19      MS. JAMES:  Five.

20      THE COURT:  Okay, it's 5.

21      (Plaintiff Exhibit 5 in evidence.)

22  BY MS. JAMES:

23  Q   Sir, have you had a chance to review the complaint

24  that is related to this lawsuit that we're here today for?

25  A   Yes.

Patzer - Direct/James

54

1  Q    And did you have a chance to, again did you review

2  that in preparation for today's testimony?

3  A    Yes.

4  Q    And sir, on the back of the complaint there are two

5  attachments.  And the first attachment lists a number of

6  columns, correct?

7         THE COURT:  I'm sorry, a number of?

8  BY MS. JAMES:

9  Q    A number of columns?

10  A    Yes.

11  Q    And can you please describe for me what, Hit Date UTC

12  is?

13  A    That's the date and time in UTC time zone when the

14  log-in connection appeared.

15  Q    Okay.  And when you say a log-in transaction

16  appeared, do you mean a log-in on behalf of Excipio, and

17  to an actual peer that documented a download?

18  A    Yes.  The date that an exchange happened with the IP

19  address here.

20  Q    And where is the IP address listed?

21  A    It's on the top of the document.

22  Q    So is it accurate for each one of the Hit Dates UTC,

23  it relates to the same IP address?

24  A    Yes.

25  Q    And can you explain what a file hash refers to?

**Patzer - Direct/James**

55

1   A    The file hash is the fingerprint of the torrent

2   content.

3   Q    And is the file hash written in that column?

4   A    Yes.

5   Q    And is each file hash individual to the related

6   content?

7   A    Yes.

8   Q    And sir, on the left-hand side, where it says, Title,

9   can you please explain that reference?

10  A    Title is actually the title of the work the client

11  provided.  It's the movie title in this case.

12  Q    So is this document depicting by title the time at

13  which the exchange download from Excipio and the IP

14  address occurred for the individual file hash?

15  A    Yes.

16  Q    And each one of those ledgers described that actual

17  exchange?

18  A    Yes.

19       MS. JAMES:  And I'm sorry, can I just approach

20  the witness for a second?

21       THE COURT:  Yes.

22  BY MS. JAMES:

23  Q    And sir, how many individual copyrighted titles are

24  depicted on that chart?

25  A    18.

56

1   Q    And when you look at the hit dates from the bottom to

2   the top, what is the first hit date?

3   A    That's the 10th of February, 2015.

4   Q    And what is the last one on the top?

5   A    It's the 23rd of May, 2015.

6   Q    2000 what?

7   A    15.

8   Q    So is it accurate that this particular IP address was

9   monitored over a number of months in order to create this

10  chart of multiple infringement being alleged?

11  A    Correct.

12  Q    And so it's from February --

13  A    To May.

14  Q    Is it roughly four and-a-half months?

15  A    Yes.

16  Q    And why do you, or why are you charged with the duty

17  to document multiple downloads over an extended period of

18  time?

19  A    Sorry, again?

20  Q    Is it purposeful that you are asked now to insure

21  that you are monitoring downloads of their copyrighted

22  material over an extended period of time?

23  A    Yes, we constantly monitor.

24  Q    And from this time it's a four and-a-half months time

25  period.  Does that indicate to you that it was, the same

Patzer - Direct/James

57

1   computer was being used?

2   A    Not based on this information.  That I have more

3   information about each of the hits.  I looked at this

4   information and it showed me that it's always been or has

5   to be the same computer system.

6   Q    Has to be?

7   A    Yes.

8   Q    But this document showed you multiple downloads over

9   a four and-a-half month period, correct?

10  A    Correct.

11  Q    Does this document also show you that these downloads

12  were conducted by the same IP address?

13  A    That's correct.

14  Q    That's correct?

15  A    Yes.

16  Q    Okay.

17          THE COURT:  Mr. Patzer, before I think you said

18  these downloads are all from the same IP address but not

19  necessarily from the same computer.

20          Is that right?  Just the information on this

21  page.

22          THE WITNESS:  Yes, it's the same.

23          THE COURT:  But later you said that you did

24  subsequent work and determined that these hits all came

25  from the same computer.

Patzer - Direct/James

58

```
1              THE WITNESS:  Yes.

2              THE COURT:  Okay.  Are we going to get to that?

3              MS. JAMES:  Yes.

4    BY MS. JAMES:

5    Q    And is there a document that would reflect that, sir?

6    A    Yes.

7    Q    And --

8              MR. PARK:  Your Honor, that testimony is based

9    on his personal assumption I think.

10             THE COURT:  So let's -- we'll get to it.

11             Let's see what the testimony is.

12             Is that the next page of the complaint that

13   reflects your subsequent work, Mr. Patzer?

14             Is that the next page?  Look at the document.

15             THE WITNESS:  It's here.

16             THE COURT:  You were looking at the second to

17   last page of that document I believe.  Is that correct?

18             THE WITNESS:  Yes, Exhibit B.

19             THE COURT:  You looked at Exhibit B.  Before you

20   were looking at Exhibit A, weren't you?  When you said

21   there are three columns.

22             THE WITNESS:  It was Exhibit A.

23             THE COURT:  Okay, and then you said for this IP

24   address you did subsequent work to identify that all the

25   hits came from one computer, right?
```

Patzer - Direct/James

1    THE WITNESS:  Yes

2    THE COURT:  Is that Exhibit B or something else?

3    THE WITNESS:  Something else.

4    THE COURT:  Okay, explain to me what the

5    subsequent work was that you did to determine that all of

6    the hits were to a single computer or computer system.

7    THE WITNESS:  I was looking at the raw

8    information.

9    THE COURT:  What kind of information?

10   THE WITNESS:  Raw information.

11   THE COURT:  R-A-W?

12   THE WITNESS:  Yes.

13   THE COURT:  The raw information.  And it shows

14   additional information about the computer on the outside.

15   It shows the software version that was used?

16   THE WITNESS:  The software version and also

17   shows the TCP port the software was using.

18   THE COURT:  What is a TCP port?

19   THE WITNESS:  A TCP port is like an extension

20   number if you compare with phone numbers.

21   THE COURT:  So each computer would have it's own

22   TCP?

23   THE WITNESS:  Every computer has about 65,000

24   ports.  And when you install a BitTorrent software,

25   depending on the software it generates a port number.  And

Case 1:19-cv-02985 Document 145 Filed 11/07/05 Page 143 of 293 Page 355

60

1   it was always the same port number.

2           THE COURT:  And that would be unique to that

3   computer, that port number?

4           THE WITNESS:  Yes, the combination of the

5   content of the IP address, port number, and software

6   version is, relates to the same computer.  It is more than

7   unlikely that a different computer shares the same content

8   with the same port using the same software.

9           THE COURT:  Have you ever seen it happen that

10  there were different computers that, as a result of that

11  information.

12          THE WITNESS:  No.

13          THE COURT:  Always from your experience it has

14  been one computer that would have that data?

15          THE WITNESS:  Yes, depending on the port number,

16  there are default port numbers out there.  And if this is

17  one of these ports then it is not proven that it is

18  unique, because every software client for example not

19  using different software, using the same port every time.

20          THE COURT:  Say that the again, the default

21  port?

22          THE WITNESS:  Default port.

23          THE COURT:  Was there another default port, or

24  you said there were two kinds of default ports?

25          THE WITNESS:  And a random-generated port.

**61**

```
 1              THE COURT:  Okay, so if you have a

 2    random-generated port that would indicate to you that it

 3    was from the same computer?

 4              THE WITNESS:  Yes.

 5              MS. JAMES:  And your Honor, may I please

 6    approach the witness.

 7              THE COURT:  Yes.

 8    BY MS. JAMES:

 9    Q    I show you Exhibit 3.

10              MS. JAMES:  Your Honor, I have handed the

11    witness what has been previously marked as Plaintiff's

12    Exhibit Number 3.

13              And I provided that to the Court and opposing

14    counsel.

15    Q    And sir, can you describe this document for us?

16    A    Yes.  It has the previously mentioned more detailed

17    information.  And it also contains multiple transactions

18    per torrent or multiple data exchanges.  It's about 90 to

19    100.

20    Q    So to break that down for an individual title, first

21    of all this additional data, what would you call this

22    document?  Is there a record you would use internally for

23    this?

24    A    It's the log information.  I call it a raw log

25    information because it's more detailed.
```

Case 1:13-cv-00205-WYD-MEH Document 144-2 Filed 11/07/13 Page 145 of 293

62

1   Q    Okay.  So is this a -- first of all, this raw log

2   information relates to this case and the Malibu Media

3   copyrighted material at issue here, correct?

4   A    Correct.

5           THE COURT:  For sake of clarity, this is an IP

6   address on the column on the left.

7           Is that the same IP address referred to in the

8   previous document?

9           THE WITNESS:  Yes.

10  BY MS. JAMES:

11  Q    And is the data created for each one of the titles

12  that we allege infringement, 18 titles that we discussed

13  attached to the complaint?  Is it true that this log shows

14  multiple exchanges per title?

15  A    Yes.

16  Q    So under the complaint chart, when we show the Hit

17  Date UTC, that is depicted one individual exchange for

18  each title, correct?

19  A    Yes.  It refers to column called transfer end.

20  Q    And can you look by file name a little bit to the

21  right.

22          That for example there are five exchanges

23  depicted for Jensa Soma (ph)?

24  A    Yes.

25  Q    So does that mean for that particular title you

Case 1:13-cv-09239-CM-KHP Document 44 Filed 10/06/15 Page 146 of 293

```
 1    actually recorded five individual exchanges with this IP
 2    address exchanging and providing you with copyrighted
 3    content?
 4    A    Yes.
 5    Q    And how big is each one of these files that were
 6    captured?
 7    A    16 kilobytes.
 8    Q    So it's 16 kilobytes times five, correct, for this
 9    particular title?
10    A    Yes.
11             THE COURT:  How much video is a kilobyte in
12    terms of 16 kilobytes.  Is that two minutes of video or is
13    it 20 minutes?
14             THE WITNESS:  More seconds.
15             THE COURT:  Seconds, okay.
16    BY MS. JAMES:
17    Q    Does that refer to as a 103,000 zero and ones.
18             Is that correct?
19    A    Yes.
20    Q    And to answer the judge's question, what else does
21    this document tell you to reinforce that this, that these
22    downloads were done by the same IP address in the same
23    computer?
24    A    It's the column, client version and the column client
25    DHT port and also the --
```

64

1  Q    If you don't mind, because it would be helpful for

2  us, can you start with the first column, identify that and

3  explain what it indicates to you?

4  A    The first of the columns I mentioned or the first

5  column that is here?

6  Q    The first column that you mentioned.

7  A    That was the client DHT port, right?  I don't know

8  which one.

9          THE COURT:  Why don't you just start from the

10  first column.

11  A    Yes.  It's the client IP, stands for client IP, the

12  IP address we're taking about.

13          The client DHT port.  This is the mentioned port

14  before which is random generated.  Also software.

15  Q    And sir, can I ask about that?

16          In the top of this chart the client DHT port is

17  53013?

18  A    Correct.

19  Q    But down about nine entries it's 29880?

20  A    Yes.

21  Q    And that is consistent to the second page.

22          Can you please explain, if you know, why those

23  numbers have changed?

24  A    We expect that the software was reinstalled or it was

25  a different computer system behind the same IP address.

65

1   Q    Okay, so either a changing of the computer would

2   change that number?

3   A    Yes.

4   Q    Or, is it fair to say a different version or a

5   different software?

6   A    It's the same software under the same version, but it

7   happens if you reinstall your computer system, reinstall

8   the same software.

9   Q    And how do you know that it's the same software?

10  A    I see in the column, client version.  It says, you

11  torrent -- it's a number of the software version used and

12  the name 4 -- is the name of the software, the BitTorrent

13  software that was used here.

14  Q    So that column is to the right after section M and

15  before file name, correct?

16  A    Yes.

17  Q    And client versions, you are able to look at this and

18  that is depicting the name of the BitTorrent software

19  downloaded by this IP address in order to engage in the

20  peer-to-peer infringement, correct?

21  A    Correct.

22  Q    And does that, does the name of that software and the

23  numerical numbers remain consistent throughout?

24  A    Yes.

25  Q    And does the number 342, does that depict exactly the

Case 1:19-cv-03782-BMC Document 44-2 Filed 10/07/19 Page 149 of 293 PageID #: 361

66

1    H  U, does that indicate to you the version of the

2    software?

3    A    Correct.

4    Q    So the version of the software in this particular

5    case did not change, correct?

6    A    Correct.

7    Q    But so that means that it must have been reinstalled

8    to generate the different port number.

9         Is that correct?

10   A    Yes.

11   Q    And if you look at it, and can you tell us; is it

12   accurate that you can tell us the port date changes in

13   29880, or in 2/15/2015 by referring to the session start

14   column?

15   A    2/15/2000?

16   Q    Yes.

17   A    Yes.

18   Q    So by February 15, 2015, this port, this was the

19   established port and remained the same throughout the rest

20   of this report, correct?

21   A    Correct.

22   Q    And the fact that the port number stayed the same

23   indicates what to you?

24   A    That it has been the same computer system behind all

25   the time.

67

1  Q    And what does the fact that the BitTorrent software

2  has remained consistent throughout the infringement period

3  indicate to you?

4  A    The combination with the port, it shows us that it

5  has to be the same computer system.

6  Q    Is that because it was somebody else or a different

7  IP address, or another computer was conducting BitTorrent

8  infringement?  Is it unlikely that would be using the same

9  software?

10  A    The same software and the same port and used the same

11  software?  It's very likely that they used the same

12  software, but with the combination with the port it's very

13  unlikely that somebody else sharing the same content with

14  the same software and the same port.

15  Q    So this also supports your opinion that this is the

16  same IP address engaged in this conduct?

17  A    It's the same computer itself and IP address.

18  Q    Same computer behind the same IP address?

19  A    Yes.

20  Q    And I'm going to show you what has been previously

21  marked as Exhibit 4.

22             THE COURT:  Before we get to that.

23             Is there objection, Mr. Park?

24             MR. PARK:  No, your Honor.

25             THE COURT:  All right, this is Exhibit 4 in

Case 1:19-cv-02000-TJK Document 14-2 Filed 10/09/19 Page 151 of 293 PageID #: 363

68

```
1    evidence, what was previously Exhibit 3.
2               MS. JAMES:  Yes, your Honor.
3               (Plaintiff Exhibit 4 in evidence.)
4    BY MS. JAMES:
5    Q    Sir, can you please identify this document for us?
6    A    Yes.
7               It shows the extended information.
8    Q    So it's accurate that internally you refer to this
9    document as extended information?
10   A    Yes.
11   Q    And sir, again by way of foundation, does this
12   information also relate to the copyright infringement
13   being alleged in this case?
14   A    Yes.
15   Q    And you're able to cross-reference this information
16   with the information that we discussed in the complaint?
17   A    Yes, based on the IP addresses and the ports.
18   Q    And is the IP address listed on this document?
19   A    Yes.
20   Q    And is that on the right-hand side second to the last
21   column?
22   A    Yes.
23   Q    And the DHT port number, is that again on the far,
24   far right-hand side?
25   A    Correct.
```

Case 1:13-cv-06312-AT-JCF Document 114-1 Filed 11/07/16 Page 30 of 45 PageID #: 364

69

1   Q    And is it -- and feel free to look at the second page

2    --is it accurate that again the port number is 29880?

3   A    Yes.

4   Q    And that remained consistent throughout the report,

5   correct?

6   A    Correct.

7   Q    And what is the information that is contained in this

8   report?

9   A    This was additional information.

10        We have seen that the IP address is also inside

11  the swarms of that particular torrent files mentioned on

12  this document.

13  Q    Okay.  So for example, if you go down the page -- if

14  you go down the page, let's say a quarter of the way

15  through, there is a number of listing of X-Art, correct?

16  A    Correct.

17  Q    So this is depicting the downloading of Malibu Media

18  copyrighted content, correct?

19  A    Yes.

20        But the difference between this document and the

21  other information is that for this information they have

22  no connection being established.  This is just from the

23  indirect monitoring.

24  Q    So can you explain to me for example the reference to

25  Microsoft Office, Sponge Bob, and other files that are

1    depicted here?

2    A    Yes.

3          So again, the question, it was a little bit

4    long.

5    Q    I'm sorry.  Can you tell, if you look at this

6    document there is a number of non-Malibu titles listed,

7    correct?

8    A    Correct.

9    Q    And if you examined these in reviewing these for

10    today's testimony, what did you understand about these

11    particular IP addresses or computer users from these

12    documents?

13    A    Gives us some kind of profiling of the person behind

14    the computer system using it based on the torrent files he

15    is downloading.

16          For example, there is some English learning

17    course here, or English learning files.  So I expect it is

18    not a native speaker.  It is also some, or a lot of

19    computer programming stuff listed here so I expect it's a

20    computer programmer learning computer programming.  And

21    also a few torrents using the word Asian in it.  So maybe

22    it can be some Asian person.

23    Q    And it also depicts other titles that are not related

24    to this lawsuit, correct?

25    A    Correct.

Case 1:19-cv-03285-DAF Document 1452 Filed 10/07/03 Page 1 of 1 PageID: 366

1   Q    And none of these titles, I mean in other words our

2   complaint is not based on any of these indirect monitoring

3   findings, correct?

4   A    That's correct.  It's just for profiling the person

5   behind the computer.

6                (Continued on the following page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 1:15-cv-03029-DAP Doc #: 14-51 Filed: 10/03/05 Page 2 of 245 Page ID #: 367

1   BY MS. JAMES (Cont'd):

2   Q    So this is the broader monitoring, but it's not

3   actually the basis of our allegation of infringement?

4   A    That's correct.

5   Q    Because there has been no direct connection and

6   exchange?

7   A    Correct.

8   Q    But this is used to profile and to get further

9   understandings on the individual or the IP address user?

10  A    Correct.

11          THE COURT:  Mr. Patzer, with respect to

12  Plaintiff Exhibit 3 and 4, the tables you are looking at,

13  were those generated by your firm?

14          THE WITNESS:  Yes.

15          THE COURT:  Are these documents generated in the

16  regular course of your firm's business?

17          THE WITNESS:  Yes.

18          THE COURT:  Were they generated by the

19  monitoring system that you had designed, you spoke about

20  originally when you first took the stand?

21          THE WITNESS:  Yes.

22          THE COURT:  Okay.

23          Has Plaintiff Exhibit 4 been admitted into

24  evidence?

25          MS. JAMES:  No, but I would move for it to be

Case 1:19-cv-09033 DLC Document 144-2 Filed 10/08/19 Page 2 of 45 Page ID #: 368

73

```
1    admitted.

2              THE COURT:  Mr. Park, objections?

3              Do you have any objections to Plaintiff Exhibit

4    4 coming into evidence?  That's the table we just looked

5    at.

6              MR. PARK:  No, your Honor.

7              THE COURT:  Plaintiff Exhibit 4 in evidence.

8              (Whereupon, Plaintiff Exhibit 4 was received in

9    evidence, as of this date.)

10             MS. JAMES:  Your Honor, I'm not sure if this is

11   necessary, but I would like to present -- I would like to

12   give the witness a copy of the declaration of my file in

13   this case on April 18th, document entry 29 A in support of

14   my letter.

15             THE COURT:  For what purpose?

16             MS. JAMES:  Well, this declaration was just

17   simply an outline of his qualifications and prospective

18   testimony and I don't know if it's formally a part of this

19   process.

20             THE COURT:  It's hearsay unless Mr. Park's going

21   to use it for cross-examination, but if it's a way to

22   speed this up so he doesn't have to go through his

23   qualifications, and Mr. Park is amenable, I would allow

24   it.

25             Does that make sense?  Typically he can't get
```

Patzer - Direct/James

74

1   his own affidavit in evidence.  There is no jury here.

2   You are certainly free to ask him all the questions to

3   lead to the affidavit, so in an effort to move this along

4   I would be inclined to allow it, but only if you are

5   inclined to allow it.

6          MR. PARK:  For the declaration, yes.

7          THE COURT:  You have no objection?

8          MR. PARK:  No objection.

9          THE COURT:  You can do it.

10         MS. JAMES:  Thank you, your Honor.

11         Again, the purpose of this is to again reiterate

12  the witness's qualifications, background and personal

13  knowledge regarding the development and use and monitoring

14  of --

15         THE COURT:  That's fine.

16         I'll accept it as is.  You don't have to ask him

17  more about it.

18         MS. JAMES:  Okay.

19         THE COURT:  We'll call it Plaintiff Exhibit 6?

20         MS. JAMES:  That's fine.

21         I marked it earlier, but 6 is perfect.

22         THE COURT:  Okay.

23         MS. JAMES:  I'm going to show the witness what

24  was previously marked as Plaintiff Exhibit 7 just to

25  clarify something on the record.

Case 1:19-cr-00808-DLC Document 143 Filed 11/07/08 Page 156 of 293 PageID #: 370

1          THE COURT:  Go ahead.

2   BY MS. JAMES:

3   Q    Sir, does this document refresh --

4          THE COURT:  Show it to Mr. Park before you ask

5   him any questions.

6          MS. JAMES:  I gave him a copy, but I'm happy to

7   wait for you to get yours.

8   BY MS. JAMES:

9   Q    Sir, I'm asking you to review this and the question

10  is simply, does this refresh your memory before you forgot

11  the last word on the reference to UTC, does this document

12  refresh your memory on that?

13  A    Yes.

14  Q    On what that means?

15  A    Yes.

16  Q    Can you please explain now.

17  A    Universal -- UTC means coordinated universal time.

18  Q    Thank you.

19         MS. JAMES:  Your Honor, at this time I don't

20  have any additional questions for the witness.

21         THE COURT:  Okay.

22         Mr. Park, you want a five-minute break or do you

23  want to jump right in?

24         MR. PARK:  Five-minute break.

25         THE COURT:  You got it.

Patzer - Direct/James

76

1        MR. PARK:  Thank you.

2        THE COURT:  Okay.

3        (Recess.)

4        (Continued on next page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Following a recess.)

2          THE COURT:  Be seated.

3          Mr. Park, whenever you are ready.

4          MR. PARK:  Yes, your Honor.

5          THE COURT:  Feel free to use the lectern.

6          Just make sure you are using a mike, wherever

7     you are.

8          MR. PARK:  Yes, your Honor.

9     CROSS-EXAMINATION

10    BY MR. PARK:

11    Q    Good morning, Mr. Patzer.

12    A    Good morning.

13    Q    I have couple of questions, just follow-up questions

14    and going to make it clear some answers you answered.

15          Sir, after your graduation, high school

16    graduation in 1999, then you joined Ex -- I'm sorry --

17    Excipio?

18    A    I joined them later.

19          I first was self-employed working as security

20    consultant for various companies and Excipio was founded

21    around 2008 and at that point of time I joined Excipio.

22    Q    So you personally engaged in development of software

23    you are using for the media?

24    A    Yeah.

25          I was planning and designing the software.  I

Case 1:19-cv-00893-TDC Document 142 Filed 10/06/03 Page 161 of 163 Page ID: 373

1  was not programming it with various programs, programming

2  software.

3  Q   So you didn't program the program software, you

4  designed the program?

5  A   Yes, I planned and managed all the development

6  process.

7  Q   And you mentioned about when the verification stage

8  you -- your company compared that the downloaded file with

9  the original files.

10          Is it correct?

11  A   Yes, that's correct.

12  Q   So which one is the full movie?

13          Are you downloading full movie to compare it or

14  you would have full movie, the original movie and compare

15  a piece of the movie file downloaded?

16  A   No.

17          We compare it -- we download the full movie and

18  then compare the full movie to their original movie and

19  the downloaded movie refers to the torrent hash I

20  mentioned before.

21  Q   What is the --

22          THE COURT:  Mr. Park, could you push the

23  microphone away from you, actually.

24          Actually, if you could put the foam end back on.

25          (There was a pause in the proceedings.)

79

1     THE COURT:  Start the question again.

2  BY MR. PARK:

3  Q    What is the purpose of that procedure, comparing the

4  downloading full movie and comparing the original movie?

5  A    To ensure that content of the torrent file's actually

6  the content or the same movie of our customer.

7  Q    The downloaded movies from the -- is it from the

8  person who is infringer or the possible infringer?

9  A    No.

10        It's downloaded from the whole swarm.

11  Q    Whole swarm?

12  A    Yes.

13  Q    Not specific infringer?

14  A    Correct.

15  Q    So basically the PCAP that you are using to compare

16  to decide whether the person is -- the infringer is

17  downloading is the same movie with the original movie that

18  Malibu Media's movie is only the piece that downloaded

19  from the infringer.

20        Is it correct?

21  A    Yes.

22        It's a 16 kilobyte piece we download from the

23  infringer.

24  Q    You mentioned it is only less than a second or

25  seconds of movie?

Patzer - Cross/Park

80

```
1   A    Yeah.

2   Q    16 kilobytes is not that much.

3        Can you explain how long is that if it is a

4   movie?

5   A    It's not comparable to a play time of a movie because

6   it depends on the data format.

7        Like I said before, it's about 131,000 ones and

8   zeros when you refer to ones and zeros of data.  It's

9   131,000 ones and zeros.

10       THE COURT:  Previously, Mr. Patzer, you told me

11  that amounted to two seconds.

12       It's not a minute, but it's something less

13  realizing you can't give me a specific amount?

14       THE WITNESS:  Yes.

15  BY MR. PARK:

16  Q    Is it fair to say two seconds or --

17       MS. JAMES:  Objection.

18       He already said it's not --

19       THE COURT:  Overruled.

20       You can finish your question and answer.

21  Ms. James, if you are going to object, let him finish the

22  question before you object.

23       Repeat the question, Mr. Park, and please answer

24  it.

25       MR. PARK:  Yes.
```

Case 1:19-cv-03285-... Document 152 Filed 11/09/23 Page 1... Page ID 376

Patzer - Cross/Park

1   BY MR. PARK:

2   Q    Can you say how long is that movie in seconds?

3   A    You can't really say, but it's less than a minute and

4   it's less than a second most of the time.

5   Q    Less than a second in most of the time, correct?

6   A    Yes, and it's not even playable.

7   Q    That was my next question, whether the piece of PCAP

8   is playable or the torrent file downloaded the infringer

9   downloaded, can it be playable before they download the

10  full movie?

11  A    The question is if the 16 kilobytes are playable,

12  right?

13         Can you just repeat the question?  It was

14  confusing.

15  Q    My question is whether the infringer downloaded piece

16  of file, torrent file, not full movie, can it be playable?

17  A    Yes, if you have pieces they are playable.

18         If you have multiple pieces than just the one.

19  Q    Multiple pieces?

20  A    Yes.

21  Q    My question is going to the direct -- the study that

22  we mentioned, I mean Ms. James mentioned about the

23  Washington State -- University of Washington study, it was

24  mentioning about direct detention also has a false

25  negatives.

Patzer - Cross/Park

<div align="right">82</div>

1    THE COURT:  Mr. Park, you are talking about

2  Plaintiff Exhibit 1, is that correct?

3    THE WITNESS:  Yes.

4    MR. PARK:  My version doesn't have a number.

5  A    Yes.

6  Q    It was mentioning about the blacklist method to

7  remove the detectors from the swarm.

8    Is there any -- I mean, do you know about that?

9  A    Yes.

10  Q    Is it your program can avoid this skill?

11  A    No.

12    We are on some blacklists too, but this only

13  prevents us from connecting to the peer and if the peer is

14  not using blacklists, we can't establish a connection.

15  Q    So your program is only using directed detection, not

16  indirect detection, is correct?

17  A    Correct.

18    THE COURT:  Say that again.

19  BY MR. PARK:

20  Q    Directed detection?

21    THE COURT:  Directed detection.

22    MR. PARK:  Directed detection.

23  BY MR. PARK:

24  Q    If infringer is using a proxy server, is your

25  software available to distinguish whether the first

Case 1:19-cv-02032-DLB Document 142 Filed 10/08/03 Page 2 of 45 PageID 378

83

1    infringer is using proxy server or their personal

2    computer?

3          Is there any way that you can distinguish it?

4    A    Proxy server normally generates random ports for each

5    connection.

6          So it's not the same connection, if you use a

7    proxy server, the proxy server software that I know.

8    Q    You can distinguish that by using the port number, is

9    it correct?

10   A    Yes, if it's a random port number so every line or

11   log information have a different port, and in this case we

12   have all the same port.

13         And also on personal computers, normally there

14   is no proxy server installed, on the home computers.

15   Q    How many proxy server services do you know?

16   A    Three or four.

17         I'm not a specialist in proxy servers.

18   Q    Do you know more users are using proxy servers?

19   A    BitTorrent normally is not used as proxy servers, but

20   with VPN providers, so I have never seen BitTorrent

21   software using a proxy service.

22   Q    Do you know how proxy servers assign the IP address

23   for the service specific to user?

24   A    Typically the proxy server uses it's own IP address.

25         So if you connect to a proxy server it's like a

CaseCase4nd5e1:13419-08009PKcDAFSonDoc0b14FF581&17D/09d/8Z21/294B61d57Page1E931386 379
CaseCase4nd5e0-03v92-8ocdanenfeite14B2 Filerd: 11/08/08 Page1ag963of945 Page1ge1393

84

1    man in the middle, you connect to some server and the

2    server makes the connection for you.  That's how a proxy

3    server works.

4    Q    Basically if your detection software by IP address,

5    only using IP address, can you distinguish the infringer

6    is using, whether they are using his own IP address or the

7    IP address assigned by a proxy server?

8         Can you distinguish in between those?

9    A    Not by just the IP address.

10   Q    What if the proxy server assigns -- works exactly

11   like your computer, I mean that assigns using only same

12   kind, same number, in that case can you distinguish the

13   proxy server and the computer?

14        MS. JAMES:  Objection.

15        His question is based on a hypothetical that he

16   already said doesn't happen.

17        THE COURT:  You can answer the question.

18        Overruled.  Repeat the question, it might be

19   easier.

20   BY MR. PARK:

21   Q    If the proxy server assign the same port number, can

22   your software distinguish using someone who is using proxy

23   server and using their own computer, can you distinguish

24   them?

25   A    If it's a special proxy server software doing what

Patzer - Cross/Park

85

1   you described, then it's not possible to see the

2   difference if it's a user or a proxy server.

3   Q    Regarding the IP address, IP address, is it limited

4   or unlimited in numbers?

5   A    It's limited in numbers.

6   Q    And ISP, they are using limited in numbers, is it

7   correct?

8   A    Yes.

9           THE COURT:  You are saying limited, right?

10          MR. PARK:  Limited.

11          THE WITNESS:  Limited.

12  BY MR. PARK:

13  Q    Most of personal users today have a fixed IP address

14  or not?

15  A    Depends on the ISP and if -- in different countries,

16  different ISPs assign dynamic numbers, other ISPs always

17  assign static numbers.

18          So it's the decision of the ISP.

19  Q    In most cases, what is the difference between static

20  and dynamic?

21  A    Dynamic means the IP address can change and static

22  means the IP address has -- always stays the same, but

23  dynamic IP address can also stay the same because it's

24  dynamic.

25          THE COURT:  Mr. Patzer, would it be possible to

Case 1:13-cv-03293-DLC Document 152 Filed 10/08/18 Page 169 of 293 PageID: 381

86

1    have a scenario where there is a dynamic IP address but

2    you still wound up with the same port number like you did

3    in Plaintiff Exhibit 3?

4           THE WITNESS:  Sorry, again, question.

5           THE COURT:  Is it possible to have a scenario if

6    you look at Plaintiff Exhibit 3, which was that table, is

7    it possible to have a situation where the IP address is

8    dynamic, meaning changing over time because of the ISP's

9    practices, but the port number would be the same?

10          THE WITNESS:  We have seen that many times.

11          THE COURT:  So you have had the same port and

12   what would that tell you in that case, if IP addresses had

13   the same port number?

14          THE WITNESS:  It's very likely it's still the

15   same PC if it's the same ISP.

16          THE COURT:  It's likely you would be in that

17   dynamic IP address situation?

18          THE WITNESS:  Yes.

19          THE COURT:  Okay.

20   BY MR. PARK:

21   Q    Dynamic situation, when the IP address would be

22   changing, when the infringer is using dynamic IP address,

23   when the IP address would be changed?

24   A    It doesn't have to, it can change but it doesn't have

25   to.

Patzer - Cross/Park

87

1     Many providers assign dynamic IP address, but if
2  you stay online for same period of time, for example, if
3  you turn off your router for one hour and turn on again it
4  often stays the same or keeps the same IP address.  It
5  doesn't has to change.

6     Just because it's dynamic, it doesn't enforce
7  the changes, can still be the same.

8  Q    But if the dynamic IP address keeps assign the same
9  IP address, why they don't use a static?

10     Why go with dynamic?

11 A    They are still flexible to changes.

12     So they can change it any time with the user
13 can't complain and say hey, my IP address changed, so they
14 always tell a dynamic IP address, but it doesn't have to
15 change but the ISP has the option to change any time they
16 want to.

17 Q    So technically the dynamic IP address can change any
18 time because of the ISP?

19 A    Yes.

20 Q    So basically even though you are using the directed
21 detection technique, there is no way to detect if the
22 proxy server user who is using the same port number, is it
23 correct?

24 A    That's correct.

25     If you compare proxy server in this case for

Case 1:19-cv-03900-PAC Document 142 Filed 11/07/03 Page 3 of 45 PageID: 383

88

1  example like a Trojan Horse or a virus in the computer,

2  somebody can connect there and then forward the connection

3  with that IP address and pretend to be the person on this

4  computer.

5  Q    Do you know there is a proxy server service that

6  gives a choice of the users to decide a IP address?

7  A    There are services, but they are only IP addresses

8  from the provider.

9          So there are service providers which you can

10  connect to us and use my IP address for BitTorrent, but

11  that's, like, ISP, it's provider out there and you pay for

12  that services.

13  Q    I mean, there is a proxy server services that allows

14  generate a arbitrary IP address and use them to the proxy

15  server subscribers?

16  A    You don't generate the IP address.

17          IP address where the service providers

18  registered owner of.  You can't generate random IP

19  address.

20  Q    When in that case the proxy server user, when the

21  infringer is using proxy server, do -- your software can

22  detect proxy server's IP address or the proxy server's

23  subscriber's computer's IP address?

24  A    We detect IP address off the provider.

25  Q    Off the provider, off the proxy server services?

Patzer - Redirect/James

89

1    A    Yes.

2    Q    Correct?

3    A    Yes.

4    Q    Thank you.

5         MR. PARK:  No more questions.

6         THE COURT:  All right.

7         Ms. James, redirect?

8         MS. JAMES:  Yes.

9    REDIRECT EXAMINATION

10   BY MS. JAMES:

11   Q    Sir, is it correct that you testified that with the

12   proxy server, you know of no proxy server that does not

13   randomly assign port numbers.

14        Correct?

15   A    Correct.

16        THE COURT:  That was a couple of negatives in

17   that sentence.

18        Are you saying proxy servers do not assign

19   random IP address numbers?

20        THE WITNESS:  No, proxy server -- wait.

21        Normal proxy servers I generate random ports for

22   each connection.

23        THE COURT:  What about IP addresses?

24        THE WITNESS:  IP address stays the IP address of

25   the proxy server.

Case 1:19-cv-02020-DAE Document 142 Filed 11/06/23 Page 3 of 45 Page ID #: 385

1    THE COURT:  A proxy server doesn't assign random

2    IP addresses, does not.

3    THE WITNESS:  No, a proxy server --

4    THE COURT:  It uses it's own.

5    THE WITNESS:  Yeah, correct.

6    THE COURT:  Got it.

7    BY MS. JAMES:

8    Q    So in this case, just to clarify, the port number was

9    not random, correct?

10    A    Correct.

11    Q    So there is no evidence that a proxy server was used

12    here, correct?

13    A    Correct.

14    Q    The hypothetical questions that you were asked

15    whether or not it's possible for the proxy server, there

16    is nothing in this record and all of your data that

17    indicates that a proxy server was involved here?

18    A    Correct.

19    Q    And there is absolutely no indication that random

20    port numbers, multiple numbers, were assigned, correct?

21    A    Correct.

22    Q    And going back to the evidence in this case, isn't it

23    correct that between February 2015 and May 2015, and feel

24    free to look at any of the documents and the chart

25    attached to the complaint, that in this case the IP

Patzer - Redirect/James

91

1   address did not change?

2   A   Correct.

3   Q   So, is it accurate that even if it's dynamic, in

4   other words Verizon reserves the right to change it, in

5   this case, for all of the infringements indicated, in

6   fact, the IP address did not change?

7   A   Correct.

8   Q   Please tell me how you are sure of that.

9   A   I see it on the documents that IP address didn't

10   change.

11         THE COURT: You say the documents, which exhibit

12   are you referring to?

13         THE WITNESS: Exhibit 3.

14         THE COURT: Okay.

15   BY MS. JAMES:

16   Q   And the other documents that we looked at, Exhibit --

17   the complaint and Exhibit 4 also indicate that, correct?

18   A   Yes, correct.

19   Q   So the questions that you were asked, hypothetically,

20   about dynamic IP addresses in this particular case, the IP

21   address did not change?

22   A   Correct.

23   Q   Sir, you were also asked about the 16 -- I

24   apologize -- about the 16 kilobits that were downloaded?

25   A   Kilobytes.

Patzer - Redirect/James

92

```
1    Q    I believe there might have been some inconsistency in
2    the question and answer.
3           I believe that you said earlier that in the
4    documents that we looked through, that you can show in
5    this particular case, from your additional data files that
6    for each one of these titles, multiple times you
7    downloaded with your software 16 kilobytes per copyrighted
8    title.
9           Is that correct?
10   A    Correct.
11   Q    Can you please take a minute and identify the
12   document that depicts that?
13   A    Exhibit 3.
14   Q    Exhibit 3.
15          So it is not correct that in any one -- for any
16   one of the titles in which we allege infringement here,
17   the download sample is limited to one 16 kilobyte,
18   correct?
19   A    I think few titles were just one 16 kilobytes
20   package, I think the title -- it was four times --
21          I think Blondes Love Brunettes title was only
22   one time, and I think few others.  So not all of them has
23   more than one 16 kilobytes.
24   Q    And in your opinion is the 16 kilobyte, is it
25   accurate -- is that enough information for you to be
```

Case 1:18-cv-02885-ESH Document 1-2 Filed 11/09/18 Page 176 of 293 PageID 388

93

1    confident in your verification process?

2    A    Yes.

3    Q    Why?

4    A    Because it's still a lot of data, even -- it's not

5    playable by movie player, it's still 131,000 ones and

6    zeros in unique order.

7            So it proves that it's a part belongs to the

8    original part, even if it's just a small part.

9    Q    I know you were kind of pushed into saying if it was

10   played it would be a certain duration, but tell me why

11   that's not a proper comparison.

12   A    Because the time of how long it plays doesn't prove

13   if the piece doesn't belong to the original movie.

14           It's like the piece is already a fingerprint

15   shows it belongs to the original movie and there is no way

16   that you get the 16 kilobytes, which are identical to the

17   original movie, without being from it.

18           It's big enough to prove that it belongs to

19   original movie.

20   Q    And you take these 16 kilobytes and you compare them

21   to both the actual title, the content you get from

22   Malibu Media, your client or our client, and also the full

23   title that you download from the swarm, correct?

24   A    We compare it to the full title and the full title

25   was already compared before to original work.

