# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| MALIBU MEDIA, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action Case No.5:19-cv-00834-DAE |
| | ) | |
| v. | ) | |
| | ) | |
| JOHN DOE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## APPENDIX TO PLAINTIFF'S RESPONSE TO DEFENDANT'S RENEWED MOTION FOR PARTIAL SUMMARY JUDGMENT

Pursuant to Rule CV-7, Malibu Media, LLC, in support of its Response to Defendant's Renewed Motion for Partial Summary Judgment, submits the following declarations:

1. Correspondence from JT Morris Law regarding John Doe's Confidentiality Designations...................................................P-Resp_Renew_MSJ001-3

2. December 9, 2020 Redacted Deposition Transcript of John Doe Defendant .....................................................................P-Resp_Renew_MSJ004-090

3. Declaration of Tobias Fieser ...........................................P-Resp_Renew_MSJ091-93

4. Declaration of Colette Pelissier .....................................P-Resp_Renew_MSJ094-100

5. October 20, 2020 Redacted Deposition Transcript of Colette Pelissier .................................................................P-Resp_Renew_MSJ101-235

6. Expert Report of Glenn K. Bard............................P-Resp_Renew_MSJ236-243

Respectfully submitted,

By: /s/ Paul S. Beik
Paul S. Beik
Texas Bar No. 24054444
BEIK LAW FIRM, PLLC
8100 Washington Ave., Suite 1000
Houston, TX 77007
T: 713-869-6975

APPENDIX

F: 713-868-2262
E-mail: paul@beiklaw.com
**ATTORNEY FOR PLAINTIFF**

APPENDIX



**JT Morris | Attorney**
jt@jtmorrislaw.com

1105 Nueces Street, Suite B, Austin, Texas 78701 | 512-717-5275

December 19, 2020

VIA E-MAIL

Paul S. Beik, Esq.
Beik Law Firm, PLLC
8100 Washington Ave., Suite 1000
Houston TX 77007
paul@beiklaw.com

**RE:** *Malibu Media v. John Doe,* Case No. 5:19-cv-00834 (W.D. Tex.) – Protective Order designations for the December 9, 2020 deposition of John Doe.

Dear Paul:

Under the Stipulated Protective Order [Dkt. 10] and Agreed Protective Order [Dkt. 46], Defendant John Doe serves the attached confidentiality designations for his December 9, 2020 deposition.

Doe reserves the right to make additional designations as the protective orders or the Court allow. And these designations do not relieve Plaintiff and its counsel from their obligations under the Stipulated Protective Order over Doe's anonymity or any of their obligations under the Agreed Protective Order.

Best,

JT Morris

P-Resp_Renew_MSJ001

**Designations under the Agreed Protective Order [Dkt. 46]**

| Deposition Page and Line | Confidentiality Level |
| --- | --- |
| 13:3-7 | Confidential |
| 14:14-19 | Confidential |
| 16:8-10 | Confidential |
| 18:13-15 | Confidential |
| 19:15-17 | Confidential |
| 20:9-11 | Confidential |
| 52:25-55 | Highly Confidential |
| 56:6-57:20 | Highly Confidential |
| 58:2-6 | Highly Confidential |
| 69:15-19 | Highly Confidential |
| 82:21-23 | Highly Confidential |
| 83:16-23 | Confidential |
| Exhibit 2 to Doe's Deposition (Letter from Charter) | Confidential |

2

P-Resp_Renew_MSJ002

**Portions subject to the Stipulated Protective Order [Dkt. 10]**

| Deposition Page and Line |
|---|
| 6:13-14 |
| 13:3-7 |
| 14:8-9 |
| 14:14-19 |
| 16:8-10 |
| 16:13 |
| 18:13-15 |
| 18:16 |
| 19:15-17 |
| 20:17 |
| 20:9-11 |
| 22:2 |
| 22:17 |
| 23:14 |
| 48:13 |
| 49:7 |
| 50:1 |
| 75:2 |
| 78:6 |
| 78:15 |
| 79:11 |
| 79:14 |
| 83:16-23 |
| 84:4 |
| 84:10 |
| Exhibit 2 to Doe's Deposition (Letter from Charter) |

3

**CONFIDENTIAL**
**ATTORNEYS' EYES ONLY**

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| MALIBU MEDIA, LLC, | ) | |
| Plaintiff, | ) | |
| | ) | |
| V. | ) | C.A. NO. 5:19-cv-00834-DAE |
| | ) | |
| JOHN DOE, | ) | |
| Defendant. | ) | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF JOHN DOE

DECEMBER 9, 2020

(REPORTED REMOTELY)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION of JOHN DOE, produced as a witness at
the instance of the Plaintiff, and duly sworn, was taken
in the above-styled and numbered cause on the 9th of
December, 2020, from 1:02 p.m. to 4:03 p.m., before
Wendi Broberg, CSR in and for the State of Texas,
reported by machine shorthand remotely via Zoom,
pursuant to the Federal Rules of Civil Procedure and
provisions stated on the record or attached hereto.

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 2

```
 1              A P P E A R A N C E S
 2
      FOR THE PLAINTIFF MALIBU MEDIA, LLC:
 3
 4         MR. PAUL S. BEIK
           BEIK LAW FIRM, P.L.L.C.
 5         8100 Washington Avenue
           Suite 1000
 6         Houston, Texas  77007
           Ph. (713) 869-6975
 7         Fax (713) 868-2262
           E-mail:  paul@beiklaw.com
 8
 9
      FOR THE DEFENDANT JOHN DOE:
10
11         MR. J.T. MORRIS
           JT MORRIS LAW, P.L.L.C.
12         1105 Nueces Street
           Suite B
13         Austin, Texas  78701
           Ph. (512) 717-5275
14         Fax (512) 582-2948
           E-mail:  jt@jtmorrislaw.com
15
16
      REPORTED BY:
17
           WENDI BROBERG, CSR 7091
18         Contracted by:
           Discovery Resource
19         1511 West 34th Street
           Houston, Texas  77018
20         Ph. (713) 223-3300
           Fax (713) 228-3311
21
22
23
24
25
```

**CONFIDENTIAL**
**ATTORNEYS' EYES ONLY**

Page 3

1                        INDEX

2     Appearances ..................................2

3     Index ........................................3

4     Index of Exhibits ............................3

5     JOHN DOE

6          Examination by Mr. Beik ..................4

7     Signature of Witness .........................86

8     Reporter's Certification .....................87

9

10                    INDEX OF EXHIBITS

11    NUMBER          DESCRIPTION          MARKED/IDENTIFIED

12    1       Plaintiff's Amended Notice of        15
              Deposition of Defendant
13
      2       Letter from Charter                  16
14            Communications to Paul Beik, Beik
              Law Firm, re response to subpoena
15            in Malibu Media v. John Doe dated
              10/23/19 with attached Attachment
16            A (No Bates)

17    3       Defendant John Doe's Answer and      23
              First Amended Counterclaims
18
      4       Declaration of Defendant (No         47
19            Bates)

20

21

22

23

24

25

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 4

1                    (Witness sworn)

2              THE WITNESS:  I do.

3              MR. MORRIS:  Okay.  And just to put it on

4    the record -- and this is J.T. Morris, counsel for the

5    witness -- we're designating this under the stipulated

6    protective order about Doe's anonymity, and also I just

7    want to remind everybody on the record that at least for

8    ten days after we receive the transcript the transcript

9    is treated as confidential under the agreed protective

10   order.

11             MR. BEIK:  Yes, agreed.

12                    JOHN DOE,

13   having been first duly sworn, testified as follows:

14                    EXAMINATION

15   BY MR. BEIK:

16     Q    My name is Paul Beik, and I represent the

17   plaintiff in this case, Malibu Media.

18             Would you please state your name for the

19   record.

20     A    The real name?

21     Q    Yes.

22     A    Okay.  For the record, just to make clear, my

23   identity to the best of my knowledge has not been

24   disclosed to the plaintiff --

25             THE REPORTER:  I can't understand him.

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 5

1    I'm sorry.

2                    THE WITNESS:  Am I speaking loud enough?

3    Is it the accent or --

4                    THE REPORTER:  It's echoing in a -- in a

5    high pitched tone, and I really didn't get what you

6    said.

7                    THE WITNESS:  Let me try to -- hold on.

8    Let's see.  Is this better?

9                    THE REPORTER:  Not really, no.

10                   THE WITNESS:  I don't see anything that

11   would involve the echo.  Yeah, I'm not sure what to do,

12   then.  I can lower my volume, but that's about it.

13                   THE REPORTER:  Okay.  I'll do my best.

14                   Can you restate what you said?

15                   THE WITNESS:  Okay.

16      **A    So to the best of my knowledge, my identity has**

17   **not been disclosed to the plaintiff, so I would like to**

18   **state that my name and identity is highly confidential,**

19   **not just confidential.**

20                   **Do we agree on this, or has it been**

21   **disclosed already to the plaintiff what my identity is?**

22      Q    (By Mr. Beik)  I'm sorry, sir.  It's just this

23   is a deposition, and so you just have to answer the

24   questions that are asked.

25      **A    I will answer.  I'm not saying that I'm not.**

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 6

1    **I'm just asking for it to be highly confidential rather**

2    **than confidential.  We do have a protective order that**

3    **has different classes of confidentiality in it.**

4                MR. MORRIS:  And I'll state again, under

5    our stipulated protective order from I think 2000 --

6    November 2019 we agreed that your identity will remain

7    anonymous until the Court orders otherwise.  They do --

8    the plaintiff does know your identity because they

9    received it from the ISP, but as far as the public

10   record, it is anonymous and will remain that way until

11   the Court orders otherwise.

12               Do you agree, Mr. Beik?

15       Q     (By Mr. Beik)  Okay.  Can you spell that?

16   ●

17       Q     Thank you.

18               Have you ever had your deposition taken

19   before?

20       **A     No, I have not.**

21       Q     Okay.  Well, I'll go through a few of the kind

22   of ground rules.  Just so you know, you're going to be

23   asked questions here under oath just like if we were

24   sitting in court with the judge and the jury.  Do you

25   understand that?

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 7

 1     **A**     **Yes.**

 2     Q     Okay.  And the court reporter is taking down

 3   all of the questions and all of the answers, and so in

 4   order for us to have a clean record, I would ask for you

 5   to wait until I finish my question before you begin to

 6   answer the question.  Can you agree on that?

 7     **A**     **Yes.**

 8     Q     Okay.  And if your attorney has any objections,

 9   you can wait for him to make his objection, and then you

10   can go forward with your answer.  Can we agree on that?

11     **A**     **Yes.**

12     Q     Okay.  And is there anything that you're aware

13   of that would impair your ability to provide your

14   testimony today?

15     **A**     **I'm not sure how to answer that question.**

16   **That's very broad.**

17     Q     For example, are you on any medications or

18   under the influence of any type of substance or anything

19   of that nature?

20     **A**     **I have medications, but I don't think the**

21   **medications that I'm on will affect my answers.**

22     Q     Okay.  So it's your understanding that you're

23   not -- you do not have anything that's going to impair

24   you from giving your testimony today?

25     **A**     **Oh, from a cognizant standpoint, no.**

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 8

1    Q    Okay.  And if you need a break, please just let

2    me know.  I'm happy to take a break.  If you need a few

3    minutes to get a drink or use the restroom or something

4    like that, just please let me know.  Okay?

5    **A    Yes.  Okay.**

6    Q    And then if don't understand one of my

7    questions or if you're confused, you know, sometimes I

8    can ask bad questions so just if I -- if you don't

9    understand my question, just please let me know you

10   don't understand and then -- then I can rephrase the

11   question for you.  Can we agree on that?

12   **A    Yes.**

13   Q    Okay.  Otherwise, I'm going to assume that you

14   understood my question if you don't ask me to rephrase

15   it or if you don't let me know that you don't understand

16   it.  Okay?

17   **A    Okay.**

18   Q    Okay.  What is your educational background?

19   **A    I do have an engineering degree so a bachelor's**

20   **in engineering.**

21   Q    And was that from a university?

22   **A    Yes.**

23   Q    Was that a university in the United States, or

24   was it somewhere else?

25   **A    In the United States.**

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 9

1    Q    Which university?

2    A    **Iowa State.**

3    Q    Iowa State.  Okay.

4    A    **Yes.**

5    Q    And what type of engineering?  What is your

6    degree --

7    A    **Electrical.  Oh, sorry.**

8    Q    I'm sorry.  It's easy to do so that's why I

9    always remind people at the beginning, but we'll get the

10   hang of it.

11            What type of engineering degree do you

12   have?

13   A    **Electrical engineering.**

14   Q    Electrical engineering.  Okay.  And do you have

15   any other degrees other than electrical engineering?

16   A    **Well, I did get it with a minor in computer**

17   **science.**

18   Q    Computer science.  Okay.  Was that also from

19   Iowa State?

20   A    **Yes, and it was a minor.  It was not a full --**

21   **a full degree.**

22   Q    Okay.  And do you have any other degrees other

23   than those two?

24   A    **No.**

25   Q    And when did you graduate from college?

CONFIDENTIAL
ATTORNEYS' EYES ONLY

```
 1     A     '97.

 2     Q     1997.  Okay.  And how are you employed?

 3     A     In a typical corporation.  I am a software

 4  architect.

 5     Q     And what is -- what is the details of the

 6  nature of your work?

 7     A     What do you mean?

 8     Q     What are your job duties?  What are you

 9  required to do in the course and scope of your

10  employment?

11     A     I set up infrastructure, I maintain some

12  infrastructure, I develop custom software and I

13  architect the distributive systems to operate.

14     Q     And is that type of software and systems, is

15  that for a particular industry?

16     A     Legal technology.

17     Q     Legal technology.  What type of legal

18  technology?

19     A     Discovery.

20     Q     Okay.  How long have you been employed in that

21  position?

22     A     Since March of 2019.

23     Q     Okay.  Where were you employed prior to that?

24     A     Prior to that, I was a consultant.  I was -- I

25  was for an LLC, but it was my LLC.  I'm the owner of the
```

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 11

1    LLC, and I was doing consulting for 18 -- 18 years or

2    so.

3         Q    Oh, wow.  And so you are essentially -- you

4    were a business owner for 18 years; is that correct?

5         A    That is correct.

6         Q    Did you have any other jobs, or was it just --

7    just working in that LLC?

8         A    Working on the LLC.  I mean, I did some things

9    on the side just for fun, but the LLC was my job.

10        Q    Okay.  And what type of work were you doing --

11   performing for the LLC?

12        A    Some of the same.  I mean, I would design

13   systems, network.  I would install full -- you can think

14   of the full IT Department type responsibilities.  I

15   would be the IT for some small companies and also some

16   educational organizations.  So anything related to IT as

17   well as develop custom software and -- yes, those were

18   basically my responsibilities, custom software as well

19   as the standard IT responsibilities.

20        Q    Okay.  And would you actually design new

21   software platforms for particular clients or customers?

22        A    Yes.

23        Q    And how would that work?  Would they come to

24   you with a particular issue and then -- and then ask you

25   to come up with a technological solution that would

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 12

1   address their needs?

2       **A    Yes.**

3       Q    And that was for 18 years?

4       **A    Yes.**

5       Q    And was that also in just the legal field?

6       **A    No.  I had customers in legal and factory,**

7   **small start-ups, education institutions like**

8   **universities.  What else.  Communications companies.  I**

9   **mean, it was a lot of different entities.**

10      Q    And would your skills be -- that were required

11  to perform the work that you would do for customers,

12  would it depend on the job, or was it generally the same

13  skills, just applications for a particular customer?

14                  MR. MORRIS:  Objection.  Form.

15      Q    (By Mr. Beik)  You can answer the question.

16      **A    Yes, I'll answer it.  I mean, some jobs were**

17  **similar to each other, and other jobs were completely**

18  **different depending on the task that they needed a**

19  **solution for.**

20      Q    Okay.  But they were all generally involved in

21  software and networks?

22      **A    Yes, software systems and networks.**

23      Q    Okay.  And so if I was a customer and I needed

24  a new software product or a new system, I would come to

25  you and say here's the type of system I need, and you

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 13

1    would be able to build that type of system for me?

2        A    Yes.

█    █    ████████  ████████  ████████  ████  ████

█    ████████  ████  ████  ████████  ████  ████

█    █    ████████████████

█    █    ████

█    █    ████████████

8        Q    All right.  I'm going to -- let me see if I

9    can -- I'm going to try and add so we can share the

10   screen.  Oh, wait.  I went to the wrong one.  Sorry.

11   One second.  I'm sorry.  I'm having an issue with the

12   exhibit there.  They must have logged me out.  I was

13   already logged in, but pardon me for one moment.

14               MR. BEIK:  I apologize, J.T.  They logged

15   me out for some reason.  Let me get my IT guy real

16   quick.  I need to take a few seconds to get this fixed.

17               MR. MORRIS:  Okay.  Do you want to go off

18   the record?

19               MR. BEIK:  Off the record.  Thank you.

20               (Recess from 1:16 p.m. to 1:19 p.m.)

21        Q    (By Mr. Beik)  All right.  I'm going to show

22   you -- can you see the -- in the chat can you share the

23   screen with me to see the document that's in the chat?

24        A    I don't see a document in the chat.

25               MR. MORRIS:  I have what looks like a

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 14

1   link, Paul, but it's not opening up.

2              THE WITNESS:  I don't see the link either.

3              MR. BEIK:  Is it not working, J.T.?

4              MR. MORRIS:  I have a link.  Let me see.

5   Yeah.  So I have a link.  I took the link and then it

6   makes me paste it in my browser and it takes me to the

7   notice of deposition.

███  ████ ███ ████ ████ ████ ████ ████ ██

███ ███ ██ ██ ██ ██ ████ ████ ███

10             THE WITNESS:  I don't see the link.

11             Does anybody see my test message?  I just

12   sent a test message.

13             MR. MORRIS:  Yes, I see it.

███ ████ ████ █ ████ ███ ███ ████

███ ███ ██ ███ ███ ███ ███ ███ ███ ███ ███ ████

███ ████ █ ███ ████ ███ █

███ ████ ██ ███ ███ ████ ████

███ ████ ███ ██ ████ ██

███ ████ ████ ███

20             MR. BEIK:  -- above that it should be --

21   at 1:18 it should be amended notice of deposition.

22             THE WITNESS:  I'm sorry.  I do not see

23   that.

24             MR. BEIK:  Let me try and do it again.

25   Yeah, I see it here.  I don't know why y'all don't see

**CONFIDENTIAL**
**ATTORNEYS' EYES ONLY**

Page 15

1    it.

2                    THE WITNESS:  I'm using Zoom in the

3    browser.  Perhaps I need the full application, I don't

4    know, but this is the first time I don't see people

5    messages in Zoom.

6                    MR. BEIK:  Well...

7                    THE WITNESS:  I can install it at the full

8    Zoom and rejoin the meeting.  Would you like me to do

9    that?

10                    MR. BEIK:  Let me try one more thing and

11   see if this works.  I tried to share screen.  Can you

12   see that?

13                    THE WITNESS:  No.  Yes, I can see that

14   screen now, yes.

15                    MR. BEIK:  Okay.  All right.  Now we're

16   working.  Okay.

17                    (Exhibit 1 marked)

18      Q     (By Mr. Beik)  Can you identify what this

19   document is?

20      **A     It is Amended Notice of Deposition of**

21   **Defendant.**

22      Q     Okay.  And did you get this notice and

23   that's -- did you get this notice prior to today?

24      **A     I'm assuming.  I do not -- I have not seen this**

25   **document before.**

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 16

1        Q      Okay.  This is the notice of deposition for
2    today's deposition.  Do you see how there's a case
3    number up there 5:19-cv-00834-DAE?  Do you see that?
4        **A      Yes, I can see that.**
5        Q      Okay.  So you understand we're here on this
6    case, correct?
7        **A      Yes.**

8    ▮      ▮      ▬▬  ▬▬▬  ▬▬  ▬▬▬  ▬▬▬
9    ▮      ▮      ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
10   ▮   ▬▬▬▬

11              **(Exhibit 2 marked)**
12       Q      (By Mr. Beik)  Okay.  Let me show you a
13  ▮   ▬▬  ▬▬  ▬▬  ▬▬▬  ▬▬  ▬▬  ▬▬
14   can you see the -- in the regarding line underneath the
15   address in the middle it says "MALIBU MEDIA, LLC v. John
16   Doe/Civil Action No. 5:19-cv-00834-DAE"?  Do you see
17   that?
18       **A      Yes, I can see the line on the document, yes.**
19       Q      Okay.  And do you see that that matches the
20   case number on the notice of deposition?
21       **A      Yes.  I mean, I don't remember.  I didn't know
22   I was going to have to do it, but, yes, I imagine that's
23   it.**
24       Q      Thank you.
25              If you look at the second page, can you

CONFIDENTIAL
ATTORNEYS' EYES ONLY

1   identify that IP address that's listed?

2           MR. MORRIS:  Objection.  Form.

3       **A      What was that?**

4       Q    (By Mr. Beik)   On the second page of this

5   exhibit, Exhibit No. 2, where it says "Attachment A" --

6   if you scroll down on the document, it will go to the

7   second page.

8       **A      Yes, I can see the second page.  I didn't quite**

9   **hear what J.T. said and the question that you asked me.**

10  **Sorry.**

11      Q    Okay.  Well, on the second page there where it

12  says "IP Address," can you confirm that that's your IP

13  address?

14          MR. MORRIS:  Objection.  Form.

15      **A      I can verify that it is 70.121.72.191.  Off the**

16  **top of my head, I don't know what my IP address is, but**

17  **that looks like the IP that has been used for the**

18  **lawsuit.**

19      Q    (By Mr. Beik)   Okay.  And is it -- is it your

20  understanding that the IP address that's used in the

21  lawsuit is your IP address?

22          MR. MORRIS:  Objection.  Form.

23      **A      It looks like it, yes.**

24      Q    (By Mr. Beik)   Okay.  And so do you see where

25  it says "First Name" and "Last Name" for Exhibit 2 on

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 18

```
1    Page 2?

2         A    Yes, it does state my name.

3         Q    Okay.  And is that your service address?

4         A    Yes.

5         Q    Do you live in a home at that address?

6         A    Yes.

7         Q    Is it a freestanding home?

8         A    Yes.

9         Q    So you don't share walls with anybody else?

10        A    No.

11        Q    When did you first move into that home?

12        A    It was either 2000 or 2001.
```

[lines 13–16 redacted]

```
17        A    Yes.

18        Q    How long have you been married?

19        A    You are going to get me in trouble.  Since

20   2001, yes.

21        Q    2001.  Wow.

22        A    Yes.

23        Q    Congratulations.

24        A    Thank you.

25        Q    Okay.  So you've lived in that home from 2001
```

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 19

1   until the present, correct?

2       **A    Yes, correct.**

3       Q    I know things are different under COVID, but do

4   you work out of your home?

5       **A    Yes.**

6       Q    Did you work out of your home prior to COVID?

7       **A    Depends.  Since I was doing consulting, it**

8   **depends on the jobs that I was doing.  Some jobs will be**

9   **me working at home.  Some jobs will be me working on**

10  **location.**

11      Q    Okay.  But you didn't have another office that

12  your LLC maintained?

13      **A    Correct.  I did not have an office just for the**

14  **company, correct.**

███   █   ███ ███ ██ ██ ████ ██ ██ ██ ██ █ █████
██ ██ ██ ██ ██ ██
██   █   ███

18      Q    And is that the type of schedule where you

19  would go in from, say, 9:00 to 5:00 or something of that

20  nature?

21              MR. MORRIS:  Objection.  Form.

22      **A    It is a more or less flexible schedule, but,**

23  **yes, it is more you go to the office for a full day's**

24  **worth of work except obviously with COVID, as you**

25  **pointed out, it's different.**

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 20

```
 1      Q     (By Mr. Beik)  Okay.  So your typical schedule
 2   would be you would go into the office.  Would you have a
 3   set schedule, or how would that work?
 4      A     It's not necessarily set in stone so I will
 5   have some flexibility, but I will have to at the very
 6   least be at the office for meetings.  So the starting
 7   time will depend, somewhere between 9:30 and 10:30, and
 8   then I will stay there for as long as needed.
```

███   █   ██ ███  ███ ███ ███ ███ ███ ███ ███ ███ ███

███  ████████ ███ ██ ███ ███ ███ ████  ██ ████████

██    █   ██████████

```
12      Q     Okay.  So your work now, is it fair to say
13   you're working for one company now as opposed to your
14   previous job you were working for lot of different
15   companies?
16      A     Correct, yes.
```

███   █   ███ ██ ███ ████ ███ ███ ███ ███ ███ ████

```
18   lawsuit?
19      A     The first communication was from Charter to let
20   me know that they had received a request for my
21   identity.
22      Q     When you referenced Charter, are you referring
23   to Charter Communications?
24      A     Yes.
25      Q     And is Charter Communications your ISP
```

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 21

1    provider?

2        **A    Yes.**

3        Q    What did the notice that you received from

4    Charter say?

5        **A    They said that they received a subpoena and**

6    **that I had -- I don't remember the exact time frame to**

7    **respond to Charter.  If I wanted my identity to be kept**

8    **from being disclosed, I had to have a court order or**

9    **something in those lines.  I don't have the letter in**

10   **front of me, but I believe it was also sent to you or --**

11   **I mean, we can look at it if you would like.  I don't**

12   **remember the exact wording.**

13       Q    What was your understanding that they were

14   letting you know that you had to get a court order for?

15                 MR. MORRIS:   Objection.  Form.

16       **A    I believe it was a subpoena, and it was whether**

17   **or not I wanted my identity disclosed based on the**

18   **subpoena.**

19       Q    (By Mr. Beik)  Did you contact them back?

20       **A    No, I did not.**

21       Q    What was your understanding as to why they were

22   contacting you?

23                 MR. MORRIS:  Objection.  Form.

24                 I'm also going to take the opportunity at

25   this time just to instruct the witness not to answer to

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 22

1    the extent it reveals attorney/client communications.

3    it doesn't reveal any privileged communications.

4            THE WITNESS:  Okay.

5        A    My understanding -- so to just make sure I do

6    understand the question, you want to know what was the

7    reason for the subpoena or -- I'm not a hundred percent

8    sure I understand.  I mean, Charter communicated with me

9    based on identity disclosed or disclosure.  Sorry.  The

10   subpoena was Malibu Media asking a judge of the district

11   court to issue a subpoena which it was issued.

12       Q    (By Mr. Beik)  Okay.  Did you learn the reason

13   for why they were requesting a subpoena for your

14   identity?

15           MR. MORRIS:  Same caution to the witness

16   about privileged communications.

18   you know, I'm not asking for any communications with

19   your attorney.  That's not what I'm asking.  I'm just

20   asking non-attorney communication.

21       A    Yeah.  I know they're asking for something

22   specific.  I just don't know what exactly it is that

23   you're asking me because right now all the questions

24   seem very similar to me, and I'm not sure I am

25   understanding the question.

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 23

```
 1       Q    Okay.  Well, I guess the question that I'm

 2   asking -- and I can try and rephrase it for you -- is

 3   the reason that there was a subpoena, did you understand

 4   the reason that there was a subpoena sent to Charter?

 5       A    Oh, why the subpoena was issued?  I think

 6   Malibu Media was claiming copyright issues.

 7       Q    Oh, okay.  Was that -- when was the first time

 8   you learned of Malibu Media?

 9       A    When I received the letter from Charter.

10       Q    I'm going to show you a document that's been

11   marked as Exhibit No. 3.

12                (Exhibit 3 marked)

13       Q    (By Mr. Beik)  Can you see that document,

15       A    Yes, I can see it.

16       Q    Okay.  Can you identify what that document is?

17       A    It's a civil action with the same ID that we've

18   been talking about before and it's jury trial demanded

19   and it is the first amended -- it says "Defendant John

20   Doe's Answer and First Amended Counterclaims."

21       Q    Okay.  We're under confidentiality, but you're

22   John Doe, right?

23       A    Yes.

24       Q    Okay.  What was your understanding that you

25   were answering with this document?
```

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 24

```
 1              MR. MORRIS:  Objection.  Form.
 2              Again, same caution to the witness about
 3   privileged communications.
 4              THE WITNESS:  I can barely hear you.  I
 5   didn't hear what you said, J.T.
 6              MR. MORRIS:  Oh.  Objection and just
 7   giving you the same caution not to answer to the extent
 8   it reveals any privileged communications.
 9              THE WITNESS:  Understood.
10      A    It was answering the questions, and it says
11   Doe's Answer and First and Amended Counterclaims.  I'm
12   not sure which one is this one.  There have been so many
13   documents.  Let's see.  So on here I guess it was the
14   first answer to the claims that Malibu Media first sent.
15   So this was the answer to the lawsuit, the first answer,
16   if I understand this correctly.
17      Q    (By Mr. Beik)  Okay.  And this is also
18   counterclaims against the plaintiff; is that correct?
19      A    Yes.
20      Q    What -- what are you -- what are your claims
21   against Malibu Media?
22      A    The first one is non-infringement.  I did not
23   do what Malibu Media claimed.
24              Second one is unauthorized access to my
25   network.  I have never provided Malibu Media with an
```

CONFIDENTIAL
ATTORNEYS' EYES ONLY

```
 1    authorization to connect to my network.

 2                And abuse of process of Malibu Media

 3    because I did not do what they claimed.  It has been

 4    using the legal system in a manner in which it was

 5    not -- it is not for.  It is being misused currently.

 6         Q    So --

 7         A    There are other ones, but I will, you know,

 8    have to go through the full document.  I remember those

 9    are the -- the primary ones.  This is I believe I saw a

10    25-page document which is already entered for the

11    record.

12         Q    So your first claim is non-infringement, and

13    that is non-infringement of what?

14         A    Malibu Media claimed that I was using

15    BitTorrent to share copyrighted works that they claimed

16    to own and I have -- I don't have the works that they

17    listed so it is impossible for me to share something

18    that I don't have and BitTorrent is something that I did

19    not use during 2017 through 2019 as they have claimed.

20    I believe Malibu Media has also claimed that 2016 or on

21    something later, something that just came in this week

22    or something like that.

23         Q    Okay.  Let me stop you there.  What is

24    BitTorrent?  You mentioned BitTorrent.  What is that?

25         A    It's a peer to peer networking protocol, so
```

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 26

1    it's basically a protocol to share files between

2    computers.

3         Q    Was that the end of your answer?

4         A    Oh, yes.  Sorry.

5         Q    I thought -- I thought you were still speaking.

6         A    My fault, yeah.

7         Q    So what does "peer to peer" mean?

8         A    Peer to peer in this case would be anybody that

9    uses the same protocol can talk to each other.  You can

10   have millions of people using the same protocol and they

11   will all be able to communicate from one computer to the

12   next without the rest of the network necessarily or

13   without the rest of the people that have the same

14   protocol being part of that communication.  So basically

15   two computers -- any two computers that have this

16   protocol and know about each other should be able to

17   communicate between -- between them.

18        Q    What is the purpose of using BitTorrent?

19             MR. MORRIS:  Objection.  Form.

20        Q    (By Mr. Beik)  Let me rephrase.

21        A    It --

22        Q    What's BitTorrent used for?

23             MR. MORRIS:  Objection.  Form.

24        A    So BitTorrent, the primary use that I'm aware

25   of, was designed for basically large files.  Back in the

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 27

```
 1    day it used to be extremely expensive to get network
 2    bandwidth, so it was a way to share the cost of file
 3    distribution to everybody that wanted such files.  So,
 4    for example, Linux distribution, you know, it can be
 5    quite large.  It will be hundreds of megabytes or
 6    gigabytes which was really expensive.  So if one company
 7    had to pay for distributing the Linux distribution by
 8    themselves, they will be paying for a service that they
 9    are providing to a lot of people as a single payer.  By
10    using protocols like BitTorrent the benefit was that
11    anybody that had that ISO downloaded could share it with
12    other computers and alleviate the bandwidth cost to the
13    distributor, to the let's say Voodoo or Red Hat.  As
14    luck were, all -- all of these distributions basically
15    were using BitTorrent in order to reduce their costs of
16    distributing their software.
17         Q    (By Mr. Beik)  And did you mention Linux?  Is
18    that what you said?
19         A    Yes, Linux.
20         Q    What is that?
21         A    It's a Unix-like operating system.
22         Q    What does it do?
23         A    It runs computers, and then, of course, it's --
24    are you using a Mac or a Windows computer?
25         Q    Have you ever used that?
```

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 28

1       A    Yes.  I mean, Linux, I'm using it right now.

2   I'm talking to you through a Linux laptop.

3       Q    Oh, okay.  Fantastic.

4       A    It's the operating system.  It's -- that's why

5   I say if you are using Windows, Windows would be the

6   equivalent.  If you are using a Mac, OS X is the

7   equivalent to Linux.  So Apple has OS X.  Microsoft has

8   Windows.  Linux is an operating system that is open

9   source, and it involves, I mean, hundreds or thousands

10  of people and big corporations as well.  I mean, it

11  involves IBM to -- can involve -- yeah, and there's

12  other companies.  They all work together to develop

13  Linux.

14      Q    Okay.  And did you ever download Linux through

15  a BitTorrent network?

16      A    When -- back in the day when the bandwidth was

17  really expensive, yes, I have downloaded Linux using

18  BitTorrent.  It predates the period that my involvement

19  in this -- in their lawsuit by years.  I don't know

20  exactly how many years but a long, long time.  As the

21  cost of bandwidth was reduced, there were also players

22  that distributed Linux.  So I would not download it from

23  Voodoo, but I would download it from universities and

24  research organizations, that kind of stuff.  As that

25  became my primary way of downloading Linux, there was no

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 29

1    reason for me to use the BitTorrent anymore.

2        Q     When did you first discover BitTorrent?

3        A     I cannot honestly tell you that.  I have no

4    idea.  It's been a long time, more than ten years for

5    sure.

6        Q     Okay.  And is -- is BitTorrent something that

7    you would use in the course of your work?

8        A     My current work?

9        Q     Well, whenever you first started using it.

10       A     Yes, part of my job was to install Linux

11   systems, and, I mean, I would use BitTorrent to download

12   the distributions, yes.

13       Q     Okay.  And was there a charge associated with

14   downloading it?

15       A     No, there was no charge other than the

16   bandwidth cost.

17       Q     Okay.  And was that because it was free?

18             MR. MORRIS:  Objection.  Form.

19       A     The software itself sourcing came with the

20   Linux distributions itself.

21       Q     (By Mr. Beik)  Okay.  So how -- did you ever

22   use BitTorrent for anything else other than Linux?

23       A     No.

24       Q     So tell me -- tell me how the BitTorrent works

25   in terms of if you -- if you wanted Linux how would

Discovery Resource
713-223-3300
P-Resp_Renew_MSJ032

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 30

1    you -- how would you obtain it through BitTorrent?

2         MR. MORRIS:   Objection.   Form.

3    **A     So the BitTorrent -- so first I already was**

4    **running Linux, and I've been running -- I've been**

5    **running Linux systems at least since 1993.  I don't**

6    **remember at what point BitTorrent came to the scene,**

7    **it's been a long time, but I used to -- to already**

8    **run -- run Linux and BitTorrent was something that would**

9    **be installed through the distribution that I was**

10   **running.  The publisher of the Linux distributions will**

11   **have what they call a torrent file.  You would start a**

12   **BitTorrent client, which I cannot even remember what it**

13   **was but it was whichever was the people, and you would**

14   **open the torrent file -- the torrent file with that**

15   **client and then the download would start.**

16   Q    (By Mr. Beik)   How long would it take for it to

17   download?

18   **A     Some things would take a lot of hours.  I mean,**

19   **you're talking about back in the days of dial up and**

20   **DSL.  Broadband was not as common as it is today.  So**

21   **hours, hours.**

22   Q    And why -- why does it take that long --

23        MR. MORRIS:   Objection.   Form.

24   Q    (By Mr. Beik)  -- to the extent you know.

25   **A     What was that?**

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 31

1      Q     To the extent you know.

2      **A     It would take long because bandwidth was not**

3   **as -- as I said, the broadband that we have today**

4   **certainly is much faster than what we had back then so**

5   **when you think about the Nineties and the 2000s, the**

6   **early 2000s, very few people had access to broadband so**

7   **you can imagine how long it takes to download a very**

8   **large Linux distribution which is hundreds of megabytes**

9   **over a dial-up line or a fractional T1 or a DSL line**

10  **which is about all we had back then.  Unless you were a**

11  **large organization, you didn't have anything beyond a**

12  **T1.**

13     Q     If you were trying to do it today, to the

14  extent you know, how long would it take to download it

15  today?

16     **A     I would imagine about as long as it takes to**

17  **download directly from Canonical.  Normally these**

18  **downloads have been in less than an hour.**

19     Q     I'm sorry.  I had a hard time understanding.

20  Did you say less than an hour?

21     **A     Yes, sir.  Less than an hour is -- is common**

22  **unless there is something happening with the connection.**

23  **That is how long it takes to download Linux**

24  **distributions right now most of the time, I mean, yeah.**

25     Q     What is the -- to the extent you -- it sounds

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 32

1    like you're an expert in this, so to the extent that you

2    know, what is going on when the download is taking

3    place?

4                MR. MORRIS:  Objection.  Form.

5        A    On the BitTorrent system --

6        Q    (By Mr. Beik)  Yes.

7        A    -- or on -- okay.

8                So on BitTorrent a computer would connect

9    to other computers and ask for parts of a file.  Now, I

10   never went into the depths of BitTorrent until this

11   lawsuit, and in this time frame, I have not read the

12   source code or anything else.  So my knowledge is with a

13   caveat that I am not an expert on BitTorrent.  It is

14   what I have read between when I heard about BitTorrent

15   being part of the issue and today.

16               So there are these computers called

17   trackers.  I don't know their full involvement in the

18   whole thing but they are critical in order to have

19   computers know about each other and that would be part

20   of what is I would say more or less centralized in this

21   time point that they are directories that let you know

22   what other computers are on and willing to connect to

23   you.  Then you connect directly to these other computers

24   and ask them if the files that you want are available

25   there and if they are -- or part of the files are

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 33

1    available there, and if those parts are available, then

2    you can request those parts.

3              The protocol seems to be based on

4    16-kilobyte packets which is the -- I guess the minimum

5    size that a computer will share with another.  For large

6    files, there can be obviously millions of -- yeah,

7    millions of these small fragments, but one computer can

8    share the whole thing with another computer if it has

9    the -- all of the packets that the other one is

10   requesting.  I don't know at what point they decide

11   which computers to connect to.  For that I will have to

12   read the algorithm.

13             Does that answer your -- your question, or

14   do you need anything else?

15       Q    Well, in terms of the identity of one computer

16   asking the other, if I'm understanding your answer

17   correctly, would the -- would the computer know who the

18   other computer is?

19             MR. MORRIS:  Objection.  Form.

20       A    The -- to the best of my knowledge -- and --

21   and this is part of what I would like to go deeper but I

22   have not had time -- they connect solely on the external

23   IP address.  Now, I do not know if BitTorrent leaks any

24   kind of information about the system itself.  That is

25   where I -- that I am not a hundred percent sure.  I have

**CONFIDENTIAL**
**ATTORNEYS' EYES ONLY**

Page 34

1   asked, in fact, several times to get that kind of

2   information to see if -- if Malibu Media or its

3   subcontractors had any additional information other than

4   the external IP, and I have not received any additional

5   information.  So I have assumed -- and this is a big

6   assumption -- that BitTorrent does not leak additional

7   information other than the external IP address that is

8   internet specific.

9        Q    So is it your understanding that that's --

10   that's the universal effect where it's only the IP

11   address that's being visible?

12             MR. MORRIS:  Objection.  Form.

13        A    To the best of my knowledge, yes.  I imagine

14   that the IP address is -- is how it is.

15        Q    (By Mr. Beik)  Okay.  So if -- if the IP

16   address is the only thing that's visible, then a person

17   using it wouldn't be able to see who the other person is

18   that they're connecting with, correct?

19             MR. MORRIS:  Objection.  Form.

20        A    They would not know the other person unless

21   they share some other details, correct.

22        Q    (By Mr. Beik)  Okay.  And that's -- is that

23   your general understanding?

24        A    That's my understanding, yes.

25        Q    Turning to the Exhibit 3, I believe, in

CONFIDENTIAL
ATTORNEYS' EYES ONLY

1    Paragraph 104.  It's on Page 16.

2        **A    Yes, I see Paragraph 104.**

3        Q    Right starting at the second sentence where it

4    says, "IPP actively seeks," can you read that sentence?

5        **A    "IPP actively seeks to avoid others learning of**

6    **its identity on the BitTorrent network."**

7        Q    What is the factual basis for that statement?

8        **A    The same way that you were able to obtain my**

9    **identity through Charter Communications, IP addresses,**

10   **especially commercial and business based IP addresses,**

11   **tend to disclose who that IP address range has been**

12   **allocated to.  That's -- that's one thing.  So if IPP is**

13   **using a typical data center, the data center would --**

14   **the communications company that would give IPP its IP**

15   **address range would through reverse address DNS look-up**

16   **inform who the IP address is assigned to and normally**

17   **unless a company wants to hide this information, they**

18   **will make it to where you look it up through whois or**

19   **reverse DNS and then whois and then it will disclose**

20   **which company it is.**

21       Q    Do you have any personal knowledge of that,

22   those statements?

23       **A    That that is how things are normally done?**

24   **What -- what do you mean?  Personal knowledge of what**

25   **precisely?**

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 36

1    Q    If I understood what you were -- what you were

2    stating it was that they -- that -- that IPP was doing

3    something to hide their identity; is that correct?

4    **A    Well, I have asked, once again, several times,**

5    **if I may add, that Malibu Media and IPP disclose the IP**

6    **addresses that IPP use in order to connect to my**

7    **network.  So far all I found was refusal.  So I have to**

8    **assume that IPP is purposely hiding it since I have not**

9    **seen any particular laws or any particular protections**

10   **for any information being provided by Malibu Media, IPP**

11   **or anybody else involved with the IP addresses of IPP.**

12   **Now, you could provide those, and then I could**

13   **personally verify that they are behaving in a manner**

14   **that is not trying to hide information.**

15   Q    So you don't know the answer to that question?

16        MR. MORRIS:  Objection.  Form.

17   **A    I believe I have answered the question.**

18   Q    (By Mr. Beik)  Do you know any other person

19   that's been -- that's been sued for copyright

20   infringement by Malibu Media?

21   **A    Nobody that I know has identified themselves as**

22   **such.  The question if somebody that I know has been**

23   **sued, I -- they have not told me that they've been sued.**

24   Q    So you've never talked to another defendant

25   about any allegations of infringement of Malibu Media's

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 37

1   copyright?

2      **A**      **Correct.  I have not talked to any other**

3   **defendant from Malibu Media.**

4      Q      Has anyone ever communicated to you a reason

5   for why they would settle a lawsuit with Malibu Media?

6                    MR. MORRIS:  Objection.  Form.

7      **A**      **Nobody has directly communicated with me to**

8   **such extent.  There are posts out in the internet I**

9   **searched Malibu Media that may give indications to one.**

10     Q      (By Mr. Beik)  If you look at Paragraph 109 of

11   your counterclaims.

12     **A**      **I don't see 109.  I see all the way to 106.  If**

13   **you could scroll down.**

14     Q      Oh, I apologize.

15     **A**      **No problem.**

16     Q      I forgot I'm the one sharing the screen.

17     **A**      **Yeah.**

18     Q      Okay.  There's 109.

19     **A**      **Yes, I can see 109.**

20     Q      All right.  Could you read the highlighted

21   section.

22     **A**      **Yes.  It says, "Often, these defendants have**

23   **settled not because they were liable, but rather because**

24   **they wished to avoid public embarrassment and**

25   **reputational harm."**

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 38

1      Q      Do you have any personal knowledge of a

2  defendant that has, in fact, settled because they wished

3  to avoid public embarrassment and reputational harm?

4      **A      There is some information that I have that is**

5  **not a public disclosure, so it is protected in this**

6  **particular case.  There is a public information on the**

7  **internet of people that have been very clear that they**

8  **felt the pressure.  There is the nature of the -- of the**

9  **type of movies that Malibu Media produces which have a**

10 **clear reputational harm when it affects people's jobs**

11 **and livelihoods.  There have been people that have been**

12 **clearly being, how would I say it, discriminated against**

13 **based on this type of industry through several manners,**

14 **and there are defendants that have stated that that**

15 **was -- that that was a pressure that they were a**

16 **philanderer.  I'm not a hundred percent sure -- yeah,**

17 **there are certain things that I cannot say to answer**

18 **this question, but I think hopefully that provides**

19 **enough.  If you search for Malibu Media on Google and**

20 **other search engines, that's how I found enough**

21 **information that supports this paragraph.**

22     Q      But you don't have any personal knowledge of

23 those allegations, correct?

24     **A      I have not talked to defendants myself, no.**

25     Q      Okay.  Do you have any personal knowledge of

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 39

1    the market for plaintiff's works?

2                    MR. MORRIS:   Objection.   Form.

3        **A**    **Could you repeat the question?**

4        Q    (By Mr. Beik)   Yes.   Do you -- do you have any

5    personal knowledge of the market for plaintiff's works?

6                    MR. MORRIS:   Same objection.

7        **A**    **What do you mean by "market," like where your**

8    **client sells the works?**

9        Q    (By Mr. Beik)   Right.   So whether -- you know,

10   like there's a market for, you know, Nike shoes so

11   there's a certain amount of the population that would

12   like to have Nike shoes and so they go buy them.   So

13   that's what I mean by market.   I mean the market for the

14   particular services that my client provides.

15       **A**    **Right.   Like the amount of clients that**

16   **normally are involved in this industry, the revenue,**

17   **those kinds of things?**

18       Q    Well, not particularly their revenue, but the

19   market for it, whether people actually are interested in

20   consuming the products.

21       **A**    **Clearly there is a market for it.   I mean,**

22   **there are plenty of companies that are in this industry**

23   **and they have sales and subscribers that are paying**

24   **money so there is a market if that is a question.   As to**

25   **the size or the details or any commercial knowledge of**

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 40

1    the industry, that's why I said normally from a
2    financial standpoint you would talk about, you know,
3    market share, what size the industry is, that kind of
4    stuff.   From that standpoint, I do not have knowledge of
5    the industry.   From the standpoint that there is a
6    market for this industry, there are plenty of companies
7    that are surviving making this type of product.
8              MR. BEIK:   I'm sorry.   Could you read that
9    back to me, Wendi.   I couldn't hear the end of that
10   answer.
11             (Requested portion was read)
12   Q    (By Mr. Beik)   Are you aware of any other
13   companies that provide this type of product?
14             MR. MORRIS:   Objection.   Form.
15   A    I -- as far as companies, there many companies.
16   You do -- definitely do a Google search, and there is
17   clearly an amount of results that seems to be hundreds.
18   As to the competitors, when I was looking at Malibu
19   Media, there seems that there is other competitors also
20   using the same let's say IPP for some of this industry.
21   There are companies that are right now by name I don't
22   remember.   There are companies that sell DVDs.   I doubt
23   anybody else sells tape anymore so there are DVDs and
24   off the top of my head if you were asking me for names,
25   I don't know.

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 41

1      Q     (By Mr. Beik)   Do you know if Malibu Media
2  charges consumers to access their -- their movies?
3      **A     I imagine that they have to charge some**
4  **consumers at the very least.   Otherwise, they would be**
5  **out of business.**
6      Q     Right.   Have you ever paid for a subscription
7  to Malibu Media?
8      **A     No, I have not.**
9      Q     Have you ever paid for a subscription for any
10 other adult entertainment site?
11     **A     No, I have not.**
12     Q     But you're aware that there are companies that
13 do charge for adult content websites?
14               MR. MORRIS:   Objection.   Form.
15     **A     Yes, I'm aware that there are companies that**
16 **charge subscriptions.   I believe in one of the responses**
17 **you-all stated Malibu Media charges $39 or something**
18 **like that.   So from the standpoint of the market, now**
19 **that I think about it, $39 per subscription seems to be**
20 **what at least Malibu Media is able to get.   Was it 39 or**
21 **99?   It was either 39 or 99.   I don't remember right**
22 **now.**
23     Q     (By Mr. Beik)   But you are aware that they
24 charge for subscriptions, correct?
25     **A     Yes, correct.**

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 42

1    Q    Do you know the value of any of plaintiff's
2  movies?
3                MR. MORRIS:  Objection.  Form.
4    **A    I believe we asked for that information, and**
5  **you classified it as highly confidential.  So from the**
6  **standpoint of Malibu Media and what its works are valued**
7  **at, you kept that from me.**
8    Q    (By Mr. Beik)  Did you have to file a motion in
9  this case to remain anonymous on the pleadings?
10   **A    Yes, I had to file one, yes.**
11   Q    Was -- do you recall if Malibu Media opposed
12  your motion?
13   **A    I don't know if they opposed it.  I know that**
14  **the -- the motion was granted.**
15   Q    In other words, do you recall whether Malibu
16  Media agreed to keep your name anonymous as John Doe
17  throughout the entire litigation?
18   **A    Yes, at least through the discovery phase.  I**
19  **don't know if through the whole litigation, but I**
20  **believe through the end of discovery.  I don't know the**
21  **exact details right now off the top of my head, but I**
22  **don't think it actually is for the full duration of**
23  **litigation.**
24   Q    But it is your understanding that Malibu Media
25  didn't oppose that, correct?

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 43

1            MR. MORRIS:  Objection.  Form.

2       A    You understand that Malibu -- and then I didn't

3   hear the rest.

4       Q    (By Mr. Beik)  Oh, it's your understanding that

5   Malibu Media did not oppose your remaining anonymous in

6   the case, right?

7       A    Again, I do not know if they opposed it or not.

8   I know that the judge granted it.  Once the judge

9   granted it, whether or not it was opposed, it doesn't

10  matter.  So I did not look to see if they opposed it or

11  not.  I don't know.

12      Q    Did we lose you?

13      A    No, sir.  Did you hear my response?

14      Q    It cut out there for a moment, I believe.

15      A    Okay.  I'll repeat it.

16           I do know that the judge, the district

17  judge granted the motion and I don't know if Malibu

18  opposed it or not, but obviously once it's granted, it

19  is granted.  So I didn't necessarily ask whether or not

20  Malibu opposed it.  I don't know.  I don't remember.

21      Q    Okay.

22      A    If it was opposed -- if I was told whether or

23  not Malibu opposed it, I don't know.

24      Q    I can represent to you that Malibu Media did

25  not oppose your motion to remain anonymous until the

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 44

1    judge requires it not to be.  My question is have you

2    suffered any embarrassment over the pendency of this

3    litigation?

4       **A    Not yet.**

5       Q    Why do you say "not yet"?

6       **A    At this point I am anonymous, so the harassment**

7    **right now that is publicly available is to John Doe.**

8       Q    Do you recall if Malibu Media has ever offered

9    you a settlement?

10      **A    Yes, I do recall that they did, in fact, offer**

11   **a settlement.**

12      Q    Do you remember what it was?

13      **A    I remember it was I believe 13,600 something or**

14   **near that amount.**

15      Q    Do you know if that offer was provided as a

16   result of a court order to do so?

17      **A    Was it provided as a result of a court order?**

18   **That's a -- let's see.  I don't know if there was a**

19   **direct correlation.  I do know -- I do know that it was**

20   **after the court order, but whether or not it was a**

21   **direct correlation, there's no way for me to know why**

22   **Malibu Media made the offer at that point in time.**

23      Q    Well, I can represent to you that the Court

24   required the plaintiff to make a written offer of

25   settlement to the defendant and that the defendant was

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 45

1   required to provide a written offer of settlement in

2   response.  Other than that written offer, has Malibu

3   Media offered you any money to settle this case?

4       **A    No.**

5       Q    I apologize.  I misspoke.  Has Malibu Media

6   demanded any other money to settle the case?

7       **A    I don't think so, no.**

8       Q    Okay.  So the only offer for settlement that

9   you've received was pursuant to a court order; is that

10  correct?

11      **A    I think the same offer was sent multiple times**

12  **so if the first time was due to a court order, then the**

13  **rest of the times would not have been pursuant to a**

14  **court order but I believe the amount at one point was**

15  **also reduced and there were several times that the same**

16  **offer was produced by Malibu Media, at least that's who**

17  **I remember it.**

18      Q    If we look down on Exhibit No. 3, I can direct

19  your attention to Paragraph 120.

20      **A    Okay.  I see it.**

21      Q    And can you read for me that sentence.

22      **A    It says, "And despite Doe stating under penalty**

23  **of perjury that he did not use BitTorrent during the**

24  **relevant timeframe and that he never accessed or viewed**

25  **Plaintiff's films, Plaintiff continues to assert its**

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 46

1    **deficient infringement claim."**

2        Q      Now, I'm breaking it down for you.  Is it true

3    that you did not use BitTorrent during the relevant time

4    frame?

5        **A      That is correct.**

6        Q      What is the -- and that's the time frame

7    between 2017 and 2019, correct?

8        **A      Correct.**

9        Q      So you did use BitTorrent prior to 2017?

10       **A      Yes, several years prior.**

11       Q      It references "under penalty of perjury."  Do

12   you know what that's referring to?

13       **A      I did sign the -- what was it, request for an**

14   **interview.  There was an interview, there was a Request**

15   **for Production and there was a Request for Admission.  I**

16   **believe this is referring to at least one of those**

17   **documents, probably the one about the interviews, the**

18   **interview questions.**

19       Q      Do you remember providing an affidavit with a

20   motion?

21       **A      Yes, I -- yeah.  Do you have it just to make**

22   **sure I understand which one that it is because now that**

23   **you said it I guess the affidavit is not one of the**

24   **three that I referred to, so it was something else, yes,**

25   **which was probably before the others.**

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 47

```
 1      Q     Okay.  Can you see the --
 2      A     Okay.  32-1?
 3      Q     -- Document 32-1.
 4      A     Yes.
 5      Q     Can you see that?
 6      A     I see that.
 7      Q     Okay.  I'm going to mark this as exhibit --
 8                  MR. BEIK:  Are we on No. 4?
 9                  THE REPORTER:  Yes.
10                  (Exhibit 4 marked)
11      Q     (By Mr. Beik)  Okay.  Exhibit No. 4.  Can you
12 tell me what this document is?
13      A     It's a declaration of something and I imagine
14 it's going to be defendant or my name because it has a
15 "I" and it's blacked out so that's probably my name,
16 "that the following statements are true and correct
17 based on my personal knowledge."  Yes, this is -- I
18 remember this now.
19      Q     Okay.  And so down there at the bottom, did you
20 sign this document?
21      A     Yes, I did.
22      Q     Paragraph 7, could you read that.
23      A     Yes.  "I never viewed any of the films listed
24 in Malibu Media's complaint.  I never stored, copied,
25 accessed, or distributed any of those films."
```

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 48

1    Q    Did you ever download the films?

2    **A    No, I have not.**

3    Q    So it's your testimony that you never

4    downloaded any of the films listed in the complaint in

5    this lawsuit; is that correct?

6    **A    That is correct.**

7         MR. MORRIS:  Hey, Paul, we've been going

8    for about 90 minutes.  Is it a good time to take a

9    break?

10         MR. BEIK:  Yeah, that sounds good.

11         (Recess from 2:27 p.m. to 2:41 p.m.)

12         MR. BEIK:  Back on the record.

14    this deposition?

15    **A    I reread the complaint and a couple of the**

16    **other documents.  That's what I did to prepare for it.**

17    Q    Did you do anything else?

18    **A    I don't know what you mean, but, no, I -- I**

19    **mean, unless something specific -- anything specific**

20    **that you're asking or, I mean, in general, no.**

21    Q    Okay.  I'm just asking what you did to prepare.

22    That's all.

23    **A    Oh, okay.**

24    Q    And so you reviewed the complaint.  And then

25    what other documents?

CONFIDENTIAL
ATTORNEYS' EYES ONLY

1    **A**    **Yeah.  Anything else would have been privileged**

2    **in nature or -- yeah -- no, I mean, it's -- yeah.**

3          MR. MORRIS:  And if I can just jump in.  I

4    don't want to step on your toes here, Paul, but I may

5    have cautioned the witness not to reveal privileged

6    communication.  You can say that you met with me,

████ ██████████ ██ ███████ ███ █████ ███████ ███████

8    Q    (By Mr. Beik)  Yeah, I'm not asking you for

9    what you talked with your lawyer about.  I'm just asking

10    you did you prepare for the deposition with your

11    attorney?

12    **A**    **We -- we had a conversation, yes.**

13    Q    Okay.

14    **A**    **For the record, just to make sure because I**

15    **don't necessarily know everything that is privileged or**

16    **not privileged, if I am not saying something that needs**

17    **to be said because it is not privileged, I hope that**

18    **Mr. Morris can -- can state so.  From my standpoint**

19    **I'm -- I don't know what counts or does not count**

20    **necessarily as privileged fully, so.**

21          MR. MORRIS:  Right.  And go ahead and

22    answer Mr. Beik's question.  If something is privileged,

23    I will -- I will affirmatively instruct you not to

24    answer.

25          THE WITNESS:  Okay.  Thank you.

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 50

2    worked in -- at your jobs in IT for 19 years?

3         A    Well, consulting for 19 years.  IT -- standard

4    IT practices was part of it, but it was not the whole

5    job.

6         Q    Okay.  But over ten years I guess is a fair

7    statement maybe?

8         A    Yes.

9         Q    Are you aware that you are designated an expert

10   in this case?

11        A    I think made an expert on -- related to what

12   expertise?

13        Q    No, I'm sorry.  My question is in the case,

14   this case, are you aware that you have designated an

15   expert in this case?

16        A    Oh, that I have designated one, not that I am

17   an expert.  Okay.  Yes, we do have an expert designated.

18        Q    I didn't mean to insult you.  If you're an

19   expert, that's great, but I was just -- I was talking

20   about the expert in this case.

21        A    Right.  Yeah.  No, it was -- I lowered the

22   volume to try to decrease the echo, and sometimes I --

23   my ear is not close enough to the speaker.

24        Q    Okay.  Did you talk to your expert in this

25   case?

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 51

1      A      No, I did not.

2      Q      Did he ever inspect any of your hard drives?

3      A      No, he has not.

4      Q      Are you claiming damages in this case?

5      A      Yes, I am.

6      Q      What are you seeking for the jury to award you

7   in damages?

8      A      The amount will be determined a little bit

9   later.  I have not at this point in time -- I haven't

10   calculated the correct amount or the appropriate amount

11   yet.

12      Q      What do you mean "calculated the correct

13   amount"?

14      A      There are damages, and the damages continue to

15   increase as you can imagine.

16      Q      No, I can't.  That's what I'm asking you.  What

17   are your damages?

18      A      Oh, you cannot imagine.  Interesting.

19             I mean, I don't know if you are charging

20   Malibu Media but legal fees are pretty severe in this

21   kind of situation and they continue to increase.  There

22   is damages that are related costs.  I have had to budget

23   a fairly large amount of money to defend myself against

24   this allegation.  That money was earmarked for

25   investments that I have not been able to make.  There is

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 52

1    the medical costs that are associated with everything

2    that's happening to me related to this lawsuit.  So,

3    yeah, there is a significant harm being caused by you

4    and your client's actions.

5        Q     And what -- you said harm to your property.

6    What harm to your property are you alleging?

7              MR. MORRIS:  Objection.  Form.

8        A     I will have to look exactly at the sentence

9    that you are talking about.

10       Q     (By Mr. Beik)  Yeah.  If you go down on the

11   document that's up right now, you can go to the --

12   Page 51.  I keep talking like you have control of it.

13   I'm sorry.

14       A     Yeah.  No problem.

15       Q     Okay.  Paragraph 150, it says, "Defendant

16   suffered harm to his property."  I'm asking you:  What

17   is the damage your property?

18       A     I'm not a hundred percent sure right now what

19   that refers to.  There is -- I mean, right now off the

20   top of my head, the only thing I can think of is the

21   depreciation value of the address that has been

22   dedicated to keep records.  Yeah, I mean, what was this

23   file.  I'm not a hundred percent sure what that refers

24   to right now.

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 53



CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 54



Discovery Resource
713-223-3300
P-Resp_Renew_MSJ057

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 55



CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 56



1    **A**    **Yes.**

2    Q    Okay.

3    **A**    **Yes, that was the end.**

4    Q    Sorry.  The sound goes in and out a little bit,

5    so I wasn't sure you were done.

CONFIDENTIAL
ATTORNEYS' EYES ONLY



Page 57

```
21      Q      You allege harm to your professional
22  activities.   What arm are you alleging?
23      A      So far, I mean, as you can see today, I should
24  be working and I am here so I have had to deal with days
25  off.   I had to deal with a decrease -- so as you can
```

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 58

1    imagine, when the stress goes up and I'm in pain, I'm

▮ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬  ▬▬▬▬▬▬▬▬▬▬▬

▮ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▮ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬  ▬▬

▮ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▮ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

7    rather than the work.  So, yes, the performance has

8    decreased as well as me having to take time off to deal

9    with this lawsuit.

10       Q      What harm are you alleging to your reputation?

11       A      To my reputation, it's going to be if my

12   identity is disclosed as well as, you know -- yeah.  If

13   one -- if and when my identity is revealed, there is

14   clearly going to be the possibility that people will no

15   longer trust me with their networks or data or hiring

16   me.  So there is a very serious effect in which I may or

17   may not be able to find work again.  So not only, you

18   know, current income, but also future income is affected

19   by this kind of situation.

20       Q      Does your employer know that you're involved in

21   a lawsuit?

22       A      Not yet, no.  Not right now.

23       Q      What did you mean by future work?

24       A      Well, if I get fired and I -- I become known

25   and people look at my name and my name is associated

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 59

1   with this lawsuit, that future job opportunities will

2   certainly decrease, if not completely vanish.  You do

3   have other examples.  Again, when I looked at Malibu

4   Media and I looked at this kind of lawsuit -- I don't

5   remember his full name -- it was Tim something made a

6   statement that he is having a very hard time because

7   every time people look at his name what they find is the

8   lawsuits.  And let's face it, we do live in a society in

9   which sometimes an accusation is enough in the public

10  view.  They don't look at actually whether or not you --

11  you were innocent or not.  All of that is reputation.  I

12  work in high stakes data.  Data that I deal with is

13  sensitive to say the least.  I cannot afford to

14  basically be tied to this kind of lawsuit and I'm being

15  accused of things that I did not do.

16      Q    So at this point in time you don't have any

17  harm to your reputation, correct?

18              MR. MORRIS:  Objection.  Form.

19      A    It's -- I would say that it is unclear.  I do

20  not know whether my current situation is affecting me at

21  work or not.  As I said, there is a particular decrease

22  in performance.  I don't know if, for example, if

23  promotion will or will not be affected by this.  I do

24  not know the performance reviews that my managers and

25  higher-ups do.  It is completely unclear and that's why

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 60

1    I say the amount of the harm and some of these

2    statements need to be completely evaluated and I do not

3    have at this point the data necessary to give you an

4    amount of otherwise so it has to be quantified at a

5    later stage I think.

6        Q    (By Mr. Beik)   So at this point you just don't

7    know?

8                   MR. MORRIS:   Objection.   Form.

9        A    I believe I have answered the question to the

10   best of my ability.   If you want to draw your own

11   conclusions, you can.

12       Q    (By Mr. Beik)   Well, I heard the answer, and I

13   heard the answer was you didn't know.

14                  MR. MORRIS:   Objection.   Form.

15       A    As I said, you -- you can draw your own

16   conclusions.   I gave the answer to the best of my

17   ability.

18       Q    (By Mr. Beik)   What other injuries are you

19   alleging?

20       A    Well, time is an interesting one, isn't it?

21   How many hours have I spent either researching or

22   reading or answering on this lawsuit?   I will say that

23   one of the intriguing aspects of lawsuits and lawyers is

24   everybody gets paid except the defendant.   You're

25   getting paid for your time, Mr. Morris is getting paid

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 61

1   for his and Ms. Del Sierra is paid by the company so her

2   time involved in all of this is also paid.  Nobody is

3   paying me for it, and this is time that I have other

4   things that I would like to be doing.  I don't enjoy

5   particularly this whole thing.  This is not -- you know,

6   this does not make my day to schedule this.  I could be

7   with my family.  I could be doing personal things.  That

8   certainly I would say is harmful.  I don't have them

9   written down right now, and, as I said, normally what

10   you are asking for, a full inclusive injury list, at

11   this time I don't have it.

12        Q     Okay.  What about other damages?

13        A     I'm drawing a blank right now.  Yeah, it's -- I

14   need to think about it in detail to provide you an

15   answer on this.

16        Q     So as you sit there today, you don't know what

17   other damages are?

18        A     Today I'm drawing a blank.  I know I've

19   discussed it before.  Right now, I'm sorry, I'm drawing

20   a blank.

21        Q     What about other losses you allege?

22        A     To me they're all inclusive in the kind of

23   things that I've been talking about.  That's why I said,

24   you know, there is -- there is lawsuits in -- in that

25   sense, but it all ties to the stress, to the time.  It

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 62

1    all ties together.   You're trying to separate it into

2    three very distinct categories, and I assume that they

3    all have very legal definitions and determinations based

4    on how they get categorized from a legal term.   I am not

5    a lawyer, so I don't know what to tell you.

6        Q    You mentioned attorney's fees earlier.   How

7    much attorney's fees have you -- are you seeking in this

8    case?

9        A    I don't have the amount in front of me.   I can

10   tell you that so far I have budgeted in the six figures.

11   Depending on how much longer this is going to take, it

12   is unclear whether or not I'll have to allocate more

13   money than my current -- my current budget.

14       Q    Are you alleging that IPP software doesn't

15   work?

16            MR. MORRIS:   Objection.   Form.

17       A    I'm alleging that IPP software does not

18   identify an individual, and I'm not the one alleging

19   that.   I'm just confirming it and agreeing to it.   But

20   when you look at your complaint, I believe Malibu Media

21   is alleging that as well.   So from the standpoint of

22   does it work, does it not work, the allegations are that

23   you are using the process that you knowingly and

24   willingly are filing lawsuits without knowing the

25   identity of even the person that you're alleging is

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 63

1    doing copyright infringement, let alone whether

2    copyright infringement is happening.  I don't think that

3    that is set in law.  Again, I'm not a lawyer, but my

4    understanding is that it is not set in law that IPP is

5    certain information or productions are in that for the

6    claims that you have filed.

7         Q     (By Mr. Beik)  So you're alleging that the

8    methodology is flawed, right?

9         A     Absolutely, yes.

10        Q     Okay.  Why?

11        A     What do you mean why?

12        Q     Why is it flawed?

13        A     So you filed a lawsuit even though you do not

14   know the person.  You cannot identify the person.  You

15   only know the external IP address.  You are informed

16   repeatedly that there are open networks.  That IP

17   address can be any number of computers and any number of

18   individuals, and you know that because you guys have

19   been filing these lawsuits for over a decade or least a

20   decade, it seems.  So you know you do not know and you

21   cannot know based on the information that you have

22   provided the identity, yet, as soon as you discover my

23   name through the ISP, you file claiming that I -- I did

24   the infringement.  That's what you have claimed.  You

25   cannot make that claim.  You have no information

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 64

1    whatsoever that I did that, and, yet, here I am spending

2    an absurd amount of money that I have to spend to defend

3    myself.

4              Do you think that that is not flawed?

5    Q    Are you alleging that the methodology is flawed

6    because the software does not correctly identify the IP

7    address from which the movie was distributed?

8              MR. MORRIS:  Objection.  Form.

9    A    I can clearly state that at best the IPP

10   software will tell you to which external IP address they

11   connected to.  Beyond that so far you have not presented

12   anything that would indicate otherwise.

13   Q    (By Mr. Beik)  So it's your position that the

14   software does connect to the IP address, correct?

15   A    To the external IP address.  Let's be very,

16   very, very clear on this.  The IPP software makes a

17   connection to an external IP address which in this

18   lawsuit seems to have been mine.  That is the only thing

19   that I know for sure.  Behind that external IP address,

20   there are further IP addresses that the software does

21   not seem to be providing.

22   Q    Do you have any other IP addresses?

23             MR. MORRIS:  Objection.  Form.

24   A    External, internal?

25   Q    (By Mr. Beik)  External.

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 65

1      A     At that residence I do not have any -- any
2  other external IP address.

3      Q     What about at other residences?
4      A     Well, I don't -- what I do have, if I'm at
5  work, I show up at different IP address.  Any time that
6  I connect to a different network, I show another IP
7  address.  I have e-mail services.  They are a different
8  IP address.  There are multitudes of IP addresses that
9  will be shown through -- through my life.  So do I show
10  up on different external IP addresses that are internet
11  derivable, the answer is absolutely, yes.

12      Q     Do you pay for any of those other IP addresses
13  to use them?
14      A     I do have servers that I pay for.  The -- the
15  service does include IP addresses obviously because I
16  have to be able to connect to servers.  Beyond that, I
17  do not specifically pay for specific IP addresses or
18  anything like that.

19      Q     So the IP address identified in this lawsuit is
20  the only one that you pay for?
21      A     Directly pay for in the sense of for an ISP
22  connection, that is correct.  As I stated, I do have
23  servers that I pay for, and they do come with IP
24  addresses.

25      Q     So if I -- beyond the IP address, is it your

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 66

1   position that there are multiple users?  Is that what

2   you're saying?

3        A     There is multiple users.  There is multiple

4   devices.  There can be -- because I do run or I did -- I

5   did run open networks, there can be any individual

6   connected to that network.  So there are people that I

7   do not know that might have connected or likely

8   connected based on this lawsuit.  But neither I, nor

9   you, nor anybody -- let's make it crystal clear because

10  I believe that this is at the core of this paragraph or

11  the flaw statement, there is nobody here that I'm aware

12  of, unless you are possibly the NSA or an incredibly

13  technically advanced individual, that can make the

14  determination of who was showing up at that IP address.

15  That's my statement, and that's why the technology is

16  flawed.  Now, if you think otherwise, I'll be more than

17  happy to hear why you think otherwise.

18       Q     Are you aware that there were nine instances

19  where your IP address showed up in association with

20  distributing Malibu's copyrighted works?

21       A     I'm aware that that is what was stated in the

22  complaint, yes.

23       Q     And do you have any basis to essentially argue

24  or assert that that was incorrect?

25       A     I cannot neither confirm nor deny that that is

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 67

1    correct or incorrect.   The only statement that I am

2    denying is that I was responsible for it.   That's my --

3    I deny that I was involved on those nine titles being

4    distributed through that external IP address.   I do not

5    have any basis whatsoever to say that it is true or

6    untrue that they were available through that IP address.

7         Q     Do you have an open Wi-Fi network?

8         A     Yes, and I stated that several times from the

9    beginning.

10        Q     You testified earlier about the amount of time

11   it would take to download the links when you were using

12   BitTorrent.

13        A     Uh-huh.

14        Q     Do you remember that testimony?

15        A     Yes.

16        Q     Are you aware of how long it takes to download

17   one of the movies that's asserted in the complaint?

18        A     I am not aware of it.   Another thing that I

19   have asked for is more details on -- on the subject.   I

20   do not even know the size of the files that you guys

21   are -- that those nine titles are.   I don't know the

22   size.   I don't know anything.   So, no, I do not know how

23   long it takes to -- to download those titles.

24        Q     So are you aware of any other defendant that

25   asserted that the actual IP address that was identified

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 68

1   by IPP was incorrect?

2           MR. MORRIS:   Objection.   Form.

3       A     I have not directly spoken with other

4   defendants on this subject, and I think that that has

5   been stated earlier.   From a standpoint of what I have

6   read or not read, this has now been going on for almost

7   a year and a half or about a year and a half, almost

8   like a year and a half, I believe.   There was a lot of

9   research that I did early on that I have since forgotten

10  details about.   When I do see it again, I probably will

11  have recollections of it.   So to be quite honest, at

12  this point in time my memory is not telling me about

13  other defendants with IP addresses.   Yeah, I'm not sure.

14  I mean, I remember cases in which an older woman was

15  being sued, and I think that it was stated that a

16  possible way would have been if somebody connected to

17  her network.   I don't remember what the claim was in the

18  Tim -- I think it would be, yeah, Tim McManus.   Right

19  now I'm not a hundred percent sure of the claims.   Let

20  me read that.

21      Q    (By Mr. Beik)   I'm sorry.   Are you looking

22  at --

23      A    Yeah.   Well, I'm trying to read Paragraph 108.

24  I remember the name Tim McManus, and I remember that at

25  that point I did read that case or some information

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 69

1   about that case.  There were others and that's why I say

2   I don't remember everything that I did read on so I can

3   only tell you right now that I possibly have read about

4   it.  Right now I cannot give you the details about it.

5       Q      Why didn't you have a secure Wi-Fi network?

6       A      I also have secure Wi-Fi networks.  In fact, I

7   have five networks of which only one was running open

8   for -- for that whole time and another one that early on

9   was running open that eventually was not open anymore.

10  One of the reasons -- so if we go back to 2014, 2015, I

11  was doing a lot of things back then, and -- and I was --

12  I was partial CPO of the company.  I was doing R&D on

13  smart devices and basically I started working way too

14  many hours and what ended up happening is I -- I ended

20  So the -- one of the Wi-Fi networks --

21      Q      I'm sorry.  Did you say that this was in 2015?

22      A      2014.

23      Q      '14.

24      A      The end of 2014, the beginning of 2015.  At

25  that point in 2015 I had to basically exit the job, exit

CONFIDENTIAL
ATTORNEYS' EYES ONLY

1    everything, and what happened is as you focus on the

2    pain everything else is -- is irrelevant.  So in my home

3    office I was running one of the open Wi-Fi's.  I have

4    one that was very reasonable.  I turned that one off

5    when it was clear I could not work.

6              The other Wi-Fi was not in a site.  It was

7    actually in my garage.  So the purpose of that Wi-Fi was

8    to kind of try to increase the range at which the -- the

9    car would detect it was close to my home.  And by

10   looking at the -- the Wi-Fi, it would connect to the

11   Wi-Fi and it would send a signal that the car is getting

12   close and that would trigger certain events through home

13   automation, et cetera.  Because I was doing research

14   into home automation devices and IT devices, the -- the

15   battery power and the amount of power consumption is

16   related to whether or not you need to authenticate, and

17   because I was only saying -- sending payloads and it was

18   R&D, I did not want to deal with -- with authentication

19   of the -- of the IoT devices.  So there were -- there

20   were some that were battery.  There were cell phones.

21   There were other things that what I wanted was a very

22   quick connection, send these messages and then

23   disconnect on the Wi-Fi and go into deep sleep to

24   conserve battery power.

25              That network completely escaped me.  I

CONFIDENTIAL
ATTORNEYS' EYES ONLY

1    forgot about that network for years.  It was when I

2    received the -- the Charter letter that I thought I have

3    been hacked and that I thought that what I was looking

4    at was a security the incident.  The letter did not go

5    into a lot of details.  It just said, you know, there is

6    something going on, things have been shared, and it --

7    it listed my IP address.

8                    I started turning everything off.  I

9    started looking at all the switches, all the lights that

10   were on.  That's when I realized I had a device that I

11   no longer knew about and it was through that discovery

12   that I found out that the -- that the Wi-Fi in the -- in

13   the garage had been left there and I did not know about

14   it.  At that point I turned, as I said, everything off,

15   and then I started only connecting things as -- as you

16   would normally do with a security event.  I -- I treated

17   the thing as a security event, and that's what I did to

18   come back on.  That's why that Wi-Fi is no longer

19   connected.  All of those devices have been -- have been

20   turned off, and I'm only now with secure networks.

21   That's the one that I'm indicating.

22                    Now, there is a different situation where

23   Spectrum -- Charter they are the ones that screwed up

24   and I'm not sure how long that one was open, but I do

25   know that I -- I did notice that one which was caused by

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 72

1    a router -- a modem.  The modem router that they had for

2    the cable modem, they made an update, and that triggered

3    the modem router to go unsecured.  Again, I have no idea

4    of the duration, but I do know that that one what I did

5    notice I did -- I did get fixed.

6        Q    So you have five internet connections in your

7    home; is that correct?

8             MR. MORRIS:  Objection.  Form.

9        A    I have one internet connection.  I have five

10   networks behind that IP address.

11       Q    (By Mr. Beik)  Okay.  Got you.  And the one in

12   the garage was a network that was connected to -- I'm

13   trying to understand if the one in the garage that you

14   didn't have secured was that one associated with the

15   Charter IP address that was -- that we had talked about

16   earlier in this case?

17       A    Yes, all -- all the networks will show has that

18   IP address to the external world.

19       Q    Okay.  Just the internal -- there are different

20   internal networks?

21       A    That is correct, yes.

22       Q    Well, who else had access to that in that

23   particular IP address?

24       A    So obviously the people that I know would be

25   family and friends.  The people that I don't know would

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 73

1    be anybody within range of that open Wi-Fi.

2        Q    What was the range?

3        A    Well, it all depends, right.  So the range for

4    my devices, I believe I was able to connect to it

5    several hundred yards.  I have not measured it, but it

6    was -- I mean, I can give you street names.  I did not

7    necessarily measure exactly how far they are.  Now, I

8    can tell you that if you get different antennas you can

9    increase the range -- the range at which you can connect

10   to Wi-Fi networks.  I am not an RF engineer so I don't

11   know if you have RF engineering knowledge, but there has

12   been people that have connected to pretty far distances.

13       Q    Did you have one of those antennas in your

14   garage?

15       A    I don't need to.  Obviously if two antennas are

16   directional, you would -- you will be able to connect

17   even farther, but even if one said is -- is directional,

18   you certainly can increase the range drastically.  I was

19   running a high gain antenna but it was not extremely

20   directional so it was not -- it did increase the range

21   maybe a little bit but I don't think it was significant

22   from the point of the other side needing perhaps a

23   directional, but you do have -- directional antenna,

24   I've seen if both sides are directional network links up

25   to 30 miles.  That's about the farthest that I know

CONFIDENTIAL
ATTORNEYS' EYES ONLY

1   people have connected, but that would be with two

2   directional antennas.  If one of them is directional and

3   the other one is not, I don't know what the maximum

4   range is.

5        Q    You think somebody else downloaded the movies

6   through your Wi-Fi?

7             MR. MORRIS:  Objection.  Form.

8        A    If we make the assumption that those titles

9   were, in fact, available through that IP address, the

10  thing that I can tell you is I did not -- I did not

11  provide them.  So it would only be logical to assume

12  somebody else did.

13       Q    (By Mr. Beik)  Are you aware that there was

14  2,257 other files that were downloaded through that --

15  that IP address as well?

16            MR. MORRIS:  Objection.  Form.

17       A    So that's the -- that's a fact that was

18  recently provided to me, and I was wondering what that

19  was.  So just -- just so that we are all on the same

20  page, are you stating that all those files, 2258, were

21  available at that IP address?

22       Q    (By Mr. Beik)  They were -- they were all

23  downloaded, yes.

24       A    All downloaded.  So IPP downloaded 2258 files

25  from my external IP address.  Are you aware that the

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 75

1    first file there is -- is from 2016?  I mean, are you?

2    ▉  ▉▉ ▉▉ ▉▉ ▉▉▉ ▉ ▉▉ ▉▉

3    questions in the depositions.  You must answer the

4    questions.

5            MR. MORRIS:  I'm sorry.  Is there a

6    question pending, counsel?

7        A    So, I mean --

8            MR. BEIK:  I think he was answering the

9    question --

10       A    -- I'm going to ask questions in order to

11   clarify some of this, and especially that you provided a

12   file that had no descriptions.  It had nothing

13   associated with it that would properly describe what it

14   is or what it isn't.  It was unclear if you came up with

15   that list, if Malibu Media came up with that list, if

16   IPP came up with that list, if you even know who came up

17   with that list.  So you're asking me questions in

18   reference to something that was very recently not -- I

19   have not been provided enough time to even look at

20   patterns within that file and at this point not knowing

21   what it is, not knowing who provided it, I think it is

22   misleading to say the least as to what that file really

23   is or isn't and you are definitely not providing enough

24   information.

25            So as far as I'm concerned, that file

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 76

1    is -- is what?  What is it?  Nobody is telling me.  Is

2    it evidence, have to turn it in to the court?  I mean,

3    you have stated that those files -- that the list of

4    files, 2258, were downloaded from my network.  That's a

5    statement that you have made.  Nothing farther.  Who

6    downloaded them?  You don't have to answer.  And that's

7    all I know.

8         Q     My client alleges you did.

9         A     Your client is alleging I downloaded them, and

10   then your client downloaded them.  Your client is not

11   alleging that I downloaded them, by the way.  Your

12   client is alleging that they saw them at the external IP

13   address, and then they are claiming that the nine titles

14   related to that, their works, I'm the one that was

15   providing them.  I don't believe that your client has

16   ever alleged, or at least you have not presented any

17   evidence to the contrary, that your client is making the

18   statement that I provided the 2258 files.

19        Q     Did you provide permission to anyone else to

20   use your Wi-Fi?

21        A     I have not provided other than the ones that I

22   have already stated.

23        Q     I'm asking like to another person did you

24   provide permission to use your Wi-Fi?

25        A     Family and friends, yes.

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 77

1    Q    Do your friends live with you?

2    **A    No, they do not.**

3    Q    If you provided permission to someone else to

4    use your Wi-Fi and they engaged in BitTorrent activity,

5    did they agree to interact with the other parties

6    through BitTorrent?

7              MR. MORRIS:  Objection.  Form.

8    **A    The -- okay.  Let's -- let's see if I**

9    **understand what you are asking just to make sure.  You**

10   **are stating that if I provide permission to connect to**

11   **my Wi-Fi and that person uses BitTorrent whether that**

12   **person is authorizing IPP to contact to my network?  Is**

13   **that the question?**

14   Q    (By Mr. Beik)  If they're engaged in BitTorrent

15   use through your network which inevitably, as you

16   described earlier in your testimony, connects with other

17   computers, aren't they providing the access to the other

18   computers?

19             MR. MORRIS:  Objection.  Form.

20   **A    People that will be running BitTorrent through**

21   **my network regardless if I authorized it or I did not**

22   **authorize it, they may open network ports through which**

23   **IPP connects.  That does not entail an authorization**

24   **from me or anybody else that I authorized to give that**

25   **authority to IPP.  IPP cannot use a third party to claim**

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 78

1    that they were authorized to connect because I did not

2    give any specific authority to such endeavor.

3            MR. BEIK:  Can we take a quick break?

4            THE WITNESS:  Sure.

5            (Recess from 3:38 p.m. to 3:50 p.m.)

7    Malibu Media has taken cases to trial on copyright

8    claims?

9    A    Yes.

10   Q    Tell me about what you know about that.

11   A    What you just said, that they have been trial

12   based cases.

13   Q    Are you aware of the result of the trials?

14   A    I believe you won some, and you lost some.

16   you intend to make to the jury to show that your

17   position is you didn't download Malibu's films?

18   A    What was the last part?

19           MR. BEIK:  Could you read that back,

20   Ms. Wendi?

21           THE REPORTER:  Sure.

22           (Requested portion was read)

23           MR. MORRIS:  Objection.  Form.

24   A    It's unclear when we're going to go to trial.

25   I imagine my statements may not match this deposition

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 79

1  completely, and I think that we are still in a mode in

2  which other things could very clearly show Malibu's

3  intentions.  What it is clear from -- from my side or if

4  the question that you're asking is am I going to change

5  my statement about me not providing those movies, I am

6  not going to change that statement.  Other things that

7  may show or may not show who it was or anything else, I

8  cannot honestly answer what the future holds.

9                MR. BEIK:  Could you read back for me the

10  last part of that sentence.  I couldn't understand it.

11  ██████  ████████ █████ ████ ███ ████████ ██ ████████

     it's the technology.  I just couldn't hear you.

12  it's the technology.  I just couldn't hear you.

13                (Requested portion was read)

14  ████  ██  █████ ████ ████████  ████ ████████ ██ ██ ████ ████

     other evidence that you would present to the jury that

15  other evidence that you would present to the jury that

16  would show that you did not download Malibu's movies?

17                MR. MORRIS:  Objection.  Form.

18                THE WITNESS:  What was that, Mr. Morris?

19                MR. MORRIS:  I just said objection, form.

20                Please answer Mr. Beik's question.

21                THE WITNESS:  Okay.

22      A     Right now not that I can think of.  I do not

23  know how to prove a negative.  To prove that I did not

24  do something, it's very difficult to say the least, and

25  right now I don't have anything that would definitively

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 80

1    **show that.**

2        Q     (By Mr. Beik)    That's my question is do you

3    have anything now definitive that you could present?

4    That's my question.

5        **A      Yeah, not that can think of right now, no.**

6        Q     So at this time you're going to ask the jury to

7    believe your word that you did not do it; is that

8    correct?

9        **A      That is correct.**

10       Q     Did you delete anything from any of your

11   servers since this lawsuit started?

12                   MR. MORRIS:    Objection.   Form.

13       **A      The -- it's a very vague question because**

14   **that's -- obviously that could be anything.   The answer**

15   **to that is obviously, yes.   I have continued to -- to**

16   **live and deal with computers, and the idea that nothing**

17   **is going to be deleted is to say the least a little**

18   **ridiculous.   Yeah, I mean, I don't know what your**

19   **expectations are, but this has now been going on for a**

20   **year and a half.   There are things that get deleted**

21   **under normal circumstances, and as I stated earlier, I**

22   **treated this as a security incident.   So there are**

23   **normal procedures and normal activities that will be**

24   **done that result on things being deleted.   I have to the**

25   **best of my ability complied with the -- what is it, an**

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 81

1   order or a notice of -- I don't remember what the legal
2   term is right now but I did have a notice of keeping
3   certain things and I have, again, to the best of my
4   ability complied with -- with what was asked of me.
5       Q    (By Mr. Beik)  Did you delete anything relevant
6   to this lawsuit?
7       A    Not that I'm aware of, no.
8       Q    What did you preserve?
9       A    I made backups of the computers and, as I said,
10  I do have backup drives that have been designated for
11  this and those will not be deleted.  So that is to the
12  extent what -- what I saved.
13      Q    When you said you treated it as a security
14  incident, what does that mean?
15      A    When -- when you normally receive notice of a
16  security incident, you have to assume that computers
17  have been compromised.  The correct response normally,
18  if -- if at all possible, is to disconnect everything
19  from the internet, which I did, turn the -- the
20  equipment off or just, you know, pull the plug, whatever
21  it takes to completely disconnect, and then you have to
22  reinstall the operating system from scratch because you
23  cannot trust any of the systems to not have a fraudulent
24  source or a virus in them.  So you slowly reinstall the
25  OSs, you restore from backups, and that's when you go

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 82

1   back to the internet.  In fact, it was this procedure

2   that made me find the -- the unsecure network.  As I was

3   turning things on, I saw a light in one of my switches I

4   could not explain.  That's when I realized where that --

5   where that cable was going and that I had forgotten

6   completely about that.  So that is what I mean by a

7   security incident and how I reacted to that security

8   incident.

9        Q    Did you talk to anybody else about the

10  incident?

11       A    I definitely talked to lawyers, all of that

12  being, you know, as you well know, privileged to them to

13  my knowledge.

14       Q    I'm not ask -- yeah, I'm not asking you what

15  you talked to your lawyer about.  I mean anybody else

16  that's not a lawyer.

17       A    No, I mean, I -- I told my family that we were

18  off.  I mean, it took me -- took me, what, I think it

19  took me somewhere between 10 or 15 days.  I mean, it

20  took me a long time to go back online because, again,

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

24  that I told people is that I have -- that this is due to

25  the incident, I need to respond to it and then I took

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 83

1    everything offline and I said we are not going to have

2    internet for a while.  As I was bringing things back

3    online, the first things that came back online were TVs

4    because there's not much I can do about TVs, but

5    computers were offline for a while.

6         Q     Who in your family did you -- did you tell

7    about that?

8         A     I told my wife.

9         Q     Did you tell your children?

10                   MR. MORRIS:  Objection.  Form.

11        A     No, they -- no.

12        Q     (By Mr. Beik)  Do they live with you?

13        A     Yes.

14        Q     Are they adults?

15        A     No.

24        Q     I know.  I'm in trouble.

25        A     Yeah.

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 84

```
 1      Q    All right.  Give me one second, and I think
 2   we'll be done.
 3      A    Okay.
 ▮      ▮    ▬▬  ▬▬▬  ▬▬  ▬▬  ▬▬▬
 5      A    Yes.
 6      Q    Okay.  Does any other family members live in
 7   your house?
 8      A    No, I mean, other than wife and children as
 9   stated.
 ▮           ▬▬ ▬▬▬  ▬▬ ▬▬▬▬ ▮ ▬▬▬ ▬▬ ▬▬▬ ▬▬
11   very much for your time.  And I will pass the witness.
12              MR. MORRIS:  I don't have any questions.
13   We'll read and sign.
14              MR. BEIK:  I'm sorry.  I didn't hear you.
15              MR. MORRIS:  I said I have no questions.
16   We will read and sign.
17              MR. BEIK:  Oh, got you.
18              (The deposition concluded at 4:03 p.m.)
19
20
21
22
23
24
25
```

**CONFIDENTIAL**
**ATTORNEYS' EYES ONLY**

Page 85

```
 1                    CHANGES AND SIGNATURE
 2    WITNESS NAME:  JOHN DOE          DATE:  DECEMBER 9, 2020
 3    PAGE      LINE            CHANGE            REASON
 4    _____
 5    _____
 6    _____
 7    _____
 8    _____
 9    _____
10    _____
11    _____
12    _____
13    _____
14    _____
15    _____
16    _____
17    _____
18    _____
19    _____
20    _____
21    _____
22    _____
23    _____
24    _____
25    _____
```

**CONFIDENTIAL**
**ATTORNEYS' EYES ONLY**

Page 86

1        I, JOHN DOE, do hereby certify that I have read the

2    foregoing transcript and that the same and accompanying

3    change sheets, if any, constitute a true and complete

4    record of my testimony.

5

6

7    _____          _____

     JOHN DOE                                  Date

8

9    ----------------------------------------------

10   STATE OF _____

11   COUNTY OF _____

12       SUBSCRIBED AND SWORN to before me, the undersigned

13   authority, on this, the _____ day of _____,

14   20_____, by said witness.

15

16                        _____

17                        (Signature)  Notary Public

18

19                        _____

20                        (Print Name) Notary Public

21

22   My commission expires _____.

23

24

25

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 87

1    STATE OF TEXAS        )

2    COUNTY OF HARRIS    )

3

4        I, Wendi Broberg, Texas CSR No. 7091, do hereby

5    certify:

6        That the foregoing oral deposition of JOHN DOE was

7    taken before me at the time herein set forth, at which

8    time the witness was put under oath by me;

9        That the testimony of the witness and all

10   objections made at the time of the examination were

11   recorded stenographically by me, were thereafter

12   transcribed under my direction and supervision and that

13   the foregoing is a true record of same.

14       I further certify that I am neither counsel for nor

15   related to any party to said action, nor in any way

16   interested in the outcome thereof.

17       In witness whereof, I have subscribed my name this

18   13th day of December, 2020.

19

20

21

22   _____
     WENDI BROBERG, CSR 7091
     Expiration Date:  1/31/22
23   Discovery Resource
     1511 West 34th Street
24   Houston, Texas   77018
     Ph. (713) 223-3300
25   Fax (713) 228-3311

## DECLARATION OF TOBIAS FIESER IN SUPPORT OF PLAINTIFF'S MOTION FOR LEAVE TO TAKE DISCOVERY PRIOR TO A RULE 26(f) CONFERENCE

**I, TOBIAS FIESER, HEREBY DECLARE:**

1.  My name is Tobias Fieser.

2.  I am over the age of 18 and am otherwise competent to make this declaration.

3.  This declaration is based on my personal knowledge and, if called upon to do so, I will testify that the facts stated herein are true and accurate.

4.  I am employed by IPP International UG ("IPP"), a company organized and existing under the laws of Germany, in its litigation support department.

5.  Among other things, IPP is in the business of providing forensic investigation services to copyright owners.

6.  IPP's system has been monitoring the BitTorrent file distribution network for the presence of Malibu Media's copyrighted works since 2011. IPP's forensic software identifies Internet Protocol ("IP") addresses that are being used by infringers to distribute Malibu Media's copyrighted works within the Bittorrent File Distribution Network.

7.  IPP tasked me with effectuating, analyzing, reviewing and attesting to the results of this investigation. I have previously provided the same support for Malibu Media in thousands of lawsuits across the United States, and I gave full and complete testimony about the workings of IPP's forensic scan during the "Bittorrent Bellwether Trial" (*Malibu Media v. John Does*, 12-cv-2078, (E.D. Pa.)).

8.  Infringement of Malibu Media's movies occurs within two formats. The first entails distribution of a specific single movie file correlating to a copyrighted Malibu Media movie. The second involves large scale distribution utilizing "Unauthorized Packs" (commonly referred to as 'siterips').

P-Resp_Renew_MSJ091                    Page 21

9.    Upon review of IPP's forensic activity logs, I determined that IPP's forensic servers connected to an electronic device using IP Address 70.121.72.191. Consequent to this connection, the IP Address used by Defendant of 70.121.72.191 was documented distributing to IPP's servers multiple pieces of Malibu Media's copyrighted movie titled Kaisa Slippery and Wet at exactly 5/5/2019 7:59:08 AM. This time is quoted in Universal Time which correlates to the assignment logs kept by US ISPs tracking which IP Address is assigned to which customer at a given point in time.

10.    A digital file can be identified by what is called a "Cryptographic Hash Value." This concept was developed by the United States National Security Agency. IPP's software determined that the file being distributed by Defendant using the IP Address of 70.121.72.191 at 5/5/2019 7:59:08 AM has a unique identifier of the Cryptographic Hash of 1B2CFE6B8C36391FC2B1F53792A5D35DD87AF510.

11.    A full copy of the digital file identified by the Hash of 1B2CFE6B8C36391FC2B1F53792A5D35DD87AF510 was downloaded by IPP's software, and I confirmed this file is a digital movie file. I further viewed this file and determined it was substantially similar to Malibu Media's copyrighted movie titled Kaisa Slippery and Wet.

12.    IPP's software is unable to distribute content; it is programmed to only allow it to download files from the Bittorrent Network. At no point did IPP distribute any part of Plaintiff's copyrighted movies at any time.

13.    It is theoretically possible to "spoof" an IP Address on the Internet. However, it is not possible to spoof an IP Address within the context of a TCP/IP connection. I verified that a TCP/IP connection was made between IPP's investigative servers and the electronic device using IP Address 70.121.72.191 and that multiple bits were conveyed over this connection.

Consequently, it is impossible that another party was "spoofing" the IP Address used by Defendant.

14.     IPP additionally confirmed through its ancillary worldwide BitTorrent surveillance program that IP address 70.121.72.191 is associated with significant long term BitTorrent use.

### FURTHER DECLARANT SAYETH NAUGHT.

### DECLARATION

**PURSUANT TO 28 U.S.C. § 1746**, I hereby declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 461 day of July, 2015.

**TOBIAS FIESER**

By:

WTX40

3
Exhibit C

## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| MALIBU MEDIA, LLC, | ) | |
| | ) | |
|     Plaintiff, | ) | Civil Action Case No. 5:19-cv-00834- |
| DAE | | |
| | ) | |
| v. | ) | |
| | ) | |
| JOHN DOE infringer using | ) | |
| IP address 70.121.72.191, | ) | |
| | ) | |
|     Defendant. | ) | |
| | ) | |

### DECLARATION OF COLETTE PELISSIER IN SUPPORT OF PLAINTIFF'S MOTION FOR LEAVE TO TAKE DISCOVERY PRIOR TO A RULE 26(f) CONFERENCE

[Remainder of page intentionally left blank]

### DECLARATION OF COLETTE PELISSIER IN SUPPORT OF PLAINTIFF'S MOTION FOR LEAVE TO SERVE A THIRD PARTY SUBPOENA PRIOR TO A RULE 26(f) CONFERENCE

### I, COLETTE PELISSIER, DO HEREBY DECLARE:

1. I am over the age of eighteen (18) and otherwise competent to make this declaration.

2. The facts stated in this declaration are based upon my personal knowledge and, if called upon to do so, I will testify that the facts stated herein are true and accurate.

3. I own Malibu Media d/b/a as X-Art.com.  No other person or entity has or can claim an ownership interest in the X-Art.com movie copyrights.

4. I developed the X-Art.com business plan in 2010 while still working full time as a realtor in the Los Angeles market.   X-Art.com was created to address the lack of artistically produced adult oriented content suitable for upscale women and couples.

5. I invested significant time, along with all of my available financial resources, into the production of content for the new X-Art.com website.  I knew that the adult content industry was in financial crisis, and the odds of success for a new adult website were low.

1



6.After a difficult start, and with much effort, I was able to perfect the X-Art genre thus propelling the X-Art.com website into one of the top websites of its kind worldwide.

7.X-Art.com customers can pay a monthly recurring subscription fee of $29.95, or an annual subscription fee of $99.95 to access our entire library of HD Video content.

8.Internet subscription sales are and have always been by far X-Art.com's primary source of revenue, however, recent additional revenue streams have been created through the licensing of X-Art content to Fortune 500 companies operating within the hospitality industry.

9.As X-Art's subscriber base has grown, our production expenditures have also grown.  We spend over two million dollars a year producing content, and millions more each year to run our business.

10.For the first several years of operation, X-Art did not have significant issues with piracy.  However, once our content became well known and highly desirable, X-Art movies started ranking as the most downloaded adult content on several of the most popular torrent websites.

11.Currently we have tens of thousands of paying subscribers, but we are finding it hard to grow and maintain our subscriber base as so many of our movies are distributed for free, without authorization, by users of the Bittorrent

2

Network.   X-Art must protect its copyrights in order to survive and for any hope for future revenue growth.

12. The only redress against Bittorrent based piracy is to initiate lawsuits against the Bittorrent users responsible for these unauthorized distributions.

13. These lawsuits must be filed as "John Doe" lawsuits because the identity of the infringer is initially unknown to us.   From my experience filing similar cases against other defendants throughout the country, once provided with the IP Address, plus the date and time of the detected and documented infringing activity, ISPs can use their subscriber logs to identify the name, address, email address and phone number of the applicable subscriber in control of that IP address at the stipulated date and time.

14. The proper forum for these lawsuits is determined by using Maxmind Premium Geolocation services.   Founded in 2002, Maxmind's website cites it as an industry-leading provider of geolocation databases[1].   It is also used by state and federal law enforcement in the prosecution of computer and cybercrimes.

15. Since January 2013, Malibu Media has used this geolocation procedure to determine the proper District for filing in 5,349 cases.   Out of these 5,349 total cases, 5,334 have accurately traced to the District Court in which the case was filed.   This translates to a 99.99% chance of proper personal jurisdiction and venue pursuant to the Maxmind Geolocation trace.

---

[1] www.maxmind.com

P-Resp_Renew_MSJ097

16.Over the past several years, Malibu Media has employed two experts to track and scan the infringement of its movies - Excipio GmbH ("Excipio") and IPP International U.G. ("IPP").

17.Investigators from both companies have testified in court and have attested to the reliability of the applicable forensic technology. Malibu Media has also independently tested each system to ensure the highest level of accuracy.

18.Each recorded infringement enumerated on Exhibit A to the Complaint in this lawsuit was documented by either IPP or Excipio. In many instances, infringing transactions were documented by both entities. Each Single Movie Hash on Exhibit A was fully downloaded and compared side by side to a control copy supplied to the applicable investigator by Malibu Media.

19.Malibu Media's intention in bringing these lawsuits is not to cause financial hardship but instead to deter infringement and be compensated for the intentional theft of its videos.

20. I have consistently instructed all attorneys representing Malibu Media in these lawsuits to seek and be open to exculpatory evidence and to be cautiously prudent when pursuing these claims. We do not pursue our claims against all Doe Defendants. For example, once receiving discovery, we may learn that a Defendant is on active duty in the military and we will dismiss that case. Also, we may learn a Defendant is possibly a coffee shop with open wireless, or some other circumstance that would prevent us from pursuing our claims. When

4



discovery indicates that pursuing the case will present for undue hardship for the Defendant, my instructions to my lawyers are to dismiss the case.

21.We invest significant resources into pursuing all types of anti-piracy enforcement, such as Digital Millennium Copyright Act ("DMCA") takedown notices and direct efforts aimed at infringing websites. We are even working with law enforcement to stop the piracy of our movies.

22.Despite sending thousands of DMCA notices per week, the infringement continues. And, if one searches for "X-Art" on a torrent website, the site will reveal thousands of unauthorized torrents available for free.

23.I have never authorized anyone to put our works on a torrent website.

24.I firmly believe that we must exercise our rights under the Copyright Act to prevent infringement. Otherwise, we face an immediate and serious risk. It is simply impossible to compete with free.

25.We do not seek to use the Court system to profit from the infringement like some have suggested. As previously stated, revenues from subscriptions to X-Art.com are by far and away the dominant driver of Malibu Media's business. We want the infringement to stop. The purpose of these lawsuits is to motivate people to pay for subscriptions by deterring infringement and seek some reasonable compensation for the massive amount of infringement of our copyrights.



5

26.It is my hope that by upholding the law, the courts will protect our ability to continue with our dream and allow all creative people the ability to make a living by distributing their work in this fast-paced digital age.

27.In conclusion, we want the courts to know that we are a small business and we need the law to be enforced to ensure our survival.  It is getting more difficult for us every day and we hope that in the future there will be a better way to protect our copyrights.

28.Thank you in advance for your time and consideration of this matter, please do not hesitate to ask if we can clarify any further questions.


## DECLARATION


**PURSUANT TO 28 U.S.C. § 1746**, I hereby declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


By: _____

COLETTE PELISSIER


6

Page 1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

MALIBU MEDIA, LLC,　　　　）
　　　　　　　　　　　　　）
　　　　Plaintiff,　　　　）
　　　　　　　　　　　　　）
vs.　　　　　　　　　　　）Case No.
　　　　　　　　　　　　　)5-19-CV-00834-DAE
JOHN DOE,　　　　　　　　）
　　　　　　　　　　　　　）
　　　　Defendant.　　　　）
_____）

VIDEOTAPED ZOOM VIDEOCONFERENCE DEPOSITION OF
30(B)(6) CORPORATE REPRESENTATIVE OF MALIBU MEDIA
COLETTE PELISSIER

Taken at 2 Bloomfield Hills Drive
Henderson, Nevada

On Tuesday, October 20, 2020
At 9:19 a.m.

Reported by:  Deborah Ann Hines, CCR #473, RPR
HUDSON COURT REPORTING & VIDEO　　　1-800-310-1769

---

Page 2

1  Appearances:
2  For the Plaintiff:
3  　　PAUL S. BEIK, ESQ.
　　　Beik Law Firm
4  　　8100 Washington Avenue
　　　Suite 1000
5  　　Houston, TX 77007
　　　(713)869-6975
6  　　paul@beiklaw.com
　　　(Via Zoom Videoconference)
7
8  For the Defendant:
9  　　RAMZI KHAZEN, ESQ.
　　　- and -
10 　　J.T. MORRIS
　　　J.T. Morris Law
11 　　1105 Nueces Street
　　　Suite B
12 　　Austin, TX 78701
　　　(512)717-5275
13 　　ramzi@jtmorrislaw.com
　　　jt@jtmorrislaw.com
14 　　(Via Zoom Videoconference)
15
16 Videographer:
　　　CODY HALL
17 　　(Via Zoom Videoconference)
18
19
20
21
22
23
24
25

---

Page 3

1  WITNESS                        PAGE
2  COLETTE PELISSIER
3  Examination By Mr. Khazen          5
4  Examination By Mr. Beik          275
5  Further Examination By Mr. Khazen  281
6
7
8              E X H I B I T S
9
10 NUMBER          DESCRIPTION       PAGE
11 Defendant's
12 　1  Defendant's Rule 30(b)(6) Deposition
13 　　　Notice to Plaintiff Malibu Media    25
14 　2  Contract Between Malibu Media and IPP   91
15 　3  Original Complaint              133
16 　4  Website Analytics               147
17 　5  List of Settlements             216
18 　6  Defendant John Doe's First Requests
19 　　　for Production to Plaintiff     222
20 　7  John Doe's First Set of Interrogatories  222
21 　8  John Doe's Second Set of Interrogatories 222
22 　9  Defendant John Doe's Second Request
23 　　　for Production to Plaintiff     222
24 　10 Tweets                          253
25 　11 Un-filed Complaint              268

---

Page 4

1  　　　THE VIDEOGRAPHER:  Today's date is
2  October 20th, 2020.  The time is 9:19 a.m. Pacific
3  time.  We are beginning the deposition of Colette
4  Pelissier.  Will counsel please announce for the
5  record who they represent.
6  　　　MR. KHAZEN:  Ramzi Khazen of the J.T. Morris
7  Law Firm on behalf of the defendant, John Doe.
8  　　　MR. MORRIS:  J.T. Morris also of J.T. Morris
9  Law, PLLC on behalf of defendant, John Doe.
10 　　　MR. BEIK:  Paul Beik, Beik Law Firm, PLLC on
11 behalf of plaintiff, Malibu Media.
12 　　　THE VIDEOGRAPHER:  Okay.  Ms. Hines.
13 　　　THE REPORTER:  Due to COVID-19, will all
14 parties please stipulate to swearing in of the
15 witness remotely.
16 　　　MR. BEIK:  Yes.
17 　　　MR. MORRIS:  Yes.
18 　　　THE WITNESS:  Yes.
19 　　　MR. KHAZEN:  Yes.
20 　　　THE WITNESS:  What if we said no?
21 　　　///
22 　　　///
23 　　　///
24 　　　///
25 　　　///

Pages 1 to 4

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

P-Resp_Renew_MSJ101

Page 5

```
 1  Thereupon--
 2          COLETTE PELISSIER
 3  was called as a witness by the Defendant, and having
 4  been first duly sworn, testified as follows:
 5          EXAMINATION
 6  BY MR. KHAZEN:
 7      Q.   Can you please introduce yourself for the
 8  record?
 9      A.   My name is Colette Pelissier, C-o-l-e-t-t-e.
10  Last name P-e-l-i-s-s-i-e-r.
11      Q.   And your address?
12      A.   I'm the owner of Malibu Media.  Malibu
13  Media, LLC and other, other companies and internet
14  companies.
15      Q.   Your address?
16      A.   My address is -- Paul, my business address?
17  Personal address?  Which business?
18      MR. BEIK:  Your business address.
19      THE WITNESS:  My business, I have two
20  different business addresses right now.  There's one
21  in California, and there would be -- I guess use the
22  business address at 2 -- where I am right now
23  actually would be a good business address.  2
24  Bloomfield Hills Drive in Henderson, Nevada and
25  89052.
```

Page 6

```
 1  BY MR. KHAZEN:
 2      Q.   Okay.  Have you been deposed before?
 3      A.   Yes.
 4      Q.   About how many times?
 5      A.   About how many times?  Maybe -- in my whole
 6  life?  In my whole life?
 7      Q.   Yeah.
 8      A.   Maybe 40 times, 40 times, maybe something
 9  like that.  40, 30, I don't know.
10      Q.   Approximately 30, 40 times you've been
11  deposed?
12      A.   Probably.
13      Q.   When was the last time you were deposed?
14      A.   Last time I was deposed, I think probably
15  2018.
16      Q.   Okay.
17      A.   Or early '19, something like -- around
18  there.
19      Q.   About how many times have you been deposed
20  in the last five years, or how many times, if you
21  know an exact number?
22      A.   Let me see.  In the last five years, so,
23  okay, I'm trying to think.  Maybe six times.
24      Q.   Have you been -- have you testified at trial
25  before?
```

Page 7

```
 1      A.   Yes, I have.
 2      Q.   How many times?
 3      A.   I'm not -- let me see.  So would it count
 4  for each different trial if it's like say the
 5  Bellwether case, there were five trials but it was
 6  all within, I don't know if you're familiar with that
 7  one, but that was in -- I'm sorry, let me turn this
 8  off.
 9          That was in Philadelphia and we had to try
10  five cases to prove, to prove that IPP and prove
11  everything worked to Judge Bellson, who -- so and
12  that it was five times there, so not more much than
13  that, but maybe ten times.  Maybe eleven, twelve, I
14  don't know.  Ten or twelve in my entitle life.
15      Q.   And were they all in regards to copyright
16  suits?
17      A.   No.  No.
18      Q.   How many times have you testified at trial
19  in regards to a copyright suit?
20      A.   Probably 90 percent.  Oh, my, God, I'm
21  sorry.  90 percent.
22      Q.   And the deposition that you took in late
23  2018 or early 2019, that was in regard to a copyright
24  suit --
25      A.   Yeah.
```

Page 8

```
 1      Q.   -- by Malibu Media?
 2      A.   Yes.
 3      Q.   I'd just like to go over a few basics.  I'll
 4  be asking questions, and it sounds like you've been
 5  through this quite a bit so you may already know
 6  these, but I'll be asking questions, and the answers
 7  will be transcribed by the court reporter.  This
 8  deposition is obviously being conducted remotely.
 9          Do you understand that?
10      A.   Yes.
11      Q.   And it's being -- and you understand that
12  you're being recorded for the record?
13      A.   Yes.
14      Q.   And if you want, ever want to take any
15  breaks, will you let me know?
16      A.   Of course.
17      Q.   And I just ask that if a question is pending
18  that you answer the question before we take any
19  breaks.
20          Do you understand that?
21      A.   Yes.  I'm sorry.
22      Q.   And please don't communicate with your
23  lawyer while a question is pending.
24      A.   No problem.  I have another lawyer that I
25  really -- I have to sign a declaration in the next 30
```

Pages 5 to 8

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

P-Resp_Renew_MSJ102

1 minutes, so that's why Im just watching out for that,
2 so it's nothing to do with this deposition. So
3 I'm -- I have an assistant helping me waiting for it
4 to come in. So let me go put this phone somewhere
5 else where they can get it, if that's okay with you.
6 Hold on. Let's see, turn off. Okay. Okay. Okay.
7 So you know, I'm not texting Paul.
8     Q.   Okay. So, right, yeah, can you please not
9 communicate while a question, with anyone while a
10 question is pending?
11    A.   Yes. Of course not.
12    Q.   Your lawyer may object, but unless he
13 objects for purposes of privilege and then instructs
14 you not to answer, you should answer.
15         Do you understand that?
16    A.   Yes, I understand.
17    Q.   So this deposition is obviously taking place
18 remotely, so I'd ask that if you can't hear a phrase
19 or if you can't hear or understand anything I'm
20 asking, please just let me know and I'll repeat the
21 question.
22    A.   Yeah. Yes. Yes.
23    Q.   And also please just give me answers that
24 you're sure of. Don't guess or speculate, unless I
25 specifically ask you to. Can you do that?

1     A.   Of course.
2     Q.   Is there any reason that you wouldn't be
3 able to answer my questions completely and accurately
4 today?
5     A.   No. I mean -- I mean unless I don't know
6 the answer.
7     Q.   Right. So is there any reason you wouldn't
8 be able to answer my questions completely and
9 accurately to the extent that you know the answer
10 today?
11    A.   No.
12    Q.   Okay.
13    A.   I mean, there's -- no, there's no reason.
14    Q.   And in your prior depositions do you have
15 any reason to believe that any testimony you gave was
16 anything but complete and accurate?
17    A.   No. I mean, I don't understand that
18 question actually. Of course anything I answered at
19 the time when I was answering it was to my knowledge
20 complete and accurate.
21    Q.   Anything comes up during the course of the
22 deposition today that would affect your ability to
23 give fully and truthful answers to my questions, can
24 you let me know?
25    A.   Of course. I don't know how that would

1 happen, but yes.
2     Q.   So you say -- so you're -- you're the owner
3 of Malibu Media?
4     A.   Yes.
5     Q.   Are you an employee?
6     A.   No. It's my company.
7     Q.   So you're -- do you have any title at
8 Malibu, other than owner?
9     A.   CEO, owner, CEO.
10    Q.   So are you -- do you issue -- do you issue
11 yourself, for example, do you issue yourself a W-2?
12    A.   No, I do not.
13    Q.   And you say you own several other companies;
14 is that correct?
15    A.   Not -- I don't solely own. So actually not.
16 At this point I do not solely own other companies,
17 not for -- not any more.
18    Q.   You own partial stakes in other companies?
19    A.   I would have to ask my accountant how they
20 file everything this year, but I believe I solely own
21 Malibu Media and it's being sorted that way, so just
22 to make things easier, everything is being combined.
23         So obviously there's multiple domain names
24 and it will all be owned by Malibu Media instead of
25 separate holding companies. So it's -- so I'd have

1 to check with my accountant as to where we stand as
2 far as that goes.
3     Q.   What are the other holding companies?
4     A.   There was a holding company called Click
5 Here, but again these were just holding companies and
6 they were no longer going -- they no longer exist.
7 They should no longer exist at this time, actually.
8         But I guess it's probably not filed because
9 it was a year behind, so I don't know what it will
10 look like on the public records, but just to be
11 completely honest, as you asked me to be. And there
12 was Zo Digital, which did some programming as well,
13 but that will as well be all combined into Malibu
14 Media.
15    Q.   Are there any other holding companies which
16 you held a stake other than Click Here and Zo
17 Digital?
18    A.   As far as -- as far as for what dates?
19    Q.   Over the last three years.
20    A.   I would need to ask my accountant.
21    Q.   Can you think of any other, any other
22 companies in which you held a stake over the
23 last -- well, let's actually say five years. Can you
24 think of any other companies in which you held a
25 stake --

Pages 9 to 12

Page 13

1    A.   Five years.  I had a company that was
2   Colette Properties, but we had someone who, you know,
3   went trying to steal property from there, so that I
4   think has been -- is inactive.
5        Colette Productions where we were trying to
6   separate the production of Malibu Media, but that --
7   we -- that has been defunct now for quite some time,
8   so it's now just Malibu Media.
9        And -- and then there was one called Colette
10   Holdings, but that, again, we got involved with an
11   attorney that got greedy and so ultimately no longer.
12   So that would -- if that answers your question.
13    Q.   What was the first one you mentioned?  You
14   mentioned there was a first one, I couldn't quite --
15    A.   Oh, Colette Properties.
16    Q.   Colette Properties?
17    A.   Yeah, but it had nothing to do with Malibu
18   Media.
19    Q.   So the companies in which you have held a
20   stake over the last five years that you're aware of
21   are Click Here, Zo Digital, Colette Productions,
22   Colette Holdings, and Colette Properties.  Are there
23   any others?
24    A.   That would be -- that would be it as far
25   as -- again, I have to check with my accountant.  I

Page 14

1   do not know exactly how they're filing everything,
2   but I believe everything is going to be funneled into
3   Malibu Media so there's no confusion, so that's the
4   best answer I can give you.
5        And I, again, I have to check with my
6   accountant.  I didn't know I was going to be going
7   through all the LLCs because I thought Malibu Media
8   was the only thing that was relevant here.
9    Q.   And what do you mean everything is going to
10   be funneled into that?  What do the holding companies
11   hold?  What do they hold?
12    A.   So we have some other -- we have other
13   websites where we have only just started copyrighting
14   the content.  Super Hot and Colette.com and other
15   websites that we actually -- your client may have
16   infringed on but we wouldn't be -- that wouldn't be
17   relevant here because we haven't been enforcing those
18   copyrights so they would give to somebody would be
19   holding other websites like that.
20    Q.   Do any of these companies hold any
21   copyrights that have ever been displayed on XR?
22    A.   No.
23    Q.   How many employees does Malibu have?
24    A.   Excuse me?
25    Q.   How many employees does Malibu Media have?

Page 15

1    A.   Employee?  We have contractors.
2    Q.   Do you have any employees?  Does Malibu
3   Media have any employees?
4    A.   We have contractors.  So we're a global
5   company and we, you know, most people that when
6   you're hiring someone globally, you can't give them
7   a -- we have a -- I wouldn't say Malibu Media has
8   technically employees.  We have technically
9   contractors in different countries.
10    Q.   Okay.  So just to be clear, so to your
11   knowledge Malibu Media has no employees?
12    A.   Yeah, we do have contractors.  We have many
13   contractors.
14    Q.   Please answer my specific question.  To your
15   knowledge Malibu Media has no employees?
16    A.   I don't want to answer that wrong, because,
17   again, I'd have to check my accountant, but to my
18   knowledge it's -- we have many contractors or other
19   small businesses doing work for us contracted for --
20   and actually some have been contracted for 12 years,
21   so...
22    Q.   As you sit here today, can you think of a
23   single employee of Malibu Media?
24    A.   So is an employee you define as a W-2
25   employee, correct?

Page 16

1    Q.   Yes.
2    A.   Versus a 1099 contractor?
3    Q.   Yes.  Employees and independent contractors
4   are different, so I'm asking about employees, so --
5    A.   Yeah, I would say no.
6    Q.   Okay.  So just that was a little unclear.
7   So just to your knowledge Malibu Media has no
8   employees?
9    A.   I really don't know the answer.  I need to
10   check with my accountant for that.  I don't know who
11   is classified as a 1099 or a W-2, but I would have to
12   guess that if they're outside the United States it
13   would be a 1099 or a, you know, not a -- not a United
14   States employee if they're not living in the United
15   States and they're from another country.
16        So, like I said, we do most of our
17   production in -- I didn't say this, but we do most of
18   our production in Eastern Europe, and we do most of
19   our -- oh, there might be -- that's what I'm saying,
20   there might be a few employees that run social media,
21   marketing, things like that.
22        So I don't know but they make their own
23   hours, but they're employees or if they're
24   contractors.  I just can't say exactly.  There's too
25   many people and I don't know how they're classified,

Pages 13 to 16

Page 17

1  how my accountant has classified all of them.
2      Q.  Do you know if Malibu Media issues any W-2s?
3      A.  I know we issue many 1099s, so probably some
4  W-2s.  I'm just not sure of the answer for that.  You
5  need to speak to my accountant.  How is this
6  relevant?
7      Q.  That's -- I'm -- I'm allowed to ask
8  questions.  This is not about whether you determine
9  whether it's relevant or not, so please just try to
10  precisely answer my questions.
11      A.  Okay.  I'm trying to but, like I said, I
12  don't -- I'm trying to tell you that, you know, we
13  have our production in Eastern Europe, we have our
14  programming in Ukraine and Ecuador, we have -- if you
15  go to artwork, we have our design from all over the
16  world.  We have like, you know, lawyers all over the
17  country.
18      We have my husband was -- I sometimes -- he
19  helps me hire people for design in different
20  countries, different states.  And then we have
21  customer service all over the world.  We have -- so I
22  just don't know.  There's too many people for me to
23  answer your question and be a hundred percent certain
24  of my answer.
25      Q.  Okay.  But to your knowledge you can't think

Page 18

1  of any employees as we sit here today?
2      MR. BEIK:  Objection, asked and answered.
3      THE WITNESS:  No, I just actually I just did
4  think of some, because I was thinking of someone who
5  runs one of the Instagram accounts.  We have multiple
6  Instagram accounts.  And I don't know if this girl is
7  an employee or a contractor, so actually there might
8  be more, so I can't answer it.  I don't want to
9  answer something not truthfully.
10  BY MR. KHAZEN:
11      Q.  Who is that?
12      A.  Who is that?
13      Q.  Yes.
14      A.  Her name is Anastasia.  I don't even know
15  how to pronounce her last name.
16      Q.  Can you give it a shot?
17      A.  It's like Truninski or something.  It's
18  Russian.  She also works in -- she works in
19  marketing, for a marketing company.
20      Q.  Okay.  So other than Anastasia can you think
21  of any employees of Malibu Media as you sit here
22  today?
23      A.  In the U.S. I'm trying to think.  So
24  everyone who works on, as far as the copyrights go,
25  the DMCA and as far as our protection of copyrights,

Page 19

1  which is what I believe this is regarding, everyone
2  who works on that works, they make their own hours,
3  they work from their own areas.
4      A lot of them worked for me for 12 years and
5  I've never met them in person.  So I believe they'd
6  all be 1099 and contractors, like paralegal
7  contractors and things like that, so, yeah.
8      Q.  And is Malibu Media still operating?
9      A.  Malibu Media still operating?
10      Q.  Yes.
11      A.  Yes.
12      Q.  Does it have to make any changes due to
13  COVID?
14      A.  We did have to slow down due to COVID, and
15  that's why we haven't been shooting in the United
16  States just because of, you know, to take extreme
17  caution.  And now that we can shoot in Eastern Europe
18  without problems, we have our teams shooting there
19  again.
20      And so, yeah, we did have to slow down due
21  to COVID, but we are now -- like we have a lot of
22  loyal members and they've been waiting.  And so we do
23  have a lot of videos that we're going to be putting
24  up for our members soon based on that we can shoot in
25  Eastern Europe with no problems with the models they

Page 20

1  tested for COVID.
2      Q.  Did any of your contractors contract COVID
3  that you're aware of?
4      A.  No.
5      Q.  And how did COVID affect your business, if
6  at all?
7      A.  I don't know the answer to that if COVID --
8  I mean, it affected -- like, I mean, I think
9  everyone's business was affected somewhat if they had
10  income to spend, but like we don't operate -- our
11  business is more affected by people who are stealing
12  our movies than COVID could ever affect our business.
13  So it's just, you know, it didn't stop millions of
14  people from being home and stealing movies, so it was
15  not, not very different I guess, so...
16      Q.  So did any of your employees or independent
17  contractor, so none of your employees, if there are
18  any, or independent contractors that you're aware of
19  contracted COVID?
20      A.  No.  I had an independent contractor who did
21  get COVID, and he's better now.  He's in Arizona
22  working part time helping manage things.
23      Q.  Is that the only one you can think of?
24      A.  I have one model and her husband that had
25  worked for us a few times, they had COVID, but not

Pages 17 to 20

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769
P-Resp_Renew_MSJ105

**New Jersey**
732-906-2078

Page 21

1  while they're working for us, and that's all I can
2  think of.
3      Q.  Did you or your husband contract COVID?
4      A.  I did get COVID, yeah, in early March
5  actually.
6      Q.  And how long did that -- did that put you
7  out of work or --
8      A.  I was actually sick for a couple months, and
9  so it's been -- I was definitely quite sick and still
10  get like slight fevers and everything, so I guess I'm
11  one of those long haulers or whatever.  But I have
12  the -- I have negative tests and everything now, so I
13  have antibodies, but it's been definitely a little
14  under the weather.  So and my husband, he had no -- I
15  guess like asymptomatic, so...
16      Q.  Okay.  So you were -- so you were -- you
17  were slowed down in say March and April.  Is that
18  about right?
19      A.  Not -- I'd say -- I'd say it wasn't slowed
20  down because I kept doing my work, even with COVID,
21  so yeah.
22      Q.  Okay.  So you weren't -- so you were able --
23  you were to keep working during March and April?
24      A.  Yes.
25      Q.  What assets does Malibu own?

Page 22

1      A.  What assets?
2      Q.  Yeah.  What are Malibu's assets?
3      A.  Our copyrighted -- our copyrighted content.
4  And I would say that would be trademarks and
5  intellectual property and that would be -- and I mean
6  movie video equipment and things of that sort.  Not
7  properties and things like that, if that's what
8  you're looking for.
9      Q.  So when you -- so when Malibu shoots a
10  movie, does it rent out -- it rents out space or how
11  does that -- how exactly --
12      A.  It depends on where we're shooting.
13      Q.  Does Malibu -- does Malibu own any real
14  estate?
15      A.  I don't think so.  I think at one point we
16  did but then -- then Malibu I think I bought out
17  Malibu personally, or something like that.  I'm not
18  sure, but at this point, no.
19      Q.  And does Malibu hold any long-term leases?
20      A.  No.
21      Q.  And when movies are shot, does Malibu
22  provide the equipment or does it rent the equipment?
23  Does it own equipment?
24      A.  Again, it depends -- it depends on the movie
25  and depends where we are in the world.

Page 23

1      Q.  So what's typical?
2      A.  What's typical?  Typical would be we rent
3  because the equipment and the lenses, the cameras,
4  everything is changing so often that you usually rent
5  because it's so expensive.  You have to change the
6  camera ever time there's a new -- better camera
7  coming or any better lens.  So typically we would
8  rent, especially for overseas.
9      Q.  So is it typical that Malibu will use the
10  equipment of independent contractors or will it use
11  its own equipment?
12      A.  It's typical that Malibu would use the
13  equipment of -- it wouldn't be independent
14  contractor.  No, if you go to rent -- you know like
15  if you go to -- if you rent something for a Hollywood
16  movie, you go to rent the lenses, the big -- they
17  have places like that in other countries, so it's not
18  an independent contractor.
19          You would go to like the equipment rental
20  house and pick what you want to use for that specific
21  movie and you rent it.  So like, what's it called
22  with a P.  I'm so tired.  Anyway, it's like -- are
23  you in L.A.?  No, you're in Texas.
24      Q.  Yeah.
25      A.  Yeah, okay.  So, yeah, you don't know it.

Page 24

1  But anyway, just like when they're shooting movies in
2  L.A., they're always renting the equipment.  So it's
3  getting the best, the best lens, the best camera.
4  And you can get that for way better price renting
5  than you would having to buy each new thing that came
6  out.
7          So we do have equipment that we have ready
8  to use if we need to, but if we're doing a special
9  movie or something like that, we would usually rent
10  the equipment.
11      Q.  Did you prepare for this deposition?
12      A.  For about ten minutes with my attorneys.
13      Q.  And with who?  Who specifically?  Can you
14  name who you prepared it?
15          MR. BEIK:  If I could, Ramzi, just so we
16  know, I know he's not doing this, but just -- he's
17  not asking you what you talked with us about, he's
18  just asking you who you talked to.  So to the extent
19  any communication's with your lawyer, he's not asking
20  you for that.  He's asking you just who you talked to.
21          THE WITNESS:  So everybody on the call,
22  who's on the call here, and then Jay, my IP attorney.
23  My other IP attorney.
24  BY MR. KHAZEN:
25      Q.  What Jay's last name?

Pages 21 to 24

**New York**
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

**New Jersey**
732-906-2078

P-Resp_Renew_MSJ106

Page 25

1    A.  Kotzker.
2    Q.  And did you prepare with them both at the
3  same -- in the same meeting?
4    A.  Yeah, on the call.
5    Q.  Okay.  And it only lasted for ten minutes?
6    A.  Yeah, roughly.  Right, Paul?  Something like
7  that.
8    Q.  Well, you should answer to the best of your
9  knowledge.
10    A.  Ten, fifteen minutes, something like that.
11    Q.  Are you aware that you have been designated
12  as the corporate representative for Malibu Media for
13  purposes of this deposition?
14    A.  I am now.
15    Q.  Were you not aware of that before?
16    A.  I don't know the difference between being
17  the owner and the corporate representative.
18    Q.  I'd like to mark as Exhibit 1 a document
19  titled Defendant's Rule 30(b)(6) Deposition Notice to
20  Plaintiff Malibu Media.
21    A.  Uh-huh.
22      (Thereupon Defendant's Exhibit 1
23      was marked for identification.)
24    MR. BEIK:  Colette, do you have the exhibit?
25    THE WITNESS:  No, I don't have it, but I'm

Page 26

1  taking -- hopefully you're referring to it.  If
2  you're looking at it, I'm okay with that.
3    MR. BEIK:  You need to -- can we take a
4  break so she can open that up?
5    MR. KHAZEN:  Yeah.  Sure.
6    MR. BEIK:  Go off for one second.  If we
7  just go off the record for one minute and she can
8  open up the exhibit.
9    THE VIDEOGRAPHER:  Off the record at 9:47.
10      (Discussion off the record.)
11    THE VIDEOGRAPHER:  We are back on the record
12  at 10:08.
13  BY MR. KHAZEN:
14    Q.  Okay.  Welcome back.  You see the supplement
15  in front of you titled, that's Exhibit 1 titled
16  Defendant's Rule 30(b)(6) Deposition Notice of
17  Plaintiff Malibu Media?
18    A.  Yes.
19    Q.  Do you recognize this document?
20    A.  I'm looking at it now.  I don't recognize it
21  from previous, but I do -- I do recognize what this
22  document is.
23    Q.  What is it?
24    A.  It's a deposition notice to Malibu Media,
25  and it looks like it's a -- it's -- that you're going

Page 27

1  to depose me and we're agreeing to that.
2    Q.  Do you understand that you are the corporate
3  representative for Malibu Media with respect to
4  the --
5    A.  Yes.  Yes, I understand that.  Yes.
6    Q.  Just let me finish the question real quick,
7  sorry, but so the record is clear.  You understand
8  that you're the corporate witness for Malibu Media
9  with respect to the topics that are listed in
10  Exhibit 1?
11    A.  Yes, I do.
12    Q.  When is the first time you saw Exhibit 1?
13    A.  First time I saw Exhibit 1?  Let's see, it's
14  been months and -- it's been a while ago, I think.  I
15  don't recall exactly, but it was a while ago, I
16  think.
17    Q.  Did you do anything to prepare to be Malibu
18  Media's corporate representative with respect to the
19  topics listed in Exhibit 1?
20    A.  There's really not much to do to prepare
21  because it's either I know the answer or I don't know
22  the answer, and I run Malibu Media, so...
23    MR. BEIK:  Colette, he's not asking you for
24  attorney-client communications, he's basically asking
25  you if you prepared for the deposition by going

Page 28

1  through those topics, and that's what he's asking.
2  He's not asking what attorneys talked about, what you
3  talked about.  He's asking you if got prepared for
4  the deposition on those topics.
5    THE WITNESS:  Okay.  Yes, I believe so.
6  BY MR. KHAZEN:
7    Q.  Yes, what?  I'm sorry.
8    A.  Yes, I believe I have been prepared for the
9  topics of this deposition.
10    Q.  What did you do to prepare?
11    A.  I spoke to my attorneys, my IP attorneys and
12  my copyright protection attorneys.
13    Q.  Did you do anything, other than speaking to
14  your attorneys, to prepare as a corporate
15  representative for this deposition?
16    A.  We -- we discussed questions and answers and
17  updated on the technology and what was being used and
18  who was the infringers and the egregious ones that we
19  actually decided to go after.
20    And, you know, I just made sure that
21  everything was just a little -- you know, touched
22  base with everything, that everything was going as it
23  should, that we only, you know, only pursue people
24  that are egregious offenders and have offended, you
25  know, over multiple years, multiple movies.

Pages 25 to 28

Page 29

1     And -- and then, you know, and then other
2 evidence that they're habitual offenders. I
3 distribute all that to make sure they're -- it was
4 the kind of person that we don't want infringing on
5 our, on our hard work.
6     Q. Did you do anything else to prepare?
7     A. There's -- not really. I mean, I guess
8 it's -- maybe I'm -- I don't know what else there
9 would be to do to prepare. It would be we already
10 spent all the money on the software to identify the
11 IP addresses and the attorneys to research the law
12 and to, to, you know, to research everything that
13 they're downloading and the law.
14     I don't know what else there would be for me
15 as the owner of the company to do to prepare except
16 answer your questions.
17     Q. Other than meeting with your attorneys, did
18 you do anything else to prepare for this deposition?
19     A. No.
20     Q. And how long did you meet with your
21 attorneys for?
22     A. Maybe 15, 20 minutes, 10 to 20 minutes. I
23 don't recall exactly.
24     Q. Okay. So other than meeting with your
25 attorneys for 15 to 20 minutes, did you do anything

Page 30

1 else to prepare for this deposition?
2     A. I think I said "no" maybe three or four
3 times.
4     Q. Did you look at any documents in order to
5 prepare for this deposition?
6     A. No.
7     Q. Did you search for any documents in order to
8 prepare for this deposition?
9     A. No.
10     Q. And are you prepared to testify as Malibu
11 Media's corporate witness for the topics listed in
12 Exhibit 1?
13     A. These topics. Hang on. It would be -- make
14 sure. There's two pages. Oh, another one, another
15 page here. Actually -- actually, hold on. Oh, I
16 would say yes, I would be prepared.
17     Paul, do you agree, or you don't get to...
18     MR. BEIK: You're the witness, Colette. You
19 have to answer the question.
20     THE WITNESS: Oh, Okay. This is actually
21 now stuck. So if I go to document one it says --
22 okay. So I don't know if I can answer this
23 completely because the documents are cut off. It
24 says, Defendant will examine Malibu's representative
25 on the matters in the numbered paragraphs set forth

Page 31

1 below in Schedule A. In accordance with Federal Rule
2 of Civil Procedure 30(b)(6), Malibu is to designate
3 one or more persons to testimony on its behalf with
4 respect -- Malibu. I think that's Malinu -- with
5 respect to the matters described in Schedule A and
6 set forth, for each individual designated, the
7 matters on which the individual will testify, no
8 later than five business days before the deposition.
9     It doesn't actually list the matters here in
10 the, in your, your rule for a deposition. Oh, here's
11 another page. Here we go. Now there's a new page up
12 and I can't see. It's too small. So I don't know.
13 I can make it bigger.
14     Okay. Here it is. These are just the
15 terms. These are the boilerplate terms. Topics for
16 examination, here we go. Okay, definitions. Okay.
17 Your claim of ownership, covers registration of the
18 copyrights in this case. The factual and legal
19 basis --
20     MR. BEIK: Colette, take a moment and just
21 read through it so you can --
22     THE WITNESS: Oh, sure. Sorry. Yeah.
23     Yes, I'm prepared to answer. Yes.
24 BY MR. KHAZEN:
25     Q. Okay. Sorry, I didn't catch that. So at

Page 32

1 the end you said "yes"?
2     A. Yes, I'm prepared to answer.
3     Q. Okay. How do you determine who to file suit
4 against?
5     A. We file suit against whoever -- who the most
6 egregious infringers are. So say if you were to
7 steal maybe more than five movies over a period of
8 more than two or three years, you would be, it would
9 be a habitual offender, versus someone who may have
10 just put on and took one, or someone who is a student
11 and there were multiple IP addresses. Someone who's
12 in a house so there'd be no way it could be someone
13 else. And just, you know, there's a lot -- a lot of
14 factors, but mostly it's the habitual offenders and
15 the most egregious infringers.
16     Q. What you do mean in a house so there's no
17 way it would be no one else?
18     A. Well, if you're in an apartment or let's say
19 you have an IP address and you lived in an apartment
20 and there were a lot of other IP addresses, and say
21 they were -- or you had a lot of roommates or
22 something like that and people were sharing an IP
23 address, or, you know, and so things like that. If
24 it's a -- and especially if it's an IT professional,
25 those guys are usually using torrent and don't expect

Pages 29 to 32

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

P-Resp_Renew_MSJ108

Page 33

1  to pay for anything.
2      So and if they've just done it one time or
3  two times, but if it's someone who's done it over a
4  number of years, then you know there's someone who
5  habitually downloads things and thinks they shouldn't
6  have to pay for them, even though other people have
7  to pay to create them.
8      So and the IT professionals usually know how
9  to use BitTorrent, because to use BitTorrent you need
10  to install a torrent client. So you need to look for
11  someone who has some kind of like, you know, some
12  kind of -- an IT professional is usually someone
13  between the ages of 40 and 70, single, male, usually
14  Caucasian for some reason, and I don't know why but
15  it is, and it's usually an IP IT professional. And
16  those are usually the ones that fight back to the
17  very end.
18      And then like the Bellson case, we had one
19  that cost us a quarter million dollars fighting back
20  against, and we took their hard drives. They lied
21  about reinstalling it on the hard drives. And it was
22  just a huge, horrible pain when they could have just
23  said, oh, you know, they did it. And then it turns
24  out, you know, after all this they finally said,
25  okay, we did it, now we're sorry. So it was just --

Page 34

1  and it's always the IT professionals.
2      So I don't know if -- actually I don't know
3  much about your defendant, this defendant, if he's an
4  IT professional or if it's even a he, actually. I
5  didn't even discuss that, but I'm guessing because
6  usually the people that we choose are they're single
7  males that have gone over multiple years and multiple
8  movies.
9      And I do recall though that there were over
10  30,000 hits and additional evidence on this
11  defendant. And so that shows that he's an habitual
12  infringer on things he should be paying for online,
13  not stealing them by bit torrents. So that would be
14  one way, one reason that we would make that decision
15  to go after your defendant.
16      Q.  Now you said there were 30,000 hits. Where
17  did you get this information from?
18      A.  No, no, you have -- there's 30 some thousand
19  additional hits. So we've been -- we're about --
20  we're about to start putting up a lot more movies,
21  and so we've been putting up less with COVID and
22  everything like that, but now we're about to start
23  putting up a lot more, but we still have over I think
24  two or 3,000 movies that are on the sites combined.
25      So but again we only sue I think on -- we

Page 35

1  have 2,000 copyrights on XR, so -- so you -- he would
2  have to have really been over multiple years multiple
3  different movies, and then again he has so many other
4  movies from other sites that this is his way of, you
5  know, downloading whatever he wants to watch or
6  whatever he wants to use for anything.
7      And so that is -- that would be -- your
8  question again was is how do we decide, and so that's
9  basically it. Just, I mean, I'll guess that he has
10  downloaded multiple movies, over two, and over
11  multiple years, and he had -- and I know for a fact
12  that he has over 30,000 infringements on other, on
13  other people's works that should have been paid for.
14      So and he's probably in some kind of IT
15  profession that makes him smart enough to know that
16  he can download a BitTorrent client and do this all
17  for free, and the more he downloads, the faster it
18  will be. And that even though it's illegal, it's
19  completely illegal, that they haven't stopped it yet.
20  I think they will at some point hopefully, but
21  haven't yet.
22      So and there's no way -- the bit torrents
23  are so sneaky, so you do have to be able to
24  technically use them because they've actually changed
25  their tails from dot com to dot T-O-R dot whatever.

Page 36

1  I mean, every 27 minutes they actually change their
2  tail, and they change their address of where they are
3  so you have to follow that with the client.
4      And so -- and so the people who are using
5  them usually all install a VPN, but some people still
6  don't. You know, no two -- I mean, I don't know that
7  anyone, but a lot of people install a VPN even, which
8  is -- which is -- which is amazing when they're IT
9  professionals. And, you know, in over 9,000 cases
10  that we filed, we haven't had any, you know, any be
11  wrong or incorrect. So I don't know. I mean, am I
12  guessing right? Is any of the thing with your
13  defendant, because I've done this for so long.
14      MR. BEIK:  Colette -- Colette, he doesn't
15  answer questions. You just answer --
16      THE WITNESS:  Oh.
17      MR. BEIK:  -- what he asks.
18      THE WITNESS:  Okay. Got it. Okay. So what
19  was the question then? Back to whatever question
20  you're asking.
21  BY MR. KHAZEN:
22      Q.  I'm really going to need you to answer my
23  questions, my specific questions.
24      A.  Oh, Okay.
25      Q.  And also please -- please have your phone on

Pages 33 to 36

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

P-Resp_Renew_MSJ109

Page 37

1  mute.
2    A.  Oh.  Sorry about that.  I was trying to turn
3  it off.  I had this other thing that was very
4  important.
5    Q.  Please listen to my --
6    A.  Okay.  Go ahead.
7    Q.  -- specific question and wait for my
8  specific questions, okay?
9    A.  Okay.  Got it.
10   Q.  Thank you.  So you said that there were over
11 30,000 additional hits for other people's works.
12 Where did you receive that information?
13   A.  My -- my -- one of my IP attorneys said that
14 about this defendant when he looked at our -- at the
15 data from our, one of our consultants, the IP
16 address.
17   Q.  And did Malibu produce this data?
18   A.  We paid for the data, yes.
19   Q.  Did they produce -- did Malibu produce this
20 data to the defendant in this case?
21   A.  I don't recall.
22   Q.  What other data do you have, do you claim to
23 have regarding my client in this case?
24   A.  Well, I mean, I don't know exactly.  I don't
25 know the exact technical details of it, but I do know

Page 38

1  that I believe that there was something of around
2  over 30,000 additional infringements by your client.
3    Q.  Is there anything else that you can recall
4  in terms of the data having to do specifically with
5  my client in this case?
6    A.  Yeah, that it was over I think 2014 to 2019.
7  So it's not like he just up and, you know, it was
8  from the same IP address to probably the same
9  computer over five years, so it wasn't just by
10 chance.  So he's a habitual, you know, user of
11 BitTorrent and downloading without paying, which is a
12 big problem, so...
13   Q.  Anything else?
14   A.  I can't recall offhand.
15   Q.  So can you explain then how an infringement
16 is detected, an alleged infringement?
17   A.  Infringement detected, okay.  The way it's
18 detected is that we basically, we pull a list of all
19 the IP addresses that have been using the BitTorrent
20 clients to download our movies and other people's
21 movies.  And what we do is the -- I silenced that --
22 we then subpoena the internet service provider, and
23 then we're supplied -- and then the internet service
24 provider will actually send a letter to your client
25 and tell them to stop breaking the law.  And then

Page 39

1  they'll do that three times, and on the third time
2  then we will contact your client.
3    Q.  And how specifically does -- how
4  specifically does that work?  Does IPP connect to
5  people's IP addresses?  What is the --
6    A.  No, it connects -- it doesn't -- no one
7  connects directly.  It connects to the torrents
8  basically.  So torrents are the ones -- so when your
9  client downloads the torrent client, he's actually
10 opening up his computer to, to anyone who wants to
11 take stolen files off his computer or -- remember
12 Napster?  It's like Napster.  It's file sharing.
13   So and anyone who wants to take one of our
14 movies of your -- stolen from his computer, and
15 anyone who wants to steal one of our movies can take
16 it from his computer and he can take it from anyone
17 else's computer.  So it's kind of like opening up a
18 highway when you install the torrent client.
19   Q.  And it's your contention that your
20 consultants took content from my client's computer?
21   A.  No.  No one took -- no one took anything
22 from your client's computer.  Other people that are
23 stealing might have, but we don't have anything to do
24 with that.  So no one took anything from your
25 client's computer.  They -- it was -- it was from the

Page 40

1  torrent clients is where we got the information, and
2  your client's IP address was listed on the torrent
3  clients.
4    Q.  So when your -- when your consultants wrote
5  in a declaration that they connected to my client's
6  computer, that wasn't true?
7    MR. BEIK:  Objection, form.
8    THE WITNESS:  Do you want to change your
9  form or should I answer?
10 BY MR. KHAZEN:
11   Q.  You can answer.
12   MR. BEIK:  Go ahead.
13   THE WITNESS:  Okay.  So no, we never
14 connected to your client's computer.  So your client
15 connected to the torrents.  And so we got our
16 information from the BitTorrent and the BitTorrent
17 client.  And so that's -- your client connected to
18 them.
19   And so no one -- so when they download
20 something -- when someone downloads an illegal movie,
21 it might come from your client's computer and but
22 we're not logging onto your client's computer and
23 taking anything from there or getting any of our
24 information from your client, we're getting it from
25 the BitTorrent, and that's where your client's IP

Pages 37 to 40

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

P-Resp_Renew_MSJ110

Page 41

1　address is because he made it available there.
2　BY MR. KHAZEN:
3　　Q.　Do you -- when your -- do you know -- are
4　you aware that your client downloaded what he claimed
5　or what they claimed to be pieces of your movies?
6　　　MR. BEIK:  Objection, form.
7　　　THE WITNESS:  Yeah, I don't understand what
8　he's -- what are you saying?
9　BY MR. KHAZEN:
10　　Q.　Are you aware that your consultants said
11　that they downloaded pieces of your copyrighted
12　movies?
13　　A.　Our consultant said that they downloaded
14　pieces of our copyrighted movies?  How is that -- I
15　don't understand what you're saying.
16　　　MR. BEIK:  Colette, if you don't -- if you
17　don't understanding the question, just ask him, ask
18　him to clarify it for you.
19　　　THE WITNESS:  Can you clarify that question
20　please?
21　BY MR. KHAZEN:
22　　Q.　Are you -- so you said that they connect to
23　the BitTorrent network; is that correct?
24　　A.　Right.
25　　Q.　Your consultants?

Page 42

1　　A.　(Nods head.)
2　　Q.　And they downloaded pieces of your
3　copyrighted works from the BitTorrent network; is
4　that correct?
5　　A.　Correct.
6　　Q.　And do you know where those pieces of data
7　came from?
8　　A.　Do I know where they came from?  No, I don't
9　know where they all came from, but I do know the IP
10　addresses that many of them came from.  And the ones
11　that are attached to our movies, if there are
12　multiple movies with the same IP address that are
13　infringing on our movies, then we will zero in on
14　those IP addresses.
15　　Q.　And was one of the IP addresses, according
16　to your contentions, the IP address of my client's
17　network?
18　　A.　That's correct.
19　　Q.　So your consultants then downloaded a piece
20　of data from, that came from the IP address of my
21　client's computer --
22　　　MR. BEIK:  Object to form.
23　BY MR. KHAZEN:
24　　Q.　-- according to your contentions, correct?
25　　A.　No, I don't think you understand how the bit

Page 43

1　torrents work.
2　　Q.　How do they work?
3　　A.　Okay.  So what happens is when you have --
4　when you -- like if you know how Napster used to
5　work, I don't know if you ever used Napster before
6　everyone found out it was illegal, you have to
7　download a client, right.
8　　　Like if you're using citrus systems, or even
9　if you're using Zoom, right, like, to use Zoom you
10　need -- you just download a client.  So that's -- so
11　that is a client-server relationship instead of like
12　a peer to peer where we would just be like talking on
13　FaceTime where you don't need to download a client.
14　　　So or -- so basically you download a torrent
15　client and that, what that does is it opens up your
16　computer saying, hey, I'm here.  Here's my IP
17　address.  It's available for, for you to take
18　anything you want off my computer that's stolen, and
19　I will then take anything I want off your computer
20　that's stolen.
21　　　And so basically what it does is whoever
22　downloads more movies, they get a faster download
23　time.  And whoever -- and so basically for us, like
24　we can't compete with free.  So it's -- and if you're
25　doing this over multiple years, you know, you're

Page 44

1　downloading the new client every year, because, like
2　I said, they change to keep people out so it makes it
3　harder and harder.  But the guys who are up on it are
4　usually IT guys, and they, they just -- so it's
5　basically you just have to download the client and
6　then you choose the movies you're looking for,
7　instead of paying for them.  You use it as an illegal
8　sharing software basically.
9　　　Like the Fly, he gets a little thing, it
10　breaks him up into little pieces, like that's his
11　head, and then they -- then it sends across the thing
12　and the pieces are put back together, that's what
13　happens to the movies.
14　　Q.　And it's sent from one network to another,
15　correct?
16　　　MR. BEIK:  Objection, form.
17　　　THE WITNESS:  Yeah, I'm not sure -- I mean,
18　you can Google how does BitTorrent work and you can
19　see exactly, but it depends on what you're using it
20　for.  There's a lot of different ways to use
21　BitTorrent, so I'm not sure -- I mean, you're asking
22　the questions, yeah.
23　　　So it's basically, you know, I would suggest
24　Google how does BitTorrent work and then you'll see
25　the different ways and you'll see the way that your

Pages 41 to 44

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

P-Resp_Renew_MSJ111

Page 45

1  client was using it to illegally download files that
2  should be paid for.
3  BY MR. KHAZEN:
4     Q.  So just to be clear, though, IPP's forensic
5  servers never connected to my client's IP address?
6     A.  Never.
7     MR. BEIK:  Object to form.
8  BY MR. KHAZEN:
9     Q.  And my client never distributed any content
10 to IPP, correct?
11    MR. BEIK:  Objection, form.
12    THE WITNESS:  I don't know what your client
13 did.
14 BY MR. KHAZEN:
15    Q.  Well, your -- your -- as Malibu Media's
16 corporate witness you're saying that you don't know
17 whether my client distributed any of your copyrighted
18 works?
19    A.  Well, I'm sure they did, I just don't know
20 over how many years specifically what they did,
21 because I think it was over five years, so I don't
22 know specifically what they did distribute and what
23 they didn't and, yeah.
24    Q.  Right.  So just to be -- just to be clear,
25 your, it's your contention that my client distributed

Page 46

1  data to, to IPP using the BitTorrent protocol; is
2  that correct?
3     A.  No.  No.  He did not distribute data to IPP.
4  You still don't understand how it works.  He
5  basically -- IPP saw that his IP address was, was
6  stealing our movies, and we could see his IP address
7  stealing our movies multiple times.  We probably --
8  he probably stole them more times than we captured,
9  we just, I captured just five times, something like
10 that.
11    But they didn't -- they did not share it
12 with IPP.  That's not how he got caught.  He got
13 caught because he installed the client and his IP
14 address showed up.
15    Q.  Okay.  So just -- so my client did not
16 distribute IPP -- to IPP pieces of Malibu Media's
17 copyrighted movies?
18    MR. BEIK:  Objection, form.
19    THE WITNESS:  Can you clarify that, please?
20 BY MR. KHAZEN:
21    Q.  Well, I'm just following up on your last
22 answer that my client did not distribute to IPP
23 pieces of Malibu Media's copyrighted movies.  That's
24 correct, right?
25    A.  I don't know.  I don't know who your client

Page 47

1  distributed movies to, besides that he did.
2     Q.  Okay.  So as Malibu Media's corporate
3  witness, you don't know whether or not my client
4  distributed data to IPP's servers?
5     A.  He obviously did distribute data.  Well, he
6  did -- he didn't necessarily distribute it.  I think
7  you have the words wrong.  He -- he was making our
8  movies available to whoever wanted them, so IPP could
9  see this.
10    Q.  And IPP never downloaded any, any or any
11 data from my, from my client's network?
12    MR. BEIK:  Objection, form.
13 BY MR. KHAZEN:
14    Q.  Correct?
15    A.  You know, I don't -- I can't answer that.  I
16 don't believe so.  But I -- once this investigation
17 got going -- I don't believe so.  That's not how we
18 do things.  But unless there's an issue finding
19 where, you know, where it came from or anything --
20 here it is -- I don't -- I don't believe so, but
21 because that's not how it works.  So I don't know
22 who's telling you how this works or where you're
23 getting you're assumptions but --
24    Q.  No, I'm trying to understand.  I'm just
25 trying to understand.  So, okay.  So just to be

Page 48

1  clear, my client did not distribute to IPP servers
2  pieces of Malibu Media's copyrighted materials,
3  correct?
4     MR. BEIK:  Objection, form.
5     THE WITNESS:  As far as I know, but stranger
6  things have happened.
7  BY MR. KHAZEN:
8     Q.  Okay.  So it's to your knowledge, to your
9  knowledge my client did not distribute to IPP servers
10 pieces of Malibu Media's copyrighted materials,
11 correct?
12    MR. BEIK:  Objection, form.
13    THE WITNESS:  I can't answer that because I
14 don't know.
15 BY MR. KHAZEN:
16    Q.  Okay.  So you have no -- so as Malibu
17 Media's corporate representative, you have no
18 knowledge of my client distributing to the IPP
19 servers pieces of Malibu Media's copyrighted
20 materials, correct?
21    MR. BEIK:  Objection, form.
22    THE WITNESS:  Millions of people are --
23 millions are on the torrents every day, and they're
24 opening up that little bridge that let's everyone
25 share the movies and the copyrighted material and not

Pages 45 to 48

Page 49

1  have to pay for it.
2      And so it's, you know, so -- so it's most
3  likely they might have done that and went to go --
4  and if they're actually going to make another torrent
5  themselves, they'll be in bigger trouble than just
6  using one torrent.
7      So I don't know why they would want to, you
8  know, use this as a, oh, you didn't know what we
9  mean, now we're going to -- I'm mean, I just don't
10  understand what you're asking.
11      Q.  Okay.  So it's possible then that IPP did
12  download data from my client's computer?
13      A.  No.
14      Q.  And so it's -- so it's not possible that IPP
15  did, or, sorry, it's not possible that my client
16  distributed data to IPP servers?
17      A.  Data to IPP servers?  No.  IPP gathered
18  their own data.  Your client didn't do any
19  distributing to IPP servers.
20      Q.  Let me see.  Now, you mentioned something
21  about, you know, we were discussing a little earlier
22  about you said that you look for people that are in a
23  house, and that's because, because you said something
24  about apartment complexes can have multiple people
25  around, that sort of thing.  I just want to kind of

Page 50

1  go back to that.  So you understand that when you
2  identify an IP address, you're not identifying a
3  person, correct?
4      MR. BEIK:  Objection, form.
5      THE WITNESS:  Yes, but the thing is we are
6  identifying the actual, the actual address to that
7  location, that residence.  And so whoever is using it
8  is -- should be a resident or have privileges to use
9  that IP address at that place.
10  BY MR. KHAZEN:
11      Q.  Right.  And so it could be any number, any
12  number of people could have privileges to that IP
13  address, correct?
14      A.  This is true.
15      Q.  And it could be hundreds -- it could be a
16  hundred people?  There's no -- is there any limit to
17  the number of people that could be behind a
18  particular IP address?
19      MR. BEIK:  Objection, form.
20  BY MR. KHAZEN:
21      Q.  To your knowledge?
22      A.  No, there's not.
23      Q.  I'm sorry, I didn't quite --
24      A.  Could you repeat the question?
25      Q.  To your knowledge -- to your knowledge there

Page 51

1  could be any number of people that could have access
2  to any particular IP address that you identify,
3  correct?
4      A.  No, they wouldn't know because they're not
5  looking like we are.  They wouldn't know what IP
6  address they have access to.
7      Q.  Who wouldn't -- who wouldn't know what IP
8  address they have access to?
9      A.  The other people that you're talking about,
10  that any number of people could have access to the IP
11  address, that's not true because all the other number
12  people wouldn't know what IP address that they were,
13  that they're getting the movies from.  We're the ones
14  looking for it.  They're not looking.
15      Q.  There are -- there can be multiple computers
16  on a -- connected to -- connected to that are using
17  one IP address; is that correct?
18      A.  That is correct.
19      Q.  And there could be multiple people that are
20  using one IP address, correct?
21      A.  Correct.
22      Q.  So when you identify an IP address, you're
23  not identifying an end user, correct?
24      A.  Yeah, but that's why we have social media
25  and that's why we have investigators and that's why

Page 52

1  we have additional evidence so we can actually make
2  sure that we know the person that was infringing is
3  the person that owns that IP address.
4      Q.  Okay.  So without additional evidence,
5  there's no way of knowing whether an IP address --
6      A.  Well, most of the time when they get the
7  letter from their internet service provider, the
8  downloading stop almost immediately, so that kind of
9  tells you.
10      Q.  So there's no way to know -- there's no way
11  to know without additional evidence whether or not a
12  person, a particular person is using an IP address,
13  correct?
14      A.  No, that's not correct.
15      Q.  Please -- why not?
16      A.  Because you're -- just what you're saying is
17  not correct.  You're saying there's no way to know
18  without additional evidence, and that's not correct.
19  Additional evidence helps, but if you're the only
20  person in the house with access to the IP address and
21  access to the computer, and you have clients on the
22  computer, and again no one else comes in the house
23  and then who else did it?
24      Q.  Well, that's all additional evidence, isn't it?
25      A.  No.

Pages 49 to 52

New York
212-273-9911
Hudson Court Reporting & Video
1-800-310-1769
New Jersey
732-906-2078
P-Resp_Renew_MSJ113

Page 53

1  Q.  Why not?
2      MR. BEIK:  Objection, form.
3  BY MR. KHAZEN:
4      Q.  How do you know -- how do you know the
5  person is the only person in the house without
6  access -- with access to the network?
7      A.  We have investigators.
8      Q.  Let me just ask you this:  Do you have any
9  additional evidence, any -- let me strike that.  Do
10 you have any evidence that my, that my client is the
11 person who downloaded your movies, and what evidence
12 is that?
13     A.  I don't know if I'm able to give you that
14 information at this point.
15     Q.  Why not?
16     A.  Why not?  Because we're going to trial.
17     MR. BEIK:  Ramzi, can I have a minute to
18 talk to her?  I think she's confused on what you're
19 asking.
20     MR. KHAZEN:  Well, let me...
21     THE WITNESS:  You want me to answer more
22 question?  I mean, so it's -- these questions are
23 just not making sense.
24 BY MR. KHAZEN:
25     Q.  What evidence do you have that my client

Page 54

1  infringed your copyrights?
2      A.  His IP address, his location, his exact
3  geolocation over five years has downloaded our movies
4  from the same torrent and 32,000 other, other pieces
5  of content.
6      Q.  Do you have any other evidence that you
7  claim against, to be against -- to prove that my
8  client has downloaded your movies?
9      A.  I believe so, but I'm -- I want to talk to
10 my attorneys about that before disclosing that.
11     Q.  Is there a privilege issue?
12     A.  There may be.  I don't know.  I just think
13 it would be something that --
14     MR. BEIK:  You could --
15     MR. KHAZEN:  Okay.  Let's go off the record.
16     MR. BEIK:  Hang on one second.  There's -- I
17 think that she's concerned about the protective
18 order, and so that -- let me -- we've got it
19 stipulated.  Let me talk to her one second.
20     THE VIDEOGRAPHER:  Off the record at 10:45.
21     (Discussion off the record.)
22     THE VIDEOGRAPHER:  We are back on the record
23 at 10:50.
24 BY MR. KHAZEN:
25     Q.  Welcome back.  So just where we left off,

Page 55

1  what evidence does Malibu Media have as Malibu
2  Media's --
3      A.  He's an IT professional, he --
4      Q.  Please -- please let me answer -- let me
5  finish my question.
6      A.  Okay.
7      Q.  What evidence -- as Malibu Media's corporate
8  representative, what evidence does Malibu Media have
9  that my client infringed Malibu's copyrighted works?
10     A.  We've tracked the IP address back to his
11 address, his computer over multiple years, so his IP
12 address over multiple years of our movies.  There's
13 32,000 or so other infringements.  He is an IT
14 professional.  He fits the criteria of someone who
15 would be downloading our movies.  He's downloaded
16 other similar movies, and he's in a single family
17 residence.
18     I mean, just everything fits the criteria of
19 someone who would be downloading our movies.  And
20 that has passed, passed everything in the Bellwether
21 trial with Judge Bellson, if you read that.  And we
22 have all the evidence that we need pointing to your
23 client as infringing upon our content.
24     Q.  Now, I'll just use the term "his," you know,
25 just for convenience sake.  So you say you mentioned

Page 56

1  his computer.  Do you have evidence that his computer
2  was used to download it, to download any Malibu Media
3  copyrighted?
4      A.  We have evidence that it was, it was at
5  the -- very, very close to the router at his house.
6  And to download a very large file, it would probably
7  take you maybe six hours, even with the fastest ISP
8  that's possible.
9      So -- so that would be really not -- you
10 know, I just don't think that that's -- it's not his
11 computer but it is -- there's no way it could be
12 someone else sitting outside his house for hours and
13 hours trying to connect onto his password protected
14 IP address.
15     Q.  Could it be a member of the family?
16     A.  What?
17     Q.  Could it be a member of his family?
18     A.  I don't believe so from the research we've
19 done.
20     Q.  Why not?
21     A.  Because I don't believe there's anyone that
22 fits the profile.  If there is someone, and he wants
23 to tell us who else it was, then we will back off him
24 and go after the person that was the infringer.  But
25 if he doesn't want to tell us that, which I don't

Pages 53 to 56

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769
P-Resp_Renew_MSJ114

New Jersey
732-906-2078

Page 57

1  think we'd be here today if he wanted to tell us and
2  give us -- like, now I'm recalling that your client
3  actually hasn't given us any reason why he didn't do
4  it. He's just saying, Oh, well, your software
5  doesn't work, or something. Well, he said it five
6  times, and so over from 2004 to 2019.
7      So, I mean, we have to pay to make these
8  movies. We have to pay the models, pay for
9  locations, we have to pay for -- it's not free. I
10  mean, we're not doing this as a free service. And so
11  he's not even given us the -- another excuse as to
12  who it could be. He didn't say, I didn't do it, so,
13  you know, this, that or anything like that.
14      Q. That you believe that he downloaded from
15  2014 to 2019?
16      A. It would be -- it was -- yeah, it might have
17  been '15. Yeah, it could have been. Yeah, I
18  think -- I think -- I think we might have missed '14,
19  but for a hundred percent we have '16 -- no, I think
20  we do have a '14 from him as well, so...
21      MR. BEIK: Colette, would you like a copy of
22  the complaint to refresh your memory?
23      THE WITNESS: Sure, if you want to refer me.
24      MR. BEIK: Ramzi, do you have a copy of the
25  amended complaint that has all that listed there to

Page 58

1  refresh her memory, because the exhibits list exactly
2  the dates and the titles and all that. That would
3  probably help her rather than having her go off of
4  memory.
5      THE WITNESS: Yeah, because I'm just kind of
6  going off of memory. You know, just, I'm just trying
7  to be as honest as humanly possible. I'm just
8  letting -- you know, just saying this is why we
9  believe he is -- that he's --
10  BY MR. KHAZEN:
11      Q. Well, I mean, is the -- is the extent of the
12  infringements that you're aware, the alleged
13  infringements that you're aware of contained in the
14  complaint or are there additional alleged
15  infringements that you contend happened that are not
16  listed in the complaint?
17      A. I'd have -- I'd have to speak to my
18  attorneys about that as far as me just being the
19  corporate representative, I'd have to speak to the
20  attorneys about that. And then as far as the, you
21  know, as this moves forward, we'll depose your
22  client. I mean, he has not offered us another --
23      MR. BEIK: Okay. Let's just answer his
24  question.
25      THE WITNESS: Okay.

Page 59

1      MR. BEIK: He asked the question. Let's
2  answer it, okay?
3      THE WITNESS: I'm sorry. Repeat -- please
4  repeat the question.
5  BY MR. KHAZEN:
6      Q. Are you aware of any additional alleged
7  infringements other than those listed in the
8  complaint against --
9      A. I'm not aware at this time.
10      MR. BEIK: Objection, form. What -- I don't
11  understand what infringements you're asking about,
12  Ramzi.
13  BY MR. KHAZEN:
14      Q. Okay. Please just object to form and please
15  just answer the question. So are you aware of any
16  additional alleged infringements against my client
17  other than those listed in the complaint?
18      A. I'm not aware at this time, but that could
19  change. It could change any day.
20      Q. Why do you believe -- why do you believe it
21  could change any day?
22      A. Sometimes we bring up more -- I mean,
23  usually they stop when they're getting into a
24  lawsuit, but sometimes they don't, so...
25      Q. Okay. Are you -- can you -- can you

Page 60

1  elaborate? What do you mean it could change?
2      A. Oh, I'm just talking --
3      Q. Do you have any -- do you have any reason to
4  believe or any as -- let me strike that. As Malibu
5  Media's corporate representative, do you have any
6  reason to believe that there are additional
7  infringements other -- by my client alleged other
8  than those in the complaint?
9      A. At this -- at this point I do not.
10      Q. So just to be clear, so how do you know
11  that -- you said that it's your understanding that
12  the downloads that took place were from a computer
13  close to the router; is that correct?
14      A. Yes.
15      Q. And on what basis do you say that?
16      A. I believe we got that information from the
17  internet service provider, and -- huh?
18      Q. Go ahead.
19      A. I believe we got that information from the
20  internet service provider that the, that that router
21  is in very kind of a hub.
22      Q. What do you mean by that?
23      A. I mean, a lot of -- a lot of -- a lot of
24  stuff passes through. Like we wouldn't -- there
25  would be -- if we only had 25,000 hits, like however

Pages 57 to 60

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

P-Resp_Renew_MSJ115

Page 61

1  many -- your software that you're telling, so, yeah,
2  that's...
3       MR. BEIK: Colette?
4       THE WITNESS: Yeah.
5       MR. BEIK: Are you okay?
6       THE WITNESS: Yeah, yeah. Sorry. I was
7  just taking a second. So go ahead. I'm sorry.
8  BY MR. KHAZEN:
9       Q.  Are you -- are you on any medications today?
10      A.  No, not at all. I'm sorry. I didn't sleep
11  and I have another very -- case I was up working on
12  all night, and they just called and moved it to
13  federal court, and was I talking to answer a bunch of
14  things. So I'm sorry about that.
15      Q.  Are -- and please just understand I have to
16  ask these questions. I mean, are you -- are you
17  under the influence of any, of any --
18      A.  No.
19      Q.  -- substances that might affect your
20  testimony today?
21      A.  No, but I am actually not feeling good. I'm
22  feeling a little bit tired. I worked so hard all
23  weekend on something that changed about five minutes
24  before we started this deposition. So -- so, yeah, I
25  mean, it would actually be really good for me if we

Page 62

1  could do this a little bit later and I could attend
2  to what I need to attend to.
3       MR. BEIK: Colette.
4       THE WITNESS: But I'll finish if we need to.
5  If we have to do it, I'll finish.
6  BY MR. KHAZEN:
7       Q.  Well, I mean, I -- if at any point during
8  this deposition you are not under full capacity to
9  answer my questions fully and truthfully, can you
10  tell me?
11      A.  Yeah. No, I can answer your questions fully
12  and truthfully. I just have a lot on my mind.
13      Q.  Okay. So and if you need to take a break at
14  any time, please tell me, okay?
15      A.  Yeah.
16      Q.  Okay. So what specific information that you
17  said that -- you mentioned that it was part of a hub.
18  What specific information did you receive from the
19  ISP that leads you to believe that the infringement
20  took place close to a -- at a computer that was close
21  to the router?
22      A.  Okay. So what specific information we
23  received from the ISP that -- we received the
24  address. So we received the address from the ISP,
25  and, yeah.

Page 63

1       Q.  Is that it? Is that the only evidence that
2  you received from the ISP?
3       A.  The name and the address and also the -- we
4  have additional evidence as well.
5       Q.  What is the additional evidence?
6       A.  The additional infringed content.
7       Q.  Okay. So what additional infringed content
8  are you referring to?
9       Hello?
10      A.  Paul's frozen. It's -- it says "your
11  internet connection is unstable." You both look
12  like -- now I know why you're saying that, because
13  you both looked like you were stalled, like you're
14  like this, and your internet said your internet froze
15  and is unstable and now you're both back. So I don't
16  know what's going on, but I think that's what
17  happened before when you were trying to ask me
18  questions.
19      Q.  All right. Let me -- let me just start
20  over. What evidence do you have, other than the IP
21  address, that leads you to believe that my client
22  infringed your copyrighted work?
23      MR. BEIK: Object to form. Ramzi, I think
24  you've asked this same question.
25      THE WITNESS: No, that's why I'm falling

Page 64

1  asleep because it's like these are all the same
2  questions over and over and over. I don't understand
3  what you want me to say.
4  BY MR. KHAZEN:
5       Q.  You listed his address, you listed he's an
6  IT professional so he fits a profile, and you said
7  that his computer is close to the router. Are there
8  any other --
9       A.  Our software has identified his IP address
10  as downloading our, our copyrighted works for his,
11  for his viewing pleasure and downloading to his
12  computer without paying for them off of an illegal
13  BitTorrent client sharing protocol. What else do you
14  need?
15      Q.  Is there any other evidence that you have?
16  I'm trying to make sure that I have all of the
17  evidence that you claim that you have that my client
18  infringed your copyrighted works. So you mentioned
19  his IT address.
20      A.  As far as what I know, but the experts --
21      Q.  Please don't -- please don't interrupt --
22  please don't interrupt me. And please take this
23  seriously, okay. You -- you're under oath. All
24  right. Now, I need to know all of the evidence that
25  you have, right, that you claim to have that my

Page 65

1  client infringed your copyrighted works.
2       I have here, based on your previous answer,
3  you said, you listed that you have his IP address,
4  you said that his computer was close to the router,
5  and that you said he's -- that he fits the profile
6  because he's an IT professional.  Is there any other
7  evidence that you have that my client infringed your
8  copyrighted works other than the IP address of his
9  network, that a computer was close to the router, and
10  that he fits a profile that you claimed to have?
11       MR. BEIK:  Object to form.
12       THE WITNESS:  Well, fitting the profile and
13  the computer being close to the router really have
14  nothing to do with it, or being an IT professional.
15  What really makes him be the, the infringer is his IP
16  address that is password protected, and he is the
17  only person, as far as -- unless he wants to get --
18  say something else.
19       As far as when we've asked, so far you
20  haven't given any -- said there's another person who
21  downloaded it or given us any other explanation that
22  it was this person that was downloading the illegal
23  content.  And so we know that whoever was in that
24  single family home with that IP address, which is
25  your client, downloaded the, the content and

Page 66

1  infringed upon it illegally.
2       So I'm not sure how many more times I can
3  say the same thing or how many different ways, but
4  it's not -- it's not that -- it's not that his house
5  is close, that he's an IT professional, or that he
6  fits a profile, that has nothing to do with it.  What
7  has to do is that he actually -- we detected over
8  9,000 times, we've never gotten it wrong, that his IP
9  address downloaded our content.  And so that -- that
10  happened.
11       And so there's other -- there's other things
12  that we can get into on a more technological basis,
13  but all we need to know at this point is is that
14  happened.  And so we're going to have to get an
15  expert testimony that explains to the judge or jury
16  how it works, you know, in just piece by piece, not
17  technological because that would be like, you know,
18  if someone asked you how to build a block chain, you
19  probably wouldn't know how to do it, or now to write
20  coded python, you wouldn't understand it.  It would
21  be speaking a different language.
22       So for me to try to explain to you how we're
23  capturing his IP address, it would be speaking a
24  different language.  I'm not going to go explain the
25  entire code because you're not going to understand

Page 67

1  it.  It would take -- and it wouldn't be possible to
2  do in this amount of time.
3       So all I can tell you is that based on what
4  our experts have done, and the code that we have
5  developed, your client, and he probably understands
6  this because he's an IT professional, it has been
7  captured as downloading our copyrighted content and
8  illegally downloading that and 22,000 other
9  copyrighted content.  So it's -- so that is it.
10       It doesn't matter about the profile.  It
11  doesn't matter about the home.  It doesn't matter
12  unless -- unless he'd like to offer some kind --
13  somehow how did this content get downloaded to his IP
14  address.
15  BY MR. KHAZEN:
16       Q.  Okay.
17       A.  He's not --
18       Q.  I'm going to need you to please answer my
19  specific questions.  You've been giving me --
20       A.  That's what I said.  I said his IP address
21  doesn't capture --
22       Q.  This is why it's not proceeding very fast.
23  I'm really going to need you to answer my question
24  and my specific questions from now on, okay?
25       A.  Okay.

Page 68

1       Q.  Now, you said that has nothing to do with
2  his profile or, or the proximity to the router, that
3  it is based on his IP address being password
4  protected; is that correct, that you believe that he
5  is -- his -- that he is the infringer because the
6  data that was sent out was, came from an IP address
7  registered to him that was password protected; is
8  that correct?
9       A.  The data was sent out to him, not so much
10  that if it was password protected or not because if
11  there's someone else who was downloading it, even if
12  it -- if they knew his wifi address, they'd have to
13  be parked outside his house for hours and hours on
14  end, and that just is -- that just doesn't happen.
15       So and also since he's done it I think over
16  four or five years, it's -- it would be a little bit
17  strange to have someone at all different times of the
18  year parked outside of your house downloading content
19  just randomly from our little website.  So it's, you
20  know, it's definitely -- it's -- so it's -- it is the
21  IP address.
22       And the technology we used to capture it is
23  the reason that we, that we feel he's guilty.  And
24  not because it's password protected or anything like,
25  anything like that.  So it's not the -- so it's

Pages 65 to 68

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

P-Resp_Renew_MSJ117

Page 69

1   everything you said but just the password protection,
2   it's, you know, it's kind of a given at this point.
3       Q.   Are you familiar with long-range wifi
4   networks?
5       A.   With what?  Long bridge?
6       Q.   Long-range wifi networks.
7       A.   Long-range wifi networks.  I've heard of it.
8       Q.   And so are you, are you aware that a
9   long-range wifi network can reach further than, you
10  know, outside someone's house?  It can reach within
11  the proximity of several houses more, or more?  Are
12  you aware of this?
13      A.   I am aware of that, but it's over that much
14  time, how long he's taken between the infringements
15  and how long it takes to download one movie, are you
16  aware -- you're asking the questions, but it takes
17  probably, like I said, about six hours to download
18  one movie.
19          So even if you had a long-range wifi,
20  that's, I mean, that's not an excuse.  I mean,
21  it's -- that's not -- that's not an excuse.  I mean,
22  this is just -- it's embarrassing how, how these
23  people steal movies to try to make excuses and say,
24  oh, so what about the other 32,000 things they stole?
25  They're all in the long-range wifi?

Page 70

1       MR. BEIK:  Colette, please let's just answer
2   his questions.
3       THE WITNESS:  Okay.  Okay.  Okay.  So, yes,
4   I'm aware of what a long-range wifi.  That's your
5   question.
6   BY MR. KHAZEN:
7       Q.   Okay.  Now, do you have any reason to
8   believe that the, that my client was the, was the
9   infringer, or strike that.  Strike that.  Do you have
10  any reason to believe it was not another member of
11  the household that downloaded the movies, and if so,
12  what --
13      A.   Because your client hasn't come forward.  I
14  believe we've asked that question and your client
15  hasn't offered any alternative solution that it
16  wasn't an alternate member of the household or
17  anything.  And he's not given any -- said, oh, it
18  wasn't me, it was my father, it was my son or
19  anything like that.
20          He keeps just giving no -- he just says --
21  he keeps just saying, oh, your software doesn't work.
22  And so we know our software works, so that's why it
23  would be hard for me to believe that it's another
24  member of the household, he should say something.
25      Q.   Now, you say that you had 9,000 cases and

Page 71

1   you've never accused anyone that's been innocent.  Is
2   that -- is that your testimony under oath, that
3   nobody in the 9,000 cases that you've filed has been
4   innocent?
5       MR. BEIK:  Object to form.
6       THE WITNESS:  As far as I know -- as far as
7   I know I believe no, but, but back in 2013 or '14 we
8   had a different system, and I think it wasn't quite
9   as precise.  So recently though, I don't know that
10  anything has been wrong, it just might have been
11  someone else in the household, but it's quite
12  accurate though.  So I can't say 100 percent, but it
13  is quite accurate.
14  BY MR. KHAZEN:
15      Q.   So it's possible you've accused innocent
16  people?
17      MR. BEIK:  Object to form.
18      THE WITNESS:  I don't believe we've accused
19  innocent people.  I believe that we would have
20  inquired.
21  BY MR. KHAZEN:
22      Q.   You would have inquired?  What does that
23  mean?
24      A.   We have inquired if to the ISP if that
25  address is downloading our content and from where and

Page 72

1   without paying.  And so -- so basically, it's just so
2   if they said -- if they said, okay, no, we didn't do
3   it and it was someone else in the house and then we
4   would go from there.  So I don't believe we would get
5   as far as to accuse an innocent person or ever take
6   an innocent person to trial.  No, we've never done that.
7       Q.   Have you ever filed suit against an innocent
8   person?
9       A.   That I can't recall.
10      MR. BEIK:  Form.
11  BY MR. KHAZEN:
12      Q.   So it's possible that you filed suit against
13  innocent people?
14      A.   If we -- if we did, which I don't know, we
15  would have dismissed it.
16      Q.   And it's -- which means that it's possible
17  that you have filed suit against innocent people,
18  correct?
19      MR. BEIK:  Object to form.
20      THE WITNESS:  Yeah, I just -- I really don't
21  believe we have.  I mean, in all those people, was it
22  a million or something, yeah, I don't -- I don't -- I
23  don't think it's -- no, we have not accused an
24  innocent person or filed a suit against an innocent
25  person.  And if we have, if we have, it's been

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

P-Resp_Renew_MSJ118

Page 73

1 dismissed like very, very quickly.
2 BY MR. KHAZEN:
3     Q.   If you have.  So it is possible?
4     A.   I'm saying if we made a mistake, we would
5 have -- we would quickly dismiss it.
6     Q.   I need your testimony under oath that you're
7 saying that out of the 9,000 cases you've filed
8 you've never filed a case against an innocent person,
9 and I want to understand if that's a correct
10 understanding or not, and please give me a straight
11 answer.
12     MR. BEIK:  Object to form.
13     THE WITNESS:  You know, sir, I actually
14 don't know.  A lot of times we have lawyers who have
15 been handling this for us because we're running the
16 business, and you know, I'm shooting and I'm
17 traveling and so I've had lawyers protect the
18 copyrights, so I just -- I can't know every --
19     MR. BEIK:  Colette, I'd ask you to answer
20 the question that he asked, and so just answer the
21 question that he asked.
22     THE WITNESS:  So is it possible or not?  So
23 it is possible that -- it could be possible.
24 BY MR. KHAZEN:
25     Q.   Now, you understand that my client uses,

Page 74

1 that my client and everybody uses a router, right,
2 pretty much?  It's very common to use a wifi router,
3 correct?
4     A.   Yes.
5     Q.   And any -- and multiple people can connect
6 to the same router, correct?
7     A.   Yeah.
8     Q.   And if somebody else besides my client
9 connected to his router and used a BitTorrent
10 network, IPP would have detected that equally to my
11 client having done it, correct?
12     MR. BEIK:  Object to form.
13     THE WITNESS:  You said -- can you ask the
14 question again please?  It's -- I don't understand if
15 you're asking a question or you're just repeating
16 something.  Would you just...
17 BY MR. KHAZEN:
18     Q.   If someone connected -- if someone else had
19 connected to my client's wifi router and downloaded
20 your copyrighted works off of the BitTorrent network,
21 IPP would not be able to tell the difference,
22 correct?
23     MR. BEIK:  Object to form.
24     THE WITNESS:  No, they would.  I think
25 they -- I think -- I believe they would be able to

Page 75

1 tell the difference because they deal with the
2 hundreds and thousands of infringements a day, and
3 just to see -- just to see the look of the software
4 and the -- and, yeah.  No, I believe we would -- they
5 would know the difference.
6 BY MR. KHAZEN:
7     Q.   How?
8     A.   How?
9     MR. BEIK:  Object to form.
10 BY MR. KHAZEN:
11     Q.   How?  You said you believed they would know
12 the difference.  How?
13     MR. BEIK:  Object to form.
14     THE WITNESS:  Because it's been over five
15 years and it just, it doesn't make sense.
16 BY MR. KHAZEN:
17     Q.   Is that your only reason?
18     A.   The question -- the question is like how
19 would -- how would we -- how would I -- how would
20 they know if someone else connected to the wifi
21 router versus -- and it wasn't password protected and
22 then someone else captured -- connected to it over
23 five years and, you know, and walks over, you said
24 whatever, how many ever times it was and then a
25 couple of the other boys in the house or whatever

Page 76

1 they -- I mean, I don't understand.
2     Like I feel like you keep repeating
3 yourself, asking me the same question, like how do we
4 know this, how do we not know this.  And again I
5 would need to explain to you how the software works.
6 So can you just ask one more very concise question?
7 You're asking me how, how.  You keep saying "how."
8     Q.   I'm asking you to explain how, how you would
9 know that it's not someone else that's connected to
10 my client's router that allegedly downloaded Malibu's
11 works?
12     A.   Okay.  Because I can -- the question, that
13 is because --
14     MR. BEIK:  Object to form.
15     THE WITNESS:  -- your client -- your client
16 has not offered an alternative infringer except for
17 himself.  So what -- if he's not -- if I were going
18 to steal someone's software and then I didn't -- and
19 or I knew someone was using my wifi to download
20 software, and then I got caught for it, I would say,
21 wait a minute, there was someone at my house on this
22 day and they, they could have possibly stolen the,
23 stolen the software and -- or stolen copyrighted
24 materials.
25     And so this would have been -- so I would

Pages 73 to 76

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

P-Resp_Renew_MSJ119

Page 77

1  offer an alternate scenario and then, you know, I
2  mean, that's just a normal thing with the law. If
3  there's an alternate scenario, you need to offer it.
4  Your client has not offered and alternate scenario.
5      MR. BEIK: Okay. Okay. Let's just answer
6  the question asked please.
7      THE WITNESS: So he hasn't offered -- he
8  hasn't offered an alternate scenario. That's how I
9  know.
10  BY MR. KHAZEN:
11     Q.  Are there any other reasons beside the one
12  you just stated?
13     A.  The programming.
14     MR. BEIK: Object to form. We're so far
15  off. I thought this question started with IPP and
16  knowledge of a router.
17     MR. KHAZEN: Please don't interrupt. Please
18  don't interrupt my question. This is coaching.
19  BY MR. KHAZEN:
20     Q.  Are there any other reasons?
21     A.  They would be -- the other reasons would be
22  from our experts.
23     Q.  As Malibu Media's corporate representative,
24  are you aware of any other reasons, besides the one
25  you just stated?

Page 78

1      A.  I feel like I stated more than one, but I --
2  the other reasons would be in the, the very, the very
3  precise software code that identifies your client's
4  IP address that our expert witness will testify to.
5      Q.  Please explain that.
6      MR. BEIK: Object to form.
7      THE WITNESS: Do you understand python code?
8  BY MR. KHAZEN:
9      Q.  Somewhat.
10     A.  Okay. So if this, then that. And, you
11  know, and so basically if you want -- I mean, if you
12  want to Google how do I tell -- how does someone tell
13  if I've infringed on their copyrighted content, on
14  their protected content, and it will tell you.
15     Q.  Yes, I need you to explain. Please explain.
16     A.  I would have to give you a python document.
17  I can't explain to you how it works. It's not like
18  that. Like, can you explain to me how Facebook
19  works?
20     MR. BEIK: Objection.
21  BY MR. KHAZEN:
22     Q.  So what does the python document tell you
23  about, other than the IP address?
24     A.  It tells you how we, how we've come to the
25  conclusion that it is that IP address and only that

Page 79

1  IP address.
2      Q.  Okay. So other than the IP address, which
3  the code allegedly tells you, what other evidence --
4  is there any other evidence that you have that you
5  claim supports your contention that my client
6  infringed your work and not someone else that was on
7  his network?
8      MR. BEIK: Object to form.
9  BY MR. KHAZEN:
10     Q.  And please just give a straightforward
11  answer.
12     A.  I believe that there, on the supporting
13  evidence we had a lot of matches as far as to what
14  your client's interests were with other things that
15  were downloaded and supporting evidence as well. So
16  that would be, that would be another thing. That is
17  not a technical answer, but he would -- if like say,
18  I don't know what he specifically likes, there's so
19  many people, but say he likes skiing and he downloads
20  about skiing. So whatever we found out his interests
21  were or what he did for a living, there were
22  downloads that matched those, those things.
23     Q.  And how do you know that those are his
24  interests and not the other people that's on the
25  network?

Page 80

1      A.  We have an investigation software.
2      Q.  And what investigation software is that?
3      A.  TRO.
4      Q.  And have you produced this information?
5      A.  I don't know.
6      Q.  Do you intend to use this information at
7  trial?
8      MR. BEIK: Object to form.
9      THE WITNESS: I have to discuss with my
10  attorneys.
11  BY MR. KHAZEN:
12     Q.  Do you have any basis for withholding this
13  information that you're aware of?
14     A.  No. No. We're just very busy and so we're
15  very busy running our business, and we need people
16  not to steal the movies. So it's kind of -- it's
17  kind of a secondary thing for us, but we need to do
18  so in this order to stay in business.
19     Q.  Okay. So other then the IP address and this
20  supposed additional information about a consistent
21  interest, what other information, what other -- what
22  else, if anything, do you have that suggests to you
23  that my client downloaded your work, your work and
24  not someone else connected to the network?
25     A.  Not someone else connected to the network?

Pages 77 to 80

New York
212-273-9911
Hudson Court Reporting & Video
1-800-310-1769
P-Resp_Renew_MSJ120
New Jersey
732-906-2078

Page 81

1  Because your client hasn't given us anyone else.  No
2  one else has stepped forward and said they're, you
3  know, this is our network.  We've talked to ISP.
4  It's your client's network.  So your client has not
5  stepped forward and said who else has access to his
6  network.
7       Q.  And so why would you expect someone else to
8  come forward and claim that they're the person on the
9  network who downloaded your copyrighted works?
10      A.  Because if your client didn't do it, then
11  whoever he let into his house and let have access --
12  you know, actually in some countries if you let
13  someone else have access to your wifi, you're
14  responsible for what they do.  So and in some
15  different states and different judges will all rule
16  differently on this.
17      So your -- so this, this client is -- your
18  client, if he -- if he let someone else have access
19  to his wifi, and they went for five years and
20  downloaded like nine different titles at least, at
21  least, just the ones we saw, at different times
22  of the year, all different times, so it doesn't make
23  much sense that you would do that and still be, you
24  know, and not give us an alternative solution to why
25  that might have happened.

Page 82

1       Like if someone were to blame me for that, I
2  would say, wait a minute, no, I wasn't.  Someone else
3  was using my IP address at that time, and I would
4  name who it was, but it wasn't me who did it.  So
5  because your client had been so adamant about --
6       Q.  If a -- if a member of your family had done
7  that, you would -- and you were being accused by a
8  pornography company, you are saying that you would
9  turn in a member of your family as, as the, as the
10  person who downloaded it and give --
11      MR. BEIK:  Object to form.
12  BY MR. KHAZEN:
13      Q.  -- give their name to a, to a pornography
14  company?
15      MR. BEIK:  Object to form.
16      THE WITNESS:  You know, well, you know, if
17  another member of his family did it, then he could
18  just say another member of his family did it and
19  not -- he doesn't have to say who that was, but he
20  can let us know if another member of his family did
21  it.
22      And it's not like we're going to go -- the
23  whole thing about settling this is that we keep the
24  names private.  It's not like we're going to run out
25  and just say, oh, you're these -- this, this and that

Page 83

1  or they're downloading and it's erotica.  So it's --
2  I mean, it's nothing to be embarrassed about.
3       He also downloaded 32,000 other files that
4  were not meant to be downloaded for free.  So I
5  think, you know, it's -- it's just a shame how many
6  internet things are getting downloaded for free now.
7  BY MR. KHAZEN:
8       Q.  Okay.  So just to clear this up and finalize
9  it, the reasons that you gave me, let me circle back
10  and make sure it's clear.  Other than the IP address,
11  the interests of the downloader, and that no one else
12  has come forward, do you have any other evidence that
13  you claim supports your claim that my client
14  downloaded your copyrighted works and it wasn't done
15  by someone else connected to his network?
16      MR. BEIK:  Object to form.
17      THE WITNESS:  At this point I cannot think
18  of how to answer your question.
19  BY MR. KHAZEN:
20      Q.  You need to answer my question.  I will --
21  can I have the court reporter please repeat my
22  question?
23           (The last question was read back as
24           follows:  "So just to clear this up and
25           finalize it, the reasons that you gave

Page 84

1       me, let me circle back and make sure it's
2       clear.  Other than the IP address, the
3       interests of the downloader and that no
4       one else has come forward, do you have
5       any other evidence that you claim
6       supports your claim that my client
7       downloaded your copyrighted works and it
8       wasn't done by someone else connected to
9       his network?")
10      THE WITNESS:  Okay.  I do not personally,
11  and I would need to check with anyone else on my
12  team, yes.
13  BY MR. KHAZEN:
14      Q.  When you say personally, you're speaking --
15  you're still speaking though as Malibu Media's
16  corporate representative, correct?
17      A.  Right.  One of the -- one of the copyright
18  infringement team members.
19      Q.  Okay.  So as Malibu Media's corporate -- as
20  Malibu Media's corporate representative, you don't
21  have additional information, correct?
22      A.  Correct.
23      MR. KHAZEN:  All right.  Can we take a quick
24  break so I can -- can we go off the record for a
25  minute.

Pages 81 to 84

1    THE VIDEOGRAPHER: Off the record at 11:28.
2    (A recess was taken.)
3    THE VIDEOGRAPHER: We are going back on and
4  record at 11:38.
5  BY MR. KHAZEN:
6    Q. Back. You mentioned that there, that you
7  believe that there were over 30,000 additional other
8  of others' works downloaded. What are those 30,000
9  additional downloads?
10    A. I don't have all 30,000 in front of me, but
11  they were also I think additional erotic movies,
12  similar movies of ours and then other, other things
13  that would be of interest to your client.
14    Q. Like what? Can you be more specific?
15    A. I don't have the -- I had my team actually
16  put a spreadsheet together of everything, but I don't
17  have it in front of me, so, no I can't be more
18  specific at this time.
19    Q. Have you produced that spreadsheet?
20    A. We probably could do that. I would have to
21  check with my attorney.
22    Q. Did you give that spreadsheet to your
23  lawyer?
24    A. I had my team produce the spreadsheet, so
25  I'm not sure how, how it's categorized or if it just

1  has the works listed, but so I can check if I can
2  produce the spreadsheet because I -- I came up with a
3  number because of the additional hits, so I would
4  definitely produce that. I just don't know how
5  they're categorized.
6    Q. Did you give that spreadsheet over to Paul
7  Biek, your lawyer?
8    A. I believe we did, and I believe he actually
9  supplied that to you in the interrogatories.
10    Q. What other -- what other -- what do you
11  recall from that spreadsheet? What dates does it --
12  what dates does it cover?
13    A. I think the same dates that we -- that the
14  movies were from. I think 2014 to '19.
15    Q. And what -- what, if anything, do you recall
16  from that spreadsheet in terms of the types of works
17  that you claim were -- are on it?
18    A. I think there's additional erotic movies,
19  adult movies.
20    Q. Anything else?
21    A. I think some like educational or technical
22  books, something like that, all software things.
23    Q. Do you remember anything more specifically
24  than that?
25    A. I don't, I'm sorry. I have so much going on

1  and this -- I really haven't had time to prepare for
2  this very well. And I do know, though, that we did
3  look very carefully, and there was 32,000 additional
4  infringements and nine of our titles infringed over
5  from 2014 to '19.
6    I actually remember one of the titles
7  specifically. It was called Truth or Dare, because I
8  actually remember shooting it, and the models were
9  playing on a, one of things where you have the
10  colored dots on it, and I remember they were asking
11  each other funny questions and it was actually like
12  comedy.
13    So I -- I remember that actually because
14  I -- that was one of the, personally one of the first
15  movies that I did and I made a comedy. And I so I
16  remembered it very clearly because I was the guest
17  specifically, so -- so I do remember your client and
18  the infringements, but I don't remember the
19  additional what it was.
20    Q. And there was a total of nine of your works
21  as you recall?
22    A. That we -- that we found, yeah. That we
23  found.
24    Q. Now, you mentioned something about a
25  protected IP address. Do you have any, any evidence

1  that would suggest that my client's network is
2  password protected?
3    A. No, actually we don't. I usually assume
4  that they are because some judges actually require it
5  now. They say if you don't password protect your
6  network, you're automatically guilty. And so some
7  states we've had that conclusion from judges, so I
8  just -- after all these years I've barely seen anyone
9  who doesn't password protect their network.
10    So I don't -- I mean, your client could very
11  well not have a password protected network, but
12  because I have seen judges rule that if a network is
13  not, if the wifi is not password protected, and not
14  by a difficult password, then the person is, is
15  responsible for that.
16    So that has happened in a couple different
17  districts where the, where the judge says if you
18  don't protect your network, then your -- it's your
19  fault if someone accesses it. So I just thought
20  that, you know, like who would get a wifi and not
21  password protect it now? That would be kind of not
22  really smart, unless you wanted to use that as an
23  excuse for downloading and saying that someone else
24  accessed. That might be a reason someone would do
25  that.

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

P-Resp_Renew_MSJ122

Page 89

1  Q.  And do you understand that it is Malibu
2  Media's burden to prove infringement, correct?
3  A.  Yes.
4  Q.  And you understand that it is Malibu Media's
5  burden to prove that it was my client and not someone
6  else that downloaded, that allegedly downloaded
7  portions of your copyrighted works?
8  A.  Yes.
9  MR. BEIK:  Object to form.
10  THE WITNESS:  But I'd also think -- yes, I
11  do -- I do understand that, but I do think that your
12  client has to -- if he didn't do it, he needs to
13  give -- like say if you didn't do, someone is
14  accusing you of murder and you didn't do it but like
15  you have to give -- someone has to give some kind of
16  other alternative theory.  So if he didn't do it,
17  then who did?
18  BY MR. KHAZEN:
19  Q.  So it's your understanding that it's my
20  client's burden to, to point to the person that you
21  believe downloaded portions of your copyrighted
22  works?
23  MR. BEIK:  Object to form.
24  THE WITNESS:  Well, it takes hours to access
25  the wifi to access to download one movie.  Hours.  So

Page 90

1  if he -- if he thinks that -- if he doesn't know --
2  if someone has access to his wifi for hours, it would
3  be -- if the long-range wifi and he lives in a house
4  on, I don't know how many square feet, but it does,
5  even long-range wifi, it would be, you know, it
6  just -- and then -- and also he would get the notice
7  from the ISP telling him to stop doing that.
8  So it actually kind of makes sense where he
9  stopped, he would get a notice and then stop doing it
10  for a while and then, and then -- then he'll get --
11  then you could wait just long enough you don't get
12  the three notices in a row, they'll leave your
13  service on.
14  So it seems like he got notice the way this
15  played out, and to me is he got notice, he waited
16  just long enough, and then started downloading again,
17  and then would get another notice, but and then wait
18  just long enough that it wouldn't shut him down if he
19  got another notice, and then continue downloading
20  again.
21  So that -- because that makes it when these
22  guys are, you know, long running like over years
23  downloading, it's because a lot of people stop when
24  they get the notice from the ISP, like, oh, I'm doing
25  something illegal.  But then if you're in IT, you

Page 91

1  know that if you don't get three notices very
2  quickly, then they're not going to shut your service
3  off.  So he would have to know that.  And so that
4  would be good.
5  And then with all of these things and then
6  him not providing another solution, that's why it
7  really does lead to, it leads to your client, unless,
8  I mean, I would love if you could give us another,
9  another idea of who it might be.
10  MR. BEIK:  Okay.  Colette, let's let him ask
11  the question.  Let's just answer the questions that
12  he asks.
13  THE WITNESS:  Okay.  All right.  Got it.
14  MR. KHAZEN:  Please -- please don't
15  interrupt when she's in the middle of a sentence,
16  Counsel.
17  (Thereupon Defendant's Exhibit 2
18  was marked for identification.)
19  BY MR. KHAZEN:
20  Q.  I marked as Exhibit 2 a document, a document
21  and at the top says, Addresses of the infringers are
22  Verified.  Let's see.  Let me see.  This is strange.
23  This is odd.  It only has one -- here we go.  Yeah,
24  so I marked as Exhibit 2 a contract between Malibu
25  Media and IPP.  Do you see that?

Page 92

1  A.  Yes.
2  Q.  Do you recognize this document?
3  A.  Yes.
4  Q.  What is it?
5  A.  These were the terms between Malibu Media
6  and IPP.
7  Q.  And it says it, it was signed on August 8th,
8  2014.  Does that sound about right to you?
9  A.  That would be the original one, yes.
10  Q.  Have there been subsequent agreements?
11  A.  They're all the same, it's just the price
12  would vary sometimes.
23  Q.  So you're no longer going to be using IPP?
24  A.  Correct.
25  Q.  How much money have you paid IPP over the

Pages 89 to 92

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

P-Resp_Renew_MSJ123

Page 93

1 years, approximately?
2    A. I don't know. I mean, I really don't know.
3    Q. Have you been paying them --
4    A. The lawyers -- the lawyers have done it.
5 Like the lawyers have paid them and they've kept the
6 settlements. And many times we haven't made any
7 money. The lawyers who are supposed to be protecting
8 our copyrights, they just kept the money.
9    So, you know, this -- and also with all
10 paying IPP all the money and them, you know, all -- a
11 lot of bad stuff happening with them, and, you know,
12 we just -- we wanted to be able to protect our own
13 content and you, know, not -- and just, yeah. That's
14 it.



24    Q. So given that it would have been somewhere
25 over the course of all these years that would have been

Page 94



1 on the order of at least $5 million; is that fair to
2 say?

8 200 times five, that would be a million. And then it
9 was -- it was definitely less than $2 million.
10    Q. Okay. So it was over -- you paid IPP over a
11 million dollars. Is that fair to say?
12    A. Yeah. But the lawyers did. I didn't really
13 have much to do with that. The lawyers did the
14 contract and negotiated with them. And -- and then
15 we had a separate -- IPP was very separate as far as
16 their being experts and having the witnesses and
17 going by the world time clock.
18    And so, yeah, it was -- it was not me, they
19 go on with IPP and then it would be lawyer. The
20 lawyers were the ones who, you know, recommended the
21 experts and we checked the experts against the other
22 experts and, you know, made sure everything was
23 working properly. And now we've made an even
24 superior software, so...
25    Q. Are you still working with IPP currently?

Page 95

1 You're not still working with IPP currently?
2    A. No.
3    Q. When did you stop?
4    A. About a year ago.
5    Q. And you've been using your own software
6 since then?
7    A. No, we haven't been filing because of COVID.
8 We didn't want to put people out of hardship because
9 of COVID and things like that. But, you know, we had
10 some leftover files from IPP and some very, you know,
11 egregious infringers, like your client had over, you
12 know, five years nine videos and, yeah, it just a few
13 that were really, you know, not good, that the person
14 was obviously a repeat infringer, and so we need that
15 to stop for our business to be able to keep running.
16 So we did take a break this year because of COVID and
17 so now we're about to start filing again.
18    Q. And when's the last time you communicated
19 with IPP?
20    A. Months ago.
21    Q. About how many months ago?
22    A. Six months.
23    Q. And why did you stop communicating with IPP?
24    A. Because we're done using them.
25    Q. And are -- are -- do you owe IPP any money

Page 96

1 still?
2    A. No.
3    Q. You said you used Ecipio and who else?
4    A. No. No one else. No real companies. A
5 couple different indi programmers, people like that
6 or people from upwards.
7    Q. And who are they?
8    A. I don't know the names.
9    Q. What do they do for you? Let's start with
10 Ecipio. What does Ecipio do for you?
11    A. Same thing as IPP.
12    Q. Are you familiar with the name Patrick
13 Paige?
14    A. Yes.
15    Q. Who is he?
16    A. Expert witness.
17    Q. And are you still using Patrick Paige?
18    A. He's working for Strike Three, and so no.
19    Q. Has someone taken his place?
20    A. We do have someone taking his place.
21    Q. Who?
22    A. I'm not at liberty to say yet, but because
23 we haven't signed the contract yet, but we do have
24 someone very -- very -- very, very good programer and
25 very good expert.

Pages 93 to 96

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

P-Resp_Renew_MSJ124

Page 97

1  Q.  So are you refusing to answer my question?
2  A.  No, I don't -- I don't have the name of the
3  person yet.  It's going to be two people, so...
4  Q.  And you don't know their names?
5  A.  I don't know -- they're both in Ecuador.
6  Q.  Okay.  And do you -- and but you don't know
7  their names?
8  A.  No, I don't know their last name and which
9  one we're going to choose to be the expert.  So
10  they're both working on the software, and then we
11  need an outside expert.  So I just do not have the
12  names to give you at this point.  I don't want to
13  give you an incorrect name.  If you want to ask me in
14  a couple weeks, I can give you at that point.
15  Q.  Do they work for a company?
16  A.  They work for an IT company.
17  Q.  What's the name of the IT company?
18  A.  I don't have it in front of me.  It's -- I'm
19  telling you it's based out of Ecuador and Canada,
20  just like IPP was based out of Germany, so I don't
21  have it in front of me.  It's -- I'm sorry, I don't
22  know the relevance.
23  Q.  Are they based out of Canada or Ecuador?
24  A.  Both.
25  Q.  And you said you don't know the relevance.

Page 98

1  Does that -- does that mean you don't know the
2  answer?  I just want to be clear.  Do you not know
3  the answer?
4  A.  I don't know the answer.  I don't know the
5  answer.  If I knew I needed to get the answer, I
6  would have had that answer for that, but they -- we
7  will have them in the next week or so.
8  So but we took a break because of COVID and
9  now we're going with a new expert and with our own
10  development and our own software developer.  So we're
11  basically ready to go.  We just have to finish a few
12  things with the experts and decide who's doing what
13  and then I will have names.
14  Q.  Are you still working were Ecipio?
15  A.  No.
16  Q.  When did you stop working with Ecipio?
17  A.  We stopped when we were with Pillar because
18  they were -- Pillar turned out to be not such good
19  guys and so that didn't work out well.
20  Q.  Why?  What was that, the name, this other
21  name?  Pillar?  Sorry.
22  A.  Pillar Law.
23  Q.  And why did they not turn out to be good
24  guys?
25  A.  Because they were criminals.

Page 99

1  Q.  I'm sorry?
2  A.  They stole.  They kept all of the settlement
3  money.
4  Q.  And did -- was -- did you ever file suit
5  against them?
6  A.  We did, but they're not collectable.
7  They're in jail.
8  Q.  And how much have you paid Ecipio over the
9  years?
10  A.  Not a lot.  I think we used them for like a
11  year, year and a half, something like that.
12  Q.  Have you tried to contact IPP in regard to
13  this lawsuit to gather documents?
14  A.  Yes.
15  Q.  And can you describe that, your effort?
16  A.  They're very hard to reach because of COVID
17  and because of the time difference.  And unless
18  you're paying them, you know, they're just --
19  their -- their system works, their software works,
20  they're just not -- they're just very difficult to
21  reach.
22  And they only really answer WhatsApp and so
23  it's like -- or Skype.  And so it's just -- just
24  because of the time zone and they're just always, I
25  don't know, they're always traveling somewhere and,

Page 100

1  you know, one's in Germany, one's in England.
2  And we started with them 12 years ago, like
3  when this wasn't even a thing, and now everyone is
4  getting their movies stolen, so it's just so
5  different now.  So -- so yes, they're not easy to
6  reach now, and that's why we're making our own
7  software.
8  Q.  So you communicate with them through
9  WhatsApp and through Skype; is that correct?
10  A.  Basically.
11  Q.  And when is the last time you communicated
12  with them through WhatsApp or Skype?
13  A.  Maybe two months ago.
14  Q.  And have you produced those records, those
15  communications to your attorney?
16  A.  I don't -- I don't think so.  I don't think
17  there's anything to produce.
18  Q.  I'll call for all that production, all those
19  communications with IP -- IPP.
20  And do you recall what, what you
21  communicated about with IPP last over WhatsApp?
22  A.  We were asking basically for some cases.  We
23  were actually asking them for documents that we did
24  not have.  And actually one of our guys who was
25  communicating with the experts, I forgot about that,

Pages 97 to 100

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

P-Resp_Renew_MSJ125

Page 101

1  he had COVID, and he was not able to get some of the
2  documents.
3      And so another guy in India, who was
4  supposed to organize IPP's information, so this guy
5  getting COVID kind of slowed down getting the
6  information from IPP. And so, yeah, I did forget
7  about that. That guy, Dane, actually it was a bigger
8  deal because he was supposed to get that information
9  from IPP.
10     So we've been trying to get information from
11  them and they've not been very responsive, all
12  because of the COVID and everyone, whatever they're
13  doing. So if we're not working with them, they're,
14  you know, they're not very quick to respond to us,
15  although, you know, we've still paid them all their
16  payments, so they should, you know, they should pay
17  us, so...
18     Q.  Did they communicate to you that it was
19  because of COVID they weren't being responsive?
20     A.  I -- well, the guy who was supposed to --
21  was dealing with them on our side, he had COVID. So
22  they're just never really that responsive. And so
23  then to couple that with the, with our guy on our
24  team who had COVID, they were very hard to reach.
25     Q.  What guy that was on your team got COVID?

Page 102

1      A.  Dane.
2      Q.  I'm sorry?
3      A.  His name is Dane.
4      Q.  And who is Dane? What role does he play?
5      A.  Dane. He was helping manage the team
6  protecting us from the copyright infringements.
7      Q.  And he was a go-between between you and IPP?
8      A.  Yeah.
9      Q.  What is Dane's last name?
10     A.  DeFelice.
11     Q.  And do you still work with Dane?
12     A.  On a limited basis.
13     Q.  Do you communicate with Dane on a -- did you
14  communicate with Dane on a regular basis at any
15  point?
16     A.  A long time ago.
17     Q.  How long have you -- how long have you
18  worked with Dane?
19     A.  I think it's been over six or seven months
20  that he has done anything, you know, on a, on a
21  regular basis for us. He was going to help rebuild
22  the software. And the guy, he didn't vet the guy
23  properly, so long story, so I went ahead and used our
24  own guys that I vetted and did that.
25     Q.  How do you communicate with Dane?

Page 103

1      A.  Phone.
2      Q.  Do you communicate with Dane in any other
3  way besides over the telephone?
4      A.  Text.
5      Q.  And how often do you -- how often do you
6  communicate with Dane over text?
7      A.  I don't know. I haven't spoken to him in
8  two weeks, so...
9      Q.  Have you produced your communications with
10  Dane to your attorneys?
11     A.  I think if it was relevant, we would have,
12  if there was anything that was relevant.
13     Q.  Do you communicate with Dane regarding,
14  regarding your work with IPP?
15     A.  We did, yes, but that was when we had a big
16  problem getting all the information because of him.
17     Sorry, I really don't feel good.
18     Q.  And do you communicate with Dane regarding
19  your, your alleged efforts to protect your
20  copyrights?
21     A.  Yes, we have.
22     Q.  When is the last time you communicated with
23  Dane about your copyright protection efforts?
24     A.  I don't know. Maybe a few months ago.
25  More.

Page 104

1      Q.  Getting to that, what do you do to protect
2  your copyrights?
3      A.  What do we do? Send DMCA notices. We take
4  screenshots when we find them being infringed. We --
5  right when I put them up, I look to see how many
6  torrents have stolen them and then we run the, our
7  tracker to track all the IP addresses that are
8  stealing them. So, yeah.
9      Q.  And so tracker software, DMCA, screenshots.
10  And what was the fourth one? I'm sorry.
11     A.  I think that was it. We run our -- we run
12  our software to track all the IP addresses that are
13  stealing them and then I search on the computer for
14  how, you know, on Google Analytics how many have been
15  stolen and where.
16     Q.  What do you mean by take screenshots? What
17  do you take screenshots of?
18     A.  I take screenshots of all the websites, the
19  websites that are making fake websites too and, you
20  know, stealing it, and then also besides just
21  stealing for personal use, stealing them for business
22  use as well.
23     Q.  So you're saying you just Google sites and
24  if you see your material on a site --
25     A.  I just Google -- like say I have a new movie

Pages 101 to 104

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

P-Resp_Renew_MSJ126

Page 105

1  up, and I Google the name of the new movie and then
2  see where it comes up.
3      Q.  And do you do this all yourself or do other
4  people do this for you?
5      A.  No.  We have a team.
6          Paul, do you think we can finish later?  I
7  really don't feel good.  Is it a possibility?
8      MR. BEIK:  It is about lunchtime.  Ramzi,
9  could we take a break for lunch maybe?  It's noon her
10  time.
11     MR. KHAZEN:  Sure.
12     THE WITNESS:  Yeah.  I'm feeling a little
13  bit nauseous.  I need --
14     THE VIDEOGRAPHER:  Do you want to go off the
15  record?
16     MR. BEIK:  Yeah, let's go off the record.
17     THE VIDEOGRAPHER:  Off the record at 12:04.
18         (A lunch recess was taken.)
19     THE VIDEOGRAPHER:  We are going back on the
20  record at 1:22 Pacific time.
21  BY MR. KHAZEN:
22     Q.  Thanks.  Welcome back.  So just to ask
23  first, is there anything, is there any reason why you
24  might not be able to answer my questions fully and
25  truthfully today?

Page 106

1      A.  No.
2      Q.  Now, you say that you do DMCA takedowns; is
3  that correct?
4      A.  That's correct.
5      Q.  What's your process for doing DMCA
6  takedowns?
7      A.  I'm not sure.  Well, I guess sometime over
8  which your client infringed was used either a
9  person who was a contractor from Canada, and he has a
10  DMCA service company, and then we also used some of
11  the online services, and then we use our programmers
12  as well.
13     Q.  During what period did you use the DMCA
14  service company?
15     A.  I can't be exact, but I think he was with us
16  all the way until 2017 from 2011.
17     Q.  What -- when in 2017 did you stop
18  contracting with the DMCA service company?
19     A.  I don't have that exact information in front
20  of me, but he's always available for us when we need
21  him, so we still do use him at random occasions.
22     Q.  When did you stop using him regularly?
23     A.  I said in 2017.
24     Q.  And you don't have more specific time than
25  that?  Was it mid 2017?  Early 2017?

Page 107

1      A.  I would probably say mid, but again, I'm
2  not -- I can't be -- I'm not -- I wouldn't put my
3  life on it, but I would say mid probably.
4      Q.  And how many times have you used him since?
5      A.  Huh?
6      Q.  How many times have you used him since?
7      A.  How many times have we used him since?
8      Q.  How many times --
9      A.  A handful.  A handful of times when we've
10  had like a really, really big breach.  A handful of
11  times, because he has to send out thousands and
12  thousands of notices at a time.  So instead of having
13  the computer automate it, he would take on that,
14  handle all those tasks with the computer software
15  systems.
16     Q.  What do you mean by handful?  Like, how many
17  would you say is a handful?
18     A.  Five, six, seven, eight, something like
19  that.
20     Q.  What's the name of the DMCA service company
21  that you used?
22     A.  I don't remember what his company was named,
23  but his name is Chris Lahey.  I don't remember what
24  they call it, what his name of his company's name is
25  called.  His name was Chris Lahey, so it was Lahey at

Page 108

1  DMCA services, something like that.
2      Q.  And why did you stop using him regularly in
3  mid --
4      A.  Because we realized that there was some new
5  softwares out there.  You know, we've been doing this
6  again since 2007, so that's a long time.  And
7  14 years, software and, you know, what you can do on
8  the internet with software has really changed, so
9  that's why we've, you know, we've automated a lot
10  more things.
11         So we just, you know, him doing a lot of
12  things manually just didn't make as much sense, so
13  that was part of the reason.  And I think he was also
14  doing some other things as well.  So he'd done very
15  well by us and it was probably taking a little bit of
16  a break, but again always welcome back, good
17  relationship.  It's just that there are more
18  softwares to use now versus manual solutions.
19     Q.  And what -- what services, if any, have you
20  used since 2017 for DMCA takedowns?
21     A.  I would need to check with the programmers
22  for the exact, exact ones, but let me Google that
23  actually right now to see which one we've been using.
24  But, you know, I'm just going to say I don't know
25  exactly.  I would need to check with the programmers

Pages 105 to 108

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

P-Resp_Renew_MSJ127

Page 109

1  because I don't want to misspeak.
2  Q.  What programmers are those that you would
3  speak to?
4  A.  We have programmers in, like I said, in
5  Ecuador and in Ukraine. We have two teams.
6  Q.  And do you know the name of the people on
7  those teams?
8  A.  Stanislav is our main programer on the
9  Ukraine team. His English isn't that great. And
10  then Alfredo is our main programmer on the Ecuador
11  team.
12  Q.  Did you talk with Stanislav or Alfredo in
13  preparation for this deposition?
14  A.  No.
15  Q.  And did you talk with anyone in preparation
16  for this deposition to determine what online services
17  or other services you've used for DMCA since 2017?
18  A.  No, I didn't. I didn't realized you'd be
19  asking me that since -- what DMCA service I've been
20  using since 2017. But if you'd like to ask that -- I
21  mean, that's quite a broad question for a company
22  like ours, because we are the, I think the most
23  widely stolen from company in -- and we do everything
24  we can to stop that, and including, you know, this
25  with the torrents, which is actually a small percent

Page 110

1  but still a big problem for us.
2  So -- so, yeah. So it might -- the question
3  was did I speak to Stani or Alfredo before the
4  deposition? No, I did not. Their -- their -- their
5  time is expensive and I mostly communicate with them
6  on Skype or G Chat anyway.
7  Q.  Please just answer the question that you're
8  asked. What -- what did you do to prepare for this
9  deposition to learn what services you used for DMCA
10  protection since 2017?
11  A.  I wasn't aware I was supposed to do
12  something to prepare to learn about services we used.
13  We mostly used, have been using attorneys and have
14  been doing it manually by finding out the IP
15  addresses that are infringing on our movies via
16  BitTorrent, because that is the, you know, by far the
17  biggest group.
18  When we just send DMCA notices, they mostly
19  get, just mostly get removed. So I did not do
20  anything to prepare for to find out what services
21  we've used since 2017. I used it myself. I just
22  don't know the exact name. Like DMCAtakedown.org or
23  I'm not sure. So I have to check that. I didn't
24  know that would be a question. If you want to give
25  me a list of questions before, I'd be happy to look

Page 111

1  at that for you.
2  Q.  Are you aware of any DMCA services that
3  you're using currently --
4  A.  I'm not aware of the exact name.
5  Q.  -- rights?
6  A.  I'm not aware of the exact names. We're
7  currently getting ready to file a large batch of
8  cases of infringing IP addresses. We find that is
9  the best way to go after the source of the people
10  really stealing from us. Just, like I said, the DMCA
11  service companies, they mostly throw them away.
12  Q.  I'd really like you to please focus on what
13  my specific question is. I'm asking about DMCA
14  notices. Okay. What services are you using
15  currently, if any?
16  A.  I told you I do not have a list of those
17  services. There are many. We switch on a daily
18  basis. It's a -- I mean, there's so many of them.
19  You Google it, you'll see, so I don't know the
20  answer.
21  (Simultaneous conversation
22  interrupted by the reporter.)
23  THE WITNESS: Okay. Got it.
24  BY MR. KHAZEN:
25  Q.  To your knowledge today, as Malibu's

Page 112

1  corporate representative, are you aware of the names
2  of any companies that you use for DMCA notices
3  currently?
4  A.  No, I'm personally not aware of which
5  companies we're using for DMCA notices.
6  Q.  Do you know approximately how many
7  companies, if any, you're using for DMCA notices?
8  A.  Probably three.
9  Q.  Are you aware of any consultants that you're
10  using outside of those companies for DMCA notices?
11  A.  I'm not sure if Dane does that for us
12  sometimes as an outside consultant.
13  Q.  How much do you pay these services for DMCA,
14  for DMCA notices?
15  A.  It varies based on the amount of letters
16  they send out on your behalf.
17  Q.  How many letters has Malibu sent out for
18  DMCA notices in the last three years?
19  A.  Hundreds of thousands.
20  Q.  And how do you know that?
21  A.  How do I know that? Because -- I'm sorry
22  I'm repeating the question. Because I supervise
23  people sending out the letters and the different
24  softwares sending out the letters. It's just when I
25  know something is -- when I see a movie or content

Pages 109 to 112

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

P-Resp_Renew_MSJ128

Page 113

1  being infringed on extremely radically, we will send
2  out hundreds of thousands of DMCA notices through
3  services and contractors. And many times Google will
4  listen and take down the links.
5      Q. Do you have any records of how many DMCA
6  notices you've put out in the last three years?
7      A. Again it would be a very large project to
8  compile that, and it wouldn't be something that I
9  would have in my hands now, but I can tell you it's
10  been hundreds of thousands.
11      Q. Do you use any -- strike that. How do you
12  communicate with the companies that do DMCA notices
13  for you?
14      A. WhatsApp, Skype, mostly those kind of web
15  apps because they're usually overseas.
16      Q. Have you produced those records to your
17  attorney?
18      A. I wasn't requested for those records.
19      Q. Have you -- do you have any raw information
20  from any of these companies that you say you use for
21  DMCA notices?
22      A. Any what?
23      Q. Any raw information, any just raw
24  information from them about the DMCA notices?
25      A. What information? What kind of information?

Page 114

1      Q. Do you have contracts with them? Do you
2  have information about --
3      A. There's no contracts. You basically -- you
4  go on and you pick a -- you go on and you basically
5  pick something that -- I don't know if you want me to
6  answer the question by explaining how it works
7  because you're not asking a question that can be
8  answered.
9      Q. Explain how you do it. Explain how you do
10  it.
11      A. Okay. So you go on, and so say you want to
12  send DMCA notices based on a certain movie, right,
13  and that -- so you put in the name of the movie and
14  name of the content or any names of -- the problem
15  with the torrents is they can change the names of the
16  movies and just put whatever they want and they call
17  it whatever they want, and so -- and they do that a
18  lot of times to trick you.
19      But say so on the DMCA services all you can
20  do is put, you know, if you want to put XR and then
21  dash and then movie name and then they'll search
22  where they found it. And then you'll let them know
23  how many letters you want them to send on your behalf
24  and they'll give you a quote on that, and then
25  they'll just bill you as they send them. They like

Page 115

1  automatically like kind of like Google apps.
2      Q. Do you have any records of that?
3      A. Excuse me?
4      Q. Do you have any records of having done this?
5      A. I'm sure, but it would just be -- it's
6  one -- they're a bunch of small records and a lot of
7  other bills and so, like I said, it's not -- it's not
8  been very successful because it's very impersonal and
9  just randomly sending out letters. You know, most
10  people just throw them away.
11      So the people that are really stealing the
12  content are going on the torrents to steal the
13  content or they're going on the tubes, which we're,
14  you know, we'll be handling -- we'll be handling that
15  as well.
16      Q. I'm going to really need you to focus on my
17  question. All right. I'll just repeat the question.
18  Do you have any records of having done this?
19      A. I don't believe I have them. Our accountant
20  might have some records, but it usually would just be
21  a bill and how much is paid.
22      Q. Do you have any records of the requests that
23  you made for takedowns?
24      A. I may have taken a few screenshots. I don't
25  know. I don't keep records of requests. There's so

Page 116

1  much that goes on. So, no, I don't -- I'm not sure.
2  I don't know.
3      Q. And you've -- and you've requested takedowns
4  in the last three years, according to my
5  understanding; is that correct?
6      A. Yes. You can even see it on your web
7  browser. A lot of times it will say Google has had
8  this removed based on a DMCA request, so if you want
9  to search for something illegal.
10      Q. And you're saying you've disposed of those
11  records?
12      A. No, I haven't disposed of them, it's just
13  they change every day so it doesn't really do you any
14  good to keep them. It's just whatever Google says at
15  the moment. So I could take a screenshot of every
16  time they take one down, but it could be back up, and
17  then, you know, and then take it down again and so
18  it's --
19      Q. Sorry. Go ahead. Sorry.
20      A. It's just not something that you would keep
21  a record of because there's -- you would just be like
22  printing out new screenshots every single day, and I
23  don't think you understand the volume that we're
24  dealing with. Like, oh, we have three records
25  because we have three movies.

Pages 113 to 116

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

P-Resp_Renew_MSJ129

Page 117

```
 1        You know, there's thousands of movies, all
 2   in eight different formats on the older ones, and so
 3   and hundreds of thousands of photos that are also
 4   copyrighted works that have been stolen, and, you
 5   know, they've been printed in Vogue and things like
 6   that and so it's -- it's not just like -- it seems to
 7   me that you're thinking like, oh, you have a record
 8   of the few DMCA notices we sent.  No, this is
 9   actually a huge, huge project with thousands and
10   thousands of videos and photos and copyrighted
11   content that not all of it is available even for
12   subscription.
13        So it's just too big to handle by taking a
14   screenshot every time you send out a DMCA run, but
15   and again they're not very successful after we find
16   out, so...
17   Q.  I'm asking a broader question.  Do you have
18   records of your attempt to take down of --
19   A.  Yes.
20   Q.  Do you have records of your transactions to
21   show that you have tried to do DMCA takedowns?  So,
22   for example, is there a confirmation email that you
23   had signed up with a service, anything?  Are there
24   any records?  I'm asking a broader question than just
25   the raw data of your DMCA.
```

Page 118

```
 1   A.  I'm sure.  I'm sure but I cannot -- I can't
 2   promise you that I can find it because I didn't
 3   know -- I didn't look -- I haven't looked for it yet.
 4   This is the first time I've received this question.
 5   Q.  So to your knowledge -- so you don't know
 6   one way or the other whether you have any record of
 7   having attempted DMCA takedowns in the last three
 8   years?
 9   A.  Within the last three years is when we've
10   really brought it in house and so we brought
11   everything in-house.  Like I said, we've brought the
12   IPP software, everything has come in house.  So
13   within the last three years, that's what I'd say it
14   would be hard for me to promise you records from
15   outside services which were used on a much lesser
16   basis and much larger basis as far as development,
17   cost developing our own system to operate DMCA.
18   Q.  But you have no records that aren't in house
19   of you having attempted DMCA takedowns; is that
20   correct?
21   A.  That's not what I'm saying.  I'm just saying
22   that I can't promise you a whole bunch of records
23   that aren't in house in the last three years, but I'm
24   not saying there are no records.
25   Q.  Do you have any records that are not in
```

Page 119

```
 1   house over the last three years of you attempting to
 2   do DMCA takedown?
 3   A.  I don't know a hundred percent.  I can't
 4   promise you.  I will look -- do my best to look for
 5   what you're asking for.
 6   Q.  Do you have any in-house records of your
 7   attempts to take -- to do DMCA takedowns?
 8   A.  Yes, I'm sure we can, we can provide that.
 9   Q.  And when you say in-house, this is referring
10   to the two teams of programmers that you have in
11   Canada and Ecuador?
12   A.  Yes, and other, other programmers as well.
13   Q.  What other programmers?
14   A.  Just anyone else who's on the team that is,
15   is good enough to help with the, with the equations
16   and where the notices need to be sent and that can
17   actually, you know, make a script to do it quicker
18   than someone who would just be writing DMCA letters.
19   Like, we're way too big to do that, so we don't use
20   services and do things like that.  Like one, you
21   know, it's not like one piece of art or something.
22   Q.  Who are those other people on the team?
23   A.  Who are the people on the team?  Just anyone
24   who has the time.
25   Q.  Who are on the team that may have records of
```

Page 120

```
 1   alleged attempts at DMCA takedowns?
 2   A.  They would be just -- there would be anyone
 3   who has time.  So let me see.  Alfredo has two people
 4   who work under him, and so I don't even know who they
 5   are, but they do it.  And Stanislav has five people
 6   on his team.
 7        And so those are -- so we have I think ten
 8   in-house programmers.  And then we have -- there's
 9   another guy we were working with.  So, yes, I could
10   provide more records in-house, but these are
11   programmers that come and go, if they come back for
12   projects and then they go and they come back, so
13   they're not on payroll, they're contractors.
14   Q.  And all of these people are contractors,
15   correct, when you say --
16   A.  Yes.
17   Q.  None of the people that are working in-house
18   with you are employees; is that right?
19   A.  No.  I mean, if you're in another country,
20   you really can't be an employee.
21   Q.  All right.  So you mentioned three, three
22   types of methods that you allegedly used for your
23   copyrights.  I have started software, screenshots
24   that you do yourself in searching, and DMCA
25   takedowns.  Am I missing anything?
```

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

P-Resp_Renew_MSJ130

Page 121

1    A.  I'm sorry, rephrase the question, because a
2  screenshot is not a method of anything.  What was
3  your question?
4    Q.  You said you took screenshot, you would
5  search for sites and take screenshots.  Search for
6  sites that are carrying your content?
7    A.  What's the question -- what's the question
8  that you're answering for yourself?
9    Q.  I am trying to make sure -- understand that
10  these are the three methods that you said that you
11  used for, for protecting your copyrights.
12    A.  Protecting my copyrights.  Okay, the three
13  methods you said, okay, that's -- you didn't have it
14  right.  A screenshot does not protect your copyright.
15  That has nothing to do with protecting your
16  copyright.
17    Q.  I'm using your --
18    A.  No, you asked me if I had records of
19  protecting the copyright with outside services, and I
20  said the only way would be a screenshot.
21    Q.  Then I'll ask the question again.  What
22  methods do you use to protect -- to, to monitor your
23  copyrights?
24    A.  We use -- we use in-house, which is our, our
25  teams of programmers to go and when there's been a

Page 122

1  big -- when the videos are getting stolen or the site
2  is getting ripped off.  And we use the -- mainly we
3  are -- we're using the BitTorrent to find out the IP
4  addresses that are, that are stealing our movies by
5  BitTorrent.  Because between BitTorrent and the tubes
6  is the majority of our infringements.
7    And then we also -- we have used, until
8  2017, a full-time employee who had, who had scripts
9  where he would send DMCA takedown notices.  And that
10  would really only work with Google.  And so the only
11  way I could verify that would be, you know, I could
12  verify his employment, but as far as verifying what
13  he took down, I could get lists of that and
14  screenshots.  But so mainly it's what we're doing --
15  if there's any other way, believe me, we would do it.
16  We tried and there aren't any other way.
17    So number one is the -- what we're doing
18  with Paul, how he's helping us with -- I'm providing
19  him with the technology and the people who are
20  infringing, and then he is legally pursuing the,
21  pursuing, protecting our copyrights.
22    Number two, we have in-house people looking
23  for anything that we can do that is software or
24  technology or we can invent something, working on all
25  things like that.

Page 123

1    Number three, any outside service, which is
2  very expensive and not very effective, but we've
3  tried to utilize whichever ones that we can to see
4  how they work.
5    So that is what we do, as far as our
6  digital mining copyright privileges and that's it,
7  those three things, and the screenshot is not one of
8  them.
9    Q.  Are you working with law enforcement?
10    A.  With law enforcement?  No, because we are
11  not -- this is not something that can be -- that law
12  enforcement would get involved with, unless it was
13  something that was, you know, violating the rights,
14  like child pornography or something like.
15    I don't think that law enforcement would
16  have -- we don't have any recourse with law
17  enforcement, because even if we gave them the, you
18  know, we'd have to prove they stole a movie, and yes
19  we caught them in the act maybe, but, you know, the
20  amount that law enforcement would pay for -- anyways,
21  to answer the question, no, we're not working with
22  law enforcement.
23    Q.  Have you worked with law enforcement since
24  2019 on -- in order to monitor your copyrights?
25    A.  Since 2019?  I would have to check with the

Page 124

1  lawyers that are making the campaigns to see if
2  anyone did work with law enforcement in their area.
3    Q.  You're not aware -- you're not aware of
4  Malibu ever having worked with law enforcement on
5  this, on, on monitoring --
6    A.  Well, did come from law enforcement so he
7  was one of -- with the FBI.  He was actually the
8  number one guy to take down all of the child
9  pornographers online, and he went through more
10  computers and hard drives.  And he's been an
11  excellent expert witness for us when we have to go to
12  court.  So -- so he did come directly from law
13  enforcement because he's not technically law
14  enforcement anymore, he's retired.
15    So but -- so but that's the kind of things.
16  This is federal, so they're federal cases and each
17  case is not a very big deal, unless you have them all
18  grouped together.  So it's -- yes, we've talked about
19  that, but at this point we are not technically
20  working with law enforcement.
21    Q.  Okay.  Okay.  So let me just ask this then.
22  I really need you just to answer my specific
23  question.  I mean, has Malibu Media ever worked with
24  active law enforcement to, to enforce its copyrights?
25    A.  I don't believe so, but I can make my answer

Pages 121 to 124

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

P-Resp_Renew_MSJ131

## Page 125

1  no if you -- because I just don't believe so. So, I
2  mean, I have been threatened by people for enforcing
3  copyrights that people have threatened to throw acid
4  on me and things like that. And so we -- I have had
5  to have bodyguards for certain amounts of time, but
6  that wasn't to directly protect the copyrights.
7      Q.   That's not my question as to whether you
8  hired bodyguards. I'm really needing you to listen
9  to my specific question.
10     A.   Well --
11     Q.   You worked -- as you work -- I'm sorry?
12     A.   I had to make a police report based on the
13  copyright protection. Everyone wanted movies to be
14  free, and that made some people very mad when we
15  were -- when we did the Bellwether trial, and so I
16  got death threats and we had to make a police report,
17  and at that point they, they did assign a bodyguard
18  to me until they had the situation under control.
19     Q.   Okay. Has Malibu Media ever worked with law
20  enforcement to stop the alleged piracy of its movie?
21     A.   Yeah, we've talked to them about it but
22  that's not something they'll assist us with.
23     Q.   I'm sorry?
24     A.   That they will not -- they will not assist
25  us with that. That's a federal -- it's a federal

## Page 126

1  crime, copyright. So you can't just call up your
2  police department or call 911 and be like someone is
3  stealing my copyright. It doesn't work like that.
4  We would have to -- we are -- what we're doing is
5  what you have to do with any civil complaint. You're
6  a lawyer. We were working with lawyers to, to
7  protect our copyrights.
8      Q.   Okay. So let me again ask you the question.
9  Has Malibu Media worked with law enforcement to stop
10  the piracy of its movies?
11     A.   I feel like we are working with law
12  enforcement civilly to bring these charges up against
13  people that are stealing our copyrights, and this is
14  as close as we've come to actually working with law
15  enforcement to protect our copyrights.
16     Q.   So by "law enforcement" you're meaning the
17  civil courts?
18     A.   Right.
19     Q.   So other than civil courts, has Malibu Media
20  worked with law enforcement to stop the alleged
21  piracy of its movies?
22     A.   The civil courts are not interested in doing
23  that. This is not a case the civil courts are
24  interested in handling. So you can look it up on
25  LexisNexis.

## Page 127

1      Q.   Please listen to my question. Other than
2  civil courts, has Malibu Media worked with law
3  enforcement to stop the alleged piracy of its movies?
4      A.   I don't know. I can't remember every single
5  case. And there might have been a few where law
6  enforcement was brought in and -- but I just, I can't
7  answer that. I don't know. It's been so many...
8      Q.   As Malibu Media's corporate witness, I'm not
9  talking about your personal knowledge, I'm talking to
10  you as Malibu Media's corporate witness, as Malibu
11  Media's corporate witness, are you aware of any time
12  that Malibu Media has worked with law enforcement to
13  stop the alleged piracy of its movies?
14     A.   I'm not personally aware.
15     Q.   And are you aware as Malibu Media's
16  corporate witness?
17     A.   If I -- if I go through files where cases, I
18  think I can refresh my memory.
19     Q.   Are you aware as you sit here today, as
20  Malibu Media's corporate witness, of any times where
21  Malibu Media has worked with law enforcement?
22     A.   Law enforcement or retired law enforcement
23  or just active law enforcement or active?
24     Q.   Let's just say -- okay. So in the last two
25  years, in the last two years has Malibu Media worked

## Page 128

1  with law enforcement to stop the piracy of its
2  movies?
3      A.   In the two -- okay. So I don't know.
4  Unfortunately. I'm trying to answer everything
5  honestly. And Lorri Lomnitzer, she tried to make it
6  her own business, and so she did a lot of the dealing
7  on all the cases, accepted the settlements. And she
8  did follow the law by the book, but if there was
9  anyone interacted with law enforcement, it would have
10  been her.
11         And so there are thousands of files in her
12  office, and we are trying to get them. And I'll be
13  able to answer that question when we see them. And I
14  think Paul knows and Paul is working on getting that
15  done and he's seen that.
16     Q.   So what's your educational background?
17     A.   I went to Rutgers College and I studied
18  math. Then I worked for a -- and minored in French.
19  And then I worked for a software company called iCode
20  and we made a software called Everest, which was a
21  front to back-end software where you would buy
22  something, it post in the journal.
23         And then I worked for a company that made
24  MRI machines, and we worked with Siemens and sold
25  them to Cedar Sinai, all the three teslas and

Pages 125 to 128

**New York**
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

**New Jersey**
732-906-2078

P-Resp_Renew_MSJ132

Page 129

1 everything.
2     And then I also worked as a fashion model
3 when I was 12 to 19. And I also worked competing
4 show jumping horses.
5     So I guess I learned from all of those
6 things. So I guess the -- I guess the computers and
7 the modeling kind of turned into the website and the
8 programming and the models.
9     Q. So you have a -- so you would say that you
10 have a technical background?
11    A. Yes.
12    Q. Fair?
13    A. Yes.
14    Q. So you understand IPP's methods when it
15 describes how it, how it detects alleged
16 infringements?
17    A. I do. I do. But the thing is it's been 12
18 years since we started working with IPP. And what
19 people keep not understanding when they're asking for
20 things about IPP is that it still works, it still
21 gets the job done, but it's like using DOS when
22 there's a new program. So -- so that's what -- so
23 that's why it's hard for me to answer why IPP works.
24 Yes, it does work, but our new system is much sleeker
25 and better, and so that's why we're moving in that

Page 130

1 direction.
2     And so, you know, we just, we just want to
3 get everything going in the right direction, and so
4 it's like you're not -- you're not a software company
5 and then you stay with the same software and you
6 don't do upgrades for 15 years. It just -- it
7 doesn't happen. You can't -- you can't -- you can't
8 do that. But it's a huge, huge understanding to
9 change.
10    So -- so, yes, I have a technical
11 background, which is why after almost 15 years we are
12 changing the software that we use to protect our
13 ability to grow as a company and our ability to even
14 do business because we can't compete with free, and
15 this has always been our biggest challenge.
16    Q. I would again just ask you and --
17    A. Well, you just asked me about my education.
18    Q. Different question. Answer my questions
19 because I'm getting these very, very long paragraphs
20 and we're really -- this is just going --
21    A. Okay. Let's go faster then.
22    Q. I need specific answers to my questions or
23 it's just going to keep going on, so...
24    A. Okay.
25    Q. When did you create Malibu?

Page 131

1     A. 2007.
2     Q. Has the -- has it been under the same entity
3 the whole time?
4     A. I believe so, yes.
5     Q. Are there any other business entities that
6 you created that have been involved in the same
7 business as Malibu?
8     A. There are, but that would be a question for
9 my accountant, how they're figuring that out. I
10 don't want to misquote anything.
11    Q. What are your accountants trying to figure
12 out that you're referring to?
13    A. If -- basically if any of the other ones are
14 just holding companies for domain names, and then
15 they would have a contract for Malibu to use that
16 if -- if we even need to do that anymore and, or
17 different companies for programming source code or if
18 we leave that within Malibu, things like that. But
19 Malibu has always created all the copyrighted
20 material and owned the copyrights directly.
21    Q. Do you have any documents to prove that
22 Malibu owns the copyrights?
23    A. Oh, yes, of course.
24    Q. What documents do you have to prove that?
25    A. Well, first off -- first off a copyright in

Page 132

1 the United States is first use. So if you -- so say
2 you created a video and you named it and it has these
3 people in it and so you do -- so based on, based on
4 the people and the video and the content and the
5 exact minutes, your video will actually be first use
6 copyrighted in the United States.
7     And then to take that further, we actually
8 file with the copyright office, U.S. copyright
9 office, and we file under, I think it's type nine and
10 downloadable video content with, with the U.S.
11 copyright office. So basically no one else can ever
12 use our domain name or use a model with a similar
13 title and have the, have a copyright.
14    So basically we protect the copyrights by
15 first having first use, and second we register them
16 with the U.S. copyright office, which you need to do
17 within three months of creating the video and you do
18 it within three months of scheduling and infringement
19 notice.
20    Q. Who produces the videos?
21    A. I do. I manage the directors.
22    Q. Is there anyone else who produces the videos
23 besides you?
24    A. I have a few directors working for me in the
25 Czech Republic, and then I had a few directors

Pages 129 to 132

Page 133

```
1   working for me here, but with COVID here we've not
2   been shooting here in over -- in America in over a
3   year.
4              (Thereupon Defendant's Exhibit 3
5              was marked for identification.)
6   BY MR. KHAZEN:
7   Q.   All right. I've marked as Exhibit 3 the
8   complaint, the original complaint in this case.  Do
9   you see it?
10  A.   Exhibit 3. Let me go there. I see this.
11  Uh-huh.
12  Q.   Can you turn to Exhibit A?
13  A.   Exhibit A. One second. Which page is that?
14          MR. BEIK:  Page eight.
15          THE WITNESS:  Page eight?
16          MR. BEIK:  Yes.
17          THE WITNESS:  Okay. Oh, there, okay. So
18  seven. Eight. No, it goes nine is movies, it has
19  seven with your -- with Paul's signature and then it
20  has nine I think. So -- okay. Exhibit A, okay. So
21  that would be Exhibit A.  Doesn't have a page number,
22  but maybe that is page eight. So is that the list of
23  the movies?
24  BY MR. KHAZEN:
25  Q.   Yes.
```

Page 134

```
1   A.   Okay. Got it.
2   Q.   Do you see this list of the movies here on
3   Exhibit A to the complaint?
4   A.   Yep.
5   Q.   Do you recognize these movies?
6   A.   Yes. There's one -- that's a list of them.
7   Oh, he downloaded on '18. Yeah, I made that in '14,
8   I think that one, Truth or Dare. Supermodel Sex, we
9   shot that in a house in Malibu. So, okay. So yes,
10  I recognize all these movies, uh-huh.
11  Q.   You produced all these movies?
12  A.   Yes.
13  Q.   Did you direct all these movies?
14  A.   No, I did not direct all of them, but I was
15  on the, on the camera from afar. So I'm kind of
16  excited to get back to make sure we're getting all
17  the quality that we always, we always liked to have.
18  I don't like to have the directors shooting without,
19  but yes.
20  Q.   Please just answer my question.
21  A.   That's fine. Yes.
22  Q.   Did you write all these movies?
23  A.   Excuse me?
24  Q.   Were there writers for any of these movies?
25  A.   No, I just -- I make -- I write a small
```

Page 135

```
1   theme and we just go with that.
2   Q.   Were you an employee of Malibu Media at the
3   time that these movies were made?
4   A.   I started Malibu. I've never been an
5   employee. I started -- I sold real estate, too. I
6   forgot to mention that. I would take my commission
7   from real estate and I would create movies and code
8   the website, and that's how it started, so...
9   Q.   Again, please just answer my questions.
10  A.   Okay. So, no, I was not an employee. I own
11  Malibu Media. I started Malibu Media.
12  Q.   Did you own any other companies at the time
13  that these movies were made?
14  A.   No.
15  Q.   Do you -- did you ever assign the rights to
16  these movies to Malibu Media?
17  A.   The movies were always made under the name
18  Malibu Media. All -- so no.
19  Q.   What does that mean that they were made
20  under the name of Malibu Media?
21  A.   I'm saying that the rights were never
22  assigned to anyone else. I was going to let you know
23  that everyone who worked on the movies signed a
24  Malibu Media release. They were paid by Malibu
25  Media.
```

Page 136

```
1        They were -- everything was -- if the
2   equipment was rented, it was rented by Malibu Media.
3   If it was owned, it was owned by Malibu Media. The
4   location was owned by Malibu Media, or if it was
5   rented by Malibu Media or if it was on a, on
6   location, also Malibu Media paid for that.
7        So it was -- everything was paid for by
8   Malibu Media. They were -- the copyrights were owned
9   by Malibu Media, as far as first use and then be
10  registered and that's -- and so that's, that's kind
11  of -- that's that.
12  Q.   When was the first use of let's say the --
13  take the first one.
14  A.   Okay. So basically it never changes on the
15  site. I don't know why it's on here still, Kaisa. I
16  think Kaisa was on 2017 or '18, but let me go look
17  really quick.
18  Q.   You think first, I'm sorry, is the
19  publication?
20  A.   Yeah, the publication is when it would be
21  the first, the first. When it was released is first
22  use date. But there could be some movies here that
23  have been infringed that have been taken down because
24  say the, you know, the girl decided to have children,
25  she didn't want to be online anymore. And so every
```

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

P-Resp_Renew_MSJ134

Page 137

1  now and then I'll get a girl who doesn't want to be
2  an adult model anymore, and we're -- we'll help her
3  take it down and help her on DMCA to get that removed
4  from other sites.
5      So -- so yeah, that's -- so, I mean, I can
6  tell you. I can tell you that one when it was first
7  used. Yeah, it's a while back. So that was -- let
8  me try this. Okay. So they're not -- the titles
9  aren't always have -- there it is. Okay. That's not
10 the full title there, but that is -- that was
11 published 5-3-2019. And you have it on 5-3-2019.
12     Yeah, so usually a lot of times they're
13 actually taken, stolen onto the, onto the BitTorrent
14 the day they're published. That one was published on
15 5-3-2019, as it says here.
16     Q. So do you have any records of anyone who
17 worked on these movies assigning their rights to
18 Malibu Media?
19     A. No. We -- Malibu Media does everything
20 in-house, so there would be no one who assigned their
21 rights on the movies to Malibu Media.
22     Q. And when you say in-house, that means it was
23 done by independent contractors, correct?
24     A. Right, that worked for us.
25     Q. And that you have a contract with?

Page 138

1      A. Yes, of course.
2      Q. And those contracts don't assign their
3  rights to copyrights to Malibu Media, correct?
4      A. They are -- they assign all the copyrights
5  to Malibu Media. They assign all the use, every --
6  they keep no rights for themselves based on whatever
7  they've worked on. If they've been on the set and
8  they've been a gaffer or they've been on camera A or
9  B or they've been, they been just someone carrying
10 their stuff around in the airport, all rights for
11 anything artistic, even behind the scenes, everything
12 is assigned to Malibu Media.
13     So even if they're not evening planning on
14 making content, but we might use the content behind
15 the scenes later, we make sure everyone signs a
16 release that no one owns anything as far as anything
17 that they've shot or on any one of our trips or on
18 anything like that. We own all the rights to
19 everything.
20     Q. Do you have copies of all of those
21 contracts?
22     A. I'm sure -- I'm not sure we have it for
23 every trip, but for -- I'm sure I can find all of
24 them though, so, yes, somewhere.
25     Q. All right. And the -- so you're saying that

Page 139

1  the independent contractors, that they assign their
2  rights, that they assign their rights to the
3  copyrights to Malibu Media?
4      A. They never had the rights to the copyright
5  to assign it. So does that not make sense to you?
6  So if you're just going to edit something that we've
7  already shot, just by us asking you to edit
8  something, you don't get a copyright for it.
9      Q. Then why did you follow up with your
10 latest -- that's what at first you said, but your
11 latest answer then said that no, they do assign their
12 rights. So which, which is it? Do they have -- they
13 have terms of the contract with assign rights?
14     A. Just to -- just so everyone -- so just
15 there's no -- just in case they do something else or,
16 I mean, we just don't -- we want to be covered at all
17 costs. So but most of the time just because, like
18 say we shoot a movie and then we want to have an
19 editor edit the movies for us, because we're busy,
20 and so instead of doing that editing in-house, we
21 give the movie to an editor.
22     And I sit -- and I actually work with them
23 and say what music I want and how I want to break the
24 movie down. And he gives us a price, and then he
25 signs a contract that says any of his work product we

Page 140

1  own, you know, a hundred percent. Doesn't -- doesn't
2  even have to talk about copyrights because he never
3  had a copyright. It's just his work product of
4  editing the raw footage.
5      Q. So there's nothing in the contracts that
6  specifies that there's a work made for hire
7  situation?
8      A. They're all for work for hire.
9      Q. I'm sorry?
10     A. All the contracts are work for hire.
11         MR. BEIK: Object to form.
12 BY MR. KHAZEN:
13     Q. And have you produced those contracts to
14 your lawyer?
15     A. I -- I don't know if we have. Like I said,
16 I had COVID for a while and some of our other people
17 did too on the teams in Europe. So I'm not sure
18 exactly what was produced and what was going on. I
19 know there were quite a few things going on during
20 this trial that made it hard for us because of also
21 the moving towards our own, our own persons instead
22 of IPP, because we just don't trust them like fully
23 at this point. And we want to make sure everything
24 is done correctly and so we wanted to check out their
25 past things.

Pages 137 to 140

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

P-Resp_Renew_MSJ135

1  So with all of that going on and with, you
2  know, us starting to file and protect our content
3  again, I guess the last thing on my mind would be,
4  would be, you know, did we do one, this or that or
5  something.  I mean, it should be done for sure, but
6  we also -- I mean, to answer your questions, we
7  always protect our rights.  We always own the
8  copyrights.  We have not assigned the copyrights to
9  anyone.
10  Q.  And have you -- and does this -- and do your
11  contracts go back to the whole time you've owned
12  Malibu Media you've had the same form of contract?
13  A.  No, because in the beginning it was only
14  photos.  So we had photos contracts and so we used to
15  sell to Playboy and Penthouse.  They had some models
16  that were like slightly naughtier, and so we would
17  actually do like a fashion style shoots with them.
18  And then everyone was very interested in seeing
19  these, you know, girls that do a little bit harder
20  core stuff in fashion style, so that's how it started
21  out as.
22  And then -- and so we of course had
23  copyrights because those were photos, and photos are
24  infringed on all the time.  And then when he started,
25  we were one of the first SLRs and we started video

1  content.  And of course through content you copyright
2  and you make sure to register your copyright and your
3  video for your video content.  I mean, that's how
4  they -- YouTube wouldn't exist otherwise.
5  Q.  Do you have any proof that these contracts
6  exist?
7  A.  Contracts between the copyright office?
8  Q.  Contracts between you and any of your
9  independent contractors that have worked, that have
10  worked on the movie, directed the movies, done
11  editing on the movies, anything?
12  A.  Yes.
13  Q.  What proof do you have?
14  A.  We would have work for hire.  We would
15  have -- anyone who's ever worked on anything for us
16  will sign a work for hire.
17  Q.  And have you produced those contracts to
18  your lawyers?
19  A.  I think this all went really fast, and I
20  don't recall being asked to produce that, because
21  I've been extremely busy lately and I think maybe
22  they just didn't want to trouble me with that.
23  But I -- like I said, I'm happy to produce
24  what I can as far as that goes.  But we -- we do own
25  all of our -- I don't know where you're trying to go

1  with this.  We own all of our copyrights.  No one
2  else owns any of our copyrights.
3  Q.  That's not for you to determine.  Please
4  just answer the question that I'm asking.  So do you
5  have those contracts in your possession, if they
6  exist?
7  A.  They do exist.  And they're -- the
8  problem -- I'm just trying to think if they're on an
9  email or on my -- the fax with the -- my fax where I
10  fax to the cloud or if they're in California or in
11  Henderson.  So, yeah, I need to find them.
12  Q.  Okay.  So, yes, if you have those -- if you
13  have those contracts -- your answers are just very,
14  very long.  I wish you would just answer my
15  questions.  This would move a lot faster.
16  A.  The thing is --
17  Q.  You do have contracts with your independent
18  contractors that are, with your independent
19  contractors that were available at the time of these
20  movies in Exhibit A of the complaint in your
21  possession; is that correct?
22  A.  Okay.  So some of them wouldn't require a
23  contract if we did all the work ourselves, so there
24  wouldn't be a contract.  Like when I said Truth or
25  Dare, remember I was telling you about that one?

1  That would not require a contract because I did all
2  the work myself on that.
3  Q.  Which ones of these would require a
4  contract?
5  MR. BEIK:  Object to the form.
6  THE WITNESS:  I think -- I don't know off
7  the top of my head.  That one, Supermodels, all of
8  that.  I mean, some -- there's only a few here that
9  would require even any contract that anyone touched
10  them.
11  A lot of them that Brig and I did by
12  ourselves, you know, are -- one of the guys who, who
13  worked with us as camera B also edited, so he had a
14  contract and, a work for hire contract.  And then our
15  camera A, actually he was an employee at one point,
16  and he made a lot money.  I think we paid him like
17  $420,000 a year, or something like that, or a lot.
18  And so but most of these are from like 2013,
19  '15, '17.  Those would be all shot, those would all
20  be shot by like Brigham and I.  So '18, '18, but --
21  Truth or Dare.
22  MR. BEIK:  Colette.
23  THE WITNESS:  Okay.  So, yeah, I don't --
24  there's a few of them that might require a contract,
25  and I don't even know if any of them do.

Page 145

```
1    BY MR. KHAZEN:
2        Q.  Okay.  But you have those contracts in your
3    possession?
4        A.  If they require a contract.
5        Q.  And you said if it doesn't require a
6    contract, correct?
7        A.  Correct.
8        Q.  Are the contracts in your possession?
9        A.  If they require a contract.  I'm looking at
10   most of these movies and they look like they were all
11   done -- like a lot of times, like Brig and I would go
12   away, and he would help me as -- you know, I would
13   sell the real estate, and so I would make the money
14   and we would rent a villa, bring the models and we
15   would make the movies and we would do all the work.
16       So there would be, except for the models
17   having a contract, which was a work for hire
18   agreement for X amount of money, they would shoot X
19   amount of films, and that's that.  We don't need to
20   worry about copyright contracts with the models, and
21   so there would literally be no contracts required,
22   so...
23       Q.  When you say Brigham, that's your husband?
24       A.  Yes.
25       Q.  And does he have a contract with Malibu
```

Page 146

```
1    Media?
2        A.  I believe he does for doing some -- yes, for
3    doing a few things now that he does.  And he also has
4    a contract to help with some of the FHGs and the,
5    because of the galleries that we send out to people
6    who promote us.  And those are picture galleries and
7    stuff, so don't get too excited, they're not what
8    your client stole.  And, yeah, that would be -- and
9    then, yeah.
10       So I still don't understand the question.
11   It's like do they require contracts, do I have the
12   contracts?  I'm telling you they don't require
13   contracts, and you're asking me if I have the
14   contracts.
15       Q.  I really need you to answer these questions.
16   This is getting to be very inappropriate, and also
17   there's no proof that my client stole anything.  So
18   please just answer the questions that I'm asking you,
19   okay?
20       A.  Okay.
21       Q.  Does your -- does Brigham have -- did
22   Brigham have contracts with Malibu Media at the time
23   that he helped to produce the films in Exhibit A of
24   the complaint?
25       A.  I don't know, but I believe if he needed to,
```

Page 147

```
1    he would have them.  He's very -- he's very, very
2    organized like that, so...
3        Q.  Do you have copies of that, of those
4    contracts?
5        A.  I would be able to check, yes, but I'm not a
6    hundred percent sure, but, yes, I will check.
7        Q.  And do you have any contracts with Malibu
8    Media assigning your right, any rights that you may
9    have in the copyrights to Malibu Media?
10       A.  No.
11           (Thereupon Defendant's Exhibit 4
12           was marked for identification.)
13   BY MR. KHAZEN:
14       Q.  All right.  I've marked as exhibit, as
15   Exhibit 3, or, sorry, Exhibit 4 a copy of your
16   website analytics, I believe.  Did you see this
17   document, Exhibit 4?
18       A.  I'm not on it, but I know I printed so I
19   know what you're talking about.
20       Q.  Do you see it now?
21       A.  I see it.
22       Q.  Do you recognize this document?
23           Do you recognize this document, ma'am?
24       A.  Yes, I do.  Yes.
25       Q.  What is it?
```

Page 148



Pages 145 to 148

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

P-Resp_Renew_MSJ137



Page 149

Page 150

Page 151

Page 152

Pages 149 to 152

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

P-Resp_Renew_MSJ138

Page 153



Page 154

1    Q. How much money did you make from paid users
2    in 2018?
3    A. I'd have to check with the accountant
4    because it's basically -- it's you're asking me a big
5    tax question. Like are you asking me gross how much
6    money came in? Like I have to check with every
7    processors and then see how much affiliates got paid
8    out and see how much it cost us to make the videos.
9    And so you're asking me tax questions now for about
10   someone who may or may not have stolen our movies. I
11   don't understand. I don't -- I don't know.
12       Q. I asked you about the exhibit, the movies in
13   Exhibit A. Is there anything special about them that
14   sets them apart from any of your other movies?
15       A. The Exhibit A. No. Where did that go? No.
16   Oh, page eight. Exhibit A. Okay. Kaisa. There's
17   some — there's actually more threesomes than on the
18   site as a whole. It's more groups of people.
19       Q. Okay. And you thought -- and you think that
20   would set these movies apart from any of your other
21   movies?
22       A. Yeah, because basically there's an orgy
23   movie, Strip Poker, Moving Day, I think we have
24   another girl come in. Supermodel I think so, but the
25   girls area really, really pretty. Truth or Dare I

Page 155

1    know has four people. So the one with the wife,
2    obviously that's a threesome, and then the one about
3    the Hot Threesome, that's obviously a threesome. So
4    whoever downloaded all these movies on all very
5    different dates has a thing for threesomes.
6        Q. Okay. So other than that they involve more
7    than two people, is there anything else that you can
8    think of that sets these apart from --
9        A. No. Some were shot in America. Some are
10   shot in Prague. Some are shot on location. Some are
11   shot in lofts. Some are shot in houses. So they're
12   all very different with different girls. And the
13   only thing that sets them apart is that they have
14   multiple -- usually two girls in it and it looks
15   like, or two girls and two guys.
16       Q. Okay.
17       A. On our site that's probably like two
18   percent.
19       Q. And you have 1,965 unique videos on XR.com;
20   is that correct?
21       A. Right. Right. Uh-huh. So this guy has
22   probably downloaded from Colette as well, but we
23   don't actually -- we haven't been persuing the
24   copyrights on that site because just, just because.
25   So that's just too much work to do it on every, on

Page 156

1    every site. So -- so I would say the person that
2    downloaded these movies has a fetish for an extra
3    girl or an extra couple.
4        Q. What are -- what are the most -- do you know
5    what the most popular videos on your site are?
6        A. None of these.
7        Q. Do you have any of that data available?
8        A. Yeah. If you go to the site, you can
9    actually click on videos and "most popular."
10       Q. Now, when it says users, do you have free
11   videos up on XR.com?
12       A. No.
13       Q. So if these users aren't paying customers,
14   why are they using, why are they using your site?
15       A. It's the way, the way Google says it. If
16   they've just gone to the site, they're a user.
17   Basically just -- once they step on the site, they
22   will turn into a user once they're on the site, but
23   if they, but if they don't, then they bounce off and,
24   and they don't become a member.
25       Q. What do you mean by bounce off?

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

P-Resp_Renew_MSJ139

Page 157

1    A.  They come to the site and they see, oh, we
2  have to pay, and then they don't want to pay so they
3  just like go away and don't pay for it.  Or what they
4  do is they look for the movies they want to watch and
5  then they go to the torrents and they download the
6  torrent where they can get them for free.
7    Q.  Is that what this bounce rate refers to in
8  the analytics pages then?
9    A.  Let me see what it says on there.  This is
10  from a long period of time, so it's probably not
11  going to be too accurate.  Bounce rate 44.  So
12  44 percent of the people that come to the site in
13  that entire time, that's actually a pretty good
14  bounce rate.
15    Most adult site have 70 or 80 percent bounce
16  rate.  So 44 percent of the people actually, they
17  just call -- they bounce off.  They go get to the
18  site and say, oh, this is a paid site, I don't want
19  to, I don't want to pay, so they just go straight
20  back somewhere elsewhere where they can find
21  something without paying.
22    Q.  Are you -- are you -- I'm sorry.  Go ahead.
23    A.  Or -- or what they do is they find something
24  they want to watch and then they bounce right off to
25  the torrent, because they already have it set up, and

Page 158

1  they start uploading the movies that they want to the
2  torrent, and then they open their door in turn and
3  say, hey, I'm uploading this movie from XR so, you
4  know, anyone who wants to come get it from me can
5  come get it, and can I get anything that you have,
6  and I'm looking for this movie from XR with another
7  threesome, you know, can I come get this movie.
8    Q.  How much does a subscription -- so are you
9  meaning to suggest then that the rest of these people
10  that aren't part of the bounce rate became paying
11  customers?
12    A.  Excuse me?
13    Q.  Are you meaning to suggest that the people
14  that aren't reflected in this bounce rate on your
15  analytics became paying customers?
16    A.  I don't know about that actually.  I mean, I
17  think they might have been looking for titles anyway,
18  and that they like -- I think they most likely went
19  to, would go to one of the torrents, and if they
20  found movies they wanted, get them from there, or
21  they would Google it and find it on the tube or
22  something like that.
23    They usually don't become paying customers
24  of they're -- if somebody isn't a paying customer,
25  they would go actually from here and visit the

Page 159

1  torrent.  So basically I was just looking.  There are
2  some people on the torrents and they actually say,
3  oh, came here looking for this movie and things like
4  that, like little notes.
5    So -- so we don't know where they go.  Some
6  people go to the torrents and they download them,
7  some of them just bounce back to their email.  Who
8  knows.
9    Q.  Do you have any evidence that any of them
10  going there are going to the torrents?
11    A.  Yeah, we can actually, with our new
12  software, I bet we can get that evidence.
13    Q.  That these specific users are going off to
14  the torrents, that's -- you have software that will
15  detect that?
16    A.  Well, we're just perfecting it now, so I bet
17  we could get it to perfect that and see what's
18  happening to them.
19    Q.  You don't -- you don't currently have that,
20  correct?
21    A.  Excuse me?
22    Q.  You don't currently have any evidence of
23  that then, correct?
24    A.  Well, we do actually have a -- you can go
25  with analytics and you can actually look and see

Page 160

1  where the, the upstream and the downstream goes.  So
2  we are doing where does your traffic go after your
3  site and where does your traffic -- like where do
4  they go after they've been on your site and where
5  have they been before.  And so you have that in
6  Google Analytics now, and it doesn't work perfectly
7  but there's something that is a -- that kind of
8  works.
9    Q.  Have you done that?
10    A.  I have.  And again, like I said, it doesn't
11  work perfectly.  And so these are smaller companies
12  and so -- so, yeah.  No, I mean, I can look at it
13  again and see if it's improved at all.
14    Q.  How much does it -- how much does it cost to
15  be a member of XR?
16    A.  It depends if -- I think you can be a member
17  for like $20 or $30 a month, or it's as much as -- I
18  think it was -- so, yeah, it's 20 or $30 a month
19  basically, and it goes up to I think $99 for six
20  months.  And then I think it's 250 for a year, or 199
21  per year.  I'm sorry.  199 per year.
22    Q.  You understand that pornography is readily
23  available on the internet for free, right?
24    A.  Yes.
25    Q.  You understand that threesome pornography is

Pages 157 to 160

Page 161

1  readily available on the internet for free, right?
2      A.   Yeah, it's not the same though because it's
3  like it's not high res, it's not -- it's not like
4  fashion model girls.  They don't look the same and
5  it's just -- I mean, and so it's just not -- I
6  think -- I just feel like it's not the same.
7          I mean, I see -- I'm members of those sites
8  just for the heck of it because I want to see what's
9  going on with our, with our movies and stuff and so,
10  I mean, what else is competing with us.  And there's
11  really not too many left since we're the only ones
12  defending our copyrights.  We're pretty much the only
13  small site, like family site left in business.
14  MindGeek has either bought all the rest or put
15  everyone out of business.
16      Q.   What evidence do you have that any of the
17  films that are asserted in your complaint have market
18  value?
19      A.   Because I can sell them for -- license them,
20  and I can -- and we have people joining every day,
21  and they comment on -- you can look at the comment
22  section.  You can see if people even, like from
23  hundreds of thousands of movies ago still downloading
24  them and joining for those movies.
25      Q.   What evidence do you have that these

Page 162

1  specific movies that are alleged in your complaint
2  have any market value?
3      A.   Again, like I said, because they are being
4  downloaded on the -- and people are requesting them
5  when they request a package of films to buy.  Because
6  we don't have many threesomes on our site, so any
7  threesome we have, if someone requests threesomes,
8  like this whole list we, we get to the list.
9      Q.   So do you have any -- so you said earlier
10  that you don't have data on which movies, correct me
11  if I'm wrong, but you said earlier that you don't
12  have data on which, which movies are, are most
13  downloaded from your, from your site.  Is that not
14  correct, you do have this data?
15      A.   It's not exactly correct, actually, no, we
16  don't have the exact data on which ones are
17  downloaded and which ones are downloaded more.
18  It's -- I mean, Google tries to do something but it's
19  extremely off.
20      Q.   Sorry, excuse me, so which ones are -- so
21  you don't have data on which ones are viewed more or
22  less often on your site; is that right?
23      A.   Well, I mean, you can have -- it's kind
24  of -- I mean, yes and no.  It's just not very good
25  data.

Page 163

1      Q.   Okay.  So you don't have any good date on
2  which movies out of the 1900-plus movies that you
3  have on your site are viewed more or less, correct?
4      A.   No, we do not.
5      Q.   And so what evidence do you have that the
6  movies, specifically let's say in Exhibit A, have any
7  market value to anyone that's paying to view your
8  website?
9      A.   I'm sorry, say again.  What evidence do we
10  have that it's...
11      Q.   That any of the movies listed in Exhibit A
12  of your complaint have value or are used by any of
13  the people on your website?
14      A.   Because I have many comments on them.  If
15  you go to the movie on the website, log in, you'll
16  see all the people commenting on whether they like
17  the movie or not.  And some of the comments I've
18  hidden, but I get the comment.
19          And when I put the movie up, I can go back
20  and I can see how many people infringed on it the day
21  I posted it.  And as you can see, the first one, I
22  just looked it up, and the day I posted it, it was
23  immediately on the torrent sites.
24      Q.   Which movie is that?
25      A.   Some of the -- Kaisa Slippery and Wet one.

Page 164

1      Q.   Do you have any reason to believe that it
2  was not somebody that works with you that was, that
3  posted them on torrent sites?
4      A.   Yes, they ultimately would be fired if they
5  did.  They're all with me on preparing the lawsuit
6  for stealing our movies.  So, no, not in a million
7  years, they wouldn't do that.
8          MR. BEIK:  Ramzi, are you getting to a good
9  stopping point for a break?
10          MR. KHAZEN:  Sure.  We can -- we can go
11  ahead and...
12          THE WITNESS:  How many more questions?
13          THE VIDEOGRAPHER:  Off the record at 2:37
14  Pacific time.
15          (A recess was taken.)
16          THE VIDEOGRAPHER:  We are back on the record
17  at 2:29 p.m. Pacific time.  2:49, sorry.
18  BY MR. KHAZEN:
19      Q.   Does Malibu Media have any evidence that
20  anyone specifically looks for XR movies?
21      A.   Yes.
22      Q.   Does Malibu Media have any evidence that my
23  client looked for XR movies?
24      A.   I don't know where he downloaded these from,
25  so the title is always in the -- it's on the movie.

Pages 161 to 164

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

P-Resp_Renew_MSJ141

Page 165

1   So -- and it's on the file name, so I would need to
2   see what file name that he downloaded.
3      Q.  So you have no evidence, Malibu Media has no
4   evidence that my client searched for XR movies,
5   correct?
6      A.  That's not true.  I would -- I need -- I
7   would need to actually look deeper into these, these
8   IP captures and see if -- because our movies are very
9   different from other movies, and I would want to
10  see -- so when you dial it, when you download it, it
11  will usually say XR underscore dash Kaisa.  Like,
12  that's how we -- that's the format we save the titles
13  in.
14      So they're not -- the title aren't saved.
15  Like they're just made into this for purposes to be
16  easily readable and to know which movies was
17  downloaded.  But he could downloaded, you know, these
18  could have all said XR first in front of it, and then
19  it would look like -- and then there would be
20  evidence that he was looking for XR, and it's also in
21  the metadata.
22      Q.  I'm not asking for a hypothetical on what
23  you may be able to find as evidence.  I'm asking you
24  as you sit here today as Malibu Media's corporate
25  representative whether you have any evidence that my

Page 166

1   client searched for XR movies?
2      A.  I'd say yes.
3      Q.  What evidence do you have?
4      A.  Well, we have so few threesomes that in
5   order to pull up that many of threesome movies, he
6   would have had to type in XR threesomes.  I mean, it
7   would be like almost numerically like proportionally
8   mathematically impossible for him to pull up all the
9   threesomes from XR until that day almost, and because
10  it's a really very small, small amount compared to
11  the rest of our movies, which are just very vanilla.
12      So in order for him to get all of those XR
13  threesome movies, he would have to type in XR
14  threesomes.  I bet I can do it right and the movie's
15  title will come up.
16      Q.  How do you know he didn't just look for
17  threesomes?
18      A.  Well, because -- because there would be --
19      Q.  As a hypothetical?
20      A.  Yeah, I mean, of the 32,000 there probably
21  are more threesomes, but the thing is to get all of
22  these movies, if you just look for threesomes, I can
23  do it right now online, actually.  Hold on, I'll do
24  it and I'll tell you I watched -- if I go XR
25  threesomes.

Page 167

1      Q.  Look, I'm not asking you to Google things
2   right now.
3      MR. BEIK:  Colette, let's just answer his,
4   answer his questions.
5      THE WITNESS:  Okay.  Got it.  Okay.  So the
6   first thing that comes up when I search for, just so
7   you know, when I search for threesome is XR Kaisa,
8   and then there's a couple of the others ones actually
9   on the list that come up, and then, you know, there's
10  a whole bunch of different, different ones mixed in.
11      But that was -- that's definitely a popular
12  search term.  And Kaisa is the first one that comes
13  up.  So it seems to me like he typed in the word "XR"
14  because if you just -- if you just look up threesome,
15  then it's, it's not going to have necessarily all XR
16  movies.  So anyway, but it to me, yes, there will be
17  evidence that your client searched for XR threesomes.
18  BY MR. KHAZEN:
19      Q.  I'm not asking whether there will be
20  hypothetically evidence, I'm asking what evidence you
21  actually have.  And since you don't know what other
22  movies that were there, then typing in threesome,
23  your search seems to have dis-proven your point.  So
24  again I'll ask what evidence do you have that my
25  client, according to your allegations, searched for

Page 168

1   XR's?
2      A.  Because it would be mathematically
3   impossible for him, over that long of a time span, to
4   get -- to only to get each threesome like per -- like
5   each year it might have like three threesomes or
6   something like that.  And so over that time span,
7   like to only download an XR threesome, I'm sure he
8   downloaded threesomes from other sites, too, but
9   obviously he was looking for all XR threesomes.
10      It's just -- probability.  So with
11  probability there's no probable explaining of how he
12  would have all of our threesomes in one place over --
13  how many years is it over?  I'm sorry, I just closed
14  that.  Over that much time that, you know, it just,
15  it's just not, it's just not possible, so --
16      Q.  But you don't know the denominator for that
17  equation.  You don't know the total number of movies.
18  So, again, that doesn't seem to be evidence to me at
19  all.  So --
20      A.  Every one of our movies -- there are so many
21  other --
22      Q.  As you've admitted --
23      A.  You know, in the briefing we can discuss all
24  of that.
25      Q.  As you admitted you said that you were sure

Page 169

1   that he had downloaded other movies. So according to
2   your hypothetical -- let me just strike -- let me
3   just ask this question. Other than -- other than
4   your -- let me just ask this: Do you -- do you know
5   how many movies this person that you've accused of
6   infringing downloaded movies?
7      A. Altogether?
8      Q. Yes.
9      A. Over that period of time, at least, I think
10  at least 32,000.
11     Q. So out of 32,000 you think it's
12  mathematically improbable to come up with nine XR
13  movies?
14     A. I think so because it's -- it definitely --
15  nine XR threesomes, basically, because there's so
16  many free movies you can get, so if he's looking
17  for -- so but there are so many free threesome
18  movies, right, and so to get -- to find paid movies
19  that he has to download on a torrent site that that
20  would be mostly XR and -- I don't even know what
21  other movies are paid for anymore that are,
22  especially that are threesomes. So maybe like a
23  Blacked or those Strike Three movies that they're
24  going after. So who knows, he's probably getting
25  sued by them, too.

Page 170

1   But this is, it's my opinion, okay. So you
2   asked a question, and it's my opinion that it is
3   mathematically not probable that he would have that
4   many XR threesome movies in one, in one download.
5   Like not one download over the years.
6      So if you keep coming back and keep coming
7   back for a threesome, so he's obviously watching the
8   site and had on his tracker, and like how you can
9   track on, too, on the, on the torrent sites. So he
10  probably was tracking them, and when a new one came
11  up, he would go find it and download it.
12     So he was a habitual offender and he had his
13  fetish and it's just -- it's too much of a
14  coincidence to say, oh, just by chance he -- you made
15  one threesome movie the whole year and he downloaded
16  it and then he did it again the next year and again
17  the next year. So that's a pretty -- that's --
18  that's quite a coinsurance to me. Once, twice --
19  once or twice maybe. Three times coincidence maybe.
20  Four, five, six, seven, eight, nine, it's not a
21  coincidence anymore.
22     Q. So out of 32,000 movies you find it highly
23  improbable that a person who would be searching for
24  threesomes would hit just nine Malibu movies. Is
25  that your testimony to the jury?

Page 171

1      A. I find it improbable that he would hit nine
2   XR movies because even the -- I don't -- and I can go
3   look and see how many because the Colette movies have
4   also more group things and a little bit harder core
5   on there. But XR, there's almost no site that does
6   kind of a beautiful erotica with a group aspect in
7   it.
8      So it's a very, very niche because most
9   people would want to look at that want to or -- it's
10  very niche and usually they just pay for it. They
11  wouldn't go back year after year unless they're an IT
12  who knows how to, thinks they can beat the tech and
13  just think that no one can beat them. And so and
14  those are -- those are the people that, you know, we
15  make the movies for, and then if they don't want to
16  pay for it, it's difficult.
17     But anyway, let's go on to the question. My
18  answer is it's not probable that he would be -- he
19  would get those movies.
20     Q. Out of those 32,000 other movies that you're
21  alleging, are you aware of whether or not those are
22  copyrighted?
23     A. I'm not aware.
24     Q. And out of those other 32,000 movies that
25  you're alleging, are you aware of whether those

Page 172



Pages 169 to 172

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

P-Resp_Renew_MSJ143

Page 173



Page 174

1    Q.  I have to ask this:  Are you under -- are
2  you under the influence of any substances today?
3    A.  No.  No.  I have a really big case going on
4  and I'm just -- I wish we'd answer, but no, I'm not.
5  I guess I'm just trying to -- I don't understand your
6  questions and how they're relating to the case.  I'm
7  not under the influence of any substances.  Just a
8  Kombucha tea here with ice.
9    Q.  So looking back at Exhibit 4, it says that
10  in 2017 -- it gives revenue, subscription revenue for
11  2017 through 2019.  Do you see that on the back, on
12  the second page?
13    A.  Shoot.  I think I closed it.  What was it?
14  It was a -- I'm sorry.  Oh, there it is.  What was
15  the name of your -- the site again?
16    Q.  Exhibit 4.
17    A.  I know.  I know, but it looks like it
18  somehow crashed out or closed me out.
19    Q.  Let's go off the record while we get this
20  fixed.
21    A.  Okay.  So it was --
22    THE VIDEOGRAPHER:  Off the record at 3:03.
23    (Discussion off the record.)
24    THE VIDEOGRAPHER:  You're back on the record
25  at 3:04.

Page 175



25  you it was more like about 12 million a month in

Page 176



Pages 173 to 176

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

P-Resp_Renew_MSJ144

Page 177

1    me, actually. I think what's increased actually are
2    the cam girls. So people want live and now. So
3    we're adding that on as well. So people still want
4    to see the movies but some people want to speak to
5    the models live and --
6        Q. I'm sorry. Isn't it also true that high
7    resolution pornography for free has increased during
8    that time?
9        A. It has increased but it's not that much
10   because they really can't get the stolen -- there's
11   not too much you can steal in high resolution, so
12   it's -- it has increased a little bit, but you can --
13   right now what they're doing is they're actually
14   stealing our movies on the tubes -- I'm not going to
15   go there.
16       So just it -- yeah, it increased, but I
17   don't know what this has to do with, you know, people
18   stealing our movies off BitTorrent. But it's gotten
19   much more way huger of a problem for us. And -- and,
20   yeah, and we have to go through things like this of
21   people, you know, that we're -- look how long this
22   takes. I have so many things to do today and we're
23   doing this all day. So -- and I still don't
24   understand how the questions relate.
25       Q. I really need you to just answer my

Page 178

1    questions.
2        A. Okay. Ask one.
3        Q. And your -- the company has a reputation for
4    terrorizing thousands and thousands of people.
5    You're putting them out of their convenience, so
6    please just --
7        A. Terrorizing?
8        Q. So do you have any revenue numbers for 2020?
9        A. 2020 is not yet over.
10       Q. Right. Do you have any year-to-date revenue
11   numbers?
12       A. No, they're not finished yet.
13       Q. Now, how much -- how much does XR spend,
14   spend per year in expenses, on its expenses?
15       A. I don't have that in front of me.
16       Q. Approximately?
17       A. I don't know. I don't have that in front of
18   me. We have a lot of different things going on and
19   it depends on the year, whether we're traveling and
20   whether, you know, just on so many different things.
21   So it's -- and then all this depends on those numbers
22   are before charge-back, before fees to processors,
23   depends which processors we're using. It's just -- I
24   can't guess at that.
25       Q. How much -- how much does XR make per year

Page 179



Page 180

1    we're not with her. And now finally we have made our
2    own software, and we have a great team, and we are
3    getting ready to file again.
4        Your client was someone who was with us
5    while we were still doing this for deterrence, but,
6    you know, we didn't make any money because the
7    attorneys cost so much and it's actually very
8    expensive to do this, to bring these cases. It's not
9    our favorite part of business.
10       And, I mean, I'm really overwhelmed running
11   so many businesses, so it's -- we actually -- your
12   answer is zero. And in 2020 we have broken even just
13   being able to pay the bills, like paying our
14   attorneys. And as 2020 goes on and we file our first
15   new batch of suits, I expect us to make money, and
16   that -- because now that I'm actually running, as the
17   lawyer before, and now we have a good lawyer on an
18   IPJ -- an IP attorney who's been with us for ten
19   years, he's just, you know, looking at the drafting,
20   making sure everything is drafting right, make sure
21   if we should move forward or if we should settle, you
22   know, based on the person and based on the district.
23       And then so I would expect we would again
24   make maybe five percent of our, of our income. So
25   it's more of a deterrent really. It's, you know, we

Pages 177 to 180

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

P-Resp_Renew_MSJ145

Page 181

1    have to do something, and we've tried everything. I
2    mean, if there was something else to do, believe me
3    we would do it. I wouldn't be in a depo the entire
4    day.
5        Q.   How much have you paid out to your lawyers
6    in 2020?
7            MR. BEIK:  Objection, form.
8            THE WITNESS:  Do I answer?
9            MR. BEIK:  Ramzi, I don't think that's -- I
10   think -- I don't think that's -- I think I'm going to
11   object on that one because I think that that's, you
12   know, first of all, there's a bunch of different
13   matters involved.
14           THE WITNESS:  Yeah, they work on other
15   things, too.
16           MR. BEIK:  There's a lot of things that I'm
17   not involved in. There's, you know, specifically
18   from this case. I think that that's not an
19   appropriate question for her to answer. I'll assert
20   attorney-client privilege on that one.
21   BY MR. KHAZEN:
22       Q.   Are you going to follow your attorney's
23   instructions not to answer?
24       A.   Yes.
25           MR. KHAZEN:  So, I mean, she volunteered the

Page 182

1    information that she said she wasn't making money
2    because of all the money she's paying lawyers, and I
3    feel like I'm entitled to understand what that, what
4    that's actually going to, if that's going to other
5    lawsuits, if that's really -- so I would say that
6    that's been effectively waived at this point. But if
7    you want to state your objection, I guess we can take
8    that up later.
9            MR. BEIK:  I'm going to stand on that
10   objection, Ramzi. I don't think that's appropriate.
11   BY MR. KHAZEN:
12       Q.   Does -- are you -- has anyone ever -- have
13   you ever given a security interest in Malibu's
14   copyrights to anyone?
15       A.   No.
16       Q.   Have you ever used them as collateral?
17       A.   No.
18       Q.   Has anyone invested in Malibu?
19       A.   No.
20       Q.   Has anyone ever invested in or given you any
21   money in any form in exchange for any interest in the
22   copyrights?
23       A.   No.
24       Q.   All those copyrights?
25       A.   No.

Page 183

1        Q.   Does anyone have a stake in the outcome of
2    Malibu's litigation?
3        A.   No.
4        Q.   Who -- what is -- so as far as Malibu is
5    concerned, there's only you as the owner and no
6    employees; is that, is that correct?
7        A.   That's correct, actually.
8        Q.   And do you have -- do you or any other
9    entity you associate with, you're associated with
10   ever receive a loan or investment from, from a
11   company from Genova?
12       A.   No.
13       Q.   How about Warmblood?
14       A.   No. No.
15       Q.   Did Genova or Warmblood ever file a lawsuit
16   against you?
17       A.   I don't know if they filed it or if they
18   just had something leaked to the press to try to
19   extort us on something, but we're -- it's a private
20   matter, but we're suing them for damages and
21   defamation.
22       Q.   Have you ever paid either of them any money,
23   you or Malibu?
24       A.   They have taken money and paid it to
25   themselves from our business and pretended to be

Page 184

1    Malibu. So that was another issue within the last
2    year.
3        Q.   Can you explain that?
4            MR. BEIK:  I'm going -- I'm going to object
5    on relevance to this because I think that the real
6    estate dispute in California with Genova is not --
7    it's a personal matter that involved -- does not
8    involve Malibu Media, so I'm going to object to form
9    on that.
10   BY MR. KHAZEN:
11       Q.   You can go ahead and answer.
12           THE WITNESS:  Do you want me to answer,
13   Paul?
14           MR. BEIK:  You can answer to the extent that
15   you know.
16           THE WITNESS:  I have no idea what this has
17   to do with this, but these, these guys represented
18   that, you know, at that point we were moving from the
19   other guys that had stolen money, the copyrights in
20   Beverly Hills, and they represented that they could
21   help us run it, even though they weren't lawyers.
22           They tried to fix us up with a lawyer that
23   was not good at all and wasn't suited for it. And
24   then they wanted to run it without being a lawyer.
25   We said no. They started collecting our judgements

Pages 181 to 184

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

P-Resp_Renew_MSJ146

Page 185

1   without us knowing. They actually had us sign, they
2   had me sign a power of attorney so they could help
3   us.
4           And I read the power of attorney after and
5   it was just, it was ridiculous, like they could have
6   loaned money and not loaned money and then they
7   didn't pay the loan to themselves. They put in a
8   default rate that they -- and then they paid the
9   money back through our account that I had no access
10  to. They set up an account and actually put
11  letterhead. It said Malibu --
12          MR. BEIK: All right, Colette, I'm going to
13  stop you here. That's pending litigation. She's --
14          THE WITNESS: Yeah, exactly. Yeah, it's
15  been --
16          MR. BEIK: -- represented by separate
17  counsel in that matter, and so she doesn't have her
18  lawyer. I don't represent her in those cases.
19          THE WITNESS: Yeah, it was --
20          MR. BEIK: I'm going -- I'm going to have to
21  say that I think that, you know, to the extent that
22  she is getting off into all these facts and, you
23  know, that --
24          THE WITNESS: I mean, I don't know what else
25  to say. I'm just trying to say the truth.

Page 186

1           MR. BEIK: Okay. Okay. Hang on. Hang on.
2   I hope you appreciate that, Ramzi. She's got other
3   lawyers in California and Florida and other places
4   that are representing her in that matter, and as a
5   result they're not here so I don't know anything
6   about those, those cases, other than that they're
7   unrelated to anything that's involved in this lawsuit
8   or, or what's going on here.
9   BY MR. KHAZEN:
10      Q. They're extremely related. These are
11  companies that claim that they owned, that they owned
12  these copyrights that are asserted here, so this is
13  highly relevant. I need to know whether you owned
14  the copyrights or not.
15      A. I can't --
16          MR. BEIK: Hang on. Hang on. You asked her
17  that question and she answered.
18          MR. KHAZEN: Yeah, and I don't know whether
19  her answer is true or not. I'm trying to look into
20  the voracity of her answers.
21          THE WITNESS: Well, go look at Pacer.
22          MR. BEIK: No, hang on. Like I said -- like
23  I said, Ramzi, the problem here is that she's
24  represented by lawyers, and those lawyers aren't
25  here. And so, again, you know...

Page 187

1           MR. KHAZEN: You're her lawyer. That's...
2           MR. BEIK: Not in those matters, Ramzi. I'm
3   not -- I'm not a real estate attorney and I'm not
4   involved in those cases. So, you know, that's what
5   I'm saying. I represent her in a copyright
6   infringement case in this, in this matter that we're
7   here on.
8           MR. KHAZEN: And there are companies saying
9   that they own those copyrights, and I'm asking her
10  about those companies. This is -- how could it be
11  more relevant, frankly? I can't -- I can't think of
12  a more relevant question.
13          THE WITNESS: They're lying. They're lying
14  and they forged my name and they are lying and there
15  is still restitution.
16          MR. MORRIS: This is J.T. Was there a
17  question pending?
18          THE WITNESS: He's asking about a lawsuit --
19          MR. BEIK: Okay. Hang on.
20          MR. MORRIS: There was a question pending so
21  I think we need to strike that testimony. Paul, and
22  I'm sorry to jump in here, are you instructing the
23  witness not to answer anything about Genova or are
24  you going to give her leeway to answer factual
25  matters about the ownership of the copyrights that

Page 188

1   Genova and Warmblood have asserted in that lawsuit?
2           MR. BEIK: I believe those questions were
3   already asked and answered.
4           MR. MORRIS: Then you can make your
5   objection --
6           MR. BEIK: Asked --
7           MR. MORRIS: -- on the record and Mr. Khazen
8   can proceed with the questioning.
9           MR. BEIK: I'm sorry, say that one more
10  time.
11          MR. MORRIS: I said you can make your
12  objection on the record and Mr. Khazen can proceed
13  with his questioning, as long as he's not asking for
14  privileged information.
15          THE WITNESS: Well, it is privileged.
16          MR. BEIK: Well, I'm objecting to it all,
17  so...
18          MR. MORRIS: Are you objecting on relevance
19  or are you objecting on privilege?
20          MR. BEIK: I'm objecting on relevance and
21  also on the fact that the questions were already
22  asked, they were already answered.
23          MR. MORRIS: Well, that's an object form in
24  the Western District of Texas, as you know.
25          MR. BEIK: That's what I said: Objection,

Pages 185 to 188

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

P-Resp_Renew_MSJ147

Page 189

1  form.
2      MR. MORRIS:  Noted.  All right.  Let's
3  proceed.
4      THE WITNESS:  Is there a question now or?
5      MR. KHAZEN:  Will the court reporter read
6  back my prior question please?
7      THE WITNESS:  Sorry, are you reading me a
8  question you said?  I'm actually really exhausted
9  because I've been working on these cases all -- the
10  whole weekend and then we had something change.  And
11  so it's this is -- I really thought this was going to
12  be a couple hours this morning, and I didn't know it
13  was going to be a whole day.
14      So you keep asking me if I'm on substance,
15  on a substance, which is actually I think is rude.
16  And I'm absolutely exhausted, mostly because dealing
17  with these criminals, and so...
18      MR. BEIK:  Okay, Colette.  Hang on.
19      MR. KHAZEN:  Debbie, would you mind reading
20  the question back.
21      (The last question was read back as
22          follows:  "Have you ever paid either of
23          them any money, you or Malibu?")
24      THE WITNESS:  Did I or Malibu every pay them
25  personally?  That -- I'm going to decline to answer

Page 190

1  that.  It's a pending litigation and I think this is,
2  this is all, this is all pending.
3      So, Paul, do I need to answer his question?
4  I mean, we paid them a lot of money but for nothing,
5  so...
6      MR. BEIK:  Under the rules, unless it's an
7  attorney-client privilege, then you're required to
8  answer their question.
9      THE WITNESS:  Well, I'll answer the question
10  but I can't be specific because this is a -- it's
11  a -- it is attorney-client privilege as far as --
12      MR. BEIK:  If it's attorney-client privilege
13  then you don't have to answer, but if it's not
14  attorney-client privilege then --
15      THE WITNESS:  Well, what's not
16  attorney-client privilege is yes, we have paid them a
17  lot of money.  And that would be something that is
18  easily found.  And we also sent them a cease and
19  desist letter to stop acting on our behalf and
20  pretending to be Malibu when they weren't.  And so
21  that, that would cover what is not attorney-client
22  privilege.
23  BY MR. KHAZEN:
24      Q.  Who specifically did you pay, Warmblood or
25  Genova?

Page 191

1      A.  Genova.  Genova Capital.  That was on a real
2  estate deal that --
3      Q.  What did you pay them for?
4      MR. BEIK:  Objection to form.  Like I said,
5  I don't -- I don't see the relevance of these
6  questions.
7      THE WITNESS:  Again that's attorney-client
8  privilege because we have some big disagreements on
9  that on what and how much and, you know, and some
10  games that have been played with us.  So Warmblood
11  we've not paid anything.
12      They -- Warmblood or Genova, I don't know
13  which one, they actually wrote themselves checks from
14  Malibu Media pretending to be Malibu Media and
15  actually even wrote it to their contracting company,
16  which I had to go back with the IRS and fix, so they
17  are -- their father still owes 15 million in
18  restitution to the government.
19      These are not nice people.  And for some
20  reason had wanted, have want -- they want to try to
21  make money of the copyrights.  We would never sell
22  our copyrights.  They tried to extort us.  Just to
23  get you so you understand it, they tried to extort us
24  into giving them half of our business, and they
25  weren't able to.

Page 192

1      So I don't know if -- because we wouldn't
2  sign their extortion deal, I don't know if they filed
3  a lawsuit ever or, you know, if people waiting around
4  the place when you file lawsuits just saw our name
5  and leaked it to the Vanity Fair or something like
6  that.  So then maybe they did file it later, but
7  nothing ever went forward.  So it was a year ago and
8  nothing ever went forward.
9      They never -- or they're not actually asking
10  for money, they're just trying to see if they can get
11  a windfall in any way by pretending they were Malibu
12  Media and that we give them a service contract to
13  work for us, like these other lawyers who all stolen
14  money.  Well, we haven't given them a service
15  contract.  And we don't owe them money.  They owe us
16  money.  So and the rest are attorney-client privilege.
17      And as far as our -- it's a very -- it's a
18  large litigation.  And it's, you know, we had it
19  about finished this weekend and then at 10:00 o'clock
20  last night they tried to move it to a federal court.
21  I mean, these are really, really tough guys.  So I
22  have litigators in California working on it.  Paul's
23  not involved.  I'm being open with you because I want
24  you to know this has nothing to do with our case,
25  nothing to do with you or your client, but it's just,

Pages 189 to 192

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

P-Resp_Renew_MSJ148

Page 193

1  you know, Will Smith gets sued 51 times a year just
2  for, you know, people putting money out there.  So if
3  they see the numbers on the copyrights and they want
4  to, they want in on it, it's people like that.
5      We want to run our business and enjoy doing
6  our business and helping the models and, you know,
7  and creating things.  Like we're creative people
8  and -- and, you know, we don't -- and I don't want to
9  watch our numbers go down more and more as more
10  people steal from the BitTorrent.  These guys just
11  want to sue people and make money doing that, but
12  they -- they're not allowed to buy copyrights to do
13  that so they are trying to pretend they're Malibu
14  Media, which we're suing them for that, and that's
15  where we are.
16      We do not have investors or whatever they
17  wrote, or something weird like that, but, I mean, we
18  don't have any -- they haven't invested anything in
19  us.  They -- we -- they haven't paid for any of the
20  ████████████████████████████████████
21  ████████████████████████████████████
22  would be a minimum minimum, and probably more because
23  to shoot that many movies and spend that much money
24  it's -- so there's no way that we say, oh, here, you
25  can have half of our business for helping us with

Page 194

1  something when they didn't even help us or do
2  anything and I didn't sign anything.  They doctored
3  that, too.
4      So but anyway, I don't want to get into a
5  case that I have lawyers handling and hopefully doing
6  a good job and we can be finished with them.  But we
7  are the title -- we are the -- I -- actually I do,
8  not my husband, he actually, because he didn't want
9  to get involved in lawsuits, he's really just
10  creative, and I said, you know, we have to or we're
11  going to lose, not be able to do business anymore, so
12  he actually signed Malibu Media over to me seven
13  years ago.  And so I've been the one that has
14  participated.
15      But, again, I've been so busy with the
16  businesses that I've not been able to really -- you
17  know, and I just trusted the lawyers because they
18  were lawyers.  And so the lawyers all pocketed all
19  the money, except now we have great lawyers like Paul
20  and like Jay, and a really great team that is -- and
21  Texas is doing a great job for us by protecting our
22  copyrights, and for just one batch that we filed 140
23  suits about a year ago.  So if -- as we start putting
24  up more movies, we're going to need to protect our
25  copyrights more.

Page 195

1      So there you go.  That's a long answer.  I
2  hope that's good enough for you.  Everything was
3  that.
4  BY MR. KHAZEN:
5      Q.  What did they try to extort you with?
6      A.  They tried to say they were going to
7  foreclose on our expensive house in Malibu on a
8  hundred thousand dollar loan that was not even a
9  loan, it was them trying to put money into our
10  business than they actually already had taken back
11  out of the business, but somehow they had a
12  promissory note that they recorded on the house.
13      This was their -- this is their business.
14  What they do is they like take little ladies' homes
15  when they haven't paid the property tax.  So we have
16  a relatively expensive home, and they literally told
17  us -- and so they lost on that.  The judge said they
18  were trying to extort us with an illegal foreclose
19  sale.  And they, to the last minute, they're saying,
20  just sign this document giving us half of your
21  business and we won't foreclose and you won't lose
22  all the money on your house.
23      And we're like -- and then they're saying,
24  oh, no, but don't wire the money to the trustee, sign
25  this and give us your business.  And so literally

Page 196

1  they tried to say, oh, do you want your house or give
2  us part of the business.  And so we got an attorney
3  involved and he said this is crazy, you know, you
4  can't get a windfall and just say -- and then also
5  they had been paid the money.  We paid it to them
6  again just for good, just so they couldn't say
7  anything.  And they have still been giving us issues
8  with the title on the house.
9      So it's been a huge, huge stress.  And these
10  are bad guys.  They are just sneaky, sneaky, bad guys
11  and it's -- yeah, it's just -- it's very --
12      Q.  Do they still claim to have half of your
13  business?
14      A.  No, they don't claim to own half of our
15  business at all, no.
16      Q.  Did they ever claim to own half of your
17  business?
18      A.  No.  No.  They tried to -- they tried to get
19  us to sign, me actually, to sign the document that
20  would give them half of the business, which we never
21  even spoke about.  They were going to maybe help us
22  with the copyrights and they would get some percent
23  for helping with the copyrights, but they
24  misrepresented what they could do, what they couldn't
25  do.

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

P-Resp_Renew_MSJ149

1    They're also of the Mormon faith, so they
2  couldn't even watch the movies.  So it was very
3  strange.  I still don't understand it.  But they -- I
4  think they saw an opportunity that we weren't -- we
5  were letting all these lawyers steal from us so maybe
6  we would let them steal from us, too, so --
7    Q.   Did you -- did you have any written
8  agreements with them --
9    A.   No.
10    Q.   -- with regards to the copyrights?
11    A.   No.
12    Q.   Did you have any oral agreements with them
13  regarding the copyrights?
14    A.   No.  No.  Only what they wrote down.  And
15  then when I wouldn't sign the paper that would make
16  their fake agreement look real, they didn't file the
17  lawsuit.  And then I think they filed it like seven
18  months later and then didn't do anything about it,
19  and then now that lawyer doesn't even work for them
20  anymore.
21    So they -- so it's just like whenever you
22  get -- when someone starts seeing you that you might
23  have money or you're making money, you know, people
24  just go after you.  And it's just not really fair but
25  it's -- you're always going to be a target, and --

1  and it is what it is.
2    So but it's great to have great attorneys
3  like Paul and the great team we have finally
4  together.  You know, live and learn.  I was like, we
5  didn't know like how quickly we'd start making money
6  with our idea.  We didn't know what to do.  We didn't
7  know that these tigers were all going to like just
8  wolves in sheep's clothing were all going to come
9  out, so it was, it's, yeah, it's been --
10    Q.   What idea are you referring to?
11    A.   Well, when we thought of actually making XR,
12  we thought, you know, Brazzers making $30 million a
13  year and their content is really disgusting and it's
14  all violence against women, and so we thought what --
15  I was still a fashion model at the time, and my ex --
16  well, my husband, he's not my ex-husband, he was a
17  photographer, and he was doing really beautiful
18  fashion nude and art photos, and I said why don't we
19  make movies.
20    Because the DSR was just coming out where
21  you could just bring your photo camera and do videos,
22  and I said why don't we make some movies that are
23  really beautiful, and because he was doing this site
24  called Beauty Effects and we can make it that sex
25  doesn't have to be disgusting, that kids who are all

1  getting on the Porn Hub and seeing these women
2  getting hit and, you know, violence against women
3  and, you know, and rape videos and child porn and all
4  these awful things that, you know, MindGeek was doing
5  to the world.  And we said, like, what if we just
6  make like really like kind of music videos but it's
7  really beautiful but they're also explicit.  And so
8  we had that idea and then all of a sudden it became
9  an actual category and so --
10    Q.   You made it for kids?
11    A.   Huh?
12    Q.   You made it for kids?
13    A.   No.  I said -- no.  And MindGeek actually
14  has, you know, child porn and things like that that
15  people can log on for free and see that.  So we, you
16  know, we made -- actually it's really funny that the
17  CEO of MindGeek wanted to buy us.  He said our site
18  was so vanilla that he could play it at dinner while
19  he was having dinner with his family and his
20  children.
21    And so obviously it's not that vanilla
22  anymore because we need to go back and take care of
23  our, control of our directors, but with COVID it's
24  not as easy.  But the thing is it became a new,
25  beautiful erotica and, you know, and they called it

1  like -- it had all these new names of like a new
2  style of, you know, beautiful, fashion model style
3  but still explicit.  And so it became something new.
4    And then we had about a hundred copycats,
5  and I think that's why we're one of the most copied
6  sites that there is.  So it was -- but we had no idea
7  how successful it would get with just 40 movies.  So
8  we were kind of surprised at the time.  And then when
9  the New Yorker did a big article on us, you know,
10  everyone just came crawling out of the woodwork
11  trying to get a piece of everything.
12    And I think these guys who are, you know,
13  want to be contractors or whatever some reason think
14  they are also lawyers, which they're not, and, and
15  decided to try to extort us for half of our company,
16  which we didn't let them, and now we are, you know,
17  going on the offensive.
18    Q.   When you said fake, you said they made a
19  fake agreement, what were you referring to?
20    A.   They -- they --
21    MR. BEIK:  Object to the form to all these
22  questions --
23    THE WITNESS:  Yeah.
24    MR. BEIK:  -- but, again, based off of asked
25  and answered.  She just went through the entire

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

P-Resp_Renew_MSJ150

Page 201

1  thing.
2       THE WITNESS: Yeah, I tried to tell him, you
3  know, what happened and it's -- it was -- it was a
4  DocuSign they were saying I sign, which I didn't, and
5  they, they wrote everything they wanted, like their
6  dream deal.  But they knew I didn't sign it so that's
7  why they kept going back and that's why they had the
8  extortion idea because they knew it wouldn't really
9  stand up because I hadn't signed it.
10 BY MR. KHAZEN:
11      Q.  And what did -- what did that DocuSign
12 document say that --
13      A.  I don't remember actually because I didn't
14 really see it because it was just -- they said they
15 had it.  It must have said something about them doing
16 some work for half of -- one thing we never would
17 have to agreed is, so I know this was fake, because
18 it said half the copyrights, not half of the -- and
19 also that's not even legal to give someone half of
20 your income from -- like, it's not nothing.  You
21 know, so we never would have agreed to this ever.
22      And so they -- so they put in their wish
23 list of, you know, they wanted to own half of our
24 business so that would mean they could license
25 anything they wanted, anything they wanted just

Page 202

1  for -- but no money.  They wanted, in exchange for
2  that they wanted to, I don't know, help with the
3  business or something.  It was just so stupid.  So
4  and they -- then I guess just DocuSigned my name on
5  it.  Who knows, they might have even been at our
6  property when they did it.  I don't know but --
7       Q.  Did that agreement have any, any agreement
8  for exclusive right to license the copyrights?
9       A.  No. No.
10      Q.  Have you produced that agreement?  Do you
11 have a copy of it?
12      A.  No, I don't have a copy of it but my
13 attorneys I'm sure do.  But it's -- it doesn't matter
14 because it's a fake agreement that it was not even
15 made by the lawyer, it was made by these guys at the
16 last minute saying, oh, either sign this or we'll
17 foreclose on you, so...
18      Q.  And you said -- you said they had power of
19 attorney; is that correct?
20      A.  They asked for power of attorney right after
21 they wanted to do a construction project with us,
22 which -- they say, oh, that's normal so we can sign
23 anything we need to sign your name for for the
24 construction project, but they -- actually it was a
25 very hard-core power of attorney where they could

Page 203

1  sign my name on anything.  And my husband was smart
2  enough to have them, have a revocation done the same
3  day and we revoked it very, very shortly after,
4  because we figured it out.
5       Q.  Is there anything that they claimed to have
6  done in the meantime?
7       MR. BEIK:  Object to the form.
8       THE WITNESS:  I don't even understand what
9  he, what he said.
10 BY MR. KHAZEN:
11      Q.  Is there anything they claim to have done
12 under that power of attorney that you --
13      A.  No. No. No.
14      Q.  And you said earlier that they had, that the
15 other guys had stolen the copyrights.  What were you
16 referring to?
17      A.  The lawyers?
18      Q.  Yeah.  Well, I don't know what you're
19 referring.  You said -- you said the other --
20      A.  I also referred to 2.4 million in six months
21 in settlements, and he's in jail now because he also
22 stole a lot more from his boss.  They were also
23 related to a Mormon group, and so they, they looked
24 normal in Beverly Hills.  Thought it would be good to
25 have a lawyer nearby, so that was a big mistake.

Page 204

1       And then we went with a lawyer in Florida
2  who also turned out to be a big mistake who wanted to
3  turn into her business.  And she also kept all of the
4  funds.  So since the first lawyer who started doing
5  this with us and paid us a good amount of money and
6  did all of our legal work, the last two, because
7  we've been so busy growing our business and our other
8  websites, we haven't had much time to pay to the
9  lawyers.  So we thought these guys, oh, they can help
10 us, but then we realized, no, they were worse than
11 the lawyers.
12      And now we do have everything set up
13 where -- like when I first started the first year, I
14 was in depos all the time.  So now we're -- I've been
15 working like crazy but we have everything set up
16 where we are going to, you know, make everything move
17 forward.
18      So, you know, I don't know if that helps you
19 or what you're trying to ask, but I'm just trying to
20 be truthful with you what has been happening and, you
21 know, why we haven't been filing and why we haven't
22 been able to get you all of the stuff from those guys
23 from Germany because it's, you know, we're not --
24 they've also -- they've also been taking money from
25 us and other countries pretending to be Malibu Media

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

P-Resp_Renew_MSJ151

Page 205

Page 206



Page 207

Page 208

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

P-Resp_Renew_MSJ152

Page 209

1  2018, 2019?
2      A.   The later years I don't really know because
3  the lawyers were -- we weren't -- we just weren't
4  paying attention to it because we were letting the
5  lawyers pay attention to it and we were just busy,
6  you know, running our business, which is how they
7  were making money off our copyright.  So -- so I
8  don't know exactly what the -- the lawyers cost us a
9  lot of money.  I mean not like Paul, he's a great
10  lawyer, and, I mean, we're so lucky to have found him
11  and now we have a really great group and we have a
12  really great head IP attorney.
13          So and I'm now running everything, our team.
14  That's another thing.  It costs -- I pay the team,
15  the paralegals, investigators, everything, you know,
16  out of my pocket, even if we're not collecting
17  anything.  And so -- so it's, you know, it's really,
18  for us, it's really we need to keep the momentum
19  going of the filing so we stop people thinking that
20  okay, you know, you can just go, if you want to watch
21  our movies, you can just go watch them for free.  And
22  we really need to keep spreading that word that you
23  can't just go watch them for free.  If you want to
24  watch free porn, there is free porn but there
25  isn't -- there isn't stuff like what we make.

Page 210



Page 211

1  3:46.
2          (A recess was taken.)
3          THE VIDEOGRAPHER:  We are back on the record
4  at 3:59 p.m.
5  BY MR. KHAZEN:
6      Q.   So you described, you said earlier that your
7  site is vanilla.  Do you consider that the, I
8  believe -- do you consider that the titles that are
9  in my, that are in Exhibit A to the complaint to be
10  vanilla?
11      A.   No, not, not really, but, I mean, compared
12  to what you'd find online now unfortunately they are
13  a little bit.
14      Q.   And you said that you thought kids were
15  watching porn sites and that this would be a better
16  way?
17      A.   My 13-year-old nephew, he has Porn Hub on
18  his phone and they literally had a video of a woman
19  getting punched in the face.  So they were just -- it
20  just seemed horrible, and so the violence against
21  women, and so, yeah.
22      Q.   So this seemed better for kids?
23      A.   No, not for kids at all.  Kids should not be
24  watching anything if they're under 18, of course.
25  But -- but if, you know, like I thought that someone

Page 212



Pages 209 to 212

Page 213

Page 214

Page 215

Page 216

```
1        So I just don't know.  Now that we have a
2    new system -- I'm not sure what your question is.
3    Like what do you -- what do you want to know?  What's
4    the question?
5             (Thereupon Defendant's Exhibit 5
6             was marked for identification.)
7    BY MR. KHAZEN:
8        Q.  So let me direct your attention to
9    Exhibit 5.  Do you see Exhibit 5?
10       A.  Yes.
11       Q.  Do you recognize this document?
12       A.  Yes.  This would be one of our -- this would
13   be -- yeah, this would be the settlements that came
14   in.  Do you -- what dates are these for?  These are
15   for -- I don't know what dates they're for.  So do
16   you know what dates these are for?
17       Q.  No, I don't.  This is -- I only have this
18   exhibit.
19       A.  Eastern Virginia.  It looks like a sampling.
20   D.C., eastern, Eastern California.  So this is a
21   sampling from how -- do you know how much time this
22   is, from when to when?  So Eastern District New York
23   and eastern district.
24           MR. BEIK:  Can we take -- can we take a
25   minute and go off the record?
```

Pages 213 to 216

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

P-Resp_Renew_MSJ154



Page 217

1      THE WITNESS: Yeah, I don't -- like how many
2  times Truth or Dare was taken --
3      THE VIDEOGRAPHER: Does everyone agree?
4      MR. KHAZEN: There's a question pending so
5  she was kind of in the middle saying something.
6      MR. BEIK: Oh.
7      THE WITNESS: I just -- I just wanted -- I'm
8  trying ask what was your question. What's your
9  question? You're showing me this sheet that looks
10 like revenue coming in on the movies that were
11 infringed on.
12 BY MR. KHAZEN:
13     Q. Correct. Is this what -- is that what this
14 is?
15     A. Yes. It looks like it. But it looks like
16 it's only a certain period of time.
17     Q. Correct. Now, so again I want to ask for
18 2019, what was your -- you keep saying that you made
19 no money, but I need to know the revenue. What
20 revenue did you generate in 2019?
21     A. That's what I'm trying to tell you. 2019
22 when, from 2019, August to August, we only filed one
23 set and -- one set of -- one set of filings, and I'm
24 saying we made, I don't know exactly, but it would be
25 on a sheet something like this, and I could get it,

Page 218

Page 219

did

Page 220

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

P-Resp_Renew_MSJ155

Page 221



Page 222

```
1   say we put a really popular title, and it's -- it
2   basically then, you know, so we know it will be
3   infringed on a lot, then, you know, but then lawyers
4   were doing this.  We weren't participating in this.
5   So it's you're asking me questions that really for
6   the last six, seven years the lawyers have been doing
7   this.
8        And so and now we're just about to start
9   getting filing again.  So -- so it's like you kind of
10  ask me questions that don't even have anything to do
11  with my business at this point.  Your -- your guy who
12  did or did not, you know, download illegally -- I
13  mean, he obviously uses the torrent sites.  But
14  anyway, next question.
15       (Thereupon Defendant's Exhibit 6,
16       Exhibit 7, Exhibit 8 and Exhibit
17       9 were marked for identification.)
18  BY MR. KHAZEN:
19   Q.  So do you see Exhibit 6?  Can you take a
20  look at Exhibit 6 through 9 and tell me if you
21  recognize these documents?
22   A.  6.  Okay.  I don't -- I don't know.  Is that
23  a document from you?  So, okay.  So I'm looking at
24  them.  So, okay.  Tell me.
25   Q.  Do you recognize these?
```

Page 223

```
1    A.  I'm looking at them now.  I'm seeing them.
2   Yeah, I do actually.  I do.  I recognize these.
3   These are actuaries.
4    Q.  Were you given these and asked to search for
5   these categories of -- let's just go to exhibit --
6    A.  Yes, I was given these actually.
7    Q.  When were you given, let's say exhibit --
8   exhibit --
9    A.  I was given these a while ago, and then --
10  and then given me to sign I think again last night
11  even, or something, or before, night before.  I'm not
12  sure.
13   Q.  Okay.  Did you search for the categories of
14  documents listed in Exhibit 6?
15   A.  Exhibit 6.  Okay.  So this was -- okay.  So
16  these were -- these were -- this is a -- this is
17  not -- this is like way, way too much.  I mean,
18  this -- so I'm not sure what you're asking me.  Are
19  you asking me did I search for these categories?
20       This is -- yeah, all these movies are
21  registered, and communications -- if you just go
22  online to uscopyright.org and you register your
23  movie, so -- or your whatever, artwork you have or
24  whatever software code.  And so -- so you're asking
25  for all documents and communications between any and
```

Page 224

```
1   all --
2    Q.  I asked have you searched for these
3   categories of documents?
4    A.  There's no searching for this.  I mean, like
5   number six, "All documents and communications
6   sufficient to show any and all income you have
7   received from licensing the films over the past five
8   years."  I mean, that's -- that's just too big of a
9   category.
10       So I could go through my taxes and see, you
11  know, but there's all different kinds of licensing
12  categories and, you know, it's just -- it's -- it's
13  doesn't -- it's definitely overreaching as far as to
14  what has to do with our, what we're talking about
15  here.  "All documents and communication sufficient to
16  show the annual income you have received from
17  cease-and-desist efforts, threatening lawsuits, and
18  filing lawsuit, including" -- okay.  So, yeah,
19  that -- is that -- yes, I went through all this many
20  times.
21   Q.  And did you -- did you find any of these
22  documents -- did you find the documents and turn them
23  over to your lawyers that were responsive to these
24  discovery requests?
25   A.  These don't have documents for them.  It's
```

Pages 221 to 224

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

P-Resp_Renew_MSJ156

1   like this it's -- okay. It's not -- so for each of
2   the copyrights, documents and communications
3   sufficient to show any and all income you have
4   received from cease-and-desist efforts,
5   threatening -- threatening lawsuits. You're calling
6   our lawsuits threatening. So, I mean, that I take
7   it, but I take -- I think that's not very nice. And
8   then filing lawsuits, including settlements, related
9   to the copyright-in-suit over the past three years.
10  That's not even a question.
11          That's basically saying that we're
12  threatening people to get settlement money, and we
13  haven't received any money for that. So all
14  documents and communications related to any and all
15  places you have shared, displayed, distributed, sold,
16  or offered for sale the films. And all that is just
17  our website. We only offer it on our website. We
18  don't offer anywhere else.
19          So these are all very -- I already spoke to
20  my attorney about these, and they're very simple
21  answers. They're -- and but most -- a lot of them
22  aren't even applicable. Any financial losses that
23  you claim resulted from any alleged infringement or
24  impermissible use of the films and your other
25  copyrighted works. So that would just be, you know,

1   that is also in a -- all involved in litigation at
2   this point with those last two lawyers, number 12.
3          So, yeah, I looked at all of them and these
4   are -- they're not -- they're not something that,
5   that is applicable here.
6      Q.  And how did you determine that they weren't
7   applicable to this case?
8      A.  Because some of them are attorney-client
9   privilege, so another one is -- so, for instance,
10  I'll just go -- if you want me to go through them, so
11  these are -- okay. So discovery requests, the term
12  document...
13     Q.  Let me just ask. Are you saying that
14  they're not applicable or that they don't exist?
15  That's what I'm trying to understand.
16     A.  I'll tell you. All documents concerning the
17  registration of the films with the United States
18  copyright office. That is easy. Those all exist,
19  and they could be found on the U.S. copyright
20  website, uscopyright.org. You put in the title and
21  you'll see we're the owner. Request two, same thing,
22  uscopyright.org. And then number --
23     Q.  What about your work made for hire
24  contracts. You sued 9,000 people. Don't you
25  think it would have made sense to produce the

1   documents that show ownership of these copyrights if
2   they exist?
3          MR. BEIK: Object to form.
4          THE WITNESS: What are you talking about? I
5   told you we produce -- we produce the -- there's no
6   work made for hire contracts that apply to
7   copyrights. We produce them. Like, so if we want to
8   hire someone to help with lighting, he's going to
9   work for hire, but that has nothing to do with the
10  copyright.
11  BY MR. KHAZEN:
12     Q.  Okay. So you don't have a provision in
13  there for -- you don't have a provision in your
14  contracts with independent contractors regarding
15  copyrights?
16     A.  No. But they don't have any rights to the
17  copyright. They have no rights to anything. All
18  they have is their daily rate.
19     Q.  That's for the law to determine, of course.
20  So the -- did you recently see -- did you see more
21  recently Exhibit 9?
22     A.  Yes.
23     Q.  And did you search for these documents --
24  when did you first see Exhibit 9?
25     A.  I think a while ago. And this was your

1   counter -- papers, emails, books, journals, ledgers,
2   memorandum. This, I have no idea what this was. So
3   tell me what you're asking for here.
4      Q.  So, for example, let's look at request 56.
5   "Your communications with Genova Capital, including
6   any discovery or communications regarding a lawsuit
7   or potential lawsuit." Did you search for this
8   category of documents?
9      A.  This is an active lawsuit and run by, right
10  now being as to eight litigators taking care of this.
11  And I can't give you attorney-client privileged
12  information with regards to this. I've explained to
13  you what it's covering, but, you know, we have a lot
14  of damages on the line here with these people.
15          And I don't understand why I would be -- if
16  you're going to file a motion to compel to have the
17  judge turn over this Genova stuff. I mean, have at
18  it, but, I mean, this doesn't make any sense to me.
19  It has nothing to do with -- you're trying to say
20  your client didn't, didn't download those nine movies
21  but then you're asking me for all communications
22  having to do with Genova. Some criminal is trying to
23  take advantage of us. I don't understand.
24     Q.  So you're claiming that your communications
25  with Genova Capital, it's your understanding that

Pages 225 to 228

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

P-Resp_Renew_MSJ157

Page 229

1    your communications with Genova are privileged?
2        THE WITNESS:  Yeah, ask --
3        MR. BEIK:  Objection, form.
4        THE WITNESS:  What?  Yeah, I mean, ask my
5    attorney, Murphy Rosen.  There -- he's right now,
6    they pulled another stunt, and we're about to get
7    them finished and they were so scared that they were
8    going to get sued for $11 million that they, they
9    illegally tried to transfer it to federal court just
10    now.  So -- so we're literally -- literally
11    illegally, like they weren't allowed to do that.
12    They just like went in and did it because they were
13    going to lose.  So -- so now I don't know where my
14    attorney's going but he's going somewhere.
15        So this is a very stressful, pending
16    litigation with some really pretty smart criminals
17    that actually from their religion you'd think they'd
18    have nothing to do with our business, so it's very
19    strange, very hard to understand.
20        So I don't know why with you trying --
21    you're trying to prove -- I know this is not a
22    mediation, it's a deposition, but you're trying to
23    prove that your client did not download these movies.
24    That's all of this -- that's what this is over, did
25    your client download these movies.

Page 230

1    Because we've been taken advantage by too
2    many lawyers in the last, what is it, five years, six
3    years, and we have been -- and we have then now being
4    taken advantage of these Genova clowns and -- taking
5    one from Joe Biden I guess, and so -- and so I don't
6    understand how that, that has anything to do with
7    your guy downloading nine of our videos over multiple
8    years.
9    BY MR. KHAZEN:
10    Q.  So, for example, if you look back at --
11        MR. MORRIS:  Ramzi, I'm sorry.
12        MR. KHAZEN:  Sorry.  Go ahead.
13        MR. MORRIS:  Paul, can we have a little
14    discussion off the record here?
15        MR. BEIK:  Why don't we talk off for a
16    second.  I don't know what you want to talk about.
17        MR. MORRIS:  Well, what I'd like to talk
18    about is the question was about whether the
19    communications were privileged, and the witness is
20    going off on tangents about Genova's religion and
21    them being criminals.
22        I think it would serve us all a lot better
23    if the witness answered the question directly so we
24    don't have to be here all night and hopefully we
25    don't have to seek court intervention.  I'm not her

Page 231

1    attorney.  I can't control her, but I'm asking you as
2    a matter of professional courtesy and as a matter of
3    keeping the record clean that we try to --
4        THE WITNESS:  I shouldn't say things about
5    them like that, but the thing is we're in the middle
6    of a --
7        MR. BEIK:  Colette, hang on.  Hang on.  Now,
8    the question of whether something is privileged is
9    obviously I objected to it because, you know, that's
10    a question of -- that's a legal question.  And, and
11    she can answer the question, because she doesn't, she
12    doesn't really -- it doesn't seem like she knows what
13    the question is because of that.  But you, you know,
14    whether something's privileged is something that say,
15    you know, decide.
16        MR. MORRIS:  Okay.  And that's fine.  And
17    she can say, I don't have an understanding about
18    that.  But going off on two-minute tangents doesn't
19    benefit anybody here.
20        THE WITNESS:  Well --
21        MR. MORRIS:  And eventually we're going to
22    have to stop this deposition and go to the court.  I
23    don't want to do that.  I'm sure you don't want to
24    waste the court's time doing that.  But it's getting
25    to the point where it's bad.  I'm just putting that

Page 232

1    on the record and putting that out there for you.
2        THE WITNESS:  What does this question number
3    56 have --
4        MR. BEIK:  Hold on.  Can we -- can we take a
5    few minutes?  Can we take a few minutes, I can try to
6    talk to my client for another second?
7        MR. MORRIS:  That's fine.
8        MR. BEIK:  Okay.
9        THE VIDEOGRAPHER:  Going off the record at
10    3:26.  Sorry, 4:26.  4:26.
11        (A recess was taken.)
12        THE VIDEOGRAPHER:  We are going back on the
13    record at 4:34 p.m.
14    BY MR. KHAZEN:
15    Q.  Did you understand that your communications
16    with Genova are privileged?
17    A.  Yes, I do understand that.
18    Q.  That's -- just to be, just to be clear, you
19    believe that the communications that you have had
20    with Genova are privileged?
21        MR. BEIK:  Object to form.
22        THE WITNESS:  Yes, I believe they are.
23    BY MR. KHAZEN:
24    Q.  And what is the, what is the basis for that?
25        MR. BEIK:  Object to form.

Pages 229 to 232

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

P-Resp_Renew_MSJ158

Page 233

1    THE WITNESS: I'm sorry. An ongoing lawsuit
2  right now. And we have attorneys, we're in the
3  middle of litigation, and there's many
4  attorney-client privilege, too much to -- that I
5  believe it's attorney-client privileged information
6  in request 55.
7  BY MR. KHAZEN:
8    Q.  And you believe your communications with
9  Warmblood are privileged?
10    MR. BEIK: Object to form.
11    THE WITNESS: Warmblood, yes, because
12  Warmblood is Genova. It's -- they're one and the
13  same.
14    MR. KHAZEN: And, Paul, I'll just ask you.
15  I mean, are you asserting privilege over, over the
16  communications she had with Genova and Warmblood?
17    MR. BEIK: Ramzi, we served the responses to
18  these questions, and the responses have objections,
19  and so the objections are stated in the responses.
20  And so, you know, again, I already objected to form.
21  I mean, you're asking a nonlawyer whether something
22  is privileged or not, and, like I said, I don't -- I
23  can't answer for her, but I don't think she knows
24  what you're asking.
25    THE WITNESS: Right. That was the problem

Page 234

1  before. So I'm going to -- my --
2    MR. BEIK: Colette, hang on. Colette, let
3  Ramzi do...
4  BY MR. KHAZEN:
5    Q.  So turn back to Exhibit 6.
6    A.  Exhibit 6, okay.
7    Q.  See request 22?
8    A.  Yes.
9    Q.  It says, All communications and documents
10  relating to your investigation of Doe, including but
11  not limited to investigations performed by IPP or
12  Computer Forensics, LLC. Do you see that?
13    A.  I see that.
14    Q.  Did you search for your communications with
15  IPP or Computer Forensics?
16    A.  Yes, I participated with my lawyers, and I
17  responded to this a long time ago, I believe.
18    Q.  And your response was you said you didn't
19  have any, other than the communications that were in
20  the possession of the Lomnitzer firm; is that
21  correct?
22    A.  That would be correct if it was, yes, if it
23  was during the years that we were with the Lomnitzer,
24  because we had -- we were just getting back our, our
25  intellectual property from her when we were answering

Page 235

1  these.
2    Q.  Have you produced -- have you communicated
3  directly with IPP at all during this period?
4    A.  No. They were actually not talking to me
5  because Lomnitzer was paying them more than I wanted
6  to pay them, so she was communicating with them.
7    Q.  And what years was that, were those?
8    A.  That was I think '17 and '18.
9    Q.  And then in 2019 did you communicate with
10  IPP directly?
11    A.  Part of -- no, we actually -- when we left
12  Lomnitzer, we left IPP.
13    Q.  So when you testified earlier that you
14  communicated with IPP over WhatsApp?
15    A.  Yeah, a couple things that we had still
16  going on with them, but we didn't -- they weren't
17  our -- providing the service anymore for us.
18    Q.  That wasn't my question. I was asking
19  whether you were communicating, whether you
20  communicated with them and you said no. So when is
21  the last time you communicated with IPP?
22    A.  Months and months. I don't recall exactly.
23  I think that's what I said before, too.
24    Q.  Did you communicate directly with IPP over
25  WhatsApp at all in 2019?

Page 236

1    A.  I believe I tried to.
2    Q.  And WhatsApp, did IPP respond to your
3  communications to them?
4    A.  I believe they tried to get us to pay more
5  money to get more data from them, and since we were
6  already designing our own that nothing every
7  progressed because they wanted more from us than we
8  were willing to give.
9    Q.  And when did they send you a series of
10  communications?
11    A.  I don't -- probably -- maybe this was seven
12  months ago.
13    Q.  And were there any communications with them
14  prior to that over WhatsApp?
15    A.  I'm not sure.
16    Q.  Were there any communications with them
17  prior to that over any means directly between you and
18  IPP?
19    A.  No, I don't believe so.
20    Q.  Did you ever communicate with Computer
21  Forensics?
22    A.  Is that -- that's it I believe. And, yes, I
23  believe I did communicate with him.
24    Q.  When is the last time you communicated with
25  Computer Forensics?

Pages 233 to 236

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

P-Resp_Renew_MSJ159

Page 237



Page 238



Page 239

1  it's -- they both do the same time, it's just done in
2  a more modern fashion.  Okay.
3      Q.  So how do you -- how -- what were your --
4  how were you communicating with Warmblood and Genova?
5      A.  Haven't been communicating with them for
6  over a year.
7      Q.  When is the last time you did?
8      A.  You know what, I can't remember.  I can't
9  remember, but I think it would have been on a text,
10 via a text.
11     Q.  And when was the lawsuit filed?
12     A.  I don't recall the lawsuit being filed.  I
13 mean, I wouldn't be able to tell you the date.
14     Q.  Was it within the last year?
15     A.  Again, I don't recall when it was filed.
16     Q.  It could -- it could have been more than a
17 year ago?
18     A.  It could have -- yeah, it could have been.
19     Q.  And did you file the lawsuit or did they?
20     A.  I believe we have filed a lawsuit against
21 them now as well.  So, yes.  So everyone's -- I don't
22 know what their lawsuit consists of anymore, but I
23 know that we -- what ours consists of, so what is the
24 exact question?  Did we file or did they file?
25     Q.  Did you file -- did you file -- did you file

Page 240

1  a lawsuit first against them or did they file a
2  lawsuit first against you?
3      A.  I can't recall.  I don't -- I don't recall,
4  because I don't know if they ever filed that one.
5      Q.  That one?
6      A.  I mean, the one that the Warmblood, the only
7  one you have listed.  I don't know.
8      Q.  I'm not limiting my question to one that I
9  have listed.  I'm asking whether you filed a lawsuit
10 against them before you or did they file the lawsuit
11 against you before, before you did?  So I'm just
12 asking who filed the lawsuit against whom first.
13     A.  Oh, yeah, I don't know.  I don't know.
14     Q.  The Lomnitzer firm, did you -- you settled a
15 lawsuit with them; is that correct?
16     A.  Yes.
17     Q.  What were the terms of that settlement?
18     MR. BEIK:  Object to form.
19     THE WITNESS:  Yeah, the terms were, they
20 were private.
21 BY MR. KHAZEN:
22     Q.  What were the terms of that settlement?
23     A.  The terms were, they were -- they weren't to
24 be shared.
25     Q.  So are you refusing to answer?

Pages 237 to 240

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

P-Resp_Renew_MSJ160

Page 241

1     A.  I'm actually -- I'm just abiding by the
2  terms of the lawsuit, which were it was I believe,
3  I'm not -- I believe from what my attorney told me
4  that the lawsuit was, was going to be sealed.  The
5  terms of the lawsuit were not to be, were not to be
6  shared.
7     Q.  Okay.  So remember the instructions I gave
8  you, unless your attorney objects and instructs you
9  not to answer that you're to answer the question?
10    A.  Okay.  So I don't know the exact terms.  All
11 I know is that there was some monetary terms, and
12 they were -- and then we were supposed to get all of
13 our IP copyright back, and they were supposed to do
14 some more things that they had done wrong and provide
15 us with some accounting and things like that, but it
16 was -- it was just basically an agreement that we
17 could move on and, you know, everyone moves on, and
18 but it was again privileged so much, in so much of a
19 way.
20    Q.  What do you mean by you were entitled to get
21 your IP and copyrights back from the Lomnitzer firm?
22    A.  She still had all of our accounting
23 information.  She still had all our copyright
24 certificates.  She was having them sent to her office
25 and -- and so on and so forth.  Anything to do with

Page 242

1  our copyrights and trademarks she had in her office,
2  and all of the -- she had all of the data from IPP,
3  since they'd been sending it, so she had all the data
4  and also the data from India where it was, where they
5  had revised the data from IPP.  So that's what I
6  mean.
7     Q.  What data was in India that was revised by
8  IPP?
9     A.  Every time --
10    Q.  What data was revised in India of IPP?
11    A.  Every time we got data from IPP, the guys in
12 India, the, I think you call them computer something,
13 that's probably their real name, but he would
14 actually have to take that data and run it through a
15 tracker and run it through a program that actually
16 brings out the geolocation of the IP addresses.
17       So he'd have to go through everything that
18 IPP gave him and then bring up the geolocations and
19 then put them into districts and then put each video
20 with how many hits on the title.  And so -- so that
21 was something that was important that be done.  And
22 actually our new software, that's -- we built that
23 in, the geolocation.
24    Q.  Did the agreement, the settlement agreement
25 with the Lomnitzer firm agree to give you any rights

Page 243

1  back into the copyrights?
2        MR. BEIK:  Object to form.
3        THE WITNESS:  They didn't.  They never got
4  any rights.
5  BY MR. KHAZEN:
6     Q.  What rights did they claim to have?
7     A.  None.  They behaved cowardly but if I spoke
8  to her face, she did claim any rights.
9     Q.  How much was the monetary settlement between
10 you and Lomnitzer?
11    A.  I don't recall but I do know --
12       MR. BEIK:  Form.
13       THE WITNESS:  -- we did not pay anything.
14 BY MR. KHAZEN:
15    Q.  Did they pay anything to you?
16    A.  There was money in the trust account, and I
17 don't remember what happened to it, but I know
18 nothing came out of our pocket.
19    Q.  You don't know if you paid anything?  You
20 don't know if you paid anything?
21    A.  No, nothing.  I'd say nothing came out of
22 our pocket.  I don't know if she had money left over
23 from us, because she didn't give us all that
24 accounting fully, but I'm just saying that nothing
25 came out of our pocket to her.

Page 244

1     Q.  Was she allowed to keep any of your money?
2     A.  I don't know that answer either.  I do know
3  that she was acting uncollectible and very, very
4  difficult, and we wanted our intellectual property
5  back.  So if there was money left over there, it was
6  just a little bit, we probably let her keep it in
7  exchange for getting all of our information back.
8     Q.  Now, when you say you're getting your
9  intellectual property back, what do you mean?
10    A.  The -- you already asked this three times,
11 but the, the -- all of our copyrights from the
12 government, the copyright forms, the -- all the
13 communications with IPP, all of the spreadsheets, all
14 of the people that we had settled with.
15       It's all -- these are all also not supposed
16 to be shared.  I mean, we don't share the names of
17 anything, just like anything to do with a copyright
18 protection.  So we needed to get all of that back
19 from her office.  She had everything sent to her
20 office like she was Malibu Media.
21    Q.  Has she returned all those things to you?
22    A.  I believe she just returned them.  So I know
23 Paul had to send her for the last batch a prepaid
24 FedEx, and so she's returned most everything.  She
25 had one more small batch to send back.

Pages 241 to 244

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

P-Resp_Renew_MSJ161

Page 245

1   Q.   One more batch to send back, did you say?
2   A.   I think so, yeah.  But I think it's back.
3   Q.   When did you receive the bulk of it?
4   A.   I believe she's been sending it over the
5   last -- ever since we've gotten these questions.
6   We've been on them every day to send it, but they're
7   so disorganized.  I don't know that they're that
8   organized.  And we've been waiting and, you know, and
9   politely asking every day and getting what we can and
10   it's been sent to my attorneys.
11   Q.   Do you send copies of your films to IPP?
12   A.   No.
13   Q.   So how do they -- how do they know to
14   compare them?
15   A.   They compare them with the ones I upload to
16   the website.
17   Q.   And are they able to download copies of your
18   films?
19   A.   Yes.
20   Q.   And is there any way to know whether or not
21   they're seeding the internet with your films in the
22   first place?
23   A.   They're not.
24   Q.   How do you know?
25   A.   Because I know because I know the way their

Page 246

1   software works and that would be illegal.
2   Q.   Is that the only reason you don't believe
3   they're seeding your, your, the internet with your
4   copyrighted works?
5   A.   Well, we're not working with them anymore
6   and nothing has changed.  The internet is still
7   getting filled with our copyrighted works.
8   Q.   I mean, you mentioned that they're actually,
9   that they're actually making money in Europe off of
10   the, off of the proliferation of your works; is that
11   correct?
12   A.   I don't know for sure but it seems like they
13   are because I've been, I've been trying to contact
14   some attorneys that they're still working with, and
15   it's not just our movies but I believe that they are
16   trying to collect on our movies.  So I'm still
17   investigating that, and we're in the middle of
18   investigating that, so that's -- I don't know the
19   answers.
20   Q.   Did you not testify that you believed that
21   they had made $400,000 already on -- from --
22   A.   I do believe that.  It hasn't been proven,
23   but I do believe that.
24   Q.   And is that illegal for them to do?
25   A.   Yeah.  They would owe us the money but it's

Page 247

1   in Europe so it's not easy to get, so...
2   Q.   So IPP operates illegally, in your opinion?
3   A.   No, I didn't say they were operating
4   illegally --
5   MR. BEIK:  Form.
6   THE WITNESS:  -- but I think that they're
7   you know, costing me money where they can.  I don't
8   know for certain.  So and they -- what they do with
9   the data is not illegal when someone buys -- when
10   someone purchases, wants to find out if their IP
11   address is -- if their movies are getting stolen by
12   which IP addresses, they can provide those services.
13   And so since they can provide those
14   services, and then if you don't want to take them up
15   on their services in Europe, I wouldn't put it past
16   them to just go ahead and just accept the money
17   themselves then.
18   BY MR. KHAZEN:
19   Q.   And it's your belief that they are
20   collecting money that is owed to you illegally in
21   Europe; is that correct?
22   A.   Yeah, I don't want to testify to that
23   because I haven't investigated it far enough, but I
24   do have one lawyer that has been telling me that and,
25   and maybe one or two others and so it's very -- I

Page 248

1   just haven't had time to handle this yet.  So I don't
2   feel like this has anything to do with what we're
3   talking about, and I don't want to say something
4   about someone until we've gone to court.
5   Q.   Yes or no, in your opinion IPP is operating
6   illegally and enforcing your copyrights in Europe?
7   MR. BEIK:  Objection, form.
8   THE WITNESS:  I don't know.  I don't know.
9   BY MR. KHAZEN:
10   Q.   You don't have an opinion?  I'm asking for
11   your opinion.
12   A.   I can't give an opinion on something like
13   that, but that's a legal -- that's a very serious
14   legal thing to give an opinion on.
15   Q.   So yes or no, do you suspect that IPP is
16   illegally enforcing your patents in Europe?
17   MR. BEIK:  Object to form.
18   THE WITNESS:  I'm not going to give that on
19   the record, I'm sorry.
20   BY MR. KHAZEN:
21   Q.   I need you to answer my question.
22   A.   I don't know.  I'm not going to say on the
23   record that what I think IPP is doing or not doing in
24   Europe.  I just can't know that.  I can't know for
25   sure until I have a lawyer investigate, tell me for

Pages 245 to 248

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769
P-Resp_Renew_MSJ162

New Jersey
732-906-2078

Page 249

1  sure.
2      Q.  I need to know your, what your -- that's not
3  my question. I asked -- my question is what do you
4  think. So I need -- you need to answer my question.
5  In your opinion is IPP operating illegally by
6  enforcing their patents in Europe?
7          MR. BEIK:  Objection, form.
8          THE WITNESS:  I don't know. I do not know
9  whether they're doing that. I can't answer that.
10  I'm not IPP. I'm not the lawyers that may or may not
11  be giving them money. I do not have those answers.
12  All I -- all I can do is suspect it. So I can --
13  there's no answer I can give you.
14  BY MR. KHAZEN:
15      Q.  Do you suspect that IPP is enforcing your
16  patents illegally in Europe?
17          MR. BEIK:  Object to form.
18          THE WITNESS:  I'm not putting that on the
19  record.
20  BY MR. KHAZEN:
21      Q.  That's not -- I'm asking again. Do you
22  suspect IPP is enforcing your patents illegally
23  in Europe?
24          MR. BEIK:  Objection, form. Ramzi, she
25  answered it three times. She said she does not know.

Page 250

1  That is an answer.
2          THE WITNESS:  I do not know. I cannot know
3  that to a point where I can put it on a legal form,
4  unless I have actually taken them to court and
5  verified it.
6  BY MR. KHAZEN:
7      Q.  I didn't ask if you know for sure, so I'm
8  going to ask the question again. This is getting to
9  the point where you're just refusing to answer my
10  questions. So do you suspect that IPP is illegally
11  enforcing your copyrights in Europe?
12          MR. BEIK:  Objection, form.
13          THE WITNESS:  I'm not going to answer
14  whether I suspect something or not. That's -- it's
15  not okay to do that, because if they're not, I'm not
16  going to slander them and say they are. I'm going to
17  go to court and do it correctly.
18  BY MR. KHAZEN:
19      Q.  You're refusing to answer my question?
20      A.  No, I'm not refusing to answer your
21  question. I'm refusing to slander someone when I
22  don't have all the information.
23      Q.  You testified earlier that you, that you
24  suspected that they stole $400,000 from you by
25  illegally enforcing your patents from Europe. Were

Page 251

1  you lying then?
2      A.  No.
3      Q.  Has your testimony changed?
4      A.  That wasn't a direct testimony, that was
5  just a little bit of color as to why we -- things
6  weren't working out between IPP and us.
7      Q.  A little bit of color? So it wasn't
8  truthful?
9      A.  I don't know. It's not a fact. It's
10  something that has to be investigated. And when
11  you're investigating something like that, you might
12  not, you know, you might not work with the person on
13  something else.
14      Q.  Where did you come up with the number
15  400,000?
16      A.  I estimated over how many months it's been
17  and how much they had been paying themselves from one
18  lawyer.
19      Q.  So wouldn't that give them incentive to seed
20  the internet with your, with your copyrights if
21  they're making money off of it?
22      A.  Well, they're not now --
23          MR. BEIK:  Form.
24          THE WITNESS:  -- for sure, so. I mean, they
25  are -- we would never let them seed the internet. I

Page 252



Pages 249 to 252

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

P-Resp_Renew_MSJ163

Page 253

```
1          And then Lorri left with us a bunch of bills
2   so it was very, you know, it was eaten up pretty
3   quickly. And then, you know, going through cases
4   like this with you, I have to pay for that, too.
5          So and then I said I didn't how much we
6   have -- that made -- with that sheet you were given
7   is all the infringements on the movies that we're
8   alleging that your client has downloaded. Those are
9   just how many times those movies have been downloaded
10  so is what you asked for.
11         Q.   Did that include the legal fees for against
12  the Lomnitzer firm?
13         A.   Does that include legal fees against the
14  Lomnitzer firm?
15         Q.   The Lomnitzer firm?
16         A.   I don't recall, but it was -- those fees
17  were minimal.
18         Q.   Does it include the legal fees in the suits
19  with Warmblood and Genova?
20         A.   No.
21             (Thereupon Defendant's Exhibit 10
22             was marked for identification.)
23  BY MR. KHAZEN:
24         Q.   I'm marking as Exhibit 10 a document.
25         A.   It's already 5:00. I really need to...
```

Page 254

```
1          Q.   I'm sorry?
2          A.   I just -- I just -- there's so much I still
3   need to do today. I mean, is there any way that we
4   can -- is there...
5          Q.   We can take a break any time you'd like.
6          A.   No, not a break, it's just it's already 5:00
7   and I had some really important calls I had to make
8   today. I didn't realize this would take the whole
9   day.
10         Q.   Yeah, I just -- well, if you need to take a
11  break, we can take a break.
12         A.   How much longer do you think?
13         Q.   I'm not sure. It depends on the answers you
14  give me. I've been getting long minute, many several
15  minute long answers to very straightforward
16  questions, so this is taking --
17         A.   I kept -- I keep --
18             MR. BEIK:  Hang on. Hang on. Do we want to
19  go off the record here or...
20             THE WITNESS:  I think we should go off the
21  record.
22             MR. KHAZEN:  Well, regardless, do you need
23  to take a break, because I just -- I'm not exactly
24  sure. We can maybe take a break and discuss it.
25             MR. BEIK:  Let's take a break.
```

Page 255

```
1          THE VIDEOGRAPHER:  Okay. Everyone agrees?
2   Off the record at 5:02.
3             (A recess was taken.)
4          THE VIDEOGRAPHER:  We are going back on the
5   record at 5:15 p.m.
6          THE WITNESS:  Okay.
7   BY MR. KHAZEN:
8          Q.   So can you take a look at Exhibit 10,
9   please?
10         A.   10. Yes, I see it.
11         Q.   Do you recognize this?
12         A.   Yes.
13         Q.   What is it?
14         A.   It's a Twitter post.
15         Q.   Is it your Twitter post?
16         A.   It's either mine or one of the guys who does
17  Twitter for us.
18         Q.   So how many people control your Twitter, XR
19  Twitter account?
20         A.   We have three people who work on -- there's
21  actually multiple Twitter accounts. XR Europe.
22  There's -- we don't have to get into it, but there's
23  multiple. There's maybe ten social media accounts
24  for XR.
25         Q.   Who controls this particular XR Twitter
```

Page 256

```
1   account in Exhibit 10?
2          A.   Seb.
3          Q.   Do you have any control over this?
4          A.   I have control over this as well.
5          Q.   Do you -- do you -- do you monitor it to
6   make sure that it's accurate?
7          A.   I do.
8          Q.   Do you see here it says "while we prepare a
9   massive plan to protect our content"?
10         A.   Yes.
11         Q.   What is -- what is this massive plan that
12  it's referring to here?
13         A.   I guess -- I guess I was sending out a
14  little warning to MindGeek.
15         Q.   What is that? What is -- why would you be
16  sending a warning to MindGeek?
17         A.   They own tube sites and they post our videos
18  illegally there.
```



New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

P-Resp_Renew_MSJ164

Page 257



Page 258

```
1   even pay attention, and so that's -- that was part of
2   the problem.  So and we do -- and we do it to be a
3   deterrent for the people on the torrents, because if
4   they think they're going to get sued for taking an XR
5   movie, they might think twice and they might actually
6   join the site instead of stealing a movie.
7       Q.  Has it been effective?
8       A.  I can't -- we can't really tell right now
9   with COVID and with MindGeek.  I wouldn't want to
10  stop.  I'd be scared to stop and see what would
11  happen because our movies are stolen much more than
12  any other movies, even with -- but a lot of people,
13  they post online, on Twitter, and all the trolls post
14  that, you know, that they will -- people will get in
15  trouble if they steal our movies.  And so when we
16  file, it's definitely effective just when they know
17  we filed that we get more sign-ups because people
18  don't go to the torrents.
19      Q.  On what basis do you -- on what basis do you
20  have to claim that your stole, that your IP is
21  allegedly stolen more than other people's?
22      A.  If you have more than five movies that
23  you've downloaded in full from our site, I would say
24  that that shows a habitual offender definitely.  Even
25  just -- even just two.  Even just one is still
```

Page 259

```
1   stealing.  I mean, content is, you know, it's up to
2   150,000 for a judge for not using -- for your
3   personal use up to 250,000 for using -- stealing it
4   and selling it.
5       Q.  How much did it -- well, let me -- that
6   didn't -- please let me restate my question because I
7   don't think you addressed the correct question.  I
8   said on what basis do you, is it that you came to the
9   conclusion that your IP is allegedly stolen more than
10  other people's, more than others?
11      A.  We've done research on that like throughout
12  the years with different lawyers.  And for some
13  reason if you Google them, like there's almost no
14  other address that's stolen as much as ours is.  It
15  says, you know, XR.org, XR hunter.  I mean, on the
16  torrents they have more XR movies than, than any
17  other, you know, single, single site.
18      So it's -- and there's just so many UDOP
19  cases, too, where they actually make websites and
20  then they send you to the torrents to go download the
21  movies for free.  So if you search XR free, you'll
22  just see so many of the free sites it's just, it's
23  just ridiculous.
24      So I've -- I've actually been holding off on
25  putting up new movies until we can get filing again
```

Page 260

```
1   and suing the -- because our really loyal people will
2   stay, and because there's, you know, 2,000 movies for
3   them to watch.  And when I put up a new movie right
4   now, it just gets immediately stolen off the torrent.
5       Like as you saw that first movie I looked up
6   with Kaisa in it, it was on the -- it was stolen the
7   day I put it up.  And this happens with, within two
8   minutes of it being put up.  It's -- it's on the
9   torrents and then within two hours it's on the tubes
10  as well.
11      And both the torrents and the tubes are
12  impossible to DMCA.  They just throw it in the
13  garbage.  The tubes you can't even reach because
14  they're out of the country, and, I mean, the
15  torrents, I'm sorry, you can't reach because they're
16  out of the country, so the DMCA notices does nothing.
17  That's our only legal line of defense if we don't
18  actually go this route and actually file a lawsuit.
19  And on the tubes they don't list that DMCA notices at
20  all.  They're also mostly based out of the country.
21      Q.  Do you have any data to back up your claims?
22      A.  Yeah, I have lots of data.
23      Q.  Have you produced that data?
24      A.  No, we haven't produced it yet.
25      Q.  Why not?
```

Pages 257 to 260

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

P-Resp_Renew_MSJ165

Page 261

```
1       A.  Well, we haven't started a lawsuit yet.
2   It's going to be very expensive.
3       Q.  Have you produced that data -- why haven't
4   you produced that data to, to us?
5       A.  To you?
6       Q.  Yeah.
7       A.  What data?
8       Q.  The --
9       A.  I haven't even sorted the data out for my
10  own attorneys yet.  It's just in the infancy of that
11  lawsuit.  Basically we want to protect ours, our
12  copyrights on the torrents and on the tubes.  So the
13  tubes stealing the data is a little different than
14  the torrents, and that lawsuit is in its infancy so I
15  don't really have anything to produce to you yet.  It
16  needs to be organized.
17      Q.  You claim that you have data showing that
18  you -- that XR content is stolen at a higher rate
19  than other sites, and I'm wondering why you've not
20  produced that data if you're in possession of it?
21      A.  I don't -- I don't have specific data that I
22  could produce at the moment.
23      Q.  Is there some reason that that data has been
24  withheld?
25          MR. BEIK:  Object to form.
```

Page 262



Page 263

```
1   but the thing is it's -- it doesn't -- go ahead.  I'm
2   sorry.  Ask the question.  But it's -- it would be
3   just my, my husband.  And I believe that it was set
4   up to have the domain names be separate, and then I
5   think everything was paid a price for and then sent
6   back to XR all to be under one domain name or one IP,
7   one IP holding company.
8       Q.  When you say "back to XR," did you mean back
9   to Malibu?
10      A.  Yeah, exactly.  I'm sorry.
11      Q.  So how did the asset get from Malibu to
12  Click Here?
13      A.  When we started, that's why I said 2007 or
14  2008, I think we put in the trademarks and the, the
15  domain names and Click Here and then the copyrights
16  into Malibu, just because we -- I don't know, I guess
17  we thought if someone -- some lawyer told us it was a
18  good idea, and then we decided it would be better to
19  have, to have everything, to have the adult things
20  under one roof and other things that aren't under
21  another roof.
22      Q.  When did you found Colette Productions?
23      A.  That was I think -- I actually didn't do it.
24  The lawyer who was at the point stealing from us, he
25  actually went and opened up in the bank account, put
```

Page 264

```
1   my name on it, and so we kept the -- we paid for
2   productions for the harder core website that, that's
3   still in existence that my friend Francisco mostly
4   did the producing and directing on, but I was there
5   as well.
6           And so that was -- that -- and so that guy
7   wanted to invest in that business, so we made a
8   separate company, and then he turned out to be not a
9   good guy and so they kind of all came together, these
10  guys, and so that business is no longer.
11      Q.  Were you -- were you a CEO of Colette
12  Productions?
13      A.  Yes.
14      Q.  From what date to -- from what dates?
15      A.  I don't know, from whenever that 2016 or '17
16  until like September of this year or something.
17      Q.  And were you working for Colette Productions
18  when you were, when you were making some of these,
19  some of these works, your pornographic works?
20      A.  Of what?  Say again.
21      Q.  When you were making these pornographic
22  movies, were you working for Colette Productions?
23      A.  Was I working for Colette Productions?  That
24  was just basically an expense account.  I was doing
25  the same work.
```

Pages 261 to 264

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

P-Resp_Renew_MSJ166

Page 265

1    Q.   What about Colette Holdings.  When did
2  you -- when did you create Colette Holdings?
3    A.   That lawyer -- that lawyer set it up for us
4  around the same time.  He actually knew the person at
5  the bank and had the bank sign my name.  And that --
6  and that money got transferred into there and then he
7  cleaned that account out, and that's when we found
8  out he was kind of a bad guy as well.
9       He was kind of involved with Genova and that
10  was a whole, just a whole mess I'm hoping to have
11  over soon and so we can just move forward and make
12  content and protect out content and that's it.
13    Q.   Were there ever any contracts between any of
14  these companies, Colette Productions, Colette
15  Holdings, Colette Properties, Click Here, or Zo
16  Digital with Malibu?
17    A.   Oh, with Malibu?  Zo Digital -- Zo Digital
18  maybe but nothing else, and Click Here probably.
19    Q.   So Colette Productions, Colette Holdings,
20  Colette Properties never had any agreements with
21  Malibu?
22    A.   No.
23    Q.   Did you -- did you personally have any
24  agreements with these companies?
25    A.   No.

Page 266

1    Q.   What was the purpose of Colette Properties?
2    A.   That was we were going to buy a property
3  together, and we did actually, and he stiffed me out
4  of half of it, so when he went to jail.  So -- so I
5  used it to pay some of my properties, rental
6  properties and things like that, and like pay the
7  mortgage payment, receive the rent.  And so that, it
8  really didn't have anything to do with XR or anything
9  like that.  It was actually I had properties in there
10  that I've owned for 15 years.
11    Q.   Now, did Warmblood ever invest $400,000 in
12  Malibu?
13    A.   No, I don't believe so.
14    Q.   Did they ever invest anything in Malibu?
15    A.   I believe they stole money from Malibu.
16    Q.   Did they ever give Malibu any money?
17    A.   They -- no, they did not.
18    Q.   So I'm just wondering why, why do you think
19  that, I mean, do you think that -- so what's behind
20  this?  Is this all just made up that Malibu, that the
21  allegations from Warmblood that Malibu Media agreed
22  to split 50/50, quote, net recovered fees generated
23  from protecting copyrights as to restitution efforts
24  to recovered losses, unquote?  Is this all fabricated
25  or?

Page 267

Page 268



Pages 265 to 268

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

P-Resp_Renew_MSJ167

Page 269

1    A.  Yeah, which is really weird because, first
2  off, I would never write that underscore under my
3  name like that, and that's not even my handwriting,
4  and I didn't sign this.  So, like I would never sign
5  this.
6        I've seen this before.  It was just a weird
7  thing that they said that they would get 50 percent
8  of the company.  And that's what they want us to file
9  instead of when -- instead of foreclosing on our
10  house, which they actually -- again it's just -- they
11  put two deeds for 2.5 million when it wasn't even
12  their money.  They were paid back.  Then they had
13  some other hundred thousand dollars that they had
14  taken out of the account and tried to foreclose on
15  that.
16        And in California how you can do
17  nonjudicial, you just go on the courthouse steps and,
18  you know, try to, you know, sell someone, and then
19  they have to go try to get their title back, and so
20  it's a huge pain.  And so this it what they do for a
21  living.  So, yeah, I am familiar with that, and it's
22  fraudulent, obviously fraudulent.
23    Q.  You're saying that's a forged signature?
24    A.  Well, it's a DocuSign, so if you can call
25  this a signature.

Page 270

1    Q.  So you're saying it's a fake DocuSign?
2    A.  I guess so.  Who else could it be?
3    Q.  So just to go back a little bit, you said --
4  you mentioned something about with respect to
5  infringement that there was a pattern that you would
6  notice from people where they would receive notices
7  and then resume again.  Did I understand that?
8    A.  Yeah, they would -- they would receive three
9  notices from -- when they get the notice from the
10  internet service provider, they would usually stop
11  and -- and then once they stopped they would, you
12  know, that would usually be it and then they would
13  either go to court or settle or end up not go back to
14  it.
15        But there's for some reason some people are
16  addicted and they'd stop for a little while and then
17  go back to it later.  And if they had enough time
18  space between the infringements, they wouldn't get
19  the three notices where their service would be turned
20  off.
21    Q.  And was that -- was that part of why your,
22  your, is that part of your alleged evidence against
23  my client?
24    A.  No, it's just truth.
25    Q.  All right.  Let's take a quick break and

Page 271

1  I'll probably just do a little bit of wrap-up and
2  then I'll conclude.
3    A.  Okay.  Thank you.
4        THE VIDEOGRAPHER:  Off the record at 5:36.
5        (A recess was taken.)
6        THE VIDEOGRAPHER:  We are back on the record
7  at 5:43 p.m.
8  BY MR. KHAZEN:
9    Q.  You mentioned before that you, that you
10  thought the Lomnitzer firm was overpaying IPP; is
11  that right?
12    A.  Yes, I did at one point.
13    Q.  Before was IPP kind of, was it in with the
14  Lomnitzer firm in terms of taking money from you?
15    A.  Yeah.  Well, I think the Lomnitzer firm,
16  like they just didn't really understand the
17  technology.  And so they really wanted to get the,
18  you know, they really put paying IPP ahead of all
19  else, because she wanted to make sure to get the IP
20  addresses so she could keep filing and keep making
21  money, which we weren't making money, we were just
22  were -- we were getting the benefit of -- and I could
23  tell actually, I was thinking back, we were -- we did
24  have more traffic and more sales when she was filing.
25        So even though we weren't making any money

Page 272

1  from our filings, she was paying it all to herself.
2  We did, as long as we filed and held people
3  accountable, we did do better.  So but I thought they
4  were getting paid 15 and then she raised them to 25
5  without telling me.
6    Q.  When did things start to go south with IPP?
7    A.  I think it was maybe four months from when
8  we left Lomnitzer.  I was upset about seeing an email
9  from one of the attorneys in Germany who said that he
10  was suing people on behalf of us and paying, and
11  paying -- actually they were paying Pillar, and then
12  I think they started paying Lomnitzer, then they
13  started -- no, then they were keeping the money.
14  After we left Pillar, they were keeping the money,
15  and so I was upset about that.  I asked the law firm,
16  I said, How could you keep the money.  You should be
17  giving it to us.
18    Q.  The -- when you said there was a law firm,
19  sorry, which law firm was this?
20    A.  Germany called Fareds, F-a-r-e-d-s.
21    Q.  And they were paying -- they were paying IPP
22  for collections that they made on your copyright?
23    A.  Yeah.  They were paying IPP for our data,
24  and then they were making collections on our
25  copyrights, and then they were giving incentive to

Pages 269 to 272

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769
P-Resp_Renew_MSJ168

New Jersey
732-906-2078

1  us, the distribution, they were giving it to IPP,
2  because IPP told them that that was fine, that we had
3  agreed to that as part of our, you know, as part of
4  their payment to them for the data we were getting in
5  America, and so that obviously wasn't the case.
6      Q.  Did you -- when did you get that, the email
7  indicating that?
8      A.  Well, actually they had been sending it and
9  it had been going to my junk, so the attorney at the
10 firm, he wasn't doing anything wrong, he was actually
11 just doing what he thought Pillar told him to do.
12 And so it had been going to my email box every month,
13 and one day I opened it up and I saw it in German,
14 and then I read it in German and then I saw that it
15 said in German that he was keeping the money.  And
16 so -- so that they were giving IPP the money to keep.
17     And Patrick Ashashay (phonetic) from IPP had
18 emailed it back in German and just said, okay, thank
19 you so much.  And -- and I looked at that, I said,
20 Wow, how long has this been going on?  And then I
21 emailed back the Fareds attorneys in German and I
22 said, How long have you been paying Patrick Ashashay
23 from IPP?  And he told me since 2017.
24     And so he said that Pillar told him that it
25 was okay to do.  So Pillar was basically keeping the

1  settlements but getting out of paying IPP by doing
2  that, and then -- and when once Pillar was gone, IPP
3  decided to still get the full amount from us but to
4  also keep the money from IPP.
5      Q.  Do you -- so you can read and write German?
6      A.  A little bit.
7      Q.  And when did you -- when did you read this?
8  Do you recall what, around what date you were able to
9  read this email?
10     A.  I think it was -- like I said, we left
11 Lorri's in August, so it would have been maybe, maybe
12 six months before that even, six months before that.
13 That's when I started getting upset about it and --
14 he didn't start anything with them basically because
15 she just wanted just to keeping everything as it was
16 so she could keep making her bills.
17     Q.  That's August of 2018?
18     A.  Correct.  Six months before that.
19     Q.  Correct.  So it would have been around
20 February of 2018?
21     A.  Right.  Sounds right.
22     MR. KHAZEN:  I think that's -- those are
23 all the questions I have for today, reserving our
24 rights.
25     THE WITNESS:  Okay.

1              EXAMINATION
2  BY MR. BEIK:
3      Q.  Hang on, Colette.  I've got a few questions
4  for you real quick.  The first one is when we started
5  this deposition, you were asked some questions about
6  COVID, and it sounded like you were giving the best
7  business answer to the questions where you mentioned
8  that you all were trying to keep the business going
9  and trying to keep --
10     A.  Right.
11     Q.  -- keep everything going on and --
12     A.  Right.
13     Q.  -- so forth.  That sounded like a good
14 business answer, but did COVID affect your business
15 in a very bad way?
16     MR. KHAZEN:  Objection, leading and form.
17     THE WITNESS:  No, it did.  I mean, I was
18 sick for months on end, and a lot of our people, like
19 our programmers, my head programmer got it as well.
20 I forgot about all this.  I mean, I was -- I was so
21 tired this morning and I didn't realize this would
22 take so long.  And so I was sick, my husband was
23 sick, and then our -- some of our best performers and
24 directors were sick.  A lot of the people we work
25 with and also our head guys in Ecuador, and our data

1  guys were sick.
2      And then Dane, who was our, actually our
3  contact with IPP and was starting a whole new
4  software system, he also got it and got sick.  And
5  I've barely spoken with him since that happened.  So
6  it was actually, it was really much more affected
7  than I did say this morning, so...
8  BY MR. BEIK:
9      Q.  Okay.  Well, it's fair to say that it
10 significantly affected you in the past seven months?
11     A.  Yeah.  Significantly, yeah.
12     MR. KHAZEN:  Objection.  Objection, form and
13 leading.
14     THE WITNESS:  Well, I mean, I'm even still a
15 little bit sick from it, so it's like it's been --
16 I've been still harder to catch my breath and
17 everything and tireder and hard to sleep, so it's --
18 I don't know if it's COVID or what, but it's just
19 been a lot's been going on, and, yeah, so but so I
20 probably didn't answer it perfectly.  I probably
21 tried to make it sound, you know, better.
22 BY MR. BEIK:
23     Q.  Okay.  And we were -- we had some
24 conversations -- I guess just to put a bow on that,
25 so whenever you were asked questions about who got

Page 277

1  it, and you didn't -- you didn't -- you didn't
2  name --
3     A.  Right.
4     Q.  -- for example, you didn't name a lot of
5  people, that was early, whatever that was --
6     A.  Right, it was more like cheerleading
7  basically, yeah.
8     Q.  You want to clear up your testimony that you
9  later stated that that was --
10    MR. KHAZEN:  Objection, form and leading.
11 BY MR. BEIK:
12    Q.  And you were asked some questions about
13 whether the defendant distributed, as alleged in your
14 complaint, whether the defendant in this case that
15 you alleged downloaded, copied and distributed the
16 films listed in Exhibit A; is that true?
17    A.  If he downloaded them, he definitely would
18 have distributed them, because that's the way the
19 torrent client works.
20    Q.  Okay.  So -- so it's your allegations that
21 they, the films were distributed by the defendant?
22    A.  Well, he would have to because once you
23 download them from the torrent client, you have to
24 distribute it.  So if I didn't say it properly then,
25 then that's what happened, but --

Page 278

1     Q.  Okay.
2     A.  Yeah, so, but, yes, he would have
3  distributed them and downloaded them.
4     Q.  There was a lot of references to 2015 to
5  2019.  And if you look back at exhibit -- if you look
6  back at Exhibit Number 3, which I believe Defendant's
7  Exhibit Number 3 was the, the complaint document 1-1.
8  So if you look at the exhibit -- if you look at the
9  Exhibit A, I guess it's Exhibit B, I'm sorry, to
10 that, can you read me where on the last title listed
11 where it shows date of publication?
12    A.  So on -- on Exhibit Number 0003 or which
13 one?  The title or which?
14    Q.  Yes, Exhibit 0003 and then Exhibit B to that
15 exhibit.
16    A.  Okay.
17    Q.  The date of first publication and then the
18 date of registration for the last title that's listed
19 on there on Exhibit B.  Do you see that?
20    A.  Okay.  So hang on.  Exhibit B, let me see.
21 Okay, so B would be -- eleven or ten?  Ten?  Ten?
22 No.  Nine.  Eight.  Six I think you said, right?  No?
23 Seven, five, four, three.  Three, right?
24    Q.  Exhibit 3, and it's the original, it's the
25 original complaint, and then it's the Exhibit B.

Page 279

1     A.  Okay.  Okay, there -- for some reason it
2  keeps going away.  There it is.  This is A.  Okay, so
3  this must be B.  Okay.  So -- so the last movie, the
4  a Fucking Hot Threesome, that one?
5     Q.  Yes.  And the date of first publication?
6     A.  It was August 7, 2015.
7     Q.  Okay.  And so my question is were you
8  referencing 2015 to 2019 because that was the range
9  of the titles that were listed in the complaint?
10    A.  Yes.
11    Q.  Okay.
12    MR. KHAZEN:  Object to form.
13 BY MR. BEIK:
14    Q.  So just to put a bow on it, if you -- if you
15 go back to Exhibit A, and the dates for the hit
16 dates, and can you tell me the years of the hit
17 dates?
18    A.  Okay.
19    Q.  Just the range from what year to what year
20 are the hit dates?
21    A.  Okay.  So the hit dates on these are --
22 okay, so the hit date from -- I'm starting from one
23 and going down it goes 12-30-2018, 12-25-2018,
24 7-29-2018, 7-24-2018, 7-7-2018, 7-6-2018, 7-26-2017,
25 so a whole year earlier, and then 7-26-2017.

Page 280

1     Q.  Okay.  So the range is from 2007, which is
2  the last one, to the first one is 2019; is that
3  correct?
4     A.  Yes.
5     Q.  Okay.  So the timeframe that you reference,
6  you're talking about that three-year period between
7  2017 and 2019; that's correct?
8     A.  Correct.
9     MR. KHAZEN:  Objection to form.
10 BY MR. BEIK:
11    Q.  When we were talking about and you were
12 answering some questions about, about the Lomnitzer
13 law firm, just to clear up a little bit, was it your
14 understanding -- what was your understanding that
15 they, they were holding from you in terms of because
16 of the dispute?
17    A.  Oh, okay.  I believe they were holding our,
18 you know, our, basically our intellectual property,
19 our copyrights.  Like they were just kind of holding
20 it until we settled everything, just we were just
21 waiting to get it back.  You know, they weren't --
22 they didn't have any interest in it, they were just,
23 you know, had it in their office, and once we settled
24 everything we would get it back.  They were just --
25 they were just kind of messing with us but did not

Pages 277 to 280

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

P-Resp_Renew_MSJ170

Page 281

1  have an interest in anything, so...
2      Q.  So they weren't claiming -- so they weren't
3  claiming -- to your knowledge they were not claiming
4  an interest --
5      A.  They --
6      Q.  Hang on.  Hang on.  Let me ask the question
7  then you answer, okay.  So they were not claiming
8  interest in any of those copyrights or intellectual
9  property, they were, they were holding the files,
10  right?
11      A.  Right.  Correct.
12          MR. KHAZEN:  Objection to form, leading.
13          THE WITNESS:  Well, that's what I was trying
14  to answer so, like, too, he's not leading because I
15  was trying to say they were holding the file.  Files.
16          MR. BEIK:  Okay.  So, okay, I reserve the
17  rest for the time of trial.
18                  EXAMINATION
19  BY MR. KHAZEN:
20      Q.  I have just follow-up on a couple things he
21  asked about.  So you mentioned that, some of the
22  COVID testimony you had forgotten a couple people,
23  your head programer.  Who else did you -- who else
24  was it?  Your head programmer and who else had COVID?
25      A.  Dane, who has actually doing all the

Page 282

1  interaction with IPP, and so that was a big issue,
2  and his friend, who was building the new system, and
3  then some of our top like performers and directors
4  over in Prague as well.  So we actually came, and
5  then they had to hold new tests for the models, so
6  they had to have COVID on it.
7          And so it's just really -- since we travel
8  so much for work, and, you know, everything just
9  really came to more of a halt then.  And then, yeah,
10  and I forgot my head programer was.  All the
11  programmers got it as well.  So we were definitely --
12  but I guess I was so sick I don't even remember,
13  remember a lot of it.
14      Q.  What, if anything, does that have to do with
15  the prosecution of this lawsuit?
16      A.  I guess I think Paul thought I was, I was
17  not really mentioning how bad that myself and a lot
18  of other people in our business had experienced
19  COVID.
20      Q.  Did your -- does your testimony change about
21  the way that it affected you, that you --
22      A.  I mean, I think it was cheerleading a little
23  bit, like Paul said giving the business answers
24  saying it wasn't so bad when it was quite a little
25  bit worse than I said.  So I guess he just wanted to

Page 283

1  make sure that was clear.
2      Q.  When you went on the break, did you discuss
3  this being a business answer?
4      A.  No.
5          MR. BEIK:  Objection, form.
6  BY MR. KHAZEN:
7      Q.  So how long were you sick with COVID?  How
8  long were you sick with COVID?
9      A.  Over two and a half months actually.
10      Q.  And that was March and April and half, and
11  half of May then?
12      A.  Yeah, basically.
13      Q.  And are there -- is there anything that you
14  would have done for this case that you weren't able
15  to do due to COVID?
16      A.  I would have had more access to data and to
17  our programmers and to being able to do scripts and
18  extract things and gotten the data back from
19  Lomnitzer faster and been able to just not have so
20  many delays and answering in having the stuff in
21  front of me that I needed to answer.
22          And I remember how frustrating that was now
23  that we couldn't get the, we couldn't get the data
24  and we didn't have the programmers to manipulate it
25  into a form that we could present to you.

Page 284

1      Q.  And you were able to prosecute your cases
2  with Lomnitzer and Genova during this time, right?
3      A.  We actually got really behind on the, on the
4  interrogatories for Genova, and I think we got
5  slapped with some sanctions on there.  I mean, I was
6  so sick.  And then with Lomnitzer, she was, she was,
7  at that point she was done.
8          So the rest of my team here were champions
9  and kept just moving forward and closing things out.
10  And but no, we had no more Lomnitzer then.  And
11  Genova, they were just burying us in discovery that
12  was just absolutely meaningless, but that was, that
13  was difficult at that point time, too, being sick and
14  so, you know, just never really catched up from all
15  that.
16      Q.  When did you file suit against Genova?
17      A.  Oh, now I can't remember.  A while back.  I
18  mean, eight months ago or something like that.  I
19  don't know how far back.
20      Q.  So at the beginning of 2020?
21      A.  Yeah.
22      Q.  How far into the beginning approximately?
23      A.  Like maybe a little bit more, like not right
24  at the beginning, so...
25      Q.  Around say March?

Pages 281 to 284

Page 285

1    A.  Yeah, probably.  Yeah.
2    Q.  And you said that you would have gathered a
3  lot of data if you hadn't had COVID.  Is that -- did
4  I understand that correctly?
5    A.  All these, all the movies, the nine movies
6  where I think you had asked for all of the sales and
7  you wanted us to prove what it was worth, and so I
8  took the whole team off of everything and I said,
9  okay, we need to, because we don't have the
10  programmers to write a script, you need to manually
11  pull out all these movies from the databases.  So it
12  made everything much, much harder.
13    Q.  Was it your contention that your failure to
14  produce documents in this case is due to you having
15  contracted COVID in March of this year?
16    A.  Yes.
17    Q.  And your failure to provide, to provide full
18  interrogatory responses, it's your contention that it
19  is because of your, that you contracted COVID earlier
20  this year?
21    MR. BEIK:  Objection, form.
22    THE WITNESS:  I mean, the thing is I think
23  that my programmers usually translate everything for
24  me weren't there to do that, so, you know, so I did
25  all the script and everything myself, and that it

Page 286

1  was, you know, much more time-consuming than I ever
2  thought it would be.
3  BY MR. KHAZEN:
4    Q.  How long did your programmer have COVID for?
5    A.  He has two young children, too, and so he
6  had it I think -- he had it three and a half weeks
7  actually.  He's in Ecuador, which is, you know,
8  it's -- it's still -- it's still nice there but it's
9  definitely not the same as it is there or here or --
10  where?  You're in Texas.  So, yeah, it's a little bit
11  more third world, but they're doing okay.
12    Q.  And how long did your other programer have
13  COVID for?
14    A.  He had it for maybe a couple weeks, but he's
15  been in and out of the hospital a lot actually, so
16  he's maybe three weeks.  But I trained his -- I
17  trained his assistant and she's absolutely doing
18  awesome, so that is always good and, you know, but
19  here's that...
20    Q.  10,000 cases, why do you not have this data
21  just handy?
22    A.  That's because we have, you know, because we
23  switched from -- and I'm telling you, the lawyers
24  were doing it before, and they were hanging onto the
25  data.  I don't know what they wanted to do with it

Page 287

1  later, but we do not have the data.  So lawyers were
2  hanging onto it and they were taking advantage of us,
3  because that was not our main business, still is not.
4  And we just, you know, they just incurred keeping
5  all -- like tried to make like it was their business,
6  because that's the only way they could keep
7  collecting the money.
8    Q.  So you said that once you download something
9  off of BitTorrent, you have to distribute it?
10    A.  Right.
11    Q.  Remember that testimony?
12    A.  Correct.  Yes.
13    Q.  So if you download something off of
14  BitTorrent and then uninstall the client, do you have
15  to -- do you still have to distribute it?
16    A.  If you uninstall the client, you -- I
17  think -- I don't know that it would still work,
18  but...
19    Q.  So that -- meaning it's not exactly true, is
20  it?
21    A.  Well, no, I'm not sure actually.  I would
22  need to do that when I install a bit client, a
23  BitTorrent client on my computer.  Yeah, I'm not
24  actually sure about that if you -- the thing is you
25  open up to the highway between your computer and all

Page 288

1  the others as soon as you download your first movie,
2  and then so everyone comes knocking on your door to
3  get that movie.
4    So you would definitely be -- you have to
5  share it with at least some people before you could
6  take the client off, because the minute you get it,
7  like other people start getting pieces of it from
8  your computer the second you get it.
9    Q.  When you get it you could shut off the
10  connection to the BitTorrent network; isn't that
11  correct?
12    A.  It depends on which torrent you're using.
13  And if you do that, though, you will get a really,
14  really slowly connection, and sometimes it won't even
15  allow you to download the movies.
16    Q.  But you can do that, correct?
17    A.  I don't know on which torrent you can do
18  that, but I'll definitely check.
19    Q.  Once you -- you testified that once you
20  download, once you download the content, you have to
21  distribute it, and that's just not true, is it?
22    A.  I think it really depends on where you are
23  in the world or the country and what you would agree
24  to do based on --
25    Q.  You could cut the client's connection to the

Pages 285 to 288

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769
P-Resp_Renew_MSJ172

New Jersey
732-906-2078

Page 289

1    internet at that point, couldn't you?
2    A.  You know, I -- the thing is it's not that
3    easy.  They can just plug back in.  Wifi, too.  It's
4    like how are you going to cut a wifi connection?
5    Q.  So it's your testimony, you are sticking to
6    this testimony that once you download a movie, you --
7    once you download content, you have to distribute
8    that content and that is part of your contentions
9    against my client; is that your testimony?
10   A.  I'm saying once he downloaded it, he opened
11   up the door for other BitTorrent clients to take the,
12   for him to distribute it to other BitTorrent client
13   users.
14   Q.  So what you said before was false, that it's
15   not that you have to distribute it after you download
16   it, correct?
17   A.  Well, just one -- it's a different way of
18   looking at it basically, because you do have to
19   distribute it basically.  Once -- like if -- he and
20   other clients will tell you this, too, and I'm not
21   sure that there's a way to prevent it because that's
22   the whole premise that BitTorrent runs on is that
23   when you share something, then you have to share with
24   other people.  And so if you're not going to do that,
25   then you probably won't be invited back on, so...

Page 290

1    Q.  Okay.  But just to be clear, it's your sworn
2    testimony that once you download content, you have to
3    distribute it?
4    A.  Well, you won't have a choice because
5    unless --
6    Q.  Yes or no?
7    A.  I believe so.  I believe so.
8    Q.  And is it your testimony that the IP address
9    for my client's network distributed pieces of Malibu
10   Media's copyright -- copyrighted movie to IPP
11   servers?
12   A.  No.  That they would -- basically what they
13   do is they would go in there and like look around and
14   they would see who's getting Malibu Media movies.
15   They would actually act like get the movies
16   themselves.  So they would get the information, okay,
17   this IP is taking Malibu Media movies, this IP is,
18   this IP is distributing them, so on.
19   Q.  So no, that's not Malibu's contention that
20   that -- it's not Malibu's contention that my client
21   distributed Malibu's copyrighted movie materials or
22   pieces of them to IPP servers?
23   A.  No, no, that's not how they found -- they
24   would -- you might have but I don't think so.  I
25   don't believe they do work that way, but they might.

Page 291

1    And -- and he would -- they were paying him for
2    a full movie price.  Like they -- I think I just --
3    one of the movies it's like $7,000, or something like
4    that for -- and so if you're going like based on the
5    movie and like how much it would cost and how much
6    trouble it is, they get on a certain speed.
7        And so when you open up your highway by
8    installing the client, and you download that movie,
9    then so many other people need to take it back from
10   you in order for you to keep up your ranking on the
11   site.
12   Q.  So you testified just earlier that about
13   distribution.  I just want to be clear.  It's not --
14   is it or is it not Malibu's contention that my client
15   distributed pieces of Malibu's copyrighted materials
16   through IPP servers, yes or no?  Is it -- is it or is
17   it not your contention?
18   A.  It's my contention that he did do that.  I
19   don't know if he did it on purpose or not.
20   THE REPORTER:  I'm going to have to take a
21   break.
22   (Discussion off the record.)
23   MR. KHAZEN:  We can just wrap it up then.
24   THE WITNESS:  Okay.
25   THE VIDEOGRAPHER:  Go off the record wrap it

Page 292

1    up or?
2    MR. KHAZEN:  I have no further questions.
3    THE WITNESS:  Okay.  Thank you very much.
4    MR. BEIK:  I have no further questions at
5    this time.
6    THE VIDEOGRAPHER:  Okay.  We are going off
7    the record at 6:10 p.m., ending the deposition.
8    MR. BEIK:  Do you have my contact
9    information to get the transcript?
10   THE REPORTER:  Yes.  I was just going to ask
11   you what you were ordering.
12   MR. BEIK:  Well, I know you said you got
13   something to do, whatever else.  Can I give you my
14   email address and we can email, that way we can go
15   offline here?
16   THE REPORTER:  I have your email.
17   Ramzi, do you know what you're ordering?  Do
18   you have a standard order?
19   MR. KHAZEN:  Yeah, I think J.T.'s been
20   communicating with you, so we should hopefully have a
21   form filled out, otherwise if I could email you.
22   MR. MORRIS:  The only thing we want, we
23   would like a rough, you know, as soon as possible.
24   THE REPORTER:  That concludes the deposition
25   proceedings.  Transcript review by the witness has

Pages 289 to 292

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

P-Resp_Renew_MSJ173

Page 293

1  been waived.
2       Any exhibit marked during the proceedings
3  will be attached to the original deposition
4  transcript, with copies attached to transcripts
5  timely ordered by counsel.
6            (Thereupon the taking of the
7            deposition was concluded at
8            6:10 p.m.)
9       *    *    *    *    *
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 294

1               CERTIFICATE OF REPORTER
2  STATE OF NEVADA  )
3                   SS:
4  COUNTY OF CLARK  )
5
6       I, Deborah Ann Hines, RPR, Nevada CCR No. 473,
   California CSR No. 11691, Certified Court Reporter,
7  certify:
8       That I reported the taking of the deposition
   of the witness, Colette Pelissier, commencing on
   Tuesday, October 20, 2020, at 9:19 a.m.;
9
10      That prior to being examined, the witness
   was by me duly sworn to testify to the truth, the
   whole truth, and nothing but the truth;
11
12      That I thereafter transcribed my shorthand
   notes into typewriting and that the typewritten
13  transcript of said deposition is a complete, true and
   accurate record of testimony provided by the witness
14  at said time to the best of my ability;
15      I further certify (1) that I am not a
   relative, employee or independent contractor of
16  counsel of any of the parties; nor a relative,
   employee or independent contractor of the parties
17  involved in said action; nor a person financially
   interested in the action; nor do I have any other
18  relationship with any of the parties or with counsel
   of any of the parties involved in the action that
19  may reasonably cause my impartiality to be
   questioned; and (2) that transcript review pursuant
20  to NRCP 30(e) was not requested.
21      IN WITNESS WHEREOF, I have hereunto set my
   hand in my office in the County of Clark, State of
22  Nevada, this 4th day of November, 2020.
23                         _____
24                         Deborah Ann Hines, CCR #473, RPR
25

Page 295

1               CERTIFICATE OF DEPONENT
2  PAGE  LINE  CHANGE          REASON
3       _____
4       _____
5       _____
6       _____
7       _____
8       _____
9       _____
10      _____
11      _____
12      _____
13      _____
14      _____
15      *    *    *    *    *
16      I, Colette Pelissier, deponent herein, do
   hereby certify and declare the within and foregoing
17  transcription to be my deposition in said action
   under penalty of perjury; that I have read, corrected
18  and do hereby affix my signature to said deposition.
19
20
21      _____
       Colette Pelissier, Deponent
22
       _____
       Date
23
24
25

| A |
|---|
| **a.m** 1:21  4:2 |
| 294:8 |
| **abiding** |
| 241:1 |
| **ability** |
| 10:22 |
| 130:13,13 |
| 294:13 |
| **able** 10:3,8 |
| 21:22 |
| 35:23 |
| 53:13 |
| 74:21,25 |
| 93:12 |
| 95:15 |
| 101:1 |
| 105:24 |
| 128:13 |
| 147:5 |
| 165:23 |
| 180:13 |
| 191:25 |
| 194:11,16 |
| 204:22 |
| 212:10 |
| 213:11 |
| 237:15 |
| 239:13 |
| 245:17 |
| 257:15 |
| 274:8 |
| 283:14,17 |
| 283:19 |
| 284:1 |
| **absolutely** |
| 189:16 |
| 284:12 |
| 286:17 |
| **accept** |
| 247:16 |
| **accepted** |
| 128:7 |
| **access** 51:1 |
| 51:6,8,10 |
| 52:20,21 |
| 53:6,6 |
| 81:5,11,13 |
| 81:18 |
| 89:24,25 |

90:2 185:9
207:6
283:16
**accessed**
88:24
**accesses**
88:19
**account**
185:9,10
218:3
219:18,19
220:4
243:16
255:19
256:1
263:25
264:24
265:7
269:14
**accountable**
272:3
**accountant**
11:19 12:1
12:20
13:25 14:6
15:17
16:10 17:1
17:5
115:19
131:9
154:3
**accountants**
131:11
**accounting**
241:15,22
243:24
**accounts**
18:5,6
255:21,23
**accurate**
10:16,20
71:12,13
157:11
175:6
256:6
294:13
**accurately**
10:3,9
**accuse** 72:5
**accused** 71:1

71:15,18
72:23 82:7
169:5
**accusing**
89:14
**acid** 125:3
**act** 123:19
290:15
**acting**
190:19
244:3
**action**
294:16,17
294:18
295:17
**active**
124:24
127:23,23
228:9
**actively**
151:4,4,5
**actual** 50:6
50:6 199:9
**actuaries**
223:3
**adamant** 82:5
**addicted**
270:16
**adding** 177:3
**additional**
34:10,19
37:11 38:2
52:1,4,11
52:18,19
52:24 53:9
58:14 59:6
59:16 60:6
63:4,5,6,7
80:20
84:21 85:7
85:9,11
86:3,18
87:3,19
148:15,21
148:21
**address** 5:11
5:15,16,16
5:17,18,22
5:23 32:19
32:23 36:2

37:16 38:8
40:2 41:1
42:12,16
42:20
43:17 45:5
46:5,6,14
50:2,6,9
50:13,18
51:2,6,8
51:11,12
51:17,20
51:22 52:3
52:5,12,20
54:2 55:10
55:11,12
56:14
62:24,24
63:3,21
64:5,9,19
65:3,8,16
65:24 66:9
66:23
67:14,20
68:3,6,12
68:21
71:25 78:4
78:23,25
79:1,2
80:19 82:3
83:10 84:2
87:25
247:11
259:14
290:8
292:14
**addressed**
259:7
**addresses**
5:20 29:11
32:11,20
38:19 39:5
42:10,14
42:15
91:21
104:7,12
110:15
111:8
122:4
242:16
247:12

271:20
**admitted**
168:22,25
**adult** 86:19
137:2
157:15
172:6
263:19
**advantage**
228:23
230:1,4
287:2
**advertising**
176:19
**afar** 134:15
**affect** 10:22
20:5,12
61:19
275:14
**affiliates**
154:7
**affix** 295:18
**ages** 33:13
**ago** 27:14,15
95:4,20,21
100:2,13
102:16
103:24
161:23
192:7
194:13,23
223:9
227:25
234:17
236:12
237:1
239:17
284:18
**agree** 30:17
217:3
242:25
288:23
**agreed**
201:17,21
266:21
273:3
**agreeing**
27:1
**agreement**
145:18

197:16
200:19
202:7,7,10
202:14
241:16
242:24,24
268:21,24
**agreements**
92:10
197:8,12
265:20,24
**agrees** 255:1
**ahead** 37:6
40:12
60:18  61:7
102:23
116:19
150:5
157:22
164:11
184:11
230:12
247:16
263:1
271:18
**airport**
138:10
**Alfredo**
109:10,12
110:3
120:3
**allegations**
167:25
266:21
277:20
**alleged**
38:16
58:12,14
59:6,16
60:7
103:19
120:1
125:20
126:20
127:3,13
129:15
148:22
162:1
225:23
270:22

277:13,15
**allegedly**
76:10  79:3
89:6
120:22
258:21
259:9
**alleging**
171:21,25
253:8
**allow** 288:15
**allowed** 17:7
193:12
229:11
244:1
**alternate**
70:16  77:1
77:3,4,8
**alternative**
70:15
76:16
81:24
89:16
**Altogether**
169:7
**amazing** 36:8
**amended**
57:25
**America**
133:2
155:9
273:5
**amount** 67:2
112:15
123:20
145:18,19
151:23
153:15
166:10
204:5
208:18
219:24
267:9
274:3
**amounts**
125:5
221:14
**analytic**
152:1
**analytics**

3:16
104:14
147:16
148:1,6,8
148:9
150:21,23
150:24
152:3,4,25
153:5,10
157:8
158:15
159:25
160:6
175:3
**Anastasia**
18:14,20
**Ann** 1:24
294:5,23
**announce** 4:4
**annual**
224:16
**answer** 8:18
9:14,14
10:3,6,8,9
14:4  15:14
15:16  16:9
17:4,10,23
17:24  18:8
18:9  20:7
25:8  27:21
27:22
29:16
30:19,22
31:23  32:2
36:15,15
36:22  40:9
40:11
46:22
47:15
48:13
53:21  55:4
58:23  59:2
59:15
61:13  62:9
62:11  65:2
67:18,23
70:1  73:11
73:19,20
77:5  79:11
79:17

83:18,20
91:11  97:1
98:2,3,4,5
98:5,6
99:22
105:24
110:7
111:20
114:6
123:21
124:22,25
127:7
128:4,13
129:23
130:18
134:20
135:9
139:11
141:6
143:4,14
146:15,18
150:8
167:3,4
171:18
173:22,24
174:4
177:25
180:12
181:8,19
181:23
184:11,12
184:14
186:19
187:23,24
189:25
190:3,8,9
190:13
195:1
210:9,11
231:11
233:23
240:25
241:9,9
244:2
248:21
249:4,9,13
250:1,9,13
250:19,23
257:4
275:7,14

276:20
281:7,14
283:3,21
**answered**
10:18  18:2
114:8
186:17
188:3,22
200:25
230:23
249:25
**answering**
10:19
121:8
234:25
280:12
283:20
**answers** 8:6
9:23  10:23
13:12
28:16
130:22
143:13
186:20
205:11
225:21
246:19
249:11
254:13,15
282:23
**antibodies**
21:13
**ANTONIO** 1:3
**anybody**
231:19
**anymore**
124:14
131:16
136:25
137:2
169:21
170:21
194:11
197:20
199:22
235:17
239:22
246:5
**anyway** 23:22
24:1  110:6

158:17
167:16
171:17
194:4
222:14
anyways
123:20
apart 154:14
154:20
155:8,13
apartment
32:18,19
49:24
Appearances
2:1
applicable
225:22
226:5,7,14
apply 227:6
appreciate
186:2
approached
207:21
appropriate
181:19
182:10
approxim...
6:10 93:1
112:6
153:12,13
178:16
221:16
284:22
apps 113:15
115:1
237:5
April 21:17
21:23
283:10
area 124:2
154:25
areas 19:3
Arizona
20:21
arm's 175:14
art 119:21
198:18
article
200:9
artistic

138:11
artwork
17:15
223:23
Ashashay
273:17,22
asked 12:11
18:2 59:1
63:24
65:19
66:18
70:14
73:20,21
77:6 110:8
121:18
130:17
142:20
148:16
150:8
151:15
154:12
170:2
173:20
186:16
188:3,6,22
200:24
202:20
205:4
207:7
223:4
224:2
244:10
249:3
253:10
272:15
275:5
276:25
277:12
281:21
285:6
asking 8:4,6
9:20 16:4
24:17,18
24:19,20
27:23,24
28:1,2,3
36:20
44:21
49:10
53:19

59:11
69:16
74:15 76:3
76:7,8
87:10
100:22,23
109:19
111:13
114:7
117:17,24
119:5
129:19
139:7
143:4
146:13,18
154:4,5,9
165:22,23
167:1,19
167:20
187:9,18
188:13
189:14
192:9
215:14,15
222:5
223:18,19
223:24
228:3,21
231:1
233:21,24
235:18
240:9,12
245:9
248:10
249:21
262:2
asks 36:17
91:12
asleep 64:1
208:11
aspect 171:6
assert
181:19
asserted
161:17
186:12
188:1
asserting
233:15
assertions

179:2
asset 263:11
assets 21:25
22:1,2
262:11,12
262:14,16
assign
125:17
135:15
138:2,4,5
139:1,2,5
139:11,13
assigned
135:22
137:20
138:12
141:8
assigning
137:17
147:8
assist
125:22,24
assistant
9:3 286:17
associate
183:9
associated
183:9
assume 88:3
assumptions
47:23
asymptom...
21:15
attached
42:11
293:3,4
attempt
117:18
attempted
118:7,19
attempting
119:1
attempts
119:7
120:1
attend 62:1
62:2
attention
209:4,5
216:8

258:1
267:5
attorney
13:11
24:22,23
85:21
100:15
113:17
180:18
185:2,4
187:3
196:2
202:19,20
202:25
203:12
207:2
209:12
225:20
229:5
231:1
241:3,8
273:9
attorney's
181:22
229:14
attorney...
27:24
181:20
190:7,11
190:12,14
190:16,21
191:7
192:16
226:8
228:11
233:4,5
attorneys
24:12 28:2
28:11,11
28:12,14
29:11,17
29:21,25
37:13
54:10
58:18,20
80:10
103:10
110:13
149:3
180:7,14

198:2
202:13
218:5
233:2
245:10
246:14
261:10
272:9
273:21
**audience**
148:2
**August** 92:7
213:5,5,7
215:21,21
215:21,22
217:22,22
274:11,17
279:6
**Austin** 2:12
**automate**
107:13
**automated**
108:9
**automati...**
88:6 115:1
**available**
41:1 43:17
47:8
106:20
117:11
143:19
151:25
153:1,9
156:7
160:23
161:1
172:1
**Avenue** 2:4
**average** 94:6
148:4
214:3
221:21
**aware** 13:20
20:3,18
25:11,15
41:4,10
58:12,13
59:6,9,15
59:18 69:8
69:12,13

69:16 70:4
77:24
80:13
110:11
111:2,4,6
112:1,4,9
124:3,3
127:11,14
127:15,19
171:21,23
171:25
172:2
**awareness**
257:14
**awesome**
286:18
**awful** 199:4

———————
**B**
**B** 2:11 3:8
138:9
144:13
278:9,14
278:19,20
278:21,25
279:3
**back** 26:11
26:14
33:16,19
36:19
44:12 50:1
54:22,25
55:10
56:23
63:15 71:7
83:9,23
84:1 85:3
85:6
105:19,22
108:16
116:16
120:11,12
134:16
137:7
141:11
148:18
157:20
159:7
163:19
164:16

170:6,7
171:11
174:9,11
174:24
176:6
185:9
189:6,20
189:21
191:16
195:10
199:22
201:7
211:3
230:10
232:12
234:5,24
241:13,21
243:1
244:5,7,9
244:18,25
245:1,2
255:4
260:21
263:6,8,8
269:12,19
270:3,13
270:17
271:6,23
273:18,21
278:5,6
279:15
280:21,24
283:18
284:17,19
289:3,25
291:9
**back-end**
128:21
**background**
128:16
129:10
130:14
**bad** 93:11
196:10,10
231:25
265:8
275:15
282:17,24
**balance**
252:17

**bank** 219:18
263:25
265:5,5
267:9
**barely** 88:8
276:5
**base** 28:22
**based** 19:24
65:2 67:3
68:3 97:19
97:20,23
112:15
114:12
116:8
125:12
132:3,3
138:6
180:22,22
200:24
207:4
238:25
260:20
288:24
291:4
**basically**
27:24 35:9
38:18 39:8
43:14,21
43:23 44:5
44:8,23
46:5 72:1
78:11
98:11
100:10,22
114:3,4
131:13
132:11,14
136:14
154:4,22
156:17
159:1
160:19
169:15
176:8
210:19
222:2
225:11
241:16
261:11
264:24

273:25
274:14
277:7
280:18
283:12
289:18,19
290:12
**basics** 8:3
**basis** 31:19
60:15
66:12
80:12
102:12,14
102:21
111:18
118:16,16
232:24
258:19,19
259:8
**batch** 92:21
111:7
180:15
194:22
210:21
213:6,7
215:25
244:23,25
245:1
**beat** 171:12
171:13
**beautiful**
171:6
173:8
198:17,23
199:7,25
200:2
212:5
**Beauty**
198:24
**beginning**
4:3 141:13
284:20,22
284:24
**behalf** 4:7,9
4:11 31:3
112:16
114:23
190:19
219:17
272:10

| | | | | |
|---|---|---|---|---|
| **behaved** | 184:4,14 | **believe** | 290:7,7,25 | 200:9 |
| 243:7 | 185:12,16 | 10:15 | **believed** | 203:25 |
| **Beik** 2:3,3 | 185:20 | 11:20  14:2 | 75:11 | 204:2 |
| 3:4  4:10 | 186:1,16 | 19:1,5 | 246:20 | 212:19 |
| 4:10,10,16 | 186:22 | 28:5,8 | **Bellson** 7:11 | 224:8 |
| 5:18  18:2 | 187:2,19 | 38:1  47:16 | 33:18 | 238:18 |
| 24:15 | 188:2,6,9 | 47:17,20 | 55:21 | 282:1 |
| 25:24  26:3 | 188:16,20 | 54:9  56:18 | **Bellwether** | **bigger** 31:13 |
| 26:6  27:23 | 188:25 | 56:21 | 7:5  55:20 | 49:5  101:7 |
| 30:18 | 189:18 | 57:14  58:9 | 125:15 | 176:21 |
| 31:20 | 190:6,12 | 59:20,20 | **benefit** | **biggest** |
| 36:14,17 | 191:4 | 60:4,6,16 | 231:19 | 110:17 |
| 40:7,12 | 200:21,24 | 60:19 | 271:22 | 130:15 |
| 41:6,16 | 203:7 | 62:19 | **best** 14:4 | 256:25 |
| 42:22 | 210:10,24 | 63:21  68:4 | 24:3,3,3 | **bill** 114:25 |
| 44:16  45:7 | 214:5 | 70:8,10,14 | 25:8  111:9 | 115:21 |
| 45:11 | 216:24 | 70:23  71:7 | 119:4 | **billing** |
| 46:18 | 217:6 | 71:18,19 | 152:22 | 151:4 |
| 47:12  48:4 | 218:25 | 72:4,21 | 275:6,23 | **bills** 115:7 |
| 48:12,21 | 219:9,11 | 74:25  75:4 | 294:13 | 180:13 |
| 50:4,19 | 227:3 | 79:12  85:7 | **bet** 159:12 | 207:6 |
| 53:2,17 | 229:3 | 86:8,8 | 159:16 | 253:1 |
| 54:14,16 | 230:15 | 89:21 | 166:14 | 274:16 |
| 57:21,24 | 231:7 | 115:19 | **better** 20:21 | **bit** 8:5 |
| 58:23  59:1 | 232:4,8,21 | 122:15 | 23:6,7 | 34:13 |
| 59:10  61:3 | 232:25 | 124:25 | 24:4 | 35:22 |
| 61:5  62:3 | 233:10,17 | 125:1 | 129:25 | 42:25 |
| 63:23 | 234:2 | 131:4 | 148:9 | 61:22  62:1 |
| 65:11  70:1 | 240:18 | 146:2,25 | 211:15,22 | 68:16 |
| 71:5,17 | 243:2,12 | 147:16 | 230:22 | 105:13 |
| 72:10,19 | 247:5 | 164:1 | 263:18 | 108:15 |
| 73:12,19 | 248:7,17 | 181:2 | 272:3 | 141:19 |
| 74:12,23 | 249:7,17 | 188:2 | 276:21 | 148:18 |
| 75:9,13 | 249:24 | 208:8 | **Beverly** | 171:4 |
| 76:14  77:5 | 250:12 | 211:8 | 184:20 | 173:9 |
| 77:14  78:6 | 251:23 | 232:19,22 | 203:24 | 175:9 |
| 78:20  79:8 | 254:18,25 | 233:5,8 | **Biden** 230:5 | 177:12 |
| 80:8  82:11 | 257:5 | 234:17 | **Biek** 86:7 | 211:13 |
| 82:15 | 261:25 | 236:1,4,19 | **big** 23:16 | 218:2,9 |
| 83:16  89:9 | 275:2 | 236:22,23 | 38:12 | 244:6 |
| 89:23 | 276:8,22 | 239:20 | 103:15 | 251:5,7 |
| 91:10 | 277:11 | 241:2,3 | 107:10 | 270:3 |
| 105:8,16 | 279:13 | 244:22 | 110:1 | 271:1 |
| 133:14,16 | 280:10 | 245:4 | 117:13 | 274:6 |
| 140:11 | 281:16 | 246:2,15 | 119:19 | 276:15 |
| 144:5,22 | 283:5 | 246:22,23 | 122:1 | 280:13 |
| 164:8 | 285:21 | 263:3 | 124:17 | 282:23,25 |
| 167:3 | 292:4,8,12 | 266:13,15 | 154:4 | 284:23 |
| 181:7,9,16 | **belief** | 278:6 | 174:3 | 286:10 |
| 182:9 | 247:19 | 280:17 | 191:8 | 287:22 |

**BitTorrent**
33:9,9
35:16
38:11,19
40:16,16
40:25
41:23 42:3
44:18,21
44:24 46:1
64:13 74:9
74:20
110:16
122:3,5,5
137:13
177:18
179:3
193:10
220:22
287:9,14
287:23
288:10
289:11,12
289:22
**Blacked**
169:23
**blame** 82:1
**block** 66:18
**Bloomfield**
1:17 5:24
**bodyguard**
125:17
**bodyguards**
125:5,8
**boilerplate**
31:15
**book** 128:8
**books** 86:22
228:1
**boss** 203:22
207:17
**bought** 22:16
161:14
267:13
**bounce** 148:4
156:18,19
156:23,25
157:7,11
157:14,15
157:17,24
158:10,14

159:7
**bow** 276:24
279:14
**box** 273:12
**boys** 75:25
**brazen** 212:8
**Brazzers**
198:12
212:8
**breach**
107:10
**break** 26:4
62:13
84:24
95:16 98:8
105:9
108:16
139:23
164:9
210:23
254:5,6,11
254:11,23
254:24,25
270:25
283:2
291:21
**breaking**
38:25
218:8
**breaks** 8:15
8:19 44:10
**breath**
276:16
**bridge** 48:24
69:5
**briefing**
168:23
**Brig** 144:11
145:11
**Brigham**
144:20
145:23
146:21,22
**bring** 59:22
126:12
145:14
180:8
198:21
213:12
242:18

**brings**
242:16
**broad** 109:21
**broader**
117:17,24
**broken**
180:12
**brought**
118:10,10
118:11
127:6
179:14
**browser**
116:7
**build** 66:18
237:10
**building**
237:17
282:2
**built** 242:22
**bulk** 245:3
**bunch** 61:13
115:6
118:22
167:10
181:12
253:1
262:19
**burden** 89:2
89:5,20
**burying**
284:11
**business**
5:16,17,18
5:19,20,22
5:23 20:5
20:9,11,12
31:8 73:16
80:15,18
95:15
104:21
128:6
130:14
131:5,7
161:13,15
176:2
180:9
183:25
191:24
193:5,6,25

194:11
195:10,11
195:13,21
195:25
196:2,13
196:15,17
196:20
201:24
202:3
204:3,7
209:6
222:11
229:18
264:7,10
275:7,8,14
275:14
282:18,23
283:3
287:3,5
**businesses**
15:19
180:11
194:16
**busy** 80:14
80:15
139:19
142:21
194:15
204:7
209:5
**buy** 24:5
128:21
162:5
172:14
193:12
199:17
266:2
**buying** 267:8
**buys** 247:9

——————
**C**
——————
**C-o-l-e-...**
5:9
**California**
5:21
143:10
184:6
186:3
192:22
216:20

269:16
294:6
**call** 24:21
24:22 25:4
100:18
107:24
114:16
126:1,2
156:18
157:17
242:12
269:24
**called** 5:3
12:4 13:9
23:21
61:12 87:7
107:25
128:19,20
198:24
199:25
272:20
**calling**
225:5
**calls** 254:7
**cam** 177:2
**camera** 23:6
23:6 24:3
134:15
138:8
144:13,15
198:21
**cameras** 23:3
**campaigns**
124:1
**Canada** 97:19
97:23
106:9
119:11
**cancel**
151:22
153:4
**capacity**
62:8
**Capital**
191:1
228:5,25
**capture**
67:21
68:22
**captured**

46:8,9
67:7 75:22
**captures**
165:8
**capturing**
66:23
**care** 199:22
228:10
**carefully**
87:3
**carrying**
121:6
138:9
**case** 1:7 7:5
31:18
33:18
37:20,23
38:5 61:11
73:8
124:17
126:23
127:5
133:8
139:15
174:3,6
181:18
187:6
192:24
194:5
226:7
257:21
273:5
277:14
283:14
285:14
**cases** 7:10
36:9 70:25
71:3 73:7
100:22
111:8
124:16
127:17
128:7
180:8
185:18
186:6
187:4
189:9
210:13,15
213:18

215:25
253:3
259:19
284:1
286:20
**catch** 31:25
276:16
**catched**
284:14
**categories**
223:5,13
223:19
224:3,12
**categorized**
85:25 86:5
**category**
199:9
224:9
228:8
**Caucasian**
33:14
**caught** 46:12
46:13
76:20
123:19
**cause** 179:12
294:18
**caution**
19:17
**CCR** 1:24
294:5,23
**cease** 190:18
**cease-an...**
224:17
225:4
**Cedar** 128:25
**CEO** 11:9,9
199:17
262:21
264:11
**certain**
17:23
114:12
125:5
217:16
247:8
291:6
**CERTIFICATE**
294:1
295:1

**certific...**
241:24
**Certified**
294:6
**certify**
294:6,14
295:16
**chain** 66:18
**challenge**
130:15
**champions**
284:8
**chance** 38:10
170:14
**change** 23:5
36:1,2
40:8 44:2
59:19,19
59:21 60:1
114:15
116:13
130:9
151:19
152:24
189:10
282:20
295:2
**changed**
35:24
61:23
92:17
108:8
246:6
251:3
**changes**
19:12
136:14
152:21
**changing**
23:4
130:12
**charge-back**
178:22
**charges**
126:12
**Chat** 110:6
**check** 12:1
13:25 14:5
15:17
16:10

84:11
85:21 86:1
108:21,25
110:23
123:25
140:24
147:5,6
151:8
154:3,6
220:3
252:12
288:18
**checked**
94:21
**checks**
191:13
210:1
**cheerlea...**
277:6
282:22
**child** 123:14
124:8
199:3,14
**children**
136:24
199:20
212:10
286:5
**choice** 290:4
**choose** 34:6
44:6 97:9
**Chris** 107:23
107:25
**circle** 83:9
84:1
**citrus** 43:8
**civil** 31:2
126:5,17
126:19,22
126:23
127:2
**civilly**
126:12
**claim** 31:17
37:22 54:7
64:17,25
79:5 81:8
83:13,13
84:5,6
86:17

186:11
196:12,14
196:16
203:11
225:23
243:6,8
258:20
261:17
**claimed** 41:4
41:5 65:10
203:5
**claiming**
228:24
281:2,3,3
281:7
**claims**
260:21
**clan** 207:15
**clarify**
41:18,19
46:19
**Clark** 294:4
294:21
**classier**
212:16,17
**classified**
16:11,25
17:1
**clean** 231:3
**cleaned**
265:7
**cleaning**
218:11
**clear** 15:10
27:7 45:4
45:24 48:1
60:10 83:8
83:10,24
84:2 98:2
232:18
277:8
280:13
283:1
290:1
291:13
**clearly**
87:16
**click** 12:4
12:16
13:21

262:5,7,11
262:12,14
262:16,21
262:24
263:12,15
265:15,18
client 14:15
33:10
35:16 36:3
37:23 38:2
38:5,24
39:2,9,9
39:18
40:14,17
40:17,24
41:4 43:7
43:10,13
43:15 44:1
44:5 45:1
45:9,12,17
45:25
46:13,15
46:22,25
47:3 48:1
48:9,18
49:15,18
53:10,25
54:8 55:9
55:23 57:2
58:22
59:16 60:7
63:21
64:13,17
65:1,7,25
67:5 70:8
70:13,14
73:25 74:1
74:8,11
76:15,15
77:4 79:5
80:23 81:1
81:4,10,17
81:18 82:5
83:13 84:6
85:13
87:17
88:10 89:5
89:12 91:7
95:11
106:8

146:8,17
164:23
165:4
166:1
167:17,25
180:4
192:25
228:20
229:23,25
232:6
253:8
270:23
277:19,23
287:14,16
287:22,23
288:6
289:9,12
290:20
291:8,14
client's
39:20,22
39:25 40:2
40:5,14,21
40:22,25
42:16,21
45:5 47:11
49:12
74:19
76:10 78:3
79:14 81:4
88:1 89:20
288:25
290:9
client-s...
43:11
clients
38:20 40:1
40:3 52:21
289:11,20
clock 94:17
close 56:5
60:13
62:20,20
64:7 65:4
65:9,13
66:5
126:14
218:8
closed
168:13

174:13,18
closing
284:9
clothing
198:8
cloud 143:10
clowns 230:4
coaching
77:18
coat 267:10
code 66:25
67:4 78:3
78:7 79:3
131:17
135:7
223:24
238:13
coded 66:20
CODY 2:16
coincidence
170:14,19
170:21
coinsurance
170:18
Colette 1:15
3:2 4:3
5:2,9 13:2
13:5,9,15
13:16,21
13:22,22
25:24
27:23
30:18
31:20
36:14,14
41:16
57:21 61:3
62:3 70:1
73:19
91:10
144:22
155:22
167:3
171:3
185:12
189:18
231:7
234:2,2
262:5,6,6
263:22

264:11,17
264:22,23
265:1,2,14
265:14,15
265:19,19
265:20
266:1
268:24
275:3
294:8
295:16,21
Colette.com
14:14
collateral
182:16
collect
246:16
collectable
99:6
collecting
184:25
209:16
247:20
287:7
collection
221:22
collections
272:22,24
College
128:17
color 251:5
251:7
colored
87:10
com 35:25
combined
11:22
12:13
34:24
come 9:4
40:21
70:13
78:24 81:8
83:12 84:4
118:12
120:11,11
120:12
124:6,12
126:14
151:2

152:5
154:24
157:1,12
158:4,5,7
166:15
167:9
169:12
176:14
198:8
205:4
251:14
comedy 87:12
87:15
comes 10:21
52:22
105:2
167:6,12
288:2
coming 23:7
170:6,6
198:20
210:20
217:10
218:10,21
commencing
294:8
comment
161:21,21
163:18
commenting
163:16
comments
163:14,17
commission
135:6
common 74:2
communicate
8:22 9:9
100:8
101:18
102:13,14
102:25
103:2,6,13
103:18
110:5
113:12
235:9,24
236:20,23
237:3
communic...

95:18
100:11,21
103:22
235:2,14
235:20,21
236:24
communic...
95:23
100:25
235:6,19
239:4,5
292:20
communic...
224:15
237:6
communic...
24:19
communic...
27:24
100:15,19
103:9
223:21,25
224:5
225:2,14
228:5,6,21
228:24
229:1
230:19
232:15,19
233:8,16
234:9,14
234:19
236:3,10
236:13,16
244:13
companies
5:13,14
11:13,16
11:18,25
12:3,5,15
12:22,24
13:19
14:10,20
96:4
111:11
112:2,5,7
112:10
113:12,20
131:14,17
135:12

160:11
186:11
187:8,10
262:5
265:14,24
company 11:6
12:4 13:1
15:5 18:19
29:15 82:8
82:14
97:15,16
97:17
106:10,14
106:18
107:20,22
109:21,23
128:19,23
130:4,13
178:3
183:11
191:15
200:15
218:21
219:25
238:20
263:7
264:8
267:12,13
267:16
269:8
company's
107:24
compare
245:14,15
compared
166:10
211:11
compel
228:16
compete
43:24
130:14
competing
129:3
161:10
compile
113:8
complaint
3:15,25
57:22,25

58:14,16
59:8,17
60:8 126:5
133:8,8
134:3
143:20
146:24
161:17
162:1
163:12
211:9
267:24
268:15,16
277:14
278:7,25
279:9
complete
10:16,20
294:12
completely
10:3,8
12:11
30:23
35:19
complexes
49:24
computer
38:9 39:10
39:11,14
39:16,17
39:20,22
39:25 40:6
40:14,21
40:22
42:21
43:16,18
43:19
49:12
52:21,22
55:11 56:1
56:1,11
60:12
62:20 64:7
64:12 65:4
65:9,13
104:13
107:13,14
234:12,15
236:20,25
242:12

287:23,25
288:8
computers
51:15
124:10
129:6
concerned
54:17
183:5
concerning
226:16
concise 76:6
conclude
271:2
concluded
293:7
concludes
292:24
conclusion
78:25 88:7
259:9
conducted
8:8
confirma...
117:22
confiscate
220:12
confiscated
220:14
confused
53:18
confusion
14:3
connect 39:4
41:22
56:13 74:5
connected
40:5,14,15
40:17 45:5
51:16,16
74:9,18,19
75:20,22
76:9 80:24
80:25
83:15 84:8
connection
63:11
288:10,14
288:25
289:4

connects
39:6,7,7
consider
211:7,8
considering
256:22
consistent
80:20
consists
239:22,23
construc...
202:21,24
consultant
41:13
112:12
consultants
37:15
39:20 40:4
41:10,25
42:19
112:9
consulting
268:21,23
contact 39:2
99:12
246:13
276:3
292:8
contacted
237:12,12
contained
58:13
contend
58:15
content
14:14 22:3
39:20 45:9
54:5 55:23
63:6,7
65:23,25
66:9 67:7
67:9,13
68:18
71:25
78:13,14
93:13
112:25
114:14
115:12,13
117:11

132:4,10
138:14,14
141:2
142:1,1,3
198:13
256:9
257:8
259:1
261:18
265:12,12
288:20
289:7,8
290:2
**contention**
39:19
45:25 79:5
285:13,18
290:19,20
291:14,17
291:18
**contentions**
42:16,24
289:8
**continue**
90:19
**contract**
3:14 20:2
21:3 91:24
93:22
94:14
96:23
131:15
137:25
139:13,25
141:12
143:23,24
144:1,4,9
144:14,14
144:24
145:4,6,9
145:17,25
146:4
192:12,15
**contracted**
15:19,20
20:19
285:15,19
**contracting**
106:18
191:15

207:7
267:16
**contractor**
16:2 18:7
20:17,20
23:14,18
106:9
294:15,16
**contractors**
15:1,4,9
15:12,13
15:18 16:3
16:24 19:6
19:7 20:2
20:18
23:10
113:3
120:13,14
137:23
139:1
142:9
143:18,19
200:13
227:14
**contracts**
114:1,3
138:2,21
140:5,10
140:13
141:11,14
142:5,7,8
142:17
143:5,13
143:17
145:2,8,20
145:21
146:11,12
146:13,14
146:22
147:4,7
226:24
227:6,14
265:13
**control**
125:18
199:23
231:1
255:18
256:3,4
**controls**

255:25
**convenience**
55:25
178:5
**conversa...**
111:21
**conversa...**
276:24
**copied** 200:5
277:15
**copies**
138:20
147:3
245:11,17
293:4
**copy** 57:21
57:24
147:15
202:11,12
**copycats**
200:4
**copyright**
7:15,19,23
28:12
84:17
102:6
103:23
121:14,16
121:19
123:6
125:13
126:1,3
131:25
132:8,8,11
132:13,16
139:4,8
140:3
142:1,2,7
145:20
187:5
209:7
213:21
226:18,19
227:10,17
241:13,23
244:12,17
268:1
272:22
290:10
**copyrigh...**

225:9
**copyrighted**
22:3,3
41:11,14
42:3 45:17
46:17,23
48:2,10,19
48:25 55:9
56:3 63:22
64:10,18
65:1,8
67:7,9
74:20
76:23
78:13 81:9
83:14 84:7
89:7,21
117:4,10
131:19
132:6
171:22
225:25
246:4,7
290:10,21
291:15
**copyrigh...**
14:13
**copyrights**
14:18,21
18:24,25
31:18 35:1
54:1 73:18
93:8
103:20
104:2
120:23
121:11,12
121:23
122:21
123:24
124:24
125:3,6
126:7,13
126:15
131:20,22
132:14
136:8
138:3,4
139:3
140:2

141:8,8,23
143:1,2
147:9
155:24
161:12
182:14,22
182:24
184:19
186:12,14
187:9,25
191:21,22
193:3,12
193:20
194:22,25
196:22,23
197:10,13
201:18
202:8
203:15
225:2
227:1,7,15
241:21
242:1
243:1
244:11
248:6
250:11
251:20
261:12
263:15
266:23
272:25
280:19
281:8
**core** 141:20
171:4
264:2
**corporate**
1:14 25:12
25:17 27:2
27:8,18
28:14
30:11
45:16 47:2
48:17 55:7
58:19 60:5
77:23
84:16,19
84:20
112:1

New York
212-273-9911
Hudson Court Reporting & Video
1-800-310-1769
P-Resp_Renew_MSJ184
New Jersey
732-906-2078

127:8,10
127:11,16
127:20
165:24
**correct**
11:14
15:25
41:23 42:4
42:5,18,24
44:15
45:10 46:2
46:24
47:14 48:3
48:11,20
50:3,13
51:3,17,18
51:20,21
51:23
52:13,14
52:17,18
60:13 68:4
68:8 72:18
73:9 74:3
74:6,11,22
84:16,21
84:22 89:2
92:24
100:9
106:3,4
116:5
118:20
120:15
137:23
138:3
143:21
145:6,7
152:17
155:20
159:20,23
162:10,14
162:15
163:3
165:5
183:6,7
202:19
206:2,3
217:13,17
234:21,22
237:18,19
238:21

240:15
246:11
247:21
252:13,16
259:7
274:18,19
280:3,7,8
281:11
287:12
288:11,16
289:16
**corrected**
295:17
**correctly**
140:24
152:5
250:17
285:4
**cost** 33:19
118:17
154:8
160:14
180:7
209:8
257:10
291:5
**costing**
247:7
**costs** 139:17
209:14
**counsel** 4:4
91:16
185:17
210:4
293:5
294:15,17
**count** 7:3
**counter**
228:1
**countries**
15:9 17:20
23:17
81:12
204:25
**country**
16:15
17:17
120:19
260:14,16
260:20

288:23
**County** 294:4
294:21
**couple** 21:8
75:25
88:16 96:5
97:14
101:23
149:21
156:3
167:8
189:12
207:23,23
235:15
281:20,22
286:14
**course** 8:16
9:11 10:1
10:18,21
10:25
93:25
131:23
138:1
141:22
142:1
175:16
206:11
211:24
220:15
227:19
**court** 1:1,25
8:7 61:13
83:21
124:12
179:11
189:5
192:20
229:9
230:25
231:22
248:4
250:4,17
267:23
270:13
294:6
**court's**
231:24
**courtesy**
231:2
**courthouse**

269:17
**courts**
126:17,19
126:22,23
127:2
**cover** 86:12
190:21
210:5
213:14,24
218:4
**covered**
139:16
**covering**
214:1
228:13
**covers** 31:17
**COVID** 19:13
19:14,21
20:1,2,5,7
20:12,19
20:21,25
21:3,4,20
34:21 95:7
95:9,16
98:8 99:16
101:1,5,12
101:19,21
101:24,25
133:1
140:16
199:23
258:9
275:6,14
276:18
281:22,24
282:6,19
283:7,8,15
285:3,15
285:19
286:4,13
**COVID-19**
4:13
**cowardly**
243:7
**crashed**
174:18
**crawling**
200:10
**crazy** 196:3
204:15

**create** 33:7
130:25
135:7
265:2
**created**
131:6,19
132:2
**creating**
132:17
193:7
**creative**
193:7
194:10
**crime** 126:1
**criminal**
228:22
**criminals**
98:25
189:17
229:16
230:21
**criteria**
55:14,18
**CSR** 294:6
**currently**
92:14,15
92:17,20
94:25 95:1
111:3,7,15
112:3
159:19,22
**customer**
17:21
158:24
**customers**
156:13
158:11,15
158:23
**cut** 30:23
288:25
289:4
**Czech** 132:25
212:20

**D**

**D.C** 216:20
**daily** 111:17
227:18
**damages**
183:20

228:14
**Dane** 101:7
102:1,3,4
102:5,11
102:13,14
102:18,25
103:2,6,10
103:13,18
103:23
112:11
237:9
276:2
281:25
**Dane's** 102:9
**Dare** 87:7
134:8
143:25
144:21
154:25
217:2
221:7,10
221:13
**dash** 114:21
165:11
**data** 37:15
37:17,18
37:20,22
38:4 42:6
42:20 46:1
46:3 47:4
47:5,11
49:12,16
49:17,18
68:6,9
117:25
156:7
162:10,12
162:14,16
162:21,25
236:5
237:24
238:18
242:2,3,4
242:5,7,10
242:11,14
247:9
260:21,22
260:23
261:3,4,7
261:9,13

261:17,20
261:21,23
262:2
272:23
273:4
275:25
283:16,18
283:23
285:3
286:20,25
287:1
**databases**
285:11
**date** 4:1
136:22
163:1
239:13
264:14
274:8
278:11,17
278:18
279:5,22
295:22
**dates** 12:18
58:2 86:11
86:12,13
155:5
216:14,15
216:16
264:14
279:15,16
279:17,20
279:21
**day** 48:23
59:19,21
75:2 76:22
116:13,22
137:14
151:20,22
151:22
152:21,24
154:23
161:20
163:20,22
166:9
173:3,25
177:23
181:4
189:13
203:3

245:6,9
254:9
260:7
273:13
294:21
**days** 31:8
149:23
**deal** 75:1
101:8
124:17
191:2
192:2
201:6
212:19
**dealing**
101:21
116:24
128:6
189:16
**death** 125:16
**Debbie**
189:19
**Deborah** 1:24
294:5,23
**decide** 35:8
98:12
231:15
**decided**
28:19
136:24
179:24
200:15
263:18
274:3
**decision**
34:14
**declaration**
8:25 40:5
**declare**
295:16
**decline**
189:25
**deeds** 269:11
**deeper** 165:7
**defamation**
183:21
**default**
185:8
**DeFelice**
102:10

**defendant**
1:9 2:8
3:18,22
4:7,9 5:3
30:24 34:3
34:3,11,15
36:13
37:14,20
277:13,14
277:21
**Defendant's**
3:11,12
25:19,22
26:16
91:17
133:4
147:11
216:5
222:15
253:21
268:11
278:6
**defending**
161:12
**defense**
260:17
**define** 15:24
**definitely**
21:9,13
68:20 86:4
94:9
167:11
169:14
173:6
212:13
218:18
224:13
258:16,24
277:17
282:11
286:9
288:4,18
**definitions**
31:16
**defunct** 13:7
**delays**
283:20
**denominator**
168:16
**department**

126:2
**depending**
93:21
**depends**
22:12,24
22:24,25
44:19
160:16
178:19,21
178:23
218:10
254:13
288:12,22
**depo** 181:3
**deponent**
295:1,16
295:21
**depos** 204:14
**depose** 27:1
58:21
**deposed** 6:2
6:11,13,14
6:19
**deposition**
1:13 3:12
4:3 7:22
8:8 9:2,17
10:22
24:11
25:13,19
26:16,24
27:25 28:4
28:9,15
29:18 30:1
30:5,8
31:8,10
61:24 62:8
109:13,16
110:4,9
179:14
229:22
231:22
275:5
292:7,24
293:3,7
294:7,12
295:17,18
**depositions**
10:14
205:9

| | | | | |
|---|---|---|---|---|
| **derived** | **developer** | 99:20 | **discuss** 34:5 | 278:3 |
| 175:3 | 98:10 | 171:16 | 80:9 | 290:9,21 |
| **describe** | **developing** | 205:7 | 168:23 | 291:15 |
| 99:15 | 118:17 | 244:4 | 254:24 | **distribu...** |
| 150:22 | **development** | 284:13 | 283:2 | 48:18 |
| **described** | 98:10 | **digital** | **discussed** | 49:19 |
| 31:5 211:6 | 118:16 | 12:12,17 | 28:16 | 290:18 |
| **describes** | **dial** 165:10 | 13:21 | **discussing** | **distribu...** |
| 129:15 | **difference** | 123:6 | 49:21 | 273:1 |
| **DESCRIPTION** | 25:16 | 265:16,17 | **discussion** | 291:13 |
| 3:10 | 74:21 75:1 | 265:17 | 26:10 | **district** 1:1 |
| **design** 17:15 | 75:5,12 | **dinner** | 54:21 | 1:2 180:22 |
| 17:19 | 99:17 | 199:18,19 | 174:23 | 188:24 |
| **designate** | 148:24 | **direct** | 230:14 | 216:22,23 |
| 31:2 | **different** | 134:13,14 | 291:22 | **districts** |
| **designated** | 5:20 7:4 | 216:8 | **disgusting** | 88:17 |
| 25:11 31:6 | 15:9 16:4 | 251:4 | 198:13,25 | 242:19 |
| **designing** | 17:19,20 | **directed** | 212:8 | **DIVISION** 1:3 |
| 236:6 | 20:15 35:3 | 142:10 | **dismiss** 73:5 | **DMCA** 18:25 |
| **desist** | 44:20,25 | **directing** | **dismissed** | 104:3,9 |
| 190:19 | 66:3,21,24 | 264:4 | 72:15 73:1 | 106:2,5,10 |
| **despite** | 68:17 71:8 | **direction** | **disorgan...** | 106:13,18 |
| 252:12 | 81:15,15 | 130:1,3 | 245:7 | 107:20 |
| 257:18 | 81:20,21 | **directly** | **displayed** | 108:1,20 |
| **details** | 81:22 | 39:7 | 14:21 | 109:17,19 |
| 37:25 | 88:16 96:5 | 124:12 | 225:15 | 110:9,18 |
| **detect** | 100:5 | 125:6 | **disposed** | 111:2,10 |
| 159:15 | 112:23 | 131:20 | 116:10,12 | 111:13 |
| **detected** | 117:2 | 230:23 | **dispute** | 112:2,5,7 |
| 38:16,17 | 130:18 | 235:3,10 | 184:6 | 112:10,13 |
| 38:18 66:7 | 131:17 | 235:24 | 280:16 | 112:14,18 |
| 74:10 | 149:20,21 | 236:17 | **distribute** | 113:2,5,12 |
| **detects** | 151:23,23 | **directors** | 29:3 45:22 | 113:21,24 |
| 129:15 | 155:5,12 | 132:21,24 | 46:3,16,22 | 114:12,19 |
| **deter** 179:5 | 155:12 | 132:25 | 47:5,6 | 116:8 |
| **determine** | 165:9 | 134:18 | 48:1,9 | 117:8,14 |
| 17:8 32:3 | 167:10,10 | 199:23 | 277:24 | 117:21,25 |
| 109:16 | 178:18,20 | 275:24 | 287:9,15 | 118:7,17 |
| 143:3 | 181:12 | 282:3 | 288:21 | 118:19 |
| 226:6 | 221:16 | **dis-proven** | 289:7,12 | 119:2,7,18 |
| 227:19 | 224:11 | 167:23 | 289:15,19 | 120:1,24 |
| **deterrence** | 238:17 | **disagree...** | 290:3 | 122:9 |
| 180:5 | 259:12 | 191:8 | **distributed** | 137:3 |
| **deterrent** | 261:13 | **disclosing** | 45:9,17,25 | 260:12,16 |
| 180:25 | 289:17 | 54:10 | 47:1,4 | 260:19 |
| 213:23 | **differently** | **discovery** | 49:16 | **DMCA take...** |
| 258:3 | 81:16 | 224:24 | 220:10 | 110:22 |
| **developed** | 267:22 | 226:11 | 225:15 | **doctored** |
| 67:5 92:15 | **difficult** | 228:6 | 277:13,15 | 194:2 |
| 92:18 | 88:14 | 284:11 | 277:18,21 | **document** |

25:18
26:19,22
30:21
78:16,22
91:20,20
92:2
147:17,22
147:23
148:1
150:7,12
195:20
196:19
201:12
216:11
222:23
226:12
253:24
268:15
278:7
**documents**
30:4,7,23
99:13
100:23
101:2
131:21,24
222:21
223:14,25
224:3,5,15
224:22,22
224:25
225:2,14
226:16
227:1,23
228:8
234:9
262:10
285:14
**DocuSign**
201:4,11
269:24
270:1
**DocuSigned**
202:4
**Doe** 1:8 4:7
4:9 234:10
**Doe's** 3:18
3:20,21,22
**doing** 15:19
21:20 24:8
24:16

43:25
57:10 90:7
90:9,24
92:16
98:12
101:13
106:5
108:5,11
108:14
110:14
122:14,17
126:4,22
139:20
146:2,3
151:10
160:2
177:13,23
179:17
180:5
193:5,11
194:5,21
198:17,23
199:4
201:15
204:4
205:24
208:5,6
222:4,6
231:24
248:23,23
249:9
252:3,4
257:25
264:24
273:10,11
274:1
281:25
286:11,17
286:24
**dollar** 195:8
267:13
**dollars**
33:19
93:16
94:11
210:14
252:12,15
252:20
257:19,20
267:14

269:13
**domain** 11:23
131:14
132:12
263:4,6,15
**door** 158:2
288:2
289:11
**DOS** 129:21
**dot** 35:25,25
35:25
**dots** 87:10
**downhill**
207:9
**download**
35:16
38:20
40:19 43:7
43:10,13
43:14,22
44:5 45:1
49:12 56:2
56:2,6
69:15,17
76:19
89:25
157:5
159:6
165:10
168:7
169:19
170:4,5,11
222:12
228:20
229:23,25
245:17
259:20
277:23
287:8,13
288:1,15
288:20,20
289:6,7,15
290:2
291:8
**download...**
132:10
**downloaded**
35:10 41:4
41:11,13
42:2,19

47:10
53:11 54:3
54:8 55:15
57:14
65:21,25
66:9 67:13
70:11
74:19
76:10
79:15
80:23 81:9
81:20
82:10 83:3
83:4,6,14
84:7 85:8
89:6,6,21
134:7
155:4,22
156:2
162:4,13
162:17,17
164:24
165:2,17
165:17
168:8
169:1,6
170:15
253:8,9
258:23
277:15,17
278:3
289:10
**downloader**
83:11 84:3
**downloading**
29:13 35:5
38:11 44:1
52:8 55:15
55:19
64:10,11
65:22 67:7
67:8 68:11
68:18
71:25 83:1
88:23
90:16,19
90:23
161:23
230:7
**downloads**

33:5 35:17
39:9 40:20
43:22
60:12
79:19,22
85:9
**downstream**
160:1
**drafting**
180:19,20
**dream** 201:6
**Drive** 1:17
5:24
**drives** 33:20
33:21
124:10
**DSR** 198:20
**due** 4:13
19:12,14
19:20
153:24,24
205:5
283:15
285:14
**duly** 5:4
294:10

**E**

**E** 3:8
**earlier**
49:21
162:9,11
203:14
211:6
235:13
250:23
279:25
285:19
291:12
**early** 6:17
7:23 21:4
106:25
277:5
**easier** 11:22
**easily**
165:16
190:18
**eastern**
16:18
17:13

| | | | | |
|---|---|---|---|---|
| 216:19,20 | 268:1 | 15:25 | 150:11 | 251:16 |
| 216:20,22 | **egregious** | 16:14 18:7 | 157:13 | **Europe** 16:18 |
| 216:23 | 28:18,24 | 120:20 | 181:3 | 17:13 |
| 221:6,7 | 32:6,15 | 122:8 | 200:25 | 19:17,25 |
| **easy** 100:5 | 95:11 | 135:2,5,10 | 262:22 | 140:17 |
| 199:24 | **eight** 107:18 | 144:15 | **entirety** | 205:19 |
| 226:18 | 117:2 | 294:15,16 | 206:8,24 | 212:16 |
| 247:1 | 133:14,15 | **employees** | 207:3,5 | 246:9 |
| 289:3 | 133:18,22 | 14:23,25 | **entities** | 247:1,15 |
| **eaten** 253:2 | 154:16 | 15:2,3,8 | 131:5 | 247:21 |
| **Ecipio** 93:17 | 170:20 | 15:11,15 | **entitle** 7:14 | 248:6,16 |
| 93:18 94:4 | 221:11 | 16:3,4,8 | **entitled** | 248:24 |
| 96:3,10,10 | 228:10 | 16:20,23 | 182:3 | 249:6,16 |
| 98:14,16 | 278:22 | 18:1,21 | 241:20 | 249:23 |
| 99:8 | 284:18 | 20:16,17 | **entity** 131:2 | 250:11,25 |
| **Ecuador** | **either** 27:21 | 120:18 | 183:9 | 255:21 |
| 17:14 97:5 | 106:8 | 183:6 | **equally** | **evening** |
| 97:19,23 | 149:15 | **employment** | 74:10 | 138:13 |
| 109:5,10 | 161:14 | 122:12 | **equation** | **eventually** |
| 119:11 | 183:22 | **enforce** | 168:17 | 231:21 |
| 275:25 | 189:22 | 124:24 | **equations** | **Everest** |
| 286:7 | 202:16 | **enforcement** | 119:15 | 128:20 |
| **edit** 139:6,7 | 244:2 | 123:9,10 | **equipment** | **everybody** |
| 139:19 | 255:16 | 123:12,15 | 22:6,22,22 | 24:21 74:1 |
| **edited** | 270:13 | 123:17,20 | 22:23 23:3 | **everyone's** |
| 144:13 | **elaborate** | 123:22,23 | 23:10,11 | 20:9 |
| **editing** | 60:1 | 124:2,4,6 | 23:13,19 | 213:16 |
| 139:20 | **eleven** 7:13 | 124:13,14 | 24:2,7,10 | 239:21 |
| 140:4 | 278:21 | 124:20,24 | 136:2 | **evidence** |
| 142:11 | **else's** 39:17 | 125:20 | **erotic** 85:11 | 29:2 34:10 |
| **editor** | **email** 117:22 | 126:9,12 | 86:18 | 52:1,4,11 |
| 139:19,21 | 143:9 | 126:15,16 | **erotica** 83:1 | 52:18,19 |
| **education** | 159:7 | 126:20 | 171:6 | 52:24 53:9 |
| 130:17 | 237:4 | 127:3,6,12 | 173:8 | 53:10,11 |
| **educational** | 272:8 | 127:21,22 | 199:25 | 53:25 54:6 |
| 86:21 | 273:6,12 | 127:22,23 | **especially** | 55:1,7,8 |
| 128:16 | 274:9 | 128:1,9 | 23:8 32:24 | 55:22 56:1 |
| **effective** | 292:14,14 | **enforcing** | 148:10 | 56:4 63:1 |
| 123:2 | 292:16,21 | 14:17 | 169:22 | 63:4,5,20 |
| 258:7,16 | **emailed** | 125:2 | 212:19 | 64:15,17 |
| **effectively** | 205:3 | 248:6,16 | **ESQ** 2:3,9 | 64:24 65:7 |
| 182:6 | 273:18,21 | 249:6,15 | **estate** 22:14 | 79:3,4,13 |
| **Effects** | **emails** 228:1 | 249:22 | 135:5,7 | 79:15 |
| 198:24 | **embarrassed** | 250:11,25 | 145:13 | 83:12 84:5 |
| **effort** 99:15 | 83:2 | **England** | 184:6 | 87:25 |
| **efforts** | **embarras...** | 100:1 | 187:3 | 159:9,12 |
| 103:19,23 | 69:22 | **English** | 191:2 | 159:22 |
| 224:17 | **employee** | 109:9 | **estimate** | 161:16,25 |
| 225:4 | 11:5 15:1 | **enjoy** 193:5 | 268:5 | 163:5,9 |
| 266:23 | 15:23,24 | **entire** 66:25 | **estimated** | 164:19,22 |

165:3,4,20
165:23,25
166:3
167:17,20
167:20,24
168:18
270:22
**ex** 198:15
**ex-husband**
198:16
**exact** 6:21
37:25 54:2
106:15,19
108:22,22
110:22
111:4,6
132:5
162:16
239:24
241:10
**exactly** 14:1
16:24
22:11
27:15
29:23
37:24
44:19 58:1
108:25
140:18
150:1
151:10
162:15
185:14
209:8
217:24
235:22
254:23
263:10
287:19
**examination**
3:3,4,5
5:5 31:16
275:1
281:18
**examine**
30:24
**examined**
294:9
**example**
11:11

117:22
228:4
230:10
277:4
**excellent**
124:11
**exchange**
182:21
202:1
244:7
**excited**
134:16
146:7
**excluding**
215:20
**exclusive**
202:8
**excuse** 14:24
57:11
69:20,21
88:23
115:3
134:23
158:12
159:21
162:20
175:19
238:10
**excuses**
69:23
**exhausted**
189:8,16
**exhibit**
25:18,22
25:24 26:8
26:15
27:10,12
27:13,19
30:12
91:17,20
91:24
133:4,7,10
133:12,13
133:20,21
134:3
143:20
146:23
147:11,14
147:15,15
147:17

154:12,13
154:15,16
163:6,11
174:9,16
175:3
211:9
216:5,9,9
216:18
222:15,16
222:16,16
222:19,20
223:5,7,8
223:14,15
227:21,24
234:5,6
253:21,24
255:8
256:1
268:11,14
268:21
277:16
278:5,6,7
278:8,9,9
278:12,14
278:14,15
278:19,20
278:24,25
279:15
293:2
**exhibits**
58:1
**exist** 12:6,7
142:4,6
143:6,7
226:14,18
227:2
**existed**
149:18
**existence**
264:3
**expect** 32:25
81:7
180:15,23
257:7
**expense**
264:24
**expenses**
178:14,14
210:5
214:13,14

215:1
**expensive**
23:5 110:5
123:2
180:8
195:7,16
237:23
261:2
**experienced**
282:18
**expert** 66:15
78:4 96:16
96:25 97:9
97:11 98:9
124:11
**experts**
64:20 67:4
77:22
94:16,21
94:21,22
98:12
100:25
**explain**
38:15
66:22,24
76:5,8
78:5,15,15
78:17,18
114:9,9
184:3
**explained**
228:12
**explaining**
114:6
168:11
**explains**
66:15
**explanation**
65:21
**explicit**
199:7
200:3
**extension**
153:23
**extent** 10:9
24:18
58:11
184:14
185:21
**extort**

183:19
191:22,23
195:5,18
200:15
**extortion**
192:2
201:8
**extra** 156:2
156:3
**extract**
283:18
**extreme**
19:16
**extremely**
113:1
142:21
162:19
186:10
238:25

**F**

**F-a-r-e-d-s**
272:20
**fabricated**
266:24
**face** 211:19
212:14
243:8
**Facebook**
78:18
**FaceTime**
43:13
**fact** 35:11
188:21
251:9
**factors**
32:14
**facts** 185:22
**factual**
31:18
187:24
**failure**
285:13,17
**fair** 94:1,11
129:12
192:5
197:24
276:9
**faith** 197:1
**fake** 104:19

197:16
200:18,19
201:17
202:14
270:1
**fall** 208:11
**falling**
63:25
**false** 289:14
**familiar** 7:6
69:3 96:12
269:21
**family** 55:16
56:15,17
65:24 82:6
82:9,17,18
82:20
161:13
199:19
**far** 12:2,18
12:18
13:24
18:24,25
48:5 58:18
58:20
64:20
65:17,19
65:19 71:6
71:6 72:5
77:14
79:13
94:15
110:16
118:16
122:12
123:5
136:9
138:16
142:24
152:22
183:4
190:11
192:17
213:21
224:13
238:15
247:23
284:19,22
**Fareds**
272:20

273:21
**fashion**
129:2
141:17,20
161:4
198:15,18
200:2
212:18
239:2
**fast** 67:22
142:19
**faster** 35:17
43:22
130:21
143:15
238:4,24
283:19
**fastest** 56:7
191:17
267:15
**fault** 88:19
**faults**
237:22
**favorite**
180:9
**fax** 143:9,9
143:10
**FBI** 124:7
**features**
148:11
**February**
274:20
**federal** 31:1
61:13
124:16,16
125:25,25
192:20
229:9
**FedEx** 244:24
**feel** 68:23
76:2 78:1
103:17
105:7
126:11
161:6
182:3
205:10
248:2
267:2,20

267:22
**feeling**
61:21,22
105:12
**feels** 267:6
**fees** 178:22
208:2
215:5
252:20,21
252:21
253:11,13
253:16,18
266:22
**feet** 90:4
**fetish** 156:2
170:13
**fevers** 21:10
**FHGs** 146:4
**fifteen**
25:10
**fight** 33:16
**fighting**
33:19
**figure**
131:11
**figured**
203:4
**figuring**
131:9
**file** 11:20
32:3,5
39:12 56:6
99:4 111:7
132:8,9
141:2
165:1,2
176:6,11
176:18
180:3,14
183:15
192:4,6
197:16
213:25
218:4,16
228:16
239:19,24
239:24,25
239:25,25
240:1,10
258:16

260:18
269:8
281:15
284:16
**filed** 12:8
36:10 71:3
72:7,12,17
72:24 73:7
73:8
153:23,25
183:17
192:2
194:22
197:17
210:15
213:6,7,10
213:14
217:22
221:20
239:11,12
239:15,20
240:4,9,12
258:17
268:17
272:2
**files** 39:11
45:1 83:3
95:10
127:17
128:11
281:9,15
**filing** 14:1
92:21 95:7
95:17
179:1
204:21
208:7
209:19
210:8
213:20
214:4,15
214:16
215:19,25
218:23
219:6
222:9
224:18
225:8
252:21
259:25

268:9
271:20,24
**filings**
207:1
213:15
217:23
272:1
**filled** 246:7
292:21
**films** 145:19
146:23
161:17
162:5
224:7
225:16,24
226:17
245:11,13
245:21
277:16,21
**finalize**
83:8,25
**finally**
33:24
180:1
198:3
**financial**
225:22
**financially**
294:16
**find** 104:4
110:20
111:8
117:15
118:2
122:3
138:23
143:11
157:20,23
158:21
165:23
169:18
170:11,22
171:1
211:12
224:21,22
247:10
**finding**
47:18
110:14
**fine** 134:21

231:16
232:7
273:2
**finish** 27:6
55:5 62:4
62:5 98:11
105:6
**finished**
178:12
192:19
194:6
229:7
**fired** 164:4
**firm** 2:3 4:7
4:10 94:4
179:16
205:25
206:4,5,20
206:22
207:11,13
207:22,25
220:11,13
234:20
240:14
241:21
242:25
253:12,14
253:15
271:10,14
271:15
272:15,18
272:19
273:10
280:13
**first** 3:18
3:20 5:4
13:13,14
27:12,13
87:14 94:6
105:23
118:4
131:25,25
132:1,5,15
132:15
136:9,12
136:13,18
136:21,21
136:21
137:6
139:10

141:25
163:21
165:18
167:6,12
180:14
181:12
204:4,13
204:13
215:4
227:24
240:1,2,12
245:22
257:11
260:5
269:1
275:4
278:17
279:5
280:2
288:1
**fits** 55:14
55:18
56:22 64:6
65:5,10
66:6
**fitting**
65:12
**five** 6:20,22
7:5,10,12
12:23 13:1
13:20 31:8
32:7 38:9
45:21 46:9
54:3 57:5
61:23
68:16
75:14,23
81:19 94:6
94:8 95:12
107:18
120:5
170:20
173:17
175:8
179:19,21
180:24
214:3
221:11
224:7
230:2

258:22
278:23
**fix** 184:22
191:16
**fixed** 174:20
**flaws** 237:21
**Florida**
186:3
204:1
206:22
219:21
**Fly** 44:9
**focus** 111:12
115:16
**follow** 36:3
128:8
139:9
181:22
**follow-up**
281:20
**following**
46:21
**follows** 5:4
83:24
189:22
**footage**
140:4
**foreclose**
195:7,18
195:21
202:17
269:14
**foreclosing**
269:9
**foregoing**
295:16
**forensic**
45:4
**Forensics**
234:12,15
236:21,25
**forged**
187:14
269:23
**forget** 101:6
**forgot**
100:25
135:6
275:20
282:10

**forgotten**
281:22
**form** 40:7,9
41:6 42:22
44:16 45:7
45:11
46:18
47:12 48:4
48:12,21
50:4,19
53:2 59:10
59:14
63:23
65:11 71:5
71:17
72:10,19
73:12
74:12,23
75:9,13
76:14
77:14 78:6
79:8 80:8
82:11,15
83:16 89:9
89:23
140:11
141:12
144:5
181:7
182:21
184:8
188:23
189:1
191:4
200:21
203:7
210:10
214:5
218:25
219:9
227:3
229:3
232:21,25
233:10,20
240:18
243:2,12
247:5
248:7,17
249:7,17
249:24

250:3,12
251:23
257:5
261:25
275:16
276:12
277:10
279:12
280:9
281:12
283:5,25
285:21
292:21
**format**
165:12
**formats**
117:2
**forms** 244:12
**forth** 30:25
31:6
241:25
275:13
**forward**
58:21
70:13 81:2
81:5,8
83:12 84:4
180:21
192:7,8
204:17
213:19
265:11
284:9
**found** 43:6
79:20
87:22,23
114:22
158:20
190:18
209:10
226:19
262:7
263:22
265:7
290:23
**four** 30:2
68:16
155:1
170:20
221:11

Page 314

272:7
278:23
**fourth**
104:10
**Francisco**
264:3
**frankly**
187:11
**fraudulent**
269:22,22
**free** 35:17
43:24  57:9
57:10  83:4
83:6
125:14
130:14
156:10
157:6
160:23
161:1
169:16,17
172:1,3,4
176:23
177:7
199:15
209:21,23
209:24,24
259:21,21
259:22
**French**
128:18
**friend**
237:10
264:3
282:2
**friends**
179:9
**front** 26:15
85:10,17
97:18,21
106:19
128:21
148:18
165:18
178:15,17
283:21
**froze** 63:14
**frozen** 63:10
**frustrating**
283:22

**Fucking**
279:4
**full** 62:8
137:10
205:8
238:18
258:23
274:3
285:17
291:2
**full-time**
122:8
**fully** 10:23
62:9,11
105:24
140:22
243:24
**fun** 173:8
**funding**
257:12
**funds** 204:4
**funneled**
14:2,10
**funny** 87:11
173:8
199:16
**further** 3:5
69:9  132:7
292:2,4
294:14

_____
**G**
**G** 110:6
**gaffer** 138:8
**galleries**
146:5,6
**games** 191:10
**garbage**
260:13
**gather** 99:13
**gathered**
49:17
285:2
**general**
219:19
**generate**
217:20
257:8,13
268:6
**generated**

215:1,3
266:22
268:2
**generating**
257:19
**Genova**
183:11,15
184:6
187:23
188:1
190:25
191:1,1,12
215:10
228:5,17
228:22,25
229:1
230:4
232:16,20
233:12,16
239:4
253:19
265:9
284:2,4,11
284:16
**Genova's**
230:20
**geolocation**
54:3
242:16,23
**geolocat...**
242:18
**German**
273:13,14
273:15,18
273:21
274:5
**Germany**
97:20
100:1
204:23
205:4
272:9,20
**getting** 24:3
40:23,24
47:23
51:13
59:23  83:6
100:4
101:5,5
103:16

104:1
111:7
122:1,2
128:14
130:19
134:16
146:16
151:13
164:8
169:24
180:3
185:22
199:1,2
205:2,2
208:9
211:19
212:4,7
219:16,17
222:9
231:24
234:24
244:7,8
245:9
246:7
247:11
250:8
254:14
271:22
272:4
273:4
274:1,13
288:7
290:14
**girl** 18:6
136:24
137:1
154:24
156:3
**girls** 141:19
151:9
154:25
155:12,14
155:15
161:4
173:8
177:2
**give** 9:23
10:23  14:4
14:18  15:6
18:16

53:13  57:2
73:10
78:16
79:10
81:24
82:10,13
85:22  86:6
89:13,15
89:15  91:8
97:12,13
97:14
110:24
114:24
139:21
172:12
187:24
192:12
195:25
196:1,20
201:19
207:8
208:13
228:11
236:8
238:18
242:25
243:23
248:12,14
248:18
249:13
251:19
254:14
266:16
292:13
**given** 57:3
57:11
65:20,21
69:2  70:17
81:1  93:24
182:13,20
192:14
223:4,6,7
223:9,10
253:6
**gives** 139:24
174:10
**giving** 67:19
70:20
191:24
195:20

| | | | | |
|---|---|---|---|---|
| 196:7 | 157:3,5,17 | **God** 7:20 | 177:14 | 273:20 |
| 205:11 | 157:19,22 | **goes** 12:2 | 178:18 | 275:8,11 |
| 249:11 | 158:19,25 | 116:1 | 179:25 | 276:19 |
| 272:17,25 | 159:5,6,24 | 133:18 | 181:10,22 | 279:2,23 |
| 273:1,16 | 160:2,4 | 142:24 | 182:4,4,9 | 289:4,24 |
| 275:6 | 163:15,19 | 160:1,19 | 184:4,4,8 | 291:4,20 |
| 282:23 | 164:10 | 180:14 | 185:12,20 | 292:6,10 |
| **global** 15:4 | 166:24 | 279:23 | 185:20 | **good** 5:23 |
| **globally** | 170:11 | **going** 12:6 | 186:8 | 61:21,25 |
| 15:6 | 171:2,11 | 14:2,6,6,9 | 187:24 | 91:4 95:13 |
| **go** 8:3 9:4 | 171:17 | 19:23 | 189:11,13 | 96:24,25 |
| 17:15 | 174:19 | 26:25 | 189:25 | 98:18,23 |
| 18:24 | 177:15,20 | 27:25 | 194:11,24 | 103:17 |
| 23:14,15 | 184:11 | 28:22 | 195:6 | 105:7 |
| 23:16,19 | 186:21 | 36:22 | 196:21 | 108:16 |
| 26:6,7 | 191:16 | 47:17 49:4 | 197:25 | 116:14 |
| 28:19 | 193:9 | 49:9 53:16 | 198:7,8 | 119:15 |
| 30:21 | 195:1 | 58:6 63:16 | 200:17 | 157:13 |
| 31:11,16 | 197:24 | 66:14,24 | 201:7 | 162:24 |
| 34:15 37:6 | 199:22 | 66:25 | 204:16 | 163:1 |
| 40:12 49:3 | 209:20,21 | 67:18,23 | 205:10,10 | 164:8 |
| 50:1 54:15 | 209:23 | 76:17 | 209:19 | 180:17 |
| 56:24 58:3 | 216:25 | 82:22,24 | 210:21 | 184:23 |
| 60:18 61:7 | 223:5,21 | 85:3 86:25 | 213:25 | 194:6 |
| 66:24 72:4 | 224:10 | 91:2 92:22 | 214:10,18 | 195:2 |
| 82:22 | 226:10,10 | 92:23 | 220:2 | 196:6 |
| 84:24 | 230:12 | 94:17 97:3 | 227:8 | 203:24 |
| 91:23 | 231:22 | 97:9 98:9 | 228:16 | 204:5 |
| 94:19 | 237:9 | 102:21 | 229:8,13 | 207:20 |
| 98:11 | 238:5,19 | 105:19 | 229:14,14 | 221:5 |
| 105:14,16 | 238:20 | 108:24 | 230:20 | 263:18 |
| 111:9 | 242:17 | 115:12,13 | 231:18,21 | 264:9 |
| 114:4,4,11 | 247:16 | 115:16 | 232:9,12 | 275:13 |
| 116:19 | 250:17 | 130:3,20 | 234:1 | 286:18 |
| 120:11,12 | 254:19,20 | 130:23,23 | 235:16 | **Google** 44:18 |
| 121:25 | 258:18 | 135:22 | 237:10 | 44:24 |
| 124:11 | 259:20 | 139:6 | 241:4 | 78:12 |
| 127:17 | 260:18 | 140:18,19 | 248:18,22 | 104:14,23 |
| 130:21 | 263:1 | 141:1 | 250:8,13 | 104:25 |
| 133:10 | 267:23 | 150:15 | 250:16,16 | 105:1 |
| 135:1 | 269:17,19 | 151:8 | 253:3 | 108:22 |
| 136:16 | 270:3,13 | 153:4,8 | 255:4 | 111:19 |
| 141:11 | 270:13,17 | 157:11 | 256:20 | 113:3 |
| 142:25 | 272:6 | 159:10,10 | 257:10,13 | 115:1 |
| 145:11 | 279:15 | 159:13 | 257:13 | 116:7,14 |
| 148:11 | 290:13 | 161:9 | 258:4 | 122:10 |
| 150:5 | 291:25 | 167:15 | 261:2 | 148:1,8 |
| 153:3 | 292:14 | 169:24 | 266:2 | 150:23 |
| 154:15 | **go-between** | 174:3 | 267:22 | 152:3,4 |
| 156:8 | 102:7 | 176:17 | 273:9,12 | 153:4,10 |

156:15
158:21
160:6
162:18
167:1
259:13
**gotten** 66:8
177:18
210:7
245:5
283:18
**government**
191:18
207:16
244:12
**grabbing**
151:8
**grandpar...**
212:20
**great** 109:9
150:23
152:8,8,9
180:2
194:19,20
194:21
198:2,2,3
209:9,11
209:12
213:23
**greedy** 13:11
**gross** 154:5
175:13,13
179:20,20
179:21,21
**group** 110:17
171:4,6
203:23
209:11
221:2
**grouped**
124:18
**groups**
154:18
**grow** 130:13
**growing**
204:7
**guess** 5:21
9:24  12:8
16:12
20:15

21:10,15
29:7  35:9
106:7
129:5,6,6
141:3
148:17
174:5
178:24
182:7
202:4
213:7
214:4
230:5
256:13,13
263:16
270:2
276:24
278:9
282:12,16
282:25
**guessing**
34:5  36:12
**guest** 87:16
**guilty** 68:23
88:6
**gutsy** 257:14
**guy** 94:5
101:3,4,7
101:20,23
101:25
102:22,22
120:9
124:8
155:21
207:14
215:4
222:11
230:7
264:6,9
265:8
**guys** 32:25
44:3,4
90:22
98:19,24
100:24
102:24
144:12
155:15
184:17,19
192:21

193:10
196:10,10
200:12
202:15
203:15
204:9,22
207:23,24
242:11
255:16
264:10
275:25
276:1

**H**

**H** 3:8
**habitual**
29:2  32:9
32:14
34:11
38:10
170:12
258:24
**habitually**
33:5
**half** 99:11
149:22
176:1,4
191:24
193:25
195:20
196:12,14
196:16,20
200:15
201:16,18
201:18,19
201:23
266:4
283:9,10
283:11
286:6
**HALL** 2:16
**halt** 282:9
**hand** 294:21
**handful**
107:9,9,10
107:16,17
**handle**
107:14
117:13
248:1

**handling**
73:15
115:14,14
126:24
194:5
**hands** 113:9
**handwriting**
269:3
**handy** 286:21
**hang** 30:13
54:16
186:1,1,16
186:16,22
187:19
189:18
231:7,7
234:2
254:18,18
275:3
278:20
281:6,6
**hanging**
286:24
287:2
**happen** 11:1
68:14
130:7
212:12
252:2,7
258:11
**happened**
48:6  58:15
63:17
66:10,14
81:25
88:16
201:3
243:17
276:5
277:25
**happening**
93:11
159:18
204:20
**happens** 43:3
44:13
260:7
**happy** 110:25
142:23
**hard** 29:5

33:20,21
61:22
70:23
99:16
101:24
118:14
124:10
129:23
140:20
212:12
229:19
276:17
**hard-core**
202:25
**harder** 44:3
44:3
141:19
171:4
264:2
276:16
285:12
**hardship**
95:8
**haulers**
21:11
**he'll** 90:10
**head** 42:1
44:11
144:7
209:12
275:19,25
281:23,24
282:10
**headquar...**
257:17
**hear** 9:18,19
**heard** 69:7
**heck** 161:8
**held** 12:16
12:22,24
13:19
272:2
**Hello** 63:9
**help** 58:3
102:21
119:15
137:2,3
145:12
146:4
150:13

184:21
185:2
194:1
196:21
202:2
204:9
227:8
**helped**
146:23
219:20
**helping** 9:3
20:22
102:5
122:18
193:6,25
196:23
**helps** 17:19
52:19
204:18
**Henderson**
1:18 5:24
143:11
**hereunto**
294:20
**hey** 43:16
158:3
**hidden**
163:18
**high** 153:15
153:15
156:20
161:3
177:6,11
**higher**
261:18
**highly**
170:22
186:13
**highway**
39:18
287:25
291:7
**Hills** 1:17
5:24
184:20
203:24
**Hines** 1:24
4:12 294:5
294:23
**hire** 17:19

140:6,8,10
142:14,16
144:14
145:17
219:20
226:23
227:6,8,9
**hired** 125:8
**hiring** 15:6
**hit** 170:24
171:1
199:2
212:13
221:15
279:15,16
279:20,21
279:22
**hits** 34:10
34:16,19
37:11
60:25 86:3
221:12
238:10
242:20
**hold** 9:6
14:11,11
14:20
22:19
30:15
166:23
232:4
282:5
**holding**
11:25 12:3
12:4,5,15
14:10,19
131:14
259:24
263:7
280:15,17
280:19
281:9,15
**Holdings**
13:10,22
262:6
265:1,2,15
265:19
**Hollywood**
23:15
**home** 20:14

65:24
67:11
195:16
**homes** 195:14
**honest** 12:11
58:7
**honestly**
128:5
**hope** 186:2
195:2
**hopefully**
26:1 35:20
179:5
194:5
230:24
292:20
**hoping**
265:10
267:4
**horrible**
33:22
211:20
**horses** 129:4
**hospital**
286:15
**Hot** 14:14
155:3
279:4
**hours** 16:23
19:2 56:7
56:12,13
68:13,13
69:17
89:24,25
90:2
189:12
260:9
**house** 23:20
32:12,16
49:23
52:20,22
53:5 56:5
56:12 66:4
68:13,18
69:10 72:3
75:25
76:21
81:11 90:3
118:10,12
118:18,23

119:1
134:9
195:7,12
195:22
196:1,8
269:10
**household**
70:11,16
70:24
71:11
**houses** 69:11
155:11
**Houston** 2:5
**hub** 60:21
62:17
199:1
211:17
**HUDSON** 1:25
**huge** 33:22
117:9,9
130:8,8
196:9,9
219:22
269:20
**huger** 177:19
**huh** 60:17
107:5
175:19
199:11
219:10
**humanly** 58:7
**hundred**
17:23
50:16
57:19
119:3
140:1
147:6
195:8
200:4
269:13
**hundreds**
50:15 75:2
112:19
113:2,10
117:3
161:23
**hunter**
259:15
**husband**

17:18
20:24 21:3
21:14
145:23
194:8
198:16
203:1
262:23,25
263:3
275:22
**hypothet...**
165:22
166:19
169:2
**hypothet...**
167:20

---
**I**

**ice** 174:8
**iCode** 128:19
**idea** 91:9
184:16
198:6,10
199:8
200:6
201:8
212:1,21
212:23
228:2
257:12
263:18
268:8
**identifi...**
25:23
91:18
133:5
147:12
216:6
222:17
253:22
268:12
**identified**
64:9
**identifies**
78:3
**identify**
29:10 50:2
51:2,22
**identifying**
50:2,6

51:23
**illegal**
35:18,19
40:20 43:6
44:7 64:12
65:22
90:25
116:9
195:18
246:1,24
247:9
252:2
**illegally**
45:1 66:1
67:8
222:12
229:9,11
247:2,4,20
248:6,16
249:5,16
249:22
250:10,25
256:18
**Im** 9:1
**immediately**
52:8
163:23
260:4
**impartia...**
294:18
**impermis...**
225:24
**impersonal**
115:8
**implying**
176:5
**important**
37:4 176:9
242:21
254:7
**impossible**
166:8
168:3
260:12
**improbable**
169:12
170:23
171:1
**improved**
160:13

**improvem...**
238:1,2,3
238:11,12
238:15
**in-house**
92:18
118:11
119:6,9
120:8,10
120:17
121:24
122:22
137:20,22
139:20
**inactive**
13:4
**inapprop...**
146:16
**incentive**
251:19
272:25
**include**
253:11,13
253:18
**including**
109:24
224:18
225:8
228:5
234:10
**income** 20:10
175:17,20
175:20
179:20,20
179:22,25
180:24
201:20
210:2
215:6
224:6,16
225:3
257:1
**incorrect**
36:11
97:13
**increased**
176:24
177:1,7,9
177:12,16
**incurred**

287:4
**independent**
16:3 20:16
20:18,20
23:10,13
23:18
137:23
139:1
142:9
143:17,18
227:14
294:15,16
**indi** 96:5
**India** 101:3
242:4,7,10
242:12
252:25
**Indian** 94:4
**indicating**
273:7
**individual**
31:6,7
149:13
150:17
**infancy**
261:10,14
**influence**
61:17
174:2,7
**information**
34:17
37:12 40:1
40:16,24
53:14
60:16,19
62:16,18
62:22 80:4
80:6,13,20
80:21
84:21
101:4,6,8
101:10
103:16
106:19
113:19,23
113:24,25
113:25
114:2
148:15,21
148:25

149:2
151:25
152:9,16
152:19,25
182:1
188:14
208:12
228:12
233:5
237:13
241:23
244:7
250:22
290:16
292:9
**infringed**
14:16 54:1
55:9 63:6
63:7,22
64:18 65:1
65:7 66:1
78:13 79:6
87:4 104:4
106:8
113:1
136:23
141:24
163:20
217:11
222:3
**infringe...**
38:15,16
38:17
62:19
84:18 89:2
132:18
148:23
179:3
187:6
225:23
270:5
**infringe...**
35:12 38:2
55:13
58:12,13
58:15 59:7
59:11,16
60:7 69:14
75:2 87:4
87:18

102:6
122:6
129:16
220:24
253:7
270:18
**infringer**
34:12
56:24
65:15 68:5
70:9 76:16
95:14
**infringers**
28:18 32:6
32:15
91:21
95:11
**infringing**
29:4 42:13
52:2 55:23
110:15
111:8
122:20
169:6
173:6
**innocent**
71:1,4,15
71:19 72:5
72:6,7,13
72:17,24
72:24 73:8
**inquired**
71:20,22
71:24
**Instagram**
18:5,6
**install**
33:10 36:5
36:7 39:18
287:22
**installed**
46:13
**installing**
291:8
**instance**
172:13
226:9
**instructing**
187:22
**instruct...**

181:23
241:7
**instructs**
9:13 241:8
**intellec...**
22:5
234:25
244:4,9
280:18
281:8
**intend** 80:6
**interacted**
128:9
**interaction**
282:1
**interest**
80:21
85:13
182:13,21
280:22
281:1,4,8
**interested**
126:22,24
141:18
294:17
**interests**
79:14,20
79:24
83:11 84:3
**interface**
238:8
**internet**
5:13 38:22
38:23 52:7
60:17,20
63:11,14
63:14 83:6
108:8
160:23
161:1
212:3
245:21
246:3,6
251:20,25
252:5,5
270:10
289:1
**interrog...**
3:20,21
86:9 284:4

**interrog...**
285:18
**interrupt**
64:21,22
77:17,18
91:15
**interrupted**
111:22
**interven...**
230:25
**introduce**
5:7
**invent**
122:24
**invest** 264:7
266:11,14
**invested**
182:18,20
193:18
**investigate**
248:25
**investig...**
247:23
251:10
**investig...**
246:17,18
251:11
**investig...**
47:16 80:1
80:2
234:10
**investig...**
234:11
**investig...**
51:25 53:7
209:15
213:17
**investment**
183:10
**investors**
193:16
**invited**
289:25
**involve**
155:6
184:8
221:22
**involved**
13:10
123:12

131:6
181:13,17
184:7
186:7
187:4
192:23
194:9
196:3
226:1
265:9
294:16,18
**IP** 24:22,23
28:11
29:11
32:11,19
32:20,22
33:15
37:13,15
38:8,19
39:5 40:2
40:25 42:9
42:12,14
42:15,16
42:20
43:16 45:5
46:5,6,13
50:2,9,12
50:18 51:2
51:5,7,10
51:12,17
51:20,22
52:3,5,12
52:20 54:2
55:10,11
56:14
63:20 64:9
65:3,8,15
65:24 66:8
66:23
67:13,20
68:3,6,21
78:4,23,25
79:1,2
80:19 82:3
83:10 84:2
87:25
100:19
104:7,12
110:14
111:8

122:3
165:8
180:18
209:12
237:4
241:13,21
242:16
247:10,12
258:20
259:9
263:6,7
271:19
290:8,17
290:17,18
**IPJ** 180:18
**IPP** 3:14
7:10 39:4
45:10 46:1
46:3,5,12
46:16,16
46:22 47:8
47:10 48:1
48:9,18
49:11,14
49:16,17
49:17,19
74:10,21
77:15
91:25 92:6
92:14,19
92:20,23
92:25
93:10,16
93:20 94:5
94:10,15
94:19,25
95:1,10,19
95:23,25
96:11
97:20
99:12
100:19,21
101:6,9
102:7
103:14
118:12
129:18,20
129:23
140:22
205:14

220:19
234:11,15
235:3,10
235:12,14
235:21,24
236:2,18
237:22
238:1
242:2,5,8
242:10,11
242:18
244:13
245:11
247:2
248:5,15
248:23
249:5,10
249:15,22
250:10
251:6
252:23,25
271:10,13
271:18
272:6,21
272:23
273:1,2,16
273:17,23
274:1,2,4
276:3
282:1
290:10,22
291:16
**IPP's** 45:4
47:4 101:4
129:14
**IRS** 191:16
**ISP** 56:7
62:19,23
62:24 63:2
71:24 81:3
90:7,24
**issue** 11:10
11:10,11
17:3 47:18
54:11
184:1
282:1
**issues** 17:2
196:7

**J.T** 2:10,10
  4:6,8,8
  187:16
**J.T.'s**
  292:19
**jail** 99:7
  203:21
  207:14,18
  266:4
**January**
  153:25
**Jay** 24:22
  194:20
**Jay's** 24:25
**job** 129:21
  194:6,21
**Joe** 230:5
**John** 1:8
  3:18,20,21
  3:22 4:7,9
**join** 151:22
  258:6
**joining**
  161:20,24
**journal**
  128:22
**journals**
  228:1
**jt@jtmor...**
  2:13
**judge** 7:11
  55:21
  66:15
  88:17
  195:21
  228:17
  259:2
**judgements**
  184:25
**judges** 81:15
  88:4,7,12
**jump** 187:22
**jumping**
  129:4
**junk** 273:9
**jury** 66:15
  170:25

  ———
  **K**
  ———
**Kaisa** 136:15

136:16
154:16
163:25
165:11
167:7,12
260:6
**keep** 21:23
  44:2 76:2
  76:7 82:23
  95:15
  115:25
  116:14,20
  129:19
  130:23
  138:6
  170:6,6
  179:18,25
  189:14
  205:11
  208:5,6
  209:18,22
  217:18
  244:1,6
  254:17
  257:22
  271:20,20
  272:16
  273:16
  274:4,16
  275:8,9,11
  287:6
  291:10
**keeping**
  152:22
  215:6
  231:3
  272:13,14
  273:15,25
  274:15
  287:4
**keeps** 70:20
  70:21
  279:2
**Keith** 179:7
  208:19
  215:8
  252:1
**kept** 21:20
  93:5,8
  99:2 179:8

201:7
204:3
208:1
254:17
264:1
284:9
**Khazen** 2:9
  3:3,5 4:6
  4:6,19 5:6
  6:1 18:10
  24:24 26:5
  26:13 28:6
  31:24
  36:21
  40:10 41:2
  41:9,21
  42:23 45:3
  45:8,14
  46:20
  47:13 48:7
  48:15
  50:10,20
  53:3,20,24
  54:15,24
  58:10 59:5
  59:13 61:8
  62:6 64:4
  67:15 70:6
  71:14,21
  72:11 73:2
  73:24
  74:17 75:6
  75:10,16
  77:10,17
  77:19 78:8
  78:21 79:9
  80:11
  82:12 83:7
  83:19
  84:13,23
  85:5 89:18
  91:14,19
  105:11,21
  111:24
  133:6,24
  140:12
  145:1
  147:13
  164:10,18
  167:18

175:1
181:21,25
182:11
184:10
186:9,18
187:1,8
188:7,12
189:5,19
190:23
195:4
201:10
203:10
210:16,22
211:5
214:11
216:7
217:4,12
219:1,13
222:18
227:11
230:9,12
232:14,23
233:7,14
234:4
240:21
243:5,14
247:18
248:9,20
249:14,20
250:6,18
252:10
253:23
254:22
255:7
257:6
262:3
268:13
271:8
274:22
275:16
276:12
277:10
279:12
280:9
281:12,19
283:6
286:3
291:23
292:2,19
**kids** 198:25

199:10,12
211:14,22
211:23,23
**kind** 29:4
  33:11,12
  35:14
  39:17
  49:25 52:8
  58:5 60:21
  67:12 69:2
  80:16,17
  88:21
  89:15 90:8
  101:5
  113:14,25
  115:1
  124:15
  129:7
  134:15
  136:10
  152:7
  160:7
  162:23
  171:6
  199:6
  200:8
  210:19
  212:15
  217:5
  222:9
  264:9
  265:8,9
  271:13
  280:19,25
**kinds** 224:11
**Kingston**
  207:15
**knew** 68:12
  76:19 98:5
  201:6,8
  265:4
**knocking**
  288:2
**know** 6:9,21
  7:6,14 8:5
  8:15 9:7
  9:20 10:5
  10:9,24,25
  12:9 13:2
  14:1,6

| | | | | |
|---|---|---|---|---|
| 15:5 16:9 | 63:12,16 | 112:21,25 | 173:5,12 | 210:11,12 |
| 16:10,13 | 64:20,24 | 114:5,20 | 173:13,15 | 211:25 |
| 16:22,25 | 65:23 | 114:22 | 173:16,17 | 212:1,6,14 |
| 17:2,3,12 | 66:13,16 | 115:9,14 | 174:17,17 | 212:16,19 |
| 17:16,22 | 66:17,19 | 115:25 | 175:24 | 212:21 |
| 18:6,14 | 68:20 69:2 | 116:2,17 | 176:8,16 | 213:3,22 |
| 19:16 20:7 | 69:10 | 117:1,5 | 176:17,18 | 214:8,10 |
| 20:13 | 70:22 71:6 | 118:3,5 | 176:20,25 | 216:1,3,15 |
| 23:14,25 | 71:7,9 | 119:3,17 | 177:17,17 | 216:16,21 |
| 24:16,16 | 72:14 | 119:21 | 177:21 | 217:19,24 |
| 25:16 | 73:13,14 | 120:4 | 178:17,20 | 218:6 |
| 27:21,21 | 73:16,18 | 122:11 | 180:6,19 | 219:14,21 |
| 28:20,21 | 75:5,11,20 | 123:13,18 | 180:22,25 | 220:18,20 |
| 28:23,25 | 75:23 76:4 | 123:19 | 181:12,17 | 221:18,18 |
| 29:1,8,12 | 76:4,9 | 127:4,7 | 183:17 | 221:20 |
| 29:14 | 77:1,9 | 128:3 | 184:15,18 | 222:2,2,3 |
| 30:22 | 78:11 | 130:2 | 185:21,23 | 222:12,22 |
| 31:12 | 79:18,23 | 135:22 | 185:24 | 224:11,12 |
| 32:13,23 | 80:5 81:3 | 136:15,24 | 186:5,13 | 225:25 |
| 33:4,8,11 | 81:12,24 | 140:1,15 | 186:18,25 | 228:13 |
| 33:14,23 | 82:16,16 | 140:19 | 187:4 | 229:13,20 |
| 33:24 34:2 | 82:20 83:5 | 141:2,4,19 | 188:24 | 229:21 |
| 34:2 35:5 | 86:4 87:2 | 142:25 | 189:12 | 230:16 |
| 35:11,15 | 88:20 90:1 | 144:6,12 | 191:9,12 | 231:9,13 |
| 36:6,6,9 | 90:4,5,22 | 144:25 | 192:1,2,3 | 231:15 |
| 36:10,11 | 91:1,3 | 145:12 | 192:18,24 | 233:20 |
| 37:24,25 | 93:2,2,9 | 146:25 | 193:1,2,6 | 238:19,25 |
| 37:25 38:7 | 93:10,11 | 147:18,19 | 193:8,21 | 239:8,22 |
| 38:10 41:3 | 93:13 | 149:4 | 194:10,17 | 239:23 |
| 42:6,8,9,9 | 94:20,22 | 150:20,25 | 196:3 | 240:4,7,13 |
| 43:4,5,25 | 95:9,10,12 | 151:10,20 | 197:23 | 240:13 |
| 44:23 | 95:13 96:8 | 151:21 | 198:4,5,6 | 241:10,11 |
| 45:12,16 | 97:4,5,6,8 | 152:12,13 | 198:7,12 | 241:17 |
| 45:19,22 | 97:22,25 | 153:4,8,13 | 199:2,3,4 | 243:11,17 |
| 46:25,25 | 98:1,2,4,4 | 153:14 | 199:14,16 | 243:19,20 |
| 47:3,15,19 | 99:18,25 | 154:11 | 199:25 | 243:22 |
| 47:21 48:5 | 100:1 | 155:1 | 200:2,9,12 | 244:2,2,22 |
| 48:14 49:2 | 101:14,15 | 156:4 | 200:16 | 245:7,8,13 |
| 49:7,8,8 | 101:16 | 158:4,7,16 | 201:3,17 | 245:20,24 |
| 49:21 51:4 | 102:20 | 159:5 | 201:21,23 | 245:25,25 |
| 51:5,7,12 | 103:7,24 | 164:24 | 202:2,6 | 246:12,18 |
| 52:2,10,11 | 104:14,20 | 165:16,17 | 203:18 | 247:7,8 |
| 52:17 53:4 | 108:5,7,9 | 166:16 | 204:16,18 | 248:8,8,22 |
| 53:4,13 | 108:11,24 | 167:7,9,21 | 204:18,21 | 248:24,24 |
| 54:12 | 108:24 | 168:14,16 | 204:23 | 249:2,8,8 |
| 55:24 | 109:6,24 | 168:17,23 | 205:1,8,23 | 249:25 |
| 56:10 | 110:16,22 | 169:4,20 | 207:5 | 250:2,2,7 |
| 57:13 58:6 | 110:24 | 171:14 | 209:2,6,8 | 251:9,12 |
| 58:8,21 | 111:19 | 172:5,6,9 | 209:15,17 | 252:1,3,23 |
| 60:10 | 112:6,20 | 172:17,19 | 209:20 | 253:2,3 |

257:4,10
257:17,23
257:24
258:14,16
259:1,15
259:17
260:2
262:1,25
263:16
264:15
267:8,10
267:21
268:3,7,10
269:18,18
270:12
271:18
273:3
276:18,21
280:18,21
280:23
282:8
284:14,19
285:24
286:1,7,18
286:22,25
287:4,17
288:17
289:2
291:19
292:12,17
292:23
**knowing** 52:5
185:1
**knowledge**
10:19
15:11,15
15:18  16:7
17:25  25:9
48:8,9,18
50:21,25
50:25
77:16
111:25
118:5
127:9
281:3
**knows** 128:14
159:8
169:24
171:12

202:5
231:12
233:23
**Kombucha**
174:8
**Kotzker** 25:1

**L**

**L** 179:15
**L.A** 23:23
24:2
**ladies'**
195:14
**Lahey** 107:23
107:25,25
**language**
66:21,24
**large** 56:6
111:7
113:7
192:18
**larger**
118:16
**lasted** 25:5
**late** 7:22
**lately**
142:21
**latest**
139:10,11
**law** 2:3,10
4:7,9,10
29:11,13
38:25  77:2
98:22
123:9,10
123:11,15
123:16,20
123:22,23
124:2,4,6
124:12,13
124:20,24
125:19
126:9,11
126:14,16
126:20
127:2,5,12
127:21,22
127:22,23
128:1,8,9
179:16

205:25
207:11,13
207:22
227:19
272:15,18
272:19
280:13
**lawsuit**
59:24
99:13
164:5
183:15
186:7
187:18
188:1
192:3
197:17
214:21,23
215:1,13
224:18
228:6,7,9
233:1
239:11,12
239:19,20
239:22
240:1,2,9
240:10,12
240:15
241:2,4,5
260:18
261:1,11
261:14
282:15
**lawsuits**
179:1
182:5
192:4
194:9
215:19
218:23
219:7
221:21
224:17
225:5,6,8
257:19,20
**lawyer** 8:23
8:24  9:12
24:19
85:23  86:7
93:22

94:19
126:6
140:14
151:1
179:7,24
180:17,17
184:22,24
185:18
187:1
197:19
202:15
203:25
204:1,4
209:10
219:15,15
220:3,8
247:24
248:25
251:18
263:17,24
265:3,3
**lawyers**
17:16
73:14,17
93:4,4,5,7
94:12,13
94:20
124:1
126:6
142:18
152:11,12
181:5
182:2
184:21
186:3,24
186:24
192:13
194:5,17
194:18,18
194:19
197:5
200:14
203:17
204:9,11
205:1
209:3,5,8
210:1,3
222:3,6
224:23
226:2

230:2
234:16
249:10
257:24
259:12
286:23
287:1
**lead** 91:7
**leading**
275:16
276:13
277:10
281:12,14
**leads** 62:19
63:21  91:7
**leaked**
183:18
192:5
**learn** 110:9
110:12
198:4
**learned**
129:5
**leases** 22:19
**leave** 90:12
131:18
**led** 173:21
**ledgers**
228:1
**leeway**
187:24
**left** 54:25
161:11,13
235:11,12
237:8
243:22
244:5
253:1
272:8,14
274:10
**left-hand**
149:6
**leftover**
95:10
**legal** 31:18
201:19
204:6
208:2
213:18
231:10

248:13,14
250:3
252:20,21
253:11,13
253:18
260:17
**legally**
122:20
**length**
175:14
**lens** 23:7
24:3
**lenses** 23:3
23:16
**lesser**
118:15
**let's** 9:6
12:23
27:13
32:18
48:24
54:15
58:23  59:1
70:1  77:5
91:10,11
91:22  96:9
105:16
127:24
130:21
136:12
163:6
167:3
171:17
174:19
179:1
189:2
223:5,7
228:4
254:25
270:25
**letter** 38:24
52:7
190:19
**letterhead**
185:11
**letters**
112:15,17
112:23,24
114:23
115:9

119:18
**letting** 58:8
197:5
209:4
**LexisNexis**
126:25
**liberty**
96:22
**license**
161:19
201:24
202:8
**licensing**
173:1
224:7,11
**lied** 33:20
**life** 6:6,6
7:14  107:3
208:10
**lighting**
227:8
**liked** 134:17
172:16
212:23
**likes** 79:18
79:19
**limit** 50:16
**limited**
102:12
234:11
**limiting**
240:8
**line** 228:14
238:21
260:17
295:2
**links** 113:4
**Lipscomb**
179:7
215:8
**list** 3:17
31:9  38:18
58:1
110:25
111:16
133:22
134:2,6
162:8,8
167:9
201:23

237:16
260:19
**listed** 27:9
27:19
30:11  40:2
57:25
58:16  59:7
59:17  64:5
64:5  65:3
86:1
163:11
223:14
240:7,9
277:16
278:10,18
279:9
**listen** 37:5
113:4
125:8
127:1
**lists** 122:13
**literally**
145:21
195:16,25
208:1
211:18
229:10,10
**litigation**
183:2
185:13
190:1
192:18
226:1
229:16
233:3
257:12
**litigations**
208:10
**litigators**
192:22
228:10
**little** 16:6
21:13
28:21  44:9
44:10
48:24
49:21
61:22  62:1
68:16,19
105:12

108:15
141:19
148:18
159:4
171:4
173:9
175:8,9
177:12
195:14
211:13
218:1,2,9
230:13
244:6
251:5,7
256:14
261:13
270:3,16
271:1
274:6
276:15
280:13
282:22,24
284:23
286:10
**live** 177:2,5
198:4
**lived** 32:19
**lives** 90:3
207:20
**living** 16:14
79:21
269:21
**LLC** 1:5  5:13
234:12
**LLCs** 14:7
**loan** 183:10
185:7
195:8,9
**loaned** 185:6
185:6
**location**
50:7  54:2
136:4,6
155:10
**locations**
57:9
**lofts** 155:11
**log** 163:15
199:15
238:9

**logging**
40:22
**Lomnitzer**
128:5
206:4,5,17
206:20,22
215:10
219:16
220:7,11
220:13
234:20,23
235:5,12
237:9
240:14
241:21
242:25
243:10
253:12,14
253:15
271:10,14
271:15
272:8,12
280:12
283:19
284:2,6,10
**long** 21:6,11
29:20
36:13  69:5
69:14,15
90:11,16
90:18,22
102:16,17
102:17,23
108:6
130:19
143:14
148:13
157:10
168:3
177:21
188:13
195:1
220:15
234:17
254:14,15
272:2
273:20,22
275:22
283:7,8
286:4,12

**long-range**
69:3,6,7,9
69:19,25
70:4 90:3
90:5
**long-term**
22:19
**longer** 12:6
12:6,7
13:11
92:23
206:5
254:12
264:10
**look** 12:10
30:4 33:10
49:22
63:11 75:3
87:3 104:5
110:25
118:3
119:4,4
126:24
136:16
145:10
157:4
159:25
160:12
161:4,21
165:7,19
166:16,22
167:1,14
171:3,9
177:21
186:19,21
197:16
207:14
222:20
228:4
230:10
255:8
278:5,5,8
278:8
290:13
**looked** 37:14
63:13
118:3
163:22
164:23
203:23

220:7
226:3
260:5
273:19
**looking** 22:8
26:2,20
44:6 51:5
51:14,14
122:22
145:9
158:6,17
159:1,3
165:20
168:9
169:16
174:9
180:19
208:11
222:23
223:1
257:11
289:18
**looks** 26:25
155:14
164:20
174:17
175:11
216:19
217:9,15
217:15
221:6,12
**Lorri** 128:5
253:1
**Lorri's**
274:11
**lose** 194:11
195:21
208:6
229:13
256:25,25
**losses**
225:22
266:24
**lost** 195:17
**lot** 19:4,21
19:23
32:13,13
32:20,21
34:20,23
36:7 44:20

60:23,23
60:23
62:12
73:14
79:13
90:23
92:17
93:11
99:10
108:9,11
114:18
115:6
116:7
128:6
137:12
143:15
144:11,16
144:17
145:11
173:3
178:18
181:16
190:4,17
203:22
209:9
221:25
222:3
225:21
228:13
230:22
257:10
258:12
275:18,24
277:4
278:4
282:13,17
285:3
286:15
**lot's** 276:19
**lots** 260:22
**love** 91:8
**loyal** 19:22
260:1
**lucky** 209:10
**lunch** 105:9
105:18
**lunchtime**
105:8
**lying** 187:13
187:13,14

251:1
_____
**M**
_____
**ma'am** 147:23
**machines**
128:24
**mad** 125:14
**main** 109:8
109:10
176:18
287:3
**majority**
122:6
**making** 47:7
53:23
100:6
104:19
124:1
138:14
172:18,22
172:23
173:1,2,4
173:21
180:20
182:1
197:23
198:5,11
198:12
209:7
213:20
215:12
246:9
251:21
252:4,11
257:18,25
264:18,21
267:10
271:20,21
271:25
272:24
274:16
**male** 33:13
**males** 34:7
**Malibu** 1:5
1:14 3:13
3:14 4:11
5:12,12
8:1 11:3,8
11:21,24
12:13 13:6

13:8,17
14:3,7,23
14:25 15:2
15:7,11,15
15:23 16:7
17:2 18:21
19:8,9
21:25 22:9
22:13,13
22:16,17
22:19,21
23:9,12
25:12,20
26:17,24
27:3,8,17
27:22
30:10 31:2
31:4 37:17
37:19
45:15
46:16,23
47:2 48:2
48:10,16
48:19 55:1
55:1,7,8
56:2 60:4
77:23
84:15,19
84:20 89:1
89:4 91:24
92:5
112:17
124:4,23
125:19
126:9,19
127:2,8,10
127:10,12
127:15,20
127:21,25
130:25
131:7,15
131:18,19
131:22
134:9
135:2,4,11
135:11,16
135:18,20
135:24,24
136:2,3,4
136:5,6,8

136:9
137:18,19
137:21
138:3,5,12
139:3
141:12
145:25
146:22
147:7,9
153:12,12
164:19,22
165:3,24
170:24
182:18
183:4,23
184:1,8
185:11
189:23,24
190:20
191:14,14
192:11
193:13
194:12
195:7
204:25
219:16
220:1,3,4
220:6,9,10
221:17
244:20
263:9,11
263:16
265:16,17
265:21
266:12,14
266:15,16
266:20,21
290:9,14
290:17
**Malibu's**
22:2 30:24
55:9 76:10
111:25
182:13
183:2
268:1
290:19,20
290:21
291:14,15
**Malinu** 31:4

**manage** 20:22
102:5
132:21
**manipulate**
283:24
**manual**
108:18
**manually**
108:12
110:14
285:10
**March** 21:4
21:17,23
283:10
284:25
285:15
**mark** 25:18
**marked** 25:23
91:18,20
91:24
133:5,7
147:12,14
216:6
222:17
253:22
268:12
293:2
**market**
161:17
162:2
163:7
172:7,11
173:7
**marketing**
16:21
18:19,19
**marking**
253:24
268:14
**massive**
256:9,11
**matched**
79:22
**matches**
79:13
**material**
48:25
104:24
131:20
**materials**

48:2,10,20
76:24
290:21
291:15
**math** 128:18
**mathemat...**
166:8
168:2
169:12
170:3
**matter** 67:10
67:11,11
183:20
184:7
185:17
186:4
187:6
202:13
231:2,2
**matters**
30:25 31:5
31:7,9
181:13
187:2,25
**mean** 10:5,5
10:13,17
14:9 20:8
20:8 22:5
29:7 32:16
35:9 36:1
36:6,11
37:24
44:17,21
49:9,9
53:22
55:18 57:7
57:10
58:11,22
59:22 60:1
60:22,23
61:16,25
62:7 69:20
69:20,21
71:23
72:21 76:1
77:2 78:11
83:2 88:10
91:8 93:2
98:1
104:16

107:16
109:21
111:18
120:19
124:23
125:2
135:19
137:5
139:16
141:5,6
142:3
144:8
152:23
153:14
156:25
158:16
160:12
161:5,7,10
162:18,23
162:24
166:6,20
172:11,12
175:16,23
180:10
181:2,25
185:24
190:4
192:21
193:17,21
201:24
205:8
209:9,10
211:11
214:16
221:20
222:13
223:17
224:4,8
225:6
228:17,18
229:4
233:15,21
238:15
239:13
240:6
241:20
242:6
244:9,16
246:8
251:24

252:22
254:3
257:17
259:1,15
260:14
263:8
266:19
268:7
275:17,20
276:14
282:22
284:5,18
285:22
**meaning**
126:16
158:9,13
287:19
**meaningless**
284:12
**means** 72:16
137:22
236:17
**meant** 83:4
**media** 1:5,14
3:13,14
4:11 5:12
5:13 8:1
11:3,21,24
12:14 13:6
13:8,18
14:3,7,25
15:3,7,11
15:15,23
16:7,20
17:2 18:21
19:8,9
25:12,20
26:17,24
27:3,8,22
51:24 55:1
55:8 56:2
91:25 92:5
124:23
125:19
126:9,19
127:2,12
127:21,25
135:2,11
135:11,16
135:18,20

135:24,25
136:2,3,4
136:5,6,8
136:9
137:18,19
137:21
138:3,5,12
139:3
141:12
146:1,22
147:8,9
164:19,22
165:3
184:8
191:14,14
192:12
193:14
194:12
204:25
219:16
220:1,3,6
220:9,10
244:20
255:23
266:21
290:14,17
**Media's**
27:18
30:11
45:15
46:16,23
47:2 48:2
48:10,17
48:19 55:2
55:7 60:5
77:23
84:15,19
84:20 89:2
89:4 127:8
127:10,11
127:15,20
165:24
220:4
290:10
**mediation**
229:22
**medications**
61:9
**meet** 29:20
**meeting** 25:3

29:17,24
**member** 56:15
56:17
70:10,16
70:24 82:6
82:9,17,18
82:20
156:24
160:15,16
173:18
**members**
19:22,24
84:18
153:6,7
161:7
173:12
**memorandum**
228:2
**memory** 57:22
58:1,4,6
127:18
**mention**
135:6
**mentioned**
13:13,14
49:20
55:25
62:17
64:18 85:6
87:24
120:21
152:15
212:24,24
246:8
262:4
270:4
271:9
275:7
281:21
**mentioning**
282:17
**mess** 265:10
**mess-up**
219:22
**messing**
280:25
**met** 19:5
**metadata**
165:21
214:18

**method** 121:2
**methods**
120:22
121:10,13
121:22
129:14
**mid** 106:25
107:1,3
108:3
**middle** 91:15
217:5
231:5
233:3
246:17
**million**
33:19
72:22
93:15 94:1
94:8,9,11
149:5
164:6
172:14
175:10,22
175:25
179:16
191:17
193:21
198:12
203:20
206:1,21
206:23
207:10,16
207:16,17
208:15,20
210:14
212:25
213:1,2,12
213:13
214:3
215:23,24
218:1,9
220:14
229:8
252:12
267:17
268:2
269:11
**millions**
20:13
48:22,23

252:15,19
257:19,20
267:14
**mind** 62:12
141:3
189:19
**MindGeek**
161:14
172:25
176:20
199:4,13
199:17
256:14,16
256:23,24
257:2
258:9
**mine** 255:16
**minimal**
253:17
**minimum**
193:21,22
193:22
**mining** 123:6
**minored**
128:18
**minute** 26:7
53:17
76:21 82:2
84:25
195:19
202:16
216:25
254:14,15
288:6
**minutes** 9:1
24:12 25:5
25:10
29:22,22
29:25 36:1
61:23
132:5
149:24
150:2
232:5,5
260:8
**misquote**
131:10
153:20
**misrepre...**
196:24

**missed** 57:18
**missing**
120:25
**misspeak**
109:1
**mistake** 73:4
203:25
204:2
237:12
**mixed** 151:13
167:10
**model** 20:24
129:2
132:12
137:2
161:4
198:15
200:2
212:18
**modeling**
129:7
**models** 19:25
57:8 87:8
129:8
141:15
145:14,16
145:20
177:5
193:6
282:5
**modern** 239:2
**moment** 31:20
116:15
261:22
**momentum**
209:18
**monetary**
241:11
243:9
**money** 29:10
92:25 93:7
93:8,10
95:25 99:3
144:16
145:13,18
153:21
154:1,6
172:18,22
172:23
179:4,6,8

| | | | | |
|---|---|---|---|---|
| 180:6,15 | 274:4 | 275:21 | 164:25 | 127:3,13 |
| 182:1,2,21 | 287:7 | 276:7 | 170:15 | 128:2 |
| 183:22,24 | **monitor** | **Morris** 2:10 | 221:8,8,13 | 133:18,23 |
| 184:19 | 121:22 | 2:10 4:6,8 | 223:23 | 134:2,5,10 |
| 185:6,6,9 | 123:24 | 4:8,8,17 | 238:10 | 134:11,13 |
| 189:23 | 256:5 | 187:16,20 | 258:5,6 | 134:22,24 |
| 190:4,17 | **monitoring** | 188:4,7,11 | 260:3,5 | 135:3,7,13 |
| 191:21 | 124:5 | 188:18,23 | 279:3 | 135:16,17 |
| 192:10,14 | **month** 93:19 | 189:2 | 288:1,3 | 135:23 |
| 192:15,16 | 94:7 | 230:11,13 | 289:6 | 136:22 |
| 193:2,11 | 160:17,18 | 230:17 | 290:10,21 | 137:17,21 |
| 193:23 | 173:13,14 | 231:16,21 | 291:2,5,8 | 139:19 |
| 194:19 | 175:25 | 232:7 | **movie's** | 142:10,11 |
| 195:9,22 | 206:13 | 292:22 | 166:14 | 143:20 |
| 195:24 | 207:11 | **mortgage** | **movies** 20:12 | 145:10,15 |
| 196:5 | 213:17,21 | 266:7 | 20:14 | 148:17 |
| 197:23,23 | 219:23 | **motion** | 22:21 24:1 | 154:10,12 |
| 198:5 | 252:24 | 228:16 | 28:25 32:7 | 154:14,20 |
| 202:1 | 273:12 | **move** 143:15 | 34:8,20,24 | 154:21 |
| 204:5,24 | **months** 21:8 | 180:21 | 35:3,4,10 | 155:4 |
| 208:3,7 | 27:14 | 192:20 | 38:20,21 | 156:2 |
| 209:7,9 | 95:20,21 | 204:16 | 39:14,15 | 157:4 |
| 213:20,21 | 95:22 | 207:21 | 41:5,12,14 | 158:1,20 |
| 214:23 | 100:13 | 208:13 | 42:11,12 | 161:9,23 |
| 215:3,12 | 102:19 | 241:17 | 42:13 | 161:24 |
| 217:19 | 103:24 | 265:11 | 43:22 44:6 | 162:1,10 |
| 219:16,17 | 132:17,18 | **moved** 61:12 | 44:13 46:6 | 162:12 |
| 219:24 | 160:20 | **moves** 58:21 | 46:7,17,23 | 163:2,2,6 |
| 225:12,13 | 173:16 | 241:17 | 47:1,8 | 163:11 |
| 236:5 | 197:18 | **movie** 22:6 | 48:25 | 164:6,20 |
| 243:16,22 | 203:20 | 22:10,24 | 51:13 | 164:23 |
| 244:1,5 | 206:2 | 23:16,21 | 53:11 54:3 | 165:4,8,9 |
| 246:9,25 | 208:15 | 24:9 40:20 | 54:8 55:12 | 165:16 |
| 247:7,16 | 235:22,22 | 69:15,18 | 55:15,16 | 166:1,5,11 |
| 247:20 | 236:12 | 89:25 | 55:19 57:8 | 166:13,22 |
| 249:11 | 237:1 | 104:25 | 69:23 | 167:16,22 |
| 251:21 | 251:16 | 105:1 | 70:11 | 168:17,20 |
| 252:4,11 | 272:7 | 112:25 | 80:16 | 169:1,5,6 |
| 257:11,21 | 274:12,12 | 114:12,13 | 85:11,12 | 169:13,16 |
| 257:25 | 274:18 | 114:21 | 86:14,18 | 169:18,18 |
| 265:6 | 275:18 | 123:18 | 86:19 | 169:21,23 |
| 266:15,16 | 276:10 | 125:20 | 87:15 | 170:4,22 |
| 267:9 | 283:9 | 139:18,21 | 100:4 | 170:24 |
| 268:4 | 284:18 | 139:24 | 110:15 | 171:2,3,15 |
| 269:12 | **Montreal** | 142:10 | 114:16 | 171:19,20 |
| 271:14,21 | 257:16 | 154:23 | 116:25 | 171:24 |
| 271:21,25 | **Mormon** 197:1 | 158:3,6,7 | 117:1 | 172:5,5,8 |
| 272:13,14 | 203:23 | 159:3 | 122:4 | 172:9,10 |
| 272:16 | **morning** | 163:15,17 | 125:13 | 172:12,13 |
| 273:15,16 | 189:12 | 163:19,24 | 126:10,21 | 172:15,22 |

176:7,13
176:15,20
177:4,14
177:18
193:20,23
194:24
197:2
198:19,22
200:7
208:20
209:21
217:10
218:5
223:20
228:20
229:23,25
246:15,16
247:11
253:7,9
257:16
258:11,12
258:15,22
259:16,21
259:25
260:2
264:22
285:5,5,11
288:15
290:14,15
290:17
291:3
**moving**
129:25
140:21
154:23
184:18
284:9
**MRI** 128:24
**multiple**
11:23 18:5
28:25,25
32:11 34:7
34:7 35:2
35:2,10,11
42:12
43:25 46:7
49:24
51:15,19
55:11,12
74:5

155:14
230:7
255:21,23
**murder** 89:14
**Murphy** 229:5
**music** 139:23
199:6
**mute** 37:1

**N**
**name** 5:9,10
18:14,15
24:14,25
63:3 82:4
82:13
96:12 97:2
97:8,13,17
98:20,21
102:3,9
105:1
107:20,23
107:24,24
107:25
109:6
110:22
111:4
114:13,14
114:21
132:12
135:17,20
165:1,2
174:15
187:14
192:4
202:4,23
203:1
205:19
220:4
242:13
263:6
264:1
265:5
269:3
277:2,4
**named** 107:22
132:2
**names** 11:23
82:24 96:8
97:4,7,12
98:13

111:6
112:1
114:14,15
131:14
200:1
244:16
263:4,15
**Napster**
39:12,12
43:4,5
**naughtier**
141:16
**nauseous**
105:13
**nearby**
203:25
**necessarily**
47:6
167:15
**need** 12:20
16:9 17:5
24:8 26:3
33:9,10
36:22
43:10,13
55:22 62:2
62:4,13
64:14,24
66:13
67:18,23
73:6 76:5
77:3 78:15
80:15,17
83:20
84:11
95:14
97:11
105:13
106:20
108:21,25
115:16
119:16
124:22
130:22
131:16
132:16
143:11
145:15
146:15
150:8

165:1,6,7
173:24
177:25
186:13
187:21
190:3
194:24
199:22
202:23
205:12,22
205:22,23
208:5,10
209:18,22
217:19
248:21
249:2,4,4
253:25
254:3,10
254:22
285:9,10
287:22
291:9
**needed** 98:5
146:25
219:23
237:13,14
244:18
283:21
**needing**
125:8
**needs** 89:12
261:16
**negative**
21:12
268:9
**negotiated**
94:14
**nephew**
211:17
**net** 266:22
**network**
41:23 42:3
42:17
44:14
47:11 53:6
65:9 69:9
74:10,20
79:7,25
80:24,25
81:3,4,6,9

83:15 84:9
88:1,6,9
88:11,12
88:18
288:10
290:9
**networks**
69:4,6,7
**Nevada** 1:18
5:24 294:2
294:5,21
**never** 19:5
40:13 45:5
45:6,9
47:10 66:8
71:1 72:6
73:8
101:22
135:4,21
136:14
139:4
140:2
149:18
153:8
179:13,13
191:21
192:9
196:20
201:16,21
214:23
215:3
219:18
220:9
243:3
251:25
252:1
265:20
268:17
269:2,4
284:14
**new** 23:6
24:5 31:11
44:1 92:18
92:21 98:9
104:25
105:1
108:4
116:22
129:22,24
148:3

| | | | | |
|---|---|---|---|---|
| 149:14,17 | 233:21 | 50:17 51:1 | 140:11 | 281:12 |
| 149:18 | **noon** 105:9 | 51:10,11 | 144:5 | 283:5 |
| 159:11 | **normal** 77:2 | 86:3 | 181:11 | 285:21 |
| 170:10 | 179:13 | 122:17,22 | 184:4,8 | **objections** |
| 176:2,2 | 202:22 | 123:1 | 188:23 | 233:18,19 |
| 180:15 | 203:24 | 124:8 | 200:21 | **objects** 9:13 |
| 199:24 | 207:22 | 133:21 | 203:7 | 241:8 |
| 200:1,1,3 | 218:16 | 149:12 | 210:10 | **obviously** |
| 200:9 | **normally** | 151:5 | 218:25 | 8:8 9:17 |
| 210:21 | 218:19 | 152:20,23 | 219:9 | 11:23 47:5 |
| 216:2,22 | **note** 195:12 | 168:17 | 227:3 | 95:14 |
| 237:25,25 | **Noted** 189:2 | 175:6 | 232:21,25 | 155:2,3 |
| 242:22 | **notes** 159:4 | 220:22 | 233:10 | 168:9 |
| 259:25 | 267:8 | 221:23 | 240:18 | 170:7 |
| 260:3 | 294:12 | 224:5 | 243:2 | 199:21 |
| 276:3 | **notice** 3:13 | 226:2,22 | 248:17 | 207:24 |
| 282:2,5 | 25:19 | 232:2 | 249:17 | 212:12 |
| **news** 207:20 | 26:16,24 | 251:14 | 257:5 | 222:13 |
| **nice** 191:19 | 90:6,9,14 | 278:6,7,12 | 261:25 | 231:9 |
| 207:25 | 90:15,17 | **numbered** | 279:12 | 267:22 |
| 225:7 | 90:19,24 | 30:25 | **objected** | 269:22 |
| 286:8 | 132:19 | **numbers** | 231:9 | 273:5 |
| **niche** 171:8 | 270:6,9 | 178:8,11 | 233:20 | **occasions** |
| 171:10 | **notices** | 178:21 | **objecting** | 106:21 |
| 173:7 | 90:12 91:1 | 193:3,9 | 188:16,18 | **occurring** |
| **night** 61:12 | 104:3 | **numerically** | 188:19,20 | 238:23 |
| 192:20 | 107:12 | 166:7 | **objection** | **October** 1:20 |
| 205:11 | 110:18 | | 18:2 40:7 | 4:2 294:8 |
| 223:10,11 | 111:14 | ——— **O** ——— | 41:6 44:16 | **odd** 91:23 |
| 230:24 | 112:2,5,7 | **o'clock** | 45:11 | **offended** |
| **nightmare** | 112:10,14 | 192:19 | 46:18 | 28:24 |
| 208:4 | 112:18 | **oath** 64:23 | 47:12 48:4 | **offender** |
| **nine** 81:20 | 113:2,6,12 | 71:2 73:6 | 48:12,21 | 32:9 |
| 87:4,20 | 113:21,24 | 219:2 | 50:4,19 | 170:12 |
| 95:12 | 114:12 | **object** 9:12 | 53:2 59:10 | 258:24 |
| 132:9 | 117:8 | 42:22 45:7 | 78:20 | **offenders** |
| 133:18,20 | 119:16 | 59:14 | 181:7 | 28:24 29:2 |
| 169:12,15 | 122:9 | 63:23 | 182:7,10 | 32:14 |
| 170:20,24 | 260:16,19 | 65:11 71:5 | 188:5,12 | **offensive** |
| 171:1 | 270:6,9,19 | 71:17 | 188:25 | 200:17 |
| 172:7,9,11 | **November** | 72:19 | 191:4 | **offer** 67:12 |
| 221:12 | 294:21 | 73:12 | 214:5 | 77:1,3 |
| 228:20 | **NRCP** 294:19 | 74:12,23 | 229:3 | 225:17,18 |
| 230:7 | **nude** 198:18 | 75:9,13 | 248:7 | **offered** |
| 278:22 | **nudity** | 76:14 | 249:7,24 | 58:22 |
| 285:5 | 212:19 | 77:14 78:6 | 250:12 | 70:15 |
| **Nods** 42:1 | **Nueces** 2:11 | 79:8 80:8 | 275:16 | 76:16 77:4 |
| **nonjudicial** | **number** 3:10 | 82:11,15 | 276:12,12 | 77:7,8 |
| 269:17 | 6:21 33:4 | 83:16 89:9 | 277:10 | 172:14 |
| **nonlawyer** | 50:11,12 | 89:23 | 280:9 | 225:16 |

| | | | | |
|---|---|---|---|---|
| **offhand** | 280:17 | 128:3 | 271:3 | 161:11 |
| 38:14 | 284:17 | 130:21,24 | 273:18,25 | 162:16,17 |
| **office** | **okay** 4:12 | 133:17,17 | 274:25 | 162:20,21 |
| 128:12 | 6:2,16,23 | 133:20,20 | 276:9,23 | 167:8,10 |
| 132:8,9,11 | 9:5,6,6,6 | 134:1,9 | 277:20 | 220:24,24 |
| 132:16 | 9:8 10:12 | 135:10 | 278:1,16 | 245:15 |
| 142:7 | 15:10 16:6 | 136:14 | 278:20,21 | **ongoing** |
| 226:18 | 17:11,25 | 137:8,9 | 279:1,1,2 | 233:1 |
| 241:24 | 18:20 | 143:12,22 | 279:3,7,11 | **online** 34:12 |
| 242:1 | 21:16,22 | 144:23 | 279:18,21 | 106:11 |
| 244:19,20 | 23:25 25:5 | 145:2 | 279:22 | 109:16 |
| 280:23 | 26:2,14 | 146:19,20 | 280:1,5,17 | 124:9 |
| 294:21 | 28:5 29:24 | 150:5 | 281:7,16 | 136:25 |
| **offline** | 30:20,22 | 151:14 | 281:16 | 166:23 |
| 292:15 | 31:14,16 | 154:16,19 | 285:9 | 176:23 |
| **oh** 7:20 | 31:16,25 | 155:6,16 | 286:11 | 211:12 |
| 13:15 | 32:3 33:25 | 163:1 | 290:1,16 | 223:22 |
| 16:19 | 36:18,18 | 167:5,5 | 291:24 | 258:13 |
| 30:14,15 | 36:24 37:6 | 170:1 | 292:3,6 | **open** 26:4,8 |
| 30:20 | 37:8,9 | 173:23,25 | **old** 212:11 | 158:2 |
| 31:10,22 | 38:17 | 174:21 | **older** 117:2 | 192:23 |
| 33:23 | 40:13 43:3 | 178:2 | 218:11,12 | 238:24 |
| 36:16,24 | 46:15 47:2 | 186:1,1 | **once** 47:16 | 287:25 |
| 37:2 49:8 | 47:25 48:8 | 187:19 | 156:17,22 | 291:7 |
| 57:4 60:2 | 48:16 | 189:18 | 170:18,19 | **opened** |
| 69:24 | 49:11 52:4 | 205:21,21 | 219:8 | 149:20 |
| 70:17,21 | 54:15 55:6 | 206:19 | 270:11 | 263:25 |
| 82:25 | 58:23,25 | 207:10 | 274:2 | 273:13 |
| 90:24 | 59:2,14,25 | 209:20 | 277:22 | 289:10 |
| 116:24 | 61:5 62:13 | 214:2,12 | 280:23 | **opening** |
| 117:7 | 62:14,16 | 215:3,14 | 287:8 | 39:10,17 |
| 131:23 | 62:22 63:7 | 215:16 | 288:19,19 | 48:24 |
| 133:17 | 64:23 | 219:2 | 288:20 | **opens** 43:15 |
| 134:7 | 67:16,24 | 220:13 | 289:6,7,10 | **operate** |
| 151:16,19 | 67:25 70:3 | 221:8 | 289:19 | 20:10 |
| 154:16 | 70:3,3,7 | 222:22,23 | 290:2 | 118:17 |
| 157:1,18 | 72:2 76:12 | 222:24 | **one's** 100:1 | **operates** |
| 159:3 | 77:5,5 | 223:13,15 | 100:1 | 247:2 |
| 170:14 | 78:10 79:2 | 223:15 | 267:5 | **operating** |
| 174:14 | 80:19 83:8 | 224:18 | **ones** 28:18 | 19:8,9 |
| 193:24 | 84:10,19 | 225:1 | 33:16 39:8 | 247:3 |
| 195:24 | 91:10,13 | 226:11 | 42:10 | 248:5 |
| 196:1 | 94:10 97:6 | 227:12 | 51:13 | 249:5 |
| 202:16,22 | 111:14,23 | 231:16 | 81:21 | **opinion** |
| 204:9 | 114:11 | 232:8 | 94:20 | 170:1,2 |
| 217:6 | 121:12,13 | 234:6 | 108:22 | 247:2 |
| 218:6,7 | 124:21,21 | 239:2 | 117:2 | 248:5,10 |
| 219:14 | 125:19 | 241:7,10 | 123:3 | 248:11,12 |
| 240:13 | 126:8 | 250:15 | 131:13 | 248:14 |
| 265:17 | 127:24 | 255:1,6 | 144:3 | 249:5 |

opportunity
  197:4
opposing
  210:4
oral 197:12
order 30:4,7
  54:18
  80:18
  93:15  94:1
  123:24
  166:5,12
  179:12
  291:10
  292:18
ordered
  293:5
ordering
  292:11,17
organize
  101:4
organized
  147:2
  245:8
  261:16
orgy 154:22
original
  3:15  92:9
  133:8
  278:24,25
  293:3
others' 85:8
outcome
  183:1
outside
  16:12
  56:12
  68:13,18
  69:10
  97:11
  112:10,12
  118:15
  121:19
  123:1
overall
  152:24
overpaying
  271:10
overreac...
  224:13
overseas

23:8
  113:15
overview
  148:2
overwhelmed
  180:10
owe 95:25
  192:15,15
  246:25
owed 247:20
owes 191:17
  267:16
owned 11:24
  131:20
  136:3,3,4
  136:8
  141:11
  186:11,11
  186:13
  237:24
  266:10
owner 5:12
  11:2,8,9
  25:17
  29:15
  183:5
  226:21
ownership
  31:17
  187:25
  227:1
owns 52:3
  131:22
  138:16
  143:2

_____
        P
_____
P 23:22
  179:15
P-e-l-i-...
  5:10
p.m 164:17
  211:4
  232:13
  255:5
  271:7
  292:7
  293:8
Pacer 186:21
Pacific 4:2

105:20
  164:14,17
pack 238:18
package
  162:5
page 3:1,10
  30:15
  31:11,11
  133:13,14
  133:15,21
  133:22
  148:4
  149:20,25
  150:3
  154:16
  174:12
  175:2
  295:2
pages 30:14
  157:8
paid 35:13
  37:18  45:2
  92:25  93:5
  93:16,19
  94:3,4,4,6
  94:10  99:8
  101:15
  115:21
  135:24
  136:6,7
  144:16
  149:11
  150:10,19
  150:22
  151:14,15
  151:15,16
  151:17,19
  151:21
  152:1,14
  152:16
  153:3,5,11
  153:11,22
  154:1,7
  157:18
  169:18,21
  173:13,14
  173:15,16
  176:10
  179:9,16
  181:5

183:22,24
  185:8
  189:22
  190:4,16
  191:11
  193:19
  195:15
  196:5,5
  204:5
  205:2
  207:1
  208:20
  213:17
  219:8,16
  219:17,23
  220:5
  243:19,20
  263:5
  264:1
  269:12
  272:4
Paige 96:13
  96:17
pain 33:22
  269:20
paint 267:10
paper 197:15
papers 228:1
paragraph
  173:22
paragraphs
  30:25
  130:19
paralegal
  19:6
paralegals
  209:15
  252:21
parked 68:13
  68:18
part 20:22
  62:17
  108:13
  158:10
  180:9
  196:2
  213:4,5
  235:11
  258:1
  270:21,22

273:3,3
  289:8
partial
  11:18
particip...
  194:14
  234:16
particip...
  222:4
particular
  50:18  51:2
  52:12
  255:25
parties 4:14
  294:15,16
  294:17,18
partying
  207:15
passed 55:20
  55:20
passes 60:24
password
  56:13
  65:16  68:3
  68:7,10,24
  69:1  75:21
  88:2,5,9
  88:11,13
  88:14,21
patents
  248:16
  249:6,16
  249:22
  250:25
Patrick
  96:12,17
  273:17,22
pattern
  270:5
Paul 2:3
  4:10  5:16
  9:7  25:6
  30:17  86:6
  105:6
  122:18
  128:14,14
  184:13
  187:21
  190:3
  194:19

198:3
209:9
210:9
213:6
219:15,20
230:13
233:14
244:23
282:16,23
**Paul's** 63:10
133:19
192:22
**paul@bei...**
2:6
**pay** 33:1,6,7
49:1 57:7
57:8,8,9
101:16
112:13
123:20
153:3
157:2,2,3
157:19
171:10,16
176:10
180:13
185:7
189:24
190:24
191:3
204:8
209:5,14
213:16,17
213:18
218:4,5
220:2,3,5
235:6
236:4
243:13,15
253:4
258:1
266:5,6
**paying** 34:12
38:11 44:7
64:12 72:1
92:14,20
93:3,10
99:18
150:25,25
156:13

157:21
158:10,15
158:23,24
163:7
173:18
180:13
182:2
206:12
207:6
208:1
209:4
213:23
215:5,6
235:5
238:19
251:17
252:19,19
267:5
271:18
272:1,10
272:11,11
272:12,21
272:21,23
273:22
274:1
291:1
**payment**
266:7
273:4
**payments**
101:16
**payroll**
120:13
**peer** 43:12
43:12
**Pelissier**
1:15 3:2
4:4 5:2,9
268:24
294:8
295:16,21
**penalty**
295:17
**pending** 8:17
8:23 9:10
185:13
187:17,20
190:1,2
217:4
229:15

**pennies**
267:13
**penny** 179:10
215:12
**Penthouse**
141:15
**people** 15:5
16:25
17:19,22
20:11,14
28:23
32:22 33:6
34:6 36:4
36:5,7
39:22 44:2
48:22
49:22,24
50:12,16
50:17 51:1
51:9,10,12
51:19
69:23
71:16,19
72:13,17
72:21 74:5
79:19,24
80:15
90:23 95:8
96:5,6
97:3 105:4
109:6
111:9
112:23
115:10,11
119:22,23
120:3,5,14
120:17
122:19,22
125:2,3,14
126:13
129:19
132:3,4
140:16
146:5
149:9,13
150:25
153:6,6
154:18
155:1,7
157:12,16

158:9,13
159:2,6
161:20,22
162:4
163:13,16
163:20
171:9,14
172:19
173:6,7,12
173:16,17
176:9,10
177:2,3,4
177:17,21
178:4
179:5,18
191:19
192:3
193:2,4,7
193:10,11
197:23
199:15
205:9,13
205:19
209:19
212:2,23
220:1
221:17
225:12
226:24
228:14
238:7
244:14
252:7
255:18,20
258:3,12
258:14,17
260:1
270:6,15
272:2,10
275:18,24
277:5
281:22
282:18
288:5,7
289:24
291:9
**people's**
35:13
37:11
38:20 39:5

258:21
259:10
**percent** 7:20
7:21 17:23
57:19
71:12
109:25
119:3
140:1
147:6
155:18
156:21
157:12,15
157:16
179:19,21
180:24
196:22
212:3
214:20,20
267:10
269:7
**perfect**
159:17
**perfecting**
159:16
**perfectly**
160:6,11
276:20
**performed**
234:11
**performers**
275:23
282:3
**period** 32:7
106:13
149:10
157:10
169:9
176:24
206:6
217:16
235:3
280:6
**perjury**
295:17
**person** 19:5
29:4 50:3
52:2,3,12
52:12,20
53:5,5,11

| | | | | |
|---|---|---|---|---|
| 56:24 | 141:23,23 | 3:13,19,23 | 255:9 | 245:9 |
| 65:17,20 | 198:18 | 4:11 25:20 | 259:6 | **popular** |
| 65:22 72:5 | **phrase** 9:18 | 26:17 | **pleasure** | 153:17 |
| 72:6,8,24 | **pick** 23:20 | **plan** 256:9 | 64:11 | 156:5,9 |
| 72:25 73:8 | 114:4,5 | 256:11 | **PLLC** 4:9,10 | 167:11 |
| 81:8 82:10 | **picture** | 257:8 | **plug** 289:3 | 172:19,21 |
| 88:14 | 146:6 | **planning** | **pocket** | 173:10 |
| 89:20 | 148:19 | 138:13 | 209:16 | 213:10 |
| 95:13 97:3 | 151:8 | 257:2 | 243:18,22 | 222:1 |
| 106:9 | **piece** 42:19 | **play** 102:4 | 243:25 | **porn** 199:1,3 |
| 150:3 | 66:16,16 | 199:18 | **pocketed** | 199:14 |
| 156:1 | 119:21 | **Playboy** | 194:18 | 209:24,24 |
| 169:5 | 200:11 | 141:15 | **point** 11:16 | 211:15,17 |
| 170:23 | **pieces** 41:5 | **played** 90:15 | 22:15,18 | 212:4 |
| 180:22 | 41:11,14 | 191:10 | 35:20 | **pornogra...** |
| 251:12 | 42:2,6 | 212:22 | 53:14 60:9 | 124:9 |
| 265:4 | 44:10,12 | **playing** 87:9 | 62:7 66:13 | **pornogra...** |
| 294:16 | 46:16,23 | **please** 4:4 | 69:2 83:17 | 264:19,21 |
| **personal** | 48:2,10,19 | 4:14 5:7 | 89:20 | **pornography** |
| 5:17 | 54:4 288:7 | 8:22 9:8 | 93:20 | 82:8,13 |
| 104:21 | 290:9,22 | 9:20,23 | 97:12,14 | 123:14 |
| 127:9 | 291:15 | 15:14 17:9 | 102:15 | 160:22,25 |
| 184:7 | **Pillar** 98:17 | 36:25,25 | 124:19 | 176:24 |
| 259:3 | 98:18,21 | 37:5 41:20 | 125:17 | 177:7 |
| **personally** | 98:22 | 46:19 | 140:23 | **portion** |
| 22:17 | 179:8 | 52:15 55:4 | 144:15 | 215:7 |
| 84:10,14 | 207:13 | 55:4 59:3 | 150:6 | **portions** |
| 87:14 | 215:9 | 59:14,14 | 164:9 | 89:7,21 |
| 112:4 | 220:8 | 61:15 | 167:23 | **possession** |
| 127:14 | 272:11,11 | 62:14 | 172:15,24 | 143:5,21 |
| 189:25 | 273:11,24 | 64:21,21 | 182:6 | 145:3,8 |
| 265:23 | 273:25 | 64:22,22 | 184:18 | 234:20 |
| **persons** 31:3 | 274:2 | 67:18 70:1 | 210:14 | 261:20 |
| 140:21 | **piracy** | 73:10 | 213:25 | **possibility** |
| **persuing** | 125:20 | 74:14 77:6 | 222:11 | 105:7 |
| 155:23 | 126:10,21 | 77:17,17 | 226:2 | **possible** |
| **Philadel...** | 127:3,13 | 78:5,15 | 231:25 | 49:11,14 |
| 7:9 | 128:1 | 79:10 | 250:3,9 | 49:15 56:8 |
| **phone** 9:4 | **place** 9:17 | 83:21 | 252:24 | 58:7 67:1 |
| 36:25 | 50:9 60:12 | 91:14,14 | 263:24 | 71:15 |
| 103:1 | 62:20 | 110:7 | 271:12 | 72:12,16 |
| 211:18 | 96:19,20 | 111:12 | 284:7,13 | 73:3,22,23 |
| **phonetic** | 168:12 | 127:1 | 289:1 | 73:23 |
| 273:17 | 192:4 | 134:20 | **pointing** | 168:15 |
| **photo** 198:21 | 245:22 | 135:9 | 55:22 | 292:23 |
| **photogra...** | **places** 23:17 | 143:3 | **Poker** 154:23 | **possibly** |
| 198:17 | 186:3 | 146:18 | **police** | 76:22 |
| **photos** 117:3 | 225:15 | 178:6 | 125:12,16 | **post** 128:22 |
| 117:10 | **plaintiff** | 189:6 | 126:2 | 255:14,15 |
| 141:14,14 | 1:6 2:2 | 219:13 | **politely** | 256:17 |

258:13,13
**posted**
163:21,22
164:3
**potential**
228:7
**power** 185:2
185:4
202:18,20
202:25
203:12
**Prague**
155:10
282:4
**precise** 71:9
78:3
**precisely**
17:10
**premise**
289:22
**prepaid**
244:23
**preparation**
109:13,15
**prepare**
24:11  25:2
27:17,20
28:10,14
29:6,9,15
29:18  30:1
30:5,8
87:1  110:8
110:12,20
256:8
**prepared**
24:14
27:25  28:3
28:8  30:10
30:16
31:23  32:2
**preparing**
164:5
**present**
283:25
**press** 183:18
**pretend**
193:13
**pretended**
183:25
**pretending**

190:20
191:14
192:11
204:25
**pretty** 74:2
154:25
156:20
157:13
161:12
170:17
173:8
175:23
207:4
208:17,17
221:5
229:16
253:2
**prevent**
289:21
**previous**
26:21  65:2
**price** 24:4
92:11,13
139:24
263:5
291:2
**printed**
117:5
147:18
**printing**
116:22
**prior** 10:14
189:6
236:14,17
237:7,7,20
237:21
294:9
**private**
82:24
183:19
240:20
**privilege**
9:13  54:11
181:20
188:19
190:7,11
190:12,14
190:16,22
191:8
192:16

226:9
233:4,15
**privileged**
188:14,15
228:11
229:1
230:19
231:8,14
232:16,20
233:5,9,22
241:18
**privileges**
50:8,12
123:6
**pro** 148:10
148:10
**probability**
168:10,11
**probable**
168:11
170:3
171:18
**probably**
6:12,14
7:20  12:8
17:3  35:14
38:8  46:7
46:8  56:6
58:3  66:19
67:5  69:17
85:20
107:1,3
108:15
112:8
148:8
155:17,22
157:10
166:20
169:24
170:10
172:3,4
193:20,22
205:18,18
206:18
207:18
214:19
218:8
236:11
242:13
244:6

265:18
271:1
276:20,20
285:1
289:25
**problem** 8:24
38:12
103:16
110:1
114:14
143:8
176:21
177:19
186:23
233:25
258:2
**problems**
19:18,25
**Procedure**
31:2
**proceed**
188:8,12
189:3
**proceeding**
67:22
**proceedings**
292:25
293:2
**process**
106:5
**processors**
151:3
152:16,20
154:7
178:22,23
**produce**
37:17,19
37:19
85:24  86:2
86:4
100:17
142:20,23
146:23
148:14,16
148:20
226:25
227:5,5,7
261:15,22
285:14
**produced**

80:4  85:19
100:14
103:9
113:16
134:11
140:13,18
142:17
151:1
202:10
235:2
260:23,24
261:3,4,20
**produces**
132:20,22
**producing**
264:4
**product**
139:25
140:3
**production**
3:19,23
13:6  16:17
16:18
17:13
100:18
262:6
**productions**
13:5,21
263:22
264:2,12
264:17,22
264:23
265:14,19
**profession**
35:15
**professi...**
32:24
33:12,15
34:4  55:3
55:14  64:6
65:6,14
66:5  67:6
231:2
**professi...**
33:8  34:1
36:9
**profile**
56:22  64:6
65:5,10,12
66:6  67:10

68:2
**profit**
  267:11
**profits**
  215:15
**program**
  129:22
  242:15
**programer**
  96:24
  109:8
  281:23
  282:10
  286:12
**programmer**
  109:10
  275:19
  281:24
  286:4
**programmers**
  96:5
  106:11
  108:21,25
  109:2,4
  119:10,12
  119:13
  120:8,11
  121:25
  275:19
  282:11
  283:17,24
  285:10,23
**programming**
  12:12
  17:14
  77:13
  129:8
  131:17
**progressed**
  236:7
**project**
  113:7
  117:9
  202:21,24
**projects**
  120:12
**prolifer...**
  246:10
**promise**
  118:2,14

118:22
119:4
**promissory**
  195:12
**promote**
  146:6
**pronounce**
  18:15
**proof** 142:5
  142:13
  146:17
**properly**
  94:23
  102:23
  277:24
**properties**
  13:2,15,16
  13:22 22:7
  262:6
  265:15,20
  266:1,5,6
  266:9
**property**
  13:3 22:5
  195:15
  202:6
  234:25
  244:4,9
  266:2
  280:18
  281:9
**proporti...**
  166:7
**prosecute**
  284:1
**prosecution**
  282:15
**protect**
  73:17 88:5
  88:9,18,21
  93:12
  103:19
  104:1
  121:14,22
  125:6
  126:7,15
  130:12
  132:14
  141:2,7
  194:24

256:9
257:8
261:11
265:12
**protected**
  56:13
  65:16 68:4
  68:7,10,24
  75:21
  78:14
  87:25 88:2
  88:11,13
**protecting**
  93:7 102:6
  121:11,12
  121:15,19
  122:21
  194:21
  266:23
**protection**
  18:25
  28:12 69:1
  103:23
  110:10
  125:13
  244:18
  268:1
**protective**
  54:17
**protocol**
  46:1 64:13
**prove** 7:10
  7:10,10
  54:7 89:2
  89:5
  123:18
  131:21,24
  229:21,23
  285:7
**proven**
  246:22
**provide**
  22:22
  119:8
  120:10
  241:14
  247:12,13
  285:17,17
**provided**
  152:10

294:13
**provider**
  38:22,24
  52:7 60:17
  60:20
  270:10
**providers**
  151:24
**providing**
  91:6
  122:18
  235:17
**provision**
  227:12,13
**proximity**
  68:2 69:11
**public** 12:10
**publication**
  136:19,20
  278:11,17
  279:5
**published**
  137:11,14
  137:14
**pull** 38:18
  166:5,8
  285:11
**pulled** 229:6
**pulling**
  152:6
**punched**
  211:19
**purchases**
  247:10
**purpose**
  266:1
  291:19
**purposes**
  9:13 25:13
  165:15
**pursuant**
  294:19
**pursue** 28:23
  220:20,25
**pursues**
  220:19
**pursuing**
  122:20,21
**put** 9:4 21:6
  32:10

44:12
85:16 95:8
104:5
107:2
113:6
114:13,16
114:20,20
161:14
163:19
176:2
185:7,10
195:9
201:22
219:19
222:1
226:20
242:19,19
247:15
250:3
260:3,7,8
263:14,25
267:25
269:11
271:18
276:24
279:14
**putting**
  19:23
  34:20,21
  34:23
  178:5
  193:2
  194:23
  231:25
  232:1
  249:18
  259:25
  267:9
**python** 66:20
  78:7,16,22
  238:23

———— **Q** ————
**quality**
  134:17
**quarter**
  33:19
**question**
  8:17,18,23
  9:9,10,21

10:18
13:12
15:14
17:23 27:6
30:19 35:8
36:19,19
37:7 41:17
41:19
50:24
53:22 55:5
58:24 59:1
59:4,15
63:24
67:23 70:5
70:14
73:20,21
74:14,15
75:18,18
76:3,6,12
77:6,15,18
83:18,20
83:22,23
91:11 97:1
109:21
110:2,7,24
111:13
112:22
114:6,7
115:17,17
117:17,24
118:4
121:1,3,7
121:7,21
123:21
124:23
125:7,9
126:8
127:1
128:13
130:18
131:8
134:20
143:4
146:10
150:9
151:11,14
154:5
169:3
170:2
171:17

173:20
181:19
186:17
187:12,17
187:20
189:4,6,8
189:20,21
190:3,8,9
216:2,4
217:4,8,9
218:13
219:12
221:18
222:14
225:10
230:18,23
231:8,10
231:10,11
231:13
232:2
235:18
239:24
240:8
241:9
248:21
249:3,3,4
250:8,19
250:21
259:6,7
263:2
279:7
281:6
**questioned**
294:19
**questioning**
188:8,13
**questions**
8:4,6 10:3
10:8,23
17:8,10
28:16
29:16
36:15,23
36:23 37:8
44:22
53:22
61:16 62:9
62:11
63:18 64:2
67:19,24

69:16 70:2
87:11
91:11
105:24
110:25
130:18,22
135:9
141:6
143:15
146:15,18
150:8
151:13
154:9
164:12
167:4
174:6
177:24
178:1
179:14
188:2,21
191:6
200:22
222:5,10
233:18
245:5
250:10
254:16
274:23
275:3,5,7
276:25
277:12
280:12
292:2,4
**quick** 27:6
84:23
101:14
136:17
210:23
270:25
275:4
**quicker**
119:17
150:15
**quickly** 73:1
73:5 91:2
198:5
253:3
**quite** 8:5
13:7,14
21:9 50:23

71:8,11,13
109:21
140:19
170:18
282:24
**quote** 114:24
266:22

_____
**R**
**radically**
113:1
**raised** 272:4
**Ramzi** 2:9
4:6 24:15
53:17
57:24
59:12
63:23
105:8
164:8
181:9
182:10
186:2,23
187:2
219:12
230:11
233:17
234:3
249:24
292:17
**ramzi@jt...**
2:13
**random**
106:21
262:18
**randomly**
68:19
115:9
**range** 279:8
279:19
280:1
**ranking**
291:10
**rape** 199:3
212:14
**rate** 148:4
156:19
157:7,11
157:14,16
158:10,14

185:8
227:18
261:18
**raw** 113:19
113:23,23
117:25
140:4
**reach** 69:9
69:10
99:16,21
100:6
101:24
260:13,15
**read** 31:21
55:21
83:23
185:4
189:5,21
267:18
273:14
274:5,7,9
278:10
295:17
**readable**
165:16
**readily**
160:22
161:1
**reading**
189:7,19
**ready** 24:7
98:11
111:7
180:3
210:21
**real** 22:13
27:6 96:4
135:5,7
145:13
184:5
187:3
191:1
197:16
242:13
275:4
**realize**
254:8
275:21
**realized**
108:4

109:18
204:10
237:11
268:17
**really** 8:25
16:9 27:20
29:7 35:2
36:22 56:9
61:25
65:13,15
67:23
72:20 87:1
88:22 91:7
93:2 94:12
95:13
99:22
101:22
103:17
105:7
107:10,10
108:8
111:10,12
115:11,16
116:13
118:10
120:20
122:10
124:22
125:8
130:20
136:17
142:19
146:15
152:12
153:13,14
153:19
154:25,25
161:11
166:10
172:16
173:10,10
174:3
177:10,25
180:10,25
182:5
189:8,11
192:21,21
194:9,16
194:20
197:24

198:13,17
198:23
199:6,7,16
201:8,14
209:2,11
209:12,17
209:18,22
210:5
211:11
212:6,22
212:23
213:19,20
222:1,5
229:16
231:12
253:25
254:7
257:25
258:8
260:1
261:15
266:8
267:1
268:7
269:1
271:16,17
271:18
276:6
282:7,9,17
284:3,14
288:13,14
288:22
**reason** 10:2
10:7,13,15
33:14
34:14 57:3
60:3,6
68:23 70:7
70:10
75:17
88:24
105:23
108:13
148:14,20
164:1
191:20
200:13
205:6
246:2
259:13

261:23
270:15
279:1
295:2
**reasonably**
294:18
**reasons**
77:11,20
77:21,24
78:2 83:9
83:25
**rebuild**
102:21
**recall** 27:15
29:23 34:9
37:21 38:3
38:14 72:9
86:11,15
87:21
100:20
142:20
235:22
239:12,15
240:3,3
243:11
253:16
274:8
**recalling**
57:2
**receive**
37:12
62:18
183:10
245:3
266:7
270:6,8
**received**
62:23,23
62:24 63:2
118:4
206:16
212:25
213:3
220:7
224:7,16
225:4,13
252:15
**receiving**
220:9
252:12

**recess** 85:2
105:18
164:15
211:2
232:11
255:3
271:5
**recognize**
26:19,20
26:21 92:2
134:5,10
147:22,23
216:11
222:21,25
223:2
255:11
268:15
**recommended**
94:20
**record** 4:5
5:8 8:12
26:7,9,10
26:11 27:7
54:15,20
54:21,22
84:24 85:1
85:4
105:15,16
105:17,20
116:21
117:7
118:6
164:13,16
174:19,22
174:23,24
188:7,12
210:25
211:3
216:25
230:14
231:3
232:1,9,13
248:19,23
249:19
254:19,21
255:2,5
271:4,6
291:22,25
292:7
294:13

**recorded**
8:12
195:12
**records**
12:10
100:14
113:5,16
113:18
115:2,4,6
115:18,20
115:22,25
116:11,24
117:18,20
117:24
118:14,18
118:22,24
118:25
119:6,25
120:10
121:18
137:16
**recourse**
123:16
**recovered**
266:22,24
**recurring**
151:4
**refer** 57:23
149:8
150:9,10
**reference**
280:5
**references**
278:4
**referencing**
279:8
**referred**
203:20
**referring**
26:1 63:8
119:9
131:12
148:22
198:10
200:19
203:16,19
205:14
256:12
257:9
**refers** 149:9

157:7
**reflected**
158:14
**refresh**
57:22 58:1
127:18
**refusing**
97:1
240:25
250:9,19
250:20,21
**regard** 7:23
99:12
**regarding**
19:1 37:23
103:13,14
103:18
151:17
152:20
197:13
227:14
228:6
**regardless**
254:22
**regards** 7:15
7:19
197:10
228:12
**register**
132:15
142:2
218:5
223:22
**registered**
68:7
136:10
223:21
**registra...**
31:17
226:17
278:18
**regular**
102:14,21
**regularly**
106:22
108:2
**reimburs...**
206:18
**reinstal...**
33:21

**relate**
177:24
**related**
186:10
203:23
225:8,14
**relating**
174:6
234:10
**relation...**
43:11
108:17
294:17
**relative**
294:15,15
**relatively**
153:15
195:16
**release**
135:24
138:16
**released**
136:21
**relevance**
97:22,25
184:5
188:18,20
191:5
**relevant**
14:8,17
17:6,9
103:11,12
186:13
187:11,12
**religion**
229:17
230:20
**remember**
39:11
86:23 87:6
87:8,10,13
87:17,18
107:22,23
127:4
143:25
201:13
239:8,9
241:7
243:17
282:12,13

283:22
284:17
287:11
**remembered**
87:16
**remotely**
4:15 8:8
9:18
**removed**
110:19
116:8
137:3
**rent** 22:10
22:22 23:2
23:4,8,14
23:15,16
23:21 24:9
145:14
266:7
**rental** 23:19
266:5
**rented** 136:2
136:2,5
**renting** 24:2
24:4
**rents** 22:10
**repeat** 9:20
50:24 59:3
59:4 83:21
95:14
115:17
151:12
**repeating**
74:15 76:2
112:22
**rephrase**
121:1
**report**
125:12,16
152:9
**reported**
1:24 294:7
**reporter**
4:13 8:7
83:21
111:22
189:5
291:20
292:10,16
292:24

294:1,6
**REPORTING**
1:25
**represent**
4:5 185:18
187:5
**represen...**
221:5
**represen...**
1:14 25:12
25:17 27:3
27:18
28:15
30:24
48:17 55:8
58:19 60:5
77:23
84:16,20
112:1
165:25
**represented**
184:17,20
185:16
186:24
**represen...**
186:4
**Republic**
132:25
212:20
**reputation**
178:3
**request** 3:22
116:8
162:5
226:21
228:4
233:6
234:7
**requested**
113:18
116:3
152:19
294:19
**requesting**
162:4
**requests**
3:18
115:22,25
162:7
224:24

226:11
**require** 88:4
143:22
144:1,3,9
144:24
145:4,5,9
146:11,12
**required**
145:21
190:7
**res** 161:3
**research**
29:11,12
56:18
259:11
**reserve**
281:16
**reserving**
274:23
**residence**
50:7 55:17
**resident**
50:8
**resolution**
177:7,11
**respect** 27:3
27:9,18
31:4,5
270:4
**respectful**
212:6
**respond**
101:14
236:2
**responded**
234:17
**response**
234:18
**responses**
233:17,18
233:19
285:18
**responsible**
81:14
88:15
**responsive**
101:11,19
101:22
224:23
**rest** 158:9

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

P-Resp_Renew_MSJ217

161:14
166:11
192:16
281:17
284:8
**restate**
259:6
**restitution**
187:15
191:18
213:22
266:23
267:17
**result** 186:5
**resulted**
225:23
**resume** 270:7
**retired**
124:14
127:22
**returned**
244:21,22
244:24
**returning**
149:16
**returns**
179:15
**revenue**
174:10,10
175:3
178:8,10
206:24
214:3,9,12
214:14,25
214:25
215:22
217:10,19
217:20
218:13,14
218:23
219:6
220:7,9,10
220:11
257:7,20
**revenues**
215:15,18
**review**
292:25
294:19
**revised**

242:5,7,10
**revocation**
203:2
**revoked**
203:3
**rid** 208:9
**ridiculous**
185:5
219:24
252:9
259:23
**right** 5:20
5:22  9:8
10:7  21:18
25:6  36:12
41:24  43:7
43:9  45:24
46:24
50:11
63:19
64:24,25
74:1  84:17
84:23
91:13  92:8
104:5
108:23
114:12
115:17
120:18,21
121:14
126:18
130:3
133:7
137:24
138:25
147:8,14
148:12
150:14
152:18,25
153:10
155:21,21
156:18
157:24
160:23
161:1
162:22
166:14,23
167:2
169:18
177:13

178:10
180:20
185:12
189:2
202:8,20
207:19,25
210:23
212:12
213:6
214:4,7
219:3
228:9
229:5
233:2,25
256:22
257:11
258:8
260:3
270:25
271:11
274:21,21
275:10,12
277:3,6
278:22,23
281:10,11
284:2,23
287:10
**rights** 111:5
123:13
135:15,21
137:17,21
138:3,6,10
138:18
139:2,2,4
139:12,13
141:7
147:8
227:16,17
242:25
243:4,6,8
274:24
**rip** 176:11
176:12
**ripped** 122:2
**Rodeo** 207:25
**role** 102:4
**roof** 263:20
263:21
**roommates**
32:21

**Rosen** 229:5
**rough** 292:23
**roughly** 25:6
210:13,15
**route** 260:18
**router** 56:5
60:13,20
62:21  64:7
65:4,9,13
68:2  74:1
74:2,6,9
74:19
75:21
76:10
77:16
**row** 90:12
**RPR** 1:24
294:5,23
**rude** 189:15
**rudimentary**
152:7
**rule** 3:12
25:19
26:16  31:1
31:10
81:15
88:12
**rules** 190:6
**run** 16:20
27:22
82:24
104:6,11
104:11
117:14
184:21,24
193:5
228:9
242:14,15
252:22
**running**
73:15
80:15
90:22
95:15
180:10,16
209:6,13
**runs** 18:5
289:22
**Russian**
18:18

**Rutgers**
128:17

**S**

**S** 2:3  3:8
**sake** 55:25
**salary**
213:16
**sale** 195:19
225:16
**sales** 271:24
285:6
**sampling**
216:19,21
**SAN** 1:3
**sanctions**
284:5
**save** 165:12
**saved** 165:14
**saw** 27:12,13
46:5  81:21
192:4
197:4
260:5
273:13,14
**saying** 16:19
41:8,15
43:16
45:16
52:16,17
57:4  58:8
63:12
70:21  73:4
73:7  76:7
82:8  88:23
104:23
116:10
118:21,21
118:24
135:21
138:25
187:5,8
195:19,23
201:4
202:16
205:16
213:4,4
217:5,18
217:24
218:15,22

219:5,22
225:11
226:13
243:24
269:23
270:1
282:24
289:10
**says** 30:21
30:24
63:10
70:20
88:17
91:21 92:7
116:14
137:15
139:25
149:5
156:10,15
157:9
174:9
234:9
256:8
259:15
**SBK** 207:14
**scared** 229:7
258:10
**scenario**
77:1,3,4,8
**scenes**
138:11,15
**Schedule**
31:1,5
**scheduling**
132:18
**screenshot**
116:15
117:14
121:2,4,14
121:20
123:7
**screenshots**
104:4,9,16
104:17,18
115:24
116:22
120:23
121:5
122:14
**script**

119:17
285:10,25
**scripts**
122:8
283:17
**sealed** 241:4
**search** 30:7
104:13
114:21
116:9
121:5,5
167:6,7,12
167:23
220:23
223:4,13
223:19
227:23
228:7
234:14
259:21
**searched**
165:4
166:1
167:17,25
224:2
**searching**
120:24
170:23
220:21
224:4
**Seb** 256:2
**second** 3:21
3:22 26:6
54:16,19
61:7
132:15
133:13
174:12
175:2
230:16
232:6
288:8
**secondary**
80:17
**section**
161:22
**security**
182:13
**see** 6:22 7:3
9:6 26:14

27:13
31:12
44:19,24
44:25 46:6
47:9 49:20
75:3,3
91:22,22
91:25
104:5,24
105:2
108:23
111:19
112:25
116:6
120:3
123:3
124:1
128:13
133:9,10
134:2
147:16,20
147:21
148:13
149:6,14
151:3,5
154:7,8
157:1,9
159:17,25
160:13
161:7,8,22
163:16,20
163:21
165:2,8,10
171:3
173:7
174:11
175:2
177:4
191:5
192:10
193:3
199:15
201:14
215:11,23
216:9
221:4,13
222:19
224:10
226:21
227:20,20

227:24
234:7,12
234:13
238:5,9,9
255:10
256:8
258:10
259:22
268:20,22
268:23
278:19,20
290:14
**seed** 251:19
251:25
252:5,8
**seeding**
245:21
246:3
**seeing**
141:18
197:22
199:1
223:1
272:8
**seek** 230:25
**seen** 88:8,12
128:15
269:6
**select**
220:22
**sell** 141:15
145:13
161:19
191:21
269:18
**selling**
259:4
**send** 38:24
104:3
107:11
110:18
112:16
113:1
114:12,23
114:25
117:14
122:9
146:5
236:9
244:23,25

245:1,6,11
259:20
**sending**
112:23,24
115:9
242:3
245:4
256:13,16
273:8
**sends** 44:11
**sense** 53:23
75:15
81:23 90:8
108:12
139:5
149:23
151:17
226:25
228:18
**sent** 44:14
68:6,9
112:17
117:8
119:16
190:18
205:4
241:24
244:19
245:10
263:5
**sentence**
91:15
**separate**
11:25 13:6
94:15,15
185:16
263:4
264:8
**September**
264:16
**series** 236:9
**serious**
248:13
**seriously**
64:23
**serve** 230:22
**served**
233:17
**servers** 45:5
47:4 48:1

| | | | | |
|---|---|---|---|---|
| 48:9,19 | 213:15,15 | 222:6 | 134:9 | 202:23 |
| 49:16,17 | 217:23,23 | 236:11 | 138:17 | 203:1 |
| 49:19 | 217:23 | 276:10 | 139:7 | 223:10 |
| 290:11,22 | 220:4 | 278:23 | 144:19,20 | 265:5 |
| 291:16 | 263:3 | **sex** 134:8 | 155:9,10 | 269:4,4 |
| **service** | 265:3 | 198:24 | 155:10,11 | **sign-ups** |
| 17:21 | 294:20 | **shame** 83:5 | 155:11 | 258:17 |
| 38:22,23 | **sets** 154:14 | **share** 46:11 | **show** 117:21 | **signature** |
| 52:7 57:10 | 155:8,13 | 48:25 | 129:4 | 133:19 |
| 60:17,20 | **settle** | 176:11 | 148:19 | 268:25 |
| 90:13 91:2 | 180:21 | 244:16 | 176:18 | 269:23,25 |
| 106:10,14 | 205:1 | 288:5 | 179:12 | 295:18 |
| 106:18 | 270:13 | 289:23,23 | 224:6,16 | **signed** 92:7 |
| 107:20 | **settled** | **shared** | 225:3 | 96:23 |
| 109:19 | 240:14 | 225:3 | 227:1 | 117:23 |
| 111:11 | 244:14 | 240:24 | **showed** 46:14 | 135:23 |
| 117:23 | 280:20,23 | 241:6 | 179:15 | 194:12 |
| 123:1 | **settlement** | 244:16 | **showing** | 201:9 |
| 151:23 | 99:2 | **shares** | 217:9 | **signific...** |
| 192:12,14 | 221:14 | 176:18 | 261:17 | 276:10,11 |
| 235:17 | 225:12 | **sharing** | **shows** 34:11 | **signs** 138:15 |
| 270:10,19 | 240:17,22 | 32:22 | 148:2 | 139:25 |
| **services** | 242:24 | 39:1 44:8 | 258:24 | **silenced** |
| 106:11 | 243:9 | 64:13 | 278:11 | 38:21 |
| 108:1,19 | **settlements** | 176:6 | **shut** 90:18 | **similar** |
| 109:16,17 | 3:17 93:6 | **sheep's** | 91:2 288:9 | 55:16 |
| 110:9,12 | 128:7 | 198:8 | **sick** 21:8,9 | 85:12 |
| 110:20 | 203:21 | **sheet** 217:9 | 275:18,22 | 132:12 |
| 111:2,14 | 205:17,20 | 217:25 | 275:23,24 | 267:15,19 |
| 111:17 | 206:1,8,21 | 253:6 | 276:1,4,15 | **simple** 150:9 |
| 112:13 | 206:25 | **shoot** 19:17 | 282:12 | 173:20 |
| 113:3 | 207:5,11 | 19:24 | 283:7,8 | 225:20 |
| 114:19 | 208:15 | 139:18 | 284:6,13 | **Simultan...** |
| 118:15 | 210:2 | 145:18 | **side** 101:21 | 111:21 |
| 119:20 | 216:13 | 174:13 | 149:6 | **Sinai** 128:25 |
| 121:19 | 221:10 | 193:23 | 214:21,22 | **single** 15:23 |
| 247:12,14 | 225:8 | **shooting** | 214:23 | 33:13 34:6 |
| 247:15 | 252:16 | 19:15,18 | 215:2 | 55:16 |
| **sessions** | 274:1 | 22:12 24:1 | **Siemens** | 65:24 |
| 148:4 | **settling** | 73:16 87:8 | 128:24 | 116:22 |
| 149:19 | 82:23 | 133:2 | **sign** 8:25 | 127:4 |
| 150:2 | **seven** 102:19 | 134:18 | 142:16 | 259:17,17 |
| 151:6 | 107:18 | **shoots** 22:9 | 185:1,2 | **sir** 73:13 |
| **set** 3:20,21 | 133:18,19 | 141:17 | 192:2 | **sit** 15:22 |
| 30:25 31:6 | 170:20 | **shorthand** | 194:2 | 18:1,21 |
| 138:7 | 194:12 | 294:11 | 195:20,24 | 127:19 |
| 154:20 | 197:17 | **shortly** | 196:19,19 | 139:22 |
| 157:25 | 218:20,22 | 203:3 | 197:15 | 165:24 |
| 185:10 | 219:5 | **shot** 18:16 | 201:4,6 | **site** 104:24 |
| 204:12,15 | 221:11 | 22:21 | 202:16,22 | 122:1 |

| | | | | |
|---|---|---|---|---|
| 136:15 | **sitting** | 21:19 | 128:21 | 97:21 |
| 149:10 | 56:12 | 101:5 | 130:4,5,12 | 98:21 99:1 |
| 150:11,18 | **situation** | **slowly** | 159:12,14 | 102:2 |
| 151:4,18 | 125:18 | 288:14 | 180:2 | 103:17 |
| 154:18 | 140:7 | **SLRs** 141:25 | 213:18 | 104:10 |
| 155:17,24 | **six** 6:23 | **small** 15:19 | 223:24 | 112:21 |
| 156:1,5,8 | 56:7 69:17 | 31:12 | 237:10 | 116:19,19 |
| 156:14,16 | 95:22 | 109:25 | 242:22 | 121:1 |
| 156:17,22 | 102:19 | 115:6 | 246:1 | 125:11,23 |
| 157:1,12 | 107:18 | 134:25 | 276:4 | 136:18 |
| 157:15,18 | 160:19 | 161:13 | **softwares** | 140:9 |
| 157:18 | 170:20 | 166:10,10 | 108:5,18 | 147:15 |
| 160:3,4 | 173:16 | 221:22 | 112:24 | 150:12 |
| 161:13,13 | 203:20 | 244:25 | **sold** 128:24 | 151:12 |
| 162:6,13 | 206:2,2 | 267:9 | 135:5 | 157:22 |
| 162:22 | 207:11 | **smaller** | 225:15 | 160:21 |
| 163:3 | 208:15 | 160:11 | 267:14 | 162:20 |
| 169:19 | 215:13,18 | **smart** 35:15 | **solely** 11:15 | 163:9 |
| 170:8 | 218:19,22 | 88:22 | 11:16,20 | 164:17 |
| 171:5 | 219:5 | 203:1 | **solution** | 168:13 |
| 172:14 | 221:11 | 229:16 | 70:15 | 174:14 |
| 173:12,19 | 222:6 | **Smith** 193:1 | 81:24 91:6 | 175:12 |
| 174:15 | 224:5 | **sneaky** 35:23 | **solutions** | 177:6 |
| 176:11,12 | 230:2 | 196:10,10 | 108:18 | 187:22 |
| 176:16,17 | 274:12,12 | **social** 16:20 | **somebody** | 188:9 |
| 198:23 | 274:18 | 51:24 | 14:18 74:8 | 189:7 |
| 199:17 | 278:22 | 255:23 | 158:24 | 206:14,19 |
| 208:9 | **size** 221:2 | **software** | 164:2 | 219:14 |
| 211:7 | **skiing** 79:19 | 29:10 44:8 | **someone's** | 230:11,12 |
| 258:6,23 | 79:20 | 57:4 61:1 | 69:10 | 232:10 |
| 259:17 | **Skype** 99:23 | 64:9 70:21 | 76:18 | 233:1 |
| 291:11 | 100:9,12 | 70:22 75:3 | **something's** | 248:19 |
| **sites** 34:24 | 110:6 | 76:5,18,20 | 231:14 | 254:1 |
| 35:4 | 113:14 | 76:23 78:3 | **somewhat** | 260:15 |
| 104:23 | **slander** | 80:1,7 | 20:9 78:9 | 263:2,10 |
| 121:5,6 | 250:16,21 | 86:22 | **son** 70:18 | 272:19 |
| 137:4 | **slapped** | 92:18,22 | **soon** 19:24 | 278:9 |
| 153:5 | 284:5 | 94:24 95:5 | 265:11 | **sort** 22:6 |
| 161:7 | **sleeker** | 97:10 | 288:1 | 49:25 |
| 163:23 | 129:24 | 98:10 | 292:23 | 238:20 |
| 164:3 | **sleep** 61:10 | 99:19 | **sorry** 7:7,21 | **sorted** 11:21 |
| 168:8 | 276:17 | 100:7 | 8:21 27:7 | 261:9 |
| 170:9 | **slight** 21:10 | 102:22 | 28:7 31:22 | **sound** 92:8 |
| 176:2,17 | **slightly** | 104:9,12 | 31:25 | 210:23 |
| 200:6 | 141:16 | 107:14 | 33:25 37:2 | 276:21 |
| 211:15 | **Slippery** | 108:7,8 | 49:15 | **sounded** |
| 222:13 | 163:25 | 118:12 | 50:23 59:3 | 275:6,13 |
| 256:17 | **slow** 19:14 | 120:23 | 61:6,7,10 | **sounds** 8:4 |
| 259:22 | 19:20 | 122:23 | 61:14 | 274:21 |
| 261:19 | **slowed** 21:17 | 128:19,20 | 86:25 | **source** 111:9 |

Page 343

| | | | | |
|---|---|---|---|---|
| 131:17 | **speed** 291:6 | 222:8 | 175:17,21 | 207:15 |
| 238:13,24 | **spend** 20:10 | 262:7 | **steady** | 250:24 |
| **south** 272:6 | 178:13,14 | 272:6 | 175:17,21 | 258:20 |
| **space** 22:10 | 193:23 | 274:14 | 176:3 | 266:15 |
| 270:18 | **spent** 29:10 | 288:7 | **steal** 13:3 | **stolen** 39:11 |
| **span** 168:3,6 | **split** 266:22 | **started** | 32:7 39:15 | 39:14 |
| **speak** 17:5 | **spoke** 28:11 | 14:13 | 69:23 | 43:18,20 |
| 58:17,19 | 196:21 | 61:24 | 76:18 | 76:22,23 |
| 109:3 | 225:19 | 77:15 | 80:16 | 76:23 |
| 110:3 | 243:7 | 90:16 | 115:12 | 100:4 |
| 177:4 | **spoken** 103:7 | 100:2 | 177:11 | 104:6,15 |
| **speaking** | 276:5 | 120:23 | 193:10 | 109:23 |
| 28:13 | **spreading** | 129:18 | 197:5,6 | 117:4 |
| 66:21,23 | 209:22 | 135:4,5,8 | 258:15 | 122:1 |
| 84:14,15 | **spreadsheet** | 135:11 | **stealing** | 137:13 |
| **special** 24:8 | 85:16,19 | 141:20,24 | 20:11,14 | 154:10 |
| 154:13 | 85:22,24 | 141:25 | 34:13 | 177:10 |
| **specific** | 86:2,6,11 | 179:17 | 39:23 46:6 | 184:19 |
| 15:14 | 86:16 | 184:25 | 46:7 104:8 | 192:13 |
| 23:20 | 152:6,10 | 204:4,13 | 104:13,20 | 203:15 |
| 36:23 37:7 | 152:14 | 261:1 | 104:21,21 | 238:9 |
| 37:8 62:16 | **spreadsh...** | 263:13 | 111:10 | 247:11 |
| 62:18,22 | 244:13 | 272:12,13 | 115:11 | 258:11,21 |
| 67:19,24 | **square** 90:4 | 274:13 | 122:4 | 259:9,14 |
| 85:14,18 | **SS** 294:3 | 275:4 | 126:3,13 | 260:4,6 |
| 106:24 | **stake** 12:16 | **starting** | 164:6 | 261:18 |
| 111:13 | 12:22,25 | 141:2 | 177:14,18 | **stop** 20:13 |
| 124:22 | 13:20 | 276:3 | 252:7 | 38:25 52:8 |
| 125:9 | 183:1 | 279:22 | 258:6 | 59:23 90:7 |
| 130:22 | **stakes** 11:18 | **starts** | 259:1,3 | 90:9,23 |
| 159:13 | **stalled** | 197:22 | 261:13 | 95:3,15,23 |
| 162:1 | 63:13 | **state** 182:7 | 263:24 | 98:16 |
| 190:10 | **stand** 12:1 | 294:2,21 | **step** 156:17 | 106:17,22 |
| 261:21 | 182:9 | **stated** 77:12 | **stepped** 81:2 | 108:2 |
| **specific...** | 201:9 | 77:25 78:1 | 81:5 215:9 | 109:24 |
| 9:25 24:13 | **standard** | 233:19 | 215:10,11 | 125:20 |
| 38:4 39:3 | 292:18 | 257:18 | **steps** 269:17 | 126:9,20 |
| 39:4 45:20 | **Stani** 110:3 | 277:9 | **sticking** | 127:3,13 |
| 45:22 | **Stanislav** | **states** 1:1 | 289:5 | 128:1 |
| 79:18 | 109:8,12 | 16:12,14 | **stiffed** | 185:13 |
| 86:23 87:7 | 120:5 | 16:15 | 266:3 | 190:19 |
| 87:17 | **start** 34:20 | 17:20 | **stipulate** | 205:23 |
| 163:6 | 34:22 | 19:16 | 4:14 | 209:19 |
| 164:20 | 63:19 | 81:15 88:7 | **stipulated** | 231:22 |
| 181:17 | 95:17 96:9 | 132:1,6 | 54:19 | 258:10,10 |
| 190:24 | 153:8 | 226:17 | **stole** 46:8 | 270:10,16 |
| **specifies** | 158:1 | **stay** 80:18 | 69:24 99:2 | **stopped** |
| 140:6 | 194:23 | 130:5 | 123:18 | 35:19 90:9 |
| **speculate** | 198:5 | 260:2 | 146:8,17 | 98:17 |
| 9:24 267:3 | 213:20 | **stayed** | 203:22 | 270:11 |

**stopping**
164:9
**story** 102:23
173:9
**straight**
73:10
157:19
**straight...**
79:10
254:15
**strange**
68:17
91:22
197:3
229:19
**stranger**
48:5
**Street** 2:11
**stress** 196:9
**stressful**
229:15
**strike** 53:9
60:4 70:9
70:9 96:18
113:11
169:2,23
179:1
187:21
207:21,22
220:19,19
**Strip** 154:23
**stuck** 30:21
213:11
**student**
32:10
**studied**
128:17
**stuff** 60:24
93:11
138:10
141:20
146:7
161:9
204:22
209:25
215:13
228:17
283:20
**stunt** 229:6
**stupid** 202:3

**style** 141:17
141:20
172:16
200:2,2
**subpoena**
38:22
**subscrip...**
117:12
158:8
174:10
**subscrip...**
173:1,3
175:4,10
175:14,20
176:1
**subsequent**
92:10
**substance**
189:14,15
**substances**
61:19
174:2,7
**successful**
115:8
117:15
200:7
**sudden** 199:8
**sue** 34:25
193:11
205:22
256:21
257:2
**sued** 169:25
193:1
221:17
226:24
229:8
258:4
**sufficient**
224:6,15
225:3
**suggest**
44:23 88:1
158:9,13
**suggests**
80:22
**suing** 183:20
193:14
205:19
256:22

257:22
260:1
272:10
**suit** 7:19,24
32:3,5
72:7,12,17
72:24 99:4
214:16
284:16
**Suite** 2:4,11
**suited**
184:23
**suits** 7:16
180:15
194:23
213:6,7,12
214:15
218:11,12
218:17
253:18
**Super** 14:14
**superior**
94:24
**Supermodel**
134:8
154:24
**Supermodels**
144:7
**supervise**
112:22
**supplement**
26:14
**supplied**
38:23 86:9
**supporting**
79:12,15
**supports**
79:5 83:13
84:6
**supposed**
80:20 93:7
101:4,8,20
110:11
241:12,13
244:15
**sure** 9:24
17:4 22:18
26:5 28:20
29:3 30:14
31:22

44:17,21
45:19 52:2
57:23
64:16 66:2
83:10 84:1
85:25
94:22
105:11
106:7
110:23
112:11
115:5
116:1
118:1,1
119:8
121:9
134:16
138:15,22
138:22,23
140:17,23
141:5
142:2
147:6
151:11
164:10
168:7,25
180:20,20
202:13
216:2
223:12,18
231:23
236:15
237:13
238:21
246:12
248:25
249:1
250:7
251:24
254:13,24
256:6
271:19
283:1
287:21,24
289:21
**surprised**
200:8
**suspect**
248:15
249:12,15

249:22
250:10,14
**suspected**
250:24
**swearing**
4:14
**switch**
111:17
**switched**
286:23
**sworn** 5:4
290:1
294:10
**system** 71:8
99:19
118:17
129:24
216:2
237:17,20
237:21,25
237:25
276:4
282:2
**systems** 43:8
107:15

**T**

**T** 3:8
**T-O-R** 35:25
**tail** 36:2
**tails** 35:25
**take** 8:14,18
19:16 26:3
31:20
39:11,13
39:15,16
43:17,19
56:7 62:13
64:22 67:1
72:5 84:23
95:16
104:3,16
104:17,18
105:9
107:13
113:4
116:15,16
116:17
117:18
119:7

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769
P-Resp_Renew_MSJ223

New Jersey
732-906-2078

121:5
124:8
132:7
135:6
136:13
137:3
182:7
195:14
199:22
205:21
210:22,23
215:11
216:24,24
218:3
222:19
225:6,7
228:23
232:4,5
242:14
247:14
254:5,8,10
254:11,23
254:24,25
255:8
270:25
275:22
288:6
289:11
291:9,20
**takedown**
119:2
122:9
**takedowns**
106:2,6
108:20
115:23
116:3
117:21
118:7,19
119:7
120:1,25
**taken** 1:17
69:14 85:2
96:19
105:18
115:24
136:23
137:13
164:15
183:24

195:10
211:2
217:2
230:1,4
232:11
250:4
255:3
269:14
271:5
**takes** 69:15
69:16
89:24
177:22
**talk** 53:18
54:9,19
109:12,15
140:2
230:15,16
230:17
232:6
**talked** 24:17
24:18,20
28:2,3
81:3
124:18
125:21
**talking**
43:12 51:9
60:2 61:13
127:9,9
147:19
214:12,25
224:14
227:4
235:4
248:3
280:6,11
**tandem** 92:19
**tangents**
230:20
231:18
**target**
197:25
**tasks** 107:14
**tax** 154:5,9
179:15
195:15
**taxes** 208:21
213:2,2
224:10

**tea** 174:8
**team** 84:12
84:18
85:15,24
101:24,25
102:5
105:5
109:9,11
119:14,22
119:23,25
120:6
180:2
194:20
198:3
209:13,14
284:8
285:8
**teams** 19:18
109:5,7
119:10
121:25
140:17
**tech** 171:12
**technical**
37:25
79:17
86:21
129:10
130:10
**technically**
15:8,8
35:24
124:13,19
**technolo...**
66:12,17
**technology**
28:17
68:22
122:19,24
271:17
**telephone**
103:3
**tell** 17:12
38:25
56:23,25
57:1 62:10
62:14 67:3
74:21 75:1
78:12,12
78:14,22

113:9
137:6,6
166:24
201:2
217:21
222:20,24
226:16
228:3
239:13
248:25
258:8
271:23
279:16
289:20
**telling**
47:22 61:1
90:7 97:19
143:25
146:12
247:24
272:5
286:23
**tells** 52:9
78:24 79:3
**ten** 7:13,14
24:12 25:5
25:10
120:7
173:13,14
173:15
180:18
255:23
278:21,21
278:21
**term** 55:24
167:12
226:11
**terms** 31:15
31:15 38:4
86:16 92:5
139:13
152:1
220:21
240:17,19
240:22,23
241:2,5,10
241:11
271:14
280:15
**terrorizing**

178:4,7
**teslas**
128:25
**tested** 20:1
**testified**
5:4 6:24
7:18
235:13
250:23
288:19
291:12
**testify**
30:10 31:7
78:4
246:20
247:22
294:10
**testimony**
10:15 31:3
61:20
66:15 71:2
73:6
170:25
187:21
215:17
251:3,4
277:8
281:22
282:20
287:11
289:5,6,9
290:2,8
294:13
**tests** 21:12
282:5
**Texas** 1:2
23:23
188:24
194:21
286:10
**text** 103:4,6
239:9,10
**texting** 9:7
**thank** 37:10
219:15
271:3
273:18
292:3
**Thanks**
105:22

| | | | | |
|---|---|---|---|---|
| **theme** 135:1 | 69:24 | 21:2 22:15 | 154:24 | 248:23 |
| 173:9 | 79:14,22 | 22:15,16 | 155:8 | 249:4 |
| **theory** 89:16 | 83:6 85:12 | 27:14,16 | 156:19,20 | 254:12,20 |
| **Thereupon--** | 86:22 87:9 | 30:2 31:4 | 158:17,18 | 258:4,5 |
| 5:1 | 91:5 95:9 | 34:23,25 | 160:16,18 | 259:7 |
| **they'd** 19:5 | 98:12 | 35:20 38:6 | 160:19,20 | 262:19 |
| 68:12 | 108:10,12 | 42:25 | 161:6 | 263:5,14 |
| 229:17 | 108:14 | 45:21 47:6 | 169:9,11 | 263:23 |
| 242:3 | 117:5 | 53:18 | 169:14 | 266:18,19 |
| 270:16 | 119:20 | 54:12,17 | 171:13 | 267:12,20 |
| **thing** 14:8 | 122:25 | 56:10 57:1 | 172:6 | 268:18 |
| 24:5 36:12 | 123:7 | 57:18,18 | 173:2 | 271:15 |
| 37:3 44:9 | 124:15 | 57:18,19 | 174:13 | 272:7,12 |
| 44:11 | 125:4 | 63:16,23 | 177:1 | 274:10,22 |
| 49:25 50:5 | 129:6,20 | 68:15 71:8 | 179:6 | 278:22 |
| 66:3 77:2 | 131:18 | 72:23 | 181:9,10 | 282:16,22 |
| 79:16 | 140:19,25 | 74:24,25 | 181:10,10 | 284:4 |
| 80:17 | 146:3 | 83:5,17 | 181:11,18 | 285:6,22 |
| 82:23 | 152:7 | 85:11 | 182:10 | 286:6 |
| 96:11 | 159:3 | 86:13,14 | 184:5 | 287:17 |
| 100:3 | 167:1 | 86:18,21 | 185:21 | 288:22 |
| 129:17 | 171:4 | 89:10,11 | 187:11,21 | 290:24 |
| 141:3 | 176:21 | 93:18 | 189:15 | 291:2 |
| 143:16 | 177:20,22 | 99:10 | 190:1 | 292:19 |
| 155:5,13 | 178:18,20 | 100:16,16 | 197:4,17 | **thinking** |
| 166:21 | 181:15,16 | 102:19 | 200:5,12 | 18:4 117:7 |
| 167:6 | 193:7 | 103:11 | 200:13 | 209:19 |
| 172:10 | 199:4,14 | 104:11 | 206:16 | 271:23 |
| 199:24 | 212:14,17 | 105:6 | 207:17,23 | **thinks** 33:5 |
| 201:1,16 | 231:4 | 106:15 | 208:23 | 90:1 |
| 209:14 | 235:15 | 108:13 | 210:8,12 | 171:12 |
| 226:21 | 237:14 | 109:22 | 210:13 | **third** 39:1 |
| 231:5 | 238:8 | 116:23 | 213:1,5 | 286:11 |
| 237:4 | 241:14,15 | 120:7 | 214:5 | **thought** 14:7 |
| 248:14 | 244:21 | 123:15 | 215:9,22 | 77:15 |
| 263:1 | 251:5 | 127:18 | 218:1 | 88:19 |
| 267:15 | 263:19,20 | 128:14 | 219:11 | 150:15 |
| 269:7 | 266:6 | 132:9 | 221:20 | 154:19 |
| 285:22 | 268:18 | 133:20 | 223:10 | 189:11 |
| 287:24 | 272:6 | 134:8 | 225:7 | 198:11,12 |
| 289:2 | 281:20 | 136:16,18 | 226:25 | 198:14 |
| 292:22 | 283:18 | 142:19,21 | 227:25 | 203:24 |
| **things** 11:22 | 284:9 | 143:8 | 229:17 | 204:9 |
| 16:21 19:7 | **think** 6:14 | 144:6,16 | 230:22 | 211:14,25 |
| 20:22 22:6 | 6:23 12:21 | 148:16 | 233:23 | 212:1,5,15 |
| 22:7 32:23 | 12:24 13:4 | 149:3 | 235:8,23 | 263:17 |
| 33:5 34:12 | 15:22 | 152:13 | 239:9 | 271:10 |
| 47:18 48:6 | 17:25 18:4 | 153:14,24 | 242:12 | 272:3 |
| 61:14 | 18:20,23 | 153:24 | 245:2,2 | 273:11 |
| 66:11 | 20:8,23 | 154:19,23 | 247:6 | 282:16 |

```
286:2              244:10          69:14 82:3      284:2,13       137:10
thousand           249:25          85:18 87:1      292:5          164:25
 34:18             255:20          94:17           294:13         165:14
 176:16            270:8,19        95:18           time-con...    166:15
 195:8             278:23,23       99:17,24        237:23         194:7
 215:9             286:6,16        100:11          286:1          196:8
 269:13            three-year      102:16          timeframe      222:1
thousands          280:6           103:22          280:5          226:20
 75:2              threesome       105:10,20       timely 293:5   242:20
 107:11,12          155:2,3,3      106:24          times 6:4,5    269:19
 112:19             158:7          107:12           6:8,8,10      278:10,13
 113:2,10           160:25         108:6            6:19,20,23    278:18
 117:1,3,9          162:7          110:5            7:2,12,13     titled 25:19
 117:10             166:5,13       116:16           7:18 20:25    26:15,15
 128:11             167:7,14       117:17           30:3 33:3     titles 58:2
 161:23             167:22         118:4            39:1 46:7     81:20 87:4
 178:4,4            168:4,7        119:24           46:8,9        87:6 137:8
threatened          169:17         120:3            57:6 66:2     158:17
 125:2,3            170:4,7,15     125:5            66:8 68:17     165:12
threatening         279:4          127:11           73:14         211:8
 224:17            threesomes      131:3            75:24         213:9
 225:5,5,6          154:17         135:3,12         81:21,22      220:18,21
 225:12             155:5          139:17           93:6 94:8     221:3,16
threats             162:6,7        141:11,24        107:4,6,7     221:19,23
 125:16             166:4,6,9      143:19           107:8,9,11    221:24,25
three 12:19         166:14,17      146:22           113:3         279:9
 30:2 32:8          166:21,22      149:10           114:18        today 10:4
 39:1 90:12         166:25         157:10,13        116:7          10:10,22
 91:1 96:18         167:17         164:14,17        127:20         15:22 18:1
 112:8,18           168:5,8,9      168:3,6,14       137:12         18:22 57:1
 113:6              168:12         169:9            145:11         61:9,20
 116:4,24           169:15,22      177:8            149:20         105:25
 116:25             170:24         188:10           170:19         111:25
 118:7,9,13         173:10         198:15           193:1         127:19
 118:23            throw 111:11    200:8            217:2         165:24
 119:1              115:10         204:8,14         221:25        174:2
 120:21,21          125:3          216:21          224:20        177:22
 121:10,12          260:12         217:16          244:10        254:3,8
 123:1,7           tidbit 149:4    231:24          249:25        274:23
 128:25            tigers 198:7    234:17          253:9         Today's 4:1
 132:17,18         time 4:2,3      235:21          257:18        told 111:16
 168:5              6:13,14        236:24          tiniest        149:1
 169:23             10:19 12:7     239:1,7          148:12        175:24
 170:19             13:7 20:22     242:9,11        tired 23:22     195:16
 173:21             23:6 27:12     248:1            61:22          215:4
 175:9,18           27:13 33:2     254:5            275:21        227:5
 175:21,24          39:1 43:23     262:22          tireder        241:3
 207:21,22          52:6 59:9      265:4            276:17        263:17
 221:11             59:18          270:17          title 11:7     273:2,11
 225:9              62:14 67:2     281:17           132:13        273:23,24
```

**top** 91:21
144:7
282:3
**topics** 27:9
27:19 28:1
28:4,9
30:11,13
31:15
**torrent**
32:25
33:10 39:9
39:18 40:1
40:2 43:14
49:4,6
54:4 157:6
157:25
158:2
159:1
163:23
164:3
169:19
170:9
172:3,4
222:13
260:4
277:19,23
288:12,17
**torrents**
34:13
35:22 39:7
39:8 40:15
43:1 48:23
104:6
109:25
114:15
115:12
153:16
157:5
158:19
159:2,6,10
159:14
172:19,21
172:25
176:19
179:19,21
208:7
213:11
214:19
256:24
258:3,18

259:16,20
260:9,11
260:15
261:12,14
**total** 87:20
168:17
**touch** 205:7
**touched**
28:21
144:9
**tough** 192:21
**track** 104:7
104:12
152:22
170:9
257:15
**tracked**
55:10
**tracker**
104:7,9
170:8
242:15
**tracking**
170:10
**trademarks**
22:4 242:1
263:14
**traffic**
151:21
160:2,3
214:17,18
256:25
271:24
**trained**
286:16,17
**transact...**
117:20
175:15
**transcribed**
8:7 294:11
**transcript**
292:9,25
293:4
294:12,19
295:17
**transcripts**
293:4
**transfer**
229:9

**transferred**
262:17
265:6
**transfer...**
262:10,12
262:14
**translate**
285:23
**travel** 282:7
**traveling**
73:17
99:25
178:19
**trial** 6:24
7:4,18
53:16
55:21 72:6
80:7
125:15
140:20
281:17
**trials** 7:5
**trick** 114:18
**tried** 99:12
117:21
122:16
123:3
128:5
152:3,6
181:1
184:22
191:22,23
192:20
195:6
196:1,18
196:18
201:2
229:9
236:1,4
269:14
276:21
287:5
**tries** 162:18
**trip** 138:23
**trips** 138:17
**TRO** 80:3
**trolls**
258:13
**trouble** 49:5
142:22

258:15
291:6
**true** 40:6
50:14
51:11
165:6
176:23
177:6
186:19
268:19
277:16
287:19
288:21
294:12
**Truninski**
18:17
**trust** 140:22
243:16
**trusted**
194:17
**trustee**
195:24
**truth** 87:7
134:8
143:24
144:21
154:25
185:25
205:8
217:2
221:7,10
221:13
270:24
294:10,10
294:10
**truthful**
10:23
204:20
251:8
**truthfully**
18:9 62:9
62:12
105:25
**try** 7:9 17:9
66:22
69:23
137:8
183:18
191:20
195:5

200:15
212:15
231:3
232:5
269:18,19
**trying** 6:23
13:3,5
17:11,12
18:23 37:2
47:24,25
56:13 58:6
63:17
64:16
101:10
121:9
128:4,12
131:11
142:25
143:8
150:6,12
150:14
174:5
185:25
186:19
192:10
193:13
195:9,18
200:11
204:19,19
215:11
217:8,21
226:15
228:19,22
229:20,21
229:22
238:6
246:13,16
267:2,4
275:8,9
281:13,15
**tube** 158:21
256:17
**tubes** 115:13
122:5
153:16
176:20
177:14
214:19
260:9,11
260:13,19

261:12,13
**Tuesday** 1:20
294:8
**turn** 7:7  9:6
37:2 82:9
98:23
133:12
156:22
158:2
204:3
224:22
228:17
234:5
**turned** 98:18
129:7
204:2
264:8
270:19
**turns** 33:23
**Tweets** 3:24
**twelve** 7:13
7:14
**twice** 170:18
170:19
258:5
**Twitter**
255:14,15
255:17,18
255:19,21
255:25
258:13
**two** 5:15
30:14 32:8
33:3 34:24
35:10 36:6
97:3
100:13
103:8
109:5
119:10
120:3
122:22
127:24,25
128:3
155:7,14
155:15,15
155:17
176:17
204:6
210:14,14

213:12
214:2
215:8
221:11
226:2,21
237:1
247:25
256:24
258:25
260:7,9
269:11
283:9
286:5
**two-minute**
231:18
**TX** 2:5,12
**type** 132:9
166:6,13
**typed** 167:13
**types** 86:16
120:22
**typewriting**
294:12
**typewritten**
294:12
**typical** 23:1
23:2,2,9
23:12
208:17,25
**typically**
23:7
**typing**
167:22

___

**U**

**U.S** 18:23
132:8,10
132:16
207:16
226:19
**UDOP** 259:18
**uh-huh** 25:21
133:11
134:10
155:21
175:13
**Ukraine**
17:14
109:5,9
**ultimately**

13:11
164:4
**un-filed**
3:25
268:14,16
**unclear** 16:6
**uncollec...**
207:18
244:3
**underscore**
165:11
269:2
**understand**
8:9,11,20
9:15,16,19
10:17 27:2
27:5,7
41:7,15
42:25 46:4
47:24,25
49:10 50:1
59:11
61:15 64:2
66:20,25
73:9,25
74:14 76:1
78:7 89:1
89:4,11
116:23
121:9
129:14
146:10
154:11
160:22,25
174:5
177:24
182:3
191:23
197:3
203:8
205:12
219:2
226:15
228:15,23
229:19
230:6
232:15,17
267:2
270:7
271:16

285:4
**understa...**
41:17
60:11
73:10
89:19
116:5
129:19
130:8
228:25
231:17
280:14,14
**understands**
67:5
219:11
**unfortun...**
128:4
211:12
**uninstall**
287:14,16
**unique**
155:19
**United** 1:1
16:12,13
16:14
19:15
132:1,6
226:17
**unquote**
266:24
**unrelated**
186:7
**unstable**
63:11,15
**updated**
28:17
**updating**
208:9
**upgrades**
130:6
**upload**
245:15
**uploading**
158:1,3
257:16
**upset** 272:8
272:15
274:13
**upstream**
160:1

**upwards** 96:6
**uscopyri...**
223:22
226:20,22
**use** 5:21
23:9,10,12
23:20 24:8
33:9,9
35:6,24
43:9 44:7
44:20 49:8
50:8 55:24
74:2 80:6
88:22
93:17
104:21,22
106:11,13
106:21
108:18
112:2
113:11,20
119:19
121:22,24
121:24
122:2
130:12
131:15
132:1,5,12
132:12,15
136:9,12
136:22
138:5,14
148:10
151:14
172:20
225:24
238:6
259:3
**user** 38:10
51:23
149:14
150:9
151:6
153:3
156:16,18
156:22
238:8
**users** 148:3
148:4
149:5,11

149:12,14
149:15,17
149:17,18
150:10,10
150:16,16
150:17,17
150:19,22
151:3,15
151:15,16
151:18,19
151:21
152:1,13
152:15,16
152:23
153:11,22
154:1
156:10,13
159:13
179:3
289:13
**uses** 73:3
74:1
222:13
**usually** 23:4
24:9 32:25
33:8,12,13
33:15,16
34:6 36:5
44:4 59:23
88:3
113:15
115:20
137:12
155:14
156:21
158:23
165:11
171:10
205:9
270:10,12
285:23
**utilize**
123:3

― V ―
**value** 161:18
162:2
163:7,12
172:7,11
**vanilla**

166:11
199:18,21
211:7,10
**Vanity** 192:5
**varies**
112:15
**vary** 92:12
**verified**
91:22
250:5
**verify**
122:11,12
**verifying**
122:12
**versus** 16:2
32:9 75:21
108:18
**vet** 102:22
**vetted**
102:24
**victim**
267:21
**victims**
267:17,21
**video** 1:25
22:6 132:2
132:4,5,10
132:17
141:25
142:3,3
149:21
211:18
242:19
**Videocon...**
1:13 2:6
2:14,17
**Videogra...**
2:15 4:1
4:12 26:9
26:11
54:20,22
85:1,3
105:14,17
105:19
164:13,16
174:22,24
210:25
211:3
217:3
232:9,12

255:1,4
271:4,6
291:25
292:6
**videos** 19:23
95:12
117:10
122:1
132:20,22
149:22
154:8
155:19
156:5,9,11
198:21
199:3,6
212:14
230:7
256:17
**VIDEOTAPED**
1:13
**view** 163:7
**viewed**
162:21
163:3
**viewing**
64:11
**views** 148:4
149:25
150:3
**villa** 145:14
**violating**
123:13
**violence**
198:14
199:2
211:20
**Virginia**
216:19
221:7
**visit** 150:17
158:25
**visited**
149:9
**Vogue** 117:5
**voiceover**
237:4
**volume** 93:22
116:23
**volunteered**
181:25

**voracity**
186:20
**VPN** 36:5,7
238:5,7
**VPNs** 172:20
**vs** 1:7

― W ―
**W-2** 11:11
15:24
16:11
**W-2s** 17:2,4
**wait** 37:7
76:21 82:2
90:11,17
**waited** 90:15
**waiting** 9:3
19:22
192:3
245:8
280:21
**waived** 182:6
293:1
**walks** 75:23
**want** 8:14,14
15:16 18:8
23:20 29:4
40:8 43:18
43:19 49:7
49:25
53:21 54:9
56:25
57:23 64:3
73:9 78:11
78:12 95:8
97:12,13
98:2
105:14
109:1
110:24
114:5,11
114:16,17
114:20,23
116:8
130:2
131:10
136:25
137:1
139:16,18
139:23,23

140:23
142:22
153:19
157:2,4,18
157:19,24
158:1
161:8
165:9
171:9,9,15
173:7
177:2,3,4
182:7
184:12
191:20,20
192:23
193:3,4,5
193:8,11
194:4,8
196:1
200:13
207:8
208:8,11
209:20,23
216:3
217:17
220:2
226:10
227:7
230:16
231:23,23
237:24
247:14,22
248:3
254:18
258:9
261:11
267:3,18
269:8
277:8
291:13
292:22
**wanted** 47:8
57:1 88:22
93:12
125:13
140:24
158:20
176:10
184:24
191:20

199:17
201:5,23
201:25,25
202:1,2,21
204:2
217:7
235:5
236:7
244:4
264:7
271:17,19
274:15
282:25
285:7
286:25
**wants** 35:5,6
39:10,13
39:15
56:22
65:17
158:4
247:10
**Warmblood**
183:13,15
188:1
190:24
191:10,12
233:9,11
233:12,16
239:4
240:6
253:19
266:11,21
**warning**
256:14,16
256:19
**Washington**
2:4
**wasn't** 21:19
38:9 40:6
70:16,18
71:8 75:21
82:2,4
83:14 84:8
100:3
110:11
113:18
125:6
182:1
184:23

214:8
235:18
251:4,7
269:11
273:5,10
282:24
**waste** 231:24
**watch** 35:5
149:22
157:4,24
193:9
197:2
209:20,21
209:23,24
212:11
260:3
**watched**
166:24
**watching** 9:1
170:7
211:15,24
212:4,13
**way** 11:21
24:4 32:12
32:17
34:14 35:4
35:22
38:17
44:25 52:5
52:10,10
52:17
56:11
90:14 94:3
94:3 103:3
106:16
111:9
118:6
119:19
121:20
122:11,15
122:16
151:20
153:2
156:15,15
176:21
177:19
179:13,17
192:11
193:24
211:16

223:17,17
238:17
241:19
245:20,25
252:6
254:3
275:15
277:18
282:21
287:6
289:17,21
290:25
292:14
**ways** 44:20
44:25 66:3
148:9
**we'll** 58:21
115:14,14
137:2
202:16
**we're** 15:4
19:23
22:12 24:8
27:1 33:25
34:19,20
34:22
38:23
40:22,24
49:9 51:13
53:16
57:10
66:14,22
73:15
77:14
80:14,14
82:22,24
92:15,18
92:21,21
95:17,24
97:9 98:9
98:10
100:6
101:13
111:6
112:5
115:13
116:23
119:19
122:3,14
122:17

123:21
126:4
129:25
130:20
134:16
137:2
139:19
159:16
161:11,12
172:21
173:4
176:17
177:3,21
177:22
178:19,23
180:1
183:19,20
187:6
193:7,14
194:10,24
195:23
200:5
204:14,23
205:6,10
205:10
208:7
209:10,16
210:20,25
213:18,19
213:23,24
213:25
214:4
220:2
222:8
224:14
225:11
226:21
229:6,10
231:5,21
233:2
238:23
246:5,17
248:2
252:3,3
253:7
267:5
**we've** 34:19
34:21
54:18
55:10

56:18
65:19 66:8
70:14
71:18 72:6
78:24 81:3
88:7 92:16
92:17
93:18
94:23
101:10,15
107:9
108:5,9,9
108:23
110:21
118:9,11
123:2
124:18
125:21
126:14
133:1
139:6
152:3,6
153:14
181:1
191:11
204:7
214:23
230:1
245:5,6,8
248:4
257:15
259:11
267:20,21
**weather**
21:14
**web** 113:14
116:6
238:25
**web-based**
238:17
**website** 3:16
68:19
129:7
135:8
147:16
148:3,7,10
163:8,13
163:15
225:17,17
226:20

245:16
264:2
**websites**
14:13,15
14:19
104:18,19
104:19
204:8
259:19
262:18,18
262:19,20
**week** 98:7
205:3
**weekend**
61:23
189:10
192:19
**weeks** 97:14
103:8
286:6,14
286:16
**weird** 193:17
269:1,6
**welcome**
26:14
54:25
105:22
108:16
**went** 13:3
49:3 81:19
102:23
124:9
128:17
142:19
158:18
179:8,11
192:7,8
200:25
204:1
207:9
212:22
218:7
224:19
229:12
263:25
266:4
283:2
**weren't**
21:22
101:19

148:12
172:19
176:9
184:21
190:20
191:25
197:4
209:3,3
222:4
226:6
229:11
235:16
240:23
251:6
268:10
271:21,25
280:21
281:2,2
283:14
285:24
**Western** 1:2
188:24
**Wet** 163:25
**WhatsApp**
99:22
100:9,12
100:21
113:14
235:14,25
236:2,14
237:5
**when's** 95:18
**WHEREOF**
294:20
**whichever**
123:3
**widely**
109:23
**wife** 155:1
**wifi** 68:12
69:3,6,7,9
69:19,25
70:4 74:2
74:19
75:20
76:19
81:13,19
88:13,20
89:25 90:2
90:3,5

289:3,4
**willing**
236:8
**windfall**
192:11
196:4
267:4
**wire** 195:24
**wish** 143:14
174:4
201:22
**withheld**
261:24
**withholding**
80:12
**witness** 3:1
4:15,18,20
5:3,19
18:3 24:21
25:25 27:8
28:5 30:11
30:18,20
31:22
36:16,18
40:8,13
41:7,19
44:17
45:12,16
46:19 47:3
48:5,13,22
50:5 53:21
57:23 58:5
58:25 59:3
61:4,6
62:4 63:25
65:12 70:3
71:6,18
72:20
73:13,22
74:13,24
75:14
76:15 77:7
78:4,7
80:9 82:16
83:17
84:10
89:10,24
91:13
96:16
105:12

111:23
124:11
127:8,10
127:11,16
127:20
133:15,17
144:6,23
164:12
167:5
181:8,14
184:12,16
185:14,19
185:24
186:21
187:13,18
187:23
188:15
189:4,7,24
190:9,15
191:7
200:23
201:2
203:8
210:12
214:7
217:1,7
219:10,14
227:4
229:2,4
230:19,23
231:4,20
232:2,22
233:1,11
233:25
240:19
243:3,13
247:6
248:8,18
249:8,18
250:2,13
251:24
254:20
255:6
262:1
274:25
275:17
276:14
281:13
285:22
291:24

292:3,25
294:8,9,13
294:20
**witnesses**
94:16
**wolves** 198:8
**woman** 211:18
**women** 198:14
199:1,2
211:21
212:13
**wondering**
208:12
261:19
266:18
**woodwork**
200:10
**word** 167:13
205:11
209:22
**words** 47:7
**work** 15:19
19:3 21:7
21:20 29:5
39:4 43:1
43:2,5
44:18,24
57:5 63:22
70:21 79:6
80:23,23
97:15,16
98:19
102:11
103:14
120:4
122:10
123:4
124:2
125:11
126:3
129:24
139:22,25
140:3,6,8
140:10
142:14,16
143:23
144:2,14
145:15,17
152:4,5
155:25

160:6,11
181:14
192:13
197:19
201:16
204:6
207:22
226:23
227:6,9
237:11
251:12
252:8
255:20
264:25
275:24
282:8
287:17
290:25
**worked** 7:11
19:4 20:25
61:22
102:18
123:23
124:4,23
125:11,19
126:9,20
127:2,12
127:21,25
128:18,19
128:23,24
129:2,3
135:23
137:17,24
138:7
142:9,10
142:15
144:13
**working**
20:22 21:1
21:23
61:11
94:23,25
95:1 96:18
97:10
98:14,16
101:13
120:9,17
122:24
123:9,21
124:20

126:6,11
126:14
128:14
129:18
132:24
133:1
179:16,18
189:9
192:22
204:15
205:6
206:17
208:8,19
215:5
246:5,14
251:6
264:17,22
264:23
**works** 18:18
18:18,24
19:2,2
35:13
37:11 42:3
45:18 46:4
47:21,22
55:9 64:10
64:18 65:1
65:8 66:16
70:22
74:20 76:5
76:11
78:17,19
81:9 83:14
84:7 85:8
86:1,16
87:20 89:7
89:22
99:19,19
114:6
117:4
129:20,23
160:8
164:2
225:25
246:1,4,7
246:10
264:19,19
277:19
**world** 17:16
17:21

22:25
94:17
199:5
267:7
286:11
288:23
**worry** 145:20
**worse** 204:10
282:25
**worth** 173:11
193:21
285:7
**wouldn't**
10:2,7
14:16,16
15:7 23:13
51:4,5,7,7
51:12
60:24
66:19,20
67:1 90:18
107:2
113:8
142:4
143:22,24
148:24
164:7
171:11
176:8
181:3
192:1
197:15
201:8
210:3
220:1
239:13
247:15
251:19
252:6
258:9
270:18
**Wow** 273:20
**wrap** 291:23
291:25
**wrap-up**
271:1
**write** 66:19
134:22,25
269:2
274:5

285:10
**writers**
134:24
**writing**
119:18
**written**
197:7
**wrong** 15:16
36:11 47:7
66:8 71:10
162:11
241:14
273:10
**wrote** 40:4
191:13,15
193:17
197:14
201:5

**X**

**X** 3:8 145:18
145:18
**XR** 14:21
35:1
114:20
158:3,6
160:15
164:20,23
165:4,11
165:18,20
166:1,6,9
166:12,13
166:24
167:7,13
167:15,17
168:7,9
169:12,15
169:20
170:4
171:2,5
175:3
176:15
178:13,25
179:2
198:11
214:21
255:18,21
255:24,25
258:4
259:15,16

259:21
261:18
263:6,8
266:8
**XR's** 168:1
**XR.com**
155:19
156:11
**XR.org**
259:15

**Y**

**yeah** 6:7
7:25 9:8
9:22 13:17
15:12 16:5
19:7,20
21:4,21
22:2 23:24
23:25,25
25:4,6
26:5 31:22
38:6 41:7
44:17,22
45:23
51:24
57:16,17
57:17 58:5
61:1,4,6,6
61:24
62:11,15
62:25
72:20,22
74:7 75:4
87:22
91:23
93:13
94:12,18
95:12
101:6
102:8
104:8
105:12,16
110:2
125:21
134:7
136:20
137:5,7,12
143:11
144:23

| | | | | |
|---|---|---|---|---|
| 146:8,9 | 276:11,11 | 252:15,18 | 212:11 | **1.5** 150:2 |
| 149:7,13 | 276:19 | 264:16 | 215:13,18 | 151:6 |
| 150:1 | 277:7 | 279:19,19 | 218:20,22 | **1:22** 105:20 |
| 151:16 | 278:2 | 279:25 | 219:5 | **10** 3:24 |
| 153:14 | 282:9 | 285:15,20 | 222:6 | 29:22 |
| 154:22 | 283:12 | **year-to-...** | 224:8 | 207:17 |
| 156:8 | 284:21 | 178:10 | 225:9 | 221:9 |
| 159:11 | 285:1,1 | **years** 6:20 | 230:2,3,8 | 253:21,24 |
| 160:12,18 | 286:10 | 6:22 12:19 | 234:23 | 255:8,10 |
| 161:2 | 287:23 | 12:23 13:1 | 235:7 | 256:1 |
| 166:20 | 292:19 | 13:20 | 259:12 | **10,000** |
| 177:16,20 | **year** 11:20 | 15:20 19:4 | 266:10 | 173:18 |
| 181:14 | 12:9 44:1 | 28:25 32:8 | 268:8 | 221:9 |
| 185:14,14 | 68:18 | 33:4 34:7 | 279:16 | 286:20 |
| 185:19 | 81:22 95:4 | 35:2,11 | **Yep** 134:4 | **10:00** 192:19 |
| 186:18 | 95:16 | 38:9 43:25 | **York** 216:22 | **10:08** 26:12 |
| 196:11 | 99:11,11 | 45:20,21 | **Yorker** 200:9 | **10:45** 54:20 |
| 198:9 | 133:3 | 54:3 55:11 | **young** 286:5 | **10:50** 54:23 |
| 200:23 | 144:17 | 55:12 | **YouTube** | **100** 71:12 |
| 201:2 | 153:12 | 68:16 | 142:4 | **1000** 2:4 |
| 203:18 | 160:20,21 | 75:15,23 | | **1099** 16:2,11 |
| 205:22 | 160:21 | 81:19 88:8 | **Z** | 16:13 19:6 |
| 211:21 | 168:5 | 90:22 | **zero** 42:13 | **1099s** 17:3 |
| 212:8 | 170:15,15 | 92:16 93:1 | 180:12 | **11** 3:25 |
| 213:19 | 170:17 | 93:25 94:6 | **Zo** 12:12,16 | 229:8 |
| 214:7,8 | 171:11,11 | 95:12 99:9 | 13:21 | 268:11,14 |
| 216:13 | 173:15 | 100:2 | 265:15,17 | **11:28** 85:1 |
| 217:1 | 178:14,19 | 108:7 | 265:17 | **11:38** 85:4 |
| 223:2,20 | 178:25 | 112:18 | **zone** 99:24 | **1105** 2:11 |
| 224:18 | 179:2 | 113:6 | **Zoom** 1:13 | **11691** 294:6 |
| 226:3 | 184:2 | 116:4 | 2:6,14,17 | **12** 15:20 |
| 229:2,4 | 192:7 | 118:8,9,13 | 43:9,9 | 19:4 92:16 |
| 235:15 | 193:1 | 118:23 | | 100:2 |
| 238:16 | 194:23 | 119:1 | **0** | 129:3,17 |
| 239:18 | 198:13 | 127:25,25 | **0003** 278:12 | 175:25 |
| 240:13,19 | 204:13 | 129:18 | 278:14 | 221:9 |
| 245:2 | 206:7,11 | 130:6,11 | **08** 262:9 | 226:2 |
| 246:25 | 206:20 | 148:16,22 | | **12-25-2018** |
| 247:22 | 208:14,18 | 164:7 | **1** | 279:23 |
| 252:21 | 208:22 | 168:13 | **1** 3:12 25:18 | **12-30-2018** |
| 254:10 | 210:2,6,8 | 170:5 | 25:22 | 279:23 |
| 260:22 | 210:18,19 | 173:13,14 | 26:15 | **12:04** 105:17 |
| 261:6 | 212:25 | 173:15,17 | 27:10,12 | **122** 149:21 |
| 263:10 | 213:3 | 175:9,18 | 27:13,19 | **122,945,000** |
| 267:1 | 214:3 | 175:21,24 | 30:12 | 149:17 |
| 268:16 | 215:4,20 | 176:3 | 294:14 | **123** 149:5 |
| 269:1,21 | 215:20,21 | 180:19 | **1-1** 278:7 | **123,956,564** |
| 270:8 | 220:16 | 194:13 | **1-800-31...** | 149:15 |
| 271:15 | 239:6,14 | 208:25 | 1:25 | **13** 176:4 |
| 272:23 | 239:17 | 209:2 | **1,965** 155:19 | 208:23,24 |

| | | | | |
|---|---|---|---|---|
| 208:24 | **1900** 221:24 | 262:9 | 219:6 | **3:26** 232:10 |
| 215:9 | 221:25 | 263:13 | 235:9,25 | **3:46** 211:1 |
| **13-year-old** | **1900-plus** | 280:1 | 278:5 | **3:59** 211:4 |
| 211:17 | 163:2 | **2008** 263:14 | 279:8 | **30** 6:9,10 |
| **133** 3:15 | **199** 160:20 | **2011** 106:16 | 280:2,7 | 8:25 34:18 |
| **14** 57:18,20 | 160:21 | **2012** 268:1,6 | **2020** 1:20 | 149:24 |
| 71:7 108:7 | ___ | **2013** 71:7 | 4:2 178:8 | 156:21 |
| 134:7 | **2** | 144:18 | 178:9 | 160:17,18 |
| 176:4 | **2** 1:17 3:14 | 176:6 | 180:12,14 | 193:21 |
| 179:6 | 5:22,23 | 179:6,11 | 181:6 | 198:12 |
| 208:23 | 91:17,20 | 214:9 | 213:5 | 207:16 |
| 215:9 | 91:24 94:9 | **2014** 38:6 | 215:21 | **30(b)(6)** |
| **140** 194:22 | 215:23 | 57:15 | 284:20 | 1:14 3:12 |
| 210:13,15 | 218:1,9 | 86:14 87:5 | 294:8,21 | 25:19 |
| 213:8,12 | 294:19 | 92:8 | **20th** 4:2 | 26:16 31:2 |
| **147** 3:16 | **2,000** 35:1 | **2015** 278:4 | **216** 3:17 | **30(e)** 294:19 |
| **15** 29:22,25 | 176:16 | 279:6,8 | **22** 234:7 | **30,000** 34:10 |
| 57:17 | 260:2 | **2016** 208:16 | **22,000** 67:8 | 34:16 |
| 130:6,11 | 267:10 | 264:15 | **222** 3:19,20 | 35:12 |
| 144:19 | **2.4** 203:20 | **2017** 106:16 | 3:21,23 | 37:11 38:2 |
| 176:4 | 206:1 | 106:17,23 | **240** 173:14 | 85:7,8,10 |
| 191:17 | 207:10 | 106:25,25 | **253** 3:13 | **32,000** 54:4 |
| 221:9 | 208:14 | 108:20 | 93:20,21 | 55:13 |
| 266:10 | 213:13 | 109:17,20 | 221:9 | 69:24 83:3 |
| 267:17 | 215:24 | 110:10,21 | 272:4 | 87:3 |
| 272:4 | **2.5** 269:11 | 122:8 | **25,000** 60:25 | 166:20 |
| **15,000** 93:19 | **2.7** 212:25 | 136:16 | 219:8 | 169:10,11 |
| 94:7 | 213:2,3 | 174:10,11 | **250** 160:20 | 170:22 |
| **150** 94:7 | **2.8** 206:5,19 | 179:23 | **250,000** | 171:20,24 |
| **150,000** | 206:20,23 | 273:23 | 259:3 | 172:8,9,11 |
| 259:2 | 213:13 | 280:7 | **253** 3:24 | 172:12 |
| **16** 57:19 | 220:14 | **2018** 6:15 | **26.5** 268:2 | **35** 221:9 |
| 176:4 | **2:29** 164:17 | 7:23 154:2 | **268** 3:25 | ___ |
| 267:17 | **2:37** 164:13 | 206:23 | **27** 36:1 | **4** |
| **17** 144:19 | **2:49** 164:17 | 209:1 | **275** 3:4 | **4** 3:16 |
| 208:16 | **20** 1:20 | 268:1,6 | **28,000** 173:2 | 147:11,15 |
| 235:8 | 29:22,22 | 274:17,20 | **281** 3:5 | 147:17 |
| 264:15 | 29:25 | **2019** 7:23 | ___ | 173:18 |
| **18** 134:7 | 160:17,18 | 38:6 57:6 | **3** | 174:9,16 |
| 136:16 | 173:13,14 | 57:15 | **3** 3:15 133:4 | **4:26** 232:10 |
| 144:20,20 | 294:8 | 123:24,25 | 133:7,10 | 232:10 |
| 179:23 | **20,000** | 153:22,23 | 147:15 | **4:34** 232:13 |
| 211:24 | 206:16 | 174:11 | 179:16 | **40** 6:8,8,9 |
| 212:11 | **200** 94:8 | 175:8 | 208:20 | 6:10 33:13 |
| 235:8 | 173:16 | 209:1 | 213:1 | 93:21 |
| **180** 94:7 | **200,000** | 213:4,5 | 278:6,7,24 | 156:21 |
| **19** 6:17 | 206:12 | 215:21 | **3,000** 34:24 | 172:13,15 |
| 86:14 87:5 | **2004** 57:6 | 217:18,20 | 172:22 | 200:7 |
| 129:3 | **2007** 108:6 | 217:21,22 | **3:03** 174:22 | 221:12,12 |
| 221:9 | 131:1 | 218:14 | **3:04** 174:25 | **40,000** 205:5 |

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769
P-Resp_Renew_MSJ234

New Jersey
732-906-2078

**400,000**
205:17
246:21
250:24
251:15
266:11
**420,000**
144:17
**44** 157:11,12
157:16
**45** 150:2
**473** 1:24
294:5,23
**4th** 294:21

---

**5**

**5** 3:3,17
94:1
172:14
175:10,22
207:17
216:5,9,9
**5-19-CV-...**
1:7
**5-3-2019**
137:11,11
137:15
**5,000** 173:18
**5:00** 253:25
254:6
**5:02** 255:2
**5:15** 255:5
**5:36** 271:4
**5:43** 271:7
**50** 214:20,20
221:12
269:7
**50,000**
252:23
**50/50** 266:22
**500** 262:20
**51** 193:1
**512) 717-...**
2:12
**55** 233:6
**56** 228:4
232:3

---

**6**

**6** 3:18  221:9

222:15,19
222:20,22
223:14,15
234:5,6
**6:10** 292:7
293:8

---

**7**

**7** 3:20  221:9
222:16
279:6
**7-24-2018**
279:24
**7-26-2017**
279:24,25
**7-29-2018**
279:24
**7-6-2018**
279:24
**7-7-2018**
279:24
**7,000** 291:3
**70** 33:13
157:15
**713) 869-...**
2:5
**731,000**
150:3
**731,180,000**
150:4
**77007** 2:5
**78701** 2:12

---

**8**

**8** 3:21  221:9
222:16
**80** 157:15
**8100** 2:4
**89052** 5:25
**8th** 92:7

---

**9**

**9** 3:22
222:17,20
227:21,24
**9,000** 36:9
66:8  70:25
71:3  73:7
221:9,21
226:24

**9:19** 1:21
4:2  294:8
**9:47** 26:9
**90** 7:20,21
212:3
**900** 207:15
**91** 3:14
**911** 126:2
**99** 160:19

Text
Text
Text

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

MALIBU MEDIA, LLC,

Plaintiff,

vs.

JOHN DOE,

Defendant.

CIVIL ACTION NO.  5-19-CV-00834-DAE

**JURY TRIAL DEMANDED**

## EXPERT REPORT OF GLENN K. BARD

1. My name is Glenn K. Bard.    Currently I serve as the Senior Forensic Examiner for Flashback Data, LLC.    My duties at Flashback Data, LLC include conducting forensic examinations of computers, laptops, servers, mobile devices, flash drives, and other digital storage devices.

2. Flashback Data, LLC is ISO/IEC 17025:2017 compliant accredited by the ANSI Accreditation Board.  To maintain this accreditation, Flashback Data, LLC adheres to standards related to the handling and analysis of digital evidence to include proper chain of custody, acquisition of digital devices, validation of forensic software, internal and external proficiency testing, and peer review of forensic analysis.

3. I earned my Associates Degree from the Community College of Beaver County.

4. Prior to my work at Flashback Data, LLC I was a Pennsylvania State Trooper assigned to the computer crime unit until retiring in 2010. During my career with the Pennsylvania State Police I was also sworn as a US Marshal and FBI agent, tasked with conducting computer and cellular forensics. I am also a Veteran of the US Army, completed a tour in support of Operation Desert Storm, and was a faculty instructor at a college in Pennsylvania from 2003 to 2010.

5. During my tenure as a Pennsylvania State Trooper I was tasked with conducting investigating crimes ranging from child pornography to Criminal Homicide.

6. Some of the cases I have worked on involved the impeachment of the Deputy Prime Minister of Albania, examinations of numerous devices of persons attempting to disrupt the G20 summit in 2009, persons involved in plots to commit terroristic attacks against the United States, and more.

7. I have examined over 15 thousand different types of digital evidence ranging from cellular devices to RAID arrays, servers, gaming systems, NVR / DVR systems and more.

8. One of my functions at the Pennsylvania State Police was conducting online P2P (Peer to Peer) child pornography investigations.

9. I have taken part in over 500 search warrants for a wide range of crimes. Additionally, I have testified as an expert in numerous states and Federal court as well as the US Virgin Islands for crimes involving Criminal Homicide, Child Pornography, Kidnapping, and more.

10. I have volunteered for the National Center for Missing and Exploited Children as a member of Project Alert, and additionally I have instructed members of NCMEC on digital technology.

11. I have taught hundreds of classes to Law Enforcement since 2007. During that time I have taught thousands of investigators.

12. I have developed two forensic certifications obtained by hundreds of members of Law Enforcement in the United States. Additionally, I have been contracted to develop and teach the certifications for the forensic software programs SecureView and Passware.

13. During my career I have attended training from various organizations including the Computer Science and Artificial Intelligence Laboratories (CSAIL) and the Massachusetts

Institute of Technology (MIT), the University of Washington, and I am currently enrolled in a professional education course at Curtin University.

14. My work has often involved the study and evaluation of evidence involving the use of file sharing networks, including BitTorrent. I am experienced with the BitTorrrent network and how it works, if called upon to explain the operation of the BitTorrent network in the context of this case at trial, I expect to do so.

15. I have also obtained numerous certifications during my career to include the CISSP, CFCE, CHFI, A+, Network+, Security+ and more.

16. I have been retained as a technical expert by JT Morris Law, PLLCon behalf of the defendant in this case, who I understand remains anonymous to the public in this litigation and is referred to as "John Doe," to provide my expert opinion regarding Malibu Media's allegations of copyright infringement. I have attached a current copy of my curriculum vitae as Exhibit 1. My employer is being compensated at the rate of $350 per hour for my services related to this report. My compensation does not depend on the outcome of this litigation. I have no personal interest in the outcome of this litigation.

17. In forming the opinions presented in this report, I have reviewed and relied upon, among other things, the following documents:

   a. The Complaint from Malibu Media in this matter, attached as Exhibit 2.

   b. Malibu Media's Motion for Leave to File Third Party Subpoena, attached as Exhibit 3.

   c. Declaration of John Doe, which I understand had been submitted to the Court in this case, attached as Exhibit 4.

   d. The transcript of a Court Hearing involving Malibu Media before Hon.

Steven I. Locke in the United States District Court for the Eastern District of New York, in Case No. CV-15-3504, attached as Exhibit 5.

e. A copy of a Court opinion in which Malibu was involved, *Malibu Media LLC v. Doe*, No. 13 C 6312, 2016 U.S. Dist. LEXIS 14798, at *8 (N.D. Ill. Feb. 8, 2016), attached as Exhibit 6.

18. Upon reviewing Exhibit 3, I focused on the technological aspects of the incidents described in the Motion and its attachments.

19. In reviewing Exhibit 3, I found that the document made statements concerning the IP address identifying a person. To the extent that Malibu Media or its consultant state or imply that identification of an IP address alone can identify a specific person, this statement or implication is false.

20. When an ISP (Internet Service Provider) identifies a person's name in response to legal process supplied, that name is merely the subscriber information for the account, and not necessarily the person conducting activity on the network, or not even necessarily a person at the location.

21. What the IP address truly identifies is that of the gateway of the network to the internet. That gateway acts as the bridge between the internet and the internal network, and that gateway is the single device that is assigned both an external and internal IP address.

22. Behind that gateway can be numerous devices accessed by many people. In some cases, the network can be a small residential system, or it can be a large network such as ones used at hospitals, airports, universities and so on.

23. Assuming, for the moment, that the declarations submitted by Malibu Media are true,

the IP address those declarations claim was captured during this incident was the IP address of the gateway, and not an individual computer system within the network.

24. Anyone within that network would be sharing the same external IP address of the gateway, therefore the identity of the subscriber cannot simply be used as the person responsible for this event.

25. This is highly relevant since more modern routers have capabilities to have both a secured private internal network and an open guest network. This is a very common occurrence seen every day in locations such as restaurants, coffee shops, doctors' offices and so on. There will be one secured private internal network for employees and a second guest network for customers to access.

26. It would not be unlikely, therefore, for the information packets described in the declarations to have come from someone other than John Doe. Given that there are usually several potential users of the gateway IP address, without additional information, it is not unreasonable to assume that John Doe is likely not the user that Malibu Media's consultants say uploaded a piece or pieces of data. In other words, one cannot say with any confidence that John Doe is associated with those information packets. In addition, if John Doe were to have kept any portion of his network open during the relevant times, without password protection, then it is additionally likely that Doe was not the accused user, and, as a matter of logic and in my investigative experience, significantly more likely, particularly given the nature of the materials that Malibu Media has listed and the ready availability of such materials elsewhere.

27. A typical household will have several potential users of the gateway IP address. In addition, the potential users are not limited to members of the household.

28. I have personally conducted investigations involving P2P child pornography

downloads where the suspect was not the subscriber name associated with the ISP, and was instead, for example, a neighbor using the subscriber's open WiFi. This happens so often there are tools for tracking such "moochers," such as the tool named "moocher hunter."

29. Additionally, the external (Public) IP address is generally assigned using a lease. This means that the IP address will be the same for a specific time period established by the ISP, and when that lease expires, a new IP address is assigned. As I reviewed the contents of the document, I noticed a discrepancy between the years listed for this event. In one instance it was listed as 2016 and in another it was listed at 2019. If such an error occurred during the course of the download of the pieces of information, then the wrong IP address could have been identified, and the wrong subscriber information obtained.

30. I also reviewed a case in which Malibu Media was a Plaintiff, in which the Court examined the same methodology Malibu Media claims to have used in this case (Exhibit 6). This case is instructive, in my opinion, because it involved testimony from the same Declarants from whom Malibu has submitted testimony in this case, involving the same packet capture methodology in accusing the subscriber corresponding to an IP address from which a piece or pieces of data were said to have been downloaded. The Court states:

> Malibu's proof that Doe copied its works relies, then, on the evidence it tenders to show that a computer linked to Doe's IP address distributed one or more bits of each of the works. Even if that disputed evidence were accepted, the IP address alone is not enough to impose liability on Doe. An IP address discloses the location of the internet line used for the transaction (*see, e.g., TCYK, LLC v. Does 1-87,* No 13 C 3845, 2013 U.S. Dist. LEXIS 95817, 2013 WL 3465186, at *2 (N.D. Ill. July 10, 2013)), but it does not identify the individual person who engaged in the transaction. 'An IP address provides only the location at which one of any number of computer devices may be deployed, much like a telephone number can be used for any number of telephones.' *In re BitTorrent Adult Film Copyright Infringement Cases,* 296 F. R. D. 80, 84 (E.D.N.Y. 2012)

31. The Court goes on to state:

> Malibu contends that this court previously held that Malibu need only prove that Doe's IP address was used in order to prove Doe's liability. [Dkt 147 at 1.] That is not correct.... Evidence of a link between an IP address and Malibu's movies ... is not enough to prove liability.... Malibu has no evidence suggesting that an IP address used by Doe's work computer was in any way involved with Malibu's works. The court concluded that Malibu's effort to take discovery about Doe's work computer without even a link to the IP address used by those computers was 'just fishing.'

32. I agree with the Court's conclusions.  Specifically, I agree that "Evidence of a link between an IP address and Malibu's movies ... is not enough to prove liability." I also agree that Malibu's Packet Capture methodology constitutes "no evidence" that any end computer (and, thus, even further, that any user) "was in any way involved with Malibu's works."

33. In addition, according to the Declaration of Tobias Fieser submitted by Malibu Media in this case as the evidence of copyright infringement by Doe, he downloaded multiple pieces of data from IP address 70.121.72.191. He claims that the pieces where identified by a cryptographic hash corresponding to a Malibu Media copyrighted movie. His declaration does not explain the precise nature of these pieces, but based on my experience with the BitTorrent network and review of the documents and testimony from Malibu Media, should any such pieces have been transferred, they would likely have been extremely small in relation to the data file for any of the films in this case—likely 16 Kb. But thousands of times this volume of additional data from other sources are needed to constitute an entire film. I also noticed that nowhere in the declaration is there conclusive evidence that an entire film was ever downloaded, displayed, or distributed as part of this exercise.

34. It is my opinion that the neither the declarations and other materials submitted by Malibu Media in this case and provided to me in the attached exhibits, nor the methodology used,

is, or could be, sufficient to show that John Doe distributed, displayed, or otherwise interacted with the films for which Malibu Media states that it owns the copyrights.

35. My opinions are based upon my education, training, and experience in addition to the information reviewed and my analysis in this case and are stated to a reasonable degree of certainty in my field of expertise.

36. I reserve the right to supplement my opinions upon future findings of the Court or receipt of additional information.

August 28, 2020

Glenn K. Bard