UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF TEXAS

SAN ANTONIO DIVISION

MALIBU MEDIA, LLC,                )
                                  )
          Plaintiff,              )
                                  )
  vs.                             ) Case No.
                                  ) 5-19-CV-00834-DAE
JOHN DOE,                         )
                                  )
          Defendant.              )
_____)

VIDEOTAPED ZOOM VIDEOCONFERENCE DEPOSITION OF

30(B)(6) CORPORATE REPRESENTATIVE OF MALIBU MEDIA

COLETTE PELISSIER

Taken at 2 Bloomfield Hills Drive

Henderson, Nevada

On Tuesday, October 20, 2020

At 9:19 a.m.

Reported by:  Deborah Ann Hines, CCR #473, RPR

HUDSON COURT REPORTING & VIDEO          1-800-310-1769

```
 1   Appearances:
 2   For the Plaintiff:
 3         PAUL S. BEIK, ESQ.
           Beik Law Firm
 4         8100 Washington Avenue
           Suite 1000
 5         Houston, TX 77007
           (713)869-6975
 6         paul@beiklaw.com
           (Via Zoom Videoconference)
 7
 8   For the Defendant:
 9         RAMZI KHAZEN, ESQ.
           - and -
10         J.T. MORRIS
           J.T. Morris Law
11         1105 Nueces Street
           Suite B
12         Austin, TX 78701
           (512)717-5275
13         ramzi@jtmorrislaw.com
           jt@jtmorrislaw.com
14         (Via Zoom Videoconference)
15
     Videographer:
16
           CODY HALL
17         (Via Zoom Videoconference)
18
19
20
21
22
23
24
25
```

| | WITNESS | PAGE |
|---|---|---|
| 1 | | |
| 2 | COLETTE PELISSIER | |
| 3 | Examination By Mr. Khazen | 5 |
| 4 | Examination By Mr. Beik | 275 |
| 5 | Further Examination By Mr. Khazen | 281 |

E X H I B I T S

| | NUMBER | DESCRIPTION | PAGE |
|---|---|---|---|
| 11 | Defendant's | | |
| 12-13 | 1 | Defendant's Rule 30(b)(6) Deposition Notice to Plaintiff Malibu Media | 25 |
| 14 | 2 | Contract Between Malibu Media and IPP | 91 |
| 15 | 3 | Original Complaint | 133 |
| 16 | 4 | Website Analytics | 147 |
| 17 | 5 | List of Settlements | 216 |
| 18-19 | 6 | Defendant John Doe's First Requests for Production to Plaintiff | 222 |
| 20 | 7 | John Doe's First Set of Interrogatories | 222 |
| 21 | 8 | John Doe's Second Set of Interrogatories | 222 |
| 22-23 | 9 | Defendant John Doe's Second Request for Production to Plaintiff | 222 |
| 24 | 10 | Tweets | 253 |
| 25 | 11 | Un-filed Complaint | 268 |

1        THE VIDEOGRAPHER:  Today's date is
2   October 20th, 2020.  The time is 9:19 a.m. Pacific
3   time.  We are beginning the deposition of Colette
4   Pelissier.  Will counsel please announce for the
5   record who they represent.
6        MR. KHAZEN:  Ramzi Khazen of the J.T. Morris
7   Law Firm on behalf of the defendant, John Doe.
8        MR. MORRIS:  J.T. Morris also of J.T. Morris
9   Law, PLLC on behalf of defendant, John Doe.
10       MR. BEIK:  Paul Beik, Beik Law Firm, PLLC on
11  behalf of plaintiff, Malibu Media.
12       THE VIDEOGRAPHER:  Okay.  Ms. Hines.
13       THE REPORTER:  Due to COVID-19, will all
14  parties please stipulate to swearing in of the
15  witness remotely.
16       MR. BEIK:  Yes.
17       MR. MORRIS:  Yes.
18       THE WITNESS:  Yes.
19       MR. KHAZEN:  Yes.
20       THE WITNESS:  What if we said no?
21       ///
22       ///
23       ///
24       ///
25       ///