94

1  Q    So you believe the 16 kilobyte is an accurate
2  measurement to use?
3  A    Yes.
4  Q    And you don't think it's a fair analogy to refer to
5  play times for this particular data?
6  A    Correct.
7  Q    Is it a compressed file or it's just not a video
8  file, correct?
9  A    Correct.
10  Q    Okay.
11          MS. JAMES:  Thank you.
12          I have no further questions.
13          THE COURT:  Mr. Park, do you have any recross?
14          MR. PARK:  Yes, your Honor.
15  RECROSS-EXAMINATION
16  BY MR. PARK:
17  Q    The same question, I mean, you said that only 16
18  kilobytes is enough to identify the movie, is it correct?
19  A    That's correct.
20  Q    By having the 16 kilobytes, is there any way that you
21  can see that the infringer downloaded whole movie?
22  A    Not by the 16 kilobytes.
23          But there is an additional field on Exhibit 3
24  that's called bit field, and this information is exchanged
25  while doing the handshake with the infringer and it's a

95

1   percentage value how much the infringer shared at time of

2   our handshake.

3            THE COURT:  So 95 would be 95 percent of the

4   video, is that what you are saying?

5            THE WITNESS:  Correct.

6            THE COURT:  Okay.

7   BY MR. PARK:

8   Q    Where is the number?

9   A    It's on Exhibit 3, the column No. 3, it's called

10  BitTorrent bit field.

11  Q    You mean this number means percentage of download?

12  A    It's the percentage of the content, when we did the

13  handshake.

14           When we connect, for example, to the first one

15  it told us it's 95 percent of the torrent content he has

16  to offer and we can choose which piece of the data we want

17  to have.

18           Sometimes it shows zero, but this just means

19  it's at the beginning, so they just joined a swarm and

20  when we did the handshake he didn't have something, but

21  while we were connected he had something and we downloaded

22  some data from him.

23           So that proves our data exchange proves that he

24  actually had data and if you follow the column you can see

25  it increases by time.  So it starts at a low value and

goes up because the infringer downloading more and more from the IP and the swarm.

THE COURT: Does that mean if you are looking at the BitTorrent bit field column that it's the largest number for each video that would be relevant, that would show you what percentage of the video was available through the handshake?

THE WITNESS: Yeah.

THE COURT: Okay.

THE WITNESS: Yes.

And we always see it ends at 99 percent because most of the infringers just stop sharing the content when they finish downloading. It's configurable in the software to do it.

MR. PARK: No more questions.

THE COURT: Ms. James, anything else?

MS. JAMES: No, thank you.

THE COURT: You may step down.

Thank you for your testimony.

(Witness steps down.)

THE COURT: Ms. James, do you have another witness?

MS. JAMES: Yes, your Honor, we do.

THE COURT: Let's do it.

Case 1:19-cr-80030-DAC Document 112 Filed 10/08/21 Page 1 of 1 Page ID 392

97

```
 1          MS. JAMES:  May we please call Patrick Paige to

 2    the stand.

 3          THE COURT:  Yes.

 4    PATRICK PAIGE,

 5          having been duly sworn, was examined

 6          and testified as follows:

 7          THE CLERK:  Please state and spell your name for

 8    the record.

 9          THE WITNESS:  Patrick Paige, last name

10    P-A-I-G-E.

11          THE COURT:  Mr. Paige, I'm going to ask you to

12    remember to speak into the microphone.

13          The acoustics are terrible in here.

14    DIRECT EXAMINATION

15    BY MS. JAMES:

16    Q    Good afternoon, Mr. Paige.

17          Can I please ask you to give us a little bit of

18    background about your professional experience, starting

19    from 1989.

20    A    I have over 25 years of law enforcement experience in

21    three different agencies, my last one Palm Beach County

22    sheriff's office where I spent just about ten years in the

23    computer crimes unit.

24    Q    And is it accurate that you started your law

25    enforcement career in about 1989?
```

98

```
 1  A    Yes.
 2  Q    And you continued in law enforcement for the next,
 3  did you say, 20 years?
 4          I apologize.
 5  A    I have been in law enforcement for over 25 years.
 6  Q    Over 25 years.  Okay.
 7          And did there come a time somewhere around the
 8  year 2000 that you became a detective in the computer
 9  crimes unit?
10  A    Yes.
11  Q    For what organization did you work in that capacity?
12  A    For the Palm Beach County sheriff's office.
13  Q    And as a detective, did you investigate internet
14  frauds, crimes, child pornography and the like?
15  A    Yes, computer-related crimes and computer forensics.
16  Q    And was that a special unit?
17  A    Yes.
18  Q    Did you -- have you had an opportunity in that
19  position to conduct forensic computer exams for the
20  Broward County sheriff's office?
21  A    Yes.
22          I conducted forensic examinations for the Palm
23  Beach County sheriff's office as well as all the
24  municipalities within that jurisdiction.
25          Also I have done examinations for the Broward
```

99

1   County sheriff's office, FBI, US Customs, FDLE, Florida

2   Department of Law Enforcement.

3   Q     And the secret service?

4   A     Yes.

5   Q     And the Bureau of Alcohol, Tobacco & Firearms?

6   A     Yes.

7   Q     Were you called in by those other agencies in your

8   professional capacity to provide that assistance in

9   relevant cases?

10  A     Yes.

11  Q     Have you taken courses, have you taken courses to

12  inform you and basically to train you on investigating

13  computers?

14  A     Yes.

15        I have taken hundreds of hours of

16  computer-related investigative classes involving computer

17  forensics over the course of my employment.

18  Q     And have you remained current in those classes?

19  A     Yes.

20  Q     Have you ever been a teacher of computer forensic

21  classes.

22  A     Yes.

23        I believe it was in 2003 I was an instructor for

24  Guidance Software which is the maker of NK Software,

25  forensic software that's used widely by investigators all

Case 1:15-cv-09003-BBPD 4DAS Endoc-19d-19f5H50-10Fild408/24/2100 Drf4d5Pane293/-26

Paige - Direct/James

100

1    over the world.

2    Q    Did you have an opportunity to teach at beginning and

3    advanced levels?

4    A    Yes.

5    Q    And in 1990, were you awarded the deputy of the year?

6    A    Yes.

7    Q    And in 1997 were you awarded the deputy of the month

8    for June?

9    A    Yes.

10   Q    And in 19 -- 2001 were you the detective of the month

11   for October?

12   A    I believe so, yes.

13   Q    And in 2002 were you awarded the distinction of

14   outstanding law enforcement officer of the year?

15   A    Yes, for the Department of Justice.

16   Q    For the United States Department of Justice?

17   A    Yes.

18   Q    In 2003 did you receive the US Customs service unit

19   citation award?

20   A    Yes.

21   Q    And in 2005, again, the detective of the month in

22   December?

23   A    Yes.

24   Q    And in 2007 were you again awarded the award by the

25   United States Justice Department for outstanding law

Case 1:15-cv-02063-PAE Document 14-25 Filed 10/09/19 Page 10 of 45 PageID #: 396
Case 1:13-cv-06785-PAE Document 114 Filed 11/06/14 Page 183 of 293 PageID #: 396

Paige - Direct/James

101

1    enforcement officer of the year?

2    A    Yes.

3    Q    Mr. Paige, have you testified as a fact and expert

4    witness previously?

5    A    Yes.

6    Q    Have you done that both at the trial level and the

7    appellate level?

8    A    Yes.

9    Q    Have you provided testimony in state, federal and

10   military courts?

11   A    Yes.

12   Q    Has any court ever refused your ability to provide

13   testimony in the topic as an expert in computer forensics?

14   A    No.

15   Q    Sir, have you testified on behalf of Malibu Media in

16   other cases?

17   A    Yes.

18   Q    Can you tell me roughly how many of those cases?

19   A    Actual testimony including depositions probably four

20   or five times.

21   Q    And did you provide testimony and deposition

22   testimony in a recent case **Malibu Media v John Doe** pending

23   in the Southern District of New York in front of Judge

24   Forrest?

25   A    Yes.

Case 1:19-cv-09439-PKC Document 142-1 Filed 01/08/21 Page 185 of 293
Case 1:20-cv-02151-PKC Document 142-1 Filed 01/08/21 Page 185 of 293 PageID #:
397

Paige - Direct/James

102

```
 1    Q    And did that relate to your individual forensic work
 2    on a computer?
 3    A    Yes.
 4    Q    And what did you find in your forensic examination of
 5    that computer?
 6    A    Extensive -- in that case I found extensive use of
 7    wiping programs, antiforensic programs, in other words,
 8    spoliation on the drive.
 9    Q    And have you been asked to analyze computer databases
10    for such evidence?
11    A    Yes.
12    Q    Are you proficient in that proceeding -- I mean in
13    those procedures to detect that information?
14    A    Yes.
15    Q    And in this particular case, sir, have you had an
16    opportunity to submit declaration in support of
17    plaintiff's motion for -- a request to serve a third-party
18    subpoena?
19    A    Yes.
20    Q    And, sir, did you also submit a declaration,
21    supplemental declaration in support of plaintiff's
22    opposition to this motion that we are discussing today,
23    the motion to quash?
24    A    Yes.
25    Q    And, sir, did you have an opportunity in preparation
```

Paige - Direct/James

<span>103</span>

1   for today's testimony to review your declaration?

2   A   Yes.

3         MS. JAMES:  Just for the record, that

4   declaration is docket entry No. 15 and it was filed on

5   October 27, 2015.

6   BY MS. JAMES:

7   Q   Sir, does that declaration also accurately reflect

8   your background as an expert?

9   A   Yes.

10   Q   And your work in this case and other cases?

11   A   Yes.

12   Q   And, sir, do you know whether or not an IP provider

13   will provide a civil litigant it's subscriber's

14   information without a subpoena?

15   A   No.

16         They require a subpoena.

17   Q   And what is the basis of your knowledge of that fact?

18   A   Based on the Congress -- congressional act that was

19   put forth that requires subpoena, or the subpoena be

20   issued to an ISP to provide personal information about a

21   subscriber.

22         It's common knowledge in law enforcement as well

23   as in the private sector.

24   Q   And in preparation for today's testimony, did you

25   have a chance to review the Verizon statement about when

Case 1:12-cv-01008-JDB Document 14-25 Filed 10/08/24 Page 187 of 293 PageID #: 399

104

1  they would provide subscriber information in civil

2  litigation?

3  A    Yes.

4  Q    And we have already introduced it into evidence, so

5  feel free to refer to it if it's helpful.

6         But is it -- does Verizon provide notice to its

7  subscribers that it will not disclose their personal

8  information without a court-issued subpoena?

9  A    Yes.

10 Q    Is there any other way for a civil litigant in your

11 experience to get a subscriber's name based on IP address

12 only?

13 A    No.

14 Q    No.

15        And was that true in your experience in law

16 enforcement?

17 A    Yes.

18 Q    So was there a procedure in place when you were

19 working in law enforcement for you to present a court or

20 the appropriate party an IP address and request the

21 identification of the actual target defendant?

22 A    Yes.

23        Whenever an IP address is identified in an

24 investigation, a request is made to the state attorney's

25 office to issue a subpoena to the ISP for the records.

Paige - Direct/James

1   Q    So it's a required step in both civil and criminal

2   process to request permission to seek that individual's

3   information?

4   A    Yes.

5   Q    And when they do respond, they tell you who the

6   subscriber is, correct?

7   A    Yes.

8   Q    And if the subscriber is an individual in a

9   residency, the response will indicate that.

10          Correct?

11  A    Will you repeat your question.

12  Q    Yes.

13          When the response is returned from the ISP

14  provider, if it's a residential home, the response will

15  indicate that, correct?

16  A    It will -- the response will be the address of

17  where -- of the subscriber.

18          As to whether it's residential or commercial, I

19  don't know if that distinction is actually made.

20  Q    I apologize.

21          You are correct, and I misstated my question.

22  A    Sure.

23  Q    It will give you the address and the name of the

24  subscriber, correct?

25  A    Yes.

Case 1:16-cv-03595-JSR Document 44-25 Filed 10/04/21 Page 293 of 86
Case 1:16-cv-03595-JSR Document 14-25 Filed 10/03/21 Page 189 of 293 Page ID #:
401

**106**

1    Q    And, sir, did you in your work on behalf of

2    Malibu Media have an opportunity to verify or work with

3    the Excipio software that we were discussing earlier

4    today?

5    A    Yes.

6    Q    And can you tell me what was the nature of your

7    assignment?

8    A    In 2013 we were engaged to conduct tests to real life

9    scenarios to determine whether the software can actually

10   detect an IP address, identify it correctly.

11   Q    So is it accurate that you were retained or given the

12   marching order to set up a system to verify the accuracy

13   of the software.

14        Correct?

15   A    Yes.

16   Q    And what steps did you take to conduct that

17   investigation?

18   A    We first started by renting four virtual servers

19   through GoDaddy, and all these servers had static IP

20   addresses.

21        Once we established the four servers, we

22   installed BitTorrent software on those servers, and once

23   the installation of the BitTorrent software was complete,

24   we used four different types of BitTorrent software, I

25   believe one of them was BitComet, I don't recall the names

Case 1:15-cv-09697-DAB Document 14-25 Filed 10/06/16 Page 29 of 145 Page #: 402

1    of the other ones.

2            Once the software was set up, we then needed

3    four movies, we took four public domain movies that were

4    not copyright protected and I encoded them with specific

5    verbiage across the video.  Once the video was prepared,

6    they were loaded into the BitTorrent client software.

7    BitTorrent was created for those movies.

8            The torrent file was uploaded as you would do in

9    a normal situation to like Pirate Bay, was one of them,

10   and once that process is complete, the test was ready to

11   begin, and Excipio was given the title names as they do in

12   all their cases.

13           Once they have the title names, they use their

14   software to identify the movies in the --

15   Q    So in this case you provided Excipio with the four

16   tiles that you selected of the public domain content?

17   A    Yeah.

18           The only information they were given were the

19   title names.  They were not given any information as to

20   the server's identity, where they were located, IP address

21   or anything relating to that.

22   Q    And I apologize for not laying this foundation, but

23   when you were conducting this verification process, for

24   whom were you employed?

25           Were you in private employment then?

108

1   A    Yes.

2         I was working for a Computer Forensic, LLC, it

3   was founded in 2012.

4   Q    And this is after your service as a law enforcement

5   officer?

6   A    Yes.

7         This is in the private sector.

8   Q    And this is where you were working at the time?

9   A    Yes.

10  Q    After you provide Excipio with the four titles and no

11  other information, what was the next step that occurred?

12  A    Once the servers were installed, the BitTorrent

13  client software was installed in the servers and the

14  movies were uploaded, there was also a program called

15  Wireshark, which was discussed earlier.

16        Essentially that program will provide PCAP

17  files, in other words it's going to monitor the network

18  traffic in and out of our servers in the form of PCAP

19  files that were discussed earlier.

20  Q    Is this software downloaded into your system in order

21  to ensure that when an exchange occurred you were going to

22  capture that so you could preserve a record of that.

23        Correct?

24  A    Yes.

25  Q    And that is software that you either purchased or

1    downloaded called Wireshark that you didn't actually

2    develop but used?

3    A    It's open source software.

4    Q    It's open source.

5          And, again, those PCAPs, those files are

6    accurate because they cannot be modified or adjusted after

7    they have been created.

8          Correct?

9    A    Correct.

10   Q    Did I misspeak?

11   A    Well, I mean, when you say a file can't be modified,

12   I think when you look at the totality of the file itself,

13   if you were to go in there and, you know, take what we

14   call a hex editor and start manipulating data, eventually

15   the data would not make sense.

16          The PCAP files contain millions and millions of

17   bits of information.  So given the circumstances, any file

18   when you think of that could be somehow manipulated.

19   That's why there are steps put in place to prevent stuff

20   like that.

21   Q    So let me ask this question then, the intent of using

22   a PCAP capturing is to have a record that the file that

23   was exchanged was recorded.

24          Correct?

25   A    Correct.

1  Q    And it's also the point that it's not based on you,
2  but third-party software that this evidence is being
3  captured, correct?
4  A    Correct.
5  Q    And if we gave it to another IT professional, if they
6  were to open a PCAP file they would be able to understand
7  that the information was maybe the snapshot of this
8  exchange of information, correct?
9            They would be able to read that file?
10 A    Yes.
11 Q    So the purpose was to verify your experiment?
12 A    Yes, and compare it with PCAP files after the testing
13 process from Excipio.
14 Q    Then what happened next?
15           Was there an exchange between Excipio and you?
16 A    Yes.
17           Within 24 hours they -- Excipio identified all
18 four of our servers and were able to provide us with their
19 locations via IP address.
20           So they were able to identify all four IP
21 addresses and, given that information, had they been law
22 enforcement or requested a subpoena for those IP
23 addresses, they would have eventually led to our identity.
24 Q    So when you -- I hope I didn't -- I apologize if I'm
25 circling back -- in the beginning of your answer you said

Case 1:16-cv-08033-RA-HBP Document 142 Filed 10/30/18 Page 20 of 35 PageID #:
406

111

1   the Excipio was able to identify the IP addresses and the

2   location.

3           You don't mean the physical location, correct?

4   A    No.

5           I mean the location via IP address.

6   Q    So the IP address only?

7   A    Only the IP address.

8   Q    And then the rest of your answer is talking about the

9   next step that if somebody has the IP address, then they

10  would have to ask for the court intervention to require or

11  request a subpoena for the actual subscriber information?

12  A    That's correct.

13  Q    And that would give the location?

14  A    Correct.

15  Q    Within this 24-hour period, Excipio was successful in

16  identifying your IP addresses as people that were sharing

17  and downloading and uploading -- is that correct?

18          Were you uploading also?

19  A    Well, at the time of the test, yeah.

20          In order to complete the test we were using a

21  noncopyrighted movie and when you have a movie that's

22  never been in the BitTorrent swarm, it's considered a new

23  movie.

24          So you have to be the initial seeder of that

25  movie, so essentially we were sharing that movie out for

Paige - Direct/James

112

1   other people -- for everybody in the BitTorrent community

2   to download.

3   Q    And Excipio was able to locate that offer, enter into

4   the handshake and actually download that information?

5   A    Yes.

6        An examination of the PCAP files that we created

7   showed Excipio's IP address engaged in transactions with

8   our computer.

9   Q    And what was the next step after that review?

10  A    Once that was reviewed there was also communications

11  via e-mail where the individuals from Excipio provided

12  some screen captures as well as Excel spreadsheets similar

13  to the ones we are seeing here in Exhibit 3, I believe it

14  is up here.

15       They were able to provide us also with their

16  PCAP files is how we make the determination that we had a

17  successful test.

18  Q    So after this -- after your test, then Excipio

19  provided you their PCAP files and you compared them.

20       Correct?

21  A    Correct.

22  Q    And from that you determined that there was an actual

23  exchange of the content?

24  A    Yeah, they showed connections between our computers

25  and their computers, BitTorrent connections, yes.

Paige - Direct/James

113

1   Q    And they were sharing the content?

2   A    Yes.

3   Q    And from this investigation or experiment, you have

4   concluded or is it accurate that you have concluded that

5   the Excipio software is effective in monitoring?

6   A    Yes.

7   Q    And, sir, I know you have heard a lot of testimony

8   about the University of Washington article today, correct?

9   A    Yes.

10  Q    And is it your understanding that the Excipio

11  software is a direct monitoring service, not an indirect?

12  A    That's correct.  They sort of pick up where the other

13  one left off.

14  Q    And when you say the other one, do you mean the

15  monitoring service that was discussed in that article?

16  A    Correct.

17  Q    And then subsequent to those steps, they actually

18  engage in direct exchanges of information?

19  A    Yes.

20  Q    So it's above and beyond what was described in the

21  University of Washington article.

22       Is that correct?

23  A    Yes.

24  Q    Could you briefly describe for me, and feel free to

25  look at the complaint and any of the attachments, is it

Case 1:16-cv-08897-DAB Document 114-4 Filed 10/31/24 Page 2 of 185 PageID #: 409

114

1   accurate that in this particular case, the case that's

2   pending before the court now, that the IP address remained

3   consistent between the infringement period of February

4   2015 and May of 2015?

5   A    I have not looked at the log files in this particular

6   case.

7   Q    Okay.

8         What I was referring to is the exhibit attached

9   to the complaint that's before you in 3.

10  A    Exhibit 3?

11  Q    I believe so.

12        It should be the actual complaint in this case.

13        MS. JAMES:  Your Honor, can I just show it to

14  him?

15        THE COURT:  Yes.

16        (There was a pause in the proceedings.)

17  BY MS. JAMES:

18  Q    Yes.

19  A    Exhibit 5?

20  Q    Yes, I apologize.

21        I am referring to Exhibit A to the complaint.

22  Sir, when you look at that chart, does it indicate to you

23  that each one of the alleged downloads and infringement is

24  attributable to the same IP address?

25  A    Yes, according to this document.

Paige - Direct/James

115

1   Q    I know that you didn't draft the document.

2   A    Exactly.

3        I did not draft this document, so...

4   Q    But you do see that it's the same IP address?

5   A    Yes, I did.

6   Q    And when you referred earlier to Excipio's -- the

7   Exhibit 3, you have in your past experience have reviewed

8   such additional data charts, correct?

9   A    Yeah.

10       These are provided when I conduct forensic

11  examinations.  On computers that are turned over for

12  examination, I have seen this document before.

13  Q    So you have used this in the course of your expert

14  testimony and your investigation, correct?

15  A    Yes.

16  Q    And if you look at the client IP on the left-hand

17  side, you can see that that remains consistent.

18       Correct?

19  A    Yes.

20  Q    Does that indicate to you, if it does, I know you are

21  not the drafter, that at least for the information

22  depicted on this chart, that the IP address stayed the

23  same?

24  A    Yes.

25  Q    And whether or not it was dynamic in this particular

Paige - Cross/Park

116

1   case it remained the same?

2   A    Correct.

3   Q    Thank you.

4           MS. JAMES:  I have no further questions.

5           THE COURT:  Mr. Park.

6           MR. PARK:  Yes, your Honor.

7           THE COURT:  Mr. Park, approximately how much

8   time do you think you will need?

9           MR. PARK:  Maybe ten to 15 minutes.

10          THE COURT:  Okay.

11  CROSS-EXAMINATION

12  BY MR. PARK:

13  Q    Good afternoon, Mr. Paige.

14  A    Good afternoon, Mr. Park.

15  Q    In April 10, 2015, Judge Kevin Nathaniel Fox, he in

16  Southern District of New York, he found you don't have any

17  personal knowledge of what information ISPs can use and

18  what procedure if any ISP employee were the substantive

19  work they perform in analyzing the data or identifying the

20  subscribers.

21          Is it correct?

22  A    I haven't read the document.

23  Q    You haven't read that document?

24  A    No.

25  Q    Actually **Malibu Media v John Doe** that I have a case

**117**

1    number, but the judge found you don't have any personal

2    knowledge of the ISPs, how they locate the subscriber by

3    using the IP address.  But you say you didn't hear about

4    this.

5              And --

6              MS. JAMES:  Is that a question?

7              THE COURT:  That's a different question.

8              First you said you didn't read the document.

9    Then you said did you hear about this.  You can answer

10   that.

11   A    No, I don't recall that.

12   Q    Okay.

13             I would ask regarding your test, so the test

14   that you did with the four servers, so you rented the four

15   virtual server for the test, is it correct?

16   A    Correct.

17   Q    How much did you pay for the renting the virtual

18   servers?

19   A    I don't have that number offhand.

20             I have a receipt in one of my documents probably

21   over there that I can produce.

22             THE COURT:  It's in the courtroom?

23             THE WITNESS:  I believe so.

24             THE COURT:  Take a second.

25             You can produce or maybe Ms. James can find it

Paige - Cross/Park

118

1    for you.

2              (There was a pause in the proceedings.)

3    A    You want the initial price or the renewal over a year

4    combined?

5    Q    Just the initial price.

6    A    $1,150.

7    Q    $1,150?

8    A    Yes.

9    Q    Did you rent the virtual server from a commercial

10   server services?

11   A    Yes, GoDaddy.

12   Q    GoDaddy.com?

13   A    Yes.

14   Q    Is it for four servers or only one server?

15   A    Four individual different servers with four different

16   static IP addresses.

17   Q    Static IP addresses.

18             And when you upload them, install the softwares

19   to the virtual software, did you use your computer in your

20   office?

21   A    Yes.

22   Q    Is it --

23   A    Well, they are virtual servers, so you have the VPN,

24   virtual private network, you log into your server.

25   Q    So do you know where is the virtual server is

Paige - Cross/Park

119

1    located?

2    A    Physically?

3    Q    Yes.

4    A    No.

5    Q    You use your computer through internet that

6    connect -- to connect the virtual servers, is it correct?

7    A    That's how you connect to a virtual server, yes.

8    Q    Did you choose your virtual server's IP addresses?

9    A    No.

10        They were chosen by GoDaddy when we purchased

11   the four servers or when we rented the four servers.

12   Q    We were discussing previous, I mean witnesses --

13   witness was discussing about the port number in that case,

14   in your virtual servers.

15        Your virtual servers have the fixed port numbers

16   or randomly generated one?

17   A    The software was installed on the servers.

18        So it would have generated a random port.

19   Q    Random port.

20        And you said that you installed -- you

21   transferred the document -- the sample movies in the

22   server and have Excipio detected that server, right, you

23   give the name of the file to them, is it correct?

24   A    I'm sorry.

25        Can you repeat the question.

120

1    Q    After up loading your movie file for the test and did

2    you let the Excipio know about -- knows about the file

3    number, file name?

4    A    Yes.

5              They were only provided the file name.

6    Q    And Excipio detected the four servers you said within

7    24 hours, they detected that file was in the servers, is

8    it correct?

9    A    Yes.

10             They identified all the server IP addresses.

11   Q    So they detected the server's IP addresses, is it

12   correct?

13   A    Yes.

14   Q    They couldn't detect your computer's IP address, is

15   it correct?

16   A    They detected the devices or computers that were

17   running the BitTorrent software.

18   Q    So that means the server, virtual server, is it

19   correct?

20   A    Yes.

21   Q    And your computers that you were using to upload the

22   files to the virtual server, the computer has different IP

23   address, is it correct?

24   A    Different what address?

25   Q    IP address.

1   A    IP address?

2   Q    Yes.

3   A    Yes.

4   Q    And is there any Excipio -- have they detected your

5   computers, not server's IP address?

6        Did they detect your computer's IP address?

7   A    When you say they, are you asking Excipio?

8   Q    Yes.

9   A    Okay.

10       Excipio identified the server IP addresses that

11  was running our BitTorrent software.

12  Q    Is there any way that they can detect your computer?

13  A    Given the scenario that we are talking about here?

14  Q    Yes.

15  A    You are talking about the computer -- so I understand

16  your question correctly, you are talking about my computer

17  that I used to VPN into the --

18  Q    Yes.

19  A    -- the servers.

20  Q    Yeah, your computer that you are sitting on and is

21  there any way that they detect your computer, not virtual

22  server?

23  A    Not -- no, not through the test described by me.

24  Q    So basically your computer is not detectible by the

25  Excipio software?

122

```
 1   A     By Excipio software, no.

 2         Again, the virtual server that's running the

 3   BitTorrent software would be the -- in that particular

 4   case Excipio, in order to identify who is using that

 5   particular server would have to have somebody issue a

 6   subpoena to GoDaddy.

 7         And they would be able to provide log

 8   information.  That's how they would trace it back to me.

 9   They would ask GoDaddy, who had the servers, who's logging

10   into these servers at these particular times and days?

11         They will have my actual VPN login files that

12   would trace it back to me.

13   Q     But GoDaddy.com is not an ISP, is it correct?

14   A     Yeah, they -- yeah.

15         THE COURT:  Yes, it's correct or --

16         THE WITNESS:  Yes, it is.

17   A     They provide web hosting.  They provide all kinds of

18   services.

19         THE COURT:  GoDaddy is an ISP?

20         THE WITNESS:  Yes.

21         THE COURT:  Okay.

22   BY MR. PARK:

23   Q     So basically the method you were using to test the

24   software, is it comparable to the proxy server system, is

25   it correct?
```

App. 203

123

```
1    A    No.

2    Q    How different?

3    A    They are just different.

4              I mean, in the -- in the situation that I use,

5    I'm essentially using four independent virtual servers and

6    I'm VPNing into the servers and controlling those servers

7    because they are, again, virtual.

8              They are independent of each other, and they

9    have static IP addresses, but they are still independent

10   of each other.  It really has nothing to do with proxy

11   servers in the scenario that I used.

12   Q    Isn't same method to using some server that has

13   distance from the infringer and then the server is

14   downloading something, transacting something with a swarm

15   and the person who is using that server just simply

16   download or transmit a document from the server in that

17   way there was no way to detect the real IP address of the

18   infringer.

19             So basically isn't it the same method and same

20   way that you use is the same that the proxy server users

21   are using?

22   A    To be honest, I didn't even follow your question.

23             I can only attest to what I did in that

24   situation.

25   Q    Okay.
```

1        MR. PARK:  No further questions.

2        THE COURT:  Ms. James, any redirect?

3        MS. JAMES:  Yes.

4   REDIRECT EXAMINATION

5   BY MS. JAMES:

6   Q    Mr. Paige, is it correct when -- I know that Mr. Park

7   just asked you a series of questions about was Excipio

8   able to detect your computer.

9        I understand your testimony to be that the

10  BitTorrent software was being run on the servers, correct?

11  A    Yeah, theoretically it's my computer because I'm the

12  one that rented it, yes.

13  Q    I understand.

14       But I think he was making a distinction between

15  those servers that you rented to do this test and conduct

16  the test and your own individual computer that you signed

17  in to the servers.

18       Correct?

19  A    Yes.

20  Q    And your computer you were not running the BitTorrent

21  software?

22  A    Right.

23  Q    So, of course you wouldn't have been detected because

24  you weren't doing it, correct?

25  A    That's correct.

Paige - Redirect/James

125

1       THE COURT:  Mr. Paige, if your individual

2  computer had been running BitTorrent, and you didn't

3  bother with the GoDaddy servers, would the same experiment

4  have led to the computer you were using?

5       THE WITNESS:  Absolutely.

6       MS. JAMES:  That is exactly my point.

7  BY MS. JAMES:

8  Q    So without the use, unless an individual -- in other

9  words an individual has to download and operate BitTorrent

10 software in order to be detected by Excipio.

11      Correct?

12 A    Correct.

13 Q    And this hypothetical about a proxy server, again, an

14 individual that was somehow signed in to a proxy server,

15 they would have to download and be using BitTorrent

16 software in order to be detected by Excipio software and

17 then subsequently have the direct connection.

18      Correct?

19 A    That's my understanding.

20      Again, proxy server is not my expertise.

21 Q    Is it a term of art?

22 A    Excuse me?

23 Q    Is it a term of art, proxy server?

24 A    I don't understand what you said, a term of art?

25 Q    Term of art, in other words, does it have any

Case 1:16-cv-03987-DAP Document 14-4 Filed 10/18/21 Page 42 of 145 PageID #: 421

126

1   specialized meaning to people in the computer service

2   field?

3   A    I don't know what you are getting at.

4         Sorry.

5   Q    What does the term proxy server mean to you?

6   A    It's allowing someone's ability to mask their IP

7   address.

8         People use proxy servers to remain anonymous

9   sometimes on the internet.

10  Q    And the idea would be so that no one could detect

11  their IP address?

12  A    To remain anonymous.

13  Q    Okay.

14        And in this case we have detected the IP

15  address, correct?

16  A    It's my understanding that's the case, that would be

17  what Mr. Patzer revealed on that.

18  Q    Thank you.

19        MS. JAMES:  No further questions.

20        THE COURT:  Mr. Park, any further questions?

21        MR. PARK:  No, your Honor.

22        THE COURT:  You may step down.

23  Thank you, Mr. Paige.

24        THE WITNESS:  Thank you.

25        (Witness steps down.)

127

1    THE COURT:  Any other witnesses, Ms. James?

2    MS. JAMES:  No, your Honor.

3    THE COURT:  Mr. Park, any other witnesses?

4    MR. PARK:  No, your Honor.

5    THE COURT:  Let's talk about schedule.

6         You should both order the transcript and provide

7    posthearing briefing in whatever form you want.  I don't

8    mind if it's a letter, but let's be realistic about the

9    page limits.

10        How many pages you think you need, Ms. James?

11    MS. JAMES:  A letter is fine.

12    THE COURT:  How many pages?

13    MS. JAMES:  How many pages?

14    THE COURT:  Do you need?

15    MS. JAMES:  I would say between five and ten.

16    THE COURT:  If you are going to do a ten-page

17    letter, why don't you just write a 20-page brief and

18    double space it to make it easier for me to get through.

19        So it's a motion to quash, so 20 pages,

20    Mr. Park, also.  I would ask you to cite to the record.

21    It would be helpful for me as you make your arguments.

22    How much time do you need?

23        You want 30 days, I'll give you 30 days after

24    that?  Ms. James, if you want to move faster that's fine,

25    but you have to order from the court reporter.

Ellen S. Combs, CSR
OFFICIAL COURT REPORTER

App. 208

Case 1:16-cv-09517-DAB Document 142-1 Filed 10/04/21 Page 209 of 287 Page ID #:

128

```
1          MS. JAMES:  Yes, so 30 days from the receipt of

2     the transcript?

3          THE COURT:  I'll give you that, but you are the

4     plaintiff.

5          This depends how fast you want to move.

6          MS. JAMES:  He's the movant, it's his motion.

7          THE COURT:  That's correct, but typically in any

8     case the defendant likes to delay and the plaintiff does

9     not.  That's why I'm asking you.

10          I get it's your motion, so do you want to wait

11     30 days?

12          MS. JAMES:  No.

13          THE COURT:  I'll make him do it faster, but then

14     you have to order the transcript faster.

15          I can have you do it tomorrow, but then you are

16     going to have to pay for it.

17          MS. JAMES:  I would like to have 30 days after I

18     receive the transcript and I'd like to review with the

19     court reporter, my client, the difference in the expedited

20     and what's viable or not.

21          THE COURT:  Okay.

22          MS. JAMES:  Hopefully we'll get it in a week.

23          THE COURT:  Let's agree within one week from

24     today you will submit to me a briefing schedule.

25          You can have 30 days from receipt of the
```

1   transcript.  Work that out with the court reporter, what

2   that looks like, and then file a one-page letter letting

3   me know when you will submit briefs.

4          MS. JAMES:  Okay.

5          And are you envisioning both of us submitting

6   simultaneously?

7          THE COURT:  That's fine.

8          You can do that.

9          MS. JAMES:  Right.

10         THE COURT:  You can both have the same amount of

11  time.

12         MS. JAMES:  Right.

13         THE COURT:  30 days from getting the transcript

14  and write me a letter telling me when you will have it

15  because I want to get these motions done sooner rather

16  than later.

17         MS. JAMES:  Right.

18         THE COURT:  Is there anything else?

19         MS. JAMES:  No.

20         Once we both submit our posthearing submissions,

21  do we respond to each other or we don't?

22         THE COURT:  No, you don't need to.

23         MS. JAMES:  Good.

24         I wanted to clarify.

25         THE COURT:  One brief is fine.

130

1          MS. JAMES:  Okay.

2          THE COURT:  I want you to tell me how the

3   hearing basically helped your arguments each of you.

4          MS. JAMES:  All right.

5          THE COURT:  I'll wait for a letter from you, but

6   once we get something we are going to try to bang this out

7   sooner rather than later.