1    Q.   I'm sorry?
2    A.   They stole.  They kept all of the settlement
3    money.
4    Q.   And did -- was -- did you ever file suit
5    against them?
6    A.   We did, but they're not collectable.
7    They're in jail.
8    Q.   And how much have you paid Ecipio over the
9    years?
10   A.   Not a lot.  I think we used them for like a
11   year, year and a half, something like that.
12   Q.   Have you tried to contact IPP in regard to
13   this lawsuit to gather documents?
14   A.   Yes.
15   Q.   And can you describe that, your effort?
16   A.   They're very hard to reach because of COVID
17   and because of the time difference.  And unless
18   you're paying them, you know, they're just --
19   their -- their system works, their software works,
20   they're just not -- they're just very difficult to
21   reach.
22        And they only really answer WhatsApp and so
23   it's like -- or Skype.  And so it's just -- just
24   because of the time zone and they're just always, I
25   don't know, they're always traveling somewhere and,

1  you know, one's in Germany, one's in England.
2          And we started with them 12 years ago, like
3  when this wasn't even a thing, and now everyone is
4  getting their movies stolen, so it's just so
5  different now.  So -- so yes, they're not easy to
6  reach now, and that's why we're making our own
7  software.
8      Q.   So you communicate with them through
9  WhatsApp and through Skype; is that correct?
10     A.   Basically.
11     Q.   And when is the last time you communicated
12 with them through WhatsApp or Skype?
13     A.   Maybe two months ago.
14     Q.   And have you produced those records, those
15 communications to your attorney?
16     A.   I don't -- I don't think so.  I don't think
17 there's anything to produce.
18     Q.   I'll call for all that production, all those
19 communications with IP -- IPP.
20          And do you recall what, what you
21 communicated about with IPP last over WhatsApp?
22     A.   We were asking basically for some cases.  We
23 were actually asking them for documents that we did
24 not have.  And actually one of our guys who was
25 communicating with the experts, I forgot about that,

1  he had COVID, and he was not able to get some of the
2  documents.
3            And so another guy in India, who was
4  supposed to organize IPP's information, so this guy
5  getting COVID kind of slowed down getting the
6  information from IPP.  And so, yeah, I did forget
7  about that.  That guy, Dane, actually it was a bigger
8  deal because he was supposed to get that information
9  from IPP.
10           So we've been trying to get information from
11 them and they've not been very responsive, all
12 because of the COVID and everyone, whatever they're
13 doing.  So if we're not working with them, they're,
14 you know, they're not very quick to respond to us,
15 although, you know, we've still paid them all their
16 payments, so they should, you know, they should pay
17 us, so...
18      Q.   Did they communicate to you that it was
19 because of COVID they weren't being responsive?
20      A.   It -- well, the guy who was supposed to --
21 was dealing with them on our side, he had COVID.  So
22 they're just never really that responsive.  And so
23 then to couple that with the, with our guy on our
24 team who had COVID, they were very hard to reach.
25      Q.   What guy that was on your team got COVID?

1       A.      Dane.

2       Q.      I'm sorry?

3       A.      His name is Dane.

4       Q.      And who is Dane?  What role does he play?

5       A.      Dane.  He was helping manage the team

6   protecting us from the copyright infringements.

7       Q.      And he was a go-between between you and IPP?

8       A.      Yeah.

9       Q.      What is Dane's last name?

10      A.      DeFelice.

11      Q.      And do you still work with Dane?

12      A.      On a limited basis.

13      Q.      Do you communicate with Dane on a -- did you

14  communicate with Dane on a regular basis at any

15  point?

16      A.      A long time ago.

17      Q.      How long have you -- how long have you

18  worked with Dane?

19      A.      I think it's been over six or seven months

20  that he has done anything, you know, on a, on a

21  regular basis for us.  He was going to help rebuild

22  the software.  And the guy, he didn't vet the guy

23  properly, so long story, so I went ahead and used our

24  own guys that I vetted and did that.

25      Q.      How do you communicate with Dane?

1    A.    Phone.
2    Q.    Do you communicate with Dane in any other
3    way besides over the telephone?
4    A.    Text.
5    Q.    And how often do you -- how often do you
6    communicate with Dane over text?
7    A.    I don't know.  I haven't spoken to him in
8    two weeks, so...
9    Q.    Have you produced your communications with
10   Dane to your attorneys?
11   A.    I think if it was relevant, we would have,
12   if there was anything that was relevant.
13   Q.    Do you communicate with Dane regarding,
14   regarding your work with IPP?
15   A.    We did, yes, but that was when we had a big
16   problem getting all the information because of him.
17         Sorry, I really don't feel good.
18   Q.    And do you communicate with Dane regarding
19   your, your alleged efforts to protect your
20   copyrights?
21   A.    Yes, we have.
22   Q.    When is the last time you communicated with
23   Dane about your copyright protection efforts?
24   A.    I don't know.  Maybe a few months ago.
25   More.