8          MS. JAMES:  Thank you.

9          MR. PARK:  Thank you.

10          (The matter concluded.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    I N D E X

2

3  **MICHAEL PATZER**                                    5
   DIRECT EXAMINATION                                   6
   BY MS. JAMES
4  CROSS-EXAMINATION                                   77
   BY MR. PARK
5  REDIRECT EXAMINATION                                89
   BY MS. JAMES
6  RECROSS-EXAMINATION                                 94
   BY MR. PARK

7

8  **PATRICK PAIGE**                                    97
   DIRECT EXAMINATION                                  97
   BY MS. JAMES
9  CROSS-EXAMINATION                                  116
   BY MR. PARK
10 REDIRECT EXAMINATION                               124
   BY MS. JAMES

11

12                    EXHIBITS

13    Plaintiff Exhibit 1 in evidence.                  49
      Plaintiff Exhibit 2 in evidence.                  49
14    Plaintiff Exhibit 5 in evidence.                  53
      Plaintiff Exhibit 4 in evidence.                  68
15    Plaintiff Exhibit 4 was received in evidence      73

16

17

18

19

20

21

22

23

24

25

# $

**$1,150** [2] - 118:6, 118:7

# 1

**1** [10] - 16:24, 30:20, 30:24, 48:23, 48:25, 49:1, 52:23, 53:10, 82:2, 131:13
**1.2** [1] - 39:12
**10** [1] - 116:15
**100** [1] - 1:22, 61:19
**103,000** [1] - 63:17
**10601** [1] - 1:16
**10th** [1] - 56:3
**1102** [1] - 1:15
**11354** [1] - 1:19
**116** [1] - 131:9
**11722** [1] - 1:23
**1180** [1] - 1:22
**124** [1] - 131:10
**131,000** [5] - 25:7, 25:9, 80:7, 80:9, 93:5
**147th** [1] - 1:19
**15** [4] - 56:7, 66:18, 103:4, 116:9
**15-CV-3504** [1] - 53:11
**150** [2] - 43:10, 43:15
**16** [26] - 23:9, 23:10, 25:6, 25:18, 26:5, 26:9, 43:25, 63:7, 63:8, 63:12, 79:22, 80:2, 81:11, 91:23, 91:24, 92:7, 92:17, 92:19, 92:23, 92:24, 93:16, 93:20, 94:1, 94:17, 94:20, 94:22
**17** [1] - 7:9
**18** [3] - 2:15, 55:25, 62:12
**18th** [2] - 3:25, 73:13
**19** [1] - 100:10
**1989** [1] - 97:19, 97:25
**1990** [1] - 100:5
**1997** [1] - 100:7
**1999** [4] - 6:17, 6:19, 6:20, 77:16

# 2

**2** [4] - 49:3, 49:4, 49:10, 131:13
**2/15/2000** [1] - 66:15
**2/15/2015** [1] - 66:13
**20** [4] - 1:8, 63:13, 98:3, 127:19
**20-page** [1] - 127:17
**200** [1] - 45:19
**2000** [2] - 56:6, 98:8
**2001** [1] - 100:10
**2002** [1] - 100:13
**2003** [2] - 99:23, 100:18
**2005** [1] - 100:21
**2007** [1] - 100:24
**2008** [5] - 5:9, 7:23, 7:24, 31:7, 77:21
**2012** [1] - 108:3

**2013** [1] - 106:8
**2015** [9] - 56:3, 56:5, 66:18, 90:23, 103:5, 114:4, 116:15
**2016** [1] - 1:8
**23rd** [1] - 56:5
**24** [2] - 110:17, 120:7
**24-hour** [1] - 111:15
**25** [3] - 97:20, 98:5, 98:6
**27** [1] - 103:5
**29** [2] - 2:17, 73:13
**29880** [3] - 64:19, 66:13, 69:2
**2C** [1] - 1:19

# 3

**3** [17] - 53:14, 61:9, 61:12, 68:1, 72:12, 86:3, 86:6, 91:13, 92:13, 92:14, 94:23, 95:9, 112:13, 114:9, 114:10, 115:7
**30** [8] - 40:6, 127:23, 128:1, 128:11, 128:17, 128:25, 129:13
**342** [1] - 65:25
**3520** [1] - 1:19

# 4

**4** [12] - 65:12, 67:21, 67:25, 68:3, 72:12, 72:23, 73:4, 73:7, 73:8, 91:17, 131:14, 131:15
**4.2** [1] - 38:9
**445** [1] - 1:15
**49** [2] - 131:13, 131:13

# 5

**5** [7] - 53:17, 53:18, 53:20, 53:21, 114:19, 131:2, 131:14
**53** [1] - 131:14
**53013** [1] - 64:17

# 6

**6** [4] - 41:17, 74:19, 74:21, 131:3
**6.1** [2] - 41:25, 43:4
**6/16/2015** [1] - 53:11
**631** [1] - 1:23
**65,000** [1] - 59:23
**68** [1] - 131:14

# 7

**7** [1] - 74:24
**712-6107** [1] - 1:23
**73** [1] - 131:15
**77** [1] - 131:4

# 8

**89** [1] - 131:5

# 9

**90** [1] - 61:18
**94** [1] - 131:6
**95** [3] - 95:3, 95:15
**97** [2] - 131:7, 131:8
**98.116.160.61** [1] - 1:7
**99** [1] - 96:11
**9:30** [1] - 1:8
**9:32** [1] - 2:1

# A

**a.m** [2] - 1:8, 2:1
**ability** [4] - 13:25, 22:13, 101:12, 126:6
**able** [18] - 14:3, 17:25, 22:1, 26:5, 28:17, 38:11, 47:15, 65:17, 68:15, 110:6, 110:9, 110:18, 110:20, 111:1, 112:3, 112:15, 122:7, 124:8
**absolutely** [2] - 90:19, 125:5
**accept** [1] - 74:16
**access** [2] - 26:11, 46:12
**according** [1] - 114:25
**accumulation** [1] - 50:8
**accuracy** [1] - 106:12
**accurate** [33] - 8:12, 10:16, 11:10, 12:13, 17:6, 22:1, 22:6, 22:11, 29:16, 29:23, 31:5, 35:2, 37:14, 39:18, 39:19, 40:4, 41:18, 42:9, 42:19, 48:12, 54:22, 56:8, 66:12, 68:8, 69:2, 91:3, 92:25, 94:1, 97:24, 106:11, 109:6, 113:4, 114:1
**accurately** [2] - 21:25, 103:7
**acoustics** [2] - 6:2, 97:13
**acronym** [1] - 32:9
**act** [2] - 103:18
**Act** [1] - 50:1
**actions** [1] - 44:23
**actual** [15] - 5:12, 10:18, 19:20, 21:18, 24:1, 53:9, 54:17, 55:16, 93:21, 101:19, 104:21, 111:11, 112:22, 114:12, 122:11
**add** [1] - 2:19
**additional** [7] - 59:14, 61:21, 69:9, 75:20, 92:5, 94:23, 115:8
**address** [118] - 1:7, 5:9, 32:24, 33:13, 33:17, 33:19, 33:22, 33:23, 34:4, 35:17, 36:17, 38:5, 38:12, 38:15, 39:3, 39:7, 40:1, 40:16, 40:21, 40:22, 45:1, 46:15, 47:7, 54:19, 54:20, 54:23, 55:14, 56:8, 57:12, 57:18, 58:24, 60:5, 62:6, 62:7, 63:2, 63:22, 64:12, 64:25, 65:19, 67:7, 67:16, 67:17, 67:18, 68:18, 69:10, 72:9, 83:22, 83:24, 84:4, 84:5, 84:6, 84:7, 84:9, 85:3, 85:13, 85:21,

85:22, 85:23, 86:1, 86:7, 86:17, 86:21, 86:22, 86:23, 87:1, 87:4, 87:8, 87:9, 87:13, 87:14, 87:17, 88:3, 88:6, 88:10, 88:14, 88:16, 88:17, 88:19, 88:22, 88:23, 88:24, 89:19, 89:24, 91:1, 91:6, 91:9, 91:21, 104:11, 104:20, 104:23, 105:16, 105:23, 106:10, 107:20, 110:19, 111:5, 111:6, 111:7, 111:9, 112:7, 114:2, 114:24, 115:4, 115:22, 117:3, 120:14, 120:23, 120:24, 120:25, 121:1, 121:5, 121:6, 123:17, 126:7, 126:11, 126:15
**addresses** [42] - 31:23, 33:14, 33:15, 34:2, 34:11, 34:16, 35:5, 35:12, 35:22, 35:24, 36:4, 36:8, 36:16, 37:3, 37:11, 37:23, 38:14, 40:14, 40:15, 45:4, 45:16, 45:20, 45:24, 68:17, 70:11, 86:12, 88:7, 89:23, 90:2, 91:20, 106:20, 110:21, 110:23, 111:1, 111:16, 118:16, 118:17, 119:8, 120:10, 120:11, 121:10, 123:9
**adjusted** [1] - 109:6
**admit** [1] - 52:19
**admitted** [3] - 52:20, 72:23, 73:1
**adopted** [1] - 42:13
**adopting** [1] - 43:6
**advanced** [1] - 100:3
**affidavit** [6] - 14:19, 16:17, 16:25, 17:6, 74:1, 74:3
**afternoon** [4] - 6:14, 97:16, 116:13, 116:14
**agencies** [3] - 42:1, 97:21, 99:7
**ago** [3] - 7:18, 27:5, 42:10
**agree** [1] - 128:23
**ahead** [3] - 3:25, 49:11, 75:1
**akin** [1] - 32:16
**Alcohol** [1] - 99:5
**alert** [1] - 49:5
**algorithm** [1] - 24:13
**all-around** [1] - 7:15
**allegation** [1] - 72:3
**allege** [2] - 62:12, 92:16
**alleged** [5] - 26:14, 40:12, 56:10, 68:13, 114:23
**allow** [5] - 4:3, 9:11, 73:23, 74:4, 74:5
**allowing** [1] - 126:6
**allows** [1] - 88:13
**amenable** [1] - 73:23
**amount** [3] - 25:11, 80:13, 129:10
**amounted** [1] - 80:11
**analogy** [2] - 38:20, 94:4
**analyze** [1] - 102:9
**analyzing** [1] - 116:19
**and-a-half** [5] - 15:10, 15:11, 56:14, 56:24, 57:9

1

**anonymous** [2] - 126:8, 126:12
**answer** [9] - 27:14, 63:20, 80:20, 80:23, 84:17, 92:2, 110:25, 111:8, 117:9
**answered** [1] - 77:14
**answering** [1] - 35:9
**answers** [1] - 77:14
**antenna** [1] - 29:22
**antiforensic** [1] - 102:7
**apologize** [11] - 3:16, 3:19, 11:23, 52:24, 53:7, 91:24, 98:4, 105:20, 107:22, 110:24, 114:20
**appearances** [1] - 2:4
**APPEARANCES** [1] - 1:14
**appeared** [2] - 54:14, 54:16
**appearing** [1] - 37:23
**appellate** [1] - 101:7
**approach** [3] - 41:18, 55:19, 61:6
**appropriate** [4] - 4:16, 15:22, 52:19, 104:20
**April** [4] - 1:8, 2:15, 73:13, 116:15
**arbitrary** [1] - 38:12, 88:14
**architect** [2] - 6:22, 6:23
**arguments** [2] - 127:21, 130:3
**Art** [1] - 69:15
**art** [5] - 19:14, 125:21, 125:23, 125:24, 125:25
**article** [25] - 31:1, 31:5, 31:6, 31:9, 31:12, 31:25, 35:2, 35:11, 36:2, 36:23, 37:17, 37:20, 38:3, 38:9, 40:10, 41:3, 41:17, 42:10, 42:21, 43:3, 44:5, 44:15, 113:8, 113:15, 113:21
**Asian** [2] - 70:21, 70:22
**asserted** [1] - 51:10
**assign** [9] - 83:22, 84:21, 85:16, 85:17, 87:1, 87:8, 89:13, 89:18, 90:1
**assigned** [4] - 1:7, 43:20, 84:7, 90:20
**assignment** [2] - 14:8, 106:7
**assigns** [2] - 84:10, 84:11
**assistance** [1] - 99:8
**assistant** [2] - 6:22, 6:23
**associated** [1] - 43:5
**assume** [2] - 14:24, 46:10
**assumption** [1] - 58:9
**attached** [3] - 62:13, 90:25, 114:8
**attachment** [1] - 54:5
**attachments** [2] - 54:5, 113:25
**attest** [1] - 123:23
**attorney** [1] - 2:9
**attorney's** [1] - 104:24
**attributable** [1] - 114:24
**authors** [1] - 30:8
**available** [8] - 7:5, 10:2, 18:8, 34:9, 46:12, 49:18, 82:25, 96:6
**Avenue** [1] - 1:15

**avoid** [2] - 41:1, 82:10
**award** [2] - 100:19, 100:24
**awarded** [4] - 100:5, 100:7, 100:13, 100:24
**aware** [1] - 41:10

### B

**B-A-Y** [1] - 9:2
**background** [6] - 5:16, 6:15, 8:4, 74:12, 97:18, 103:8
**bang** [1] - 130:6
**bar** [1] - 3:10
**based** [11] - 24:14, 29:11, 57:2, 58:8, 68:17, 70:14, 71:2, 84:15, 103:18, 104:11, 110:1
**basis** [4] - 2:18, 3:10, 72:3, 103:17
**Bay** [8] - 8:24, 9:1, 9:5, 107:9
**Beach** [3] - 97:21, 98:12, 98:23
**became** [2] - 17:4, 98:8
**BEFORE** [1] - 1:11
**begin** [1] - 107:11
**beginning** [4] - 27:14, 95:19, 100:2, 110:25
**behalf** [8] - 2:6, 27:20, 28:21, 38:4, 46:16, 54:16, 101:15, 106:1
**behind** [5] - 64:25, 66:24, 67:18, 70:13, 71:5
**belong** [1] - 93:13
**belongs** [4] - 25:15, 93:7, 93:15, 93:18
**best** [1] - 9:3
**better** [1] - 6:4
**between** [11] - 21:17, 22:6, 27:16, 37:19, 40:11, 69:20, 84:8, 85:19, 90:23, 110:15, 112:24, 114:3, 124:14, 127:15
**beyond** [1] - 113:20
**big** [3] - 22:19, 63:5, 93:18
**bit** [9] - 10:15, 21:15, 21:16, 62:20, 70:3, 94:24, 95:10, 96:4, 97:17
**BitComet** [1] - 106:25
**bits** [1] - 109:17
**BitTorn** [2] - 39:23, 47:13
**BitTorrent** [56] - 8:17, 8:21, 8:23, 9:4, 9:14, 10:1, 10:18, 10:21, 14:6, 14:25, 15:6, 18:8, 18:20, 18:21, 18:23, 19:1, 21:22, 23:19, 33:10, 33:12, 33:16, 33:25, 34:3, 34:14, 38:1, 47:14, 47:16, 47:20, 47:24, 48:2, 59:24, 65:12, 65:18, 67:1, 67:7, 83:20, 88:10, 95:10, 96:4, 106:22, 106:23, 106:24, 107:6, 107:7, 108:12, 111:22, 112:1, 112:25, 120:17, 121:11, 122:3, 124:10, 124:20, 125:2, 125:9, 125:15

**bitTorrent** [1] - 83:19
**blacklist** [1] - 82:6
**blacklists** [4] - 41:3, 41:6, 82:12, 82:14
**Blondes** [1] - 92:21
**Bob** [1] - 69:25
**book** [1] - 38:23
**books** [1] - 7:7
**bother** [1] - 125:3
**bottom** [1] - 66:1
**break** [6] - 4:1, 10:14, 19:13, 61:20, 75:22, 75:24
**brief** [2] - 127:17, 129:25
**briefing** [2] - 127:7, 128:24
**briefly** [1] - 113:24
**briefs** [1] - 129:3
**bring** [1] - 5:7
**broader** [1] - 72:2
**brought** [1] - 30:11
**Broward** [2] - 98:20, 98:25
**Brunettes** [1] - 92:21
**Bureau** [1] - 99:5
**business** [5] - 6:21, 7:8, 27:25, 28:12, 72:16
**button** [1] - 14:19
**BY** [48] - 1:16, 1:20, 6:8, 6:13, 15:20, 30:22, 35:1, 49:12, 51:18, 53:22, 54:8, 55:22, 58:4, 61:8, 62:10, 63:16, 68:4, 72:1, 75:2, 75:8, 77:10, 79:2, 80:15, 81:1, 82:19, 82:23, 84:20, 85:12, 86:20, 89:10, 90:7, 91:15, 94:16, 95:7, 97:15, 103:6, 114:17, 116:12, 122:22, 124:5, 125:7, 131:3, 131:4, 131:5, 131:6, 131:8, 131:9, 131:10

### C

**cannot** [4] - 11:5, 40:8, 41:7, 109:6
**capacity** [2] - 98:11, 99:8
**capture** [1] - 108:22
**captured** [5] - 43:17, 46:16, 47:2, 63:6, 110:3
**captures** [1] - 112:12
**capturing** [1] - 109:22
**career** [1] - 97:25
**case** [51] - 2:2, 7:14, 7:17, 13:22, 15:2, 17:4, 20:3, 24:7, 26:18, 32:22, 45:14, 45:22, 46:24, 46:25, 49:13, 49:15, 51:12, 53:9, 53:10, 55:11, 62:2, 66:5, 68:13, 73:13, 83:11, 84:12, 86:12, 87:25, 88:20, 90:8, 90:22, 90:25, 91:5, 91:20, 92:5, 101:22, 102:6, 102:15, 103:10, 107:15, 114:1, 114:6, 114:12, 116:1, 116:25, 119:13, 122:4, 126:14, 126:16, 128:8

**cases** [12] - 28:24, 41:9, 44:19, 45:13, 45:14, 45:23, 85:19, 99:9, 101:16, 101:18, 103:10, 107:12
**CAT** [1] - 1:25
**CD** [1] - 9:17
**Central** [2] - 1:6, 1:23
**certain** [2] - 47:2, 93:10
**certainly** [1] - 74:2
**Challenges** [2] - 31:2, 41:18
**chance** [5] - 5:5, 30:7, 53:23, 54:1, 103:25
**change** [15] - 25:2, 65:2, 66:5, 85:21, 86:24, 87:5, 87:12, 87:15, 87:17, 91:1, 91:4, 91:6, 91:10, 91:21
**changed** [4] - 24:5, 64:23, 86:23, 87:13
**changes** [4] - 24:6, 66:12, 87:7, 87:11
**changing** [3] - 65:1, 86:8, 86:22
**charged** [2] - 9:19, 56:16
**chart** [7] - 55:24, 56:10, 62:16, 64:16, 90:24, 114:22, 115:22
**charts** [1] - 115:8
**check** [1] - 16:18
**Chejin** [1] - 2:9
**CHEJIN** [2] - 1:18, 1:20
**child** [1] - 98:14
**choice** [1] - 88:6
**choose** [2] - 95:16, 119:8
**chosen** [1] - 119:10
**circling** [1] - 110:25
**circumstances** [1] - 109:17
**citation** [1] - 100:19
**cite** [1] - 127:20
**cited** [1] - 5:10
**Civil** [1] - 50:16
**civil** [5] - 50:20, 103:13, 104:1, 104:10, 105:1
**clarification** [1] - 3:13
**clarifications** [1] - 3:24
**clarify** [3] - 74:25, 90:8, 129:24
**clarity** [1] - 62:5
**classes** [3] - 99:16, 99:18, 99:21
**clear** [2] - 38:19, 77:14
**CLERK** [3] - 2:2, 5:22, 97:7
**click** [2] - 14:19, 48:1
**client** [30] - 7:25, 8:1, 8:2, 8:11, 8:12, 10:10, 10:13, 13:21, 15:4, 42:8, 43:11, 45:5, 55:10, 60:18, 63:24, 64:7, 64:11, 64:13, 64:16, 65:10, 65:17, 93:22, 107:6, 108:13, 115:16, 128:19
**clients** [5] - 8:22, 18:20, 18:23, 35:18, 35:19
**code** [11] - 20:18, 20:19, 23:14, 23:20, 24:8, 24:12, 24:22, 24:25, 25:1, 25:3, 32:14
**codes** [2] - 20:21, 24:23
**coffee** [1] - 39:22

3

**collected** [6] - 11:10, 11:20, 12:22, 12:25, 36:16, 45:17
**collection** [1] - 43:24
**column** [16] - 55:3, 62:6, 62:19, 63:24, 64:2, 64:5, 64:6, 64:10, 65:10, 65:14, 66:14, 68:21, 95:9, 95:24, 96:4
**columns** [4] - 54:6, 54:9, 58:21, 64:4
**combination** [3] - 60:4, 67:4, 67:12
**combined** [1] - 118:4
**coming** [2] - 39:24, 73:4
**commercial** [2] - 105:18, 118:9
**common** [2] - 46:18, 103:22
**communal** [1] - 46:8
**communicate** [3] - 3:2, 14:17, 20:8
**communication** [2] - 27:16, 28:8
**communications** [1] - 112:10
**community** [1] - 112:1
**companies** [2] - 41:5, 77:20
**company** [4] - 6:24, 12:14, 41:12, 78:8
**comparable** [3] - 27:17, 80:5, 122:24
**compare** [17] - 10:9, 14:3, 14:24, 16:2, 25:7, 31:18, 38:16, 59:20, 78:13, 78:14, 78:17, 78:18, 79:15, 87:25, 93:20, 93:24, 110:12
**compared** [4] - 43:9, 78:8, 93:25, 112:19
**comparing** [4] - 14:5, 15:21, 79:3, 79:4
**comparison** [1] - 93:11
**complain** [1] - 87:13
**complaint** [17] - 49:15, 52:23, 52:25, 53:9, 53:23, 54:4, 58:12, 62:13, 62:16, 68:16, 71:2, 90:25, 91:17, 113:25, 114:9, 114:12, 114:21
**complete** [8] - 14:16, 14:25, 15:1, 15:3, 15:7, 106:23, 107:10, 111:20
**completed** [1] - 16:17
**completely** [1] - 18:1
**compose** [1] - 39:15
**compressed** [1] - 94:7
**computer** [68] - 47:11, 47:21, 48:6, 57:1, 57:5, 57:19, 57:25, 58:25, 59:6, 59:14, 59:21, 59:23, 60:3, 60:6, 60:7, 60:14, 61:3, 63:23, 64:25, 65:1, 65:7, 66:24, 67:5, 67:7, 67:17, 67:18, 70:11, 70:14, 70:19, 70:20, 71:5, 83:2, 84:11, 84:13, 84:23, 88:1, 88:4, 97:23, 98:8, 98:15, 98:19, 99:16, 99:20, 101:13, 102:2, 102:5, 102:9, 112:8,

118:19, 119:5, 120:22, 121:12, 121:15, 121:16, 121:20, 121:21, 121:24, 124:8, 124:11, 124:16, 124:20, 125:2, 125:4, 126:1
**Computer** [1] - 108:2
**computer's** [3] - 88:23, 120:14, 121:6
**computer-related** [2] - 98:15, 99:16
**computers** [10] - 60:10, 83:13, 83:14, 99:13, 112:24, 112:25, 115:11, 120:16, 120:21, 121:5
**concept** [2] - 31:15, 40:10
**concluded** [2] - 113:4, 130:10
**conduct** [7] - 3:21, 67:16, 98:19, 106:8, 106:16, 115:10, 124:15
**conducted** [2] - 57:12, 98:22
**conducting** [2] - 67:7, 107:23
**confident** [2] - 24:22, 93:1
**configurable** [1] - 96:13
**confirmed** [1] - 20:24
**confusing** [1] - 81:14
**Congress** [1] - 103:18
**congressional** [1] - 103:18
**connect** [13] - 19:3, 19:7, 29:22, 36:16, 37:1, 83:25, 84:1, 88:2, 88:10, 95:14, 119:6, 119:7
**connected** [1] - 95:21
**connecting** [2] - 19:16, 82:13
**connection** [18] - 23:5, 25:20, 33:15, 39:4, 40:17, 41:6, 41:7, 42:6, 54:14, 69:22, 72:5, 82:14, 83:5, 83:6, 84:2, 88:2, 89:22, 125:17
**connections** [3] - 40:11, 112:24, 112:25
**connects** [1] - 19:1
**consider** [1] - 39:9
**considered** [1] - 111:22
**consistent** [7] - 29:9, 64:21, 65:23, 67:2, 69:4, 114:3, 115:17
**constantly** [2] - 18:14, 56:23
**consultant** [1] - 77:20
**Cont'd** [1] - 72:1
**contact** [3] - 12:10, 13:16, 34:10
**contain** [2] - 20:15, 109:16
**contained** [2] - 34:16, 69:7
**containing** [1] - 37:10
**contains** [2] - 27:23, 61:17
**content** [63] - 9:15, 9:16, 10:6, 10:8, 10:13, 13:15, 13:20, 16:7, 18:21, 19:12, 20:1, 20:2, 20:5, 20:11, 20:14, 20:22, 21:2, 21:16, 21:17, 22:16, 22:23, 23:3, 23:10, 23:19, 23:23, 23:24, 24:2, 24:14, 25:25, 27:21, 29:14, 33:22, 34:11, 35:20, 37:24, 38:15, 39:7, 40:20, 40:22, 41:24, 42:7,

43:21, 45:2, 45:5, 45:21, 46:2, 48:1, 55:2, 55:6, 60:5, 60:7, 63:3, 67:13, 69:18, 79:5, 79:6, 93:21, 95:12, 95:15, 96:12, 107:16, 112:23, 113:1
**contents** [4] - 14:20, 47:24
**continue** [1] - 4:2
**Continued** [2] - 71:6, 76:4
**continued** [1] - 98:2
**contract** [1] - 51:1
**contractor** [1] - 8:3
**controlling** [1] - 123:6
**conversation** [1] - 9:18
**coordinated** [1] - 75:17
**copies** [2] - 30:15, 52:22
**copy** [6] - 13:23, 30:13, 53:2, 53:5, 73:12, 75:6
**copyright** [15] - 9:10, 9:12, 13:23, 32:13, 37:13, 41:4, 49:5, 49:6, 49:21, 49:24, 52:1, 52:5, 68:12, 107:4
**copyrighted** [15] - 8:13, 10:1, 17:19, 18:6, 18:12, 19:4, 32:15, 32:25, 36:9, 55:23, 56:21, 62:3, 63:2, 69:18, 92:7
**copyrights** [1] - 9:7
**corporation** [1] - 12:19
**correct** [235] - 3:14, 8:14, 10:19, 10:20, 10:23, 11:14, 11:18, 12:16, 12:19, 12:20, 12:23, 12:24, 13:2, 13:3, 14:6, 14:7, 14:11, 14:12, 14:15, 16:1, 16:9, 16:10, 16:15, 16:16, 17:11, 17:12, 18:7, 18:13, 19:17, 19:18, 20:6, 20:7, 20:16, 20:17, 20:18, 20:23, 21:5, 21:24, 22:9, 23:12, 23:21, 23:25, 24:3, 24:9, 24:10, 24:19, 25:14, 26:1, 26:3, 26:18, 27:9, 28:14, 28:19, 28:20, 28:22, 28:23, 29:10, 31:10, 31:13, 36:6, 36:10, 36:11, 38:2, 38:5, 38:6, 38:21, 38:22, 39:11, 41:11, 41:15, 41:16, 41:19, 41:20, 42:11, 42:12, 42:15, 42:23, 43:2, 43:8, 43:13, 43:17, 43:18, 43:22, 43:23, 43:25, 44:1, 44:16, 45:9, 45:25, 46:1, 46:4, 46:5, 47:4, 47:5, 47:18, 47:19, 47:24, 48:9, 49:16, 49:17, 50:11, 50:13, 50:14, 51:3, 52:7, 52:16, 54:6, 56:11, 57:9, 57:10, 57:13, 57:14, 58:17, 62:3, 62:4, 62:18, 63:8, 63:18, 64:18, 65:15, 65:20, 65:21, 66:3, 66:5, 66:6, 66:9, 66:20, 66:21, 68:25, 69:5, 69:6, 69:15, 69:16, 69:18, 70:7, 70:8, 70:24, 70:25, 71:3, 71:4, 72:4, 72:7, 72:10, 78:10, 78:11, 79:14, 79:20, 81:5, 82:2, 82:16, 82:17, 83:9, 85:7, 87:23, 87:24, 89:2, 89:11, 89:14, 89:15, 90:5,

90:9, 90:10, 90:12, 90:13, 90:18, 90:20, 90:21, 90:23, 91:2, 91:7, 91:17, 91:18, 91:22, 92:9, 92:10, 92:15, 92:18, 93:23, 94:6, 94:8, 94:9, 94:18, 94:19, 95:5, 105:6, 105:10, 105:15, 105:21, 105:24, 106:14, 108:23, 109:8, 109:9, 109:24, 109:25, 110:3, 110:4, 110:8, 111:3, 111:12, 111:14, 111:17, 112:20, 112:21, 113:8, 113:12, 113:16, 113:22, 115:8, 115:14, 115:18, 116:2, 116:21, 117:15, 117:16, 119:6, 119:23, 120:8, 120:12, 120:15, 120:19, 120:23, 122:13, 122:15, 122:25, 124:6, 124:10, 124:18, 124:24, 124:25, 125:11, 125:12, 125:18, 126:15, 128:7
**correctly** [2] - 106:10, 121:16
**cost** [1] - 43:4
**costs** [2] - 43:5, 43:9
**counsel** [3] - 2:4, 29:1, 61:14
**countries** [1] - 85:15
**County** [5] - 97:21, 98:12, 98:20, 98:23, 99:1
**couple** [5] - 30:13, 77:13, 89:16
**course** [5] - 70:17, 72:16, 99:17, 115:13, 124:23
**courses** [2] - 99:11
**court** [19] - 4:12, 8:25, 9:19, 26:20, 35:22, 45:13, 45:14, 49:14, 50:18, 50:21, 50:22, 101:12, 104:8, 104:19, 111:10, 114:2, 127:25, 128:19, 129:1
**COURT** [169] - 1:1, 2:11, 2:22, 2:24, 3:20, 4:9, 4:24, 5:1, 5:3, 5:14, 5:25, 6:5, 6:10, 6:18, 14:23, 15:6, 15:9, 15:14, 15:19, 30:14, 30:17, 30:21, 32:11, 32:16, 32:21, 33:2, 33:6, 33:16, 33:19, 33:24, 34:3, 34:7, 34:12, 34:14, 34:21, 34:24, 48:18, 48:21, 48:25, 49:7, 49:9, 49:11, 51:8, 51:12, 51:16, 52:11, 52:17, 52:20, 53:1, 53:6, 53:12, 53:14, 53:18, 53:20, 54:7, 55:21, 57:17, 57:23, 58:2, 58:10, 58:16, 58:19, 58:23, 59:2, 59:4, 59:9, 59:11, 59:13, 59:18, 59:21, 60:2, 60:9, 60:13, 60:20, 60:23, 61:1, 61:7, 62:5, 63:11, 63:15, 64:9, 67:22, 67:25, 72:11, 72:15, 72:18, 72:22, 73:2, 73:7, 73:15, 73:20, 74:7, 74:9, 74:15, 74:19, 74:22, 75:1, 75:4, 75:21, 75:25, 76:2, 77:2, 77:5, 78:22, 79:1, 80:10, 80:19, 82:1, 82:18, 82:21, 84:17, 85:9, 85:25, 86:5, 86:11, 86:16, 86:19, 89:6, 89:16, 89:23, 90:1, 90:4, 90:6, 91:11,

91:14, 94:13, 95:3, 95:6, 96:3, 96:9, 96:16, 96:18, 96:22, 96:25, 97:3, 97:11, 114:15, 116:5, 116:7, 116:10, 117:7, 117:22, 117:24, 122:15, 122:19, 122:21, 124:2, 125:1, 126:20, 126:22, 127:1, 127:3, 127:5, 127:12, 127:14, 127:16, 128:3, 128:7, 128:13, 128:21, 128:23, 129:7, 129:10, 129:13, 129:18, 129:22, 129:25, 130:2, 130:5

**Court** [4] - 1:21, 30:16, 53:5, 61:13

**Court's** [1] - 3:1

**court-issued** [1] - 104:8

**court-ordered** [1] - 50:22

**Courthouse** [1] - 1:5

**courtroom** [1] - 117:22

**courts** [1] - 101:10

**CR** [1] - 1:22

**crawl** [2] - 8:16, 8:18

**create** [2] - 24:20, 56:9

**created** [5] - 24:22, 62:11, 107:7, 109:7, 112:6

**creation** [1] - 28:9

**crimes** [4] - 97:23, 98:9, 98:14, 98:15

**criminal** [1] - 105:1

**cross** [4] - 3:22, 43:21, 68:15, 73:21

**CROSS** [4] - 77:9, 116:11, 131:4, 131:9

**cross-examination** [2] - 3:22, 73:21

**CROSS-EXAMINATION** [4] - 77:9, 116:11, 131:4, 131:9

**cross-reference** [2] - 43:21, 68:15

**current** [1] - 99:18

**customer** [3] - 30:3, 39:24, 79:6

**customers** [1] - 44:20

**Customs** [2] - 99:1, 100:18

**cut** [1] - 44:10

**CV-15-3504** [2] - 1:4, 2:2

**D**

**D-TRUST** [1] - 12:9

**data** [48] - 11:5, 11:8, 11:10, 12:4, 17:23, 18:4, 18:5, 19:9, 19:11, 19:22, 20:25, 21:9, 21:21, 23:8, 23:9, 24:6, 25:1, 25:2, 25:14, 26:15, 27:18, 28:5, 28:18, 32:21, 39:5, 41:8, 41:23, 42:6, 42:7, 60:14, 61:18, 61:21, 62:11, 80:6, 80:8, 90:16, 92:5, 93:4, 94:5, 95:16, 95:22, 95:23, 95:24, 109:14, 109:15, 115:8, 116:19

**databases** [1] - 102:9

**date** [14] - 11:21, 12:7, 12:22, 26:25, 27:2, 27:3, 27:6, 29:13, 39:24, 54:13, 54:18, 56:2, 66:12, 73:9

**Date** [2] - 54:11, 62:17

**dated** [3] - 2:15, 31:9, 31:12

**Dates** [1] - 54:22

**dates** [1] - 56:1

**days** [8] - 122:10, 127:23, 128:1, 128:11, 128:17, 128:25, 129:13

**December** [1] - 100:22

**decide** [2] - 79:16, 88:6

**decides** [1] - 33:21

**decision** [1] - 85:18

**declaration** [13] - 3:6, 3:7, 4:1, 4:8, 73:12, 73:16, 74:6, 102:16, 102:20, 102:21, 103:1, 103:4, 103:7

**declarations** [1] - 3:3

**default** [5] - 60:16, 60:20, 60:22, 60:23, 60:24

**defendant** [4] - 2:9, 2:10, 2:15, 3:2, 104:21, 128:8

**Defendant** [2] - 1:8, 1:18

**delay** [2] - 39:25, 128:8

**Department** [4] - 99:2, 100:15, 100:16, 100:25

**depict** [1] - 65:25

**depicted** [5] - 55:24, 62:17, 62:23, 70:1, 115:22

**depicting** [5] - 55:12, 65:18, 69:17

**depicts** [2] - 70:23, 92:12

**deposition** [1] - 101:21

**depositions** [1] - 101:19

**deputy** [2] - 100:5, 100:7

**describe** [15] - 8:7, 8:19, 9:3, 13:4, 13:7, 13:17, 17:13, 18:17, 25:5, 27:8, 37:18, 37:21, 54:11, 61:15, 113:24

**described** [7] - 17:14, 18:25, 36:25, 55:16, 85:1, 113:20, 121:23

**design** [3] - 7:18, 7:19, 28:10

**designed** [3] - 7:15, 72:19, 78:4

**designing** [2] - 7:13, 77:25

**detailed** [2] - 61:16, 61:25

**details** [2] - 5:12, 47:9

**detect** [12] - 87:21, 88:22, 88:24, 102:13, 106:10, 120:14, 121:6, 121:12, 121:21, 123:17, 124:8, 126:10

**detected** [11] - 50:6, 119:22, 120:6, 120:7, 120:11, 120:16, 121:4, 124:23, 125:10, 125:16, 126:14

**detectible** [1] - 121:24

**detection** [15] - 31:16, 31:18, 31:21, 37:19, 37:21, 41:1, 41:5, 41:14, 82:15, 82:16, 82:20, 82:21, 82:22, 84:4, 87:21

**detective** [4] - 98:8, 98:13, 100:10, 100:21

**detectors** [1] - 82:7

**detects** [1] - 22:22

**detention** [1] - 81:24

**determination** [1] - 112:16

**determine** [3] - 11:25, 59:5, 106:9

**determined** [3] - 24:11, 57:24, 112:22

**develop** [1] - 109:2

**developed** [1] - 17:24

**developing** [1] - 7:24

**development** [3] - 74:13, 77:22, 78:5

**devices** [1] - 120:16

**DHT** [5] - 63:25, 64:7, 64:13, 64:16, 68:23

**difference** [5] - 37:18, 69:20, 85:2, 85:19, 128:19

**different** [29] - 13:9, 14:13, 23:23, 25:1, 25:22, 25:24, 30:8, 49:19, 60:7, 60:10, 60:19, 64:25, 65:4, 65:5, 66:8, 67:6, 83:11, 85:15, 85:16, 97:21, 106:24, 117:7, 118:15, 120:22, 120:24, 123:2, 123:3

**Digital** [1] - 49:25

**digits** [2] - 20:10

**DIRECT** [4] - 6:7, 97:14, 131:3, 131:8

**direct** [15] - 17:14, 39:9, 41:6, 41:7, 42:10, 42:16, 43:4, 43:6, 46:7, 72:5, 81:21, 81:24, 113:11, 113:18, 125:17

**directed** [2] - 82:15, 82:20, 82:21, 82:22, 87:20

**Directions** [1] - 31:2

**directly** [3] - 41:23, 42:17, 42:25

**discard** [1] - 30:4

**disclose** [1] - 104:7

**discuss** [2] - 5:8, 49:19

**discussed** [13] - 30:12, 35:11, 36:1, 40:10, 42:20, 42:21, 44:14, 46:2, 62:12, 68:16, 108:15, 108:19, 113:15

**discussing** [7] - 31:25, 35:3, 36:23, 102:22, 106:3, 119:12, 119:13

**discussion** [1] - 38:3

**dispute** [1] - 17:4

**disregard** [2] - 29:24, 30:5

**distance** [1] - 123:13

**distinction** [3] - 100:13, 105:19, 124:14

**distinguish** [8] - 82:25, 83:3, 83:8, 84:5, 84:8, 84:12, 84:22, 84:23

**District** [2] - 101:23, 116:16

**DISTRICT** [2] - 1:1, 1:1

**DMCA** [8] - 31:4, 32:7, 32:9,

35:6, 35:7, 50:1, 50:6, 50:8

**docked** [1] - 3:16

**docket** [4] - 2:17, 52:23, 53:10, 103:4

**docketing** [1] - 3:19

**document** [35] - 14:21, 51:13, 52:14, 53:16, 54:21, 55:12, 56:17, 57:8, 57:11, 58:5, 58:14, 58:17, 61:15, 61:22, 62:8, 63:21, 68:5, 68:9, 68:18, 69:12, 69:20, 70:6, 73:13, 75:3, 75:11, 92:12, 114:25, 115:1, 115:3, 115:12, 116:22, 116:23, 117:8, 119:21, 123:16

**documented** [1] - 54:17

**documents** [11] - 16:22, 17:3, 49:14, 70:12, 72:15, 90:24, 91:9, 91:11, 91:16, 92:4, 117:20

**Doe** [4] - 2:3, 2:10, 101:22, 116:25

**DOE** [1] - 1:7

**domain** [2] - 107:3, 107:16

**done** [7] - 4:14, 15:16, 31:7, 63:22, 98:25, 101:6, 129:15

**double** [1] - 127:18

**down** [14] - 9:20, 9:21, 10:14, 19:13, 37:13, 50:12, 61:20, 64:19, 69:13, 69:14, 96:18, 96:20, 126:22, 126:25

**download** [32] - 9:10, 9:16, 10:6, 10:21, 21:19, 21:25, 23:9, 25:12, 25:18, 26:5, 26:17, 27:20, 39:5, 39:23, 42:6, 46:1, 47:17, 48:4, 54:17, 55:13, 78:17, 79:22, 81:9, 92:17, 93:23, 95:11, 112:2, 112:4, 123:16, 125:9, 125:15

**downloaded** [23] - 14:6, 15:3, 15:5, 22:23, 29:14, 44:3, 47:21, 65:19, 78:8, 78:15, 78:19, 79:7, 79:10, 79:18, 81:8, 81:9, 81:15, 91:24, 92:7, 94:21, 95:21, 108:20, 109:1

**downloading** [17] - 17:17, 22:13, 29:17, 36:9, 41:23, 45:17, 47:1, 47:15, 69:17, 70:15, 78:13, 79:4, 79:17, 96:1, 96:13, 111:17, 123:14

**downloads** [10] - 43:25, 46:17, 48:2, 56:17, 56:21, 57:8, 57:11, 57:18, 63:22, 114:23

**draft** [2] - 115:1, 115:3

**drafted** [1] - 49:19

**drafter** [1] - 115:21

**drive** [5] - 11:13, 11:19, 12:2, 16:21, 102:8

**drives** [1] - 26:10

**drop** [1] - 30:4

**duly** [2] - 5:20, 97:5

**duration** [2] - 47:2, 93:10

4

App. 216

5

**duty** [2] - 9:20, 56:16
**DVD** [1] - 11:6
**dynamic** [19] - 85:16, 85:20, 85:21, 85:23, 85:24, 86:1, 86:8, 86:17, 86:21, 86:22, 87:1, 87:6, 87:8, 87:10, 87:14, 87:17, 91:3, 91:20, 115:25

### E

**e-mail** [1] - 112:11
**ease** [1] - 33:17
**easier** [2] - 84:19, 127:18
**easily** [1] - 9:9
**EASTERN** [1] - 1:1
**economical** [1] - 37:15
**editor** [1] - 109:14
**educational** [1] - 6:15
**effective** [2] - 3:21, 113:5
**efficiently** [1] - 37:15
**effort** [1] - 74:3
**eight** [2] - 37:17, 42:10
**either** [2] - 65:1, 108:25
**elaborate** [4] - 12:8, 40:20, 43:7, 44:18
**electronically** [1] - 19:16
**eliminate** [1] - 44:13
**employed** [3] - 7:3, 77:19, 107:24
**employee** [1] - 116:18
**employees** [1] - 43:19
**employment** [2] - 99:17, 107:25
**encoded** [1] - 107:4
**end** [3] - 4:17, 62:19, 78:24
**ends** [1] - 96:11
**enforce** [1] - 87:6
**Enforcement** [1] - 99:2
**enforcement** [12] - 41:25, 97:20, 97:25, 98:2, 98:5, 100:14, 101:1, 103:22, 104:16, 104:19, 108:4, 110:22
**engage** [3] - 51:1, 65:19, 113:18
**engaged** [6] - 36:8, 38:1, 67:16, 77:22, 106:8, 112:7
**engineer** [1] - 8:3
**English** [2] - 70:16, 70:17
**ensure** [2] - 79:5, 108:21
**enter** [1] - 112:3
**entire** [1] - 16:14
**entirely** [1] - 16:10
**entirety** [1] - 16:7
**entries** [1] - 64:19
**entry** [5] - 2:17, 52:23, 53:10, 73:13, 103:4
**envisioning** [1] - 129:5
**erroneous** [1] - 39:25
**ESQ** [2] - 1:16, 1:20
**essentially** [4] - 3:12, 108:16, 111:25, 123:5
**establish** [6] - 23:5, 23:12, 25:20, 33:15, 42:5, 82:14