1  own, you know, a hundred percent.  Doesn't -- doesn't
2  even have to talk about copyrights because he never
3  had a copyright.  It's just his work product of
4  editing the raw footage.
5      Q.   So there's nothing in the contracts that
6  specifies that there's a work made for hire
7  situation?
8      A.   They're all for work for hire.
9      Q.   I'm sorry?
10     A.   All the contracts are work for hire.
11          MR. BEIK:  Object to form.
12 BY MR. KHAZEN:
13     Q.   And have you produced those contracts to
14 your lawyer?
15     A.   I -- I don't know if we have.  Like I said,
16 I had COVID for a while and some of our other people
17 did too on the teams in Europe.  So I'm not sure
18 exactly what was produced and what was going on.  I
19 know there were quite a few things going on during
20 this trial that made it hard for us because of also
21 the moving towards our own, our own persons instead
22 of IPP, because we just don't trust them like fully
23 at this point.  And we want to make sure everything
24 is done correctly and so we wanted to check out their
25 past things.

1  these.
2      Q.   Have you produced -- have you communicated
3  directly with IPP at all during this period?
4      A.   No.  They were actually not talking to me
5  because Lomnitzer was paying them more than I wanted
6  to pay them, so she was communicating with them.
7      Q.   And what years was that, were those?
8      A.   That was I think '17 and '18.
9      Q.   And then in 2019 did you communicate with
10 IPP directly?
11     A.   Part of -- no, we actually -- when we left
12 Lomnitzer, we left IPP.
13     Q.   So when you testified earlier that you
14 communicated with IPP over WhatsApp?
15     A.   Yeah, a couple things that we had still
16 going on with them, but we didn't -- they weren't
17 our -- providing the service anymore for us.
18     Q.   That wasn't my question.  I was asking
19 whether you were communicating, whether you
20 communicated with them and you said no.  So when is
21 the last time you communicated with IPP?
22     A.   Months and months.  I don't recall exactly.
23 I think that's what I said before, too.
24     Q.   Did you communicate directly with IPP over
25 WhatsApp at all in 2019?

1     A.    I believe I tried to.
2     Q.    And WhatsApp, did IPP respond to your
3  communications to them?
4     A.    I believe they tried to get us to pay more
5  money to get more data from them, and since we were
6  already designing our own that nothing every
7  progressed because they wanted more from us than we
8  were willing to give.
9     Q.    And when did they send you a series of
10 communications?
11    A.    I don't -- probably -- maybe this was seven
12 months ago.
13    Q.    And were there any communications with them
14 prior to that over WhatsApp?
15    A.    I'm not sure.
16    Q.    Were there any communications with them
17 prior to that over any means directly between you and
18 IPP?
19    A.    No, I don't believe so.
20    Q.    Did you ever communicate with Computer
21 Forensics?
22    A.    Is that -- that's it I believe.  And, yes, I
23 believe I did communicate with him.
24    Q.    When is the last time you communicated with
25 Computer Forensics?

1  a lawsuit first against them or did they file a
2  lawsuit first against you?
3      A.   I can't recall.  I don't -- I don't recall,
4  because I don't know if they ever filed that one.
5      Q.   That one?
6      A.   I mean, the one that the Warmblood, the only
7  one you have listed.  I don't know.
8      Q.   I'm not limiting my question to one that I
9  have listed.  I'm asking whether you filed a lawsuit
10 against them before you or did they file the lawsuit
11 against you before, before you did?  So I'm just
12 asking who filed the lawsuit against whom first.
13     A.   Oh, yeah, I don't know.  I don't know.
14     Q.   The Lomnitzer firm, did you -- you settled a
15 lawsuit with them; is that correct?
16     A.   Yes.
17     Q.   What were the terms of that settlement?
18          MR. BEIK:  Object to form.
19          THE WITNESS:  Yeah, the terms were, they
20 were private.
21 BY MR. KHAZEN:
22     Q.   What were the terms of that settlement?
23     A.   The terms were, they were -- they weren't to
24 be shared.
25     Q.   So are you refusing to answer?