**established** [3] - 66:19, 69:22, 106:21
**estimate** [1] - 45:16
**evade** [1] - 41:14
**evening** [1] - 4:2
**eventually** [2] - 109:14, 110:23
**evidence** [25] - 48:22, 48:25, 49:1, 49:9, 49:10, 52:21, 53:15, 53:21, 68:1, 68:3, 72:24, 73:4, 73:7, 73:9, 74:1, 90:11, 90:22, 102:10, 104:4, 110:2, 131:13, 131:13, 131:14, 131:14, 131:15
**Ex** [1] - 77:16
**exact** [2] - 27:6, 42:14
**exactly** [5] - 22:24, 65:25, 84:10, 115:2, 125:6
**EXAMINATION** [4] - 6:7, 77:9, 89:9, 94:15, 97:14, 116:11, 124:4, 131:3, 131:4, 131:5, 131:6, 131:8, 131:9, 131:10
**examination** [3] - 3:22, 73:21, 102:4, 112:6, 115:12
**examinations** [3] - 98:22, 98:25, 115:11
**examined** [3] - 5:21, 70:9, 97:5
**example** [13] - 21:5, 22:12, 22:18, 38:17, 46:20, 60:18, 62:22, 69:13, 69:24, 70:16, 87:2, 88:1, 95:14
**exams** [1] - 98:19
**Excel** [1] - 112:12
**exchange** [22] - 19:9, 19:11, 20:21, 21:7, 21:17, 22:19, 23:14, 28:2, 28:4, 35:10, 35:13, 39:5, 54:18, 55:13, 55:17, 62:17, 72:6, 95:23, 108:21, 110:8, 110:15, 112:23
**exchanged** [2] - 94:24, 109:23
**exchanges** [5] - 61:18, 62:14, 62:22, 63:1, 113:18
**exchanging** [2] - 27:18, 63:2
**excipio** [1] - 6:25
**Excipio** [33] - 7:11, 41:5, 54:16, 55:13, 77:17, 77:20, 77:21, 106:3, 107:11, 107:15, 108:10, 110:13, 110:15, 110:17, 111:1, 111:15, 112:3, 112:11, 112:18, 113:5, 113:10, 119:22, 120:2, 120:6, 121:4, 121:7, 121:10, 121:25, 122:1, 122:4, 124:7, 125:10, 125:16
**Excipio's** [2] - 112:7, 115:6
**excuse** [2] - 14:23, 125:22
**exhibit** [4] - 48:17, 48:21, 91:11, 114:8
**Exhibit** [48] - 30:20, 30:24, 48:23, 48:25, 49:1, 49:3, 49:4, 49:10, 53:17, 53:21, 58:18, 58:19, 58:20, 58:22, 59:2, 61:9, 61:12, 67:21, 67:25, 68:1, 68:3, 72:12, 72:23, 73:3, 73:7, 73:8,

74:19, 74:24, 82:2, 86:3, 86:6, 91:13, 91:16, 91:17, 92:13, 92:14, 94:23, 95:9, 112:13, 114:10, 114:19, 114:21, 115:7, 131:13, 131:13, 131:14, 131:14, 131:15
**EXHIBITS** [1] - 131:12
**exhibits** [1] - 53:9
**existing** [1] - 36:12
**expect** [4] - 15:17, 64:24, 70:17, 70:19
**expecting** [1] - 38:7
**expedited** [1] - 128:19
**expenses** [1] - 44:6
**experience** [8] - 7:7, 51:20, 60:13, 97:18, 97:20, 104:11, 104:15, 115:7
**experiment** [5] - 35:4, 36:1, 110:11, 113:3, 125:3
**experiments** [1] - 31:6
**expert** [7] - 28:7, 28:16, 28:25, 101:3, 101:13, 103:8, 115:13
**expertise** [1] - 125:20
**experts's** [1] - 3:3
**explain** [19] - 8:23, 11:3, 12:8, 16:20, 27:11, 31:15, 32:17, 38:10, 39:1, 39:14, 42:3, 54:25, 55:9, 59:4, 64:3, 64:22, 69:24, 75:16, 80:3
**extended** [4] - 56:17, 56:22, 68:7, 68:9
**extension** [1] - 59:19
**extensive** [2] - 102:6
**extra** [2] - 30:15, 44:6

### F

**fact** [6] - 36:4, 66:22, 67:1, 91:6, 101:3, 103:17
**factors** [1] - 47:8
**fair** [5] - 42:19, 48:6, 65:4, 80:16, 94:4
**fake** [5] - 35:23, 40:15, 40:19, 40:21, 44:14
**false** [7] - 37:10, 37:20, 42:20, 44:13, 44:16, 44:21, 81:24
**falsified** [1] - 39:2
**far** [3] - 4:4, 68:23, 68:24
**fast** [2] - 15:14, 128:5
**faster** [4] - 9:18, 127:24, 128:13, 128:14
**FBI** [1] - 99:1
**FDLE** [1] - 99:1
**February** [5] - 56:3, 56:12, 66:18, 90:23, 114:3
**federal** [1] - 101:9
**Federal** [1] - 1:22
**few** [3] - 70:21, 92:19, 92:22
**field** [5] - 94:23, 94:24, 95:10, 96:4, 126:2
**File** [1] - 31:3

**file** [57] - 9:15, 10:9, 11:3, 11:11, 12:11, 12:25, 13:19, 13:20, 14:25, 17:21, 19:12, 20:12, 24:14, 24:20, 25:15, 27:11, 27:12, 28:8, 28:9, 28:17, 33:3, 33:10, 33:12, 33:16, 33:25, 34:1, 34:3, 34:14, 54:25, 55:1, 55:3, 55:5, 55:14, 62:20, 65:15, 73:12, 78:8, 78:15, 81:8, 81:16, 94:7, 94:8, 107:8, 109:11, 109:12, 109:17, 109:22, 110:6, 110:9, 119:23, 120:1, 120:2, 120:3, 120:5, 120:7, 129:2
**file's** [1] - 79:5
**filed** [4] - 53:10, 53:17, 103:4
**files** [28] - 8:21, 9:14, 9:15, 10:7, 11:1, 14:24, 18:22, 25:13, 28:21, 37:1, 63:5, 69:11, 69:25, 70:14, 70:17, 78:9, 92:5, 108:17, 108:19, 109:5, 109:16, 110:12, 112:6, 112:16, 112:19, 114:5, 120:22, 122:11
**finally** [1] - 2:12
**findings** [1] - 71:3
**fine** [9] - 3:8, 3:20, 4:10, 74:15, 74:20, 127:11, 127:24, 129:7, 129:25
**fingerprint** [5] - 20:11, 24:3, 24:6, 55:1, 93:14
**finish** [4] - 42:16, 80:20, 80:21, 96:13
**Firearms** [1] - 99:5
**FIRM** [1] - 1:15
**firm** [1] - 72:13
**firm's** [1] - 72:16
**first** [20] - 5:20, 7:3, 10:16, 30:14, 48:21, 54:5, 56:2, 61:20, 62:1, 64:2, 64:4, 64:6, 64:10, 72:20, 77:19, 82:25, 95:14, 106:18, 117:8
**five** [8] - 53:19, 62:22, 63:1, 63:8, 75:22, 75:24, 101:20, 127:15
**five-minute** [2] - 75:22, 75:24
**fixed** [5] - 25:8, 25:10, 36:25, 85:13, 119:15
**flexible** [1] - 87:11
**Florida** [1] - 99:1
**Flushing** [1] - 1:19
**foam** [1] - 78:24
**follow** [4] - 53:3, 77:13, 95:24, 123:22
**follow-up** [1] - 77:13
**following** [2] - 2:1, 71:6, 77:1
**follows** [2] - 5:21, 97:6
**Forensic** [1] - 108:2
**forensic** [7] - 98:19, 98:22, 99:20, 99:25, 102:1, 102:4, 115:10
**forensics** [2] - 98:15, 99:17, 101:13

App. 217

6

**forgot** [2] - 29:6, 75:10
**form** [3] - 21:19, 108:18, 127:7
**formal** [1] - 7:1
**formally** [1] - 73:18
**format** [2] - 27:24, 80:6
**Forrest** [1] - 101:24
**forth** [1] - 103:19
**forward** [3] - 15:14, 44:8, 88:2
**foundation** [2] - 68:11, 107:22
**founded** [2] - 77:20, 108:3
**four** [26] - 27:5, 46:21, 56:14, 56:24, 57:9, 83:16, 92:20, 101:19, 106:18, 106:21, 106:24, 107:3, 107:15, 108:10, 110:18, 110:20, 117:14, 118:14, 118:15, 119:11, 120:6, 123:5
**Fox** [1] - 116:15
**frame** [3] - 15:24, 38:5, 38:12
**frames** [1] - 15:22
**frauds** [1] - 98:14
**free** [9] - 4:18, 38:7, 38:8, 69:1, 74:2, 77:5, 90:24, 104:5, 113:24
**front** [2] - 30:23, 101:23
**full** [12] - 22:1, 78:12, 78:13, 78:14, 78:17, 78:18, 79:4, 81:10, 81:16, 93:22, 93:24
**function** [1] - 18:1

## G

**Game** [1] - 22:18
**generally** [2] - 22:15, 27:2
**generate** [11] - 24:8, 24:15, 24:18, 25:3, 29:12, 35:20, 66:8, 88:14, 88:16, 88:18, 89:21
**generated** [12] - 24:12, 24:14, 24:20, 35:23, 60:25, 61:2, 64:14, 72:13, 72:15, 72:18, 119:16, 119:18
**generates** [2] - 59:25, 83:4
**German** [2] - 12:9, 12:18
**Germany** [1] - 3:5
**give-and-take** [1] - 21:11
**given** [9] - 50:25, 51:20, 106:11, 107:11, 107:18, 107:19, 109:17, 110:21, 121:13
**goal** [1] - 16:13
**GoDaddy** [7] - 106:19, 118:11, 119:10, 122:6, 122:9, 122:19, 125:3
**GoDaddy.com** [2] - 118:12, 122:13
**government** [4] - 12:3, 12:7, 12:9, 12:19
**GPS** [5] - 29:21, 29:22, 39:17, 39:18, 39:19
**graduated** [3] - 6:17, 6:19, 7:9
**graduation** [2] - 77:15, 77:16
**group** [1] - 18:20

## H

**guess** [3] - 14:9, 24:21
**Guidance** [1] - 99:24
**guide** [1] - 49:5

## H

**half** [5] - 15:10, 15:11, 56:14, 56:24, 57:9
**Hamilton** [1] - 1:15
**hand** [5] - 30:12, 55:8, 68:20, 68:24, 115:16
**handed** [2] - 49:3, 61:10
**hands** [1] - 27:18
**handshake** [18] - 19:7, 19:10, 19:11, 19:15, 20:24, 23:6, 23:8, 23:12, 23:16, 23:17, 39:4, 94:25, 95:2, 95:13, 95:20, 96:7, 112:4
**handshaking** [1] - 20:4
**happy** [1] - 75:6
**hardware** [1] - 29:20
**hash** [23] - 19:9, 20:9, 20:10, 20:16, 20:18, 20:21, 23:14, 23:20, 23:24, 24:8, 24:12, 24:22, 24:23, 24:25, 25:1, 25:3, 54:25, 55:1, 55:3, 55:5, 55:14, 78:19
**hear** [5] - 6:9, 23:24, 27:15, 117:3, 117:9
**heard** [1] - 113:7
**hearing** [6] - 2:12, 3:25, 5:6, 30:6, 30:12, 130:3
**HEARING** [1] - 1:11
**hearsay** [1] - 73:20
**helped** [1] - 130:3
**helpful** [3] - 64:1, 104:5, 127:21
**hex** [1] - 109:14
**high** [5] - 6:17, 6:19, 7:9, 43:9, 77:15
**Hit** [3] - 54:11, 54:22, 62:16
**hit** [2] - 56:1, 56:2
**hits** [4] - 57:3, 57:24, 58:25, 59:6
**hold** [2] - 8:25, 21:16
**holders** [1] - 37:13
**home** [2] - 83:14, 105:14
**honest** [1] - 123:22
**Honor** [35] - 2:5, 2:8, 2:23, 3:15, 4:6, 5:2, 30:10, 48:16, 49:3, 49:8, 51:5, 51:9, 52:8, 52:19, 53:4, 53:8, 53:13, 58:8, 61:5, 61:10, 67:24, 68:2, 73:6, 73:10, 74:10, 75:19, 77:4, 77:8, 94:14, 96:24, 114:13, 116:6, 126:21, 127:2, 127:4
**Honor's** [1] - 35:9
**HONORABLE** [1] - 1:11
**hope** [1] - 110:24
**hopefully** [2] - 52:15, 128:22
**Horse** [1] - 88:1
**hosted** [1] - 9:13

## H

**hosting** [1] - 122:17
**hot** [2] - 46:8, 46:10
**hour** [3] - 15:9, 15:11, 87:3
**hours** [3] - 99:15, 110:17, 120:7
**hundred** [2] - 29:24, 39:18
**hundreds** [5] - 45:11, 45:12, 45:14, 99:15
**hundredth** [1] - 40:4
**hypothetical** [5] - 39:21, 40:2, 84:15, 90:14, 125:13
**hypothetically** [1] - 91:19

## I

**idea** [1] - 126:10
**identical** [1] - 93:16
**identification** [3] - 10:5, 43:4, 104:21
**identifications** [1] - 24:1
**identified** [6] - 17:18, 21:2, 104:23, 110:17, 120:10, 121:10
**identify** [7] - 10:16, 23:2, 58:24, 64:2, 68:5, 92:11, 94:18, 106:10, 107:14, 110:20, 111:1, 122:4
**identifying** [4] - 3:18, 47:8, 111:16, 116:19
**identities** [1] - 44:14
**identity** [3] - 50:18, 107:20, 110:23
**illegal** [3] - 9:7, 18:5, 49:24
**ills** [1] - 42:19
**impermissible** [1] - 51:22
**implemented** [1] - 7:15
**important** [1] - 21:1
**imprint** [1] - 20:12
**inaccurate** [1] - 45:6
**inclined** [2] - 74:4, 74:5
**including** [1] - 101:19
**inconsistency** [1] - 92:1
**incorrect** [1] - 45:24
**increase** [1] - 22:13
**increased** [1] - 43:5
**increases** [1] - 95:25
**independent** [5] - 10:7, 10:11, 28:16, 29:20, 123:5, 123:8, 123:9
**index** [1] - 34:2
**indicate** [9] - 56:25, 61:2, 66:1, 67:3, 91:17, 105:9, 105:15, 114:22, 115:20
**indicated** [4] - 12:12, 44:5, 45:5, 91:5
**indicates** [3] - 64:3, 66:23, 90:17
**indication** [3] - 39:20, 47:6, 90:19
**indirect** [22] - 8:1, 17:14, 31:15, 31:18, 31:21, 31:25, 32:4, 32:16, 32:19, 34:21, 35:11, 35:15, 35:25, 37:21, 38:11,

## I

42:22, 43:9, 44:15, 69:23, 71:2, 82:16, 113:11
**individual** [40] - 10:17, 12:19, 14:14, 17:4, 20:3, 20:4, 22:12, 23:20, 24:1, 24:3, 24:17, 25:17, 26:6, 26:11, 26:17, 28:24, 39:22, 43:16, 43:19, 44:22, 46:17, 46:24, 47:1, 47:21, 50:9, 55:5, 55:14, 55:23, 61:20, 62:17, 63:1, 72:9, 102:1, 105:8, 118:15, 124:16, 125:1, 125:8, 125:9, 125:14
**individual's** [1] - 105:2
**individually** [2] - 31:12, 43:20
**individuals** [3] - 13:4, 13:6, 112:11
**industry** [2] - 28:15, 41:21
**inform** [1] - 99:12
**information** [81] - 7:5, 10:18, 10:22, 10:25, 11:16, 11:20, 11:24, 11:25, 14:5, 14:10, 15:3, 15:4, 16:18, 17:7, 19:3, 19:20, 19:22, 19:25, 20:15, 21:8, 22:6, 22:8, 22:20, 24:23, 25:5, 25:11, 29:13, 29:17, 29:19, 29:20, 29:25, 39:15, 46:20, 48:14, 51:25, 52:5, 57:2, 57:3, 57:4, 57:20, 59:8, 59:9, 59:10, 59:13, 59:14, 60:11, 61:17, 61:24, 61:25, 62:2, 68:7, 68:9, 68:12, 68:15, 68:16, 69:7, 69:9, 69:21, 83:11, 92:25, 94:24, 102:13, 103:14, 103:20, 104:1, 104:8, 105:3, 107:18, 107:19, 108:11, 109:17, 110:7, 110:8, 110:21, 111:11, 112:4, 113:18, 115:21, 116:17, 122:8
**infringed** [2] - 32:14, 32:25
**infringement** [20] - 32:13, 40:12, 41:2, 41:22, 49:21, 50:5, 51:2, 52:1, 52:6, 56:10, 62:12, 65:20, 67:2, 67:8, 68:12, 72:3, 92:16, 114:3, 114:23
**infringements** [2] - 26:14, 91:5
**infringer** [21] - 25:21, 42:6, 79:8, 79:13, 79:16, 79:19, 79:23, 81:8, 81:15, 82:24, 83:1, 84:5, 86:22, 88:21, 94:21, 94:25, 95:1, 96:1, 123:13, 123:18
**infringers** [4] - 40:25, 41:9, 41:10, 96:12
**infringing** [2] - 37:13, 41:4
**initial** [3] - 111:24, 118:3, 118:5
**initiate** [2] - 48:2, 48:4
**innocent** [1] - 38:5
**inside** [2] - 33:12, 69:10
**install** [2] - 59:24, 118:18
**installation** [1] - 106:23
**installed** [6] - 83:14, 106:22, 108:12, 108:13, 119:17, 119:20
**instance** [1] - 38:24

instruct [1] - 50:20
instructor [1] - 99:23
insure [1] - 56:20
intent [4] - 16:6, 21:1, 22:4, 109:21
intention [1] - 3:1
interested [1] - 33:3
internally [2] - 61:22, 68:8
international [1] - 29:5
internationally [1] - 29:8
Internet [9] - 7:7, 8:16, 8:20, 32:24, 34:6, 37:12, 46:13, 51:21, 52:1
internet [3] - 98:13, 119:5, 126:9
intervention [1] - 111:10
introduced [1] - 104:4
investigate [1] - 98:13
investigates [1] - 32:22
investigating [1] - 99:12
investigation [5] - 34:22, 104:24, 106:17, 113:3, 115:14
investigative [1] - 99:16
investigator [5] - 33:2, 33:20, 33:21, 33:24, 34:17
investigators [1] - 99:25
involved [6] - 8:2, 13:4, 16:4, 17:2, 26:17, 90:17
involvement [1] - 7:13
involving [1] - 99:16
IP [159] - 1:7, 31:23, 32:24, 33:14, 33:17, 33:19, 33:21, 33:22, 34:2, 34:4, 34:11, 34:16, 35:4, 35:12, 35:16, 35:22, 35:23, 36:4, 36:8, 36:16, 36:17, 37:2, 37:10, 37:23, 38:5, 38:12, 38:14, 38:15, 39:3, 39:6, 39:25, 40:14, 40:15, 40:16, 40:21, 45:1, 45:4, 45:16, 45:19, 45:23, 46:15, 47:6, 54:18, 54:20, 54:23, 55:13, 56:8, 57:12, 57:18, 58:23, 60:5, 62:5, 62:7, 63:1, 63:22, 64:11, 64:12, 64:25, 65:19, 67:7, 67:16, 67:17, 67:18, 68:17, 68:18, 69:10, 70:11, 72:9, 83:22, 83:24, 84:4, 84:5, 84:6, 84:7, 84:9, 85:3, 85:13, 85:21, 85:22, 85:23, 86:1, 86:7, 86:12, 86:17, 86:21, 86:22, 86:23, 87:1, 87:4, 87:8, 87:9, 87:13, 87:14, 87:17, 88:3, 88:6, 88:7, 88:10, 88:14, 88:16, 88:17, 88:18, 88:22, 88:23, 88:24, 89:19, 89:23, 89:24, 90:2, 90:25, 91:6, 91:9, 91:20, 96:2, 103:12, 104:11, 104:20, 104:23, 106:10, 106:19, 107:20, 110:19, 110:20, 110:22, 111:1, 111:5, 111:6, 111:7, 111:9, 111:16, 112:7, 114:2, 114:24, 115:4,

115:16, 115:22, 117:3, 118:16, 118:17, 119:8, 120:10, 120:11, 120:14, 120:22, 120:25, 121:1, 121:5, 121:6, 121:10, 123:9, 123:17, 126:6, 126:11, 126:14
IPP [2] - 8:1, 8:2
Islip [2] - 1:6, 1:23
ISP [14] - 49:15, 85:6, 85:15, 85:18, 86:15, 87:15, 87:18, 88:11, 103:20, 104:25, 105:13, 116:18, 122:13, 122:19
ISP's [1] - 86:8
ISPs [4] - 85:16, 116:17, 117:2
issue [3] - 62:3, 104:25, 122:5
issued [4] - 12:3, 12:9, 103:20, 104:8
issues [1] - 42:24
IT [6] - 6:21, 7:8, 28:11, 28:16, 28:25, 110:5
itself [7] - 31:9, 31:12, 33:25, 35:5, 51:13, 67:17, 109:12

J

JACQUELINE [1] - 1:16
Jacqueline [1] - 2:6
JAMES [103] - 1:15, 1:16, 2:5, 2:23, 3:15, 4:23, 5:2, 5:4, 5:15, 6:6, 6:8, 6:12, 6:13, 15:20, 30:10, 30:15, 30:20, 30:22, 35:1, 48:16, 48:19, 49:2, 49:12, 51:9, 51:15, 51:18, 52:8, 52:15, 52:18, 52:22, 53:4, 53:7, 53:16, 53:19, 53:22, 54:8, 55:19, 55:22, 58:3, 58:4, 61:5, 61:8, 61:10, 62:10, 63:16, 68:2, 68:4, 72:1, 72:25, 73:10, 73:16, 74:10, 74:18, 74:20, 74:23, 75:2, 75:6, 75:8, 75:19, 80:17, 84:14, 89:8, 89:10, 90:7, 91:15, 94:11, 96:17, 96:24, 97:1, 97:15, 103:3, 103:6, 114:13, 114:17, 116:4, 117:6, 124:3, 124:5, 125:6, 125:7, 126:19, 127:2, 127:11, 127:13, 127:15, 128:1, 128:6, 128:12, 128:17, 128:22, 129:4, 129:9, 129:12, 129:17, 129:19, 129:23, 130:1, 130:4, 130:8, 131:3, 131:5, 131:8, 131:10
James [14] - 2:6, 3:14, 4:22, 6:5, 80:21, 81:22, 89:7, 96:16, 96:22, 117:25, 124:2, 127:1, 127:10, 127:24
Jensa [1] - 62:23
job [1] - 14:8
John [4] - 2:3, 2:9, 101:22, 116:25
JOHN [1] - 1:7
join [2] - 22:15, 48:12
joined [6] - 48:8, 48:10, 77:16,

77:18, 77:21, 95:19
joining [1] - 18:14
Judge [2] - 101:23, 116:15
JUDGE [1] - 1:12
judge [1] - 117:1
judge's [1] - 63:20
jump [2] - 15:12, 75:23
June [1] - 100:8
jurisdiction [1] - 98:24
jury [2] - 4:20, 74:1
Justice [3] - 100:15, 100:16, 100:25

K

keep [3] - 6:1, 6:11, 26:4
keeps [2] - 87:4, 87:8
Kevin [1] - 116:15
kilobits [1] - 91:24
kilobyte [7] - 26:5, 43:25, 63:11, 79:22, 92:17, 92:24, 94:1
kilobytes [19] - 23:9, 23:10, 25:6, 25:18, 26:9, 63:7, 63:8, 63:12, 80:2, 81:11, 91:25, 92:7, 92:19, 92:23, 93:16, 93:20, 94:18, 94:20, 94:22
kind [8] - 11:19, 27:13, 33:7, 34:2, 59:9, 70:13, 84:12, 93:9
kinds [2] - 60:24, 122:17
knowledge [2] - 52:4, 74:13, 103:17, 103:22, 116:17, 117:2
known [3] - 8:17, 8:20, 40:11
knows [2] - 33:24, 120:2

L

largest [1] - 96:4
last [11] - 4:8, 29:6, 30:12, 39:21, 52:15, 56:4, 58:17, 68:20, 75:11, 97:9, 97:21
LAW [2] - 1:15, 1:18
Law [1] - 99:2
law [11] - 97:20, 97:24, 98:2, 98:5, 100:14, 100:25, 103:22, 104:15, 104:19, 108:4, 110:21
lawsuit [3] - 26:13, 53:24, 70:24
laying [1] - 107:22
lead [1] - 74:3
learning [3] - 70:16, 70:17, 70:20
least [2] - 38:8, 115:21
leaving [1] - 39:23
lectern [2] - 6:11, 77:5
led [2] - 110:23, 125:4
ledgers [1] - 55:16
left [4] - 55:8, 62:6, 113:13, 115:16
left-hand [1] - 55:8, 115:16
less [5] - 79:24, 80:12, 81:3, 81:4, 81:5
Lessons [1] - 41:17

letter [10] - 2:15, 4:15, 29:6, 73:14, 127:8, 127:11, 127:17, 129:2, 129:14, 130:5
letting [1] - 129:2
level [2] - 101:6, 101:7
levels [1] - 100:3
life [1] - 106:8
likely [3] - 67:11, 86:14, 86:16
limine [1] - 2:14
limited [7] - 85:3, 85:5, 85:6, 85:9, 85:10, 85:11, 92:17
limits [1] - 127:9
line [2] - 52:15, 83:10
list [23] - 8:10, 8:13, 9:7, 9:25, 32:24, 33:9, 33:14, 34:2, 34:8, 34:10, 34:17, 35:4, 35:5, 35:18, 35:22, 35:23, 36:17, 37:2, 37:25, 40:15, 40:16, 45:1
listed [4] - 54:20, 68:18, 70:6, 70:19
listen [1] - 10:8
listing [1] - 69:15
lists [3] - 37:24, 41:4, 54:5
literally [1] - 28:4
litigant [2] - 103:13, 104:10
litigants [1] - 50:20
litigation [1] - 104:2
LLC [3] - 1:4, 2:3, 108:2
loaded [1] - 107:6
loading [1] - 120:1
locate [2] - 112:3, 117:2
located [5] - 13:8, 33:11, 34:15, 107:20, 119:1
location [5] - 14:13, 111:2, 111:3, 111:5, 111:13
locations [1] - 110:19
LOCKE [1] - 1:11
log [16] - 22:23, 29:19, 29:24, 29:25, 43:11, 54:14, 54:15, 54:16, 61:24, 62:1, 62:13, 83:11, 114:5, 118:24, 122:7
log-in [4] - 43:11, 54:14, 54:15, 54:16
logging [2] - 17:21, 122:9
login [1] - 122:12
Lombardi [1] - 1:22
look [17] - 11:25, 13:15, 16:3, 38:7, 56:1, 58:14, 62:20, 65:17, 66:11, 69:1, 70:5, 86:6, 90:24, 109:12, 113:25, 114:22, 115:16
looked [6] - 57:3, 58:19, 73:4, 91:16, 92:4, 114:5
looking [7] - 38:23, 39:7, 58:16, 58:20, 59:7, 72:12, 96:3
looks [1] - 129:2
loss [1] - 46:20
louder [1] - 6:18
Love [1] - 92:21
low [1] - 95:25
luck [1] - 25:9

# M

**MAGISTRATE** [1] - 1:12
**mail** [1] - 112:11
**main** [1] - 21:18
**maintain** [1] - 28:21
**maintenance** [1] - 7:21
**maker** [1] - 99:24
**Malibu** [34] - 2:2, 2:7, 7:25, 8:2, 8:5, 9:25, 10:17, 13:23, 20:5, 21:5, 22:12, 22:22, 23:2, 24:7, 25:13, 25:17, 26:6, 27:9, 27:20, 27:21, 28:22, 29:12, 30:1, 45:22, 46:16, 62:2, 69:17, 70:6, 79:18, 93:22, 101:15, 101:22, 106:2, 116:25
**MALIBU** [1] - 1:4
**malicious** [1] - 38:4
**maliciously** [1] - 38:11
**man** [2] - 40:17, 84:1
**man-in-the-middle** [1] - 40:17
**managed** [1] - 78:5
**mandates** [1] - 40:25
**manipulated** [1] - 109:18
**manipulating** [1] - 109:14
**marching** [1] - 106:12
**marked** [5] - 30:23, 61:11, 67:21, 74:21, 74:24
**mask** [1] - 126:6
**match** [1] - 8:21
**material** [14] - 9:8, 9:10, 9:13, 10:1, 17:19, 18:12, 19:4, 32:15, 32:25, 36:9, 45:18, 49:24, 56:22, 62:3
**materials** [2] - 8:13, 18:6
**mathematical** [1] - 24:13
**matter** [4] - 5:6, 27:7, 52:24, 130:10
**matters** [1] - 51:10
**mean** [31] - 9:12, 14:17, 16:22, 16:23, 19:19, 22:25, 25:24, 36:7, 36:15, 37:6, 40:20, 46:1, 47:12, 54:16, 62:25, 71:1, 81:22, 82:8, 84:11, 88:13, 94:17, 95:11, 96:3, 102:12, 109:11, 111:3, 111:5, 113:14, 119:12, 123:4, 126:5
**meaning** [2] - 86:8, 126:1
**means** [16] - 11:4, 17:18, 20:10, 31:18, 32:11, 32:19, 40:21, 66:7, 75:14, 75:17, 85:21, 85:22, 95:11, 95:18, 120:18
**measurement** [1] - 94:2
**mechanical** [1] - 1:25
**mechanism** [1] - 18:11
**media** [1] - 77:23
**Media** [27] - 2:3, 2:7, 8:2, 13:23, 20:5, 21:5, 22:12, 22:22, 23:2, 24:7, 25:13, 25:17, 26:6, 27:9, 27:20, 27:21, 28:22, 29:12, 30:1, 46:16, 62:2, 69:17, 93:22,

101:15, 101:22, 106:2, 116:25
**MEDIA** [1] - 1:4
**Media's** [4] - 9:25, 10:17, 45:22, 79:18
**meeting** [1] - 27:18
**memo** [1] - 4:15
**memorize** [1] - 38:8
**memory** [2] - 75:10, 75:12
**mentioned** [16] - 13:1, 23:6, 26:9, 29:15, 36:25, 39:17, 61:16, 64:4, 64:6, 64:13, 69:11, 78:7, 78:20, 79:24, 81:22
**mentioning** [2] - 81:24, 82:6
**method** [7] - 39:9, 39:10, 42:25, 82:6, 122:23, 123:12, 123:19
**Michael** [2] - 5:17, 5:24
**MICHAEL** [2] - 5:19, 131:2
**microphone** [3] - 6:2, 78:23, 97:12
**Microsoft** [1] - 69:25
**middle** [2] - 40:17, 84:1
**might** [7] - 4:9, 15:24, 38:11, 44:6, 50:9, 84:18, 92:1
**mike** [1] - 77:6
**military** [1] - 101:10
**Millennium** [1] - 49:25
**million** [1] - 45:19
**millions** [2] - 109:16
**mind** [5] - 11:2, 13:17, 36:21, 64:1, 127:8
**minute** [7] - 37:19, 46:25, 75:22, 75:24, 80:12, 81:3, 92:11
**minutes** [4] - 40:6, 63:12, 63:13, 116:9
**mis** [2] - 3:19, 38:4
**mis-docketing** [1] - 3:19
**mis-reporting** [1] - 38:4
**misidentify** [1] - 46:7
**misreading** [1] - 3:18
**misspeak** [1] - 109:10
**misstated** [1] - 105:21
**mistimed** [2] - 39:13, 39:15
**modified** [6] - 11:5, 11:9, 11:17, 24:5, 109:6, 109:11
**modify** [3] - 24:6, 24:7, 24:25
**monitor** [6] - 8:13, 10:1, 42:25, 47:16, 56:23, 108:17
**monitored** [2] - 7:16, 56:9
**Monitoring** [1] - 31:2
**monitoring** [39] - 5:8, 7:14, 8:5, 8:7, 8:15, 17:14, 17:15, 28:22, 32:1, 32:4, 32:16, 35:10, 35:11, 35:15, 35:25, 36:12, 38:11, 39:9, 40:12, 41:10, 41:22, 42:11, 42:17, 42:22, 43:6, 43:10, 44:15, 46:7, 48:7, 56:21, 69:23, 71:2, 72:2, 72:19, 74:13, 113:5, 113:11, 113:15
**monitors** [2] - 44:6, 48:13
**month** [4] - 57:9, 100:7, 100:10, 100:21

**months** [4] - 46:21, 56:9, 56:14, 56:24
**morning** [5] - 2:5, 2:8, 2:11, 77:11, 77:12
**most** [5] - 81:4, 81:5, 85:13, 85:19, 96:12
**motion** [11] - 2:12, 2:14, 2:15, 2:18, 30:11, 102:17, 102:22, 102:23, 127:19, 128:6, 128:10
**motions** [1] - 129:15
**movant** [1] - 128:6
**move** [6] - 4:10, 44:7, 72:25, 74:3, 127:24, 128:5
**movie** [48] - 8:10, 9:16, 10:17, 13:23, 19:23, 21:5, 21:18, 22:1, 22:2, 23:23, 23:24, 24:8, 55:11, 78:12, 78:13, 78:14, 78:15, 78:17, 78:18, 78:19, 79:4, 79:6, 79:17, 79:18, 79:25, 80:4, 80:5, 81:2, 81:10, 81:16, 93:5, 93:13, 93:15, 93:17, 93:19, 94:18, 94:21, 111:21, 111:23, 111:25, 120:1
**movies** [7] - 79:7, 107:3, 107:7, 107:14, 108:14, 119:21
**moving** [1] - 2:13
**MR** [46] - 2:8, 2:21, 4:6, 4:25, 48:24, 49:8, 51:4, 53:13, 58:8, 67:24, 73:6, 74:6, 74:8, 75:24, 76:1, 77:4, 77:8, 77:10, 79:2, 80:15, 80:25, 81:1, 82:4, 82:19, 82:22, 82:23, 84:20, 85:10, 85:12, 86:20, 89:5, 94:14, 94:16, 95:7, 96:15, 116:6, 116:9, 116:12, 122:22, 124:1, 126:21, 127:4, 130:9, 131:4, 131:6, 131:9
**MS** [101] - 2:5, 2:23, 3:15, 4:23, 5:2, 5:4, 5:15, 6:6, 6:8, 6:12, 6:13, 15:20, 30:10, 30:15, 30:20, 30:22, 35:1, 48:16, 48:19, 49:2, 49:12, 51:9, 51:15, 51:18, 52:8, 52:15, 52:18, 52:22, 53:4, 53:7, 53:16, 53:19, 53:22, 54:8, 55:19, 55:22, 58:3, 58:4, 61:5, 61:8, 61:10, 62:10, 63:16, 68:2, 68:4, 72:1, 72:25, 73:10, 73:16, 74:10, 74:18, 74:20, 74:23, 75:2, 75:6, 75:8, 75:19, 80:17, 84:14, 89:8, 89:10, 90:7, 91:15, 94:11, 96:17, 96:24, 97:1, 97:15, 103:3, 103:6, 114:13, 114:17, 116:4, 117:6, 124:3, 124:5, 125:6, 125:7, 126:19, 127:2, 127:11, 127:13, 127:15, 128:1, 128:6, 128:12, 128:17, 128:22, 129:4, 129:9, 129:12, 129:17, 129:19, 129:23, 130:1, 130:4, 130:8, 131:3, 131:5, 131:8, 131:10
**multimedia** [1] - 45:21

**multiple** [18] - 24:18, 25:18, 26:2, 33:13, 34:15, 47:3, 50:8, 52:22, 56:10, 56:17, 57:8, 61:17, 61:18, 62:14, 81:18, 81:19, 90:20, 92:6
**municipalities** [1] - 98:24
**music** [2] - 9:17
**must** [5] - 45:12, 47:21, 47:23, 50:21, 66:7

# N

**name** [16] - 2:5, 2:8, 6:24, 62:20, 65:12, 65:15, 65:18, 65:22, 97:7, 97:9, 104:11, 105:23, 119:23, 120:3, 120:5
**named** [1] - 5:22
**names** [4] - 106:25, 107:11, 107:13, 107:19
**Nathaniel** [1] - 116:15
**native** [1] - 70:18
**nature** [2] - 52:8, 106:6
**necessarily** [1] - 57:19
**necessary** [2] - 17:11, 73:11
**need** [14] - 4:1, 4:7, 5:4, 19:10, 28:6, 32:15, 41:8, 47:25, 51:13, 116:8, 127:10, 127:14, 127:22, 129:22
**needed** [2] - 3:8, 107:2
**negatives** [2] - 81:25, 89:16
**network** [8] - 9:10, 15:5, 27:12, 27:16, 27:25, 51:2, 108:17, 118:24
**Networks** [1] - 31:3
**never** [10] - 15:16, 23:23, 23:24, 33:22, 39:2, 44:16, 44:20, 45:1, 83:20, 111:22
**NEW** [1] - 1:1
**new** [3] - 24:8, 25:3, 111:22
**New** [5] - 1:16, 1:19, 1:23, 101:23, 116:16
**newer** [1] - 37:16
**next** [15] - 8:15, 8:16, 10:4, 13:20, 22:18, 39:21, 58:12, 58:14, 76:4, 81:7, 98:2, 108:11, 110:14, 111:9, 112:9
**night** [1] - 4:8
**nine** [1] - 64:19
**NK** [1] - 99:24
**non** [1] - 70:6
**non-Malibu** [1] - 70:6
**noncopyrighted** [1] - 111:21
**none** [1] - 71:1
**normal** [3] - 9:18, 89:21, 107:9
**normally** [3] - 83:4, 83:13, 83:19
**note** [2] - 32:14, 38:8
**notes** [1] - 18:21
**nothing** [3] - 51:7, 90:16, 123:10
**Notice** [1] - 31:4
**notice** [10] - 3:21, 49:20, 50:5,

9

50:17, 50:25, 51:9, 51:10, 51:20, 51:25, 104:6
**notices** [3] - 32:7, 50:6, 50:8
**notification** [2] - 35:6, 50:1
**number** [42] - 16:24, 30:8, 30:19, 38:9, 52:23, 53:10, 54:5, 54:7, 54:9, 56:9, 59:20, 59:25, 60:1, 60:3, 60:5, 60:15, 65:2, 65:11, 65:25, 66:8, 66:22, 68:23, 69:2, 69:15, 70:6, 82:4, 83:8, 83:10, 84:12, 84:21, 86:2, 86:9, 86:13, 87:22, 90:8, 95:8, 95:11, 96:5, 117:1, 117:19, 119:13, 120:3
**Number** [6] - 30:20, 30:24, 49:3, 49:4, 53:17, 61:12
**numbers** [19] - 31:20, 35:21, 38:17, 44:2, 45:19, 59:20, 60:16, 64:23, 65:23, 85:4, 85:5, 85:6, 85:16, 85:17, 89:13, 89:19, 90:20, 119:15
**numerical** [1] - 65:23
**numerous** [1] - 18:15
**NY** [1] - 1:6