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

1  software works and that would be illegal.
2      Q.   Is that the only reason you don't believe
3  they're seeding your, your, the internet with your
4  copyrighted works?
5      A.   Well, we're not working with them anymore
6  and nothing has changed.  The internet is still
7  getting filled with our copyrighted works.
8      Q.   I mean, you mentioned that they're actually,
9  that they're actually making money in Europe off of
10 the, off of the proliferation of your works; is that
11 correct?
12     A.   I don't know for sure but it seems like they
13 are because I've been, I've been trying to contact
14 some attorneys that they're still working with, and
15 it's not just our movies but I believe that they are
16 trying to collect on our movies.  So I'm still
17 investigating that, and we're in the middle of
18 investigating that, so that's -- I don't know the
19 answers.
20     Q.   Did you not testify that you believed that
21 they had made $400,000 already on -- from --
22     A.   I do believe that.  It hasn't been proven,
23 but I do believe that.
24     Q.   And is that illegal for them to do?
25     A.   Yeah.  They would owe us the money but it's

1  in Europe so it's not easy to get, so...

2  Q. So IPP operates illegally, in your opinion?

3  A. No, I didn't say they were operating

4  illegally --

5  MR. BEIK: Form.

6  THE WITNESS: -- but I think that they're

7  you know, costing me money where they can. I don't

8  know for certain. So and they -- what they do with

9  the data is not illegal when someone buys -- when

10 someone purchases, wants to find out if their IP

11 address is -- if their movies are getting stolen by

12 which IP addresses, they can provide those services.

13 And so since they can provide those

14 services, and then if you don't want to take them up

15 on their services in Europe, I wouldn't put it past

16 them to just go ahead and just accept the money

17 themselves then.

18 BY MR. KHAZEN:

19 Q. And it's your belief that they are

20 collecting money that is owed to you illegally in

21 Europe; is that correct?

22 A. Yeah, I don't want to testify to that

23 because I haven't investigated it far enough, but I

24 do have one lawyer that has been telling me that and,

25 and maybe one or two others and so it's very -- I

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

1   That is an answer.
2           THE WITNESS:  I do not know.  I cannot know
3   that to a point where I can put it on a legal form,
4   unless I have actually taken them to court and
5   verified it.
6   BY MR. KHAZEN:
7       Q.   I didn't ask if you know for sure, so I'm
8   going to ask the question again.  This is getting to
9   the point where you're just refusing to answer my
10  questions.  So do you suspect that IPP is illegally
11  enforcing your copyrights in Europe?
12          MR. BEIK:  Objection, form.
13          THE WITNESS:  I'm not going to answer
14  whether I suspect something or not.  That's -- it's
15  not okay to do that, because if they're not, I'm not
16  going to slander them and say they are.  I'm going to
17  go to court and do it correctly.
18  BY MR. KHAZEN:
19      Q.   You're refusing to answer my question?
20      A.   No, I'm not refusing to answer your
21  question.  I'm refusing to slander someone when I
22  don't have all the information.
23      Q.   You testified earlier that you, that you
24  suspected that they stole $400,000 from you by
25  illegally enforcing your patents from Europe.  Were

1  you lying then?

2  A.  No.

3  Q.  Has your testimony changed?

4  A.  That wasn't a direct testimony, that was
5  just a little bit of color as to why we -- things
6  weren't working out between IPP and us.

7  Q.  A little bit of color?  So it wasn't
8  truthful?

9  A.  I don't know.  It's not a fact.  It's
10 something that has to be investigated.  And when
11 you're investigating something like that, you might
12 not, you know, you might not work with the person on
13 something else.

14 Q.  Where did you come up with the number
15 400,000?

16 A.  I estimated over how many months it's been
17 and how much they had been paying themselves from one
18 lawyer.

19 Q.  So wouldn't that give them incentive to seed
20 the internet with your, with your copyrights if
21 they're making money off of it?

22 A.  Well, they're not now --

23     MR. BEIK:  Form.

24     THE WITNESS:  -- for sure, so.  I mean, they
25 are -- we would never let them seed the internet.  I