**O**

**object** [4] - 52:17, 52:21, 80:21, 80:22
**objection** [11] - 14:8, 48:23, 49:7, 52:9, 52:12, 53:12, 67:23, 74:7, 74:8, 80:17, 84:14
**Objection** [1] - 51:4
**objections** [2] - 73:2, 73:3
**obsolete** [1] - 37:6
**occur** [1] - 19:6
**occurred** [4] - 27:4, 55:14, 108:11, 108:21
**October** [2] - 100:11, 103:5
**OF** [3] - 1:1, 1:11, 1:18
**offer** [2] - 95:16, 112:3
**offered** [1] - 11:17
**offhand** [1] - 117:19
**Office** [1] - 69:25
**office** [8] - 17:1, 97:22, 98:12, 98:20, 98:23, 99:1, 104:25, 118:20
**officer** [3] - 100:14, 101:1, 108:5
**offices** [1] - 13:9
**OFFICES** [1] - 1:18
**Official** [1] - 1:21
**often** [2] - 37:12, 87:4
**old** [7] - 36:18, 36:19, 36:20, 36:21, 37:5, 37:17
**ON** [1] - 38:8
**once** [22] - 11:7, 11:10, 19:3, 22:22, 23:2, 23:12, 24:21, 24:23, 25:18, 28:9, 35:16, 48:4, 106:21, 106:22, 107:2, 107:5, 107:10, 107:13, 108:12, 112:10, 129:20, 130:6

**one** [58] - 3:5, 3:6, 3:23, 7:19, 9:20, 12:14, 19:1, 20:3, 21:9, 21:13, 21:14, 25:13, 26:14, 27:23, 30:16, 30:17, 30:18, 33:17, 39:18, 39:22, 47:1, 53:5, 54:22, 55:16, 56:4, 58:25, 60:14, 60:17, 62:11, 62:17, 63:5, 64:8, 78:12, 81:18, 87:3, 92:6, 92:15, 92:16, 92:17, 92:19, 92:22, 92:23, 95:14, 97:21, 106:25, 107:9, 113:13, 113:14, 114:23, 117:20, 118:14, 119:16, 124:12, 126:10, 128:23, 129:2, 129:25
**one-page** [1] - 129:2
**ones** [5] - 25:7, 25:9, 63:17, 80:7, 80:8, 80:9, 93:5, 107:1, 112:13
**online** [1] - 87:2
**open** [6] - 20:21, 28:7, 28:17, 109:3, 109:4, 110:6
**opened** [1] - 48:6
**opening** [2] - 4:19, 5:5
**operate** [1] - 125:9
**operated** [1] - 12:18
**opinion** [1] - 35:25, 67:15, 92:24
**opportunity** [9] - 98:18, 100:2, 102:16, 102:25, 106:2
**opposing** [2] - 28:25, 61:13
**opposition** [1] - 102:22
**option** [1] - 87:15
**orally** [1] - 14:9
**order** [18] - 12:21, 20:8, 25:8, 25:10, 50:18, 50:21, 56:9, 65:19, 93:6, 106:12, 108:20, 111:20, 122:4, 125:10, 125:16, 127:6, 127:25, 128:14
**ordered** [1] - 50:22
**organization** [1] - 98:11
**original** [13] - 10:9, 13:20, 78:9, 78:14, 78:18, 79:4, 79:17, 93:8, 93:13, 93:15, 93:17, 93:19, 93:25
**originally** [1] - 72:20
**ourselves** [1] - 17:25, 18:2
**outline** [1] - 73:17
**outlining** [1] - 51:21
**outside** [1] - 59:14
**outstanding** [2] - 100:14, 100:25
**Overruled** [1] - 80:19
**overruled** [1] - 84:18
**own** [9] - 17:24, 33:8, 59:21, 74:1, 83:24, 84:6, 84:23, 90:4, 124:16
**owner** [1] - 88:18

**P**

**P-A-I-G-E** [1] - 97:10
**PA** [1] - 5:24

**PA-T-Z-E-R** [1] - 5:24
**package** [1] - 92:20
**page** [18] - 38:9, 39:21, 39:22, 47:25, 50:15, 57:21, 58:12, 58:14, 58:17, 64:21, 69:1, 69:13, 69:14, 71:6, 76:4, 127:9, 127:16, 129:2
**pages** [15] - 8:21, 9:8, 31:19, 31:20, 31:22, 32:17, 33:6, 33:8, 38:16, 38:20, 127:10, 127:12, 127:13, 127:19
**Paige** [9] - 97:1, 97:9, 97:11, 97:16, 101:3, 116:13, 124:6, 125:1, 126:23
**PAIGE** [1] - 97:4, 131:7
**Palm** [3] - 97:21, 98:12, 98:22
**paper** [4] - 2:20, 2:21, 5:9, 5:10
**papers** [1] - 3:12
**paragraph** [1] - 41:25
**parameters** [1] - 3:7
**pardon** [1] - 27:1
**Park** [4] - 2:9, 2:19, 4:24, 30:17
**PARK** [48] - 1:18, 1:20, 2:8, 2:21, 4:6, 4:25, 48:24, 49:8, 51:4, 53:13, 58:8, 67:24, 73:6, 74:6, 74:8, 75:24, 76:1, 77:4, 77:8, 77:10, 79:2, 80:15, 80:25, 81:1, 82:4, 82:19, 82:22, 82:23, 84:20, 85:10, 85:12, 86:20, 89:5, 94:14, 94:16, 95:7, 96:15, 116:6, 116:9, 116:12, 122:22, 124:1, 126:21, 127:4, 130:9, 131:4, 131:6, 131:9
**park** [28] - 3:8, 3:17, 3:21, 3:23, 30:14, 48:23, 49:7, 52:17, 53:2, 53:4, 53:12, 67:23, 73:2, 73:23, 75:4, 75:22, 77:3, 78:22, 80:23, 82:1, 94:13, 116:5, 116:7, 116:14, 124:6, 126:20, 127:3, 127:20
**Park's** [1] - 52:12
**park's** [3] - 5:10, 30:11, 73:20
**part** [9] - 3:19, 23:16, 23:17, 25:14, 27:20, 73:18, 93:7, 93:8
**particular** [13] - 13:22, 17:17, 17:21, 23:22, 26:13, 35:4, 38:24, 40:5, 49:13, 56:8, 62:25, 63:9, 66:4, 69:11, 70:11, 91:20, 92:5, 94:5, 102:15, 114:1, 114:5, 115:25, 122:3, 122:5, 122:10
**parties** [1] - 12:21
**parts** [3] - 25:22, 25:24, 25:25
**party** [3] - 102:17, 104:20, 110:2
**past** [1] - 115:7
**Patrick** [2] - 97:1, 97:9
**PATRICK** [2] - 97:4, 131:7
**Patzer** [5] - 5:17, 5:24, 6:1, 6:18, 14:23, 57:17, 58:13, 72:11, 77:11, 80:10, 85:25, 126:17

**PATZER** [2] - 5:19, 131:2
**Paul** [1] - 1:22
**pause** [3] - 78:25, 114:16, 118:2
**pay** [3] - 88:11, 117:17, 128:16
**PC** [2] - 1:18, 86:15
**PCAP** [1] - 79:15, 81:7, 108:16, 108:18, 109:16, 109:22, 110:6, 110:12, 112:6, 112:16, 112:19
**PCAPs** [1] - 109:5
**peer** [27] - 18:24, 19:1, 19:2, 22:1, 24:17, 25:21, 31:3, 38:1, 40:25, 41:9, 46:21, 49:21, 51:2, 54:17, 65:20, 82:13
**peer-to-peer** [9] - 18:24, 19:1, 31:3, 38:1, 40:25, 41:9, 49:21, 51:2, 65:20
**peers** [11] - 19:16, 21:13, 21:18, 22:7, 22:8, 23:2, 24:18, 27:17, 27:18, 27:20
**pending** [2] - 101:22, 114:2
**people** [7] - 3:6, 22:11, 22:15, 111:16, 112:1, 126:1, 126:8
**per** [4] - 24:4, 61:18, 62:14, 92:7
**percent** [4] - 39:18, 95:3, 95:15, 96:11
**percentage** [4] - 95:1, 95:11, 95:12, 96:6
**perfect** [1] - 74:21
**perform** [1] - 116:19
**period** [8] - 56:17, 56:22, 56:25, 57:9, 67:2, 87:2, 111:15, 114:3
**permissible** [3] - 51:1, 51:21, 52:2
**permission** [1] - 105:2
**person** [12] - 15:10, 15:16, 24:4, 39:6, 46:22, 70:13, 70:22, 71:4, 79:8, 79:16, 88:3, 123:15
**person's** [1] - 39:3
**personal** [9] - 58:9, 74:12, 83:1, 83:13, 85:13, 103:20, 104:7, 116:17, 117:1
**personally** [2] - 16:4, 77:22
**persons** [4] - 3:6, 10:8, 10:11, 32:25
**ph** [1] - 62:23
**Philadelphia** [1] - 26:24
**phone** [2] - 31:20, 59:20
**physical** [1] - 111:3
**physically** [4] - 13:7, 13:17, 35:25, 119:2
**pick** [3] - 15:24, 25:23, 113:12
**pictorial** [1] - 15:5
**piece** [8] - 78:15, 79:18, 79:22, 81:7, 81:15, 93:13, 93:14, 95:16
**pieces** [3] - 81:17, 81:18, 81:19
**Pirate** [4] - 8:24, 9:1, 9:4, 107:9
**PIRATE** [1] - 9:2
**place** [4] - 2:1, 14:13, 104:18, 109:19
**places** [1] - 21:21

**placing** [1] - 48:23
**Plains** - 1:16
**plaintiff** [7] - 2:7, 2:16, 3:11, 5:7, 5:17, 128:4, 128:8
**Plaintiff** [21] - 1:5, 1:15, 49:1, 49:10, 53:21, 68:3, 72:12, 72:23, 73:3, 73:7, 73:8, 74:19, 74:24, 82:2, 86:3, 86:6, 131:13, 131:13, 131:14, 131:14, 131:15
**plaintiff's** [3] - 30:20, 102:17, 102:21
**Plaintiff's** [6] - 30:24, 49:2, 49:4, 53:14, 53:17, 61:11
**planned** [2] - 7:15, 78:5
**planning** [2] - 7:20, 77:25
**play** [4] - 13:19, 80:5, 94:5
**playable** [7] - 81:6, 81:8, 81:9, 81:11, 81:16, 81:17, 93:5
**played** [1] - 93:10
**player** [1] - 93:5
**plays** [1] - 93:12
**Plaza** [1] - 1:22
**point** [4] - 48:13, 77:21, 110:1, 125:6
**Policy** [1] - 50:16
**popular** [1] - 22:16
**pornography** [1] - 98:14
**port** [50] - 47:8, 59:17, 59:18, 59:19, 59:25, 60:1, 60:3, 60:5, 60:8, 60:15, 60:16, 60:19, 60:21, 60:22, 60:23, 60:25, 61:2, 63:25, 64:7, 64:13, 64:16, 66:8, 66:12, 66:18, 66:19, 66:22, 67:4, 67:10, 67:12, 67:14, 68:23, 69:2, 83:8, 83:10, 83:11, 83:12, 84:21, 86:2, 86:9, 86:11, 86:13, 87:22, 89:13, 90:8, 90:20, 119:13, 119:15, 119:18, 119:19
**portions** [2] - 26:5
**ports** [7] - 47:9, 59:24, 60:17, 60:24, 68:17, 83:4, 89:21
**position** [2] - 7:2, 98:19
**positive** [2] - 37:10, 44:17
**positives** [4] - 37:21, 42:20, 44:13, 44:21
**possible** [12] - 17:24, 32:25, 35:18, 38:14, 40:17, 41:7, 79:8, 85:1, 85:25, 86:5, 86:7, 90:15
**posthearing** [2] - 127:7, 129:20
**potential** [1] - 41:4
**practice** [1] - 41:22
**practices** [2] - 52:13, 86:9
**prefer** [1] - 20:1
**preparation** [4] - 30:6, 54:2, 102:25, 103:24
**prepare** [1] - 4:3
**prepared** [3] - 3:23, 49:13, 107:5
**present** [3] - 42:24, 73:11, 104:19

**preservation** [1] - 43:25
**preserve** [3] - 10:25, 47:16, 108:22
**preserved** [6] - 11:16, 11:20, 11:24, 12:1, 12:25, 44:2
**pretend** [2] - 38:15, 88:3
**prevent** [2] - 37:13, 109:19
**prevents** [1] - 82:13
**previous** [2] - 26:9, 62:8, 119:12
**previously** [7] - 61:11, 61:16, 67:20, 68:1, 74:24, 80:10, 101:4
**price** [2] - 118:3, 118:5
**Printer** [1] - 31:3
**printout** [1] - 49:4
**private** [4] - 103:23, 107:25, 108:7, 118:24
**problems** [1] - 42:20
**procedure** [6] - 42:4, 42:14, 51:11, 79:3, 104:18, 116:18
**procedures** [2] - 52:5, 52:6, 102:13
**proceeding** [1] - 102:12
**Proceedings** [1] - 1:25
**proceedings** [5] - 26:20, 46:2, 78:25, 114:16, 118:2
**process** [26] - 10:5, 13:1, 13:5, 13:18, 14:14, 16:4, 16:20, 17:13, 17:15, 17:16, 17:19, 25:12, 27:19, 28:22, 35:13, 43:11, 48:3, 48:4, 48:5, 73:19, 78:6, 93:1, 105:2, 107:10, 107:23, 110:13
**produce** [3] - 28:25, 117:21, 117:25
**produced** [1] - 1:25
**profession** [1] - 6:20
**professional** [4] - 51:19, 97:18, 99:8, 110:5
**proficient** [1] - 102:12
**profile** [1] - 72:8
**profiling** [2] - 70:13, 71:4
**program** [10] - 7:19, 28:7, 49:5, 78:3, 78:4, 82:10, 82:15, 108:14, 108:16
**programmer** [1] - 7:20, 70:20
**programming** [4] - 70:19, 70:20, 78:1
**programs** [7] - 7:21, 44:22, 44:23, 44:25, 78:1, 102:7
**prohibited** [1] - 50:25
**prohibiting** [1] - 18:10
**prohibition** [1] - 49:20
**proof** [2] - 44:20, 44:25
**proper** [5] - 21:19, 21:20, 21:21, 48:5, 93:11
**properly** [1] - 44:7
**proposed** [1] - 43:14
**prospective** [1] - 73:17
**protected** [6] - 9:7, 9:10, 9:12, 13:23, 45:17, 107:4

**protecting** [1] - 33:4
**protocol** [1] - 50:3
**protocols** [1] - 44:11
**prove** [5] - 3:12, 11:8, 41:8, 93:12, 93:18
**proven** [3] - 45:4, 45:23, 60:17
**proves** [4] - 12:4, 93:7, 95:23
**provide** [21] - 8:5, 9:9, 30:1, 30:3, 34:10, 35:12, 99:8, 101:12, 101:21, 103:13, 103:20, 104:1, 104:6, 108:10, 108:16, 110:18, 112:15, 122:7, 122:17, 127:6
**provided** [12] - 10:9, 10:13, 13:20, 35:16, 55:11, 61:13, 101:9, 107:15, 112:11, 112:19, 115:10, 120:5
**provider** [4] - 49:15, 88:8, 88:11, 88:24, 88:25, 103:12, 105:14
**providers** [5] - 51:21, 83:20, 87:1, 88:9, 88:17
**provides** [1] - 8:12
**providing** [2] - 51:25, 63:2
**proxy** [52] - 82:24, 83:1, 83:4, 83:7, 83:14, 83:15, 83:17, 83:18, 83:19, 83:21, 83:22, 83:24, 83:25, 84:2, 84:7, 84:10, 84:13, 84:21, 84:22, 84:25, 85:2, 87:22, 87:25, 88:5, 88:13, 88:14, 88:20, 88:21, 88:22, 88:25, 89:12, 89:18, 89:20, 89:21, 89:25, 90:1, 90:3, 90:11, 90:15, 90:17, 122:24, 123:10, 123:20, 125:13, 125:14, 125:20, 125:23, 126:5, 126:8
**PTAP** [12] - 27:11, 27:12, 27:22, 27:23, 27:24, 28:1, 28:8, 28:9, 28:10, 28:17, 44:24
**PTAPS** [2] - 28:25, 43:16
**public** [3] - 50:25, 107:3, 107:16
**publicly** [3] - 7:5, 46:12, 49:18
**purchase** [1] - 28:13
**purchased** [2] - 108:25, 119:10
**purpose** [9] - 9:4, 9:11, 13:11, 13:13, 18:3, 18:10, 28:1, 73:15, 74:11, 79:3, 110:11
**purposeful** [1] - 56:20
**push** [1] - 78:22
**pushed** [1] - 93:9
**put** [5] - 5:14, 41:5, 78:24, 103:19, 109:19
**puts** [1] - 21:23
**puzzle** [1] - 21:23

---

## Q

**qualifications** [3] - 73:17, 73:23, 74:12
**qualified** [1] - 52:13
**quarter** [1] - 69:14

**quash** [2] - 102:23, 127:19
**questioning** [1] - 52:16
**questions** [16] - 30:13, 74:2, 75:5, 75:20, 77:13, 89:5, 90:14, 91:19, 94:12, 96:15, 116:4, 124:1, 124:7, 126:19, 126:20
**quite** [1] - 37:11

---

## R

**random** [18] - 16:6, 25:23, 35:21, 35:22, 45:19, 60:25, 61:2, 64:14, 83:4, 83:10, 88:18, 89:19, 89:21, 90:1, 90:9, 90:19, 119:18, 119:19
**random-generated** [2] - 60:25, 61:2
**randomly** [5] - 15:14, 15:24, 25:21, 89:13, 119:16
**rather** [2] - 129:15, 130:7
**raw** [5] - 59:7, 59:10, 59:13, 61:24, 62:1
**RAW** [1] - 59:11
**read** [9] - 12:2, 21:19, 30:7, 31:1, 51:14, 110:9, 116:22, 116:23, 117:8
**reading** [1] - 31:5
**reads** [1] - 11:4
**ready** [2] - 77:3, 107:10
**real** [4] - 12:4, 39:4, 106:8, 123:17
**realistic** [1] - 127:8
**realizing** [1] - 80:13
**really** [3] - 39:7, 81:3, 123:10
**reason** [5] - 4:18, 9:8, 11:8, 24:25, 35:21
**receipt** [3] - 117:20, 128:1, 128:25
**receive** [6] - 9:25, 32:6, 32:7, 50:6, 100:18, 128:18
**received** [3] - 3:24, 73:8, 131:15
**Received** [1] - 31:4
**recent** [1] - 101:22
**Recess** [1] - 76:3
**recess** [1] - 77:1
**recommended** [1] - 42:4
**recommending** [1] - 42:10
**record** [14] - 2:4, 5:23, 26:4, 26:8, 47:16, 53:16, 61:22, 74:25, 90:16, 97:8, 103:3, 108:22, 109:22, 127:20
**recorded** [3] - 1:25, 63:1, 109:23
**recording** [4] - 27:12, 27:15, 27:17, 28:6
**recordings** [1] - 44:24
**records** [1] - 104:25
**recross** [1] - 94:13
**RECROSS** [2] - 94:15, 131:6
**RECROSS-EXAMINATION** [2] - 94:15, 131:6

---

11

redirect [2] - 89:7, 124:2
**REDIRECT** [4] - 89:9, 124:4, 131:5, 131:10
refer [11] - 9:15, 19:15, 19:19, 19:25, 32:12, 37:3, 63:17, 68:8, 80:8, 94:4, 104:5
reference [6] - 38:8, 43:21, 55:9, 68:15, 69:24, 75:11
referred [2] - 62:7, 115:6
referring [8] - 36:22, 37:22, 37:23, 38:19, 66:13, 91:12, 114:8, 114:21
refers [6] - 34:1, 34:5, 34:7, 54:25, 62:19, 78:19
reflect [2] - 58:5, 103:7
reflects [1] - 58:13
refresh [3] - 75:3, 75:10, 75:12
refused [1] - 101:12
regarding [5] - 41:3, 52:5, 74:13, 85:3, 117:13
register [1] - 38:14
registered [1] - 88:18
registration [1] - 39:2
regular [1] - 72:16
regulated [1] - 12:18
reinforce [1] - 63:21
reinstall [1] - 65:7
reinstalled [2] - 64:24, 66:7
reiterate [1] - 74:11
relate [2] - 68:12, 102:1
related [8] - 9:16, 10:6, 42:21, 53:24, 55:5, 70:23, 98:15, 99:16
relates [4] - 29:3, 54:23, 60:6, 62:2
relating [1] - 44:15, 107:21
relationship [1] - 21:11
relevant [3] - 46:2, 96:5, 99:9
reliable [2] - 35:24, 36:2
rely [3] - 37:7, 37:9, 40:16
remain [1] - 65:23, 126:8, 126:12
remained [6] - 66:19, 67:2, 69:4, 99:18, 114:2, 116:1
remains [1] - 115:17
remember [4] - 7:22, 26:25, 27:6, 97:12
remove [1] - 82:7
renewal [1] - 118:3
rent [1] - 118:9
rented [4] - 117:14, 119:11, 124:12, 124:15
renting [2] - 106:18, 117:17
repeat [6] - 11:22, 80:23, 81:13, 84:18, 105:11, 119:25
rephrase [1] - 22:24
replaced [1] - 37:16
report [6] - 29:12, 30:7, 30:10, 66:20, 69:4, 69:8
**Reporter** [1] - 1:21
reporter [6] - 4:13, 8:25, 9:19,

127:25, 128:19, 129:1
reporting [3] - 31:6, 38:4
reports [2] - 39:13, 39:16
request [7] - 23:3, 23:8, 102:17, 104:20, 104:24, 105:2, 111:11
requested [2] - 29:1, 110:22
requests [1] - 21:9
require [2] - 103:16, 111:10
required [1] - 105:1
requires [1] - 103:19
reserves [1] - 91:4
residency [1] - 105:9
residential [2] - 105:14, 105:18
respect [1] - 72:11
respond [3] - 50:21, 105:5, 129:21
response [5] - 2:16, 105:9, 105:13, 105:14, 105:16
rest [2] - 66:19, 111:8
result [6] - 32:6, 35:5, 35:23, 39:2, 40:11, 60:10
resulted [1] - 35:7
retained [1] - 106:11
retrieve [1] - 19:23
returned [1] - 105:13
revealed [1] - 126:17
review [8] - 5:6, 53:23, 54:1, 75:9, 103:1, 103:25, 112:9, 128:18
reviewed [3] - 4:8, 112:10, 115:7
reviewing [2] - 49:14, 70:9
right-hand [2] - 68:20, 68:24
roof [1] - 29:22
roughly [3] - 45:10, 56:14, 101:18
router [1] - 87:3
run [3] - 43:10, 43:14, 124:10
running [2] - 29:20, 120:17, 121:11, 122:2, 124:20, 125:2

## S

safe [1] - 45:1
safest [1] - 44:7
safety [1] - 44:10
sake [1] - 62:5
sample [3] - 28:5, 92:17, 119:21
satellites [1] - 29:22
save [1] - 10:25
scenario [6] - 35:7, 40:5, 86:1, 86:5, 121:13, 123:11
scenarios [1] - 106:9
schedule [2] - 127:5, 128:24
school [4] - 6:17, 6:19, 7:9, 77:15
screen [2] - 14:1, 112:12
search [2] - 8:20, 32:17
seated [3] - 2:11, 5:25, 77:2
second [14] - 14:14, 29:24, 39:25, 40:5, 48:17, 55:20,

58:16, 64:21, 68:20, 69:1, 79:24, 81:4, 81:5, 117:24
secondary [1] - 13:1
seconds [6] - 63:14, 63:15, 79:25, 80:11, 80:16, 81:2
secret [2] - 19:10, 99:3
section [2] - 41:17, 65:14
sector [2] - 103:23, 108:7
security [1] - 77:19
see [15] - 4:4, 10:2, 19:7, 20:4, 28:8, 48:14, 58:11, 65:10, 85:1, 91:9, 94:21, 95:24, 96:11, 115:4, 115:17
seeder [1] - 111:24
seeing [1] - 112:13
seek [1] - 105:2
segment [1] - 15:1
segregation [2] - 13:13, 13:14
select [1] - 20:13
selected [1] - 107:16
selections [1] - 16:7
self [2] - 7:3, 77:19
self-employed [2] - 7:3, 77:19
send [1] - 40:23
sends [1] - 40:21
senior [2] - 6:21, 6:23
sense [3] - 4:5, 73:25, 109:15
sentence [1] - 89:17
separately [1] - 10:12
sequence [2] - 21:20, 21:22
series [1] - 124:7
serve [1] - 102:17
server [78] - 33:9, 33:10, 34:5, 34:7, 34:8, 34:12, 34:13, 34:15, 34:18, 35:12, 37:1, 50:13, 82:24, 83:1, 83:4, 83:7, 83:14, 83:15, 83:24, 83:25, 84:1, 84:2, 84:3, 84:7, 84:10, 84:13, 84:21, 84:23, 84:25, 85:2, 87:22, 87:25, 88:5, 88:13, 88:15, 88:20, 88:21, 88:25, 89:12, 89:20, 89:25, 90:1, 90:3, 90:11, 90:15, 90:17, 117:15, 118:9, 118:10, 118:14, 118:24, 118:25, 119:7, 119:22, 120:10, 120:18, 120:22, 121:10, 121:22, 122:2, 122:5, 122:24, 123:12, 123:13, 123:15, 123:16, 123:20, 125:13, 125:14, 125:20, 125:23, 126:5
server's [1] - 88:22, 107:20, 119:8, 120:11, 121:5
servers [52] - 29:21, 34:8, 34:9, 34:15, 34:16, 35:16, 37:2, 37:12, 40:12, 40:23, 43:10, 43:12, 49:20, 83:17, 83:18, 83:19, 83:22, 89:18, 89:21, 106:18, 106:19, 106:21, 106:22, 108:12, 108:13, 108:18, 110:18, 117:14, 117:18, 118:14, 118:15,

118:23, 119:6, 119:11, 119:14, 119:15, 119:17, 120:6, 120:7, 121:19, 122:9, 122:10, 123:5, 123:6, 123:11, 124:10, 124:15, 124:17, 125:3, 126:8
service [13] - 9:9, 51:21, 83:21, 83:23, 88:5, 88:9, 88:17, 99:3, 100:18, 108:4, 113:11, 113:15, 126:1
services [9] - 8:5, 38:18, 83:15, 88:7, 88:12, 88:13, 88:25, 118:10, 122:18
session [1] - 66:13
set [2] - 106:12, 107:2
shaking [1] - 27:18
share [5] - 9:8, 19:3, 20:9, 23:3, 49:24
shared [5] - 39:7, 40:22, 45:2, 45:5, 95:1
shares [1] - 60:7
sharing [22] - 9:12, 18:5, 18:12, 18:21, 18:24, 22:6, 22:8, 22:12, 23:2, 33:22, 34:11, 35:18, 35:19, 37:24, 38:1, 38:15, 48:14, 67:13, 96:12, 111:16, 111:25, 113:1
Sharing [1] - 31:3
sheriff's [5] - 97:22, 98:12, 98:20, 98:23, 99:1
shop [1] - 39:23
show [16] - 12:11, 30:14, 48:16, 48:19, 52:25, 53:1, 53:8, 57:11, 61:9, 62:16, 67:20, 74:23, 75:4, 92:4, 96:6, 114:13
showed [4] - 57:4, 57:8, 112:7, 112:24
showing [1] - 52:14
shown [2] - 45:23, 49:18
shows [8] - 59:13, 59:15, 59:17, 62:13, 67:4, 68:7, 93:15, 95:18
side [6] - 21:9, 55:8, 68:20, 68:24, 115:17
sides [1] - 20:25
sign [3] - 14:19, 14:21, 16:17
signed [2] - 124:16, 125:14
similar [4] - 15:21, 27:8, 31:21, 112:12
simply [3] - 73:17, 75:10, 123:15
simultaneously [2] - 9:21, 129:6
single [4] - 36:17, 37:2, 37:11, 59:6
sit [1] - 15:10
site [3] - 9:11, 9:13, 14:6
sites [5] - 8:17, 8:23, 8:24, 9:4, 10:1
sitting [2] - 13:9, 121:20
situation [4] - 86:7, 86:17, 86:21, 107:9, 123:4, 123:24
skill [1] - 82:10
slow [2] - 9:21, 37:11

**slowing** [1] - 50:12
**small** [1] - 93:8
**snapshot** [1] - 110:7
**so-called** [1] - 32:23
**so..** [1] - 115:3
**software** [109] - 7:16, 7:18, 8:7, 12:3, 12:17, 17:25, 18:11, 18:14, 21:21, 21:22, 21:23, 22:22, 24:12, 27:8, 27:9, 28:10, 28:11, 28:13, 35:20, 36:12, 36:14, 39:14, 40:8, 44:22, 44:23, 44:25, 47:9, 47:10, 47:12, 47:13, 47:14, 47:16, 47:21, 47:24, 48:2, 59:15, 59:16, 59:17, 59:24, 59:25, 60:5, 60:8, 60:18, 60:19, 64:14, 64:24, 65:5, 65:6, 65:8, 65:9, 65:11, 65:12, 65:13, 65:18, 65:22, 66:2, 66:4, 67:1, 67:9, 67:10, 67:11, 67:12, 67:14, 77:22, 77:25, 78:2, 78:3, 82:25, 83:7, 83:21, 84:4, 84:22, 84:25, 88:21, 92:7, 96:14, 99:25, 106:3, 106:9, 106:13, 106:22, 106:23, 106:24, 107:2, 107:6, 107:14, 108:13, 108:20, 108:25, 109:3, 110:2, 113:5, 113:11, 118:19, 119:17, 120:17, 121:11, 121:25, 122:1, 122:3, 122:24, 124:10, 124:21, 125:10, 125:16
**Software** [2] - 99:24
**softwares** [1] - 118:18
**Soma** [1] - 62:23
**someone** [1] - 84:22
**sometimes** [2] - 95:18, 126:9
**somewhere** [4] - 16:25, 25:8, 29:7, 98:7
**sooner** [2] - 129:15, 130:7
**sorry** [18] - 11:13, 11:22, 16:12, 17:1, 19:21, 27:1, 29:6, 31:11, 42:16, 46:9, 54:7, 55:19, 56:19, 70:5, 77:16, 86:4, 119:24, 126:4
**sort** [3] - 4:1, 13:25, 113:12
**sought** [4] - 19:20, 19:22, 19:23
**source** [2] - 109:3, 109:4
**Southern** [2] - 101:23, 116:16
**space** [2] - 46:8, 127:18
**spaces** [2] - 46:18, 46:19
**speaker** [1] - 70:18
**speaks** [1] - 51:13
**special** [3] - 28:7, 84:25, 98:16
**specialist** [1] - 83:17
**specialized** [2] - 51:6, 126:1
**specific** [11] - 15:4, 31:22, 31:23, 33:1, 34:4, 38:17, 47:25, 79:13, 80:13, 83:23, 107:4
**specifically** [1] - 49:14
**speed** [2] - 22:13, 73:22
**spell** [2] - 9:1, 97:7

**spend** [1] - 44:6
**spent** [1] - 97:22
**spoliation** [1] - 102:8
**Sponge** [1] - 69:25
**spoof** [1] - 40:15
**spoofed** [1] - 40:19
**spoofs** [1] - 44:14
**spot** [3] - 46:8, 46:10, 46:23
**spreadsheets** [1] - 112:12
**stage** [1] - 78:7
**stamp** [7] - 12:3, 12:4, 12:7, 12:11, 29:9, 29:13, 39:24
**stamped** [1] - 12:14
**stamping** [1] - 29:18
**stamps** [1] - 12:17
**stand** [3] - 5:18, 72:20, 97:2
**standard** [6] - 27:13, 27:25, 28:11, 28:13, 29:5, 41:21
**stands** [3] - 29:4, 32:10, 64:11
**start** [10] - 17:17, 17:20, 25:12, 26:9, 48:1, 64:2, 64:9, 66:13, 79:1, 109:14
**started** [4] - 7:3, 7:24, 97:24, 106:18
**starting** [2] - 39:23, 97:18
**starts** [4] - 8:10, 17:15, 36:14, 95:25
**state** [5] - 2:4, 5:22, 97:7, 101:9, 104:24
**State** [1] - 81:23
**statement** [5] - 3:17, 4:19, 5:5, 49:6, 103:25
**STATES** [2] - 1:1, 1:12
**States** [3] - 26:21, 100:16, 100:25
**static** [8] - 85:17, 85:19, 85:21, 87:9, 106:19, 118:16, 118:17, 123:9
**stay** [3] - 3:7, 85:23, 87:2
**stayed** [2] - 66:22, 115:22
**stays** [3] - 85:22, 87:4, 89:24
**stenography** [1] - 1:25
**step** [9] - 8:15, 8:16, 10:4, 96:18, 105:1, 108:11, 111:9, 112:9, 126:22
**steps** [7] - 41:1, 50:9, 96:20, 106:16, 109:19, 113:17, 126:25
**STEVEN** [1] - 1:11
**still** [10] - 7:11, 34:9, 37:7, 86:2, 86:14, 87:7, 87:11, 93:4, 93:5, 123:9
**stop** [2] - 32:15, 96:12
**storage** [1] - 16:20
**store** [3] - 11:1, 27:24, 45:19
**stored** [4] - 16:18, 16:25, 17:2, 17:11
**storing** [1] - 39:15
**straight** [1] - 4:20
**Street** [1] - 1:19
**study** [2] - 81:21, 81:23
**stuff** [2] - 70:19, 109:19

**subject** [2] - 27:7, 50:15
**submissions** [1] - 129:20
**submit** [6] - 4:15, 102:16, 102:20, 128:24, 129:3, 129:20
**submitted** [3] - 3:4, 3:12, 3:17
**submitting** [1] - 129:5
**subparagraph** [1] - 39:12
**Subpoena** [1] - 50:16
**subpoena** [12] - 50:22, 102:18, 103:14, 103:16, 103:19, 104:8, 104:25, 110:22, 111:11, 122:6
**subscriber** [11] - 1:7, 50:10, 50:25, 103:21, 104:1, 105:6, 105:8, 105:17, 105:24, 111:11, 117:2
**subscriber's** [3] - 88:23, 103:13, 104:11
**subscribers** [6] - 50:17, 51:11, 51:20, 88:15, 104:7, 116:20
**subsequent** [6] - 39:24, 57:24, 58:13, 58:24, 59:5, 113:17
**subsequently** [1] - 125:17
**substance** [1] - 3:11
**substantive** [1] - 116:18
**substitute** [1] - 3:5
**subtitle** [1] - 43:4
**successful** [4] - 14:21, 21:25, 111:15, 112:17
**successfully** [1] - 23:15
**suggestion** [1] - 4:13
**Suite** [2] - 1:15, 1:22
**sum** [1] - 3:10
**supplemental** [1] - 102:21
**supplied** [1] - 17:7
**support** [2] - 73:13, 102:16, 102:21
**supporting** [1] - 17:7
**supports** [1] - 67:15
**supposed** [1] - 35:20
**surfing** [1] - 32:23
**suspected** [2] - 41:22, 41:23
**sustained** [1] - 51:8
**swarm** [16] - 18:17, 18:19, 18:20, 22:7, 22:8, 48:8, 48:10, 48:12, 79:10, 79:11, 82:7, 93:23, 95:19, 96:2, 111:22, 123:14
**swarms** [4] - 18:15, 22:15, 22:19, 69:11
**sworn** [2] - 5:20, 97:5
**system** [18] - 7:14, 32:4, 35:15, 36:12, 38:11, 43:6, 46:7, 57:5, 59:6, 64:25, 65:7, 66:24, 67:5, 70:14, 72:19, 106:12, 108:20, 122:24
**systems** [1] - 32:1

**T**

**table** [2] - 73:4, 86:6
**tables** [1] - 72:12

**tag** [1] - 23:24
**takedown** [4] - 32:14, 35:6, 35:8, 35:16
**Takedown** [1] - 31:4
**talks** [2] - 33:22, 40:14
**tape** [4] - 11:12, 12:2, 16:21, 26:10
**target** [2] - 17:17, 104:21
**task** [1] - 43:20
**TCP** [5] - 47:9, 59:17, 59:18, 59:19, 59:22
**teach** [1] - 100:2
**teacher** [1] - 99:20
**teaching** [1] - 7:4
**technically** [1] - 87:17
**technique** [1] - 87:21
**technologies** [1] - 37:16
**technology** [13] - 5:8, 36:18, 36:19, 36:20, 36:22, 36:25, 37:4, 37:8, 37:9, 39:1, 40:3, 40:9
**ten** [4] - 97:22, 116:9, 127:15, 127:16
**ten-page** [1] - 127:16
**term** [7] - 8:23, 29:3, 125:21, 125:23, 125:24, 125:25, 126:5
**terminating** [1] - 50:12
**terms** [3] - 19:14, 40:20, 63:12
**terrible** [2] - 6:3, 97:13
**test** [13] - 107:10, 111:19, 111:20, 112:17, 112:18, 117:13, 117:15, 120:1, 121:23, 122:23, 124:15, 124:16
**testified** [5] - 5:21, 26:20, 89:11, 97:6, 101:3, 101:15
**testimony** [18] - 3:10, 27:7, 54:2, 58:8, 58:11, 70:10, 73:18, 96:19, 101:9, 101:13, 101:19, 101:21, 101:22, 103:1, 103:24, 113:7, 115:14, 124:9
**testing** [1] - 110:12
**tests** [1] - 106:8
**THE** [237] - 1:11, 1:15, 2:2, 2:11, 2:22, 2:24, 3:20, 4:9, 4:24, 5:1, 5:3, 5:14, 5:22, 5:24, 5:25, 6:4, 6:5, 6:10, 6:18, 14:23, 15:2, 15:6, 15:8, 15:9, 15:12, 15:14, 15:16, 15:19, 30:14, 30:17, 30:21, 32:11, 32:13, 32:16, 32:19, 32:21, 32:22, 33:2, 33:5, 33:6, 33:12, 33:16, 33:18, 33:19, 33:21, 33:24, 34:1, 34:3, 34:5, 34:7, 34:8, 34:12, 34:13, 34:14, 34:20, 34:21, 34:23, 34:24, 48:18, 48:21, 48:25, 49:7, 49:9, 49:11, 51:8, 51:12, 51:16, 52:11, 52:17, 52:20, 53:1, 53:6, 53:12, 53:14, 53:18, 53:20, 54:7, 55:21, 57:17, 57:22, 57:23, 58:1, 58:2, 58:10, 58:15, 58:16, 58:18, 58:19,

58:22, 58:23, 59:1, 59:2, 59:3, 59:4, 59:7, 59:9, 59:10, 59:11, 59:12, 59:13, 59:16, 59:18, 59:19, 59:21, 59:23, 60:2, 60:4, 60:9, 60:12, 60:13, 60:15, 60:20, 60:22, 60:23, 60:25, 61:1, 61:4, 61:7, 62:5, 62:9, 63:11, 63:14, 63:15, 64:9, 67:22, 67:25, 72:11, 72:14, 72:15, 72:17, 72:18, 72:21, 72:22, 73:2, 73:7, 73:15, 73:20, 74:7, 74:9, 74:15, 74:19, 74:22, 75:1, 75:4, 75:21, 75:25, 76:2, 77:2, 77:5, 78:22, 79:1, 80:10, 80:14, 80:19, 82:1, 82:3, 82:18, 82:21, 84:17, 85:9, 85:11, 85:25, 86:4, 86:5, 86:10, 86:11, 86:14, 86:16, 86:18, 86:19, 89:6, 89:16, 89:20, 89:23, 89:24, 90:1, 90:3, 90:4, 90:5, 90:6, 91:11, 91:13, 91:14, 94:13, 95:3, 95:5, 95:6, 96:3, 96:8, 96:9, 96:10, 96:16, 96:18, 96:22, 96:25, 97:3, 97:7, 97:9, 97:1, 114:15, 116:5, 116:7, 116:10, 117:7, 117:22, 117:23, 117:24, 122:15, 122:16, 122:19, 122:20, 122:21, 124:2, 125:1, 125:5, 126:20, 126:22, 126:24, 127:1, 127:3, 127:5, 127:12, 127:14, 127:16, 128:3, 128:7, 128:13, 128:21, 128:23, 129:7, 129:10, 129:13, 129:18, 129:22, 129:25, 130:2, 130:5
**themselves** [1] - 42:25
**theoretically** [1] - 124:11
**therefore** [1] - 50:24
**third** [4] - 12:21, 50:15, 102:17, 110:2
**third-party** [2] - 102:17, 110:2
**thoughts** [1] - 43:7
**three** [5] - 27:5, 46:21, 58:21, 83:16, 97:21
**Thrones** [1] - 22:18
**throughout** [4] - 65:23, 66:19, 67:2, 69:4
**tiles** [1] - 107:16
**Title** [1] - 55:8
**title** [26] - 10:17, 22:12, 25:17, 26:2, 26:6, 31:1, 50:16, 55:10, 55:11, 55:12, 61:20, 62:14, 62:18, 62:25, 63:9, 92:8, 92:20, 92:21, 93:21, 93:23, 93:24, 107:11, 107:13, 107:19
**titles** [16] - 8:10, 8:11, 8:17, 8:22, 26:17, 43:21, 55:23, 62:11, 62:12, 70:6, 70:23, 71:1, 92:6, 92:16, 92:19, 108:10
**Tobacco** [1] - 99:5
**today** [7] - 5:10, 53:24, 85:13, 102:22, 106:4, 113:8, 128:24
**today's** [1] - 30:6, 54:2, 70:10,

103:1, 103:24
**together** [1] - 21:23
**tomorrow** [2] - 4:2, 128:15
**took** [4] - 2:1, 7:19, 72:20, 107:3
**top** [4] - 54:21, 56:2, 56:4, 64:16
**topic** [1] - 101:13
**torrent** [45] - 8:21, 9:14, 9:15, 10:7, 10:8, 18:21, 19:8, 19:12, 19:19, 19:25, 20:1, 20:2, 20:5, 20:12, 20:13, 21:2, 21:16, 21:17, 22:16, 22:22, 23:3, 23:22, 23:23, 24:14, 24:20, 25:15, 27:21, 31:22, 31:23, 33:1, 33:3, 34:1, 37:1, 55:1, 61:18, 65:11, 69:11, 70:14, 78:19, 79:5, 81:8, 81:16, 95:15, 107:8
**torrents** [1] - 70:21
**total** [1] - 22:2
**totality** [1] - 109:12
**trace** [2] - 122:8, 122:12
**tracker** [5] - 35:20, 36:18, 36:19, 36:20, 37:3, 38:10
**trackers** [3] - 32:20, 32:23, 38:4
**tracking** [2] - 36:22, 47:15
**trading** [1] - 24:23
**traffic** [1] - 108:18
**train** [1] - 99:12
**training** [3] - 7:1, 7:4, 7:6
**transacting** [1] - 123:14
**transaction** [4] - 22:23, 27:13, 27:16, 54:15
**transactions** [3] - 27:23, 61:17, 112:7
**TRANSCRIPT** [1] - 1:11
**Transcript** [1] - 1:25
**transcript** [9] - 4:14, 5:6, 48:20, 127:6, 128:2, 128:14, 128:18, 129:1, 129:13
**transfer** [1] - 62:19
**transferred** [1] - 119:21
**transmit** [1] - 123:16
**trial** [2] - 17:5, 101:6
**Trojan** [1] - 88:1
**true** [12] - 11:16, 18:14, 22:15, 23:19, 23:22, 42:13, 44:10, 45:22, 46:6, 48:13, 62:13, 104:15
**TRUST** [1] - 12:9
**trust** [1] - 12:10
**truth** [1] - 51:10
**try** [4] - 41:1, 41:5, 41:14, 130:6
**trying** [4] - 2:12, 19:23, 22:19, 24:21
**turn** [1] - 50:17, 87:3
**turned** [1] - 115:11
**two** [12] - 10:7, 10:11, 13:6, 15:11, 19:15, 29:20, 43:19, 54:4, 60:24, 63:12, 80:11, 80:16
**types** [1] - 106:24

**typically** [3] - 73:25, 83:24, 128:7

## U

**ultimately** [1] - 21:25
**under** [6] - 41:17, 41:25, 43:3, 50:25, 62:16, 65:6
**understandings** [1] - 72:9
**unique** [5] - 9:15, 23:19, 60:2, 60:18, 93:6
**unit** [4] - 97:23, 98:9, 98:16, 100:18
**UNITED** [2] - 1:1, 1:12
**United** [3] - 26:21, 100:16, 100:25
**universal** [1] - 75:17
**Universal** [1] - 29:4
**university** [1] - 39:22
**University** [7] - 5:9, 30:7, 32:3, 35:3, 81:23, 113:8, 113:21
**unless** [4] - 5:11, 50:18, 73:20, 125:8
**unlikely** [4] - 46:22, 60:7, 67:8, 67:13
**unlimited** [1] - 85:4
**up** [16] - 6:2, 6:11, 8:25, 20:21, 26:15, 30:11, 30:13, 73:22, 77:13, 86:2, 96:1, 106:12, 107:2, 112:14, 113:12, 120:1
**upload** [4] - 18:4, 48:5, 118:18, 120:21
**uploaded** [5] - 17:23, 18:5, 18:7, 107:8, 108:14
**uploading** [3] - 18:10, 111:17, 111:18
**uploads** [1] - 48:2
**US** [3] - 1:5, 99:1, 100:18
**user** [9] - 41:23, 47:7, 49:5, 72:9, 83:23, 85:2, 87:12, 87:22, 88:20
**user's** [1] - 49:20
**users** [9] - 18:8, 38:5, 47:12, 50:5, 70:11, 83:18, 85:13, 88:6, 123:20
**uses** [2] - 83:24, 90:4
**UTC** [9] - 29:3, 29:11, 29:15, 54:11, 54:13, 54:22, 62:17, 75:11, 75:17

## V

**value** [3] - 19:9, 95:1, 95:25
**various** [7] - 7:21, 19:11, 20:10, 47:9, 47:14, 77:20, 78:1
**verbiage** [1] - 107:5
**verification** [24] - 11:19, 13:1, 13:5, 13:10, 13:14, 13:18, 14:14, 14:21, 14:22, 16:22, 16:24, 17:6, 17:16, 17:19, 17:20, 23:14, 25:12, 35:13,

36:8, 42:11, 78:7, 93:1, 107:23
**verified** [10] - 13:16, 14:18, 14:20, 24:24, 25:15, 35:19, 36:5, 36:7, 45:17, 45:20
**verifier** [1] - 13:22
**verify** [19] - 10:12, 12:21, 14:9, 15:25, 16:13, 20:14, 23:10, 28:1, 28:22, 29:19, 29:23, 39:17, 42:7, 43:1, 45:6, 106:2, 106:12, 110:11
**verifying** [8] - 15:10, 20:16, 25:15, 29:17, 41:24, 42:17, 43:20, 44:22
**Verizon** [11] - 49:16, 49:19, 50:16, 50:24, 51:5, 51:6, 51:7, 91:4, 103:25, 104:6
**Verizon's** [2] - 49:5, 52:13
**versa** [1] - 21:10
**version** [12] - 47:10, 59:15, 59:16, 60:6, 63:24, 65:4, 65:6, 65:10, 65:11, 66:1, 66:4, 82:4
**versions** [1] - 65:17
**via** [3] - 110:19, 111:5, 112:11
**viable** [1] - 128:20
**vice** [1] - 21:10
**video** [22] - 11:12, 13:19, 13:20, 14:25, 15:1, 15:3, 15:7, 15:9, 16:2, 16:3, 16:14, 24:20, 27:17, 63:11, 63:12, 94:7, 95:4, 96:5, 96:6, 107:5
**videos** [2] - 15:11, 16:5
**videotape** [3] - 28:4, 28:5, 28:6
**view** [2] - 10:8, 13:25
**virtual** [19] - 106:18, 117:15, 117:17, 118:19, 118:19, 118:23, 118:24, 118:25, 119:6, 119:7, 119:8, 119:14, 119:15, 120:18, 120:22, 121:21, 122:2, 123:5, 123:7
**virus** [1] - 88:1
**visually** [1] - 14:9
**voice** [2] - 6:2, 6:11
**volume** [1] - 11:6
**VPN** [4] - 83:20, 118:23, 121:17, 122:11
**VPNing** [1] - 123:6
**vs** [1] - 2:3

## W

**wait** [4] - 75:7, 89:20, 128:10, 130:5
**walk** [1] - 6:10
**warning** [1] - 51:25
**Washington** [8] - 5:9, 30:7, 32:4, 35:3, 81:23, 113:8, 113:21
**watch** [3] - 15:13, 22:2, 28:6
**web** [2] - 47:25, 122:17
**week** [3] - 22:18, 128:22, 128:23
**well-known** [2] - 8:17, 8:20

Case 1:16-cv-00932-PB Document 142 Filed 10/06/21 Page 145 of 145 Page ID #: 440

**White** [1] - 1:16

**whole** [5] - 15:13, 16:11, 79:10, 79:11, 94:21

**widely** [1] - 99:25

**WiFi** [3] - 46:8, 46:10, 46:22

**wiping** [1] - 102:7

**Wireshark** [2] - 108:15, 109:1

**witness** [14] - 5:20, 49:3, 51:5, 52:25, 53:8, 55:20, 61:6, 61:11, 73:12, 74:23, 75:20, 96:23, 101:4, 119:13

**Witness** [2] - 96:20, 126:25

**WITNESS** [64] - 5:24, 6:4, 15:2, 15:8, 15:12, 15:16, 32:13, 32:19, 32:22, 33:5, 33:12, 33:18, 33:21, 34:1, 34:5, 34:8, 34:13, 34:20, 34:23, 57:22, 58:1, 58:15, 58:18, 58:22, 59:1, 59:3, 59:7, 59:10, 59:12, 59:16, 59:19, 59:23, 60:4, 60:12, 60:15, 60:22, 60:25, 61:4, 62:9, 63:14, 72:14, 72:17, 72:21, 80:14, 82:3, 85:11, 86:4, 86:10, 86:14, 86:18, 89:20, 89:24, 90:3, 90:5, 91:13, 95:5, 96:8, 96:10, 97:9, 117:23, 122:16, 122:20, 125:5, 126:24

**witness's** [1] - 74:12

**witnesses** [7] - 3:18, 4:20, 5:7, 5:14, 119:12, 127:1, 127:3

**word** [7] - 8:18, 15:22, 18:25, 20:19, 40:19, 70:21, 75:11

**words** [13] - 9:20, 29:16, 33:9, 37:15, 47:7, 47:23, 48:6, 71:1, 91:4, 102:7, 108:17, 125:9, 125:25

**works** [6] - 8:8, 8:22, 27:8, 27:9, 84:3, 84:10

**world** [1] - 100:1

**worldwide** [3] - 44:19, 44:20, 45:3

**wound** [1] - 86:2

**write** [3] - 11:6, 127:17, 129:14

**written** [8] - 3:17, 11:5, 11:9, 12:5, 12:6, 12:12, 18:2, 55:3

---

## X

**X-Art** [1] - 69:15

---

## Y

**year** [7] - 7:19, 7:22, 98:8, 100:5, 100:14, 101:1, 118:3

**years** [10] - 7:9, 27:5, 37:17, 42:10, 97:20, 97:22, 98:3, 98:5, 98:6

**yellow** [10] - 31:19, 31:22, 32:17, 33:6, 33:8, 38:16, 38:20, 38:23

**yesterday** [1] - 3:24

**YORK** [2] - 1:1, 11:13

**York** [5] - 1:16, 1:19, 1:23, 101:23, 116:16

**YORM** [5] - 11:1, 11:3, 11:4, 11:11, 26:10

**yourself** [1] - 7:6

---

## Z

**zero** [4] - 29:10, 45:8, 63:17, 95:18

**zeros** [7] - 25:7, 25:8, 25:9, 80:8, 80:9, 93:6

**zone** [2] - 29:10, 54:13

**zones** [1] - 29:11

 Positive
As of: August 21, 2020 9:10 PM Z

## *Malibu Media LLC v. Doe*

United States District Court for the Northern District of Illinois, Eastern Division

February 8, 2016, Decided; February 8, 2016, Filed

Case No. 13 C 6312

**Reporter**
2016 U.S. Dist. LEXIS 14798 *

MALIBU MEDIA LLC, Plaintiff, v. JOHN DOE, Defendant.

**Prior History:** *Malibu Media, LLC v. Doe, 2014 U.S. Dist. LEXIS 47539 (N.D. Ill., Apr. 7, 2014)*

## Core Terms

infringement, disclosure, software, movies, discovery, forensic, downloaded, drive, bits, network, internet, Packet, media, harmless, deleted, digital, hash, cross-motions, captured, deadline, genuine, depose, screen, shot, user, visualization, installed, machines, license, router

**Counsel:** **[*1]** For Malibu Media LLC, Plaintiff: Mary K. Schulz, LEAD ATTORNEY, Schulz Law, P.C., Geneva, IL; Paul Joseph Nicoletti, LEAD ATTORNEY, Nicoletti Law, PLC, Birmingham, MI.

For John Doe, subscriber assigned IP address 24.14.81.195, Defendant: Jonathan Lucas Allen Phillips, LEAD ATTORNEY, PRO HAC VICE, Shay Kepple Phillips, Ltd., Peoria, IL.

For Excipio GmbH, Intervenor: Keith A. Vogt, Takiguchi & Vogt, Oak Brook, IL.

**Judges:** Geraldine Soat Brown, United States Magistrate Judge.

**Opinion by:** Geraldine Soat Brown

## Opinion

### MEMORANDUM OPINION AND ORDER

Pending before the court are cross-motions for summary judgment by plaintiff Malibu Media, LLC [dkt 147] and defendant John Doe [dkt 144]. Also pending are defendant's motions to Strike Certain Portions of Plaintiff's Statement of Undisputed Material Facts [dkt 160] and to Strike Portions of Plaintiff's Local Rule 56.1(b)(C)(3) Statement [dkt 161]. For the reasons stated below, plaintiff's motion for summary judgment is denied. Defendant's motions are granted.

### BACKGROUND

Plaintiff Malibu Media, LLC ("Malibu") alleges that between May 27, 2013 and July 30, 2013, the defendant infringed Malibu's copyright in 24 movies by downloading them from the internet using a network known as "BitTorrent." [Dkt 1 at 6; **[*2]** 148 ¶¶ 6-7 n.2, 22-23.][1] Malibu alleges that it identified the defendant by an Internet Protocol ("IP") address. (Dkt ¶ 5.) The defendant was allowed to proceed anonymously as "John Doe." (Dkt 17.)

The defendant ("Doe") denies Malibu's allegations [dkt

---

[1] Because of the large number of filings on the motions, record references in this opinion will be to docket number and page or paragraph number.

2016 U.S. Dist. LEXIS 14798, *2

19] and contests Malibu's method of proof. [Dkt 145.] Discovery, including expert discovery, has concluded. The cross-motions rest on the question of whether Malibu has, or can, establish proof of infringement by admissible evidence.

## JURISDICTION

The court has federal subject matter jurisdiction under _28 U.S.C. §§ 1331_ and _1338_ because Malibu claims copyright infringement. The parties have consented to the jurisdiction of the magistrate judge. [Dkt 22.]

## LEGAL STANDARD

Summary judgment on all or part of a claim or defense is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." _Fed. R. Civ. P. 56(a)_. To oppose a motion for summary judgment successfully, the responding party may not simply rest on its pleadings, but rather must submit evidentiary materials [*3] showing that a material fact is genuinely disputed. _Fed. R. Civ. P. 56(c)_. A genuine dispute of material fact exists when there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." _Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)_. The nonmoving party bears the responsibility of identifying applicable evidence. _Bombard v. Ft. Wayne Newspapers, Inc., 92 F.3d 560, 562 (7th Cir. 1996)_. In determining whether a genuine dispute of material fact exists, the court construes all facts and draws all reasonable and justifiable inferences in favor of the nonmoving party. _Anderson, 477 U.S. at 255_.

Cross-motions for summary judgment do not, of course, waive the right to a trial. _Marcatante v. City of Chicago, 657 F.3d 433, 438-39 (7th Cir. 2011)_. Rather, on cross-motions for summary judgment, the same standard in _Rule 56_ is applied to each motion to determine whether there is a genuine dispute of material fact and whether judgment should be entered as a matter of law. _Id._; _Cont'l. Cas. Co. v. Nw. Nat'l. Ins. Co., 427 F.3d 1038, 1041 (7th Cir. 2005)_. In ruling on each cross-motion for summary judgment, the court draws inferences in favor of the party against whom the motion under consideration is made. _Siliven v. Indiana Dept. of Child Servs., 635 F.3d 921, 925 (7th Cir. 2011)_.

## BACKGROUND

Fact discovery was ordered completed by November 19, 2014. [Dkt 98.] The court entered an agreed order for expert discovery which required Malibu to serve its _Rule 26(a)(2)_ disclosures by January 9, 2015, and Doe to serve his _Rule 26(a)(2)_ disclosures by February 9, 2015. [Dkt [*4] 122.] Any motions with respect to expert testimony were to have been filed by April 3, 2015. [_Id._]

Malibu served one _Rule 26(b)(2)_ disclosure, in the form of a Declaration of Patrick Paige dated January 9, 2015. [Dkt 161-1.] Doe deposed Paige on February 17, 2015. [Dkt 160-2.] Doe served an expert report by Delvan Neville dated February 9, 2014. [Dkt 146-2.] Malibu's counsel took Neville's deposition on March 19, 2015. [Dkt 148-19.] At a hearing on March 26, 2015, the parties reported that they were unable to reach a settlement, and a schedule was set for filing dispositive motions. [Dkt 139.] Malibu did not ask leave to serve any additional expert disclosures or to serve a rebuttal expert report.

## FACTS

It is undisputed that Malibu owns the copyright in the 24 movies at issue and that it did not give Doe permission to copy or distribute the works. [Dkt 163 ¶¶ 4, 72.] The issue is whether Malibu has proven or can prove by admissible evidence that Doe copied or distributed the works.[2]

## I. Malibu's evidence

_Collette_ [*5]  _Pelissier Field's declaration about Malibu and its products_

Malibu submits the declaration of its co-managing member Collette Pelissier Field, who founded Malibu with her husband Brigham Field in 2011. [Dkt 148-1 ¶¶ 2,4.] According to Field, Malibu sells its product, "erotic movies," by operating a subscription-based website using the domain name X-art.com. [Dkt 148-1 ¶ 6, 15.] Field states that Malibu owns the copyright in the works

---

[2] Malibu has stipulated that it will seek only a maximum of $750 in damages per infringement (a maximum total of $18,000), but reserves the right to recover costs and attorney's fees under _17 U.S.C. § 505_. [Dkt 61.]

2016 U.S. Dist. LEXIS 14798, *5

and never authorized Doe to use or distribute them. [*Id.* ¶¶48-58.] The declaration appears to be a pro forma document that could be filed in any of Malibu's cases.[3] There is nothing in that declaration that is particular to this case except ¶ 48 which lists the works allegedly infringed. There is nothing in the declaration to establish that Doe copied or distributed any of Malibu's works.

*Malibu's technical evidence*

Malibu has presented no evidence that any part of its works was found on Doe's computers [*6] or other electronic devices that Malibu subjected to forensic examination. In addition, Doe's statement of undisputed facts includes the statement, "There are no copies of any of Malibu Media works on any of Doe's devices." [Dkt 153 ¶ 5.] Malibu responds simply, "Disputed," without citing anything in the record to support that statement. [*Id.*] That fact is, therefore, deemed admitted. *Fed. R. Civ. P. 56(e)(2)*; *N.D. Ill. L.R. 56.1(b)(3)(B)*; *Cracco v. Vitran Exp., Inc., 559 F.3d 625, 632 (7th Cir. 2009)* ("When a responding party's statement fails to dispute the facts set forth in the moving party's statement in the manner dictated by the rule, those facts are deemed admitted for purposes of the motion.").

Instead, Malibu argues that technical evidence gathered by its forensic investigators located in Germany demonstrates that Doe copied and distributed parts of Malibu's movies. In an earlier submission in the case, Malibu summarized its proposed proof:

> Data sent through the internet is delivered in the form of "packets" of information. PCAP stands for "Packet Capture." A PCAP is a computer file containing captured or recorded data being transmitted between two computers. A "Packet Analyzer" records packets of data being transmitted between two computers over a network, such as the internet, [*7] and saves it in a computer file called a PCAP. Packet analyzers also enable users to read and analyze PCAPs. IPP's [Malibu's forensic investigator] data collection system uses a proprietary packet analyzer and TCPDump to

record the entire infringing transaction. TCPDump is an open source free packet analyzer.
. . . The proof of infringement is a PCAP recording of Defendant's IP Address sending a piece of the copyrighted work to the MySQL server. The PCAP recording speaks for itself. Testimony about what is contained in the PCAP can be elicited at trial by either IPP's employee, Mr. Fieser, Malibu's computer forensic expert Mr. Patrick Paige, Excipio's independent contractor, Mr. Michael Patzer, or via a demonstration during trial by any other witness. The demonstration would merely require the witness to install TCPDump so that he or she could read and analyze the PCAP.

[Dkt 40 at 3-4 (footnotes and emphasis omitted).]

Malibu also stated in an earlier submission, "Defendant infringed twenty four (24) works. Defendant sent Excip[i]o's servers 301 'pieces' of these works. . . . At trial, Plaintiff will introduce one PCAP per infringed work and the log report." [Dkt 94-1 at 14.] Malibu objected to [*8] Doe's request that it produce all of the PCAPs allegedly captured because "IPP charges Malibu by the hour to extract the PCAPs." [*Id.*]

As evidence on the cross-motions, Malibu attaches the declarations of Tobias Fieser, Michael Patzer and Patrick Paige. [Dkt 148-8, 148-9, 148-13.] Doe has moved to strike Fieser's and Patzer's declarations, parts of Paige's declaration, and all of Malibu's statements of fact that rely on them. [Dkt 160, 161.] Doe argues that the testimony of those declarants was not timely and properly disclosed under *Fed. R. Civ. P. 26(a)(2)* and, as a consequence, *Fed. R. Civ. P. 37(c)(1)* precludes Malibu from using that evidence. [*Id.*]

*Tobias Fieser declaration*

Malibu's motion for summary judgment attaches the "Declaration of Tobias Fieser in Support of Plaintiff's Motion for Leave to take Discovery Prior to a *Rule 26(f)* Conference," dated September 3, 2013. [Dkt 148-8.] That is the same declaration Malibu filed in September 2013 immediately after the case was filed [Dkt 2-4.] Like Field's declaration, it is a pro forma document that has no particularized statements with respect to Doe except to the extent that it refers to an "Exhibit A," which is described in a footnote as referring to the corresponding exhibit to the Complaint. [*9] [Dkt 148-8 ¶ 13 n.1] No exhibits are actually attached to the declaration. [Dkt 148-8.] Fieser does not state that he actually has read the Complaint in this case or that he

---

[3] Malibu has filed a considerable number of virtually identical lawsuits around the country. *See Malibu Media, LLC v. Doe, No 15 Civ. 4369 (AKH), 2015 U.S. Dist. LEXIS 87751, 2015 WL 4092417, at *3 (S.D.N.Y. July 6, 2015)* (stating, "Malibu is a prolific litigant: between January and May 2014, for example, Malibu was responsible for 38% of copyright lawsuits filed in the United States.")

2016 U.S. Dist. LEXIS 14798, *9

prepared Exhibit A to the Complaint. [*Id.*]

Fieser states that he is employed by IPP, Limited ("IPP"), a company organized under the laws of Germany. [*Id.* ¶ 4.] Among other things, IPP provides forensic investigation services to copyright owners. [*Id.* ¶ 5.] As part of his duties, Fieser monitors the BitTorrent file distribution network and identifies the IP addresses being used by infringers to distribute the copyrighted works. [*Id.* ¶ 6.] He states, "IPP tasked me with effectuating, analyzing, reviewing and attesting to the results of this investigation." [*Id.* ¶ 8.] He used forensic software to scan the BitTorrent distribution network for infringing transactions and IP addresses being used on the BitTorrent network to distribute Malibu's works. [*Id.* ¶ 9.] He declares that the IP address identified on Exhibit A to the Complaint connected to IPP's investigative server in order to transmit a copy or portion of a copy of each media file identified by the hash values on Exhibit A to the Complaint. [*Id.* ¶ 13.] He states **[*10]** that IPP's software downloaded one or more bits of each file listed on Exhibit A from the IP address referenced on Exhibit A. [*Id.* ¶ 15.]

As mentioned above, Malibu did not serve a *Rule 26(a)(2)* disclosure with respect to Fieser.

Michael Patzer declaration

The Declaration of Michael Patzer is dated March 17, 2015. [Dkt 148-9.] Patzer's declaration does not relate specifically to Doe's alleged activity except to refer to a spreadsheet exhibit described below. [*Id.*] Rather, it is an overview of the technical process used to link the IP address identified with Doe's internet access to the digital media file described by Fieser. [*Id.*] Patzer states that he is an independent contractor for Excipio Gmbh ("Excipio") a German company. [*Id.* ¶ 5.] He designed, implemented, maintained, and monitors the data collection system that Excipio owns and uses "to identify the IP addresses used by people to commit copyright infringement via the BitTorrent protocol." [*Id.* ¶ 6.] Excipio licenses its proprietary software to IPP. [*Id.* ¶ 7.] He declares that "Excipio's data collection system accurately collected and recorded evidence proving that the defendant infringed Plaintiff's copyrighted work." [*Id.* ¶ 10.] His declaration **[*11]** includes a 18-paragraph description of the technical process under which Excipio's software collects evidence for Malibu. [*Id.* ¶¶ 11-28.]

As described by Patzer, the process begins when IPP

gives Excipio titles of Malibu's works. Excipio then searches torrent websites for the titles. When there is a match, Excipio "joins the swarm" distributing a computer file. Each piece of a computer file and the entire file has its own hash value. Excipio's software downloads a piece or pieces of the file from the computer connected to the internet through the defendant's IP address. The process is recorded in Excipio's database. [*Id.* ¶¶ 11-15.] Excipio uses a proprietary packet analyzer and TCPDump to record infringing transactions in PCAPs. A PCAP is a computer file containing recorded data transmitted between two computers, in the form of ones and zeros. He states that each infringing transaction is recorded on a MySQL server log file, which is attached as Exhibit A to his declaration, on which each entry relates to a specific PCAP file in Excipio's possession. [*Id.* ¶¶ 16-21.]

As a result of this process, he produces one technical report per movie, one ".tar file" for each infringed work, and one **[*12]** ".torrent file" for each infringed work. [Id. ¶ 28.][4] He states that, if asked, he could bring the actual computer files to trial. He also states that he has testified "as a fact witness" in a trial of consolidated cases for Malibu, and that he is not paid by Malibu for his testimony. [Id. ¶¶ 26, 29-30.]

Malibu did not serve a *Rule 26(a)(2)* disclosure for Patzer. Doe states that on March 17, 2015, his attorneys received a PDF containing Patzer's declaration from Malibu's attorneys with no explanation of its purpose. [Dkt 160 at 2.] Malibu did not move for leave to serve an additional expert report.

Patrick Paige declaration in support of Malibu's motion for summary judgment

The Declaration of Patrick Paige submitted in support of Malibu's motion for summary judgment is dated April 17, **[*13]** 2015. [Dkt 148-13.] Unlike the other declarations, Paige's declaration is focused on this case and, particularly, Doe's denial of liability and Doe's position that an unknown device accessed his router. [Dkt 148-13 ¶¶ 60-68.] Doe points out that this

---

[4] An exhibit to Patzer's declaration states that "CDs containing the following computer evidence were Fed Ex-ed to the Court on April 17, 2014. These CDs contains [sic]: one PCAP per infringed work; one technical report per infringed work; one .tar file for each infringed work; and one .torrent file for each infringed work." [Dkt 148-11.] The docket does not reflect any such filing, nor has this court received any such CD.

declaration contains material in addition to the declaration dated January 9, 2015 that Malibu served as its *Rule 26(a)(2)* expert report. [Dkt 160 at 8-9.]

Paige states that he was a police officer and detective in a computer crimes unit until 2011, taking and teaching various courses relating to computer forensics. [Dkt 148-13 ¶¶ 2-9.] He founded Computer Forensics, LLC, where he is currently employed. [*Id.* ¶ 10.] He has testified in numerous cases as an expert in computer forensics. [*Id.* ¶ 12.] He states that he tested IPP's system by transferring public domain movies to his local computer to make .torrent files, which he then uploaded into torrent websites. [*Id.*¶¶ 25-35.] IPP captured the movies he "seeded." [*Id.* ¶¶ 33-35.] He does not state the date when he conducted that test, nor does he state whether the equipment used is the same system Excipio licensed to IPP in 2013 as described by Fieser and Patzer.

In June 2014, he received a package containing [*14] hard drives from Doe's computer, and on September 22, 2014, he received a DVD with a data export of Doe's iPad. [*Id.* ¶¶ 39-41.] He examined the hard drive images using forensic software and searched for all devices that had been connected to Doe's hard drive. [*Id.* ¶¶ 42-43.] Notably, although he looked for evidence that Malibu's copyrighted works were or had been on Doe's devices [*id.* ¶ 38], he does not say that he found any.

He states that he found evidence that one external storage device and one internal hard drive that were capable of storing files downloaded via BitTorrent had been connected to Doe's computer, but they had not been produced by Doe. [*Id.* ¶¶ 44-45.] He also found files indicating Doe had an interest in peer-to-peer file sharing, digital forensics, BitTorrent, PCAPs, virtual machines, and virtualization software. [*Id.* ¶¶ 46-52.] A virtual machine is an emulation of a computer system which imitates the structure and functions of a real computer system. [*Id.* ¶ 53.] He found several virtual machines on one of Doe's hard drives, but not the program "VMWare" he believes was used to create them. [*Id.* ¶¶ 54, 56-58.] He believes that a hard drive used in connection with the [*15] virtual machines was not produced or the visualization program was deleted. [*Id.* ¶ 59.] He is paid on an hourly basis by Malibu for pretrial investigative work and trial testimony. [*Id.* ¶ 69.]

In a section that was not included in his January 9 declaration, Paige opines that "Defendant is the infringer." [*Id.* ¶ 61.] He states that he has reviewed the screen shot Doe produced, which Doe claims shows that an unknown device accessed his router, and, in his opinion, the screen shot "does not remotely suggest a WiFi hacker." [*Id.* ¶¶ 63-64.]

Patrick Paige declaration in opposition to Doe's motion for summary judgment

In opposition to Doe's motion for summary judgment, Malibu filed yet a third Declaration of Patrick Paige, this one dated April 20, 2015. [Dkt 152-2.] The third declaration adds two paragraphs opining that "[i]t is possible to delete evidence from the unallocated space of a computer without leaving any detectable proof of the deletion," and four paragraphs opining that there is "woefully insufficient evidence" to support Doe's statement that the two unproduced devices were last used prior to the time of the claimed infringement. [*Id.* ¶¶ 60-61, 71-74.]

## II. Doe's evidence

Doe denies that [*16] he downloaded any of Malibu's works. [Dkt 146-1 at 105.] Doe submits Neville's expert report, in which Neville states that he operates a computer forensics company specializing in BitTorrent. [Dkt 146-2 at 1.] He was retained to conduct a forensic examination of Doe's devices. [Id.] He opines that: 1) there is no evidence that Malibu's works are now or ever have been on Doe's devices; 2) there is no evidence that BitTorrent was used for copyright infringement by Doe's devices, and no evidence that BitTorrent was installed on these devices during the period of infringement (May 27 through July 30, 2013); 3) the two devices identified by Paige as having been connected to Doe's computer but not produced in discovery were last used in 2012, which is before the infringement period and before the date Malibu says the works at issue were created; and 4) the virtual machines found on one of Doe's external drives were last used no more recently than September 30, 2010, which is the expiration date for the one-year student license for VMWare that Doe would have received as a graduate student. [*Id.* at 2-3.]

## III. Malibu's motion for summary judgment

Considering all of Malibu's evidence, including the Fieser, [*17] Patzer, and Paige declarations Doe has moved to strike, in the light most favorable to Doe, Malibu's summary judgment motion must be denied. Even if those contested declarations are considered,

Malibu has not eliminated all material questions of fact about whether there was actionable infringement and, if so, whether Doe was the infringer.

"To establish copyright infringement, [a party] must prove two elements: '(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.'" *JCW Invs., Inc. v. Novelty, Inc., 482 F.3d 910, 914 (7th Cir 2007)* (quoting *Feist Pubs., Inc. v. Rural Tel. Serv. Co., Inc., 499 U.S. 340, 361, 111 S. Ct. 1282, 113 L. Ed. 2d 358 (1991))*. The first element is not disputed here. The second is disputed.

### A. What is the evidence that Doe copied or distributed Malibu's works?

Unlike other cases, Malibu has no evidence that any of its works were ever on Doe's computer or storage device. *See, e.g., Malibu Media, LLC v. Winkler, No. 13-cv-03358-WYD-MEH, 2015 U.S. Dist. LEXIS 91305, at *14-15 (D. Colo. June 24, 2015)* (Malibu's expert Paige found evidence that at least 28 of the 39 films at issue had once existed on the defendant's computer). Here, Paige says there is evidence that at one time two other devices which have not been produced were connected to the hard drive of Doe's computer. Doe rebuts an inference of spoliation with Neville's report stating those devices were **[*18]** last used in connection with Doe's computer in June 2012, which is before the works at issue were created and one year prior to the alleged infringement period. Malibu responds with Paige's speculation in his last declaration that the devices "could have been connected to other computers after June 14, 2012," which is based on further speculation that Doe had other computers that were not produced or that the computers that he did produce were "modified in such a way to cause Plaintiff's Works to be undetectable." [Dkt 152-2 ¶¶ 73-74.]

Malibu admits that there is no evidence of visualization software on Doe's computer, and not even any evidence of the deletion of visualization software. [Dkt 151 at 5.] Malibu says that is "beyond fishy," and speculates that Doe must have deleted visualization software from his computer in some way that hides the fact that it was deleted, and then extends the speculation to suggest that Doe must have done that deletion to hide his infringement of Malibu's works. [*Id.*] That is not evidence that Doe copied or distributed Malibu's works.

Malibu's proof that Doe copied its works relies, then, on the evidence it tenders to show that a computer linked to Doe's **[*19]** IP address distributed one or more bits of each of the works. Even if that disputed evidence were

accepted, the IP address alone is not enough to impose liability on Doe. An IP address discloses the location of the internet line used for the transaction (*see, e.g., TCYK, LLC v. Does 1-87, No 13 C 3845, 2013 U.S. Dist. LEXIS 95817, 2013 WL 3465186, at *2 (N.D. Ill. July 10, 2013))*, but it does not identify the individual person who engaged in the transaction. "An IP address provides only the location at which one of any number of computer devices may be deployed, much like a telephone number can be used for any number of telephones." *In re BitTorrent Adult Film Copyright Infringement Cases, 296 F. R. D. 80, 84 (E.D.N.Y. 2012)*.[5]

Doe denies that he downloaded any of Malibu's works and states that he has presented evidence of unidentified users on his network as well as other persons in his home during the infringement period. [Dkt 163 ¶¶ 26-30, 60.] Doe testified that during the period of alleged infringement there were a lot of people visiting his home because he and his wife had just had a new child. [Dkt 148-23 at 21.] Although Malibu argues that no one living outside Doe's home had "sufficient access to his Internet to be the infringer" [dkt 147 at 6], Malibu presents no evidence that eliminates the possibility. Doe also testified that when he "check[ed] the router [there was] at least one, another drone connected to my network." [Dkt 148-23 at 101.] He provided MAC addresses and a screen shot showing an unknown router on Doe's network. [Dkt 148-25 at 6; 148-26.] Paige disputes the value of this evidence, saying that it is "irrelevant" if not taken during **[*21]** the time of infringement, and that the screen shot does not "even remotely suggest a WiFi hacker" because MAC addresses can be "spoofed." [Dkt 152-2 ¶¶ 65-69.] The court, however, concludes that it is relevant. *See Fed.*

---

[5] Malibu contends that this court previously held that Malibu need only prove that Doe's IP address was used in order to prove Doe's liability. [Dkt 147 at 1.] That is not correct and the partial quotation cited by Malibu is taken out of context. Evidence of a link between an IP address and Malibu's movies may be enough to justify discovery, but it is not enough to prove liability. As Malibu's counsel is aware, the hearing on September 30, 2014 did not involve the standard to prove liability; rather, the issue was whether Malibu could take discovery regarding Doe's work computer as well as his home computer. [Dkt 159.] Malibu has no evidence suggesting **[*20]** that an IP address used by Doe's work computer was in any way involved with Malibu's works. The court concluded that Malibu's effort to take discovery about Doe's work computer without even a link to the IP address used by those computers was "just fishing." [*Id.* at 6.]

*R. Evid. 401*. That Doe did not check for access by unauthorized users until after he had notice of this lawsuit is not surprising. The persuasive value of Doe's evidence would be for the jury to determine.

Even considering the disputed declarations, Malibu has failed to demonstrate that there is no genuine question of material fact about whether Doe infringed its works, and, therefore, Malibu's motion for summary judgment is denied.

B. Has Malibu demonstrated copying of constituent elements of its work that are original?

There is a second reason why summary judgment could not be granted for Malibu based on the evidence before the court. Malibu must show copying of "constituent elements of the work that are original." *Feist, 499 U.S. at 361*. There is virtually no evidence before the court of what Doe allegedly copied or distributed.

BitTorrent copyright litigation is premised on the fact that BitTorrent software allows the user to download "bits" and assemble them to comprise an entire or significant portion **[*22]** of a digital file. "After a [BitTorrent] user receives all the bits of a digital file, the BT software reassembles the bits so the reassembled file may be opened and used." *Malibu Media v. Gilvin, No. 3:13-cv-72 JVB, 2014 U.S. Dist. LEXIS 40830, 2014 WL 1260110, at *1 (N. D. Ind. March 26, 2014)*. Malibu's problem in this case is that there is no evidence that Doe actually used BitTorrent software to download Malibu's movies onto his computer. There is no evidence that Malibu's movies are or were on Doe's computer or storage devices, and no evidence that BitTorrent software was installed on Doe's computer during the infringement period. Paige specifically looked for evidence of BitTorrent use on Doe's hard drive, as well as any evidence of Malibu's works. [Dkt 152-2 ¶ 38.] The most he found was evidence that at some time two devices that are "capable of storing movie files downloaded via BitTorrent" were connected but not produced in discovery. [*Id.* ¶¶ 44-45.]

Fieser's and Patzer's declarations state that some undescribed "bits" of Malibu's works were detected being distributed from Doe's IP address. Even assuming for the sake of argument that Malibu could show Doe copied and distributed those bits, Malibu makes **[*23]** no effort to prove that those bits meet the standard for copyright infringement. "Not all copying, however, is copyright infringement." *Feist, 499 U.S. at 361*. "*Feist* stands for the proposition that even admitted literal copying is not actionable when limited to unoriginal

expression." 4 Melville B. Nimmer and David Nimmer, *Nimmer on Copyright §13.03 [B][2][b]*, 83-84 (Matthew Bender, Rev. Ed.).

[E]ven where the fact of copying is conceded, no legal consequences will follow from that fact unless the copying is substantial. Even when there is no dispute about (a) the validity of the plaintiff's copyright, (b) defendant's access to the work, and (c) very strong resemblances between them, the result is only to show probative similarity — but the court may still grant summary judgment to defendant, to the extent that substantial similarity is lacking, as when defendant took only the unprotected elements of plaintiff's work.

*Id.* § 13.03[A], 38.1 (quotations and citations omitted).

Malibu's evidence on the motion does not come close to carrying its burden on this element of infringement. Patzer states that each PCAP shows Doe's IP address distributing "a piece of Malibu Media's copyrighted movie(s)." [Dkt 148-9 ¶ 20.] Fieser says that the IPP software verified that each bit **[*24]** downloaded from the IP address was a portion of a file hash listed on Exhibit A, and that each file hash was verified to be a digital media file containing a motion picture. He viewed each movie listed on Exhibit A side-by-side with the digital media file, and the file was "identical, strikingly similar or substantially similar to the Movie associated with it." [Dkt 148-8 ¶¶ 15-16.] Because both declarations are pro forma, they do not describe what "constituent elements" of Malibu's works Doe allegedly copied. There is nothing in either declaration that would allow the court to conclude that the "bits" and "pieces" captured by IPP's technology as allegedly distributed from Doe's IP address meet the standard of originality justifying a finding that they are protectable elements of the works. Even if the hash value captured in the PCAP corresponds to portion of a digital file that is "identical, strikingly similar or substantially similar to" Malibu's copyrighted work, there is nothing before the court that describes the audio/visual material that is represented by that hash value. Is it the entire movie or is it some portion so small that it would not be identifiable as part of the **[*25]** movie? There is nothing in this record to answer that question.

Doe asked for that information in discovery and moved to compel its production. [Dkt 124.] At a hearing on January 23, 2015, Doe's counsel stated, "Malibu has claimed that they received from our client's IP address a piece of each of the copyrighted works at issue. . . . We have asked for them to identify and produce to us what

piece are you claiming you got from our guy, not other pieces that you got from other people, what pieces are you claiming our guy distributed." [Dkt 177 at 4-5.] Malibu's counsel responded that Malibu had produced the MySQL log, as well as a "voluminous" spreadsheet of the hash values, which Malibu had obtained from Excipio. [*Id.* at 6-7.] He said, "[T]hat is the only form that we are able to get the information in." [*Id.* at 7.] Doe's counsel complained that the MySQL log and spreadsheet do not enable counsel to see "what piece did you get from our client and then hold up next to your movie to say that matches, that's an infringing piece of the work." [*Id.* at 8.] Malibu's counsel did not disagree. Rather, he said:

> It is very technical, your Honor. And perhaps the remedy for the issue is for them to have an expert look at the PCAP's, [*26] the SQL files in the spreadsheets that we have given them, because that's all we have.
>
> . . .
>
> They are trying to get us to interpret that data for them when, first of all, I can't do it, my client can't do it.

[*Id.* at 9.] Malibu has submitted nothing that would enable the court to do it, either.

Patzer says that, if requested, he could bring the computer files to the trial. [Dkt 148-9 ¶ 26.] That does not demonstrate Malibu's entitlement to summary judgment. *See Winkler, 2015 U.S. Dist. LEXIS 91305, at *29* (denying summary judgment with respect to works that were not found on defendant's computer notwithstanding Fieser and Patzer declarations).

Malibu's motion for summary judgment is denied.

## IV. Doe's motions to strike

Doe moves to strike Fieser's and Patzer's declarations, and the additional portions of Paige's declaration that appeared in the April 17 and April 20 versions, and all of Malibu's statements of fact that rely upon them. [Dkt 160, 161.] Those motions are granted pursuant to *Fed. R. Civ. P. 26(a)(1)* and *37(c)(1)*.

### A. Fieser's and Patzer's declarations.

*Rule 26(a)(2)(A)* provides: "In addition to the disclosures required by *Rule 26(a)(1)*, a party must disclose to the other parties the identity of any witness it may use at trial to present evidence under *Federal Rule of Evidence*

*702*, *703* or *705*." *Fed. R. Evid. 702* relates to "Testimony by Expert [*27] Witnesses," that is, "[a] witness who is qualified as an expert by knowledge, skill experience, training, or education." In contrast, *Fed. R. Evid. 701*, relating to "Opinion Testimony by Lay Witnesses," provides that a witness not testifying as an expert may testify in the form of an opinion only if it is "not based on scientific, technical, or otherwise specialized knowledge within the scope of *Rule 702*."

If a witness is to give testimony based on scientific, technical, or otherwise specialized knowledge, *Rule 26(a)(2)* requires a formal disclosure, notwithstanding any prior disclosure of the witness under *Rule 26(a)(1)* or the fact that the witness is "already known . . . through prior discovery." *Musser v. Gentiva Health Servs., 356 F.3d 751, 757 (7th Cir. 2004.)* Whether the witness must provide a report as described in *Rule 26(a)(2)(B)* or a disclosure meeting the standards of *Rule 26(a)(2)(C)* depends on the nature of the witness. *See Rule 26(a)(2)(B)*. But there is no doubt that a formal disclosure is required.

Malibu never served any *Rule 26(a)(2)* disclosure of Fieser or Patzer. Malibu now contends that they are "lay witnesses — not experts." [Dkt 167 at 1.] It is clear from the descriptions above, however, that their testimony is based on their "scientific, technical, or otherwise specialized knowledge."

> Lay opinion "most often takes the form [*28] of a summary of firsthand sensory observations" and may "not provide specialized explanations or interpretations that an untrained layman could not make if perceiving the same acts or events."

*Tribble v. Evangelides, 670 F.3d 753, 758 (7th Cir. 2011)* (*quoting U.S. v. Conn, 297 F. 3d 548, 554 (7th Cir 2002))*. An untrained layman could not provide the testimony in Fieser's or Patzer's declarations.

That conclusion is reinforced by reviewing Malibu's description of its proposed evidence to prove infringement: "The demonstration would merely require the witness to *install TCPDump* so he or she could *read and analyze* the PCAP." [Dkt 40 at 3-4 (emphasis added).] A PCAP, Patzer states, is not a recording of light and sound, it is a computer file consisting of zeros and ones. [Dkt 148-9 ¶ 16.] Patzer's testimony in the declaration requires an ability to read and analyze a computer program that is the result of a proprietary process. As Malibu's counsel admitted at the January 25, 2015 hearing, he cannot do it, his client cannot do it,

2016 U.S. Dist. LEXIS 14798, *28

and Doe would be required to retain an expert to do it. It is not lay testimony.[6]

Fieser's declaration is likewise expert testimony. He monitors the BitTorrent file distribution network to identify the IP addresses being used by infringers. [Dkt 148-8 ¶ 6.] His task is "effectuating, analyzing, reviewing and attesting to the results of the investigation." [Id. ¶ 8.] He uses forensic software and related technology, which he attests was "correctly installed and initiated on a server." [Id. ¶¶ 9-10.] An untrained layman could not so testify. Fieser's declaration is testimony based on his scientific, technical, or other specialized knowledge.

Any doubt on this question is resolved by the statements of Malibu's counsel at the hearing on January 23, 2015, quoted above. Malibu's counsel also admitted, "It is very complicated. And I'm not going to stand here and say that I understand the technical aspects of it because it is way over my head." [*30] [Dkt 177 at 8.] The court then referred counsel to *Rule 26(a)(2)* and the Seventh Circuit's holding in *Musser* that expert testimony must be the subject of a formal *Rule 26(a)(2)* disclosure. [Id. at 10-13.] The court warned the parties that "this case seems to rely very strongly on technical information, technical testimony, and . . . if that's not sufficiently disclosed, it is not coming in." [Id. at 18.] By then it was past the deadline for Malibu's expert disclosures. [Dkt 122.]

At the next status hearing on February 12, 2015, Malibu's counsel referred to the discussion on January 23, 2015 about "whether or not IPP is an expert witness." He stated, "I think that shortly we will be filing a motion to amend our expert witness list based on the concerns that were raised at the last hearing." [Dkt at 4.] Malibu never filed any such motion. Instead, it simply sent Doe's counsel a PDF with Patzer's declaration on March 17, 2015, more than two months after the deadline for Malibu's expert disclosures, a month after Doe served his expert's report, and almost a month after

the deadline for Doe to depose Malibu's experts. [Dkt 122.]

Under *Rule 37(c)(1)*, Fieser's and Patzer's declarations are automatically excluded unless Malibu's violation was substantially justified [*31] or harmless. *Tribble, 670 F.3d at 758*; *Musser, 356 F. 3d at 758*. The burden is on Malibu to show that its failure was substantially justified or harmless. "The sanction of exclusion is 'automatic and mandatory unless the party to be sanctioned can show that its violation of *Rule 26(a)* was either justified or harmless.'" *NutraSweet Co. v. X-L Engineering Co, 227 F.3d 776, 785-86 (7th Cir. 2000)* (quoting *Finley v. Marathon Oil Co., 75 F.3d 1225, 1230 (7th Cir. 1996))*. The court should consider several factors in deciding whether non-compliance with *Rule 26(a)* is harmless: "(1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date." *Tribble, 670 F.3d at 760* (quoting *David v Caterpillar, Inc., 324 F.3d 851, 857 (7th Cir. 2003)*.

Malibu claims that there is no prejudice because Doe has known of the substance of both witnesses' testimony. [Dkt 167 at 7.] Malibu points to its filing on a earlier discovery motion where, it claims, it "summarized the testimony that would be offered by both Tobias Fieser and Michael Patzer." [Id., citing Dkt 40.] In fact, that material would not have informed Doe about the declarations submitted here. In that earlier filing, Malibu said, "Mr. Fieser is the only employee of IPP who *may* testify. His testimony is unnecessary. Therefore, [*32] Malibu will *not* likely call Mr. Fieser." [Dkt 40 at 5 (emphasis in the original).]

With that earlier filing, Malibu included a portion of Patzer's testimony from another case (which did not involve this defendant or his counsel) [dkt 40-9] and a declaration [dkt 40-11] that is not "substantively identical" to his declaration here, contrary to Malibu's assertion, [dkt 167 at 7]. The fact that Malibu sent Doe's counsel a PDF of Patzer's declaration on March 17 (two months after its disclosure deadline) demonstrates Malibu's awareness that the earlier information was insufficient.

As noted above, the fact that a witness's proposed testimony might have been known to the opposing party does not excuse a formal disclosure. If Malibu intended to present the *Rule 702* testimony of either Fieser or Patzer in this case, it was obligated to make a timely

---

[6] Malibu cites one district court case in which an objection to Patzer's testimony on similar grounds was overruled, *Malibu Media, LLC v. Tashiro, 1:13-cv-205-WTL-MJD, 2015 U.S. Dist. LEXIS 64281, 2015 WL 2371597 (S.D. Ind. May 18, 2015)*. That ruling came in the context [*29] of a hearing on a motion for sanctions, not a motion for summary judgment, and Patzer's testimony there was limited to "his relationship to IPP; the nature of his business; and the sorts of records he had obtained while working in that business." *2015 U.S. Dist. LEXIS 64281, [WL] at * 7*. Here, however, Patzer's testimony goes beyond laying the foundation for business records.

disclosure of the substance of that testimony to Doe. Doe was not required to guess from testimony in another case what Fieser or Patzer might say if Malibu in fact called either to testify here. On the contrary, from the absence of a formal disclosure, Doe was entitled to assume that Malibu would not call either Fieser or Patzer to testify or to submit [*33] their declarations on summary judgment. Doe "should not be made to assume that each witness disclosed by [Malibu] could be an expert witness at trial." *Musser, 356 F.3d at 757*.

Had Fieser or Patzer been disclosed pursuant to *Rule 26(a)(2)*, there are steps that Doe could have taken. *See Musser, 356 F.3d at 757-58*. "Without proper disclosures, a party may miss its opportunity to disqualify the expert, retain rebuttal experts, or hold depositions for an expert not required to provide a report." *Tribble, 670 F.3d at 759-60*. Although Malibu argues that reports under *Rule 26(a)(2)(B)* would not have been required, there is a good possibility that such reports would have been required, or at least Doe would have had a chance to argue that they were required.[7]

The testimony of Fieser and Patzer is critical to Malibu's case. Without their declarations, there is no evidence linking Doe or Doe's IP address to Malibu's work. The failure to disclose them under *Rule 26(a)(2)* was not harmless. *See Tribble, 670 F.3d at 761* (stating that failure to make *Rule 26(a)(2)* disclosure not harmless where witness's testimony was critical to party's theory of the case). Weighing heavily in favor of exclusion is the fact that the court drew Malibu's attention to the need for formal expert disclosures at the hearing on January 23, 2015, specifically referring to the *Musser* decision. Malibu's counsel frankly acknowledged that the technology involved in IPP's work was beyond his or his client's understanding, which clearly suggested that it was testimony an untrained layman could not make.

_____

[7] *See Fed. R. Civ. P. 26(a)(2)(B)*: report required by witness who "is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony." Fieser states that he is an employee of IPP, Malibu's forensic investigator, whose work includes "attesting" to the results of the forensic investigation for which Malibu hired IPP. [Dkt 148-8 ¶¶ 4,7-8.] Although Patzer states that he was not paid anything by Malibu for his declaration, he licenses his proprietary system to IPP. The nature [*34] of his declaration, as well as his testimony in other cases suggests that he has a regular practice of providing testimony for Malibu. Doe would have had an opportunity to explore the nature of Patzer's compensation.

At the following hearing, Malibu's counsel said Malibu would move for leave to disclose additional experts. That was before the deadline for Doe to depose Malibu's experts had passed and before Doe's expert disclosures [*35] were due. If Malibu had, in fact, moved for and been given leave to serve additional expert disclosures even at that late date, the schedule could have been adjusted to allow Doe appropriate time to deal with those disclosures. Malibu did not so move. As a result, expert discovery closed with Paige as Malibu's sole disclosed expert witness, and a schedule for dispositive motions was set. Having been informed by the court that there was a risk of exclusion, Malibu simply decided to take the risk.

That Malibu ignored the court's admonition is evidence of at least willfulness, if not bad faith. "Disagreement with [the court's] ruling or a belief that such testimony would be lay and not expert opinion (or no opinion at all) is not a justification; at best, it's just a misunderstanding of law." *Tribble, 670 F.3d at 760*. The Advisory Committee notes to *Rule 37* state that, even in a case of a pro se litigant, "exclusion would be proper if the requirement for disclosure had been called to the litigant's attention by either the court or another party." *Fed. R. Civ. P. 37* Advisory Committee's Note, 1993 Amendment, Subdivision (c).

Accordingly, the court finds that Malibu's failure to serve *Rule 26(a)(2)* disclosures regarding Fieser and Patzer was not substantially justified or harmless, and their declarations [*36] are stricken, as are Malibu's statements of fact that rely on their declarations.

B. The additional portions of Paige's April 17 and April 20 declarations.

Doe's motion to strike the additional portions of Paige's April 17 and April 20 declarations is also granted. As described above, Paige's original declaration was dated January 9, 2015, the final date for Malibu's expert disclosures. Doe deposed Paige on February 17, 2015. At the conclusion of his deposition, Paige stated that the opinions set out in his January 9 declaration were complete and there was nothing he wanted to add. [Dkt 160-2 at 41.] The April 17 and April 20 declarations, however, add more than a dozen paragraphs expressing, for example, his opinion that "Defendant is the infringer," opinions disputing Doe's contention that an unknown device accessed his router, and an opinion that, based on Doe's computer expertise, Malibu's works were either on a computer Doe failed to produce or one he did produce that was modified to make the works undetectable. [Dkt 148-13 ¶¶ 60-68; 152-2 ¶¶ 71-

75.]

Malibu claims that these additional opinions — which were tendered only as exhibits on summary judgment briefing after all expert discovery **[\*37]** is closed — are "timely supplementation" under *Rule 26(e)*. [Dkt 168 at 2.] According to Malibu, they "clarify and complete" his prior opinions. [*Id.* at 1.] In fact, the April 17 declaration goes into a completely different area of expert testimony: responding to Doe's contention about the unknown device. All of the facts about that contention, including Doe's deposition and the screen shot that Doe produced, were explored during fact discovery. Paige's January 9 declaration [dkt 161-1] did not mention Doe's contention about the unknown devices or the screen shot he produced. Doe had no opportunity to depose Paige on those opinions or to expand Neville's report to respond. Contrary to Malibu's suggestion, the additional paragraphs do not respond to — or even refer to — Neville's report. Malibu never sought leave to serve a rebuttal report to counter Neville's opinions. There is no reason why all of Paige's opinions could not have been disclosed on January 9. The additional paragraphs in the April 20 declaration have little value because they are essentially argument that because Doe is a "sophisticated computer user," Malibu's works must have existed on his computers at one time. [Dkt 152-2.] But, again, **[\*38]** Doe's counsel had no opportunity to depose Paige on the basis for his statements.

Malibu's effort to add new opinions to Paige's original declaration is gamesmanship under the guise of supplementation. Courts have regularly stricken such purported supplementation of an expert report that appears on summary judgment briefing. 8A Charles Alan Wright, Arthur R. Miller & Charles L. Marcus, *Federal Practice And Procedure* §2049.1, at 319-20 (3d ed. 2010) (collecting cases).

> Supplementation of an expert report permits a party to correct inadvertent errors or omissions. Supplementation, however, is not a license to amend an expert report to avoid summary judgment. Courts distinguish "true supplementation" (e.g., correcting inadvertent errors or omissions) from gamesmanship, and have therefore repeatedly rejected attempts to avert summary judgment by "supplementing" an expert report with a "new and improved" expert report.

*Gallagher v. Southern Source Packaging, LLC., 568 F. Supp. 2d 624, 630-31 (E.D.N.C. 2008)*.

*Rule 26(e)* "does not give license to sandbag one's opponent with claims and issues which should have been included in the expert report." *Beller ex rel. Beller v. U.S., 221 F.R.D. 696, 701 (D.N.M. 2003)* (citation omitted). To allow additional substantive opinions to an expert report under the guise of "supplementation" after the deadline for expert discovery **[\*39]** would "create a system where preliminary reports could be followed by supplementary reports and there would be no finality." *Id.*

Accordingly, the additional paragraphs of Paige's April 17 and April 20 declarations are stricken, as are Malibu's statements of fact that rely on those paragraphs.

**V. Doe's motion for summary judgment**.

Without the evidence of Fieser's and Patzer's declarations, there is no evidence linking Doe or even his IP address to Malibu's works. Paige's evidence, which depends entirely on the finding of IPP using Excipio's system, does not contain any evidence based on his personal knowledge that Doe copied or distributed any of Malibu's works. Doe's motion for summary judgment is, accordingly, granted.

**CONCLUSION**

For the foregoing reasons, Plaintiff's motion for Summary Judgment [147] is denied; Defendant's Motion for Summary Judgment [144] is granted; Defendant's Motion to Strike Certain Portions of Plaintiff's Statement of Undisputed Material Facts [160] is granted; and Defendant's Motion to Strike Portions of Plaintiff's LR 56.1(b)(C) Statement [161] is granted. Judgment is entered in favor of the defendant and against the plaintiff.

IT IS SO ORDERED.

/s/ Geraldine Soat Brown

Geraldine **[\*40]**  Soat Brown

United States Magistrate Judge

February 8, 2016

**End of Document**

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF TEXAS

SAN ANTONIO DIVISION


MALIBU MEDIA, LLC,                    )
                                      )
                    Plaintiff,        )
                                      )
   vs.                                )Case No.
                                      )5-19-CV-00834-DAE
JOHN DOE,                             )
                                      )
                    Defendant.        )
_____)




VIDEOTAPED ZOOM VIDEOCONFERENCE DEPOSITION OF

30(B)(6) CORPORATE REPRESENTATIVE OF MALIBU MEDIA

COLETTE PELISSIER


Taken at 2 Bloomfield Hills Drive

Henderson, Nevada


On Tuesday, October 20, 2020

At 9:19 a.m.



Reported by:  Deborah Ann Hines, CCR #473, RPR

HUDSON COURT REPORTING & VIDEO          1-800-310-1769

```
1    Appearances:
2    For the Plaintiff:
3            PAUL S. BEIK, ESQ.
             Beik Law Firm
4            8100 Washington Avenue
             Suite 1000
5            Houston, TX 77007
             (713)869-6975
6            paul@beiklaw.com
             (Via Zoom Videoconference)
7
8    For the Defendant:
9            RAMZI KHAZEN, ESQ.
             - and -
10           J.T. MORRIS
             J.T. Morris Law
11           1105 Nueces Street
             Suite B
12           Austin, TX 78701
             (512)717-5275
13           ramzi@jtmorrislaw.com
             jt@jtmorrislaw.com
14           (Via Zoom Videoconference)
15
     Videographer:
16
             CODY HALL
17           (Via Zoom Videoconference)
18
19
20
21
22
23
24
25
```

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

App. 239

3

```
 1   WITNESS                                    PAGE

 2   COLETTE PELISSIER

 3   Examination By Mr. Khazen                     5

 4   Examination By Mr. Beik                     275

 5   Further Examination By Mr. Khazen           281

 6

 7

 8                     E X H I B I T S

 9

10   NUMBER                  DESCRIPTION         PAGE

11   Defendant's

12      1    Defendant's Rule 30(b)(6) Deposition

13             Notice to Plaintiff Malibu Media     25

14      2    Contract Between Malibu Media and IPP   91

15      3    Original Complaint                     133

16      4    Website Analytics                      147

17      5    List of Settlements                    216

18      6    Defendant John Doe's First Requests

19             for Production to Plaintiff         222

20      7    John Doe's First Set of Interrogatories 222

21      8    John Doe's Second Set of Interrogatories 222

22      9    Defendant John Doe's Second Request

23             for Production to Plaintiff         222

24     10    Tweets                                253

25     11    Un-filed Complaint                    268
```

App. 240

1          THE VIDEOGRAPHER:  Today's date is

2  October 20th, 2020.  The time is 9:19 a.m. Pacific

3  time.  We are beginning the deposition of Colette

4  Pelissier.  Will counsel please announce for the

5  record who they represent.

6          MR. KHAZEN:  Ramzi Khazen of the J.T. Morris

7  Law Firm on behalf of the defendant, John Doe.

8          MR. MORRIS:  J.T. Morris also of J.T. Morris

9  Law, PLLC on behalf of defendant, John Doe.

10         MR. BEIK:  Paul Beik, Beik Law Firm, PLLC on

11  behalf of plaintiff, Malibu Media.

12         THE VIDEOGRAPHER:  Okay.  Ms. Hines.

13         THE REPORTER:  Due to COVID-19, will all

14  parties please stipulate to swearing in of the

15  witness remotely.

16         MR. BEIK:  Yes.

17         MR. MORRIS:  Yes.

18         THE WITNESS:  Yes.

19         MR. KHAZEN:  Yes.

20         THE WITNESS:  What if we said no?

21         ///

22         ///

23         ///

24         ///

25         ///

1    Thereupon--

2                        COLETTE PELISSIER

3    was called as a witness by the Defendant, and having

4    been first duly sworn, testified as follows:

5                        EXAMINATION

6    BY MR. KHAZEN:

7        Q.    Can you please introduce yourself for the

8    record?

9        A.    My name is Colette Pelissier, C-o-l-e-t-t-e.

10   Last name P-e-l-i-s-s-i-e-r.

11       Q.    And your address?

12       A.    I'm the owner of Malibu Media.  Malibu

13   Media, LLC and other, other companies and internet

14   companies.

15       Q.    Your address?

16       A.    My address is -- Paul, my business address?

17   Personal address?  Which business?

18            MR. BEIK:  Your business address.

19            THE WITNESS:  My business, I have two

20   different business addresses right now.  There's one

21   in California, and there would be -- I guess use the

22   business address at 2 -- where I am right now

23   actually would be a good business address.  2

24   Bloomfield Hills Drive in Henderson, Nevada and

25   89052.

1    happen, but yes.

2        Q.   So you say -- so you're -- you're the owner

3    of Malibu Media?

4        A.   Yes.

5        Q.   Are you an employee?

6        A.   No.  It's my company.

7        Q.   So you're -- do you have any title at

8    Malibu, other than owner?

9        A.   CEO, owner, CEO.

10       Q.   So are you -- do you issue -- do you issue

11   yourself, for example, do you issue yourself a W-2?

12       A.   No, I do not.

13       Q.   And you say you own several other companies;

14   is that correct?

15       A.   Not -- I don't solely own.  So actually not.

16   At this point I do not solely own other companies,

17   not for -- not any more.

18       Q.   You own partial stakes in other companies?

19       A.   I would have to ask my accountant how they

20   file everything this year, but I believe I solely own

21   Malibu Media and it's being sorted that way, so just

22   to make things easier, everything is being combined.

23            So obviously there's multiple domain names

24   and it will all be owned by Malibu Media instead of

25   separate holding companies.  So it's -- so I'd have

1        A.    Kotzker.

2        Q.    And did you prepare with them both at the

3    same -- in the same meeting?

4        A.    Yeah, on the call.

5        Q.    Okay.  And it only lasted for ten minutes?

6        A.    Yeah, roughly.  Right, Paul?  Something like

7    that.

8        Q.    Well, you should answer to the best of your

9    knowledge.

10        A.    Ten, fifteen minutes, something like that.

11        Q.    Are you aware that you have been designated

12    as the corporate representative for Malibu Media for

13    purposes of this deposition?

14        A.    I am now.

15        Q.    Were you not aware of that before?

16        A.    I don't know the difference between being

17    the owner and the corporate representative.

18        Q.    I'd like to mark as Exhibit 1 a document

19    titled Defendant's Rule 30(b)(6) Deposition Notice to

20    Plaintiff Malibu Media.

21        A.    Uh-huh.

22              (Thereupon Defendant's Exhibit 1

23              was marked for identification.)

24              MR. BEIK:  Colette, do you have the exhibit?

25              THE WITNESS:  No, I don't have it, but I'm

1    taking -- hopefully you're referring to it.  If

2    you're looking at it, I'm okay with that.

3          MR. BEIK:  You need to -- can we take a

4    break so she can open that up?

5          MR. KHAZEN:  Yeah.  Sure.

6          MR. BEIK:  Go off for one second.  If we

7    just go off the record for one minute and she can

8    open up the exhibit.

9          THE VIDEOGRAPHER:  Off the record at 9:47.

10              (Discussion off the record.)

11          THE VIDEOGRAPHER:  We are back on the record

12   at 10:08.

13   BY MR. KHAZEN:

14      Q.   Okay.  Welcome back.  You see the supplement

15   in front of you titled, that's Exhibit 1 titled

16   Defendant's Rule 30(b)(6) Deposition Notice of

17   Plaintiff Malibu Media?

18      A.   Yes.

19      Q.   Do you recognize this document?

20      A.   I'm looking at it now.  I don't recognize it

21   from previous, but I do -- I do recognize what this

22   document is.

23      Q.   What is it?

24      A.   It's a deposition notice to Malibu Media,

25   and it looks like it's a -- it's -- that you're going

1    to depose me and we're agreeing to that.

2        Q.   Do you understand that you are the corporate

3    representative for Malibu Media with respect to

4    the --

5        A.   Yes.  Yes, I understand that.  Yes.

6        Q.   Just let me finish the question real quick,

7    sorry, but so the record is clear.  You understand

8    that you're the corporate witness for Malibu Media

9    with respect to the topics that are listed in

10   Exhibit 1?

11       A.   Yes, I do.

12       Q.   When is the first time you saw Exhibit 1?

13       A.   First time I saw Exhibit 1?  Let's see, it's

14   been months and -- it's been a while ago, I think.  I

15   don't recall exactly, but it was a while ago, I

16   think.

17       Q.   Did you do anything to prepare to be Malibu

18   Media's corporate representative with respect to the

19   topics listed in Exhibit 1?

20       A.   There's really not much to do to prepare

21   because it's either I know the answer or I don't know

22   the answer, and I run Malibu Media, so...

23            MR. BEIK:  Colette, he's not asking you for

24   attorney-client communications, he's basically asking

25   you if you prepared for the deposition by going

1    could be any number of people that could have access
2    to any particular IP address that you identify,
3    correct?
4         A.   No, they wouldn't know because they're not
5    looking like we are.  They wouldn't know what IP
6    address they have access to.
7         Q.   Who wouldn't -- who wouldn't know what IP
8    address they have access to?
9         A.   The other people that you're talking about,
10   that any number of people could have access to the IP
11   address, that's not true because all the other number
12   people wouldn't know what IP address that they were,
13   that they're getting the movies from.  We're the ones
14   looking for it.  They're not looking.
15        Q.   There are -- there can be multiple computers
16   on a -- connected to -- connected to that are using
17   one IP address; is that correct?
18        A.   That is correct.
19        Q.   And there could be multiple people that are
20   using one IP address, correct?
21        A.   Correct.
22        Q.   So when you identify an IP address, you're
23   not identifying an end user, correct?
24        A.   Yeah, but that's why we have social media
25   and that's why we have investigators and that's why

1    we have additional evidence so we can actually make

2    sure that we know the person that was infringing is

3    the person that owns that IP address.

4        Q.   Okay.  So without additional evidence,

5    there's no way of knowing whether an IP address --

6        A.   Well, most of the time when they get the

7    letter from their internet service provider, the

8    downloading stop almost immediately, so that kind of

9    tells you.

10       Q.   So there's no way to know -- there's no way

11   to know without additional evidence whether or not a

12   person, a particular person is using an IP address,

13   correct?

14       A.   No, that's not correct.

15       Q.   Please -- why not?

16       A.   Because you're -- just what you're saying is

17   not correct.  You're saying there's no way to know

18   without additional evidence, and that's not correct.

19   Additional evidence helps, but if you're the only

20   person in the house with access to the IP address and

21   access to the computer, and you have clients on the

22   computer, and again no one else comes in the house

23   and then who else did it?

24       Q.   Well, that's all additional evidence, isn't it?

25       A.   No.

1      Q.   Why not?

2           MR. BEIK:   Objection, form.

3  BY MR. KHAZEN:

4      Q.   How do you know -- how do you know the

5  person is the only person in the house without

6  access -- with access to the network?

7      A.   We have investigators.

8      Q.   Let me just ask you this:  Do you have any

9  additional evidence, any -- let me strike that.  Do

10 you have any evidence that my, that my client is the

11 person who downloaded your movies, and what evidence

12 is that?

13     A.   I don't know if I'm able to give you that

14 information at this point.

15     Q.   Why not?

16     A.   Why not?  Because we're going to trial.

17          MR. BEIK:   Ramzi, can I have a minute to

18 talk to her?  I think she's confused on what you're

19 asking.

20          MR. KHAZEN:   Well, let me...

21          THE WITNESS:   You want me to answer more

22 question?  I mean, so it's -- these questions are

23 just not making sense.

24 BY MR. KHAZEN:

25     Q.   What evidence do you have that my client

1    client infringed your copyrighted works.

2           I have here, based on your previous answer,

3    you said, you listed that you have his IP address,

4    you said that his computer was close to the router,

5    and that you said he's -- that he fits the profile

6    because he's an IT professional.  Is there any other

7    evidence that you have that my client infringed your

8    copyrighted works other than the IP address of his

9    network, that a computer was close to the router, and

10   that he fits a profile that you claimed to have?

11          MR. BEIK:  Object to form.

12          THE WITNESS:  Well, fitting the profile and

13   the computer being close to the router really have

14   nothing to do with it, or being an IT professional.

15   What really makes him be the, the infringer is his IP

16   address that is password protected, and he is the

17   only person, as far as -- unless he wants to get --

18   say something else.

19          As far as when we've asked, so far you

20   haven't given any -- said there's another person who

21   downloaded it or given us any other explanation that

22   it was this person that was downloading the illegal

23   content.  And so we know that whoever was in that

24   single family home with that IP address, which is

25   your client, downloaded the, the content and

1　infringed upon it illegally.

2　　　　So I'm not sure how many more times I can

3　say the same thing or how many different ways, but

4　it's not -- it's not that -- it's not that his house

5　is close, that he's an IT professional, or that he

6　fits a profile, that has nothing to do with it.  What

7　has to do is that he actually -- we detected over

8　9,000 times, we've never gotten it wrong, that his IP

9　address downloaded our content.  And so that -- that

10　happened.

11　　　　And so there's other -- there's other things

12　that we can get into on a more technological basis,

13　but all we need to know at this point is is that

14　happened.  And so we're going to have to get an

15　expert testimony that explains to the judge or jury

16　how it works, you know, in just piece by piece, not

17　technological because that would be like, you know,

18　if someone asked you how to build a block chain, you

19　probably wouldn't know how to do it, or now to write

20　coded python, you wouldn't understand it.  It would

21　be speaking a different language.

22　　　　So for me to try to explain to you how we're

23　capturing his IP address, it would be speaking a

24　different language.  I'm not going to go explain the

25　entire code because you're not going to understand

1          MR. BEIK:  Colette, please let's just answer

2     his questions.

3          THE WITNESS:  Okay.  Okay.  Okay.  So, yes,

4     I'm aware of what a long-range wifi.  That's your

5     question.

6     BY MR. KHAZEN:

7     Q.   Okay.  Now, do you have any reason to

8     believe that the, that my client was the, was the

9     infringer, or strike that.  Strike that.  Do you have

10    any reason to believe it was not another member of

11    the household that downloaded the movies, and if so,

12    what --

13    A.   Because your client hasn't come forward.  I

14    believe we've asked that question and your client

15    hasn't offered any alternative solution that it

16    wasn't an alternate member of the household or

17    anything.  And he's not given any -- said, oh, it

18    wasn't me, it was my father, it was my son or

19    anything like that.

20         He keeps just giving no -- he just says --

21    he keeps just saying, oh, your software doesn't work.

22    And so we know our software works, so that's why it

23    would be hard for me to believe that it's another

24    member of the household, he should say something.

25    Q.   Now, you say that you had 9,000 cases and

1   you've never accused anyone that's been innocent.  Is

2   that -- is that your testimony under oath, that

3   nobody in the 9,000 cases that you've filed has been

4   innocent?

5          MR. BEIK:  Object to form.

6          THE WITNESS:  As far as I know -- as far as

7   I know I believe no, but, but back in 2013 or '14 we

8   had a different system, and I think it wasn't quite

9   as precise.  So recently though, I don't know that

10  anything has been wrong, it just might have been

11  someone else in the household, but it's quite

12  accurate though.  So I can't say 100 percent, but it

13  is quite accurate.

14  BY MR. KHAZEN:

15     Q.  So it's possible you've accused innocent

16  people?

17         MR. BEIK:  Object to form.

18         THE WITNESS:  I don't believe we've accused

19  innocent people.  I believe that we would have

20  inquired.

21  BY MR. KHAZEN:

22     Q.  You would have inquired?  What does that

23  mean?

24     A.  We have inquired if to the ISP if that

25  address is downloading our content and from where and

1    or they're downloading and it's erotica.  So it's --

2    I mean, it's nothing to be embarrassed about.

3           He also downloaded 32,000 other files that

4    were not meant to be downloaded for free.  So I

5    think, you know, it's -- it's just a shame how many

6    internet things are getting downloaded for free now.

7    BY MR. KHAZEN:

8      Q.  Okay.  So just to clear this up and finalize

9    it, the reasons that you gave me, let me circle back

10    and make sure it's clear.  Other than the IP address,

11    the interests of the downloader, and that no one else

12    has come forward, do you have any other evidence that

13    you claim supports your claim that my client

14    downloaded your copyrighted works and it wasn't done

15    by someone else connected to his network?

16           MR. BEIK:  Object to form.

17           THE WITNESS:  At this point I cannot think

18    of how to answer your question.

19    BY MR. KHAZEN:

20      Q.  You need to answer my question.  I will --

21    can I have the court reporter please repeat my

22    question?

23           (The last question was read back as

24            follows:  "So just to clear this up and

25            finalize it, the reasons that you gave

1           me, let me circle back and make sure it's

2           clear.  Other than the IP address, the

3           interests of the downloader and that no

4           one else has come forward, do you have

5           any other evidence that you claim

6           supports your claim that my client

7           downloaded your copyrighted works and it

8           wasn't done by someone else connected to

9           his network?")

10      THE WITNESS:  Okay.  I do not personally,

11  and I would need to check with anyone else on my

12  team, yes.

13  BY MR. KHAZEN:

14      Q.   When you say personally, you're speaking --

15  you're still speaking though as Malibu Media's

16  corporate representative, correct?

17      A.   Right.  One of the -- one of the copyright

18  infringement team members.

19      Q.   Okay.  So as Malibu Media's corporate -- as

20  Malibu Media's corporate representative, you don't

21  have additional information, correct?

22      A.   Correct.

23      MR. KHAZEN:  All right.  Can we take a quick

24  break so I can -- can we go off the record for a

25  minute.

1   where the, the upstream and the downstream goes.  So

2   we are doing where does your traffic go after your

3   site and where does your traffic -- like where do

4   they go after they've been on your site and where

5   have they been before.  And so you have that in

6   Google Analytics now, and it doesn't work perfectly

7   but there's something that is a -- that kind of

8   works.

9        Q.   Have you done that?

10       A.   I have.  And again, like I said, it doesn't

11  work perfectly.  And so these are smaller companies

12  and so -- so, yeah.  No, I mean, I can look at it

13  again and see if it's improved at all.

14       Q.   How much does it -- how much does it cost to

15  be a member of XR?

16       A.   It depends if -- I think you can be a member

17  for like $20 or $30 a month, or it's as much as -- I

18  think it was -- so, yeah, it's 20 or $30 a month

19  basically, and it goes up to I think $99 for six

20  months.  And then I think it's 250 for a year, or 199

21  per year.  I'm sorry.  199 per year.

22       Q.   You understand that pornography is readily

23  available on the internet for free, right?

24       A.   Yes.

25       Q.   You understand that threesome pornography is

**CONFIDENTIAL**
**ATTORNEYS' EYES ONLY**

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

```
MALIBU MEDIA, LLC,              )
      Plaintiff,               )
                               )
V.                             ) C.A. NO. 5:19-cv-00834-DAE
                               )
JOHN DOE,                      )
      Defendant.               )
```

```
         ******************************************

              ORAL DEPOSITION OF JOHN DOE

                   DECEMBER 9, 2020

                  (REPORTED REMOTELY)

         ******************************************
```

ORAL DEPOSITION of JOHN DOE, produced as a witness at
the instance of the Plaintiff, and duly sworn, was taken
in the above-styled and numbered cause on the 9th of
December, 2020, from 1:02 p.m. to 4:03 p.m., before
Wendi Broberg, CSR in and for the State of Texas,
reported by machine shorthand remotely via Zoom,
pursuant to the Federal Rules of Civil Procedure and
provisions stated on the record or attached hereto.

**Discovery Resource**
**713-223-3300**

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 2

```
 1              A P P E A R A N C E S

 2

    FOR THE PLAINTIFF MALIBU MEDIA, LLC:
 3
      MR. PAUL S. BEIK
 4    BEIK LAW FIRM, P.L.L.C.
 5    8100 Washington Avenue
      Suite 1000
 6    Houston, Texas  77007
      Ph. (713) 869-6975
 7    Fax (713) 868-2262
      E-mail:  paul@beiklaw.com
 8

 9
    FOR THE DEFENDANT JOHN DOE:
10
11    MR. J.T. MORRIS
      JT MORRIS LAW, P.L.L.C.
12    1105 Nueces Street
      Suite B
13    Austin, Texas  78701
      Ph. (512) 717-5275
14    Fax (512) 582-2948
      E-mail:  jt@jtmorrislaw.com
15

16
    REPORTED BY:
17
      WENDI BROBERG, CSR 7091
18    Contracted by:
      Discovery Resource
19    1511 West 34th Street
      Houston, Texas  77018
20    Ph. (713) 223-3300
      Fax (713) 228-3311
21

22

23

24

25
```

**CONFIDENTIAL**
**ATTORNEYS' EYES ONLY**

Page 3

1                          INDEX

2    Appearances ...................................2

3    Index .........................................3

4    Index of Exhibits .............................3

5    JOHN DOE

6          Examination by Mr. Beik ..................4

7    Signature of Witness .........................86

8    Reporter's Certification .....................87

9

10                      INDEX OF EXHIBITS

11   NUMBER          DESCRIPTION          MARKED/IDENTIFIED

12   1        Plaintiff's Amended Notice of          15
              Deposition of Defendant
13
     2        Letter from Charter                    16
14            Communications to Paul Beik, Beik
              Law Firm, re response to subpoena
15            in Malibu Media v. John Doe dated
              10/23/19 with attached Attachment
16            A (No Bates)

17   3        Defendant John Doe's Answer and        23
              First Amended Counterclaims
18
     4        Declaration of Defendant (No           47
19            Bates)

20

21

22

23

24

25

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 4

```
 1                 (Witness sworn)
 2                 THE WITNESS:  I do.
 3                 MR. MORRIS:  Okay.  And just to put it on
 4   the record -- and this is J.T. Morris, counsel for the
 5   witness -- we're designating this under the stipulated
 6   protective order about Doe's anonymity, and also I just
 7   want to remind everybody on the record that at least for
 8   ten days after we receive the transcript the transcript
 9   is treated as confidential under the agreed protective
10   order.
11                 MR. BEIK:  Yes, agreed.
12                        JOHN DOE,
13   having been first duly sworn, testified as follows:
14                        EXAMINATION
15   BY MR. BEIK:
16     Q    My name is Paul Beik, and I represent the
17   plaintiff in this case, Malibu Media.
18                 Would you please state your name for the
19   record.
20     A    The real name?
21     Q    Yes.
22     A    Okay.  For the record, just to make clear, my
23   identity to the best of my knowledge has not been
24   disclosed to the plaintiff --
25                 THE REPORTER:  I can't understand him.
```

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 25

1    authorization to connect to my network.

2              And abuse of process of Malibu Media

3    because I did not do what they claimed.  It has been

4    using the legal system in a manner in which it was

5    not -- it is not for.  It is being misused currently.

6    Q    So --

7    A    There are other ones, but I will, you know,

8    have to go through the full document.  I remember those

9    are the -- the primary ones.  This is I believe I saw a

10   25-page document which is already entered for the

11   record.

12   Q    So your first claim is non-infringement, and

13   that is non-infringement of what?

14   A    Malibu Media claimed that I was using

15   BitTorrent to share copyrighted works that they claimed

16   to own and I have -- I don't have the works that they

17   listed so it is impossible for me to share something

18   that I don't have and BitTorrent is something that I did

19   not use during 2017 through 2019 as they have claimed.

20   I believe Malibu Media has also claimed that 2016 or on

21   something later, something that just came in this week

22   or something like that.

23   Q    Okay.  Let me stop you there.  What is

24   BitTorrent?  You mentioned BitTorrent.  What is that?

25   A    It's a peer to peer networking protocol, so

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 46

1   deficient infringement claim."

2       Q    Now, I'm breaking it down for you.  Is it true

3   that you did not use BitTorrent during the relevant time

4   frame?

5       A    That is correct.

6       Q    What is the -- and that's the time frame

7   between 2017 and 2019, correct?

8       A    Correct.

9       Q    So you did use BitTorrent prior to 2017?

10      A    Yes, several years prior.

11      Q    It references "under penalty of perjury."  Do

12  you know what that's referring to?

13      A    I did sign the -- what was it, request for an

14  interview.  There was an interview, there was a Request

15  for Production and there was a Request for Admission.  I

16  believe this is referring to at least one of those

17  documents, probably the one about the interviews, the

18  interview questions.

19      Q    Do you remember providing an affidavit with a

20  motion?

21      A    Yes, I -- yeah.  Do you have it just to make

22  sure I understand which one that it is because now that

23  you said it I guess the affidavit is not one of the

24  three that I referred to, so it was something else, yes,

25  which was probably before the others.

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 48

1    Q   Did you ever download the films?

2    **A   No, I have not.**

3    Q   So it's your testimony that you never

4 downloaded any of the films listed in the complaint in

5 this lawsuit; is that correct?

6    **A   That is correct.**

7         MR. MORRIS:  Hey, Paul, we've been going

8 for about 90 minutes.  Is it a good time to take a

9 break?

10        MR. BEIK:  Yeah, that sounds good.

11        (Recess from 2:27 p.m. to 2:41 p.m.)

12        MR. BEIK:  Back on the record.

13    Q  (By Mr. Beik)  ████ ██████, did you prepare for

14 this deposition?

15    **A   I reread the complaint and a couple of the**

16 **other documents.  That's what I did to prepare for it.**

17    Q   Did you do anything else?

18    **A   I don't know what you mean, but, no, I -- I**

19 **mean, unless something specific -- anything specific**

20 **that you're asking or, I mean, in general, no.**

21    Q   Okay.  I'm just asking what you did to prepare.

22 That's all.

23    **A   Oh, okay.**

24    Q   And so you reviewed the complaint.  And then

25 what other documents?

CONFIDENTIAL
ATTORNEYS' EYES ONLY

1    about that case.  There were others and that's why I say

2    I don't remember everything that I did read on so I can

3    only tell you right now that I possibly have read about

4    it.  Right now I cannot give you the details about it.

5        Q    Why didn't you have a secure Wi-Fi network?

6        A    I also have secure Wi-Fi networks.  In fact, I

7    have five networks of which only one was running open

8    for -- for that whole time and another one that early on

9    was running open that eventually was not open anymore.

10   One of the reasons -- so if we go back to 2014, 2015, I

11   was doing a lot of things back then, and -- and I was --

12   I was partial CPO of the company.  I was doing R&D on

13   smart devices and basically I started working way too

14   many hours and what ended up happening is I -- I ended

15   ████████████████████████████████████████████████

     █   ███████████████████████████████████████████████

     █   █████████████████████     ███████████████████████

     █   █████████   ████████████████████████████████████

     █   ███████████████████████████████████████████.

20   So the -- one of the Wi-Fi networks --

21       Q    I'm sorry.  Did you say that this was in 2015?

22       A    2014.

23       Q    '14.

24       A    The end of 2014, the beginning of 2015.  At

25   that point in 2015 I had to basically exit the job, exit

Discovery Resource
713-223-3300

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 70

```
1   everything, and what happened is as you focus on the
2   pain everything else is -- is irrelevant.  So in my home
3   office I was running one of the open Wi-Fi's.  I have
4   one that was very reasonable.  I turned that one off
5   when it was clear I could not work.
6              The other Wi-Fi was not in a site.  It was
7   actually in my garage.  So the purpose of that Wi-Fi was
8   to kind of try to increase the range at which the -- the
9   car would detect it was close to my home.  And by
10  looking at the -- the Wi-Fi, it would connect to the
11  Wi-Fi and it would send a signal that the car is getting
12  close and that would trigger certain events through home
13  automation, et cetera.  Because I was doing research
14  into home automation devices and IT devices, the -- the
15  battery power and the amount of power consumption is
16  related to whether or not you need to authenticate, and
17  because I was only saying -- sending payloads and it was
18  R&D, I did not want to deal with -- with authentication
19  of the -- of the IoT devices.  So there were -- there
20  were some that were battery.  There were cell phones.
21  There were other things that what I wanted was a very
22  quick connection, send these messages and then
23  disconnect on the Wi-Fi and go into deep sleep to
24  conserve battery power.
25              That network completely escaped me.  I
```

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 71

1 forgot about that network for years.  It was when I

2 received the -- the Charter letter that I thought I have

3 been hacked and that I thought that what I was looking

4 at was a security the incident.  The letter did not go

5 into a lot of details.  It just said, you know, there is

6 something going on, things have been shared, and it --

7 it listed my IP address.

8            I started turning everything off.  I

9 started looking at all the switches, all the lights that

10 were on.  That's when I realized I had a device that I

11 no longer knew about and it was through that discovery

12 that I found out that the -- that the Wi-Fi in the -- in

13 the garage had been left there and I did not know about

14 it.  At that point I turned, as I said, everything off,

15 and then I started only connecting things as -- as you

16 would normally do with a security event.  I -- I treated

17 the thing as a security event, and that's what I did to

18 come back on.  That's why that Wi-Fi is no longer

19 connected.  All of those devices have been -- have been

20 turned off, and I'm only now with secure networks.

21 That's the one that I'm indicating.

22            Now, there is a different situation where

23 Spectrum -- Charter they are the ones that screwed up

24 and I'm not sure how long that one was open, but I do

25 know that I -- I did notice that one which was caused by

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 72

1    a router -- a modem.  The modem router that they had for

2    the cable modem, they made an update, and that triggered

3    the modem router to go unsecured.  Again, I have no idea

4    of the duration, but I do know that that one what I did

5    notice I did -- I did get fixed.

6        Q    So you have five internet connections in your

7    home; is that correct?

8             MR. MORRIS:  Objection.  Form.

9        A    I have one internet connection.  I have five

10   networks behind that IP address.

11       Q    (By Mr. Beik)  Okay.  Got you.  And the one in

12   the garage was a network that was connected to -- I'm

13   trying to understand if the one in the garage that you

14   didn't have secured was that one associated with the

15   Charter IP address that was -- that we had talked about

16   earlier in this case?

17       A    Yes, all -- all the networks will show has that

18   IP address to the external world.

19       Q    Okay.  Just the internal -- there are different

20   internal networks?

21       A    That is correct, yes.

22       Q    Well, who else had access to that in that

23   particular IP address?

24       A    So obviously the people that I know would be

25   family and friends.  The people that I don't know would

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 76

1  is -- is what?  What is it?  Nobody is telling me.  Is

2  it evidence, have to turn it in to the court?  I mean,

3  you have stated that those files -- that the list of

4  files, 2258, were downloaded from my network.  That's a

5  statement that you have made.  Nothing farther.  Who

6  downloaded them?  You don't have to answer.  And that's

7  all I know.

8      Q    My client alleges you did.

9      A    Your client is alleging I downloaded them, and

10 then your client downloaded them.  Your client is not

11 alleging that I downloaded them, by the way.  Your

12 client is alleging that they saw them at the external IP

13 address, and then they are claiming that the nine titles

14 related to that, their works, I'm the one that was

15 providing them.  I don't believe that your client has

16 ever alleged, or at least you have not presented any

17 evidence to the contrary, that your client is making the

18 statement that I provided the 2258 files.

19     Q    Did you provide permission to anyone else to

20 use your Wi-Fi?

21     A    I have not provided other than the ones that I

22 have already stated.

23     Q    I'm asking like to another person did you

24 provide permission to use your Wi-Fi?

25     A    Family and friends, yes.

**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

MALIBU MEDIA, LLC,

                    Plaintiff,

v.

JOHN DOE,

                    Defendant.

**CASE NO. 5:19-cv-00834-DAE**

## PLAINTIFF'S RESPONSES AND OBJECTIONS TO DEFENDANT'S FIRST SET OF INTERROGATORIES

Plaintiff, MALIBU MEDIA, LLC, responds to Defendant's First Set of Interrogatories served April 9, 2020, as follows:

### GENERAL STATEMENT

1. By responding to any request, Plaintiff does not concede the materiality of the subject to which they refer. Plaintiff's responses are made expressly subject to and without waiting or intending to waive any questions, or objections as to the competency, relevancy, materiality, privilege, or admissibility as evidence or for any other purpose, or any of the documents or information produced, or of the subject matter thereof, in any proceeding, including the trial of this action or any subsequent proceeding.

2. Plaintiff objects to these Interrogatories to the extent that they demand documents and/or information which are protected by the attorney-client or work-product privilege, or which constitute material prepared for litigation purposes.

3. Inadvertent production of any document or information which is privileged, was prepared in anticipation of litigation, or is otherwise immune from discovery, shall not constitute

a waiver of any privilege or of another ground for objecting to discovery with respect to that document or any or the document, or its subject matter, or the information contained therein, or of the defendant's right to object to the use of any such document or the information contained therein during any proceeding in this litigation or otherwise.

4. Defendant objects in the entirety to any request for information or production from entities not represented by Paul Beik or the Beik Law Firm, PLLC in this specific action.

5. Plaintiff is continuing to search for information responsive to Defendant's requests and therefore reserves the right to supplement the response to each request with additional information, if and when such information becomes available to Plaintiff's counsel. Plaintiff also reserves the right to object to the future disclosure of any such information.

1. Separately for each of the Copyrights In Suit, describe in detail all factual and legal bases for Your contention that Doe committed infringement in violation of 17 U.S.C. § 501, including, without limitation, detailed identification and evidence of any specific alleged acts of infringement, any basis for alleging or evidence that any alleged act of infringement was committed by Doe, and the specific nature and extent of any such infringement.

**Response** – the Amended Complaint sets forth the legal and factual basis for bringing the instant suit against Defendant. Plaintiff otherwise objects to this discovery request on the grounds responsive information is protected by the privilege against disclosure of work product and contain communications protected from disclosure by the federal rules, including that they seek the mental impression of counsel and consulting experts, and the request is so broad that a privilege log may not be formed. See Fed. R. Civ. P. 26(b).

2. Separately for each alleged act of infringement, describe in detail all factual and legal bases for Your contention that You have been harmed or are entitled to recover based on said acts,

including, without limitation, any monetary losses suffered as a result of the alleged infringement(s); any lost profits or revenues suffered as a result of Defendant's alleged infringement; any lost customer subscriptions; and an identification of any Documents that support your contentions.

**Response** – Plaintiff's Amended Complaint sets for the legal and statutory grounds for which Plaintiff seeks statutory damages.  Plaintiff does not allege, and indeed, does not need to allege, any specific loss of revenue or profits in order to seek statutory damages.

3. Separately for each of works underlying the Copyrights-in-Suit, state the basis for Your claim of ownership of the copyright in the work.

**Response** – Plaintiff's claim of ownership is based on the certificates of registration, which are being made available to Defendant.

4. Separately for each of the Copyrights-in-Suit, describe the market value for the underlying work, including but not limited to any evidence of market value; sales and subscription revenue that is attributable to the work; requests to license the underlying work; and any licensing fees attributable to the work.

**Response** – Plaintiff objects to this interrogatory on the basis that it seeks information that is neither relevant nor likely to lead to the discovery of admissible information.  Plaintiff avers that copyright infringement is a strict liability offense and statutory damages are available under the Copyright Act.

5. Separately for each of the Copyrights-in-Suit, identify all demands or assertions of infringement involving the Copyright-in-Suit and the outcome of the assertion, including, without limitation, any demand letters or lawsuits in which You have asserted the Copyright In suit was infringed, and the status or disposition of any lawsuit (including dismissals, settlements, licenses,

damages, judgments, and injunctions).

**Response -** Plaintiff objects to this interrogatory on the basis that it seeks information outside of the instant action that is neither relevant nor likely to lead to the discovery of admissible information.  Plaintiff further objects on the basis that the information requested is unduly burdensome and overly broad.

6. Separately for each of the Copyrights-in-Suit, identify any income generated or damages awarded in whole or in part from Your assertions of infringement in the Copyright through both demand letters and lawsuits, including without limitation, (a) any recoveries, settlements, or payments received as a result of assertions of infringement involving any of the Copyrights In Suit; and (b) the amount of payments or other income generated in whole or in part by any of the Copyrights In Suit (including any settlements, recovery, or potential settlement or recovery from any other suit in which any Copyright in Suit had been or is asserted); (c) licenses or other agreements concerning the use of the Copyrights in Suit; and (d) any non-commercial or royalty-free usages of the Copyrights in Suit.

**Response -** Plaintiff objects to this interrogatory on the basis that it seeks information that is neither relevant nor likely to lead to the discovery of admissible information.  Plaintiff further objects on the basis that the information requested is unduly burdensome and overly broad.

7. For each of the Films, identify in detail for the past three (3) years each location, platform, media, or environment in which You have, directly or indirectly, posted, displayed, distributed, made available for distribution, reproduced, offered for sale, or offered for license the Film.

**Response –** Films are only available with consent on X-Art.com

8. State all factual and legal bases for Your contention that Defendant's alleged

infringement was willful within the meaning of 17 U.S.C. § 504.

**Response** – Plaintiff's factual and legal bases are contained within the Amended Complaint.

9. Identify all persons, parties, and entities with a financial interest in this litigation and describe the financial interest in detail, including identification of all relevant witnesses and agreements with said parties, persons, and entities.

**Response** – Plaintiff's counsel, Malibu Media, LLC, and its sole owner, Colette Pelissier, have financial interests. The engagement agreement between counsel and Plaintiff is protected by attorney-client privilege.

10. Identify all persons, parties, and entities involved in the monitoring, discovery, and investigation of the alleged infringement in this case. Your answer should include the start date of Your relationship with the person, party, or entity; the length and nature of Your relationship with the person, party or entity; and sufficient contact information for each person, party, or entity.

**Response** – IPP International UG.  Contact information will be provided to counsel.

11. Describe in detail any policy, practice, or custom You have implemented and maintained related to enforcement of the Copyrights-in-Suit or Your other copyrighted works.


**Response** – Plaintiff enforces its copyrights against blatant infringers.  There is no established policy, practice or custom in place.  Plaintiff reviews evidence provided by its investigator, IPP, prior to bringing suit against any infringer.

12. Describe in detail any policy, practice, or custom You have implemented and maintained related to protecting Your copyrighted works from infringement including but not limited to methods and tools used to detect, discourage, and prevent infringement.

**Response  -** Plaintiff protects its films by filing federal copyright registration applications.  IPP recorded the infringements of those films.  Any request related to the methods and tools should be directed to IPP.

13. Describe all times You, Your agents, Your representatives, or other affiliated party or person accessed or attempted to access any computer network, device, or system associated with IP address 70.121.72.191.  Your answer should include the date and time of such access or attempted access, the person(s) involved, the purpose of accessing or attempting to access the network, and any data or documents accessed, copied, or received during any access.

**Response -** Plaintiff does not have sufficient information in its possession, custody or control to answer this interrogatory.  IPP recorded the infringement.  Therefore, this request should be directed to IPP.

14. Describe in detail all factual basis for your contention that Defendant Doe "is a habitual and persistent BitTorrent user."

**Response –** Defendant's IP address was captured downloading numerous Films over a period of extended time.  This constitutes a habitual infringer.  Defendant is the owner of the IP address.  Evidence of this will be provided by IPP International UG.

15. Describe in detail all factual basis for your contention that "IPP connected, over a course of time, with Defendant who was using [IP address 70.121.72.191]. . . ."

**Response –** IPP International, UG captured, recorded and verified the connection.  They are in possession of the evidence establishing such.

16. Identify each Person who participated in or supplied information used in answering any of Defendant's interrogatories, and for each such Person, identify the number of the interrogatory that the Person participated in answering or supplied information in support of.

**Response** – Colette Pelissier and counsel.

Dated: May 28, 2020                    Respectfully submitted,

                                       By: /s/ Paul S. Beik
                                       PAUL S. BEIK
                                       Texas Bar No. 24054444
                                       S.D. Tex. ID No. 642213
                                       BEIK LAW FIRM, PLLC
                                       8100 Washington Ave., Suite 1000
                                       Houston, TX 77007
                                       T: 713-869-6975
                                       F: 713-868-2262
                                       E-mail: paul@beiklaw.com

                                       **ATTORNEY FOR PLAINTIFF**


                            **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that, on May 28, 2020, the foregoing was served via email to the following

counsel of record:

    JT Morris Texas
    jt@jtmorrislaw.com
    Ramzi Khazen
    ramzi@jtmorrislaw.com
    JT Morris Law, PLLC
    1105 Nueces Street, Suite B
    Austin, Texas 78701

                                       By: /s/ Paul S. Beik
                                       PAUL S. BEIK

## VERIFICATION OF ANSWERS

I, Colette Pelissier, both individually and on behalf of Malibu Media, LLC, have read and reviewed the foregoing and state that the factual content, exclusive of objections and legal conclusions and contentions, contained in the foregoing responses to Defendant's First Set of Interrogatories are correct and to the best of my knowledge based upon a reasonable inquiry.

Dated: **May 28, 2020**

**Colette Pelissier**

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

MALIBU MEDIA, LLC,

               Plaintiff,

v.

JOHN DOE,

               Defendant.

**CASE NO. 5:19-cv-00834-DAE**

### PLAINTIFF'S SUPPLEMENTAL RESPONSES TO DEFENDANT'S FIRST SET OF INTERROGATORIES

Plaintiff, Malibu Media, LLC, responds to Defendant's First Set of Interrogatories served April 9, 2020, as follows:

### GENERAL STATEMENT

1. By responding to any request, Plaintiff does not concede the materiality of the subject to which they refer. Plaintiff's responses are made expressly subject to and without waiting or intending to waive any questions, or objections as to the competency, relevancy, materiality, privilege, or admissibility as evidence or for any other purpose, or any of the documents or information produced, or of the subject matter thereof, in any proceeding, including the trial of this action or any subsequent proceeding.

2. Plaintiff objects to these Interrogatories to the extent that they demand documents and/or information which are protected by the attorney-client or work-product privilege, or which constitute material prepared for litigation purposes.

3. Inadvertent production of any document or information which is privileged, was prepared in anticipation of litigation, or is otherwise immune from discovery, shall not constitute

a waiver of any privilege or of another ground for objecting to discovery with respect to that document or any or the document, or its subject matter, or the information contained therein, or of the defendant's right to object to the use of any such document or the information contained therein during any proceeding in this litigation or otherwise.

4. Plaintiff is continuing to search for information responsive to Defendant's requests and therefore reserves the right to supplement the response to each request with additional information, if and when such information becomes available to Plaintiff's counsel. Plaintiff also reserves the right to object to the future disclosure of any such information.

1. **Interrogatory 2** - Separately for each alleged act of infringement, describe in detail all factual and legal bases for Your contention that You have been harmed or are entitled to recover based on said acts, including, without limitation, any monetary losses suffered as a result of the alleged infringement(s); any lost profits or revenues suffered as a result of Defendant's alleged infringement; any lost customer subscriptions; and an identification of any Documents that support your contentions.

**Response** – Plaintiff's Amended Complaint sets for the legal and statutory grounds for which Plaintiff seeks statutory damages. Plaintiff does not allege, and indeed, does not need to allege, any specific loss of revenue or profits in order to seek statutory damages.

Plaintiff has produced three years of revenues from its website and total number of films on the website at the relevant times. Plaintiff agrees to produce analytics and statistics from its website from before and during the time it hosted the works in this lawsuit. Plaintiff agrees to produce all licenses and offers to license. Plaintiff represents that it has never licensed or offered to license the Copyrights in Suit other than to users of its website.

2. **Interrogatory 3** - Separately for each of works underlying the Copyrights-in-Suit, state the basis for Your claim of ownership of the copyright in the work.

**Response** –Plaintiff has produced documents showing proof of authorship evidencing the vesting of ownership and chain of title to Plaintiff. Plaintiff represents that it is not in possession, custody, or control of any assignments, work for hire agreement or other responsive documents other than the certificates of registration, which have been provided. Plaintiff represents that the Copyrights in Suit have never been assigned and it is not in possession, custody, or control of any responsive documents or information.

3.   **Interrogatory 4** - Separately for each of the Copyrights-in-Suit, describe the market value for the underlying work, including but not limited to any evidence of market value; sales and subscription revenue that is attributable to the work; requests to license the underlying work; and any licensing fees attributable to the work.

**Response –**Plaintiff has produced three years of revenues from its website and total number of films on the website at the relevant times. Plaintiff has also produced analytics and statistics from its website from before and during the time it hosted the works in this lawsuit. Plaintiff agrees to produce all licenses and offers to license. Plaintiff represents that it has never licensed or offered to license the Copyrights in Suit other than to users of its website is not in possession, custody, or control of any responsive documents or information. Plaintiff has not identified any specific financial or reputational losses from the alleged infringement and has no responsive documents or information in its possession, custody, or control.

4.   **Interrogatory 5** - Separately for each of the Copyrights-in-Suit, identify all demands or assertions of infringement involving the Copyright-in-Suit and the outcome of the assertion, including, without limitation, any demand letters or lawsuits in which You have asserted the Copyright In suit was infringed, and the status or disposition of any lawsuit (including dismissals, settlements, licenses, damages, judgments, and injunctions).

**Response –**Plaintiff has provided the number and amount of settlements related to the specific Copyrights In Suit.

5.   **Interrogatory 6** - Separately for each of the Copyrights-in-Suit, identify any income generated or damages awarded in whole or in part from Your assertions of infringement in the Copyright through both demand letters and lawsuits, including without limitation, (a) any recoveries, settlements, or payments received as a result of assertions of infringement involving any of the Copyrights In Suit; and (b) the amount of payments or other income generated in whole or in part by any of the Copyrights In Suit (including any settlements, recovery, or potential settlement or recovery from any other suit in which any Copyright in Suit had been or is asserted); (c) licenses or other agreements concerning the use of the Copyrights in Suit; and (d) any non-commercial or royalty- free usages of the Copyrights in Suit.

**Response –** Plaintiff has produced three years of revenues from its website and total number of films on the website at the relevant times. Plaintiff has also produced analytics and statistics from its website from before and during the time it hosted the works in this lawsuit. Plaintiff agrees to produce all licenses and offers to license. Plaintiff represents that it has never licensed or offered to license the Copyrights in Suit other than to users of its website is not in possession, custody, or control of any responsive documents or information. Plaintiff has not identified any specific financial or reputational losses from the alleged infringement and has no responsive documents or information in its possession, custody, or control.

6.   **Interrogatory 7** - State all factual and legal bases for Your contention that Defendant's alleged infringement was willful within the meaning of 17 U.S.C. § 504.

**Response –** Plaintiff's factual and legal bases are contained within the Amended

Complaint. Plaintiff is providing Defendant with evidence showing widespread downloading of protected content by Defendant's IP address – the large amount of downloading activity over a long period of time is evidence of Defendant's willfulness.

7. **Interrogatory 11 -** Describe in detail any policy, practice, or custom You have implemented and maintained related to enforcement of the Copyrights-in-Suit or Your other copyrighted works.

**Response –** Plaintiff enforces its copyrights against blatant infringers. There is no established policy, practice or custom in place. Plaintiff reviews evidence provided by its investigator, IPP, prior to bringing suit against any infringer. Plaintiff agrees to produce its communications with IPP related to this suit. Plaintiff further agrees to produce engagement or other agreements with IPP. Plaintiff represents that all such materials are in the possession of its former counsel and it is in the process of obtaining them. Plaintiff represents that it has no written communications with IPP that are not in possession of its former counsel, and any communications with IPP since the dispute with former counsel arose have been oral.

8. **Interrogatory 12 -** Describe in detail any policy, practice, or custom You have implemented and maintained related to protecting Your copyrighted works from infringement including but not limited to methods and tools used to detect, discourage, and prevent infringement.

**Response -** Plaintiff protects its films by filing federal copyright registration applications and enforcing its copyrights through federal litigation. Plaintiff has engaged IPP International, UG to monitor, detect and capture evidence of infringement. Plaintiff has produced its communications with IPP related to this suit. Plaintiff has also produced engagement or other agreements with IPP. Plaintiff represents that it has no written communications with IPP that are not in possession of its former counsel, and any communications with IPP since the dispute with former counsel arose have been oral.

9. **Interrogatory 13 -** Describe all times You, Your agents, Your representatives, or other affiliated party or person accessed or attempted to access any computer network, device, or system associated with IP address 70.121.72.191. Your answer should include the date and time of such access or attempted access, the person(s) involved, the purpose of accessing or attempting to access the network, and any data or documents accessed, copied, or received during any access.

**Response –** IPP International, UG recorded the instances of infringement. Plaintiff agrees to produce its communications with IPP related to this suit. Plaintiff has produced engagement or other agreements with IPP. Plaintiff represents that any remaining materials, if any, are in the possession of its former counsel and it is in the process of obtaining them. Plaintiff represents that it has no written communications with IPP that are not in possession of its former counsel, and any communications with IPP since the dispute with former counsel arose have been oral.

10. **Interrogatory 14 -** Describe in detail all factual basis for your contention that Defendant Doe "is a habitual and persistent BitTorrent user."

**Response –** Defendant's IP address was captured downloading numerous Films over a period of extended time.  This constitutes a habitual infringer.  Defendant is the owner of the IP address.  Evidence of this will be provided by IPP International UG. Plaintiff has produced its communications with IPP related to this suit and Defendant's IP Address

11. **Interrogatory 15 -** Describe in detail all factual basis for your contention that "IPP connected, over a course of time, with Defendant who was using [IP address 70.121.72.191]. . . ."

**Response –** IPP International, UG captured, recorded and verified the connection.  They are in possession of the evidence establishing such. Plaintiff has produced its communications with IPP related to this suit.

Dated: October 12, 2020

Respectfully submitted,

By: /s/ Paul S. Beik
PAUL S. BEIK
Texas Bar No. 24054444
S.D. Tex. ID No. 642213
BEIK LAW FIRM, PLLC
8100 Washington Ave., Suite 1000
Houston, TX 77007
T: 713-869-6975
F: 713-868-2262
E-mail: paul@beiklaw.com

**ATTORNEY FOR PLAINTIFF**

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that, on October 12, 2020, the foregoing was served via email to the following counsel of record:

JT Morris Texas
jt@jtmorrislaw.com
Ramzi Khazen
ramzi@jtmorrislaw.com
JT Morris Law, PLLC
1105 Nueces Street, Suite B
Austin, Texas 78701

By: /s/ Paul S. Beik
PAUL S. BEIK

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | |
|---|---|
| MALIBU MEDIA, LLC, | |
| Plaintiff, | |
| | CIVIL ACTION NO.  5-19-CV-00834-DAE |
| vs. | **JURY TRIAL DEMANDED** |
| JOHN DOE, | |
| Defendant. | |

**DEFENDANT JOHN DOE'S OBJECTIONS AND RESPONSES TO PLAINTIFF'S**
**FIRST SET OF REQUESTS FOR ADMISSION**

Defendant John Doe ("Defendant" or "Doe"), by and through his[1] counsel, and pursuant

to Fed. R. Civ. P. 36 and the Local Rules of this Court, responds and objects to Plaintiff's First

Set of Requests for Admission as follows:

**PRELIMINARY STATEMENT**

1.      Defendant's investigation and development of all facts and circumstances relating

to this action is ongoing. The responses and objections are made on the basis of information and

writings currently available to and located by Defendant upon reasonable investigation. Defendant

expressly reserves the right to modify, revise, supplement, or amend their responses as he deems

appropriate.

2.      No incidental or implied admissions are intended by these responses. The fact that

Respondents have objected or responded to any Request shall not be deemed an admission that

---

[1]      Doe uses generic male pronouns for convenience and is not intending to imply anything about
Doe's gender or identity.

Respondents accept or admit the existence of any facts set forth or assumed by such Request or that such objection or response constitutes admissible evidence.

3.      By making the accompanying responses and objections to Plaintiff's requests for admission ("RFA"), Defendant does not waive, and hereby expressly reserves, its right to assert any and all objections as to the admissibility of such responses into evidence in this action, or in any other proceedings, on any and all grounds including, but not limited to, competency, relevancy, materiality, and privilege. Further, Defendant makes the responses and objections herein without in any way implying that he considers an RFA, and responses thereto, to be relevant or material to the subject matter of this action.

4.      Defendant expressly reserves the right to supplement, clarify, revise, or correct any or all of the responses and objections herein, and to assert additional objections or privileges, in one or more subsequent supplemental response(s).

## GENERAL OBJECTIONS

5.      Defendant objects to each instruction, definition, and RFA to the extent that it purports to impose any requirement or discovery obligation greater than or different from those under the Federal Rules of Civil Procedure and the applicable Rules and Orders of the Court.

6.      Defendant objects to Plaintiff's instructions as overbroad, unduly burdensome, and seeking to impose obligations outside the scope of the Federal Rules of Civil Procedure and the applicable Rules and Orders of the Court.

7.      Defendant objects to each RFA to the extent that it calls for the disclosure of documents subject to the attorney-client privilege, attorney-work product, doctor-patient confidentiality, or other applicable privilege or protection.

8.      Defendant objects to each RFA, definition and instruction to the extent that it is compound and constitutes multiple separate RFAs.

9.      Defendant objects to each instruction, definition, and RFA as overbroad and unduly burdensome, including to the extent it is harassing, seeks personal information not relevant to this case, seeks private, personal information of persons not involve in this case, seeks information that is readily or more accessible to Plaintiff.

10.     Defendant objects to each instruction, definition, and RFA that it calls for confidential, personal, proprietary, or trade secret information of third-parties, and/or information that is not within Doe's possession, custody, or control.

11.     Defendant incorporates by reference every general objection set forth above into each specific response set forth below. A specific response may repeat a general objection for emphasis or some other reason. The failure to include any general objection in any specific response does not waive any general objection to that request. Moreover, Defendant does not waive its right to amend its responses.

12.     Defendant objects to Plaintiff's definition of "BitTorrent" as overbroad, vague, ambiguous, misleading, unintelligible, seeking information not within the scope of this case or likely to lead to the discovery of admissible evidence, and presupposing facts not in evidence.

13.     Defendant objects to Plaintiff's definition of "Control" as vague, ambiguous, and overbroad, and to the extent that it seeks information for the purposes of harassment.  Defendant particularly objects to "Control" as encompassing documents and things of "any person in your house, apartment, or dwelling." Defendant will use "Control" as it is used and understood applicable rules and statutes.

14.     Defendant objects to Plaintiff's definition of "Peer to Peer Software" as overbroad, vague, ambiguous, misleading, unintelligible, seeking information not within the scope of this case or likely to lead to the discovery of admissible evidence, and presupposing facts not in evidence.

## Defendant's Specific Objections and Replies

**RFA No. 1:** Admit that Plaintiff owns the copyrights to the works listed on Exhibit B to Plaintiff's Complaint [CM/ECF 1-2].

**Objections:** Defendant incorporates each of its general objections. Defendant objects to the extent that this request seeks information within Plaintiff's possession, custody, or control, and/or not within the possession, custody, or control of Defendant. Defendant objects to the extent that this request seeks a legal conclusion.

**Response:**   Defendant lacks sufficient information to admit or deny this request, and on that basis, denies it.


**RFA No. 2:** Admit that Defendant does not own the copyrights to the works listed on Exhibit B to Plaintiff's Complaint [CM/ECF 1-2].

**Objections:** Defendant incorporates each of its general objections. Defendant objects to the extent that this request seeks information within Plaintiff's possession, custody, or control, and/or not within the possession, custody, or control of Defendant. Defendant objects to the extent that this request seeks a legal conclusion.

**Response:** Admitted.

**RFA No. 3:** Admit that Plaintiff did not give Defendant express permission to download and distribute the works listed on Exhibit B to Plaintiff's Complaint [CM/ECF 1-2].

**Objections:** Defendant incorporates each of its general objections.  Defendant objects to the extent that this request calls for a legal conclusion.  Defendant asserts multiple affirmative defenses to any alleged copyright infringement. Defendant further objects because the Complaint, as understood, alleges distribution of a packet of information related to the works by some user associated with IP address 70.121.72.192  to Plaintiff's agents.

**Response:** Defendant lacks sufficient information to admit or deny this request, and on that basis, denies it.


**RFA No. 4:** Admit that Defendant used the BitTorrent network to download Plaintiff's works listed on Exhibit B to Plaintiff's Complaint [CM/ECF 1-2].

**Objections:** Defendant incorporates each of its general objections.

**Response:** Denied.


**RFA No. 5:** Admit that Defendant used the BitTorrent network to distribute Plaintiff's works listed on Exhibit B to Plaintiff's Complaint [CM/ECF 1-2].

**Objections:** Defendant incorporates each of its general objections.

**Response:** Denied.


**RFA No. 6:** Admit that there is no license, terms, agreement, or advertisement on the BitTorrent network that would imply that Plaintiff authorized Defendant to download the works listed on Exhibit B to Plaintiff's Complaint [CM/ECF 1-2].

**Objections:** Defendant incorporates each of its general objections.  Defendant objects to the extent that this request calls for a legal conclusion.  Defendant further objects to this request as vague and ambiguous, particularly in regard to its meaning of "on the Bittorrent network."  Defendant further objects that it this calls for information not within Defendant's possession, custody, or control, and specifically objects that he is not aware of everything "on the BitTorrent network," to the extent he understands this phrase.

**Response:** Defendant lacks sufficient information to admit or deny this request, and on that basis, denies it.

**RFA No. 7:** Admit that prior to the commencement of this suit, Defendant never approached or requested Plaintiff for authorization to download or distribute the works listed on Exhibit B to Plaintiff's Complaint [CM/ECF 1-2].

**Objections: Objections:** Defendant incorporates each of its general objections.  Defendant objects to the extent that this request calls for a legal conclusion.

**Response:** Admitted.

**RFA No. 8:** Admit that use of the BitTorrent file sharing protocol to download copyrighted works without the copyright owner's authorization constitutes copyright infringement.

**Objections:** Defendant incorporates each of its general objections.  Defendant objects to the extent that this request calls for a legal conclusion.  For example, Defendant asserts multiple affirmative defenses to any alleged copyright infringement.  Defendant also objects to this request as vague and ambiguous, including as to "download copyrighted works."

**Response:** Denied.


**RFA No. 9:** Admit that use of the BitTorrent file sharing protocol to distribute copyrighted works without the copyright owner's authorization constitutes copyright infringement.

**Objections:** Defendant incorporates each of its general objections.  Defendant objects to the extent that this request calls for a legal conclusion.  For example, Defendant asserts multiple affirmative defenses to any alleged copyright infringement.  Defendant also objects to this request as vague and ambiguous, including as to "distribute copyrighted works."

**Response:** Denied.


**RFA No. 10:** Admit that you have downloaded other works not produced by Malibu Media using BitTorrent protocol.

**Objections:** Defendant incorporates each of its general objections.  Defendant objects to the extent that this request is vague and ambiguous, and overly broad and not relevant to the claims or defenses in this case (including but not limited being unlimited in time), and/or seeks expert testimony, particularly in regard to the phrase "using the BitTorrent Protocol."  Defendant further objects to the extent that this request seeks information not within Defendant's possession, custody, or control.

**Response:** Defendant lacks sufficient information to admit or deny this request, and on that basis, denies it.

Dated: August 28, 2020                        Respectfully,


                                              By: /s/ JT Morris
                                              JT Morris
                                              Texas State Bar No. 24094444
                                              jt@jtmorrislaw.com

                                              Ramzi Khazen
                                              Texas State Bar No. 24040855
                                              ramzi@jtmorrislaw.com

                                              JT Morris Law, PLLC
                                              1105 Nueces Street, Suite B
                                              Austin, Texas 78701
                                              Tel: 512-717-5275
                                              Fax: 512-582-2948

                                              **Attorneys for Defendant John Doe**

**<u>CERTIFICATE OF SERVICE</u>**

      I certify that the foregoing was served on August 28, 2020 by electronic mail on

Plaintiff's counsel:

                                                     <u>/s/Ramzi Khazen</u>

                                                     Ramzi Khazen