## Page 1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

MALIBU MEDIA, LLC,      )
      )
    Plaintiff,  )
      )
vs.     )Case No.
     )5-19-CV-00834-DAE
JOHN DOE,    )
      )
    Defendant.  )
_____)

VIDEOTAPED ZOOM VIDEOCONFERENCE DEPOSITION OF
30(B)(6) CORPORATE REPRESENTATIVE OF MALIBU MEDIA
COLETTE PELISSIER

Taken at 2 Bloomfield Hills Drive
Henderson, Nevada

On Tuesday, October 20, 2020
At 9:19 a.m.

Reported by:  Deborah Ann Hines, CCR #473, RPR
HUDSON COURT REPORTING & VIDEO      1-800-310-1769

## Page 2

1   Appearances:
2   For the Plaintiff:
3     PAUL S. BEIK, ESQ.
      Beik Law Firm
4     8100 Washington Avenue
      Suite 1000
5     Houston, TX 77007
      (713)869-6975
6     paul@beiklaw.com
      (Via Zoom Videoconference)
7
8   For the Defendant:
9     RAMZI KHAZEN, ESQ.
      - and -
10    J.T. MORRIS
      J.T. Morris Law
11    1105 Nueces Street
      Suite B
12    Austin, TX 78701
      (512)717-5275
13    ramzi@jtmorrislaw.com
      jt@jtmorrislaw.com
14    (Via Zoom Videoconference)
15
    Videographer:
16
     CODY HALL
17    (Via Zoom Videoconference)
18
19
20
21
22
23
24
25

## Page 3

1   WITNESS         PAGE
2   COLETTE PELISSIER
3   Examination By Mr. Khazen    5
4   Examination By Mr. Beik    275
5   Further Examination By Mr. Khazen   281
6
7
8       E X H I B I T S
9
10  NUMBER    DESCRIPTION    PAGE
11  Defendant's
12  1   Defendant's Rule 30(b)(6) Deposition
13     Notice to Plaintiff Malibu Media  25
14  2   Contract Between Malibu Media and IPP  91
15  3   Original Complaint    133
16  4   Website Analytics    147
17  5   List of Settlements    216
18  6   Defendant John Doe's First Requests
19     for Production to Plaintiff  222
20  7   John Doe's First Set of Interrogatories 222
21  8   John Doe's Second Set of Interrogatories 222
22  9   Defendant John Doe's Second Request
23     for Production to Plaintiff  222
24  10  Tweets    253
25  11  Un-filed Complaint    268

## Page 4

1     THE VIDEOGRAPHER:  Today's date is
2  October 20th, 2020.  The time is 9:19 a.m. Pacific
3  time.  We are beginning the deposition of Colette
4  Pelissier.  Will counsel please announce for the
5  record who they represent.
6     MR. KHAZEN:  Ramzi Khazen of the J.T. Morris
7  Law Firm on behalf of the defendant, John Doe.
8     MR. MORRIS:  J.T. Morris also of J.T. Morris
9  Law, PLLC on behalf of defendant, John Doe.
10    MR. BEIK:  Paul Beik, Beik Law Firm, PLLC on
11  behalf of plaintiff, Malibu Media.
12    THE VIDEOGRAPHER:  Okay.  Ms. Hines.
13    THE REPORTER:  Due to COVID-19, will all
14  parties please stipulate to swearing in of the
15  witness remotely.
16    MR. BEIK:  Yes.
17    MR. MORRIS:  Yes.
18    THE WITNESS:  Yes.
19    MR. KHAZEN:  Yes.
20    THE WITNESS:  What if we said no?
21  ///
22  ///
23  ///
24  ///
25  ///

Pages 1 to 4

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

Page 5

1    Thereupon--
2              COLETTE PELISSIER
3    was called as a witness by the Defendant, and having
4    been first duly sworn, testified as follows:
5              EXAMINATION
6    BY MR. KHAZEN:
7        Q.   Can you please introduce yourself for the
8    record?
9        A.   My name is Colette Pelissier, C-o-l-e-t-t-e.
10   Last name P-e-l-i-s-s-i-e-r.
11       Q.   And your address?
12       A.   I'm the owner of Malibu Media.  Malibu
13   Media, LLC and other, other companies and internet
14   companies.
15       Q.   Your address?
16       A.   My address is -- Paul, my business address?
17   Personal address?  Which business?
18       MR. BEIK:  Your business address.
19       THE WITNESS:  My business, I have two
20   different business addresses right now.  There's one
21   in California, and there would be -- I guess use the
22   business address at 2 -- where I am right now
23   actually would be a good business address.  2
24   Bloomfield Hills Drive in Henderson, Nevada and
25   89052.

Page 6

1    BY MR. KHAZEN:
2        Q.   Okay.  Have you been deposed before?
3        A.   Yes.
4        Q.   About how many times?
5        A.   About how many times?  Maybe -- in my whole
6    life?  In my whole life?
7        Q.   Yeah.
8        A.   Maybe 40 times, 40 times, maybe something
9    like that.  40, 30, I don't know.
10       Q.   Approximately 30, 40 times you've been
11   deposed?
12       A.   Probably.
13       Q.   When was the last time you were deposed?
14       A.   Last time I was deposed, I think probably
15   2018.
16       Q.   Okay.
17       A.   Or early '19, something like -- around
18   there.
19       Q.   About how many times have you been deposed
20   in the last five years, or how many times, if you
21   know an exact number?
22       A.   Let me see.  In the last five years, so,
23   okay, I'm trying to think.  Maybe six times.
24       Q.   Have you been -- have you testified at trial
25   before?

Page 7

1        A.   Yes, I have.
2        Q.   How many times?
3        A.   I'm not -- let me see.  So would it count
4    for each different trial if it's like say the
5    Bellwether case, there were five trials but it was
6    all within, I don't know if you're familiar with that
7    one, but that was in -- I'm sorry, let me turn this
8    off.
9             That was in Philadelphia and we had to try
10   five cases to prove, to prove that IPP and everything
11   everything worked to Judge Bellson, who -- so and
12   that it was five times there, so not more much than
13   that, but maybe ten times.  Maybe eleven, twelve, I
14   don't know.  Ten or twelve in my entitle life.
15       Q.   And were they all in regards to copyright
16   suits?
17       A.   No.  No.
18       Q.   How many times have you testified at trial
19   in regards to a copyright suit?
20       A.   Probably 90 percent.  Oh, my, God, I'm
21   sorry.  90 percent.
22       Q.   And the deposition that you took in late
23   2018 or early 2019, that was in regard to a copyright
24   suit --
25       A.   Yeah.

Page 8

1        Q.   -- by Malibu Media?
2        A.   Yes.
3        Q.   I'd just like to go over a few basics.  I'll
4    be asking questions, and it sounds like you've been
5    through this quite a bit so you may already know
6    these, but I'll be asking questions, and the answers
7    will be transcribed by the court reporter.  This
8    deposition is obviously being conducted remotely.
9             Do you understand that?
10       A.   Yes.
11       Q.   And it's being -- and you understand that
12   you're being recorded for the record?
13       A.   Yes.
14       Q.   And if you want, ever want to take any
15   breaks, will you let me know?
16       A.   Of course.
17       Q.   And I just ask that if a question is pending
18   that you answer the question before we take any
19   breaks.
20            Do you understand that?
21       A.   Yes.  I'm sorry.
22       Q.   And please don't communicate with your
23   lawyer while a question is pending.
24       A.   No problem.  I have another lawyer that I
25   really -- I have to sign a declaration in the next 30

Pages 5 to 8

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

1   minutes, so that's why Im just watching out for that,
2   so it's not nothing to do with this deposition.  So
3   I'm -- I have an assistant helping me waiting for it
4   to come in.  So let me go put this phone somewhere
5   else where they can get it, if that's okay with you.
6   Hold on.  Let's see, turn off.  Okay.  Okay.  Okay.
7   So you know, I'm not texting Paul.
8   Q.  Okay.  So, right, yeah, can you please not
9   communicate while a question, with anyone while a
10   question is pending?
11   A.  Yes.  Of course not.
12   Q.  Your lawyer may object, but unless he
13   objects for purposes of privilege and then instructs
14   you not to answer, you should answer.
15   Do you understand that?
16   A.  Yes, I understand.
17   Q.  So this deposition is obviously taking place
18   remotely, so I'd ask that if you can't hear a phrase
19   or if you can't hear or understand anything I'm
20   asking, please just let me know and I'll repeat the
21   question.
22   A.  Yeah.  Yes.  Yes.
23   Q.  And also please just give me answers that
24   you're sure of.  Don't guess or speculate, unless I
25   specifically ask you to.  Can you do that?

1   A.  Of course.
2   Q.  Is there any reason that you wouldn't be
3   able to answer my questions completely and accurately
4   today?
5   A.  No.  I mean -- I mean unless I don't know
6   the answer.
7   Q.  Right.  So is there any reason you wouldn't
8   be able to answer my questions completely and
9   accurately to the extent that you know the answer
10   today?
11   A.  No.
12   Q.  Okay.
13   A.  I mean, there's -- no, there's no reason.
14   Q.  And in your prior depositions do you have
15   any reason to believe that any testimony you gave was
16   anything but complete and accurate?
17   A.  No.  I mean, I don't understand that
18   question actually.  Of course anything I answered at
19   the time when I was answering it was to my knowledge
20   complete and accurate.
21   Q.  Anything comes up during the course of the
22   deposition today that would affect your ability to
23   give fully and truthful answers to my questions, can
24   you let me know?
25   A.  Of course.  I don't know how that would

1   happen, but yes.
2   Q.  So you say -- so you're -- you're the owner
3   of Malibu Media?
4   A.  Yes.
5   Q.  Are you an employee?
6   A.  No.  It's my company.
7   Q.  So you're -- do you have any title at
8   Malibu, other than owner?
9   A.  CEO, owner, CEO.
10   Q.  So are you -- do you issue -- do you issue
11   yourself, for example, do you issue yourself a W-2?
12   A.  No, I do not.
13   Q.  And you say you own several other companies;
14   is that correct?
15   A.  Not -- I don't solely own.  So actually not.
16   At this point I do not solely own other companies,
17   not for -- not any more.
18   Q.  You own partial stakes in other companies?
19   A.  I would have to ask my accountant how they
20   file everything this year, but I believe I solely own
21   Malibu Media and it's being sorted that way, so just
22   to make things easier, everything is being combined.
23   So obviously there's multiple domain names
24   and it will all be owned by Malibu Media instead of
25   separate holding companies.  So it's -- so I'd have

1   to check with my accountant as to where we stand as
2   far as that goes.
3   Q.  What are the other holding companies?
4   A.  There was a holding company called Click
5   Here, but again these were just holding companies and
6   they were no longer going -- they no longer exist.
7   They should no longer exist at this time, actually.
8   But I guess it's probably not filed because
9   it was a year behind, so I don't know what it will
10   look like on the public records, but just to be
11   completely honest, as you asked me to be.  And there
12   was Zo Digital, which did some programming as well,
13   but that will as well be all combined into Malibu
14   Media.
15   Q.  Are there any other holding companies which
16   you held a stake other than Click Here and Zo
17   Digital?
18   A.  As far as -- as far as for what dates?
19   Q.  Over the last three years.
20   A.  I would need to ask my accountant.
21   Q.  Can you think of any other, any other
22   companies that in which you held a stake over the
23   last -- well, let's actually say five years.  Can you
24   think of any other companies in which you held a
25   stake --

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

1    A.  Five years.  I had a company that was
2  Colette Properties, but we had someone who, you know,
3  went trying to steal property from there, so that I
4  think has been -- is inactive.
5        Colette Productions where we were trying to
6  separate the production of Malibu Media, but that --
7  we -- that has been defunct now for quite some time,
8  so it's now just Malibu Media.
9        And -- and then there was one called Colette
10  Holdings, but that, again, we got involved with an
11  attorney that got greedy and so ultimately no longer.
12  So that would -- if that answers your question.
13    Q.  What was the first one you mentioned?  You
14  mentioned there was a first one, I couldn't quite --
15    A.  Oh, Colette Properties.
16    Q.  Colette Properties?
17    A.  Yeah, but it had nothing to do with Malibu
18  Media.
19    Q.  So the companies in which you have held a
20  stake over the last five years that you're aware of
21  are Click Here, Zo Digital, Colette Productions,
22  Colette Holdings, and Colette Properties.  Are there
23  any others?
24    A.  That would be -- that would be it as far
25  as -- again, I have to check with my accountant.  I

1  do not know exactly how they're filing everything,
2  but I believe everything is going to be funneled into
3  Malibu Media so there's no confusion, so that's the
4  best answer I can give you.
5        And I, again, I have to check with my
6  accountant.  I didn't know I was going to be going
7  through all the LLCs because I thought Malibu Media
8  was the only thing that was relevant here.
9    Q.  And what do you mean everything is going to
10  be funneled into that?  What do the holding companies
11  hold?  What do they hold?
12    A.  So we have some other -- we have other
13  websites where we have only just started copyrighting
14  the content.  Super Hot and Colette.com and other
15  websites that we actually -- your client may have
16  infringed on but we wouldn't be -- that wouldn't be
17  relevant here because we haven't been enforcing those
18  copyrights so they would give to somebody would be
19  holding other websites like that.
20    Q.  Do any of these companies hold any
21  copyrights that have ever been displayed on XR?
22    A.  No.
23    Q.  How many employees does Malibu have?
24    A.  Excuse me?
25    Q.  How many employees does Malibu Media have?

1    A.  Employee?  We have contractors.
2    Q.  Do you have any employees?  Does Malibu
3  Media have any employees?
4    A.  We have contractors.  So we're a global
5  company and we, you know, most people that when
6  you're hiring someone globally, you can't give them
7  a -- we have a -- I wouldn't say Malibu Media has
8  technically employees.  We have technically
9  contractors in different countries.
10    Q.  Okay.  So just to be clear, so to your
11  knowledge Malibu Media has no employees?
12    A.  Yeah, we do have contractors.  We have many
13  contractors.
14    Q.  Please answer my specific question.  To your
15  knowledge Malibu Media has no employees?
16    A.  I don't want to answer that wrong, because,
17  again, I'd have to check my accountant, but to my
18  knowledge it's -- we have many contractors or other
19  small businesses doing work for us contracted for --
20  and actually some have been contracted for 12 years,
21  so...
22    Q.  As you sit here today, can you think of a
23  single employee of Malibu Media?
24    A.  So is an employee you define as a W-2
25  employee, correct?

1    Q.  Yes.
2    A.  Versus a 1099 contractor?
3    Q.  Yes.  Employees and independent contractors
4  are different, so I'm asking about employees, so --
5    A.  Yeah, I would say no.
6    Q.  Okay.  So just that was a little unclear.
7  So just to your knowledge Malibu Media has no
8  employees?
9    A.  I really don't know the answer.  I need to
10  check with my accountant for that.  I don't know who
11  is classified as a 1099 or a W-2, but I would have to
12  guess that if they're outside the United States it
13  would be a 1099 or a, you know, not a -- not a United
14  States employee if they're not living in the United
15  States and they're from another country.
16        So, like I said, we do most of our
17  production in -- I didn't say this, but we do most of
18  our production in Eastern Europe, and we do most of
19  our -- oh, there might be -- that's what I'm saying,
20  there might be a few employees that run social media,
21  marketing, things like that.
22        So I don't know but they make their own
23  hours, but they're employees or if they're
24  contractors.  I just can't say exactly.  There's too
25  many people and I don't know how they're classified,

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

1  how my accountant has classified all of them.
2  Q.  Do you know if Malibu Media issues any W-2s?
3  A.  I know we issue many 1099s, so probably some
4  W-2s.  I'm just not sure of the answer for that.  You
5  need to speak to my accountant.  How is this
6  relevant?
7  Q.  That's -- I'm -- I'm allowed to ask
8  questions.  This is not about whether you determine
9  whether it's relevant or not, so please just try to
10  precisely answer my questions.
11  A.  Okay.  I'm trying to, but, like I said, I
12  don't -- I'm trying to tell you that, you know, we
13  have our production in Eastern Europe, we have our
14  programming in Ukraine and Ecuador, we have -- if you
15  go to artwork, we have our design from all over the
16  world.  We have like, you know, lawyers all over the
17  country.
18      We have my husband was -- I sometimes -- he
19  helps me hire people for design in different
20  countries, different states.  And then we have
21  customer service all over the world.  We have -- so I
22  just don't know.  There's too many people for me to
23  answer your question and be a hundred percent certain
24  of my answer.
25  Q.  Okay.  But to your knowledge you can't think

1  of any employees as we sit here today?
2      MR. BEIK:  Objection, asked and answered.
3      THE WITNESS:  No, I just actually I just did
4  think of some, because I was thinking of someone who
5  runs one of the Instagram accounts.  We have multiple
6  Instagram accounts.  And I don't know if this girl is
7  an employee or a contractor, so actually there might
8  be more, so I can't answer it.  I don't want to
9  answer something not truthfully.
10  BY MR. KHAZEN:
11  Q.  Who is that?
12  A.  Who is that?
13  Q.  Yes.
14  A.  Her name is Anastasia.  I don't even know
15  how to pronounce her last name.
16  Q.  Can you give it a shot?
17  A.  It's like Truninski or something.  It's
18  Russian.  She also works in -- she works in
19  marketing, for a marketing company.
20  Q.  Okay.  So other than Anastasia can you think
21  of any employees of Malibu Media as you sit here
22  today?
23  A.  In the U.S. I'm trying to think.  So
24  everyone who works on, as far as the copyrights go,
25  the DMCA and as far as our protection of copyrights,

1  which is what I believe this is regarding, everyone
2  who works on that works, they make their own hours,
3  they work from their own areas.
4      A lot of them worked for me for 12 years and
5  I've never met them in person.  So I believe they'd
6  all be 1099 and contractors, like paralegal
7  contractors and things like that, so, yeah.
8  Q.  And is Malibu Media still operating?
9  A.  Malibu Media still operating?
10  Q.  Yes.
11  A.  Yes.
12  Q.  Does it have to make any changes due to
13  COVID?
14  A.  We did have to slow down due to COVID, and
15  that's why we haven't been shooting in the United
16  States just because of, you know, to take extreme
17  caution.  And now that we can shoot in Eastern Europe
18  without problems, we have our teams shooting there
19  again.
20      And so, yeah, we did have to slow down due
21  to COVID, but we are now -- like we have a lot of
22  loyal members and they've been waiting.  And so we do
23  have a lot of videos that we're going to be putting
24  up for our members soon based on that we can shoot in
25  Eastern Europe with no problems with the models they

1  tested for COVID.
2  Q.  Did any of your contractors contract COVID
3  that you're aware of?
4  A.  No.
5  Q.  And how did COVID affect your business, if
6  at all?
7  A.  I don't know the answer to that if COVID --
8  I mean, it affected -- like, I mean, I think
9  everyone's business was affected somewhat if they had
10  income to spend, but like we don't operate -- our
11  business is more affected by people who are stealing
12  our movies than COVID could ever affect our business.
13  So it's just, you know, it didn't stop millions of
14  people from being home and stealing movies, so it was
15  not, not very different I guess, so...
16  Q.  So did any of your employees or independent
17  contractor, so none of your employees, if there are
18  any, or independent contractors that you're aware of
19  contracted COVID?
20  A.  No.  I had an independent contractor who did
21  get COVID, and he's better now.  He's in Arizona
22  working part time helping manage things.
23  Q.  Is that the only one you can think of?
24  A.  I have one model and her husband that had
25  worked for us a few times, they had COVID, but not

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 21

1    while they're working for us, and that's all I can
2    think of.
3        Q.   Did you or your husband contract COVID?
4        A.   I did get COVID, yeah, in early March
5    actually.
6        Q.   And how long did that -- did that put you
7    out of work or --
8        A.   I was actually sick for a couple months, and
9    so it's been -- I was definitely quite sick and still
10   get like slight fevers and everything, so I guess I'm
11   one of those long haulers or whatever.  But I have
12   the -- I have negative tests and everything now, so I
13   have antibodies, but it's been definitely a little
14   under the weather.  So and my husband, he had no -- I
15   guess like asymptomatic, so...
16       Q.   Okay.  So you were -- so you were -- you
17   were slowed down in say March and April.  Is that
18   about right?
19       A.   Not -- I'd say -- I'd say it wasn't slowed
20   down because I kept doing my work, even with COVID,
21   so yeah.
22       Q.   Okay.  So you weren't -- so you were able --
23   you were to keep working during March and April?
24       A.   Yes.
25       Q.   What assets does Malibu own?

Page 22

1        A.   What assets?
2        Q.   Yeah.  What are Malibu's assets?
3        A.   Our copyrighted -- our copyrighted content.
4    And I would say that would be trademarks and
5    intellectual property and that would be -- and I mean
6    movie video equipment and things of that sort.  Not
7    properties and things like that, if that's what
8    you're looking for.
9        Q.   So when you -- so when Malibu shoots a
10   movie, does it rent out -- it rents out space or how
11   does that -- how exactly --
12       A.   It depends on where we're shooting.
13       Q.   Does Malibu -- does Malibu own any real
14   estate?
15       A.   I don't think so.  I think at one point we
16   did but then -- then Malibu I think I bought out
17   Malibu personally, or something like that.  I'm not
18   sure, but at this point, no.
19       Q.   And does Malibu hold any long-term leases?
20       A.   No.
21       Q.   And when movies are shot, does Malibu
22   provide the equipment or does it rent the equipment?
23   Does it own equipment?
24       A.   Again, it depends -- it depends on the movie
25   and depends where we are in the world.

Page 23

1        Q.   So what's typical?
2        A.   What's typical?  Typical would be we rent
3    because the equipment and the lenses, the cameras,
4    everything is changing so often that you usually rent
5    because it's so expensive.  You have to change the
6    camera ever time there's a new -- better camera
7    coming or any better lens.  So typically we would
8    rent, especially for overseas.
9        Q.   So is it typical that Malibu will use the
10   equipment of independent contractors or will it use
11   its own equipment?
12       A.   It's typical that Malibu would use the
13   equipment of -- it wouldn't be independent
14   contractor.  No, if you go to rent -- you know like
15   if you go to -- if you rent something for a Hollywood
16   movie, you go to rent the lenses, the big -- they
17   have places like that in other countries, so it's not
18   an independent contractor.
19            You would go to like the equipment rental
20   house and pick what you want to use for that specific
21   movie and you rent it.  So like, what's it called
22   with a P.  I'm so tired.  Anyway, it's like -- are
23   you in L.A.?  No, you're in Texas.
24       Q.   Yeah.
25       A.   Yeah, okay.  So, yeah, you don't know it.

Page 24

1    But anyway, just like when they're shooting movies in
2    L.A., they're always renting the equipment.  So it's
3    getting the best, the best lens, the best camera.
4    And you can get that for way better price renting
5    than you would having to buy each new thing that came
6    out.
7            So we do have equipment that we have ready
8    to use if we need to, but if we're doing a special
9    movie or something like that, we would usually rent
10   the equipment.
11       Q.   Did you prepare for this deposition?
12       A.   For about ten minutes with my attorneys.
13       Q.   And with who?  Who specifically?  Can you
14   name who you prepared it?
15           MR. BEIK:  If I could, Ramzi, just so we
16   know, I know he's not doing this, but just -- he's
17   not asking you what you talked with us about, he's
18   just asking you who you talked to.  So to the extent
19   any communication with your lawyer, he's not asking
20   you for that.  He's asking you just who you talked to.
21           THE WITNESS:  So everybody on the call,
22   who's on the call here, and then Jay, my IP attorney.
23   My other IP attorney.
24   BY MR. KHAZEN:
25       Q.   What Jay's last name?

Pages 21 to 24

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

Page 25

1    A.  Kotzker.
2    Q.  And did you prepare with them both at the
3  same -- in the same meeting?
4    A.  Yeah, on the call.
5    Q.  Okay.  And it only lasted for ten minutes?
6    A.  Yeah, roughly.  Right, Paul?  Something like
7  that.
8    Q.  Well, you should answer to the best of your
9  knowledge.
10    A.  Ten, fifteen minutes, something like that.
11    Q.  Are you aware that you have been designated
12  as the corporate representative for Malibu Media for
13  purposes of this deposition?
14    A.  I am now.
15    Q.  Were you not aware of that before?
16    A.  I don't know the difference between being
17  the owner and the corporate representative.
18    Q.  I'd like to mark as Exhibit 1 a document
19  titled Defendant's Rule 30(b)(6) Deposition Notice to
20  Plaintiff Malibu Media.
21    A.  Uh-huh.
22        (Thereupon Defendant's Exhibit 1
23        was marked for identification.)
24    MR. BEIK:  Colette, do you have the exhibit?
25    THE WITNESS:  No, I don't have it, but I'm

Page 26

1  taking -- hopefully you're referring to it.  If
2  you're looking at it, I'm okay with that.
3        MR. BEIK:  You need to -- can we take a
4  break so she can open that up?
5        MR. KHAZEN:  Yeah.  Sure.
6        MR. BEIK:  Go off for one second.  If we
7  just go off the record for one minute and she can
8  open up the exhibit.
9        THE VIDEOGRAPHER:  Off the record at 9:47.
10        (Discussion off the record.)
11        THE VIDEOGRAPHER:  We are back on the record
12  at 10:08.
13  BY MR. KHAZEN:
14    Q.  Okay.  Welcome back.  You see the supplement
15  in front of you titled, that's Exhibit 1 titled
16  Defendant's Rule 30(b)(6) Deposition Notice of
17  Plaintiff Malibu Media?
18    A.  Yes.
19    Q.  Do you recognize this document?
20    A.  I'm looking at it now.  I don't recognize it
21  from previous, but I do -- I do recognize what this
22  document is.
23    Q.  What is it?
24    A.  It's a deposition notice to Malibu Media,
25  and it looks like it's a -- it's -- that you're going

Page 27

1  to depose me and we're agreeing to that.
2    Q.  Do you understand that you are the corporate
3  representative for Malibu Media with respect to
4  the --
5    A.  Yes.  Yes, I understand that.  Yes.
6    Q.  Just let me finish the question real quick,
7  sorry, but so the record is clear.  You understand
8  that you're the corporate witness for Malibu Media
9  with respect to the topics that are listed in
10  Exhibit 1?
11    A.  Yes, I do.
12    Q.  When is the first time you saw Exhibit 1?
13    A.  First time I saw Exhibit 1?  Let's see, it's
14  been months and -- it's been a while ago, I think.  I
15  don't recall exactly, but it was a while ago, I
16  think.
17    Q.  Did you do anything to prepare to be Malibu
18  Media's corporate representative with respect to the
19  topics listed in Exhibit 1?
20    A.  There's really not much to do to prepare
21  because it's either I know the answer or I don't know
22  the answer, and I run Malibu Media, so...
23        MR. BEIK:  Colette, he's not asking you for
24  attorney-client communications, he's basically asking
25  you if you prepared for the deposition by going

Page 28

1  through those topics, and that's what he's asking.
2  He's not asking what attorneys talked about, what you
3  talked about.  He's asking you if got prepared for
4  the deposition on those topics.
5        THE WITNESS:  Okay.  Yes, I believe so.
6  BY MR. KHAZEN:
7    Q.  Yes, what?  I'm sorry.
8    A.  Yes, I believe I have been prepared for the
9  topics of this deposition.
10    Q.  What did you do to prepare?
11    A.  I spoke to my attorneys, my IP attorneys and
12  my copyright protection attorneys.
13    Q.  Did you do anything, other than speaking to
14  your attorneys, to prepare as a corporate
15  representative for this deposition?
16    A.  We -- we discussed questions and answers and
17  updated on the technology and what was being used and
18  who was the infringers and the egregious ones that we
19  actually decided to go after.
20        And, you know, I just made sure that
21  everything was just a little -- you know, touched
22  base with everything, that everything was going as it
23  should, that we only, you know, only pursue people
24  that are egregious offenders and have offended, you
25  know, over multiple years, multiple movies.

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

1  And -- and then, you know, and then other
2  evidence that they're habitual offenders.  I
3  distribute all that to make sure they're -- it was
4  the kind of person that we don't want infringing on
5  our, on our hard work.
6  Q.  Did you do anything else to prepare?
7  A.  There's -- not really.  I mean, I guess
8  it's -- maybe I'm -- I don't know what else there
9  would be to do to prepare.  It would be we already
10  spent all the money on the software to identify the
11  IP addresses and the attorneys to research the law
12  and to, to, you know, to research everything that
13  they're downloading and the law.
14  I don't know what else there would be for me
15  as the owner of the company to do to prepare except
16  answer your questions.
17  Q.  Other than meeting with your attorneys, did
18  you do anything else to prepare for this deposition?
19  A.  No.
20  Q.  And how long did you meet with your
21  attorneys for?
22  A.  Maybe 15, 20 minutes, 10 to 20 minutes.  I
23  don't recall exactly.
24  Q.  Okay.  So other than meeting with your
25  attorneys for 15 to 20 minutes, did you do anything

1  else to prepare for this deposition?
2  A.  I think I said "no" maybe three or four
3  times.
4  Q.  Did you look at any documents in order to
5  prepare for this deposition?
6  A.  No.
7  Q.  Did you search for any documents in order to
8  prepare for this deposition?
9  A.  No.
10  Q.  And are you prepared to testify as Malibu
11  Media's corporate witness for the topics listed in
12  Exhibit 1?
13  A.  These topics.  Hang on.  It would be -- make
14  sure.  There's two pages.  Oh, another one, another
15  page here.  Actually -- actually, hold on.  Oh, I
16  would say yes, I would be prepared.
17  Paul, do you agree, or you don't get to...
18  MR. BEIK:  You're the witness, Colette.  You
19  have to answer the question.
20  THE WITNESS:  Oh, Okay.  This is actually
21  now stuck.  So if I go to document one it says --
22  okay.  So I don't know if I can answer this
23  completely because the documents are cut off.  It
24  says, Defendant will examine Malibu's representative
25  on the matters in the numbered paragraphs set forth

1  below in Schedule A.  In accordance with Federal Rule
2  of Civil Procedure 30(b)(6), Malibu is to designate
3  one or more persons to testimony on its behalf with
4  respect -- Malibu.  I think that's Malinu -- with
5  respect to the matters described in Schedule A and
6  set forth, for each individual designated, the
7  matters on which the individual will testify, no
8  later than five business days before the deposition.
9  It doesn't actually list the matters here in
10  the, in your, your rule for a deposition.  Oh, here's
11  another page.  Here we go.  Now there's a new page up
12  and I can't see.  It's too small.  So I don't know.
13  I can make it bigger.
14  Okay.  Here it is.  These are just the
15  terms.  These are the boilerplate terms.  Topics for
16  examination, here we go.  Okay, definitions.  Okay.
17  Your claim of ownership, covers registration of the
18  copyrights in this case.  The factual and legal
19  basis --
20  MR. BEIK:  Colette, take a moment and just
21  read through it so you can --
22  THE WITNESS:  Oh, sure.  Sorry.  Yeah.
23  Yes, I'm prepared to answer.  Yes.
24  BY MR. KHAZEN:
25  Q.  Okay.  Sorry, I didn't catch that.  So at

1  the end you said "yes"?
2  A.  Yes, I'm prepared to answer.
3  Q.  Okay.  How do you determine who to file suit
4  against?
5  A.  We file suit against whoever -- who the most
6  egregious infringers are.  So say if you were to
7  steal maybe more than five movies over a period of
8  more than two or three years, you would be, it would
9  be a habitual offender, versus someone who may have
10  just put on and took one, or someone who is a student
11  and there were multiple IP addresses.  Someone who's
12  in a house so there'd be no way it could be someone
13  else.  And just, you know, there's a lot -- a lot of
14  factors, but mostly it's the habitual offenders and
15  the most egregious infringers.
16  Q.  What you do mean in a house so there's no
17  way it would be no one else?
18  A.  Well, if you're in an apartment or let's say
19  you have an IP address and you lived in an apartment
20  and there were a lot of other IP addresses, and say
21  they were -- or you had a lot of roommates or
22  something like that and people were sharing an IP
23  address, or, you know, and so things like that.  If
24  it's a -- and especially if it's an IT professional,
25  those guys are usually using torrent and don't expect

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

1 to pay for anything.
2 So and if they've just done it one time or
3 two times, but if it's someone who's done it over a
4 number of years, then you know there's someone who
5 habitually downloads things and thinks they shouldn't
6 have to pay for them, even though other people have
7 to pay to create them.
8 So and the IT professionals usually know how
9 to use BitTorrent, because to use BitTorrent you need
10 to install a torrent client. So you need to look for
11 someone who has some kind of like, you know, some
12 kind of -- an IT professional is usually someone
13 between the ages of 40 and 70, single, male, usually
14 Caucasian for some reason, and I don't know why but
15 it is, and it's usually an IP IT professional. And
16 those are usually the ones that fight back to the
17 very end.
18 And then like the Bellson case, we had one
19 that cost us a quarter million dollars fighting back
20 against, and we took their hard drives. They lied
21 about reinstalling it on the hard drives. And it was
22 just a huge, horrible pain when they could have just
23 said, oh, you know, they did it. And then it turns
24 out, you know, after all this they finally said,
25 okay, we did it, now we're sorry. So it was just --

1 and it's always the IT professionals.
2 So I don't know if -- actually I don't know
3 much about your defendant, this defendant, if he's an
4 IT professional or if it's even a he, actually. I
5 didn't even discuss that, but I'm guessing because
6 usually the people that we choose are they're single
7 males that have gone over multiple years and multiple
8 movies.
9 And I do recall though that there were over
10 30,000 hits and additional evidence on this
11 defendant. And so that shows that he's an habitual
12 infringer on things he should be paying for online,
13 not stealing them by bit torrents. So that would be
14 one way, one reason that we would make that decision
15 to go after your defendant.
16 Q. Now you said there were 30,000 hits. Where
17 did you get this information from?
18 A. No, no, you have -- there's 30 some thousand
19 additional hits. So we've been -- we're about --
20 we're about to start putting up a lot more movies,
21 and so we've been putting up less with COVID and
22 everything like that, but now we're about to start
23 putting up a lot more, but we still have over I think
24 two or 3,000 movies that are on the sites combined.
25 So but again we only sue I think on -- we

1 have 2,000 copyrights on XR, so -- so you -- he would
2 have to have really been over multiple years multiple
3 different movies, and then again he has so many other
4 movies from other sites that this is his way of, you
5 know, downloading whatever he wants to watch or
6 whatever he wants to use for anything.
7 And so that is -- that would be -- your
8 question again was is how do we decide, and so that's
9 basically it. Just, I mean, I'll guess that he has
10 downloaded multiple movies, over two, and over
11 multiple years, and he had -- and I know for a fact
12 that he has over 30,000 infringements on other, on
13 other people's works that should have been paid for.
14 So and he's probably in some kind of IT
15 profession that makes him smart enough to know that
16 he can download a BitTorrent client and do this all
17 for free, and the more he downloads, the faster it
18 will be. And that even though it's illegal, it's
19 completely illegal, that they haven't stopped it yet.
20 I think they will at some point hopefully, but
21 haven't yet.
22 So and there's no way -- the bit torrents
23 are so sneaky, so you do have to be able to
24 technically use them because they've actually changed
25 their tails from dot com to dot T-O-R dot whatever.

1 I mean, every 27 minutes they actually change their
2 tail, and they change their address of where they are
3 so you have to follow that with the client.
4 And so -- and so the people who are using
5 them usually all install a VPN, but some people still
6 don't. You know, no two -- I mean, I don't know that
7 anyone, but a lot of people install a VPN even, which
8 is -- which is -- which is amazing when they're IT
9 professionals. And, you know, in over 9,000 cases
10 that we filed, we haven't had any, you know, any be
11 wrong or incorrect. So I don't know. I mean, am I
12 guessing right? Is any of the thing with your
13 defendant, because I've done this for so long.
14 MR. BEIK: Colette -- Colette, he doesn't
15 answer questions. You just answer --
16 THE WITNESS: Oh.
17 MR. BEIK: -- what he asks.
18 THE WITNESS: Okay. Got it. Okay. So what
19 was the question then? Back to whatever question
20 you're asking.
21 BY MR. KHAZEN:
22 Q. I'm really going to need you to answer my
23 questions, my specific questions.
24 A. Oh, Okay.
25 Q. And also please -- please have your phone on

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

Page 37

1  mute.
2      A.  Oh.  Sorry about that.  I was trying to turn
3  it off.  I had this other thing that was very
4  important.
5      Q.  Please listen to my --
6      A.  Okay.  Go ahead.
7      Q.  -- specific question and wait for my
8  specific questions, okay?
9      A.  Okay.  Got it.
10     Q.  Thank you.  So you said that there were over
11 30,000 additional hits for other people's works.
12 Where did you receive that information?
13     A.  My -- my -- one of my IP attorneys said that
14 about this defendant when he looked at our -- at the
15 data from our, one of our consultants, the IP
16 address.
17     Q.  And did Malibu produce this data?
18     A.  We paid for the data, yes.
19     Q.  Did they produce -- did Malibu produce this
20 data to the defendant in this case?
21     A.  I don't recall.
22     Q.  What other data do you have, do you claim to
23 have regarding my client in this case?
24     A.  Well, I mean, I don't know exactly.  I don't
25 know the exact technical details of it, but I do know

Page 38

1  that I believe that there was something of around
2  over 30,000 additional infringements by your client.
3      Q.  Is there anything else that you can recall
4  in terms of the data having to do specifically with
5  my client in this case?
6      A.  Yeah, that it was over I think 2014 to 2019.
7  So it's not like he just up and, you know, it was
8  from the same IP address to probably the same
9  computer over five years, so it wasn't just by
10 chance.  So he's a habitual, you know, user of
11 BitTorrent and downloading without paying, which is a
12 big problem, so...
13     Q.  Anything else?
14     A.  I can't recall offhand.
15     Q.  So can you explain then how an infringement
16 is detected, an alleged infringement?
17     A.  Infringement detected, okay.  The way it's
18 detected is that we basically, we pull a list of all
19 the IP addresses that have been using the BitTorrent
20 clients to download our movies and other people's
21 movies.  And what we do is the -- I silenced that --
22 we then subpoena the internet service provider, and
23 then we're supplied -- and then the internet service
24 provider will actually send a letter to your client
25 and tell them to stop breaking the law.  And then

Page 39

1  they'll do that three times, and on the third time
2  then we will contact your client.
3      Q.  And how specifically does -- how
4  specifically does that work?  Does IPP connect to
5  people's IP addresses?  What is the --
6      A.  No, it connects -- it doesn't -- no one
7  connects directly.  It connects to the torrents
8  basically.  So torrents are the ones -- so when your
9  client downloads the torrent client, he's actually
10 opening up his computer to, to anyone who wants to
11 take stolen files off his computer or -- remember
12 Napster?  It's like Napster.  It's file sharing.
13     So and anyone who wants to take one of our
14 movies of your -- stolen from his computer, and
15 anyone who wants to steal one of our movies can take
16 it from his computer and he can take it from anyone
17 else's computer.  So it's kind of like opening up a
18 highway when you install the torrent client.
19     Q.  And it's your contention that your
20 consultants took content from my client's computer?
21     A.  No.  No one took -- no one took anything
22 from your client's computer.  Other people that are
23 stealing might have, but we don't have anything to do
24 with that.  So no one took anything from your
25 client's computer.  They -- it was -- it was from the

Page 40

1  torrent clients is where we got the information, and
2  your client's IP address was listed on the torrent
3  clients.
4      Q.  So when your -- when your consultants wrote
5  in a declaration that they connected to my client's
6  computer, that wasn't true?
7      MR. BEIK:  Objection, form.
8      THE WITNESS:  Do you want to change your
9  form or should I answer?
10 BY MR. KHAZEN:
11     Q.  You can answer.
12     MR. BEIK:  Go ahead.
13     THE WITNESS:  Okay.  So no, we never
14 connected to your client's computer.  So your client
15 connected to the torrents.  And so we got our
16 information from the BitTorrent and the BitTorrent
17 client.  And so that's -- your client connected to
18 them.
19     And so no one -- so when they download
20 something -- when someone downloads an illegal movie,
21 it might come from your client's computer and but
22 we're not logging onto your client's computer and
23 taking anything from there or getting any of our
24 information from your client, we're getting it from
25 the BitTorrent, and that's where your client's IP

Pages 37 to 40

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

Page 41

1  address is because he made it available there.
2  BY MR. KHAZEN:
3      Q.  Do you -- when your -- do you know -- are
4  you aware that your client downloaded what he claimed
5  or what they claimed to be pieces of your movies?
6          MR. BEIK:  Objection, form.
7          THE WITNESS:  Yeah, I don't understand what
8  he's -- what are you saying?
9  BY MR. KHAZEN:
10     Q.  Are you aware that your consultants said
11 that they downloaded pieces of your copyrighted
12 movies?
13     A.  Our consultant said that they downloaded
14 pieces of our copyrighted movies?  How is that -- I
15 don't understand what you're saying.
16         MR. BEIK:  Colette, if you don't -- if you
17 don't understanding the question, just ask him, ask
18 him to clarify it for you.
19         THE WITNESS:  Can you clarify that question
20 please?
21 BY MR. KHAZEN:
22     Q.  Are you -- so you said that they connect to
23 the BitTorrent network; is that correct?
24     A.  Right.
25     Q.  Your consultants?

Page 42

1      A.  (Nods head.)
2      Q.  And they downloaded pieces of your
3  copyrighted works from the BitTorrent network; is
4  that correct?
5      A.  Correct.
6      Q.  And do you know where those pieces of data
7  came from?
8      A.  Do I know where they came from?  No, I don't
9  know where they all came from, but I do know the IP
10 addresses that many of them came from.  And the ones
11 that are attached to our movies, if there are
12 multiple movies with the same IP address that are
13 infringing on our movies, then we will zero in on
14 those IP addresses.
15     Q.  And was one of the IP addresses, according
16 to your contentions, the IP address of my client's
17 network?
18     A.  That's correct.
19     Q.  So your consultants then downloaded a piece
20 of data from, that came from the IP address of my
21 client's computer --
22         MR. BEIK:  Object to form.
23 BY MR. KHAZEN:
24     Q.  -- according to your contentions, correct?
25     A.  No, I don't think you understand how the bit

Page 43

1  torrents work.
2      Q.  How do they work?
3      A.  Okay.  So what happens is when you have --
4  when you -- like if you know how Napster used to
5  work, I don't know if you ever used Napster before
6  everyone found out it was illegal, you have to
7  download a client, right.
8          Like if you're using citrus systems, or even
9  if you're using Zoom, right, like, to use Zoom you
10 need -- you just download a client.  So that's -- so
11 that is a client-server relationship instead of like
12 a peer to peer where we would just be like talking on
13 FaceTime where you don't need to download a client.
14         So or -- so basically you download a torrent
15 client and that, what that does is it opens up your
16 computer saying, hey, I'm here.  Here's my IP
17 address.  It's available for, for you to take
18 anything you want off my computer that's stolen, and
19 I will then take anything I want off your computer
20 that's stolen.
21         And so basically what it does is whoever
22 downloads more movies, they get a faster download
23 time.  And whoever -- and so basically for us, like
24 we can't compete with free.  So it's -- and if you're
25 doing this over multiple years, you know, you're

Page 44

1  downloading the new client every year, because, like
2  I said, they change to keep people out so it makes it
3  harder and harder.  But the guys who are up on it are
4  usually IT guys, and they, they just -- so it's
5  basically you just have to download the client and
6  then you choose the movies you're looking for,
7  instead of paying for them.  You use it as an illegal
8  sharing software basically.
9          Like the Fly, he gets a little thing, it
10 breaks him up into little pieces, like that's his
11 head, and then they -- then it sends across the thing
12 and the pieces are put back together, that's what
13 happens to the movies.
14     Q.  And it's sent from one network to another,
15 correct?
16         MR. BEIK:  Objection, form.
17         THE WITNESS:  Yeah, I'm not sure -- I mean,
18 you can Google how does BitTorrent work and you can
19 see exactly, but it depends on what you're using it
20 for.  There's a lot of different ways to use
21 BitTorrent, so I'm not sure -- I mean, you're asking
22 the questions, yeah.
23         So it's basically, you know, I would suggest
24 Google how does BitTorrent work and then you'll see
25 the different ways and you'll see the way that your

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

Page 45

1  client was using it to illegally download files that
2  should be paid for.
3  BY MR. KHAZEN:
4      Q.   So just to be clear, though, IPP's forensic
5  servers never connected to my client's IP address?
6      A.   Never.
7          MR. BEIK:  Object to form.
8  BY MR. KHAZEN:
9      Q.   And my client never distributed any content
10 to IPP, correct?
11         MR. BEIK:  Objection, form.
12         THE WITNESS:  I don't know what your client
13 did.
14 BY MR. KHAZEN:
15     Q.   Well, your -- your -- as Malibu Media's
16 corporate witness you're saying that you don't know
17 whether my client distributed any of your copyrighted
18 works?
19     A.   Well, I'm sure they did, I just don't know
20 over how many years specifically what they did,
21 because I think it was over five years, so I don't
22 know specifically what they did distribute and what
23 they didn't and, yeah.
24     Q.   Right.  So just to be -- just to be clear,
25 your, it's your contention that my client distributed

Page 46

1  data to, to IPP using the BitTorrent protocol; is
2  that correct?
3      A.   No.  No.  He did not distribute data to IPP.
4  You still don't understand how it works.  He
5  basically -- IPP saw that his IP address was, was
6  stealing our movies, and we could see his IP address
7  stealing our movies multiple times.  We probably --
8  he probably stole them more times than we captured,
9  we just, I captured just five times, something like
10 that.
11         But they didn't -- they did not share it
12 with IPP.  That's not how he got caught.  He got
13 caught because he installed the client and his IP
14 address showed up.
15     Q.   Okay.  So just -- so my client did not
16 distribute IPP -- to IPP pieces of Malibu Media's
17 copyrighted movies?
18         MR. BEIK:  Objection, form.
19         THE WITNESS:  Can you clarify that, please?
20 BY MR. KHAZEN:
21     Q.   Well, I'm just following up on your last
22 answer that my client did not distribute to IPP
23 pieces of Malibu Media's copyrighted movies.  That's
24 correct, right?
25     A.   I don't know.  I don't know who your client

Page 47

1  distributed movies to, besides that he did.
2      Q.   Okay.  So as Malibu Media's corporate
3  witness, you don't know whether or not my client
4  distributed data to IPP's servers?
5      A.   He obviously did distribute data.  Well, he
6  did -- he didn't necessarily distribute it.  I think
7  you have the words wrong.  He -- he was making our
8  movies available to whoever wanted them, so IPP could
9  see this.
10     Q.   And IPP never downloaded any, any or any
11 data from my, from my client's network?
12         MR. BEIK:  Objection, form.
13 BY MR. KHAZEN:
14     Q.   Correct?
15     A.   You know, I don't -- I can't answer that.  I
16 don't believe so.  But I -- once this investigation
17 got going -- I don't believe so.  That's not how we
18 do things.  But unless there's an issue finding
19 where, you know, where it came from or anything --
20 here it is -- I don't -- I don't believe so, but
21 because that's not how it works.  So I don't know
22 who's telling you how this works or where you're
23 getting you're assumptions but --
24     Q.   No, I'm trying to understand.  I'm just
25 trying to understand.  So, okay.  So just to be

Page 48

1  clear, my client did not distribute to IPP servers
2  pieces of Malibu Media's copyrighted materials,
3  correct?
4          MR. BEIK:  Objection, form.
5          THE WITNESS:  As far as I know, but stranger
6  things have happened.
7  BY MR. KHAZEN:
8      Q.   Okay.  So it's to your knowledge, to your
9  knowledge my client did not distribute to IPP servers
10 pieces of Malibu Media's copyrighted materials,
11 correct?
12         MR. BEIK:  Objection, form.
13         THE WITNESS:  I can't answer that because I
14 don't know.
15 BY MR. KHAZEN:
16     Q.   Okay.  So you have no -- so as Malibu
17 Media's corporate representative, you have no
18 knowledge of my client distributing to the IPP
19 servers pieces of Malibu Media's copyrighted
20 materials, correct?
21         MR. BEIK:  Objection, form.
22         THE WITNESS:  Millions of people are --
23 millions are on the torrents every day, and they're
24 opening up that little bridge that let's everyone
25 share the movies and the copyrighted material and not

Page 49

1  have to pay for it.
2        And so it's, you know, so -- so it's most
3  likely they might have done that and went to go --
4  and if they're actually going to make another torrent
5  themselves, they'll be in bigger trouble than just
6  using one torrent.
7        So I don't know why they would want to, you
8  know, use this as a, oh, you didn't know what we
9  mean, now we're going to -- I'm mean, I just don't
10  understand what you're asking.
11    Q.  Okay.  So it's possible then that IPP did
12  download data from my client's computer?
13    A.  No.
14    Q.  And so it's -- so it's not possible that IPP
15  did, or, sorry, it's not possible that my client
16  distributed data to IPP servers?
17    A.  Data to IPP servers?  No.  IPP gathered
18  their own data.  Your client didn't do any
19  distributing to IPP servers.
20    Q.  Let me see.  Now, you mentioned something
21  about, you know, we were discussing a little earlier
22  about you said that you look for people that are in a
23  house, and that's because, because you said something
24  about apartment complexes can have multiple people
25  around, that sort of thing.  I just want to kind of

Page 50

1  go back to that.  So you understand that when you
2  identify an IP address, you're not identifying a
3  person, correct?
4        MR. BEIK:  Objection, form.
5        THE WITNESS:  Yes, but the thing is we are
6  identifying the actual, the actual address to that
7  location, that residence.  And so whoever is using it
8  is -- should be a resident or have privileges to use
9  that IP address at that place.
10  BY MR. KHAZEN:
11    Q.  Right.  And so it could be any number, any
12  number of people could have privileges to that IP
13  address, correct?
14    A.  This is true.
15    Q.  And it could be hundreds -- it could be a
16  hundred people?  There's no -- is there any limit to
17  the number of people that could be behind a
18  particular IP address?
19        MR. BEIK:  Objection, form.
20  BY MR. KHAZEN:
21    Q.  To your knowledge?
22    A.  No, there's not.
23    Q.  I'm sorry, I didn't quite --
24    A.  Could you repeat the question?
25    Q.  To your knowledge -- to your knowledge there

Page 51

1  could be any number of people that could have access
2  to any particular IP address that you identify,
3  correct?
4    A.  No, they wouldn't know because they're not
5  looking like we are.  They wouldn't know what IP
6  address they have access to.
7    Q.  Who wouldn't -- who wouldn't know what IP
8  address they have access to?
9    A.  The other people that you're talking about,
10  that any number of people could have access to the IP
11  address, that's not true because all the other number
12  people wouldn't know what IP address that they were,
13  that they're getting the movies from.  We're the ones
14  looking for it.  They're not looking.
15    Q.  There are -- there can be multiple computers
16  on a -- connected to -- connected to that are using
17  one IP address; is that correct?
18    A.  That is correct.
19    Q.  And there could be multiple people that are
20  using one IP address, correct?
21    A.  Correct.
22    Q.  So when you identify an IP address, you're
23  not identifying an end user, correct?
24    A.  Yeah, but that's why we have social media
25  and that's why we have investigators and that's why

Page 52

1  we have additional evidence so we can actually make
2  sure that we know the person that was infringing is
3  the person that owns that IP address.
4    Q.  Okay.  So without additional evidence,
5  there's no way of knowing whether an IP address --
6    A.  Well, most of the time when they get the
7  letter from their internet service provider, the
8  downloading stop almost immediately, so that kind of
9  tells you.
10    Q.  So there's no way to know -- there's no way
11  to know without additional evidence whether or not a
12  person, a particular person is using an IP address,
13  correct?
14    A.  No, that's not correct.
15    Q.  Please -- why not?
16    A.  Because you're -- just what you're saying is
17  not correct.  You're saying there's no way to know
18  without additional evidence, and that's not correct.
19  Additional evidence helps, but if you're the only
20  person in the house with access to the IP address and
21  access to the computer, and you have clients on the
22  computer, and again no one else comes in the house
23  and then who else did it?
24    Q.  Well, that's all additional evidence, isn't it?
25    A.  No.

Pages 49 to 52

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

Page 53

1    Q.  Why not?
2        MR. BEIK:  Objection, form.
3    BY MR. KHAZEN:
4    Q.  How do you know -- how do you know the
5    person is the only person in the house without
6    access -- with access to the network?
7    A.  We have investigators.
8    Q.  Let me just ask you this:  Do you have any
9    additional evidence, any -- let me strike that.  Do
10   you have any evidence that my, that my client is the
11   person who downloaded your movies, and what evidence
12   is that?
13   A.  I don't know if I'm able to give you that
14   information at this point.
15   Q.  Why not?
16   A.  Why not?  Because we're going to trial.
17       MR. BEIK:  Ramzi, can I have a minute to
18   talk to her?  I think she's confused on what you're
19   asking.
20       MR. KHAZEN:  Well, let me...
21       THE WITNESS:  You want me to answer more
22   question?  I mean, so it's -- these questions are
23   just not making sense.
24   BY MR. KHAZEN:
25   Q.  What evidence do you have that my client

Page 54

1    infringed your copyrights?
2    A.  His IP address, his location, his exact
3    geolocation over five years has downloaded our movies
4    from the same torrent and 32,000 other, other pieces
5    of content.
6    Q.  Do you have any other evidence that you
7    claim against, to be against -- to prove that my
8    client has downloaded your movies?
9    A.  I believe so, but I'm -- I want to talk to
10   my attorneys about that before disclosing that.
11   Q.  Is there a privilege issue?
12   A.  There may be.  I don't know.  I just think
13   it would be something that --
14       MR. BEIK:  You could --
15       MR. KHAZEN:  Okay.  Let's go off the record.
16       MR. BEIK:  Hang on one second.  There's -- I
17   think that she's concerned about the protective
18   order, and so that -- let me -- we've got it
19   stipulated.  Let me talk to her one second.
20       THE VIDEOGRAPHER:  Off the record at 10:45.
21       (Discussion off the record.)
22       THE VIDEOGRAPHER:  We are back on the record
23   at 10:50.
24   BY MR. KHAZEN:
25   Q.  Welcome back.  So just where we left off,

Page 55

1    what evidence does Malibu Media have as Malibu
2    Media's --
3    A.  He's an IT professional, he --
4    Q.  Please -- please let me answer -- let me
5    finish my question.
6    A.  Okay.
7    Q.  What evidence -- as Malibu Media's corporate
8    representative, what evidence does Malibu Media have
9    that my client infringed Malibu's copyrighted works?
10   A.  We've tracked the IP address back to his
11   address, his computer over multiple years, so his IP
12   address over multiple years of our movies.  There's
13   32,000 or so other infringements.  He is an IT
14   professional.  He fits the criteria of someone who
15   would be downloading our movies.  He's downloaded
16   other similar movies, and he's in a single family
17   residence.
18       I mean, just everything fits the criteria of
19   someone who would be downloading our movies.  And
20   that has passed, passed everything in the Bellwether
21   trial with Judge Bellson, if you read that.  And we
22   have all the evidence that we need pointing to your
23   client as infringing upon our content.
24   Q.  Now, I'll just use the term "his," you know,
25   just for convenience sake.  So you say you mentioned

Page 56

1    his computer.  Do you have evidence that his computer
2    was used to download it, to download any Malibu Media
3    copyrighted?
4    A.  We have evidence that it was, it was at
5    the -- very, very close to the router at his house.
6    And to download a very large file, it would probably
7    take you maybe six hours, even with the fastest ISP
8    that's possible.
9        So -- so that would be really not -- you
10   know, I just don't think that that's -- it's not his
11   computer but it is -- there's no way it could be
12   someone else sitting outside his house for hours and
13   hours trying to connect onto his password protected
14   IP address.
15   Q.  Could it be a member of the family?
16   A.  What?
17   Q.  Could it be a member of his family?
18   A.  I don't believe so from the research we've
19   done.
20   Q.  Why not?
21   A.  Because I don't believe there's anyone that
22   fits the profile.  If there is someone, and he wants
23   to tell us who else it was, then we will back off him
24   and go after the person that was the infringer.  But
25   if he doesn't want to tell us that, which I don't

1 think we'd be here today if he wanted to tell us and
2 give us -- like, now I'm recalling that your client
3 actually hasn't given us any reason why he didn't do
4 it. He's just saying, Oh, well, your software
5 doesn't work, or something. Well, he said it five
6 times, and so over from 2004 to 2019.
7     So, I mean, we have to pay to make these
8 movies. We have to pay the models, pay for
9 locations, we have to pay for -- it's not free. I
10 mean, we're not doing this as a free service. And so
11 he's not even given us the -- another excuse as to
12 who it could be. He didn't say, I didn't do it, so,
13 you know, this, that or anything like that.
14     Q. That you believe that he downloaded from
15 2014 to 2019?
16     A. It would be -- it was -- yeah, it might have
17 been '15. Yeah, it could have been. Yeah, I
18 think -- I think -- I think we might have missed '14,
19 but for a hundred percent we have '16 -- no, I think
20 we do have a '14 from him as well, so...
21     MR. BEIK: Colette, would you like a copy of
22 the complaint to refresh your memory?
23     THE WITNESS: Sure, if you want to refer me.
24     MR. BEIK: Ramzi, do you have a copy of the
25 amended complaint that has all that listed there to

1 refresh her memory, because the exhibits list exactly
2 the dates and the titles and all that. That would
3 probably help her rather than having her go off of
4 memory.
5     THE WITNESS: Yeah, because I'm just kind of
6 going off of memory. You know, just, I'm just trying
7 to be as honest as humanly possible. I'm just
8 letting -- you know, just saying this is why we
9 believe he is -- that he's --
10 BY MR. KHAZEN:
11     Q. Well, I mean, is the -- is the extent of the
12 infringements that you're aware, the alleged
13 infringements that you're aware of contained in the
14 complaint or are there additional alleged
15 infringements that you contend happened that are not
16 listed in the complaint?
17     A. I'd have -- I'd have to speak to my
18 attorneys about that as far as me just being the
19 corporate representative, I'd have to speak to the
20 attorneys about that. And then as far as the, you
21 know, as this moves forward, we'll depose your
22 client. I mean, he has not offered us another --
23     MR. BEIK: Okay. Let's just answer his
24 question.
25     THE WITNESS: Okay.

1     MR. BEIK: He asked the question. Let's
2 answer it, okay?
3     THE WITNESS: I'm sorry. Repeat -- please
4 repeat the question.
5 BY MR. KHAZEN:
6     Q. Are you aware of any additional alleged
7 infringements other than those listed in the
8 complaint against --
9     A. I'm not aware at this time.
10     MR. BEIK: Objection, form. What -- I don't
11 understand what infringements you're asking about,
12 Ramzi.
13 BY MR. KHAZEN:
14     Q. Okay. Please just object to form and please
15 just answer the question. So are you aware of any
16 additional alleged infringements against my client
17 other than those listed in the complaint?
18     A. I'm not aware at this time, but that could
19 change. It could change any day.
20     Q. Why do you believe -- why do you believe it
21 could change any day?
22     A. Sometimes we bring up more -- I mean,
23 usually they stop when they're getting into a
24 lawsuit, but sometimes they don't, so...
25     Q. Okay. Are you -- can you -- can you

1 elaborate? What do you mean it could change?
2     A. Oh, I'm just talking --
3     Q. Do you have any -- do you have any reason to
4 believe or any as -- let me strike that. As Malibu
5 Media's corporate representative, do you have any
6 reason to believe that there are additional
7 infringements other -- by my client alleged other
8 than those in the complaint?
9     A. At this -- at this point I do not.
10     Q. So just to be clear, so how do you know
11 that -- you said that it's your understanding that
12 the downloads that took place were from a computer
13 close to the router; is that correct?
14     A. Yes.
15     Q. And on what basis do you say that?
16     A. I believe we got that information from the
17 internet service provider, and -- huh?
18     Q. Go ahead.
19     A. I believe we got that information from the
20 internet service provider that the, that that router
21 is in very kind of a hub.
22     Q. What do you mean by that?
23     A. I mean, a lot of -- a lot of -- a lot of
24 stuff passes through. Like we wouldn't -- there
25 would be -- if we only had 25,000 hits, like however

**New York**
**212-273-9911**

Hudson Court Reporting & Video
1-800-310-1769

**New Jersey**
**732-906-2078**

Page 61

1  many -- your software that you're telling, so, yeah,
2  that's...
3       MR. BEIK:  Colette?
4       THE WITNESS:  Yeah.
5       MR. BEIK:  Are you okay?
6       THE WITNESS:  Yeah, yeah.  Sorry.  I was
7  just taking a second.  So go ahead.  I'm sorry.
8  BY MR. KHAZEN:
9       Q.  Are you -- are you on any medications today?
10      A.  No, not at all.  I'm sorry.  I didn't sleep
11  and I have another very -- case I was up working on
12  all night, and they just called and moved it to
13  federal court, and was I talking to answer a bunch of
14  things.  So I'm sorry about that.
15      Q.  Are -- and please just understand I have to
16  ask these questions.  I mean, are you -- are you
17  under the influence of any, of any --
18      A.  No.
19      Q.  -- substances that might affect your
20  testimony today?
21      A.  No, but I am actually not feeling good.  I'm
22  feeling a little bit tired.  I worked so hard all
23  weekend on something that changed about five minutes
24  before we started this deposition.  So -- so, yeah, I
25  mean, it would actually be really good for me if we

Page 62

1  could do this a little bit later and I could attend
2  to what I need to attend to.
3       MR. BEIK:  Colette.
4       THE WITNESS:  But I'll finish if we need to.
5  If we have to do it, I'll finish.
6  BY MR. KHAZEN:
7       Q.  Well, I mean, I -- if at any point during
8  this deposition you are not under full capacity to
9  answer my questions fully and truthfully, can you
10  tell me?
11      A.  Yeah.  No, I can answer your questions fully
12  and truthfully.  I just have a lot on my mind.
13      Q.  Okay.  So and if you need to take a break at
14  any time, please tell me, okay?
15      A.  Yeah.
16      Q.  Okay.  So what specific information that you
17  said that -- you mentioned that it was part of a hub.
18  What specific information did you receive from the
19  ISP that leads you to believe that the infringement
20  took place close to a -- at a computer that was close
21  to the router?
22      A.  Okay.  So what specific information we
23  received from the ISP that -- we received the
24  address.  So we received the address from the ISP,
25  and, yeah.

Page 63

1       Q.  Is that it?  Is that the only evidence that
2  you received from the ISP?
3       A.  The name and the address and also the -- we
4  have additional evidence as well.
5       Q.  What is the additional evidence?
6       A.  The additional infringed content.
7       Q.  Okay.  So what additional infringed content
8  are you referring to?
9       Hello?
10      A.  Paul's frozen.  It's -- it says "your
11  internet connection is unstable."  You both look
12  like -- now I know why you're saying that, because
13  you both looked like you were stalled, like you're
14  like this, and your internet said your internet froze
15  and is unstable and now you're both back.  So I don't
16  know what's going on, but I think that's what
17  happened before when you were trying to ask me
18  questions.
19      Q.  All right.  Let me -- let me just start
20  over.  What evidence do you have, other than the IP
21  address, that leads you to believe that my client
22  infringed your copyrighted work?
23      MR. BEIK:  Object to form.  Ramzi, I think
24  you've asked this same question.
25      THE WITNESS:  No, that's why I'm falling

Page 64

1  asleep because it's like these are all the same
2  questions over and over and over.  I don't understand
3  what you want me to say.
4  BY MR. KHAZEN:
5       Q.  You listed his address, you listed he's an
6  IT professional so he fits a profile, and you said
7  that his computer is close to the router.  Are there
8  any other --
9       A.  Our software has identified his IP address
10  as downloading our, our copyrighted works for his,
11  for his viewing pleasure and downloading to his
12  computer without paying for them off of an illegal
13  BitTorrent client sharing protocol.  What else do you
14  need?
15      Q.  Is there any other evidence that you have?
16  I'm trying to make sure that I have all of the
17  evidence that you claim that you have that my client
18  infringed your copyrighted works.  So you mentioned
19  his IT address.
20      A.  As far as what I know, but the experts --
21      Q.  Please don't -- please don't interrupt --
22  please don't interrupt me.  And please take this
23  seriously, okay.  You -- you're under oath.  All
24  right.  Now, I need to know all of the evidence that
25  you have, right, that you claim to have that my

Pages 61 to 64

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

Page 65

1   client infringed your copyrighted works.
2        I have here, based on your previous answer,
3   you said, you listed that you have his IP address,
4   you said that his computer was close to the router,
5   and that you said he's -- that he fits the profile
6   because he's an IT professional.  Is there any other
7   evidence that you have that my client infringed your
8   copyrighted works other than the IP address of his
9   network, that a computer was close to the router, and
10  that he fits a profile that you claimed to have?
11       MR. BEIK:  Object to form.
12       THE WITNESS:  Well, fitting the profile and
13  the computer being close to the router really have
14  nothing to do with it, or being an IT professional.
15  What really makes him be the, the infringer is his IP
16  address that is password protected, and he is the
17  only person, as far as -- unless he wants to get --
18  say something else.
19       As far as when we've asked, so far you
20  haven't given any -- said there's another person who
21  downloaded it or given us any other explanation that
22  it was this person that was downloading the illegal
23  content.  And so we know that whoever was in that
24  single family home with that IP address, which is
25  your client, downloaded the, the content and

Page 66

1   infringed upon it illegally.
2        So I'm not sure how many more times I can
3   say the same thing or how many different ways, but
4   it's not -- it's not that -- it's not that his house
5   is close, that he's an IT professional, or that he
6   fits a profile, that has nothing to do with it.  What
7   has to do is that he actually -- we detected over
8   9,000 times, we've never gotten it wrong, that his IP
9   address downloaded our content.  And so that -- that
10  happened.
11       And so there's other -- there's other things
12  that we can get into on a more technological basis,
13  but all we need to know at this point is is that
14  happened.  And so we're going to have to get an
15  expert testimony that explains to the judge or jury
16  how it works, you know, in just piece by piece, not
17  technological because that would be like, you know,
18  if someone asked you how to build a block chain, you
19  probably wouldn't know how to do it, or now to write
20  coded python, you wouldn't understand it.  It would
21  be speaking a different language.
22       So for me to try to explain to you how we're
23  capturing his IP address, it would be speaking a
24  different language.  I'm not going to go explain the
25  entire code because you're not going to understand

Page 67

1   it.  It would take -- and it wouldn't be possible to
2   do in this amount of time.
3        So all I can tell you is that based on what
4   our experts have done, and the code that we have
5   developed, your client, and he probably understands
6   this because he's an IT professional, it has been
7   captured as downloading our copyrighted content and
8   illegally downloading that and 22,000 other
9   copyrighted content.  So it's -- so that is it.
10       It doesn't matter about the profile.  It
11  doesn't matter about the home.  It doesn't matter
12  unless -- unless he'd like to offer some kind --
13  somehow how did this content get downloaded to his IP
14  address.
15  BY MR. KHAZEN:
16       Q.   Okay.
17       A.   He's not --
18       Q.   I'm going to need you to please answer my
19  specific questions.  You've been giving me --
20       A.   That's what I said.  I said his IP address
21  doesn't capture --
22       Q.   This is why it's not proceeding very fast.
23  I'm really going to need you to answer my question
24  and my specific questions from now on, okay?
25       A.   Okay.

Page 68

1        Q.   Now, you said that has nothing to do with
2   his profile or, or the proximity to the router, that
3   it is based on his IP address being password
4   protected; is that correct, that you believe that he
5   is -- his -- that he is the infringer because the
6   data that was sent out was, came from an IP address
7   registered to him that was password protected; is
8   that correct?
9        A.   The data was sent out to him, not so much
10  that if it was password protected or not because if
11  there's someone else who was downloading it, even if
12  it -- if they knew his wifi address, they'd have to
13  be parked outside his house for hours and hours on
14  end, and that just is -- that just doesn't happen.
15       So and also since he's done it I think over
16  four or five years, it's -- it would be a little bit
17  strange to have someone at all different times of the
18  year parked outside of your house downloading content
19  just randomly from our little website.  So it's, you
20  know, it's definitely -- it's -- so it's -- it is the
21  IP address.
22       And the technology we used to capture it is
23  the reason that we, that we feel he's guilty.  And
24  not because it's password protected or anything like,
25  anything like that.  So it's not the -- so it's

Pages 65 to 68

Page 69

1    everything you said but just the password protection,
2    it's, you know, it's kind of a given at this point.
3        Q.   Are you familiar with long-range wifi
4    networks?
5        A.   With what? Long bridge?
6        Q.   Long-range wifi networks.
7        A.   Long-range wifi networks.  I've heard of it.
8        Q.   And so are you, are you aware that a
9    long-range wifi network can reach further than, you
10   know, outside someone's house?  It can reach within
11   the proximity of several houses more, or more?  Are
12   you aware of this?
13       A.   I am aware of that, but it's over that much
14   time, how long he's taken between the infringements
15   and how long it takes to download one movie, are you
16   aware -- you're asking the questions, but it takes
17   probably, like I said, about six hours to download
18   one movie.
19       So even if you had a long-range wifi,
20   that's, I mean, that's not an excuse.  I mean,
21   it's -- that's not -- that's not an excuse.  I mean,
22   this is just -- it's embarrassing how, how these
23   people steal movies to try to make excuses and say,
24   oh, so what about the other 32,000 things he stole?
25   They're all in the long-range wifi?

Page 70

1        MR. BEIK:  Colette, please let's just answer
2    his questions.
3        THE WITNESS:  Okay.  Okay.  Okay.  So, yes,
4    I'm aware of what a long-range wifi.  That's your
5    question.
6    BY MR. KHAZEN:
7        Q.   Okay.  Now, do you have any reason to
8    believe that the, that my client was the, was the
9    infringer, or strike that.  Strike that.  Do you have
10   any reason to believe it was not another member of
11   the household that downloaded the movies, and if so,
12   what --
13       A.   Because your client hasn't come forward.  I
14   believe we've asked that question and your client
15   hasn't offered any alternative solution that it
16   wasn't an alternate member of the household or
17   anything.  And he's not given any -- said, oh, it
18   wasn't me, it was my father, it was my son or
19   anything like that.
20       He keeps just giving no -- he just says --
21   he keeps just saying, oh, your software doesn't work.
22   And so we know our software works, so that's why it
23   would be hard for me to believe that it's another
24   member of the household, he should say something.
25       Q.   Now, you say that you had 9,000 cases and

Page 71

1    you've never accused anyone that's been innocent.  Is
2    that -- is that your testimony under oath, that
3    nobody in the 9,000 cases that you've filed has been
4    innocent?
5        MR. BEIK:  Object to form.
6        THE WITNESS:  As far as I know -- as far as
7    I know I believe no, but, but back in 2013 or '14 we
8    had a different system, and I think it wasn't quite
9    as precise.  So recently though, I don't know that
10   anything has been wrong, it just might have been
11   someone else in the household, but it's quite
12   accurate though.  So I can't say 100 percent, but it
13   is quite accurate.
14   BY MR. KHAZEN:
15       Q.   So it's possible you've accused innocent
16   people?
17       MR. BEIK:  Object to form.
18       THE WITNESS:  I don't believe we've accused
19   innocent people.  I believe that we would have
20   inquired.
21   BY MR. KHAZEN:
22       Q.   You would have inquired?  What does that
23   mean?
24       A.   We have inquired if to the ISP if that
25   address is downloading our content and from where and

Page 72

1    without paying.  And so -- so basically, it's just so
2    if they said -- if they said, okay, no, we didn't do
3    it and it was someone else in the house and then we
4    would go from there.  So I don't believe we would get
5    as far as to accuse an innocent person or ever take
6    an innocent person to trial.  No, we've never done that.
7        Q.   Have you ever filed suit against an innocent
8    person?
9        A.   That I can't recall.
10       MR. BEIK:  Form.
11   BY MR. KHAZEN:
12       Q.   So it's possible that you filed suit against
13   innocent people?
14       A.   If we -- if we did, which I don't know, we
15   would have dismissed it.
16       Q.   And it's -- which means that it's possible
17   that you have filed suit against innocent people,
18   correct?
19       MR. BEIK:  Object to form.
20       THE WITNESS:  Yeah, I just -- I really don't
21   believe we have.  I mean, in all those people, was it
22   a million or something, yeah, I don't -- I don't -- I
23   don't think it's -- no, we have not accused an
24   innocent person or filed a suit against an innocent
25   person.  And if we have, if we have, it's been

Pages 69 to 72

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

Page 73

1   dismissed like very, very quickly.
2   BY MR. KHAZEN:
3       Q.   If you have.  So it is possible?
4       A.   I'm saying if we made a mistake, we would
5   have -- we would quickly dismiss it.
6       Q.   I need your testimony under oath that you're
7   saying that out of the 9,000 cases you've filed
8   you've never filed a case against an innocent person,
9   and I want to understand if that's a correct
10  understanding or not, and please give me a straight
11  answer.
12          MR. BEIK:  Object to form.
13          THE WITNESS:  You know, sir, I actually
14  don't know.  A lot of times we have lawyers who have
15  been handling this for us because we're running the
16  business, and, you know, I'm shooting and I'm
17  traveling and so I've had lawyers protect the
18  copyrights, so I just -- I can't know every --
19          MR. BEIK:  Colette, I'd ask you to answer
20  the question that he asked, and so just answer the
21  question that he asked.
22          THE WITNESS:  So is it possible or not?  So
23  it is possible that -- it could be possible.
24  BY MR. KHAZEN:
25      Q.   Now, you understand that my client uses,

Page 74

1   that my client and everybody uses a router, right,
2   pretty much?  It's very common to use a wifi router,
3   correct?
4       A.   Yes.
5       Q.   And any -- and multiple people can connect
6   to the same router, correct?
7       A.   Yeah.
8       Q.   And if somebody else besides my client
9   connected to his router and used a BitTorrent
10  network, IPP would have detected that equally to my
11  client having done it, correct?
12          MR. BEIK:  Object to form.
13          THE WITNESS:  You said -- can you ask the
14  question again please?  It's -- I don't understand if
15  you're asking a question or you're just repeating
16  something.  Would you just...
17  BY MR. KHAZEN:
18      Q.   If someone connected -- if someone else had
19  connected to my client's wifi router and downloaded
20  your copyrighted works off of the BitTorrent network,
21  IPP would not be able to tell the difference,
22  correct?
23          MR. BEIK:  Object to form.
24          THE WITNESS:  No, they would.  I think
25  they -- I think -- I believe they would be able to

Page 75

1   tell the difference because they deal with the
2   hundreds and thousands of infringements a day, and
3   just to see -- just to see the look of the software
4   and the -- and, yeah.  No, I believe we would -- they
5   would know the difference.
6   BY MR. KHAZEN:
7       Q.   How?
8       A.   How?
9           MR. BEIK:  Object to form.
10  BY MR. KHAZEN:
11      Q.   How?  You said you believed they would know
12  the difference.  How?
13          MR. BEIK:  Object to form.
14          THE WITNESS:  Because it's been over five
15  years and it just, it doesn't make sense.
16  BY MR. KHAZEN:
17      Q.   Is that your only reason?
18      A.   The question -- the question is like how
19  would -- how would we -- how would I -- how would
20  they know if someone else connected to the wifi
21  router versus -- and it wasn't password protected and
22  then someone else captured -- connected to it over
23  five years and, you know, and walks over, you said
24  whatever, how many ever times it was and then a
25  couple of the other boys in the house or whatever

Page 76

1   they -- I mean, I don't understand.
2           Like I feel like you keep repeating
3   yourself, asking me the same question, like how do we
4   know this, how do we not know this.  And again I
5   would need to explain to you how the software works.
6   So can you just ask one more very concise question?
7   You're asking me how, how.  You keep saying "how."
8       Q.   I'm asking you to explain how, how you would
9   know that it's not someone else that's connected to
10  my client's router that allegedly downloaded Malibu's
11  works?
12      A.   Okay.  Because I can -- the question, that
13  is because --
14          MR. BEIK:  Object to form.
15          THE WITNESS:  -- your client -- your client
16  has not offered an alternative infringer except for
17  himself.  So what -- if he's not -- if I were going
18  to steal someone's software and then I didn't -- and
19  or I knew someone was using my wifi to download
20  software, and then I got caught for it, I would say,
21  wait a minute, there was someone at my house on this
22  day and they, they could have possibly stolen the,
23  stolen the software and -- or stolen copyrighted
24  materials.
25          And so this would have been -- so I would

Page 77

1  offer an alternate scenario and then, you know, I
2  mean, that's just a normal thing with the law.  If
3  there's an alternate scenario, you need to offer it.
4  Your client has not offered and alternate scenario.
5      MR. BEIK:  Okay.  Okay.  Let's just answer
6  the question asked please.
7      THE WITNESS:  So he hasn't offered -- he
8  hasn't offered an alternate scenario.  That's how I
9  know.
10 BY MR. KHAZEN:
11     Q.  Are there any other reasons beside the one
12 you just stated?
13     A.  The programming.
14     MR. BEIK:  Object to form.  We're so far
15 off.  I thought this question started with IPP and
16 knowledge of a router.
17     MR. KHAZEN:  Please don't interrupt.  Please
18 don't interrupt my question.  This is coaching.
19 BY MR. KHAZEN:
20     Q.  Are there any other reasons?
21     A.  They would be -- the other reasons would be
22 from our experts.
23     Q.  As Malibu Media's corporate representative,
24 are you aware of any other reasons, besides the one
25 you just stated?

Page 78

1      A.  I feel like I stated more than one, but I --
2  the other reasons would be in the, the very, the very
3  precise software code that identifies your client's
4  IP address that our expert witness will testify to.
5      Q.  Please explain that.
6      MR. BEIK:  Object to form.
7      THE WITNESS:  Do you understand python code?
8  BY MR. KHAZEN:
9      Q.  Somewhat.
10     A.  Okay.  So if this, then that.  And, you
11 know, and basically if you want -- I mean, if you
12 want to Google how do I tell -- how does someone tell
13 if I've infringed on their copyrighted content, on
14 their protected content, and it will tell you.
15     Q.  Yes, I need you to explain.  Please explain.
16     A.  I would have to give you a python document.
17 I can't explain to you how it works.  It's not like
18 that.  Like, can you explain to me how Facebook
19 works?
20     MR. BEIK:  Objection.
21 BY MR. KHAZEN:
22     Q.  So what does the python document tell you
23 about, other than the IP address?
24     A.  It tells you how we, how we've come to the
25 conclusion that it is that IP address and only that

Page 79

1  IP address.
2      Q.  Okay.  So other than the IP address, which
3  the code allegedly tells you, what other evidence --
4  is there any other evidence that you have that you
5  claim supports your contention that my client
6  infringed your work and not someone else that was on
7  his network?
8      MR. BEIK:  Object to form.
9  BY MR. KHAZEN:
10     Q.  And please just give a straightforward
11 answer.
12     A.  I believe that there, on the supporting
13 evidence we had a lot of matches as far as to what
14 your client's interests were with other things that
15 were downloaded and supporting evidence as well.  So
16 that would be, that would be another thing.  That is
17 not a technical answer, but he would -- if like say,
18 I don't know what he specifically likes, there's so
19 many people, but say he likes skiing and he downloads
20 about skiing.  So whatever we found out his interests
21 were or what he did for a living, there were
22 downloads that matched those, those things.
23     Q.  And how do you know that those are his
24 interests and not the other people that's on the
25 network?

Page 80

1      A.  We have an investigation software.
2      Q.  And what investigation software is that?
3      A.  TRO.
4      Q.  And have you produced this information?
5      A.  I don't know.
6      Q.  Do you intend to use this information at
7  trial?
8      MR. BEIK:  Object to form.
9      THE WITNESS:  I have to discuss with my
10 attorneys.
11 BY MR. KHAZEN:
12     Q.  Do you have any basis for withholding this
13 information that you're aware of?
14     A.  No.  No.  We're just very busy and so we're
15 very busy running our business, and we need people
16 not to steal the movies.  So it's kind of -- it's
17 kind of a secondary thing for us, but we need to do
18 so in this order to stay in business.
19     Q.  Okay.  So other then the IP address and this
20 supposed additional information about a consistent
21 interest, what other information, what other -- what
22 else, if anything, do you have that suggests to you
23 that my client downloaded your work, your work and
24 not someone else connected to the network?
25     A.  Not someone else connected to the network?

Pages 77 to 80

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 81

1    Because your client hasn't given us anyone else.  No
2    one else has stepped forward and said they're, you
3    know, this is our network.  We've talked to ISP.
4    It's your client's network.  So your client has not
5    stepped forward and said who else has access to his
6    network.
7         Q.   And so why would you expect someone else to
8    come forward and claim that they're the person on the
9    network who downloaded your copyrighted works?
10        A.   Because if your client didn't do it, then
11   whoever he let into his house and let have access --
12   you know, actually in some countries if you let
13   someone else have access to your wifi, you're
14   responsible for what they do.  So and in some
15   different states and different judges will all rule
16   differently on this.
17        So your -- so this, this client is -- your
18   client, if he -- if he let someone else have access
19   to his wifi, and they went for five years and
20   downloaded like nine different titles at least, at
21   least, just the ones we saw, and at different times
22   of the year, all different times, so it doesn't make
23   much sense that you would do that and still be, you
24   know, and not give us an alternative solution to why
25   that might have happened.

Page 82

1         Like if someone were to blame me for that, I
2    would say, wait a minute, no, I wasn't.  Someone else
3    was using my IP address at that time, and I would
4    name who it was, but it wasn't me who did it.  So
5    because your client had been so adamant about --
6         Q.   If a -- if a member of your family had done
7    that, you would -- and you were being accused by a
8    pornography company, are you saying that you would
9    turn in a member of your family as, as the, as the
10   person who downloaded it and give --
11        MR. BEIK:  Object to form.
12   BY MR. KHAZEN:
13        Q.   -- give their name to a, to a pornography
14   company?
15        MR. BEIK:  Object to form.
16        THE WITNESS:  You know, well, you know, if
17   another member of his family did it, then he could
18   just say another member of his family did it and
19   not -- he doesn't have to say who that was, but he
20   can let us know if another member of his family did
21   it.
22        And it's not like we're going to go -- the
23   whole thing about settling this is that we keep the
24   names private.  It's not like we're going to run out
25   and just say, oh, you're these -- this, this and that

Page 83

1    or they're downloading and it's erotica.  So it's --
2    I mean, it's nothing to be embarrassed about.
3         He also downloaded 32,000 other files that
4    were not meant to be downloaded for free.  So I
5    think, you know, it's -- it's just a shame how many
6    internet things are getting downloaded for free now.
7    BY MR. KHAZEN:
8         Q.   Okay.  So just to clear this up and finalize
9    it, the reasons that you gave me, let me circle back
10   and make sure it's clear.  Other than the IP address,
11   the interests of the downloader, and that no one else
12   has come forward, do you have any other evidence that
13   you claim supports your claim that my client
14   downloaded your copyrighted works and it wasn't done
15   by someone else connected to his network?
16        MR. BEIK:  Object to form.
17        THE WITNESS:  At this point I cannot think
18   of how to answer your question.
19   BY MR. KHAZEN:
20        Q.   You need to answer my question.  I will --
21   can I have the court reporter please repeat my
22   question?
23        (The last question was read back as
24        follows:  "So just to clear this up and
25        finalize it, the reasons that you gave

Page 84

1         me, let me circle back and make sure it's
2         clear.  Other than the IP address, the
3         interests of the downloader and that no
4         one else has come forward, do you have
5         any other evidence that you claim
6         supports your claim that my client
7         downloaded your copyrighted works and it
8         wasn't done by someone else connected to
9         his network?")
10        THE WITNESS:  Okay.  I do not personally,
11   and I would need to check with anyone else on my
12   team, yes.
13   BY MR. KHAZEN:
14        Q.   When you say personally, you're speaking --
15   you're still speaking though as Malibu Media's
16   corporate representative, correct?
17        A.   Right.  One of the -- one of the copyright
18   infringement team members.
19        Q.   Okay.  So as Malibu Media's corporate -- as
20   Malibu Media's corporate representative, you don't
21   have additional information, correct?
22        A.   Correct.
23        MR. KHAZEN:  All right.  Can we take a quick
24   break so I can -- can we go off the record for a
25   minute.

Pages 81 to 84

Page 85

1    THE VIDEOGRAPHER:  Off the record at 11:28.
2    (A recess was taken.)
3    THE VIDEOGRAPHER:  We are going back on and
4    record at 11:38.
5    BY MR. KHAZEN:
6    Q.   Back.  You mentioned that there, that you
7    believe that there were over 30,000 additional other
8    of others' works downloaded.  What are those 30,000
9    additional downloads?
10   A.   I don't have all 30,000 in front of me, but
11   they were also I think additional erotic movies,
12   similar movies of ours and then other, other things
13   that would be of interest to your client.
14   Q.   Like what?  Can you be more specific?
15   A.   I don't have the -- I had my team actually
16   put a spreadsheet together of everything, but I don't
17   have it in front of me, so, no I can't be more
18   specific at this time.
19   Q.   Have you produced that spreadsheet?
20   A.   We probably could do that.  I would have to
21   check with my attorney.
22   Q.   Did you give that spreadsheet to your
23   lawyer?
24   A.   I had my team produce the spreadsheet, so
25   I'm not sure how, how it's categorized or if it just

Page 86

1    has the works listed, but so I can check if I can
2    produce the spreadsheet because I -- I came up with a
3    number because of the additional hits, so I would
4    definitely produce that.  I just don't know how
5    they're categorized.
6    Q.   Did you give that spreadsheet over to Paul
7    Biek, your lawyer?
8    A.   I believe we did, and I believe he actually
9    supplied that to you in the interrogatories.
10   Q.   What other -- what other -- what do you
11   recall from that spreadsheet?  What dates does it --
12   what dates does it cover?
13   A.   I think the same dates that we -- that the
14   movies were from.  I think 2014 to '19.
15   Q.   And what -- what, if anything, do you recall
16   from that spreadsheet in terms of the types of works
17   that you claim were -- are on it?
18   A.   I think there's additional erotic movies,
19   adult movies.
20   Q.   Anything else?
21   A.   I think some like educational or technical
22   books, something like that, all software things.
23   Q.   Do you remember anything more specifically
24   than that?
25   A.   I don't, I'm sorry.  I have so much going on

Page 87

1    and this -- I really haven't had time to prepare for
2    this very well.  And I do know, though, that we did
3    look very carefully, and there were 32,000 additional
4    infringements and nine of our titles infringed over
5    from 2014 to '19.
6    I actually remember one of the titles
7    specifically.  It was called Truth or Dare, because I
8    actually remember shooting it, and the models were
9    playing on a, one of things where you have the
10   colored dots on it, and I remember they were asking
11   each other funny questions and it was actually like
12   comedy.
13   So I -- I remember that actually because
14   I -- that was one of the, personally one of the first
15   movies that I did and I made a comedy.  And I so I
16   remembered it very clearly because I was the guest
17   specifically, so -- so I do remember your client and
18   the infringements, but I don't remember the
19   additional what it was.
20   Q.   And there was a total of nine of your works
21   as you recall?
22   A.   That we -- that we found, yeah.  That we
23   found.
24   Q.   Now, you mentioned something about a
25   protected IP address.  Do you have any, any evidence

Page 88

1    that would suggest that my client's network is
2    password protected?
3    A.   No, actually we don't.  I usually assume
4    that they are because some judges actually require it
5    now.  They say if you don't password protect your
6    network, you're automatically guilty.  And so some
7    states we've had that conclusion from judges, so I
8    just -- after all these years I've barely seen anyone
9    who doesn't password protect their network.
10   So I don't -- I mean, your client could very
11   well not have a password protected network, but
12   because I have seen judges rule that if a network is
13   not, if the wifi is not password protected, and not
14   by a difficult password, then the person is, is
15   responsible for that.
16   So that has happened in a couple different
17   districts where the, where the judge says if you
18   don't protect your network, then your -- it's your
19   fault if someone accesses it.  So I just thought
20   that, you know, like who would get a wifi and not
21   password protect it now?  That would be kind of not
22   really smart, unless you wanted to use that as an
23   excuse for downloading and saying that someone else
24   accessed.  That might be a reason someone would do
25   that.

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

1    Q.   And do you understand that it is Malibu
2   Media's burden to prove infringement, correct?
3    A.   Yes.
4    Q.   And you understand that it is Malibu Media's
5   burden to prove that it was my client and not someone
6   else that downloaded, that allegedly downloaded
7   portions of your copyrighted works?
8    A.   Yes.
9    MR. BEIK:  Object to form.
10    THE WITNESS:  But I do also think -- yes, I
11   do -- I do understand that, but I do think that your
12   client has to -- if he didn't do it, he needs to
13   give -- like say if you didn't do, someone is
14   accusing you of murder and you didn't do it but like
15   you have to give -- someone has to give some kind of
16   other alternative theory.  So if he didn't do it,
17   then who did?
18   BY MR. KHAZEN:
19    Q.   So it's your understanding that it's my
20   client's burden to, to point to the person that you
21   believe downloaded portions of your copyrighted
22   works?
23    MR. BEIK:  Object to form.
24    THE WITNESS:  Well, it takes hours to access
25   the wifi to access to download one movie.  Hours.  So

1   if he -- if he thinks that -- if he doesn't know --
2   if someone has access to his wifi for hours, it would
3   be -- if the long-range wifi and he lives in a house
4   on, I don't know how many square feet, but it does,
5   even long-range wifi, it would be, you know, it
6   just -- and then -- and also he would get the notice
7   from the ISP telling him to stop doing that.
8    So it actually kind of makes sense where he
9   stopped, he would get a notice and then stop doing it
10   for a while and then, and then -- then he'll get --
11   then you could wait just long enough you don't get
12   the three notices in a row, they'll leave your
13   service on.
14    So it seems like he got notice the way this
15   played out, and to me is he got notice, he waited
16   just long enough, and then started downloading again,
17   and then would get another notice, but and then wait
18   just long enough that it wouldn't shut him down if he
19   got another notice, and then continue downloading
20   again.
21    So that -- because that makes it when these
22   guys are, you know, long running like over years
23   downloading, it's because a lot of people stop when
24   they get the notice from the ISP, like, oh, I'm doing
25   something illegal.  But then if you're in IT, you

1   know that if you don't get three notices very
2   quickly, then they're not going to shut your service
3   off.  So he would have to know that.  And so that
4   would be good.
5    And then with all of these things and then
6   him not providing another solution, that's why it
7   really does lead to, it leads to your client, unless,
8   I mean, I would love if you could give us another,
9   another idea of who it might be.
10    MR. BEIK:  Okay.  Colette, let's let him ask
11   the question.  Let's just answer the questions that
12   he asks.
13    THE WITNESS:  Okay.  All right.  Got it.
14    MR. KHAZEN:  Please -- please don't
15   interrupt when she's in the middle of a sentence,
16   Counsel.
17    (Thereupon Defendant's Exhibit 2
18    was marked for identification.)
19   BY MR. KHAZEN:
20    Q.   I marked as Exhibit 2 a document, a document
21   and at the top says, Addresses of the infringers are
22   Verified.  Let's see.  Let me see.  This is strange.
23   This is odd.  It only has one -- here we go.  Yeah,
24   so I marked as Exhibit 2 a contract between Malibu
25   Media and IPP.  Do you see that?

1    A.   Yes.
2    Q.   Do you recognize this document?
3    A.   Yes.
4    Q.   What is it?
5    A.   These were the terms between Malibu Media
6   and IPP.
7    Q.   And it says it, it was signed on August 8th,
8   2014.  Does that sound about right to you?
9    A.   That would be the original one, yes.
10    Q.   Have there been subsequent agreements?
11    A.   They're all the same, it's just the price
12   would vary sometimes.



23    Q.   So you're no longer going to be using IPP?
24    A.   Correct.
25    Q.   How much money have you paid IPP over the

1   years, approximately?
2     A. I don't know. I mean, I really don't know.
3     Q. Have you been paying them --
4     A. The lawyers -- the lawyers have done it.
5   Like the lawyers have paid them and they've kept the
6   settlements. And many times we haven't made any
7   money. The lawyers who are supposed to be protecting
8   our copyrights, they just kept the money.
9       So, you know, this -- and also with all
10   paying IPP all the money and them, you know, all -- a
11   lot of bad stuff happening with them, and, you know,
12   we just -- we wanted to be able to protect our own
13   content and, you know, not -- and just, yeah. That's
14   it.



24     Q. So given that it would have been somewhere
25   over the course of all these years it would have been

---

1   on the order of at least $5 million; is that fair to
2   say?

8   200 times five, that would be a million. And then it
9   was -- it was definitely less than $2 million.
10     Q. Okay. So it was over -- you paid IPP over a
11   million dollars. Is that fair to say?
12     A. Yeah. But the lawyers did. I didn't really
13   have much to do with that. The lawyers did the
14   contract and negotiated with them. And -- and then
15   we had a separate -- IPP was very separate as far as
16   their being experts and having the witnesses and
17   going by the world time clock.
18       And so, yeah, it was -- it was not me, they
19   go on with IPP and then it would be lawyer. The
20   lawyers were the ones who, you know, recommended the
21   experts and we checked the experts against the other
22   experts and, you know, made sure everything was
23   working properly. And now we've made an even
24   superior software, so...
25     Q. Are you still working with IPP currently?

---

1   You're not still working with IPP currently?
2     A. No.
3     Q. When did you stop?
4     A. About a year ago.
5     Q. And you've been using your own software
6   since then?
7     A. No, we haven't been filing because of COVID.
8   We didn't want to put people out of hardship because
9   of COVID and things like that. But, you know, we had
10   some leftover files from IPP and some very, you know,
11   egregious infringers, like your client had over, you
12   know, five years nine videos and, yeah, it just a few
13   that were really, you know, not good, that the person
14   was obviously a repeat infringer, and so we need that
15   to stop for our business to be able to keep running.
16   So we did take a break this year because of COVID and
17   so now we're about to start filing again.
18     Q. And when's the last time you communicated
19   with IPP?
20     A. Months ago.
21     Q. About how many months ago?
22     A. Six months.
23     Q. And why did you stop communicating with IPP?
24     A. Because we're done using them.
25     Q. And are -- are -- do you owe IPP any money

---

1   still?
2     A. No.
3     Q. You said you used Ecipio and who else?
4     A. No. No one else. No real companies. A
5   couple different indi programmers, people like that
6   or people from upwards.
7     Q. And who are they?
8     A. I don't know the names.
9     Q. What do they do for you? Let's start with
10   Ecipio. What does Ecipio do for you?
11     A. Same thing as IPP.
12     Q. Are you familiar with the name Patrick
13   Paige?
14     A. Yes.
15     Q. Who is he?
16     A. Expert witness.
17     Q. And are you still using Patrick Paige?
18     A. He's working for Strike Three, and so no.
19     Q. Has someone taken his place?
20     A. We do have someone taking his place.
21     Q. Who?
22     A. I'm not at liberty to say yet, but because
23   we haven't signed the contract yet, but we do have
24   someone very -- very -- very, very good programer and
25   very good expert.

Pages 93 to 96

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

Page 97

1    Q.   So are you refusing to answer my question?
2    A.   No, I don't -- I don't have the name of the
3  person yet.  It's going to be two people, so...
4    Q.   And you don't know their names?
5    A.   I don't know -- they're both in Ecuador.
6    Q.   Okay.  And do you -- and but you don't know
7  their names?
8    A.   No, I don't know their last name and which
9  one we're going to choose to be the expert.  So
10  they're both working on the software, and then we
11  need an outside expert.  So I just do not have the
12  names to give you at this point.  I don't want to
13  give you an incorrect name.  If you want to ask me in
14  a couple weeks, I can give you at that point.
15    Q.   Do they work for a company?
16    A.   They work for an IT company.
17    Q.   What's the name of the IT company?
18    A.   I don't have it in front of me.  It's -- I'm
19  telling you it's based out of Ecuador and Canada,
20  just like IPP was based out of Germany, so I don't
21  have it in front of me.  It's -- I'm sorry, I don't
22  know the relevance.
23    Q.   Are they based out of Canada or Ecuador?
24    A.   Both.
25    Q.   And you said you don't know the relevance.

Page 98

1  Does that -- does that mean you don't know the
2  answer?  I just want to be clear.  Do you not know
3  the answer?
4    A.   I don't know the answer.  I don't know the
5  answer.  If I knew I needed to get the answer, I
6  would have had that answer for that, but they -- we
7  will have them in the next week or so.
8       So but we took a break because of COVID and
9  now we're going with a new expert and with our own
10  development and our own software developer.  So we're
11  basically ready to go.  We just have to finish a few
12  things with the experts and decide who's doing what
13  and then I will have names.
14    Q.   Are you still working were Ecipio?
15    A.   No.
16    Q.   When did you stop working with Ecipio?
17    A.   We stopped when we were with Pillar because
18  they were -- Pillar turned out to be not such good
19  guys and so that didn't work out well.
20    Q.   Why?  What was that, the name, this other
21  name?  Pillar?  Sorry.
22    A.   Pillar Law.
23    Q.   And why did they not turn out to be good
24  guys?
25    A.   Because they were criminals.

Page 99

1    Q.   I'm sorry?
2    A.   They stole.  They kept all of the settlement
3  money.
4    Q.   And did -- was -- did you ever file suit
5  against them?
6    A.   We did, but they're not collectable.
7  They're in jail.
8    Q.   And how much have you paid Ecipio over the
9  years?
10    A.   Not a lot.  I think we used them for like a
11  year, year and a half, something like that.
12    Q.   Have you tried to contact IPP in regard to
13  this lawsuit to gather documents?
14    A.   Yes.
15    Q.   And can you describe that, your effort?
16    A.   They're very hard to reach because of COVID
17  and because of the time difference.  And unless
18  you're paying them, you know, they're just --
19  their -- their system works, their software works,
20  they're just not -- they just very difficult to
21  reach.
22       And they only really answer WhatsApp and so
23  it's like -- or Skype.  And so it's just -- just
24  because of the time zone and they're just always, I
25  don't know, they're always traveling somewhere and,

Page 100

1  you know, one's in Germany, one's in England.
2       And we started with them 12 years ago, like
3  when this wasn't even a thing, and now everyone is
4  getting their movies stolen, so it's just so
5  different now.  So -- so yes, they're not easy to
6  reach now, and that's why we're making our own
7  software.
8    Q.   So you communicate with them through
9  WhatsApp and through Skype; is that correct?
10    A.   Basically.
11    Q.   And when is the last time you communicated
12  with them through WhatsApp or Skype?
13    A.   Maybe two months ago.
14    Q.   And have you produced those records, those
15  communications to your attorney?
16    A.   I don't -- I don't think so.  I don't think
17  there's anything to produce.
18    Q.   I'll call for all that production, all those
19  communications with IP -- IPP.
20       And do you recall what, what you
21  communicated about with IPP last over WhatsApp?
22    A.   We were asking basically for some cases.  We
23  were actually asking them for documents that we did
24  not have.  And actually one of our guys who was
25  communicating with the experts, I forgot about that,

Page 101

1　he had COVID, and he was not able to get some of the
2　documents.
3　　　　And so another guy in India, who was
4　supposed to organize IPP's information, so this guy
5　getting COVID kind of slowed down getting the
6　information from IPP.  And so, yeah, I did forget
7　about that.  That guy, Dane, actually it was a bigger
8　deal because he was supposed to get that information
9　from IPP.
10　　　　So we've been trying to get information from
11　them and they've not been very responsive, all
12　because of the COVID and everyone, whatever they're
13　doing.  So if we're not working with them, they're,
14　you know, they're not very quick to respond to us,
15　although, you know, we've still paid them all their
16　payments, so they should, you know, they should pay
17　us, so...
18　　　Q.   Did they communicate to you that it was
19　because of COVID they weren't being responsive?
20　　　A.   It -- well, the guy who was supposed to --
21　was dealing with them on our side, he had COVID.  So
22　they're just never really that responsive.  And so
23　then to couple that with the, with our guy on our
24　team who had COVID, they were very hard to reach.
25　　　Q.   What guy that was on your team got COVID?

Page 102

1　　　A.   Dane.
2　　　Q.   I'm sorry?
3　　　A.   His name is Dane.
4　　　Q.   And who is Dane?  What role does he play?
5　　　A.   Dane.  He was helping manage the team
6　protecting us from the copyright infringements.
7　　　Q.   And he was a go-between between you and IPP?
8　　　A.   Yeah.
9　　　Q.   What is Dane's last name?
10　　　A.   DeFelice.
11　　　Q.   And do you still work with Dane?
12　　　A.   On a limited basis.
13　　　Q.   Do you communicate with Dane on a -- did you
14　communicate with Dane on a regular basis at any
15　point?
16　　　A.   A long time ago.
17　　　Q.   How long have you -- how long have you
18　worked with Dane?
19　　　A.   I think it's been over six or seven months
20　that he has done anything, you know, on a, on a
21　regular basis for us.  He was going to help rebuild
22　the software.  And the guy, he didn't vet the guy
23　properly, so long story, so I went ahead and used our
24　own guys that I vetted and did that.
25　　　Q.   How do you communicate with Dane?

Page 103

1　　　A.   Phone.
2　　　Q.   Do you communicate with Dane in any other
3　way besides over the telephone?
4　　　A.   Text.
5　　　Q.   And how often do you -- how often do you
6　communicate with Dane over text?
7　　　A.   I don't know.  I haven't spoken to him in
8　two weeks, so...
9　　　Q.   Have you produced your communications with
10　Dane to your attorneys?
11　　　A.   I think if it was relevant, we would have,
12　if there was anything that was relevant.
13　　　Q.   Do you communicate with Dane regarding,
14　regarding your work with IPP?
15　　　A.   We did, yes, but that was when we had a big
16　problem getting all the information because of him.
17　　　　Sorry, I really don't feel good.
18　　　Q.   And do you communicate with Dane regarding
19　your, your alleged efforts to protect your
20　copyrights?
21　　　A.   Yes, we have.
22　　　Q.   When is the last time you communicated with
23　Dane about your copyright protection efforts?
24　　　A.   I don't know.  Maybe a few months ago.
25　More.

Page 104

1　　　Q.   Getting to that, what do you do to protect
2　your copyrights?
3　　　A.   What do we do?  Send DMCA notices.  We take
4　screenshots when we find them being infringed.  We --
5　right when I put them up, I look to see how many
6　torrents have stolen them and then we run the, our
7　tracker to track all the IP addresses that are
8　stealing them.  So, yeah.
9　　　Q.   And so tracker software, DMCA, screenshots.
10　And what was the fourth one?  I'm sorry.
11　　　A.   I think that was it.  We run our -- we run
12　our software to track all the IP addresses that are
13　stealing them and then I search on the computer for
14　how, you know, on Google Analytics how many have been
15　stolen and where.
16　　　Q.   What do you mean by take screenshots?  What
17　do you take screenshots of?
18　　　A.   I take screenshots of all the websites, the
19　websites that are making fake websites too and, you
20　know, stealing it, and then also besides just
21　stealing for personal use, stealing them for business
22　use as well.
23　　　Q.   So you're saying you just Google sites and
24　if you see your material on a site --
25　　　A.   I just Google -- like say I have a new movie

Pages 101 to 104

**New York**
**212-273-9911**
**Hudson Court Reporting & Video**
**1-800-310-1769**
**New Jersey**
**732-906-2078**

1  up, and I Google the name of the new movie and then
2  see where it comes up.
3       Q.  And do you do this all yourself or do other
4  people do this for you?
5       A.  No.  We have a team.
6       Paul, do you think we can finish later?  I
7  really don't feel good.  Is it a possibility?
8       MR. BEIK:  It is about lunchtime.  Ramzi,
9  could we take a break for lunch maybe?  It's noon her
10  time.
11       MR. KHAZEN:  Sure.
12       THE WITNESS:  Yeah.  I'm feeling a little
13  bit nauseous.  I need --
14       THE VIDEOGRAPHER:  Do you want to go off the
15  record?
16       MR. BEIK:  Yeah, let's go off the record.
17       THE VIDEOGRAPHER:  Off the record at 12:04.
18       (A lunch recess was taken.)
19       THE VIDEOGRAPHER:  We are going back on the
20  record at 1:22 Pacific time.
21  BY MR. KHAZEN:
22       Q.  Thanks.  Welcome back.  So just to ask
23  first, is there anything, is there any reason why you
24  might not be able to answer my questions fully and
25  truthfully today?

1       A.  No.
2       Q.  Now, you say that you do DMCA takedowns; is
3  that correct?
4       A.  That's correct.
5       Q.  What's your process for doing DMCA
6  takedowns?
7       A.  I'm not sure.  Well, I guess sometime over
8  which your client infringed was we used either a
9  person who was a contractor from Canada, and he has a
10  DMCA service company, and then we also used some of
11  the online services, and then we use our programmers
12  as well.
13       Q.  During what period did you use the DMCA
14  service company?
15       A.  I can't be exact, but I think he was with us
16  all the way until 2017 from 2011.
17       Q.  What -- when in 2017 did you stop
18  contracting with the DMCA service company?
19       A.  I don't have that exact information in front
20  of me, but he's always available for us when we need
21  him, so we still do use him at random occasions.
22       Q.  When did you stop using him regularly?
23       A.  I said in 2017.
24       Q.  And you don't have more specific time than
25  that?  Was it mid 2017?  Early 2017?

1       A.  I would probably say mid, but again, I'm
2  not -- I can't be -- I'm not -- I wouldn't put my
3  life on it, but I would say mid probably.
4       Q.  And how many times have you used him since?
5       A.  Huh?
6       Q.  How many times have you used him since?
7       A.  How many times have we used him since?
8       Q.  How many times --
9       A.  A handful.  A handful of times when we've
10  had like a really, really big breach.  A handful of
11  times, because he has to send out thousands and
12  thousands of notices at a time.  So instead of having
13  the computer automate it, he would take on that,
14  handle all those tasks with the computer software
15  systems.
16       Q.  What do you mean by handful?  Like, how many
17  would you say is a handful?
18       A.  Five, six, seven, eight, something like
19  that.
20       Q.  What's the name of the DMCA service company
21  that you used?
22       A.  I don't remember what his company was named,
23  but his name is Chris Lahey.  I don't remember what
24  they call it, what his name of his company's name is
25  called.  His name was Chris Lahey, so it was Lahey at

1  DMCA services, something like that.
2       Q.  And why did you stop using him regularly in
3  mid --
4       A.  Because we realized that there was some new
5  softwares out there.  You know, we've been doing this
6  again since 2007, so that's a long time.  And
7  14 years, software and, you know, what you can do on
8  the internet with software has really changed, so
9  that's why we've, you know, we've automated a lot
10  more things.
11       So we just, you know, him doing a lot of
12  things manually just didn't make as much sense, so
13  that was part of the reason.  And I think he was also
14  doing some other things as well.  So he'd done very
15  well by us and it was probably taking a little bit of
16  a break, but again always welcome back, good
17  relationship.  It's just that there are more
18  softwares to use now versus manual solutions.
19       Q.  And what -- what services, if any, have you
20  used since 2017 for DMCA takedowns?
21       A.  I would need to check with the programmers
22  for the exact, exact ones, but let me Google that
23  actually right now to see which one we've been using.
24  But, you know, I'm just going to say I don't know
25  exactly.  I would need to check with the programmers

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

Page 109

1  because I don't want to misspeak.
2      Q.   What programmers are those that you would
3  speak to?
4      A.   We have programmers in, like I said, in
5  Ecuador and in Ukraine.  We have two teams.
6      Q.   And do you know the name of the people on
7  those teams?
8      A.   Stanislav is our main programer on the
9  Ukraine team.  His English isn't that great.  And
10 then Alfredo is our main programmer on the Ecuador
11 team.
12     Q.   Did you talk with Stanislav or Alfredo in
13 preparation for this deposition?
14     A.   No.
15     Q.   And did you talk with anyone in preparation
16 for this deposition to determine what online services
17 or other services you've used for DMCA since 2017?
18     A.   No, I didn't.  I didn't realized you'd be
19 asking me that since -- what DMCA service I've been
20 using since 2017.  But if you'd like to ask that -- I
21 mean, that's quite a broad question for a company
22 like ours, because we are the, I think the most
23 widely stolen from company in -- and we do everything
24 we can to stop that, and including, you know, this
25 with the torrents, which is actually a small percent

Page 110

1  but still a big problem for us.
2      So -- so, yeah.  So it might -- the question
3  was did I speak to Stani or Alfredo before the
4  deposition?  No, I did not.  Their -- their -- their
5  time is expensive and I mostly communicate with them
6  on Skype or G Chat anyway.
7      Q.   Please just answer the question that you're
8  asked.  What -- what did you do to prepare for this
9  deposition to learn what services you used for DMCA
10 protection since 2017?
11     A.   I wasn't aware I was supposed to do
12 something to prepare to learn about services we used.
13 We mostly used, have been using attorneys and have
14 been doing it manually by finding out the IP
15 addresses that are infringing on our movies via
16 BitTorrent, because that is the, you know, by far the
17 biggest group.
18     When we just send DMCA notices, they mostly
19 get, just mostly get removed.  So I did not do
20 anything to prepare for to find out what services
21 we've used since 2017.  I used it myself.  I just
22 don't know the exact name.  Like DMCAtakedown.org or
23 I'm not sure.  So I have to check that.  I didn't
24 know that would be a question.  If you want to give
25 me a list of questions before, I'd be happy to look

Page 111

1  at that for you.
2      Q.   Are you aware of any DMCA services that
3  you're using currently --
4      A.   I'm not aware of the exact name.
5      Q.   -- rights?
6      A.   I'm not aware of the exact names.  We're
7  currently getting ready to file a large batch of
8  cases of infringing IP addresses.  We find that is
9  the best way to go after the source of the people
10 really stealing from us.  Just, like I said, the DMCA
11 service companies, they mostly throw them away.
12     Q.   I'd really like you to please focus on what
13 my specific question is.  I'm asking about DMCA
14 notices.  Okay.  What services are you using
15 currently, if any?
16     A.   I told you I do not have a list of those
17 services.  There are many.  We switch on a daily
18 basis.  It's a -- I mean, there's so many of them.
19 You Google it, you'll see, so I don't know the
20 answer.
21          (Simultaneous conversation
22           interrupted by the reporter.)
23          THE WITNESS:  Okay.  Got it.
24 BY MR. KHAZEN:
25     Q.   To your knowledge today, as Malibu's

Page 112

1  corporate representative, are you aware of the names
2  of any companies that you use for DMCA notices
3  currently?
4      A.   No, I'm personally not aware of which
5  companies we're using for DMCA notices.
6      Q.   Do you know approximately how many
7  companies, if any, you're using for DMCA notices?
8      A.   Probably three.
9      Q.   Are you aware of any consultants that you're
10 using outside of those companies for DMCA notices?
11     A.   I'm not sure if Dane does that for us
12 sometimes as an outside consultant.
13     Q.   How much do you pay these services for DMCA,
14 for DMCA notices?
15     A.   It varies based on the amount of letters
16 they send out on your behalf.
17     Q.   How many letters has Malibu sent out for
18 DMCA notices in the last three years?
19     A.   Hundreds of thousands.
20     Q.   And how do you know that?
21     A.   How do I know that?  Because -- I'm sorry
22 I'm repeating the question.  Because I supervise
23 people sending out the letters and the different
24 softwares sending out the letters.  It's just when I
25 know something is -- when I see a movie or content

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

1  being infringed on extremely radically, we will send
2  out hundreds of thousands of DMCA notices through
3  services and contractors.  And many times Google will
4  listen and take down the links.
5      Q.   Do you have any records of how many DMCA
6  notices you've put out in the last three years?
7      A.   Again it would be a very large project to
8  compile that, and it wouldn't be something that I
9  would have in my hands now, but I can tell you it's
10  been hundreds of thousands.
11      Q.   Do you use any -- strike that.  How do you
12  communicate with the companies that do DMCA notices
13  for you?
14      A.   WhatsApp, Skype, mostly those kind of web
15  apps because they're usually overseas.
16      Q.   Have you produced those records to your
17  attorney?
18      A.   I wasn't requested for those records.
19      Q.   Have you -- do you have any raw information
20  from any of these companies that you say you use for
21  DMCA notices?
22      A.   Any what?
23      Q.   Any raw information, any just raw
24  information from them about the DMCA notices?
25      A.   What information?  What kind of information?

1      Q.   Do you have contracts with them?  Do you
2  have information about --
3      A.   There's no contracts.  You basically -- you
4  go on and you pick a -- you go on and you basically
5  pick something that -- I don't know if you want me to
6  answer the question by explaining how it works
7  because you're not asking a question that can be
8  answered.
9      Q.   Explain how you do it.  Explain how you do
10  it.
11      A.   Okay.  So you go on, and so say you want to
12  send DMCA notices based on a certain movie, right,
13  and that -- so you put in the name of the movie and
14  name of the content or any names of -- the problem
15  with the torrents is they can change the names of the
16  movies and just put whatever they want and they call
17  it whatever they want, and so -- and they do that a
18  lot of times to trick you.
19          But say so on the DMCA services all you can
20  do is put, you know, if you want to put XR and then
21  dash and then movie name and then they'll search
22  where they found it.  And then you'll let them know
23  how many letters you want them to send on your behalf
24  and they'll give you a quote on that, and then
25  they'll just bill you as they send them.  They like

1  automatically like kind of like Google apps.
2      Q.   Do you have any records of that?
3      A.   Excuse me?
4      Q.   Do you have any records of having done this?
5      A.   I'm sure, but it would just be -- it's
6  one -- they're a bunch of small records and a lot of
7  other bills and so, like I said, it's not -- it's not
8  been very successful because it's very impersonal and
9  just randomly sending out letters.  You know, most
10  people just throw them away.
11          So the people that are really stealing the
12  content are going on the torrents to steal the
13  content or they're going on the tubes, which we're,
14  you know, we'll be handling -- we'll be handling that
15  as well.
16      Q.   I'm going to really need you to focus on my
17  question.  All right.  I'll just repeat the question.
18  Do you have any records of having done this?
19      A.   I don't believe I have them.  Our accountant
20  might have some records, but it usually must just be
21  a bill and how much is paid.
22      Q.   Do you have any records of the requests that
23  you made for takedowns?
24      A.   I may have taken a few screenshots.  I don't
25  know.  I don't keep records of requests.  There's so

1  much that goes on.  So, no, I don't -- I'm not sure.
2  I don't know.
3      Q.   And you've -- and you've requested takedowns
4  in the last three years, according to my
5  understanding; is that correct?
6      A.   Yes.  You can even see it on your web
7  browser.  A lot of times it will say Google has had
8  this removed based on a DMCA request, so if you want
9  to search for something illegal.
10      Q.   And you're saying you've disposed of those
11  records?
12      A.   No, I haven't disposed of them, it's just
13  they change every day so it doesn't really do you any
14  good to keep them.  It's just whatever Google says at
15  the moment.  So I could take a screenshot of every
16  time they take one down, but it could be back up, and
17  then, you know, and then take it down again and so
18  it's --
19      Q.   Sorry.  Go ahead.  Sorry.
20      A.   It's just not something that you would keep
21  a record of because there's -- you would just be like
22  printing out new screenshots every single day, and I
23  don't think you understand the volume that we're
24  dealing with.  Like, oh, we have three records
25  because we have three movies.

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

1     You know, there's thousands of movies, all
2  in eight different formats on the older ones, and so
3  and hundreds of thousands of photos that are also
4  copyrighted works that have been stolen, and, you
5  know, they've been printed in Vogue and things like
6  that and so it's -- it's not just like -- it seems to
7  me that you're thinking like, oh, you have a record
8  of the few DMCA notices we sent.  No, this is
9  actually a huge, huge project with thousands and
10 thousands of videos and photos and copyrighted
11 content that not all of it is available even for
12 subscription.
13     So it's just too big to handle by taking a
14 screenshot every time you send out a DMCA run, but
15 and again they're not very successful after we find
16 out, so...
17     Q.  I'm asking a broader question.  Do you have
18 records of your attempt to take down of --
19     A.  Yes.
20     Q.  Do you have records of your transactions to
21 show that you have tried to do DMCA takedowns?  So,
22 for example, is there a confirmation email that you
23 had signed up with a service, anything?  Are there
24 any records?  I'm asking a broader question than just
25 the raw data of your DMCA.

1     A.  I'm sure.  I'm sure but I cannot -- I can't
2  promise you that I can find it because I didn't
3  know -- I didn't look -- I haven't looked for it yet.
4  This is the first time I've received this question.
5     Q.  So to your knowledge -- so you don't know
6  one way or the other whether you have any record of
7  having attempted DMCA takedowns in the last three
8  years?
9     A.  Within the last three years is when we've
10 really brought it in house and so we brought
11 everything in-house.  Like I said, we've brought the
12 IPP software, everything has come in house.  So
13 within the last three years, that's what I'd say it
14 would be hard for me to promise you records from
15 outside services which were used on a much lesser
16 basis and much larger basis as far as development,
17 cost developing our own system to operate DMCA.
18     Q.  But you have no records that aren't in house
19 of you having attempted DMCA takedowns; is that
20 correct?
21     A.  That's not what I'm saying.  I'm just saying
22 that I can't promise you a whole bunch of records
23 that aren't in house in the last three years, but I'm
24 not saying there are no records.
25     Q.  Do you have any records that are not in

1  house over the last three years of you attempting to
2  do DMCA takedown?
3     A.  I don't know a hundred percent.  I can't
4  promise you.  I will look -- do my best to look for
5  what you're asking for.
6     Q.  Do you have any in-house records of your
7  attempts to take -- to do DMCA takedowns?
8     A.  Yes, I'm sure we can, we can provide that.
9     Q.  And when you say in-house, this is referring
10 to the two teams of programmers that you have in
11 Canada and Ecuador?
12     A.  Yes, and other, other programmers as well.
13     Q.  What other programmers?
14     A.  Just anyone else who's on the team that is,
15 is good enough to help with the, with the equations
16 and where the notices need to be sent and that can
17 actually, you know, make a script to do it quicker
18 than someone who would just be writing DMCA letters.
19 Like, we're way too big to do that, so we don't use
20 services and do things like that.  Like one, you
21 know, it's not like one piece of art or something.
22     Q.  Who are those other people on the team?
23     A.  Who are the people on the team?  Just anyone
24 who has the time.
25     Q.  Who are on the team that may have records of

1  alleged attempts at DMCA takedowns?
2     A.  They would be just -- there would be anyone
3  who has time.  So let me see.  Alfredo has two people
4  who work under him, and so I don't even know who they
5  are, but they do it.  And Stanislav has five people
6  on his team.
7     And so those are -- so we have I think ten
8  in-house programmers.  And then we have -- there's
9  another guy we were working with.  So, yes, I could
10 provide more records in-house, but these are
11 programmers that come and go, if they come back for
12 projects and then they go and they come back, so
13 they're not on payroll, they're contractors.
14     Q.  And all of these people are contractors,
15 correct, when you say --
16     A.  Yes.
17     Q.  None of the people that are working in-house
18 with you are employees; is that right?
19     A.  No.  I mean, if you're in another country,
20 you really can't be an employee.
21     Q.  All right.  So you mentioned three, three
22 types of methods that you allegedly used for your
23 copyrights.  I have started software, screenshots
24 that you do yourself in searching, and DMCA
25 takedowns.  Am I missing anything?

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Page 121

1    A.  I'm sorry, rephrase the question, because a
2  screenshot is not a method of anything.  What was
3  your question?
4    Q.  You said you took screenshot, you would
5  search for sites and take screenshots.  Search for
6  sites that are carrying your content?
7    A.  What's the question -- what's the question
8  that you're answering for yourself?
9    Q.  I am trying to make sure -- understand that
10  these are the three methods that you said that you
11  used for, for protecting your copyrights.
12    A.  Protecting my copyrights.  Okay, the three
13  methods you said, okay, that's -- you didn't have it
14  right.  A screenshot does not protect your copyright.
15  That has nothing to do with protecting your
16  copyright.
17    Q.  I'm using your --
18    A.  No, you asked me if I had records of
19  protecting the copyright with outside services, and I
20  said the only way legally is a screenshot.
21    Q.  Then I'll ask the question again.  What
22  methods do you use to protect -- to, to monitor your
23  copyrights?
24    A.  We use -- we use in-house, which is our, our
25  teams of programmers to go and when there's been a

Page 122

1  big -- when the videos are getting stolen or the site
2  is getting ripped off.  And we use the -- mainly we
3  are -- we're using the BitTorrent to find out the IP
4  addresses that are, that are stealing our movies by
5  BitTorrent.  Because between BitTorrent and the tubes
6  is the majority of our infringements.
7    And then we also -- we have used, until
8  2017, a full-time employee who had, who had scripts
9  where he would send DMCA takedown notices.  And that
10  would really only work with Google.  And so the only
11  way I could verify that would be, you know, I could
12  verify his employment, but as far as verifying what
13  he took down, I could get lists of that and
14  screenshots.  But so mainly it's what we're doing --
15  if there's any other way, believe me, we would do it.
16  We tried and there aren't any other way.
17    So number one is the -- what we're doing
18  with Paul, how he's helping us with -- I'm providing
19  him with the technology and the people who are
20  infringing, and then he is legally pursuing the,
21  pursuing, protecting our copyrights.
22    Number two, we have in-house people looking
23  for anything that we can do that is software or
24  technology or we can invent something, working on all
25  things like that.

Page 123

1    Number three, any outside service, which is
2  very expensive and not very effective, but we've
3  tried to utilize whichever ones that we can to see
4  how they work.
5    So that is what we do to, as far as our
6  digital mining copyright privileges and that's it,
7  those three things, and the screenshot is not one of
8  them.
9    Q.  Are you working with law enforcement?
10    A.  With law enforcement?  No, because we are
11  not -- this is not something that can be -- that law
12  enforcement would get involved with, unless it was
13  something that was, you know, violating the rights,
14  like child pornography or something like.
15    I don't think that law enforcement would
16  have -- we don't have any recourse with law
17  enforcement, because even if we gave them the, you
18  know, we'd have to prove they stole a movie, and yes
19  we caught them in the act maybe, but, you know, the
20  amount that law enforcement would pay for -- anyways,
21  to answer the question, no, we're not working with
22  law enforcement.
23    Q.  Have you worked with law enforcement since
24  2019 on -- in order to monitor your copyrights?
25    A.  Since 2019?  I would have to check with the

Page 124

1  lawyers that are making the campaigns to see if
2  anyone did work with law enforcement in their area.
3    Q.  You're not aware -- you're not aware of
4  Malibu ever having worked with law enforcement on
5  this, on, on monitoring --
6    A.  Well, did come from law enforcement so he
7  was one of -- with the FBI.  He was actually the
8  number one guy to take down all of the child
9  pornographers online, and he went through more
10  computers and hard drives.  And he's been an
11  excellent expert witness for us when we have to go to
12  court.  So -- so he did come directly from law
13  enforcement because he's not technically law
14  enforcement anymore, he's retired.
15    So but -- so but that's the kind of things.
16  This is federal, so they're federal cases and each
17  case is not a very big deal, unless you have them all
18  grouped together.  So it's -- yes, we've talked about
19  that, but at this point we are not technically
20  working with law enforcement.
21    Q.  Okay.  Okay.  So let me just ask this then.
22  I really need you just to answer my specific
23  question.  I mean, has Malibu Media ever worked with
24  active law enforcement to, to enforce its copyrights?
25    A.  I don't believe so, but I can make my answer

Pages 121 to 124

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

1  no if you -- because I just don't believe so.  So, I
2  mean, I have been threatened by people for enforcing
3  copyrights that people have threatened to throw acid
4  on me and things like that.  And so we -- I have had
5  to have bodyguards for certain amounts of time, but
6  that wasn't to directly protect the copyrights.
7      Q.   That's not my question as to whether you
8  hired bodyguards.  I'm really needing you to listen
9  to my specific question.
10     A.   Well --
11     Q.   You worked -- as you work -- I'm sorry?
12     A.   I had to make a police report based on the
13 copyright protection.  Everyone wanted movies to be
14 free, and that made some people very mad when we
15 were -- when we did the Bellwether trial, and so I
16 got death threats and we had to make a police report,
17 and at that point they, they did assign a bodyguard
18 to me until they had the situation under control.
19     Q.   Okay.  Has Malibu Media ever worked with law
20 enforcement to stop the alleged piracy of its movie?
21     A.   Yeah, we've talked to them about it but
22 that's not something they'll assist us with.
23     Q.   I'm sorry?
24     A.   That they will not -- they will not assist
25 us with that.  That's a federal -- it's a federal

1  crime, copyright.  So you can't just call up your
2  police department or call 911 and be like someone is
3  stealing my copyright.  It doesn't work like that.
4  We would have to -- we are -- what we're doing is
5  what you have to do with any civil complaint.  You're
6  a lawyer.  We were working with lawyers to, to
7  protect our copyrights.
8      Q.   Okay.  So let me again ask you the question.
9  Has Malibu Media worked with law enforcement to stop
10 the piracy of its movies?
11     A.   I feel like we are working with law
12 enforcement civilly to bring these charges up against
13 people that are stealing our copyrights, and this is
14 as close as we've come to actually working with law
15 enforcement to protect our copyrights.
16     Q.   So by "law enforcement" you're meaning the
17 civil courts?
18     A.   Right.
19     Q.   So other than civil courts, has Malibu Media
20 worked with law enforcement to stop the alleged
21 piracy of its movies?
22     A.   The civil courts are not interested in doing
23 that.  This is not a case the civil courts are
24 interested in handling.  So you can look it up on
25 LexisNexis.

1      Q.   Please listen to my question.  Other than
2  civil courts, has Malibu Media worked with law
3  enforcement to stop the alleged piracy of its movies?
4      A.   I don't know.  I can't remember every single
5  case.  And there might have been a few where law
6  enforcement was brought in and -- but I just, I can't
7  answer that.  I don't know.  It's been so many...
8      Q.   As Malibu Media's corporate witness, I'm not
9  talking about your personal knowledge, I'm talking to
10 you as Malibu Media's corporate witness, as Malibu
11 Media's corporate witness, are you aware of any time
12 that Malibu Media has worked with law enforcement to
13 stop the alleged piracy of its movies?
14     A.   I'm not personally aware.
15     Q.   And are you aware as Malibu Media's
16 corporate witness?
17     A.   If I -- if I go through files where cases, I
18 think I can refresh my memory.
19     Q.   Are you aware as you sit here today, as
20 Malibu Media's corporate witness, of any times where
21 Malibu Media has worked with law enforcement?
22     A.   Law enforcement or retired law enforcement
23 or just active law enforcement or active?
24     Q.   Let's just say -- okay.  So in the last two
25 years, in the last two years has Malibu Media worked

1  with law enforcement to stop the piracy of its
2  movies?
3      A.   In the two -- okay.  So I don't know.
4  Unfortunately.  I'm trying to answer everything
5  honestly.  And Lorri Lomnitzer, she tried to make it
6  her own business, and so she did a lot of the dealing
7  on all the cases, accepted the settlements.  And she
8  did follow the law by the book, but if there was
9  anyone interacted with law enforcement, it would have
10 been her.
11     And so there are thousands of files in her
12 office, and we are trying to get them.  And I'll be
13 able to answer that question when we see them.  And I
14 think Paul knows and Paul is working on getting that
15 done and he's seen that.
16     Q.   So what's your educational background?
17     A.   I went to Rutgers College and I studied
18 math.  Then I worked for a -- and minored in French.
19 And then I worked for a software company called iCode
20 and we made a software called Everest, which was a
21 front to back-end software where you would buy
22 something, it post in the journal.
23     And then I worked for a company that made
24 MRI machines, and we worked with Siemens and sold
25 them to Cedar Sinai, all the three teslas and

Pages 125 to 128

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

Page 129

1  everything.
2      And then I also worked as a fashion model
3  when I was 12 to 19.  And I also worked competing
4  show jumping horses.
5      So I guess I learned from all of those
6  things.  So I guess the -- I guess the computers and
7  the modeling kind of turned into the website and the
8  programming and the models.
9  Q.  So you have a -- so you would say that you
10  have a technical background?
11  A.  Yes.
12  Q.  Fair?
13  A.  Yes.
14  Q.  So you understand IPP's methods when it
15  describes how it, how it detects alleged
16  infringements?
17  A.  I do.  I do.  But the thing is it's been 12
18  years since we started working with IPP.  And what
19  people keep not understanding when they're asking for
20  things about IPP is that it still works, it still
21  gets the job done, but it's like using DOS when
22  there's a new program.  So -- so that's what -- so
23  that's why it's hard for me to answer why IPP works.
24  Yes, it does work, but our new system is much sleeker
25  and better, and so that's why we're moving in that

Page 130

1  direction.
2      And so, you know, we just, we just want to
3  get everything going in the right direction, and so
4  it's like you're not -- you're not a software company
5  and then you stay with the same software and you
6  don't do upgrades for 15 years.  It just -- it
7  doesn't happen.  You can't -- you can't -- you can't
8  do that.  But it's a huge, huge understanding to
9  change.
10      So -- so, yes, I have a technical
11  background, which is why after almost 15 years we are
12  changing the software that we use to protect our
13  ability to grow as a company and our ability to even
14  do business because we can't compete with free, and
15  this has always been our biggest challenge.
16  Q.  I would again just ask you and --
17  A.  Well, you just asked me about my education.
18  Q.  Different question.  Answer my questions
19  because I'm getting these very, very long paragraphs
20  and we're really -- this is just going --
21  A.  Okay.  Let's go faster then.
22  Q.  I need specific answers to my questions or
23  it's just going to keep going on, so...
24  A.  Okay.
25  Q.  When did you create Malibu?

Page 131

1  A.  2007.
2  Q.  Has the -- has it been under the same entity
3  the whole time?
4  A.  I believe so, yes.
5  Q.  Are there any other business entities that
6  you created that have been involved in the same
7  business as Malibu?
8  A.  There are, but that would be a question for
9  my accountant, how they're figuring that out.  I
10  don't want to misquote anything.
11  Q.  What are your accountants trying to figure
12  out that you're referring to?
13  A.  If -- basically if any of the other ones are
14  just holding companies for domain names, and then
15  they would have a contract for Malibu to use that
16  if -- if we even need to do that anymore and, or
17  different companies for programming source code or if
18  we leave that within Malibu, things like that.  But
19  Malibu has always created all the copyrighted
20  material and owned the copyrights directly.
21  Q.  Do you have any documents to prove that
22  Malibu owns the copyrights?
23  A.  Oh, yes, of course.
24  Q.  What documents do you have to prove that?
25  A.  Well, first off -- first off a copyright in

Page 132

1  the United States is first use.  So if you -- so say
2  you created a video and you named it and it has these
3  people in it and so you do -- so based on, based on
4  the people and the video and the content and the
5  exact minutes, your video will actually be first use
6  copyrighted in the United States.
7      And then to take that further, we actually
8  file with the copyright office, U.S. copyright
9  office, and we file under, I think it's type nine and
10  downloadable video content with, with the U.S.
11  copyright office.  So basically no one else can ever
12  use our domain name or use a model with a similar
13  title and have the, have a copyright.
14      So basically we protect the copyrights by
15  first having first use, and second we register them
16  with the U.S. copyright office, which you need to do
17  within three months of creating the video and you do
18  it within three months of scheduling and infringement
19  notice.
20  Q.  Who produces the videos?
21  A.  I do.  I manage the directors.
22  Q.  Is there anyone else who produces the videos
23  besides you?
24  A.  I have a few directors working for me in the
25  Czech Republic, and then I had a few directors

Pages 129 to 132

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

1  working for me here, but with COVID here we've not
2  been shooting here in over -- in America in over a
3  year.
4          (Thereupon Defendant's Exhibit 3
5          was marked for identification.)
6  BY MR. KHAZEN:
7      Q.  All right.  I've marked as Exhibit 3 the
8  complaint, the original complaint in this case.  Do
9  you see it?
10     A.  Exhibit 3.  Let me go there.  I see this.
11 Uh-huh.
12     Q.  Can you turn to Exhibit A?
13     A.  Exhibit A.  One second.  Which page is that?
14     MR. BEIK:  Page eight.
15     THE WITNESS:  Page eight?
16     MR. BEIK:  Yes.
17     THE WITNESS:  Okay.  Oh, there, okay.  So
18 seven.  Eight.  No, it goes nine is movies, it has
19 seven with your -- with Paul's signature and then it
20 has nine I think.  So -- okay.  Exhibit A, okay.  So
21 that would be Exhibit A.  Doesn't have a page number,
22 but maybe that is page eight.  So is that the list of
23 the movies?
24 BY MR. KHAZEN:
25     Q.  Yes.

1      A.  Okay.  Got it.
2      Q.  Do you see this list of the movies here on
3  Exhibit A to the complaint?
4      A.  Yep.
5      Q.  Do you recognize these movies?
6      A.  Yes.  There's one -- that's a list of them.
7  Oh, he downloaded on '18.  Yeah, I made that in '14,
8  I think that one, Truth or Dare.  Supermodel Sex, we
9  shot that in a house in Malibu.  So, okay.  So, yes,
10 I recognize all these movies, uh-huh.
11     Q.  You produced all these movies?
12     A.  Yes.
13     Q.  Did you direct all these movies?
14     A.  No, I did not direct all of them, but I was
15 on the, on the camera from afar.  So I'm kind of
16 excited to get back to make sure we're getting all
17 the quality that we always, we always liked to have.
18 I don't like to have the directors shooting without,
19 but yes.
20     Q.  Please just answer my question.
21     A.  That's fine.  Yes.
22     Q.  Did you write all these movies?
23     A.  Excuse me?
24     Q.  Were there writers for any of these movies?
25     A.  No, I just -- I make -- I write a small

1  theme and we just go with that.
2      Q.  Were you an employee of Malibu Media at the
3  time that these movies were made?
4      A.  I started Malibu.  I've never been an
5  employee.  I started -- I sold real estate, too.  I
6  forgot to mention that.  I would take my commission
7  from real estate and I would create movies and code
8  the website, and that's how it started, so...
9      Q.  Again, please just answer my questions.
10     A.  Okay.  So no, I was not an employee.  I own
11 Malibu Media.  I started Malibu Media.
12     Q.  Did you own any other companies at the time
13 that these movies were made?
14     A.  No.
15     Q.  Do you -- did you ever assign the rights to
16 these movies to Malibu Media?
17     A.  The movies were always made under the name
18 Malibu Media.  All -- so no.
19     Q.  What does that mean that they were made
20 under the name of Malibu Media?
21     A.  I'm saying that the rights were never
22 assigned to anyone else.  I was going to let you know
23 that everyone who worked on the movies signed a
24 Malibu Media release.  They were paid by Malibu
25 Media.

1      They were -- everything was -- if the
2  equipment was rented, it was rented by Malibu Media.
3  If it was owned, it was owned by Malibu Media.  The
4  location was owned by Malibu Media, or if it was
5  rented by Malibu Media or if it was on a, on
6  location, also Malibu Media paid for that.
7      So it was -- everything was paid for by
8  Malibu Media.  They were -- the copyrights were owned
9  by Malibu Media, as far as first use and then be
10 registered and that's -- and so that's, that's kind
11 of -- that's that.
12     Q.  When was the first use of let's say the --
13 take the first one.
14     A.  Okay.  So basically it never changes on the
15 site.  I don't know why it's on here still, Kaisa.  I
16 think Kaisa was on 2017 or '18, but let me go look
17 really quick.
18     Q.  You think first, I'm sorry, is the
19 publication?
20     A.  Yeah, the publication is when it would be
21 the first, the first.  When it was released is first
22 use date.  But there could be some movies here that
23 have been infringed that have been taken down because
24 say the, you know, the girl decided to have children,
25 she didn't want to be online anymore.  And so every

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

Page 137

1  now and then I'll get a girl who doesn't want to be
2  an adult model anymore, and we're -- we'll help her
3  take it down and help her on DMCA to get that removed
4  from other sites.
5      So -- so yeah, that's -- so, I mean, I can
6  tell you.  I can tell you that one when it was first
7  used.  Yeah, it's a while back.  So that was -- let
8  me try this.  Okay.  So they're not -- the titles
9  aren't always have -- there it is.  Okay.  That's not
10  the full title there, but that is -- that was
11  published 5-3-2019.  And you have it on 5-3-2019.
12      Yeah, so usually a lot of times they're
13  actually taken, stolen onto the, onto the BitTorrent
14  the day they're published.  That one was published on
15  5-3-2019, as it says here.
16      Q.  So do you have any records of anyone who
17  worked on these movies assigning their rights to
18  Malibu Media?
19      A.  No.  We -- Malibu Media does everything
20  in-house, so there would be no one who assigned their
21  rights on the movies to Malibu Media.
22      Q.  And when you say in-house, that means it was
23  done by independent contractors, correct?
24      A.  Right, that worked for us.
25      Q.  And that you have a contract with?

Page 138

1      A.  Yes, of course.
2      Q.  And those contracts don't assign their
3  rights to copyrights to Malibu Media, correct?
4      A.  They are -- they assign all the copyrights
5  to Malibu Media.  They assign all the use, every --
6  they keep no rights for themselves based on whatever
7  they've worked on.  If they've been on the set and
8  they've been a gaffer or they've been on camera A or
9  B or they've been, they been just someone carrying
10  their stuff around in the airport, all rights for
11  anything artistic, even behind the scenes, everything
12  is assigned to Malibu Media.
13      So even if they're not evening planning on
14  making content, but we might use the content behind
15  the scenes later, we make sure everyone signs a
16  release that no one owns anything as far as anything
17  that they've shot or on any one of our trips or on
18  anything like that.  We own all the rights to
19  everything.
20      Q.  Do you have copies of all of those
21  contracts?
22      A.  I'm sure -- I'm not sure we have it for
23  every trip, but for -- I'm sure I can find all of
24  them though, so, yes, somewhere.
25      Q.  All right.  And the -- so you're saying that

Page 139

1  the independent contractors, that they assign their
2  rights, that they assign their rights to the
3  copyrights to Malibu Media?
4      A.  They never had the rights to the copyright
5  to assign it.  So does that not make sense to you?
6  So if you're just going to edit something that we've
7  already shot, just by us asking you to edit
8  something, you don't get a copyright for it.
9      Q.  Then why did you follow up with your
10  latest -- that's what at first you said, but your
11  latest answer then said that no, they do assign their
12  rights.  So which, which is it?  Do they have -- they
13  have terms of the contract with assign rights?
14      A.  Just to -- just so everyone -- so just
15  there's no -- just in case they do something else or,
16  I mean, we just don't -- we want to be covered at all
17  costs.  So but most of the time just because, like
18  say we shoot a movie and then we want to have an
19  editor edit the movies for us, because we're busy,
20  and so instead of doing that editing in-house, we
21  give the movie to an editor.
22      And I sit -- and I actually work with them
23  and say what music I want and how I want to break the
24  movie down.  And he gives us a price, and then he
25  signs a contract that says any of his work product we

Page 140

1  own, you know, a hundred percent.  Doesn't -- doesn't
2  even have to talk about copyrights because he never
3  had a copyright.  It's just his work product of
4  editing the raw footage.
5      Q.  So there's nothing in the contracts that
6  specifies that there's a work made for hire
7  situation?
8      A.  They're all for work for hire.
9      Q.  I'm sorry?
10      A.  All the contracts are work for hire.
11      MR. BEIK:  Object to form.
12  BY MR. KHAZEN:
13      Q.  And have you produced those contracts to
14  your lawyer?
15      A.  I -- I don't know if we have.  Like I said,
16  I had COVID for a while and some of our other people
17  did too on the teams in Europe.  So I'm not sure
18  exactly what was produced and what was going on.  I
19  know there were quite a few things going on during
20  this trial that made it hard for us because of also
21  the moving towards our own, our own persons instead
22  of IPP, because we just don't trust them like fully
23  at this point.  And we want to make sure everything
24  is done correctly and so we wanted to check out their
25  past things.

Pages 137 to 140

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

1    So with all of that going on and with, you
2  know, us starting to file and protect our content
3  again, I guess the last thing on my mind would be,
4  would be, you know, did we do one, this or that or
5  something. I mean, it should be done for sure, but
6  we also -- I mean, to answer your questions, we
7  always protect our rights. We always own the
8  copyrights. We have not assigned the copyrights to
9  anyone.
10    Q.   And have you -- and does this -- and do your
11 contracts go back to the whole time you've owned
12 Malibu Media you've had the same form of contract?
13    A.   No, because in the beginning it was only
14 photos. So we had photos contracts and so we used to
15 sell to Playboy and Penthouse. They had some models
16 that were like slightly naughtier, and so we would
17 actually do like a fashion style shoots with them.
18 And then everyone was very interested in seeing
19 these, you know, girls that do a little bit harder
20 core stuff in fashion style, so that's how it started
21 out as.
22    And then -- and so we of course had
23 copyrights because those were photos, and photos are
24 infringed on all the time. And then when he started,
25 we were one of the first SLRs and we started video

1  content. And of course through content you copyright
2  and you make sure to register your copyright and your
3  video for your video content. I mean, that's how
4  they -- YouTube wouldn't exist otherwise.
5    Q.   Do you have any proof that these contracts
6  exist?
7    A.   Contracts between the copyright office?
8    Q.   Contracts between you and any of your
9  independent contractors that have worked, that have
10 worked on the movie, directed the movies, done
11 editing on the movies, anything?
12    A.   Yes.
13    Q.   What proof do you have?
14    A.   We would have work for hire. We would
15 have -- anyone who's ever worked on anything for us
16 will sign a work for hire.
17    Q.   And have you produced those contracts to
18 your lawyers?
19    A.   I think this all went really fast, and I
20 don't recall being asked to produce that, because
21 I've been extremely busy lately and I think maybe
22 they just didn't want to trouble me with that.
23    But I -- like I said, I'm happy to produce
24 what I can as far as that goes. But we -- we do own
25 all of our -- I don't know where you're trying to go

1  with this. We own all of our copyrights. No one
2  else owns any of our copyrights.
3    Q.   That's not for you to determine. Please
4  just answer the question that I'm asking. So do you
5  have those contracts in your possession, if they
6  exist?
7    A.   They do exist. And they're -- the
8  problem -- I'm just trying to think if they're on an
9  email or on my -- the fax with the -- my fax where I
10 fax to the cloud or if they're in California or in
11 Henderson. So, yeah, I need to find them.
12    Q.   Okay. So, yes, if you have those -- if you
13 have those contracts -- your answers are just very,
14 very long. I wish you would just answer my
15 questions. This would move a lot faster.
16    A.   The thing is --
17    Q.   You do have contracts with your independent
18 contractors that are, with your independent
19 contractors that were available at the time of these
20 movies in Exhibit A of the complaint in your
21 possession; is that correct?
22    A.   Okay. So some of them wouldn't require a
23 contract if we did all the work ourselves, so there
24 wouldn't be a contract. Like when I said Truth or
25 Dare, remember I was telling you about that one?

1  That would not require a contract because I did all
2  the work myself on that.
3    Q.   Which ones of these would require a
4  contract?
5    MR. BEIK: Object to the form.
6    THE WITNESS: I think -- I don't know off
7  the top of my head. That one, Supermodels, all of
8  that. I mean, some -- there's only a few here that
9  would require even any contract that anyone touched
10 them.
11    A lot of them that Brig and I did by
12 ourselves, you know, are -- one of the guys who, who
13 worked with us as camera B also edited, so he had a
14 contract and, a work for hire contract. And then our
15 camera A, actually he was an employee at one point,
16 and he made a lot of money. I think we paid him like
17 $420,000 a year, or something like that, or a lot.
18    And so but most of these are from like 2013,
19 '15, '17. Those would be all shot, those would all
20 be shot by like Brigham and I. So '18, '18, but --
21 Truth or Dare.
22    MR. BEIK: Colette.
23    THE WITNESS: Okay. So, yeah, I don't --
24 there's a few of them that might require a contract,
25 and I don't even know if any of them do.

Pages 141 to 144

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

Page 145

```
 1   BY MR. KHAZEN:
 2      Q.  Okay.  But you have those contracts in your
 3   possession?
 4      A.  If they require a contract.
 5      Q.  And you said if it doesn't require a
 6   contract, correct?
 7      A.  Correct.
 8      Q.  Are the contracts in your possession?
 9      A.  If they require a contract.  I'm looking at
10   most of these movies and they look like they were all
11   done -- like a lot of times, like Brig and I would go
12   away, and he would help me as -- you know, I would
13   sell the real estate, and so I would make the money
14   and we would rent a villa, bring the models and we
15   would make the movies and we would do all the work.
16        So there would be, except for the models
17   having a contract, which was a work for hire
18   agreement for X amount of money, they would shoot X
19   amount of films, and that's that.  We don't need to
20   worry about copyright contracts with the models, and
21   so there would literally be no contracts required,
22   so...
23      Q.  When you say Brigham, that's your husband?
24      A.  Yes.
25      Q.  And does he have a contract with Malibu
```

Page 146

```
 1   Media?
 2      A.  I believe he does for doing some -- yes, for
 3   doing a few things now that he does.  And he also has
 4   a contract to help with some of the FHGs and the,
 5   because of the galleries that we send out to people
 6   who promote us.  And those are picture galleries and
 7   stuff, so don't get too excited, they're not what
 8   your client stole.  And, yeah, that would be -- and
 9   then, yeah.
10        So I still don't understand the question.
11   It's like do they require contracts, do I have the
12   contracts?  I'm telling you they don't require
13   contracts, and you're asking me if I have the
14   contracts.
15      Q.  I really need you to answer these questions.
16   This is getting to be very inappropriate, and also
17   there's no proof that my client stole anything.  So
18   please just answer the questions that I'm asking you,
19   okay?
20      A.  Okay.
21      Q.  Does your -- does Brigham have -- did
22   Brigham have contracts with Malibu Media at the time
23   that he helped to produce the films in Exhibit A of
24   the complaint?
25      A.  I don't know, but I believe if he needed to,
```

Page 147

```
 1   he would have them.  He's very -- he's very, very
 2   organized like that, so...
 3      Q.  Do you have copies of that, of those
 4   contracts?
 5      A.  I would be able to check, yes, but I'm not a
 6   hundred percent sure, but, yes, I will check.
 7      Q.  And do you have any contracts with Malibu
 8   Media assigning your right, any rights that you may
 9   have in the copyrights to Malibu Media?
10      A.  No.
11            (Thereupon Defendant's Exhibit 4
12             was marked for identification.)
13   BY MR. KHAZEN:
14      Q.  All right.  I've marked as exhibit, as
15   Exhibit 3, or, sorry, Exhibit 4 a copy of your
16   website analytics, I believe.  Did you see this
17   document, Exhibit 4?
18      A.  I'm not on it, but I know I printed so I
19   know what you're talking about.
20      Q.  Do you see it now?
21      A.  I see it.
22      Q.  Do you recognize this document?
23         Do you recognize this document, ma'am?
24      A.  Yes, I do.  Yes.
25      Q.  What is it?
```

Page 148



Pages 145 to 148

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**



**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078



Page 153



Page 154

1    Q.   How much money did you make from paid users
2  in 2018?
3    A.   I'd have to check with the accountant
4  because it's basically -- it's you're asking me a big
5  tax question.  Like are you asking me gross how much
6  money came in?  Like I have to check with every
7  processors and then see how much affiliates got paid
8  out and see how much it cost us to make the videos.
9  And so you're asking me tax questions now for about
10 someone who may or may not have stolen our movies.  I
11 don't understand.  I don't -- I don't know.
12   Q.   I asked you about the exhibit, the movies in
13 Exhibit A.  Is there anything special about them that
14 sets them apart from any of your other movies?
15   A.   The Exhibit A.  No.  Where did that go?  No.
16 Oh, page eight.  Exhibit A.  Okay.  Kaisa.  There's
17 some -- there's actually more threesomes than on the
18 site as a whole.  It's more groups of people.
19   Q.   Okay.  And you thought -- and you think that
20 would set these movies apart from any of your other
21 movies?
22   A.   Yeah, because basically there's an orgy
23 movie, Strip Poker, Moving Day, I think we have
24 another girl come in.  Supermodel I think so, but the
25 girls area really, really pretty.  Truth or Dare I

Page 155

1  know has four people.  So the one with the wife,
2  obviously that's a threesome, and then the one about
3  the Hot Threesome, that's obviously a threesome.  So
4  whoever downloaded all these movies on all very
5  different dates has a thing for threesomes.
6    Q.   Okay.  So other than that they involve more
7  than two people, is there anything else that you can
8  think of that sets these apart from --
9    A.   No.  Some were shot in America.  Some are
10 shot in Prague.  Some are shot on location.  Some are
11 shot in lofts.  Some are shot in houses.  So they're
12 all very different with different girls.  And the
13 only thing that sets them apart is that they have
14 multiple -- usually two girls in it and it looks
15 like, or two girls and two guys.
16   Q.   Okay.
17   A.   On our site that's probably like two
18 percent.
19   Q.   And you have 1,965 unique videos on XR.com;
20 is that correct?
21   A.   Right.  Right.  Uh-huh.  So this guy has
22 probably downloaded from Colette as well, but we
23 don't actually -- we haven't been persuing the
24 copyrights on that site because just, just because.
25 So that's just too much work to do it on every, on

Page 156

1  every site.  So -- so I would say the person that
2  downloaded these movies has a fetish for an extra
3  girl or an extra couple.
4    Q.   What are -- what are the most -- do you know
5  what the most popular videos on your site are?
6    A.   None of these.
7    Q.   Do you have any of that data available?
8    A.   Yeah.  If you go to the site, you can
9  actually click on videos and "most popular."
10   Q.   Now, when it says users, do you have free
11 videos up on XR.com?
12   A.   No.
13   Q.   So if these users aren't paying customers,
14 why are they using, why are they using your site?
15   A.   It's the way, the way Google says it.  If
16 they've just gone to the site, they're a user.
17 Basically just -- once they step on the site, they
22 will turn into a user once they're on the site, but
23 if they, but if they don't, then they bounce off and,
24 and they don't become a member.
25   Q.   What do you mean by bounce off?

Pages 153 to 156

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

1      A.   They come to the site and they see, oh, we
2   have to pay, and then they don't want to pay so they
3   just like go away and don't pay for it.  Or what they
4   do is they look for the movies they want to watch and
5   then they go to the torrents and they download the
6   torrent where they can get them for free.
7      Q.   Is that what this bounce rate refers to in
8   the analytics pages then?
9      A.   Let me see what it says on there.  This is
10   from a long period of time, so it's probably not
11   going to be too accurate.  Bounce rate 44.  So
12   44 percent of the people that come to the site in
13   that entire time, that's actually a pretty good
14   bounce rate.
15         Most adult site have 70 or 80 percent bounce
16   rate.  So 44 percent of the people actually, they
17   just call -- they bounce off.  They go get to the
18   site and say, oh, this is a paid site, I don't want
19   to, I don't want to pay, so they just go straight
20   back somewhere elsewhere where they can find
21   something without paying.
22      Q.   Are you -- are you -- I'm sorry.  Go ahead.
23      A.   Or -- or what they do is they find something
24   they want to watch and then they bounce right off to
25   the torrent, because they already have it set up, and

1   they start uploading the movies that they want to the
2   torrent, and then they open their door in turn and
3   say, hey, I'm uploading this movie from XR so, you
4   know, anyone who wants to come get it from me can
5   come get it, and can I get anything that you have,
6   and I'm looking for this movie from XR with another
7   threesome, you know, can I come get this movie.
8      Q.   How much does a subscription -- so are you
9   meaning to suggest then that the rest of these people
10   that aren't part of the bounce rate became paying
11   customers?
12      A.   Excuse me?
13      Q.   Are you meaning to suggest that the people
14   that aren't reflected in this bounce rate on your
15   analytics became paying customers?
16      A.   I don't know about that actually.  I mean, I
17   think they might have been looking for titles anyway,
18   and that they like -- I think they most likely want
19   to, would go to one of the torrents, and if they
20   found movies they wanted, get them from there, or
21   they would Google it and find it on the tube or
22   something like that.
23         They usually don't become paying customers
24   of they're -- if somebody isn't a paying customer,
25   they would go actually from here and visit the

1   torrent.  So basically I was just looking.  There are
2   some people on the torrents and they actually say,
3   oh, came here looking for this movie and things like
4   that, like little notes.
5         So -- so we don't know where they go.  Some
6   people go to the torrents and they download them,
7   some of them just bounce back to their email.  Who
8   knows.
9      Q.   Do you have any evidence that any of them
10   going there are going to the torrents?
11      A.   Yeah, we can actually, with our new
12   software, I bet we can get that evidence.
13      Q.   That these specific users are going off to
14   the torrents, that's -- you have software that will
15   detect that?
16      A.   Well, we're just perfecting it now, so I bet
17   we could get it to perfect that and see what's
18   happening to them.
19      Q.   You don't -- you don't currently have that,
20   correct?
21      A.   Excuse me?
22      Q.   You don't currently have any evidence of
23   that then, correct?
24      A.   Well, we do actually have a -- you can go
25   with analytics and you can actually look and see

1   where the, the upstream and the downstream goes.  So
2   we are doing where does your traffic go after your
3   site and where does your traffic -- like where do
4   they go after they've been on your site and where
5   have they been before.  And so you have that in
6   Google Analytics now, and it doesn't work perfectly
7   but there's something that is a -- that kind of
8   works.
9      Q.   Have you done that?
10      A.   I have.  And again, like I said, it doesn't
11   work perfectly.  And so these are smaller companies
12   and so -- so, yeah.  No, I mean, I can look at it
13   again and see if it's improved at all.
14      Q.   How much does it -- how much does it cost to
15   be a member of XR?
16      A.   It depends if -- I think you can be a member
17   for like $20 or $30 a month, or it's as much as -- I
18   think it was -- so, yeah, it's 20 or $30 a month
19   basically, and it goes up to I think $99 for six
20   months.  And then I think it's 250 for a year, or 199
21   per year.  I'm sorry.  199 per year.
22      Q.   You understand that pornography is readily
23   available on the internet for free, right?
24      A.   Yes.
25      Q.   You understand that threesome pornography is

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

Page 161

1    readily available on the internet for free, right?
2        A.   Yeah, it's not the same though because it's
3    like it's not high res, it's not -- it's not like
4    fashion model girls.  They don't look the same and
5    it's just -- I mean, and so it's just not -- I
6    think -- I just feel like it's not the same.
7            I mean, I see -- I'm members of those sites
8    just for the heck of it because I want to see what's
9    going on with our, with our movies and stuff and so,
10   I mean, what else is competing with us.  And there's
11   really not too many kind left since we're the only ones
12   defending our copyrights.  We're pretty much the only
13   small site, like family site left in business.
14   MindGeek has either bought all the rest or put
15   everyone out of business.
16       Q.   What evidence do you have that any of the
17   films that are asserted in your complaint have market
18   value?
19       A.   Because I can sell them for -- license them,
20   and I can -- and we have people joining every day,
21   and they comment on -- you can look at the comment
22   section.  You can see if people even, like from
23   hundreds of thousands of movies ago still downloading
24   them and joining for those movies.
25       Q.   What evidence do you have that these

Page 162

1    specific movies that are alleged in your complaint
2    have any market value?
3        A.   Again, like I said, because they are being
4    downloaded on the -- and people are requesting them
5    when they request a package of films to buy.  Because
6    we don't have many threesomes on our site, so any
7    threesome we have, if someone requests threesomes,
8    like this whole list was, we get to the list.
9        Q.   So do you have any -- so you said earlier
10   that you don't have data on which movies, correct me
11   if I'm wrong, but you said earlier that you don't
12   have data on which, which movies are, are most
13   downloaded from your, from your site.  Is that not
14   correct, you do have this data?
15       A.   It's not exactly correct, actually, no, we
16   don't have the exact data on which ones are
17   downloaded and which ones are downloaded more.
18   It's -- I mean, Google tries to do something but it's
19   extremely off.
20       Q.   Sorry, excuse me, so which ones are -- so
21   you don't have data on which ones are viewed more or
22   less often on your site; is that right?
23       A.   Well, I mean, you can have -- it's kind
24   of -- I mean, yes and no.  It's just not very good
25   data.

Page 163

1        Q.   Okay.  So you don't have any good date on
2    which movies out of the 1900-plus movies that you
3    have on your site are viewed more or less, correct?
4        A.   No, we do not.
5        Q.   And so what evidence do you have that the
6    movies, specifically let's say in Exhibit A, have any
7    market value to anyone that's paying to view your
8    website?
9        A.   I'm sorry, say again.  What evidence do we
10   have that it's...
11       Q.   That any of the movies listed in Exhibit A
12   of your complaint have value or are used by any of
13   the people on your website?
14       A.   Because I have many comments on them.  If
15   you go to the movie on the website, log in, you'll
16   see all the people commenting on whether they like
17   the movie or not.  And some of the comments I've
18   hidden, but I get the comment.
19           And when I put the movie up, I can go back
20   and I can see how many people infringed on it the day
21   I posted it.  And as you can see, the first one, I
22   just looked it up, and the day I posted it, it was
23   immediately on the torrent sites.
24       Q.   Which movie is that?
25       A.   Some of the -- Kaisa Slippery and Wet one.

Page 164

1        Q.   Do you have any reason to believe that it
2    was not somebody that works with you that was, that
3    posted them on torrent sites?
4        A.   Yes, they ultimately would be fired if they
5    did.  They're all with me on preparing the lawsuit
6    for stealing our movies.  So, no, not in a million
7    years, they wouldn't do that.
8            MR. BEIK:  Ramzi, are you getting to a good
9    stopping point for a break?
10           MR. KHAZEN:  Sure.  We can -- we can go
11   ahead and...
12           THE WITNESS:  How many more questions?
13           THE VIDEOGRAPHER:  Off the record at 2:37
14   Pacific time.
15           (A recess was taken.)
16           THE VIDEOGRAPHER:  We are back on the record
17   at 2:29 p.m. Pacific time.  2:49, sorry.
18   BY MR. KHAZEN:
19       Q.   Does Malibu Media have any evidence that
20   anyone specifically looks for XR movies?
21       A.   Yes.
22       Q.   Does Malibu Media have any evidence that my
23   client looked for XR movies?
24       A.   I don't know where he downloaded these from,
25   so the title is always in the -- it's on the movie.

Pages 161 to 164

1   So -- and it's on the file name, so I would need to
2   see what file name that he downloaded.
3       Q.  So you have no evidence, Malibu Media has no
4   evidence that my client searched for XR movies,
5   correct?
6       A.  That's not true.  I would -- I need -- I
7   would need to actually look deeper into these, these
8   IP captures and see if -- because our movies are very
9   different from other movies, and I would want to
10  see -- so when you dial it, when you download it, it
11  will usually say XR underscore dash Kaisa.  Like,
12  that's how we -- that's the format we save the titles
13  in.
14      So they're not -- the title aren't saved.
15  Like they're just made into this for purposes to be
16  easily readable and to know which movies was
17  downloaded.  But he could downloaded, you know, these
18  could have all said XR first in front of it, and then
19  it would look like -- and then there would be
20  evidence that he was looking for XR, and it's also in
21  the metadata.
22      Q.  I'm not asking for a hypothetical on what
23  you may be able to find as evidence.  I'm asking you
24  as you sit here today as Malibu Media's corporate
25  representative whether you have any evidence that my

1   client searched for XR movies?
2       A.  I'd say yes.
3       Q.  What evidence do you have?
4       A.  Well, we have so few threesomes that in
5   order to pull up that many of threesome movies, he
6   would have had to type in XR threesomes.  I mean, it
7   would be like almost numerically like proportionally
8   mathematically impossible for him to pull up all the
9   threesomes from XR until that day almost, and because
10  it's a really very small, small amount compared to
11  the rest of our movies, which are just very vanilla.
12      So in order for him to get all of those XR
13  threesome movies, he would have to type in XR
14  threesomes.  I bet I can do it right and the movie's
15  title will come up.
16      Q.  How do you know he didn't just look for
17  threesomes?
18      A.  Well, because -- because there would be --
19      Q.  As a hypothetical?
20      A.  Yeah, I mean, of the 32,000 there probably
21  are more threesomes, but the thing is to get all of
22  these movies, if you just look for threesomes, I can
23  do it right now online, actually.  Hold on, I'll do
24  it and I'll tell you I watched -- if I go XR
25  threesomes.

1       Q.  Look, I'm not asking you to Google things
2   right now.
3       MR. BEIK:  Colette, let's just answer his,
4   answer his questions.
5       THE WITNESS:  Okay.  Got it.  Okay.  So the
6   first thing that comes up when I search for, just so
7   you know, when I search for threesome is XR Kaisa,
8   and then there's a couple of the others ones actually
9   on the list that come up, and then, you know, there's
10  a whole bunch of different, different ones mixed in.
11      But that was -- that's definitely a popular
12  search term.  And Kaisa is the first one that comes
13  up.  So it seems to me like he typed in the word "XR"
14  because if you just -- if you just look up threesome,
15  then it's, it's not going to have necessarily all XR
16  movies.  So anyway, but it to me, yes, there will be
17  evidence that your client searched for XR threesomes.
18  BY MR. KHAZEN:
19      Q.  I'm not asking whether there will be
20  hypothetically evidence, I'm asking what evidence you
21  actually have.  And since you don't know what other
22  movies that were there, then typing in threesome,
23  your search seems to have dis-proven your point.  So
24  again I'll ask what evidence do you have that my
25  client, according to your allegations, searched for

1   XR's?
2       A.  Because it would be mathematically
3   impossible for him, over that long of a time span, to
4   get -- to only to get each threesome like per -- like
5   each year it might have like three threesomes or
6   something like that.  And so over that time span,
7   like to only download an XR threesome, I'm sure he
8   downloaded threesomes from other sites, too, but
9   obviously he was looking for all XR threesomes.
10      It's just -- probability.  So with
11  probability there's no probable explaining of how he
12  would have all of our threesomes in one place over --
13  how many years is it over?  I'm sorry, I just closed
14  that.  Over that much time that, you know, I just,
15  it's just not, it's just not possible, so --
16      Q.  But you don't know the denominator for that
17  equation.  You don't know the total number of movies.
18  So, again, that doesn't seem to be evidence to me at
19  all.  So --
20      A.  Every one of our movies -- there are so many
21  other --
22      Q.  As you've admitted --
23      A.  You know, in the briefing we can discuss all
24  of that.
25      Q.  As you admitted you said that you were sure

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

1  that he had downloaded other movies.  So according to
2  your hypothetical -- let me just strike -- let me
3  just ask this question.  Other than -- other than
4  your -- let me just ask this:  Do you -- do you know
5  how many movies this person that you've accused of of
6  infringing downloaded movies?
7      A.   Altogether?
8      Q.   Yes.
9      A.   Over that period of time, at least, I think
10 at least 32,000.
11     Q.   So out of 32,000 you think it's
12 mathematically improbable to come up with nine XR
13 movies?
14     A.   I think so because it's -- it definitely --
15 nine XR threesomes, basically, because there's so
16 many free movies you can get, so if he's looking
17 for -- so but there are so many free threesome
18 movies, right, and so to get -- to find paid movies
19 that he has to download on a torrent site that that
20 would be mostly XR and -- I don't even know what
21 other movies are paid for anymore that are,
22 especially that are threesomes.  So maybe like a
23 Blacked or those Strike Three movies that they're
24 going after.  So who knows, he's probably getting
25 sued by them, too.

1      But this is, it's my opinion, okay.  So you
2  asked a question, and it's my opinion that it is
3  mathematically not probable that he would have that
4  many XR threesome movies in one, in one download.
5  Like not one download over the years.
6      So if you keep coming back and keep coming
7  back for a threesome, so he's obviously watching the
8  site and had on his tracker, and like how you can
9  track on, too, on the, on the torrent sites.  So he
10 probably was tracking them, and when a new one came
11 up, he would go find it and download it.
12     So he was a habitual offender and he had his
13 fetish and it's just -- it's too much of a
14 coincidence to say, oh, just by chance he -- you made
15 one threesome movie the whole year and he downloaded
16 it and then he did it again the next year and again
17 the next year.  So that's a pretty -- that's --
18 that's quite a coinsurance to me.  Once, twice --
19 once or twice maybe.  Three times coincidence maybe.
20 Four, five, six, seven, eight, nine, it's not a
21 coincidence anymore.
22     Q.   So out of 32,000 movies you find it highly
23 improbable that a person who would be searching for
24 threesomes would hit just nine Malibu movies.  Is
25 that your testimony to the jury?

1      A.   I find it improbable that he would hit nine
2  XR movies because even the -- I don't -- and I can go
3  look and see how many because the Colette movies have
4  also more group things and a little bit harder core
5  on there.  But XR, there's almost no site that does
6  kind of a beautiful erotica with a group aspect in
7  it.
8      So it's a very, very niche because most
9  people would want to look at that want to or -- it's
10 very niche and usually they just pay for it.  They
11 wouldn't go back year after year unless they're an IT
12 who knows how to, thinks they can beat the tech and
13 just think that no one can beat them.  And so and
14 those are -- those are the people that, you know, we
15 make the movies for, and then if they don't want to
16 pay for it, it's difficult.
17     But anyway, let's go on to the question.  My
18 answer is it's not probable that he would be -- he
19 would get those movies.
20     Q.   Out of those 32,000 other movies that you're
21 alleging, are you aware of whether or not those are
22 copyrighted?
23     A.   I'm not aware.
24     Q.   And out of those other 32,000 movies that
25 you're alleging, are you aware of whether those



Pages 169 to 172

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Page 173



Page 174

1      Q.   I have to ask this:  Are you under -- are
2   you under the influence of any substances today?
3      A.   No.  No.  I have a really big case going on
4   and I'm just -- I wish we'd answer, but no, I'm not.
5   I guess I'm just trying to -- I don't understand your
6   questions and how they're relating to the case.  I'm
7   not under the influence of any substances.  Just a
8   Kombucha tea here with ice.
9      Q.   So looking back at Exhibit 4, it says that
10   in 2017 -- it gives revenue, subscription revenue for
11   2017 through 2019.  Do you see that on the back, on
12   the second page?
13      A.   Shoot.  I think I closed it.  What was it?
14   It was a -- I'm sorry.  Oh, there it is.  What was
15   the name of your -- the site again?
16      Q.   Exhibit 4.
17      A.   I know.  I know, but it looks like it
18   somehow crashed out or closed me out.
19      Q.   Let's go off the record while we get this
20   fixed.
21      A.   Okay.  So it was --
22        THE VIDEOGRAPHER:  Off the record at 3:03.
23          (Discussion off the record.)
24        THE VIDEOGRAPHER:  You're back on the record
25   at 3:04.

Page 175



25   you it was more like about 12 million a month in

Page 176



**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Page 177

1   me, actually.  I think what's increased actually are
2   the cam girls.  So people want live and now.  So
3   we're adding that on as well.  So people still want
4   to see the movies but some people want to speak to
5   the models live and --
6       Q.  I'm sorry.  Isn't it also true that high
7   resolution pornography for free has increased during
8   that time?
9       A.  It has increased but it's not that much
10  because they really can't get the stolen -- there's
11  not too much you can steal in high resolution, so
12  it's -- it has increased a little bit, but you can --
13  right now what they're doing is they're actually
14  stealing our movies on the tubes -- I'm not going to
15  go there.
16         So just it -- yeah, it increased, but I
17  don't know what this has to do with, you know, people
18  stealing our movies off BitTorrent.  But it's gotten
19  much more way huger of a problem for us.  And -- and,
20  yeah, and we have to go through things like this of
21  people, you know, that we're -- look how long this
22  takes.  I have so many things to do today and we're
23  doing this all day.  So -- and I still don't
24  understand how the questions relate.
25      Q.  I really need you to just answer my

Page 178

1   questions.
2       A.  Okay.  Ask one.
3       Q.  And your -- the company has a reputation for
4   terrorizing thousands and thousands of people.
5   You're putting them out of their convenience, so
6   please just --
7       A.  Terrorizing?
8       Q.  So do you have any revenue numbers for 2020?
9       A.  2020 is not yet over.
10      Q.  Right.  Do you have any year-to-date revenue
11  numbers?
12      A.  No, they're not finished yet.
13      Q.  Now, how much -- how much does XR spend,
14  spend per year in expenses, on its expenses?
15      A.  I don't have that in front of me.
16      Q.  Approximately?
17      A.  I don't know.  I don't have that in front of
18  me.  We have a lot of different things going on and
19  it depends on the year, whether we're traveling and
20  whether, you know, just on so many different things.
21  So it's -- and then all this depends on those numbers
22  are before charge-back, before fees to processors,
23  depends which processors we're using.  It's just -- I
24  can't guess at that.
25      Q.  How much -- how much does XR make per year

Page 179

[redacted]

Page 180

1   we're not with her.  And now finally we have made our
2   own software, and we have a great team, and we are
3   getting ready to file again.
4          Your client was someone who was with us
5   while we were still doing this for deterrence, but,
6   you know, we didn't make any money because the
7   attorneys cost so much and it's actually very
8   expensive to do this, to bring these cases.  It's not
9   our favorite part of business.
10         And, I mean, I'm really overwhelmed running
11  so many businesses, so it's -- we actually -- your
12  answer is zero.  And in 2020 we have broken even just
13  being able to pay the bills, like paying our
14  attorneys.  And as 2020 goes on and we file our first
15  new batch of suits, I expect us to make money, and
16  that -- because now that I'm actually running, as the
17  lawyer before, and now we have a good lawyer on an
18  IPJ -- an IP attorney who's been with us for ten
19  years, he's just, you know, looking at the drafting,
20  making sure everything is drafting right, make sure
21  if we should move forward or if we should settle, you
22  know, based on the person and based on the district.
23         And then so I would expect we would again
24  make maybe five percent of our, of our income.  So
25  it's more of a deterrent really.  It's, you know, we

Pages 177 to 180

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Page 181

1   have to do something, and we've tried everything.  I
2   mean, if there was something else to do, believe me
3   we would do it.  I wouldn't be in a depo the entire
4   day.
5       Q.  How much have you paid out to your lawyers
6   in 2020?
7           MR. BEIK:  Objection, form.
8           THE WITNESS:  Do I answer?
9           MR. BEIK:  Ramzi, I don't think that's -- I
10  think -- I don't think that's -- I think I'm going to
11  object on that one because I think that that's, you
12  know, first of all, there's a bunch of different
13  matters involved.
14          THE WITNESS:  Yeah, they work on other
15  things, too.
16          MR. BEIK:  There's a lot of things that I'm
17  not involved in.  There's, you know, specifically
18  from this case.  I think that that's not an
19  appropriate question for her to answer.  I'll assert
20  attorney-client privilege on that one.
21  BY MR. KHAZEN:
22      Q.  Are you going to follow your attorney's
23  instructions not to answer?
24      A.  Yes.
25          MR. KHAZEN:  So, I mean, she volunteered the

Page 182

1   information that she said she wasn't making money
2   because of all the money she's paying lawyers, and I
3   feel like I'm entitled to understand what that, what
4   that's actually going to, if that's going to other
5   lawsuits, if that's really -- so I would say that
6   that's been effectively waived at this point.  But if
7   you want to state your objection, I guess we can take
8   that up later.
9           MR. BEIK:  I'm going to stand on that
10  objection, Ramzi.  I don't think that's appropriate.
11  BY MR. KHAZEN:
12      Q.  Does -- are you -- has anyone ever -- have
13  you ever given a security interest in Malibu's
14  copyrights to anyone?
15      A.  No.
16      Q.  Have you ever used them as collateral?
17      A.  No.
18      Q.  Has anyone invested in Malibu?
19      A.  No.
20      Q.  Has anyone ever invested in or given you any
21  money in any form in exchange for any interest in the
22  copyrights?
23      A.  No.
24      Q.  All those copyrights?
25      A.  No.

Page 183

1       Q.  Does anyone have a stake in the outcome of
2   Malibu's litigation?
3       A.  No.
4       Q.  Who -- what is -- so as far as Malibu is
5   concerned, there's only you as the owner and no
6   employees; is that, is that correct?
7       A.  That's correct, actually.
8       Q.  And do you have -- do you or any other
9   entity you associate with, you're associated with
10  ever receive a loan or investment from, from a
11  company from Genova?
12      A.  No.
13      Q.  How about Warmblood?
14      A.  No.  No.
15      Q.  Did Genova or Warmblood ever file a lawsuit
16  against you?
17      A.  I don't know if they filed it or if they
18  just had something leaked to the press to try to
19  extort us on something, but we're -- it's a private
20  matter, but we're suing them for damages and
21  defamation.
22      Q.  Have you ever paid either of them any money,
23  you or Malibu?
24      A.  They have taken money and paid it to
25  themselves from our business and pretended to be

Page 184

1   Malibu.  So that was another issue within the last
2   year.
3       Q.  Can you explain that?
4           MR. BEIK:  I'm going -- I'm going to object
5   on relevance to this because I think that the real
6   estate dispute in California with Genova is not --
7   it's a personal matter that involved -- does not
8   involve Malibu Media, so I'm going to object to form
9   on that.
10  BY MR. KHAZEN:
11      Q.  You can go ahead and answer.
12          THE WITNESS:  Do you want me to answer,
13  Paul?
14          MR. BEIK:  You can answer to the extent that
15  you know.
16          THE WITNESS:  I have no idea what this has
17  to do with this, but these, these guys represented
18  that, you know, at that point we were moving from the
19  other guys that had stolen money, the copyrights in
20  Beverly Hills, and they represented that they could
21  help us run it, even though they weren't lawyers.
22          They tried to fix us up with a lawyer that
23  was not good at all and wasn't suited for it.  And
24  then they wanted to run it without being a lawyer.
25  We said no.  They started collecting our judgements

Pages 181 to 184

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

Page 185

1  without us knowing.  They actually had us sign, they
2  had me sign a power of attorney so they could help
3  us.
4        And I read the power of attorney after and
5  it was just, it was ridiculous, like they could have
6  loaned money and not loaned money and then they
7  didn't pay the loan to themselves.  They put in a
8  default rate that they -- and then they paid the
9  money back through our account that I had no access
10  to.  They set up an account and actually put
11  letterhead.  It said Malibu --
12        MR. BEIK:  All right, Colette, I'm going to
13  stop you here.  That's pending litigation.  She's --
14        THE WITNESS:  Yeah, exactly.  Yeah, it's
15  been --
16        MR. BEIK:  -- represented by separate
17  counsel in that matter, and so she doesn't have her
18  lawyer.  I don't represent her in those cases.
19        THE WITNESS:  Yeah, it was --
20        MR. BEIK:  I'm going -- I'm going to have to
21  say that I think that, you know, to the extent that
22  she is getting off into all these facts and, you
23  know, that --
24        THE WITNESS:  I mean, I don't know what else
25  to say.  I'm just trying to say the truth.

Page 186

1        MR. BEIK:  Okay.  Okay.  Hang on.  Hang on.
2  I hope you appreciate that, Ramzi.  She's got other
3  lawyers in California and Florida and other places
4  that are representing her in that matter, and as a
5  result they're not here so I don't know anything
6  about those, those cases, other than that they're
7  unrelated to anything that's involved in this lawsuit
8  or, or what's going on here.
9  BY MR. KHAZEN:
10     Q.  They're extremely related.  These are
11  companies that claim that they owned, that they owned
12  these copyrights that are asserted here, so this is
13  highly relevant.  I need to know whether you owned
14  the copyrights or not.
15     A.  I can't --
16        MR. BEIK:  Hang on.  Hang on.  You asked her
17  that question and she answered.
18        MR. KHAZEN:  Yeah, and I don't know whether
19  her answer is true or not.  I'm trying to look into
20  the voracity of her answers.
21        THE WITNESS:  Well, go look at Pacer.
22        MR. BEIK:  No, hang on.  Like I said -- like
23  I said, Ramzi, the problem here is that she's
24  represented by lawyers, and those lawyers aren't
25  here.  And so, again, you know...

Page 187

1        MR. KHAZEN:  You're her lawyer.  That's...
2        MR. BEIK:  Not in those matters, Ramzi.  I'm
3  not -- I'm not a real estate attorney and I'm not
4  involved in those cases.  So, you know, that's what
5  I'm saying.  I represent her in a copyright
6  infringement case in this, in this matter that we're
7  here on.
8        MR. KHAZEN:  And there are companies saying
9  that they own those copyrights, and I'm asking her
10  about those companies.  This is -- how could it be
11  more relevant, frankly?  I can't -- I can't think of
12  a more relevant question.
13        THE WITNESS:  They're lying.  They're lying
14  and they forged my name and they are lying and there
15  is still restitution.
16        MR. MORRIS:  This is J.T.  Was there a
17  question pending?
18        THE WITNESS:  He's asking about a lawsuit --
19        MR. BEIK:  Okay.  Hang on.
20        MR. MORRIS:  There was a question pending so
21  I think we need to strike that testimony.  Paul, and
22  I'm sorry to jump in here, are you instructing the
23  witness not to answer anything about Genova or are
24  you going to give her leeway to answer factual
25  matters about the ownership of the copyrights that

Page 188

1  Genova and Warmblood have asserted in that lawsuit?
2        MR. BEIK:  I believe those questions were
3  already asked and answered.
4        MR. MORRIS:  Then you can make your
5  objection --
6        MR. BEIK:  Asked --
7        MR. MORRIS:  -- on the record and Mr. Khazen
8  can proceed with the questioning.
9        MR. BEIK:  I'm sorry, say that one more
10  time.
11        MR. MORRIS:  I said you can make your
12  objection on the record and Mr. Khazen can proceed
13  with his questioning, as long as he's not asking for
14  privileged information.
15        THE WITNESS:  Well, it is privileged.
16        MR. BEIK:  Well, I'm objecting to it all,
17  so...
18        MR. MORRIS:  Are you objecting on relevance
19  or are you objecting on privilege?
20        MR. BEIK:  I'm objecting on relevance and
21  also on the fact that the questions were already
22  asked, they were already answered.
23        MR. MORRIS:  Well, that's an object form in
24  the Western District of Texas, as you know.
25        MR. BEIK:  That's what I said:  Objection,

Page 189

1  form.
2       MR. MORRIS:  Noted.  All right.  Let's
3  proceed.
4       THE WITNESS:  Is there a question now or?
5       MR. KHAZEN:  Will the court reporter read
6  back my prior question please?
7       THE WITNESS:  Sorry, are you reading me a
8  question you said?  I'm actually really exhausted
9  because I've been working on these cases all -- the
10 whole weekend and then we had something change.  And
11 so it's this is -- I really thought this was going to
12 be a couple hours this morning, and I didn't know it
13 was going to be a whole day.
14      So you keep asking me if I'm on substance,
15 on a substance, which is actually I think is rude.
16 And I'm absolutely exhausted, mostly because dealing
17 with these criminals, and so...
18      MR. BEIK:  Okay, Colette.  Hang on.
19      MR. KHAZEN:  Debbie, would you mind reading
20 the question back.
21      (The last question was read back as
22      follows:  "Have you ever paid either of
23      them any money, you or Malibu?")
24      THE WITNESS:  Did I or Malibu every pay them
25 personally?  That -- I'm going to decline to answer

Page 190

1  that.  It's a pending litigation and I think this is,
2  this is all, this is all pending.
3       So, Paul, do I need to answer his question?
4  I mean, we paid them a lot of money but for nothing,
5  so...
6       MR. BEIK:  Under the rules, unless it's an
7  attorney-client privilege, then you're required to
8  answer their question.
9       THE WITNESS:  Well, I'll answer the question
10 but I can't be specific because this is a -- it's
11 a -- it is attorney-client privilege as far as --
12      MR. BEIK:  If it's attorney-client privilege
13 then you don't have to answer, but if it's not
14 attorney-client privilege then --
15      THE WITNESS:  Well, what's not
16 attorney-client privilege is yes, we have paid them a
17 lot of money.  And that would be something that is
18 easily found.  And we also sent them a cease and
19 desist letter to stop acting on our behalf and
20 pretending to be Malibu when they weren't.  And so
21 that, that would cover what is not attorney-client
22 privilege.
23 BY MR. KHAZEN:
24      Q.  Who specifically did you pay, Warmblood or
25 Genova?

Page 191

1       A.  Genova.  Genova Capital.  That was on a real
2  estate deal that --
3       Q.  What did you pay them for?
4       MR. BEIK:  Objection to form.  Like I said,
5  I don't -- I don't see the relevance of these
6  questions.
7       THE WITNESS:  Again that's attorney-client
8  privilege because we have some big disagreements on
9  that on what and how much and, you know, and some
10 games that have been played with us.  So Warmblood
11 we've not paid anything.
12      They -- Warmblood or Genova, I don't know
13 which one, they actually wrote themselves checks from
14 Malibu Media pretending to be Malibu Media and
15 actually even wrote it to their contracting company,
16 which I had to go back with the IRS and fix, so they
17 are -- their father still owes 15 million in
18 restitution to the government.
19      These are not nice people.  And for some
20 reason had wanted, have want -- they want to try to
21 make money off the copyrights.  We would never sell
22 our copyrights.  They tried to extort us.  Just to
23 get you so you understand it, they tried to extort us
24 into giving them half of our business, and they
25 weren't able to.

Page 192

1       So I don't know if -- because we wouldn't
2  sign their extortion deal, I don't know if they filed
3  a lawsuit ever or, you know, if people waiting around
4  the place when you file lawsuits just saw our name
5  and leaked it to the Vanity Fair or something like
6  that.  So then maybe they did file it later, but
7  nothing ever went forward.  So it was a year ago and
8  nothing ever went forward.
9       They never -- or they're not actually asking
10 for money, they're just trying to see if they can get
11 a windfall in any way by pretending they were Malibu
12 Media and that we give them a service contract to
13 work for us, like these other lawyers who all stolen
14 money.  Well, we haven't given them a service
15 contract.  And we don't owe them money.  They owe us
16 money.  So and the rest is attorney-client privilege.
17      And as far as our -- it's a very -- it's a
18 large litigation.  And it's, you know, we had it
19 about finished this weekend and then at 10:00 o'clock
20 last night they tried to move it to a federal court.
21 I mean, these are really, really tough guys.  So I
22 have litigators in California working on it.  Paul's
23 not involved.  I'm being open with you because I want
24 you to know this has nothing to do with our case,
25 nothing to do with you or your client, but it's just,

Pages 189 to 192

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

Page 193

1  you know, Will Smith gets sued 51 times a year just
2  for, you know, people putting money out there.  So if
3  they see the numbers on the copyrights and they want
4  to, they want in on it, it's people like that.
5       We want to run our business and enjoy doing
6  our business and helping the models and, you know,
7  and creating things.  Like we're creative people
8  and -- and, you know, we don't -- and I don't want to
9  watch our numbers go down more and more as more
10  people steal from the BitTorrent.  These guys just
11  want to sue people and make money doing that, but
12  they -- they're not allowed to buy copyrights to do
13  that so they are trying to pretend they're Malibu
14  Media, which we're suing them for that, and that's
15  where we are.
16       We do not have investors or whatever they
17  wrote, or something weird like that, but, I mean, we
18  don't have any -- they haven't invested anything in
19  us.  They -- we -- they haven't paid for any of the
██
██
22  would be a minimum minimum, and probably more because
23  to shoot that many movies and spend that much money
24  it's -- so there's no way that we say, oh, here, you
25  can have half of our business for helping us with

Page 194

1  something when they didn't even help us or do
2  anything and I didn't sign anything.  They doctored
3  that, too.
4       So but anyway, I don't want to get into a
5  case that I have lawyers handling and hopefully doing
6  a good job and we can be finished with them.  But we
7  are the title -- we are the -- I -- actually I do,
8  not my husband, he actually, because he didn't want
9  to get involved in lawsuits, he's really just
10  creative, and I said, you know, we have to or we're
11  going to lose, me actually, to sign the document that
12  he actually signed Malibu Media over to me seven
13  years ago.  And so I've been the one that has
14  participated.
15       But, again, I've been so busy with the
16  businesses that I've not been able to really -- you
17  know, and I just trusted the lawyers because they
18  were lawyers.  And so the lawyers all pocketed all
19  the money, except now we have great lawyers like Paul
20  and like Jay, and a really great team that is -- and
21  Texas is doing a great job for us by protecting our
22  copyrights, and for just one batch that we filed 140
23  suits about a year ago.  So if -- as we start putting
24  up more movies, we're going to need to protect our
25  copyrights more.

Page 195

1       So there you go.  That's a long answer.  I
2  hope that's good enough for you.  Everything was
3  that.
4  BY MR. KHAZEN:
5       Q.   What did they try to extort you with?
6       A.   They tried to say they were going to
7  foreclose on our expensive house in Malibu on a
8  hundred thousand dollar loan that was not even a
9  loan, it was them trying to put money into our
10  business than they actually already had taken back
11  out of the business, but somehow they had a
12  promissory note that they recorded on the house.
13       This was their -- this is their business.
14  What they do is they like take little ladies' homes
15  when they haven't paid the property tax.  So we have
16  a relatively expensive home, and they literally told
17  us -- and so they lost on that.  The judge said they
18  were trying to extort us with an illegal foreclose
19  sale.  And they, to the last minute, they're saying,
20  just sign this document giving us half of your
21  business and we won't foreclose and you won't lose
22  all the money on your house.
23       And we're like -- and then they're saying,
24  oh, no, but don't wire the money to the trustee, sign
25  this and give us your business.  And so literally

Page 196

1  they tried to say, oh, do you want your house or give
2  us part of the business.  And so we got an attorney
3  involved and he said this is crazy, you know, you
4  can't get a windfall and just say -- and then also
5  they had been paid the money.  We paid it to them
6  again just for good, just so they couldn't say
7  anything.  And they have still been giving us issues
8  with the title on the house.
9       So it's been a huge, huge stress.  And these
10  are bad guys.  They are just sneaky, sneaky, bad guys
11  and it's -- yeah, it's just -- it's very --
12       Q.   Do they still claim to have half of your
13  business?
14       A.   No, they don't claim to own half of our
15  business at all, no.
16       Q.   Did they ever claim to own half of your
17  business?
18       A.   No.  No.  They tried to -- they tried to get
19  us to sign, me actually, to sign the document that
20  would give them half of the business, which we never
21  even spoke about.  They were going to maybe help us
22  with the copyrights and they would get some percent
23  for helping with the copyrights, but they
24  misrepresented what they could do, what they couldn't
25  do.

Pages 193 to 196

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

1  They're also of the Mormon faith, so they
2  couldn't even watch the movies.  So it was very
3  strange.  I still don't understand it.  But they -- I
4  think they saw an opportunity that we weren't -- we
5  were letting all these lawyers steal from us so maybe
6  we would let them steal from us, too, so --
7      Q.   Did you -- did you have any written
8  agreements with them --
9      A.   No.
10     Q.   -- with regards to the copyrights?
11     A.   No.
12     Q.   Did you have any oral agreements with them
13  regarding the copyrights?
14     A.   No.  No.  Only what they wrote down.  And
15  then when I wouldn't sign the paper that would make
16  their fake agreement look real, they didn't file the
17  lawsuit.  And then I think they filed it like seven
18  months later and then didn't do anything about it,
19  and then now that lawyer doesn't even work for them
20  anymore.
21     So they -- so it's just like whenever you
22  get -- when someone starts seeing you that you might
23  have money or you're making money, you know, people
24  just go after you.  And it's just not really fair but
25  it's -- you're always going to be a target, and --

1  and it is what it is.
2      So but it's great to have great attorneys
3  like Paul and the great team we have finally
4  together.  You know, live and learn.  I was like, we
5  didn't know like how quickly we'd start making money
6  with our idea.  We didn't know what to do.  We didn't
7  know that these tigers were all going to like just
8  wolves in sheep's clothing were all going to come
9  out, so it was, it's, yeah, it's been --
10     Q.   What idea are you referring to?
11     A.   Well, when we thought of actually making XR,
12  we thought, you know, Brazzers making $30 million a
13  year and their content is really disgusting and it's
14  all violence against women, and so we thought what --
15  I was still a fashion model at the time, and my ex --
16  well, my husband, he's not my ex-husband, he was a
17  photographer, and he was doing really beautiful
18  fashion nude and art photos, and I said why don't we
19  make movies.
20     Because the DSR was just coming out where
21  you could just bring your photo camera and do videos,
22  and I said why don't we make some movies that are
23  really beautiful, and because he was doing this site
24  called Beauty Effects and we can make it that sex
25  doesn't have to be disgusting, that kids who are all

1  getting on the Porn Hub and seeing these women
2  getting hit and, you know, violence against women
3  and, you know, and rape videos and child porn and all
4  these awful things that, you know, MindGeek was doing
5  to the world.  And we said, like, what if we just
6  make like really like kind of music videos but it's
7  really beautiful but they're also explicit.  And so
8  we had that idea and then all of a sudden it became
9  an actual category and so --
10     Q.   You made it for kids?
11     A.   Huh?
12     Q.   You made it for kids?
13     A.   No.  I said -- no.  And MindGeek actually
14  has, you know, child porn and things like that that
15  people can log on for free and see that.  So we, you
16  know, we made -- actually it's really funny that the
17  CEO of MindGeek wanted to buy us.  He said our site
18  was so vanilla that he could play it at dinner while
19  he was having dinner with his family and his
20  children.
21     And so obviously it's not that vanilla
22  anymore because we need to go back and take care of
23  our, control of our directors, but with COVID it's
24  not as easy.  But the thing is it became a new,
25  beautiful erotica and, you know, and they called it

1  like -- it had all these new names of like a new
2  style of, you know, beautiful, fashion model style
3  but still explicit.  And so it became something new.
4      And then we had about a hundred copycats,
5  and I think that's why we're one of the most copied
6  sites that there is.  So it was -- but we had no idea
7  how successful it would get with just 40 movies.  So
8  we were kind of surprised at the time.  And then when
9  the New Yorker did a big article on us, you know,
10  everyone just came crawling out of the woodwork
11  trying to get a piece of everything.
12     And I think these guys who are, you know,
13  want to be contractors or whatever some reason think
14  they are also lawyers, which they're not, and, and
15  decided to try to extort us for half of our company,
16  which we didn't let them, and now we are, you know,
17  going on the offensive.
18     Q.   When you said fake, you said they made a
19  fake agreement, what were you referring to?
20     A.   They -- they --
21     MR. BEIK:  Object to the form to all these
22  questions --
23     THE WITNESS:  Yeah.
24     MR. BEIK:  -- but, again, based off of asked
25  and answered.  She just went through the entire

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

Page 201

1  thing.
2      THE WITNESS: Yeah, I tried to tell him, you
3  know, what happened and it's -- it was -- it was a
4  DocuSign they were saying I sign, which I didn't, and
5  they, they wrote everything they wanted, like their
6  dream deal.  But they knew I didn't sign it so that's
7  why they kept going back and that's why they had the
8  extortion idea because they knew it wouldn't really
9  stand up because I hadn't signed it.
10  BY MR. KHAZEN:
11     Q.  And what did -- what did that DocuSign
12  document say that --
13     A.  I don't remember actually because I didn't
14  really see it because it was just -- they said they
15  had it.  It must have said something about them doing
16  some work for half of -- one thing we never would
17  have to agreed is, so I know this was fake, because
18  it said half the copyrights, not half of the -- and
19  also that's not even legal to give someone half of
20  your income from -- like, it's not nothing.  You
21  know, so we never would have agreed to this ever.
22      And so they -- so they put in their wish
23  list of, you know, they wanted to own half of our
24  business so that would mean they could license
25  anything they wanted, anything they wanted just

Page 202

1  for -- but no money.  They wanted, in exchange for
2  that they wanted to, I don't know, help with the
3  business or something.  It was just so stupid.  So
4  and they -- then I guess just DocuSigned my name on
5  it.  Who knows, they might have even been at our
6  property when they did it.  I don't know but --
7      Q.  Did that agreement have any, any agreement
8  for exclusive right to license the copyrights?
9      A.  No.  No.
10     Q.  Have you produced that agreement?  Do you
11  have a copy of it?
12     A.  No, I don't have a copy of it but my
13  attorneys I'm sure do.  But it's -- it doesn't matter
14  because it's a fake agreement that it was not even
15  made by the lawyer, it was made by these guys at the
16  last minute saying, oh, either sign this or we'll
17  foreclose on you, so...
18     Q.  And you said -- you said they had power of
19  attorney; is that correct?
20     A.  They asked for power of attorney right after
21  they wanted to do a construction project with us,
22  which -- they say, oh, that's normal so we can sign
23  anything we need to sign your name for for the
24  construction project, but they -- actually it was a
25  very hard-core power of attorney where they could

Page 203

1  sign my name on anything.  And my husband was smart
2  enough to have them, have a revocation done the same
3  day and we revoked it very, very shortly after,
4  because we figured it out.
5      Q.  Is there anything that they claimed to have
6  done in the meantime?
7      MR. BEIK:  Object to the form.
8      THE WITNESS:  I don't even understand what
9  he, what he said.
10  BY MR. KHAZEN:
11     Q.  Is there anything they claim to have done
12  under that power of attorney that you --
13     A.  No.  No.  No.
14     Q.  And you said earlier that they had, that the
15  other guys had stolen the copyrights.  What were you
16  referring to?
17     A.  The lawyers?
18     Q.  Yeah.  Well, I don't know what you're
19  referring.  You said -- you said the other --
20     A.  I also referred to 2.4 million in six months
21  in settlements, and he's in jail now because he also
22  stole a lot more from his boss.  They were also
23  related to a Mormon group, and so they, they looked
24  normal in Beverly Hills.  Thought it would be good to
25  have a lawyer nearby, so that was a big mistake.

Page 204

1      And then we went with a lawyer in Florida
2  who also turned out to be a big mistake who wanted to
3  turn into her business.  And she also kept all of the
4  funds.  So since the first lawyer who started doing
5  this with us and paid us a good amount of money and
6  did all of our legal work, the last two, because
7  we've been so busy growing our business and our other
8  websites, we haven't had much time to pay to the
9  lawyers.  So we thought these guys, oh, they can help
10  us, but then we realized, no, they were worse than
11  the lawyers.
12      And now we do have everything set up
13  where -- like when I first started the first year, I
14  was in depos all the time.  So now we're -- I've been
15  working like crazy but we have everything set up
16  where we are going to, you know, make everything move
17  forward.
18      So, you know, I don't know if that helps you
19  or what you're trying to ask, but I'm just trying to
20  be truthful with you what has been happening and, you
21  know, why we haven't been filing and why we haven't
22  been able to get you all of the stuff from those guys
23  from Germany because it's, you know, we're not --
24  they've also -- they've also been taking money from
25  us and other countries pretending to be Malibu Media

Pages 201 to 204

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

Page 205

Page 206

Page 207

Page 208



Pages 205 to 208

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Page 209

1  2018, 2019?
2      A.   The later years I don't really know because
3  the lawyers were -- we weren't -- we just weren't
4  paying attention to it because we were letting the
5  lawyers pay attention to it and we were just busy,
6  you know, running our business, which is how they
7  were making money off our copyright.  So -- so I
8  don't know exactly what the -- the lawyers cost us a
9  lot of money.  I mean not like Paul, he's a great
10  lawyer, and, I mean, we're so lucky to have found him
11  and now we have a really great group and we have a
12  really great head IP attorney.
13         So and I'm now running everything, our team.
14  That's another thing.  It costs -- I pay the team,
15  the paralegals, investigators, everything, you know,
16  out of my pocket, even if we're not collecting
17  anything.  And so -- so it's, you know, it's really,
18  for us, it's really we need to keep the momentum
19  going of the filing so we stop people thinking that
20  okay, you know, you can just go, if you want to watch
21  our movies, you can just go watch them for free.  And
22  we really need to keep spreading that word that you
23  can't just go watch them for free.  If you want to
24  watch free porn, there is free porn but there
25  isn't -- there isn't stuff like what we make.



Page 211

1  3:46.
2            (A recess was taken.)
3        THE VIDEOGRAPHER:  We are back on the record
4  at 3:59 p.m.
5  BY MR. KHAZEN:
6      Q.   So you described, you said earlier that your
7  site is vanilla.  Do you consider that the, I
8  believe -- do you consider that the titles that are
9  in my, that are in Exhibit A to the complaint to be
10  vanilla?
11      A.   No, not, not really, but, I mean, compared
12  to what you'd find online now unfortunately they are
13  a little bit.
14      Q.   And you said that you thought kids were
15  watching porn sites and that this would be a better
16  way?
17      A.   My 13-year-old nephew, he has Porn Hub on
18  his phone and they literally had a video of a woman
19  getting punched in the face.  So they were just -- it
20  just seemed horrible, and so the violence against
21  women, and so, yeah.
22      Q.   So this seemed better for kids?
23      A.   No, not for kids at all.  Kids should not be
24  watching anything if they're under 18, of course.
25  But -- but if, you know, like I thought that someone



Pages 209 to 212

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

Page 213



Page 214

Page 215

Page 216

```
 1        So I just don't know.  Now that we have a
 2   new system -- I'm not sure what your question is.
 3   Like what do you -- what do you want to know?  What's
 4   the question?
 5            (Thereupon Defendant's Exhibit 5
 6            was marked for identification.)
 7   BY MR. KHAZEN:
 8        Q.  So let me direct your attention to
 9   Exhibit 5.  Do you see Exhibit 5?
10        A.  Yes.
11        Q.  Do you recognize this document?
12        A.  Yes.  This would be one of our -- this would
13   be -- yeah, this would be the settlements that came
14   in.  Do you -- what dates are these for?  These are
15   for -- I don't know what dates they're for.  So do
16   you know what dates these are for?
17        Q.  No, I don't.  This is -- I only have this
18   exhibit.
19        A.  Eastern Virginia.  It looks like a sampling.
20   D.C., eastern, Eastern California.  So this is a
21   sampling from how -- do you know how much time this
22   is, from when to when?  So Eastern District New York
23   and eastern district.
24            MR. BEIK:  Can we take -- can we take a
25   minute and go off the record?
```

Pages 213 to 216

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

Page 217

1       THE WITNESS:  Yeah, I don't -- like how many
2   times Truth or Dare was taken --
3       THE VIDEOGRAPHER:  Does everyone agree?
4       MR. KHAZEN:  There's a question pending so
5   she was kind of in the middle saying something.
6       MR. BEIK:  Oh.
7       THE WITNESS:  I just -- I just wanted -- I'm
8   trying ask what was your question.  What's your
9   question?  You're showing me this sheet that looks
10  like revenue coming in on the movies that were
11  infringed on.
12  BY MR. KHAZEN:
13      Q.   Correct.  Is this what -- is that what this
14  is?
15      A.   Yes.  It looks like it.  But it looks like
16  it's only a certain period of time.
17      Q.   Correct.  Now, so again I want to ask for
18  2019, what was your -- you keep saying that you made
19  no money, but I need to know the revenue.  What
20  revenue did you generate in 2019?
21      A.   That's what I'm trying to tell you.  2019
22  when, from 2019, August to August, we only filed one
23  set and -- one set of -- one set of filings, and I'm
24  saying we made, I don't know exactly, but it would be
25  on a sheet something like this, and I could get it,



Page 218



Page 219



did

Page 220



Pages 217 to 220

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Page 221



Page 222

1    say we put a really popular title, and it's -- it
2    basically then, you know, so we know it will be
3    infringed on a lot, then, you know, but then lawyers
4    were doing this.  We weren't participating in this.
5    So it's you're asking me questions that really for
6    the last six, seven years the lawyers have been doing
7    this.
8            And so and now we're just about to start
9    getting filing again.  So -- so it's like you kind of
10   ask me questions that don't even have anything to do
11   with my business at this point.  Your -- your guy who
12   did or did not, you know, download illegally -- I
13   mean, he obviously uses the torrent sites.  But
14   anyway, next question.
15           (Thereupon Defendant's Exhibit 6,
16           Exhibit 7, Exhibit 8 and Exhibit
17           9 were marked for identification.)
18   BY MR. KHAZEN:
19      Q.   So do you see Exhibit 6?  Can you take a
20   look at Exhibit 6 through 9 and tell me if you
21   recognize these documents?
22      A.   6.  Okay.  I don't -- I don't know.  Is that
23   a document from you?  So, okay.  So I'm looking at
24   them.  So, okay.  Tell me.
25      Q.   Do you recognize these?

Page 223

1       A.   I'm looking at them now.  I'm seeing there.
2    Yeah, I do actually.  I do.  I recognize these.
3    These are actuaries.
4       Q.   Were you given these and asked to search for
5    these categories of -- let's just go to exhibit --
6       A.   Yes, I was given these actually.
7       Q.   When were you given, let's say exhibit --
8    exhibit --
9       A.   I was given them a while ago, and then --
10   and then given them to sign I think again last night
11   even, or something, or before, night before.  I'm not
12   sure.
13      Q.   Okay.  Did you search for the categories of
14   documents listed in Exhibit 6?
15      A.   Exhibit 6.  Okay.  So this was -- okay.  So
16   these were -- these were -- this is a -- this is
17   not -- this is like way, way too much.  I mean,
18   this -- so I'm not sure what you're asking me.  Are
19   you asking me did I search for these categories?
20           This is -- yeah, all these movies are
21   registered, and communications -- if you just go
22   online to uscopyright.org and you register your
23   movie, so -- or your whatever, artwork you have or
24   whatever software code.  And so -- so you're asking
25   for all documents and communications between any and

Page 224

1    all --
2       Q.   I asked have you searched for these
3    categories of documents?
4       A.   There's no searching for this.  I mean, like
5    number six, "All documents and communications
6    sufficient to show any and all income you have
7    received from licensing the films over the past five
8    years."  I mean, that's -- that's just too big of a
9    category.
10           So I could go through my taxes and see, you
11   know, but there's all different kinds of licensing
12   categories and, you know, it's just -- it's -- it's
13   doesn't -- it's definitely overreaching as far as to
14   what has to do with our, what we're talking about
15   here.  "All documents and communication sufficient to
16   show the annual income you have received from
17   cease-and-desist efforts, threatening lawsuits, and
18   filing lawsuit, including" -- okay.  So, yeah,
19   that -- is that -- yes, I went through all this many
20   times.
21      Q.   And did you -- did you find any of these
22   documents -- did you find the documents and turn them
23   over to your lawyers that were responsive to these
24   discovery requests?
25      A.   These don't have documents for them.  It's

Pages 221 to 224

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 225

1    like this it's -- okay.  It's not -- so for each of
2    the copyrights, documents and communications
3    sufficient to show any and all income you have
4    received from cease-and-desist efforts,
5    threatening -- threatening lawsuits.  You're calling
6    our lawsuits threatening.  So, I mean, that I take
7    it, but I take -- I think that's not very nice.  And
8    then filing lawsuits, including settlements, related
9    to the copyright-in-suit over the past three years.
10   That's not even a question.
11        That's basically saying that we're
12   threatening people to get settlement money, and we
13   haven't received any money for that.  So all
14   documents and communications related to any and all
15   places you have shared, displayed, distributed, sold,
16   or offered for sale the films.  And all that is just
17   our website.  We only offer it on our website.  We
18   don't offer anywhere else.
19        So these are all very -- I already spoke to
20   my attorney about these, and they're very simple
21   answers.  They're -- and but most -- a lot of them
22   aren't even applicable.  Any financial losses that
23   you claim resulted from any alleged infringement or
24   impermissible use of the films and your other
25   copyrighted works.  So that would just be, you know,

Page 226

1    that is also in a -- all involved in litigation at
2    this point with those last two lawyers, number 12.
3         So, yeah, I looked at all of them and these
4    are -- they're not -- they're not something that,
5    that is applicable here.
6         Q.  And how did you determine that they weren't
7    applicable to this case?
8         A.  Because some of them are attorney-client
9    privilege, so another one is -- so, for instance,
10   I'll just go -- if you want me to go through them, so
11   these are -- okay.  So discovery requests, the term
12   document...
13        Q.  Let me just ask.  Are you saying that
14   they're not applicable or that they don't exist?
15   That's what I'm trying to understand.
16        A.  I'll tell you.  All documents concerning the
17   registration of the films with the United States
18   copyright office.  That is easy.  Those all exist,
19   and they could be found on the U.S. copyright
20   website, uscopyright.org.  You put in the title and
21   you'll see we're the owner.  Request two, same thing,
22   uscopyright.org.  And then number --
23        Q.  What about your work made for hire
24   contracts.  You sued say 9,000 people.  Don't you
25   think it would have made sense to produce the

Page 227

1    documents that show ownership of these copyrights if
2    they exist?
3         MR. BEIK:  Object to form.
4         THE WITNESS:  What are you talking about?  I
5    told you we produce -- we produce the -- there's no
6    work made for hire contracts that apply to
7    copyrights.  We produce them.  Like, so if we want to
8    hire someone to help with lighting, he's going to
9    work for hire, but that has nothing to do with the
10   copyright.
11   BY MR. KHAZEN:
12        Q.  Okay.  So you don't have a provision in
13   there for -- you don't have a provision in your
14   contracts with independent contractors regarding
15   copyrights?
16        A.  No.  But they don't have any rights to the
17   copyright.  They have no rights to anything.  All
18   they have is their daily rate.
19        Q.  That's for the law to determine, of course.
20   So the -- did you recently see -- did you see more
21   recently Exhibit 9?
22        A.  Yes.
23        Q.  And did you search for these documents --
24   when did you first see Exhibit 9?
25        A.  I think a while ago.  And this was your

Page 228

1    counter -- papers, emails, books, journals, ledgers,
2    memorandum.  This, I have no idea what this was.  So
3    tell me what you're asking for here.
4         Q.  So, for example, let's look at request 56.
5    "Your communications with Genova Capital, including
6    any discovery or communications regarding a lawsuit
7    or potential lawsuit."  Did you search for this
8    category of documents?
9         A.  This is an active lawsuit and run by, right
10   now being as to eight litigators taking care of this.
11   And I can't give you attorney-client privileged
12   information with regards to this.  I've explained to
13   you what it's covering, but, you know, we have a lot
14   of damages on the line here with these people.
15        And I don't understand why I would be -- if
16   you're going to file a motion to compel to have the
17   judge turn over this Genova stuff.  I mean, have at
18   it, but, I mean, this doesn't make any sense to me.
19   It has nothing to do with -- you're trying to say
20   your client didn't, didn't download those nine movies
21   but then you're asking me for all communications
22   having to do with Genova.  Some criminal is trying to
23   take advantage of us.  I don't understand.
24        Q.  So you're claiming that your communications
25   with Genova Capital, it's your understanding that

Pages 225 to 228

Page 229

1  your communications with Genova are privileged?
2      THE WITNESS:  Yeah, ask --
3      MR. BEIK:  Objection, form.
4      THE WITNESS:  What?  Yeah, I mean, ask my
5  attorney, Murphy Rosen.  There -- he's right now,
6  they pulled another stunt, and we're about to get
7  them finished and they were so scared that they were
8  going to get sued for $11 million that they, they
9  illegally tried to transfer it to federal court just
10 now.  So -- so we're literally -- literally
11 illegally, like they weren't allowed to do that.
12 They just like went in and did it because they were
13 going to lose.  So -- so now I don't know where my
14 attorney's going but he's going somewhere.
15      So this is a very stressful, pending
16 litigation with some really pretty smart criminals
17 that actually from their religion you'd think they'd
18 have nothing to do with our business, so it's very
19 strange, very hard to understand.
20      So I don't know why with you trying --
21 you're trying to prove -- I know this is not a
22 mediation, it's a deposition, but you're trying to
23 prove that your client did not download these movies.
24 That's all of this -- that's what this is over, did
25 your client download these movies.

Page 230

1      Because we've been taken advantage by too
2  many lawyers in the last, what is it, five years, six
3  years, and we have been -- and we have then now being
4  taken advantage of these Genova clowns and -- taking
5  one from Joe Biden I guess, and so -- and so I don't
6  understand how that, that has anything to do with
7  your guy downloading nine of our videos over multiple
8  years.
9  BY MR. KHAZEN:
10     Q.  So, for example, if you look back at --
11     MR. MORRIS:  Ramzi, I'm sorry.
12     MR. KHAZEN:  Sorry.  Go ahead.
13     MR. MORRIS:  Paul, can we have a little
14 discussion off the record here?
15     MR. BEIK:  Why don't we talk off for a
16 second.  I don't know what you want to talk about.
17     MR. MORRIS:  Well, what I'd like to talk
18 about is the question was about whether the
19 communications were privileged, and the witness is
20 going off on tangents about Genova's religion and
21 them being criminals.
22     I think it would serve us all a lot better
23 if the witness answered the question directly so we
24 don't have to be here all night and hopefully we
25 don't have to seek court intervention.  I'm not her

Page 231

1  attorney.  I can't control her, but I'm asking you as
2  a matter of professional courtesy and as a matter of
3  keeping the record clean that we try to --
4      THE WITNESS:  I shouldn't say things about
5  them like that, but the thing is we're in the middle
6  of a --
7      MR. BEIK:  Colette, hang on.  Hang on.  Now,
8  the question of whether something is privileged is
9  obviously I objected to it because, you know, that's
10 a question of -- that's a legal question.  And, and
11 she can answer the question, because she doesn't, she
12 doesn't really -- it doesn't seem like she knows what
13 the question is because of that.  But, you know,
14 whether something's privileged is something that say,
15 you know, decide.
16     MR. MORRIS:  Okay.  And that's fine.  And
17 she can say, I don't have an understanding about
18 that.  But going off on two-minute tangents doesn't
19 benefit anybody here.
20     THE WITNESS:  Well --
21     MR. MORRIS:  And eventually we're going to
22 have to stop this deposition and go to the court.  I
23 don't want to do that.  I'm sure you don't want to
24 waste the court's time doing that.  But it's getting
25 to the point where it's bad.  I'm just putting that

Page 232

1  on the record and putting that out there for you.
2      THE WITNESS:  What does this question number
3  56 have --
4      MR. BEIK:  Hold on.  Can we -- can we take a
5  few minutes?  Can we take a few minutes, I can try to
6  talk to my client for another second?
7      MR. MORRIS:  That's fine.
8      MR. BEIK:  Okay.
9      THE VIDEOGRAPHER:  Going off the record at
10 3:26.  Sorry, 4:26.  4:26.
11     (A recess was taken.)
12     THE VIDEOGRAPHER:  We are going back on the
13 record at 4:34 p.m.
14 BY MR. KHAZEN:
15     Q.  Did you understand that your communications
16 with Genova are privileged?
17     A.  Yes, I do understand that.
18     Q.  That's -- just to be, just to be clear, you
19 believe that the communications that you have had
20 with Genova are privileged?
21     MR. BEIK:  Object to form.
22     THE WITNESS:  Yes, I believe they are.
23 BY MR. KHAZEN:
24     Q.  And what is the, what is the basis for that?
25     MR. BEIK:  Object to form.

Pages 229 to 232

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

1    THE WITNESS: I'm sorry. An ongoing lawsuit
2    right now. And we have attorneys, we're in the
3    middle of litigation, and there's many
4    attorney-client privilege, too much to -- that I
5    believe it's attorney-client privileged information
6    in request 55.
7    BY MR. KHAZEN:
8    Q.   And you believe your communications with
9    Warmblood are privileged?
10       MR. BEIK: Object to form.
11       THE WITNESS: Warmblood, yes, because
12   Warmblood is Genova. It's -- they're one and the
13   same.
14       MR. KHAZEN: And, Paul, I'll just ask you.
15   I mean, are you asserting privilege over, over the
16   communications she had with Genova and Warmblood?
17       MR. BEIK: Ramzi, we served the responses to
18   these questions, and the responses have objections,
19   and so the objections are stated in the responses.
20   And so, you know, again, I already objected to form.
21   I mean, you're asking a nonlawyer whether something
22   is privileged or not, and, like I said, I don't -- I
23   can't answer for her, but I don't think she knows
24   what you're asking.
25       THE WITNESS: Right. That was the problem

1    before. So I'm going to -- my --
2        MR. BEIK: Colette, hang on. Colette, let
3    Ramzi do...
4    BY MR. KHAZEN:
5    Q.   So turn back to Exhibit 6.
6    A.   Exhibit 6, okay.
7    Q.   See request 22?
8    A.   Yes.
9    Q.   It says, All communications and documents
10   relating to your investigation of Doe, including but
11   not limited to investigations performed by IPP or
12   Computer Forensics, LLC. Do you see that?
13   A.   I see that.
14   Q.   Did you search for your communications with
15   IPP or Computer Forensics?
16   A.   Yes, I participated with my lawyers, and I
17   responded to this a long time ago, I believe.
18   Q.   And your response was you said you didn't
19   have any, other than the communications that were in
20   the possession of the Lomnitzer firm; is that
21   correct?
22   A.   That would be correct if it was, yes, if it
23   was during the years that we were with the Lomnitzer,
24   because we had -- we were just getting back our, our
25   intellectual property from her when we were answering

1    these.
2    Q.   Have you produced -- have you communicated
3    directly with IPP at all during this period?
4    A.   No. They were actually not talking to me
5    because Lomnitzer was paying them more than I wanted
6    to pay them, so she was communicating with them.
7    Q.   And what years was that, were those?
8    A.   That was I think '17 and '18.
9    Q.   And then in 2019 did you communicate with
10   IPP directly?
11   A.   Part of -- no, we actually -- when we left
12   Lomnitzer, we left IPP.
13   Q.   So when you testified earlier that you
14   communicated with IPP over WhatsApp?
15   A.   Yeah, a couple things that we had still
16   going on with them, but we didn't -- they weren't
17   our -- providing the service anymore for us.
18   Q.   That wasn't my question. I was asking
19   whether you were communicating, whether you
20   communicated with them and you said no. So when is
21   the last time you communicated with IPP?
22   A.   Months and months. I don't recall exactly.
23   I think that's what I said before, too.
24   Q.   Did you communicate directly with IPP over
25   WhatsApp at all in 2019?

1    A.   I believe I tried to.
2    Q.   And WhatsApp, did IPP respond to your
3    communications to them?
4    A.   I believe they tried to get us to pay more
5    money to get more data from them, and since we were
6    already designing our own that nothing every
7    progressed because they wanted more from us than we
8    were willing to give.
9    Q.   And when did they send you a series of
10   communications?
11   A.   I don't -- probably -- maybe this was seven
12   months ago.
13   Q.   And were there any communications with them
14   prior to that over WhatsApp?
15   A.   I'm not sure.
16   Q.   Were there any communications with them
17   prior to that over any means directly between you and
18   IPP?
19   A.   No, I don't believe so.
20   Q.   Did you ever communicate with Computer
21   Forensics?
22   A.   Is that -- that's it I believe. And, yes, I
23   believe I did communicate with him.
24   Q.   When is the last time you communicated with
25   Computer Forensics?

Page 237



Page 238



Page 239

```
 1    it's -- they both do the same time, it's just done in
 2    a more modern fashion.  Okay.
 3        Q.  So how do you -- how -- what were your --
 4    how were you communicating with Warmblood and Genova?
 5        A.  Haven't been communicating with them for
 6    over a year.
 7        Q.  When is the last time you did?
 8        A.  You know what, I can't remember.  I can't
 9    remember, but I think it would have been on a text,
10    via a text.
11        Q.  And when was the lawsuit filed?
12        A.  I don't recall the lawsuit being filed.  I
13    mean, I wouldn't be able to tell you the date.
14        Q.  Was it within the last year?
15        A.  Again, I don't recall when it was filed.
16        Q.  It could -- it could have been more than a
17    year ago?
18        A.  It could have -- yeah, it could have been.
19        Q.  And did you file the lawsuit or did they?
20        A.  I believe we have filed a lawsuit against
21    them now as well.  So, yes.  So everyone's -- I don't
22    know what their lawsuit consists of anymore, but I
23    know that we -- what ours consists of, so what is the
24    exact question?  Did we file or did they file?
25        Q.  Did you file -- did you file -- did you file
```

Page 240

```
 1    a lawsuit first against them or did they file a
 2    lawsuit first against you?
 3        A.  I can't recall.  I don't -- I don't recall,
 4    because I don't know if they ever filed that one.
 5        Q.  That one?
 6        A.  I mean, the one that the Warmblood, the only
 7    one you have listed.  I don't know.
 8        Q.  I'm not limiting my question to one that I
 9    have listed.  I'm asking whether you filed a lawsuit
10    against them before you or did they file the lawsuit
11    against you before, before you did?  So I'm just
12    asking who filed the lawsuit against whom first.
13        A.  Oh, yeah, I don't know.  I don't know.
14        Q.  The Lomnitzer firm, did you -- you settled a
15    lawsuit with them; is that correct?
16        A.  Yes.
17        Q.  What were the terms of that settlement?
18        MR. BEIK:  Object to form.
19        THE WITNESS:  Yeah, the terms were, they
20    were private.
21    BY MR. KHAZEN:
22        Q.  What were the terms of that settlement?
23        A.  The terms were, they were -- they weren't to
24    be shared.
25        Q.  So are you refusing to answer?
```

Pages 237 to 240

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

Page 241

1      A.   I'm actually -- I'm just abiding by the
2  terms of the lawsuit, which were it was I believe,
3  I'm not -- I believe from what my attorney told me
4  that the lawsuit was, was going to be sealed.  The
5  terms of the lawsuit were not to be, were not to be
6  shared.
7      Q.   Okay.  So remember the instructions I gave
8  you, unless your attorney objects and instructs you
9  not to answer that you're to answer the question?
10     A.   Okay.  So I don't know the exact terms.  All
11 I know is that there was some monetary terms, and
12 they were -- and then we were supposed to get all of
13 our IP copyright back, and they were supposed to do
14 some more things that they had done wrong and provide
15 us with some accounting and things like that, but it
16 was -- it was just basically an agreement that we
17 could move on and, you know, everyone moves on, and
18 but it was again privileged so much, in so much of a
19 way.
20     Q.   What do you mean by you were entitled to get
21 your IP and copyrights back from the Lomnitzer firm?
22     A.   She still had all of our accounting
23 information.  She still had all our copyright
24 certificates.  She was having them sent to her office
25 and -- and so on and so forth.  Anything to do with

Page 242

1  our copyrights and trademarks she had in her office,
2  and all of the -- she had all of the data from IPP,
3  since they'd been sending it, so she had all the data
4  and also the data from India where it was, where they
5  had revised the data from IPP.  So that's what I
6  mean.
7      Q.   What data was in India that was revised by
8  IPP?
9      A.   Every time --
10     Q.   What data was revised in India of IPP?
11     A.   Every time we got data from IPP, the guys in
12 India, the, I think you call them computer something,
13 that's probably their real name, but he would
14 actually have to take that data and run it through a
15 tracker and run it through a program that actually
16 brings out the geolocation of the IP addresses.
17        So he'd have to go through everything that
18 IPP gave him and then bring up the geolocations and
19 then put them into districts and then put each video
20 with how many hits on the title.  And so -- so that
21 was something that was important that be done.  And
22 actually our new software, that's -- we built that
23 in, the geolocation.
24     Q.   Did the agreement, the settlement agreement
25 with the Lomnitzer firm agree to give you any rights

Page 243

1  back into the copyrights?
2        MR. BEIK:  Object to form.
3        THE WITNESS:  They didn't.  They never got
4  any rights.
5  BY MR. KHAZEN:
6      Q.   What rights did they claim to have?
7      A.   None.  They behaved cowardly but if I spoke
8  to her face, she did claim any rights.
9      Q.   How much was the monetary settlement between
10 you and Lomnitzer?
11     A.   I don't recall but I do know --
12        MR. BEIK:  Form.
13        THE WITNESS:  -- we did not pay anything.
14 BY MR. KHAZEN:
15     Q.   Did they pay anything to you?
16     A.   There was money in the trust account, and I
17 don't remember what happened to it, but I know
18 nothing came out of our pocket.
19     Q.   You don't know if you paid anything?  You
20 don't know if you paid anything?
21     A.   No, nothing.  I'd say nothing came out of
22 our pocket.  I don't know if she had money left over
23 from us, because she didn't give us all that
24 accounting fully, but I'm just saying that nothing
25 came out of our pocket to her.

Page 244

1      Q.   Was she allowed to keep any of your money?
2      A.   I don't know that answer either.  I do know
3  that she was acting uncollectible and very, very
4  difficult, and we wanted our intellectual property
5  back.  So if there was money left over there, it was
6  just a little bit, we probably let her keep it in
7  exchange for getting all of our information back.
8      Q.   Now, when you say you're getting your
9  intellectual property back, what do you mean?
10     A.   The -- you already asked this three times,
11 but the, -- all of our copyrights from the
12 government, the copyright forms, the -- all the
13 communications with IPP, all of the spreadsheets, all
14 of the people that we had settled with.
15        It's all -- these are all also not supposed
16 to be shared.  I mean, we don't share the names of
17 anything, just like anything to do with a copyright
18 protection.  So we needed to get all of that back
19 from her office.  She had everything sent to her
20 office like she was Malibu Media.
21     Q.   Has she returned all those things to you?
22     A.   I believe she just returned them.  So I know
23 Paul had to send her for the last batch a prepaid
24 FedEx, and so she's returned most everything.  She
25 had one more small batch to send back.

Pages 241 to 244

**New York**
**212-273-9911**

Hudson Court Reporting & Video
1-800-310-1769

**New Jersey**
**732-906-2078**

1    Q.  One more batch to send back, did you say?
2    A.  I think so, yeah.  But I think it's back.
3    Q.  When did you receive the bulk of it?
4    A.  I believe she's been sending it over the
5  last -- ever since we've gotten these questions.
6  We've been on them every day to send it, but they're
7  so disorganized.  I don't know that they're that
8  organized.  We've been waiting and, you know, and
9  politely asking every day and getting what we can and
10  it's been sent to my attorneys.
11    Q.  Do you send copies of your films to IPP?
12    A.  No.
13    Q.  So how do they -- how do they know to
14  compare them?
15    A.  They compare them with the ones I upload to
16  the website.
17    Q.  And are they able to download copies of your
18  films?
19    A.  Yes.
20    Q.  And is there any way to know whether or not
21  they're seeding the internet with your films in the
22  first place?
23    A.  They're not.
24    Q.  How do you know?
25    A.  Because I know because I know the way their

1  software works and that would be illegal.
2    Q.  Is that the only reason you don't believe
3  they're seeding your, your, the internet with your
4  copyrighted works?
5    A.  Well, we're not working with them anymore
6  and nothing has changed.  The internet is still
7  getting filled with our copyrighted works.
8    Q.  I mean, you mentioned that they're actually,
9  that they're actually making money in Europe off of
10  the, off of the proliferation of your works; is that
11  correct?
12    A.  I don't know for sure but it seems like they
13  are because I've been, I've been trying to contact
14  some attorneys that they're still working with, and
15  it's not just our movies but I believe that they are
16  trying to collect on our movies.  So I'm still
17  investigating that, and we're in the middle of
18  investigating that, so that's -- I don't know the
19  answers.
20    Q.  Did you not testify that you believed that
21  they had made $400,000 already on -- from --
22    A.  I do believe that.  It hasn't been proven,
23  but I do believe that.
24    Q.  And is that illegal for them to do?
25    A.  Yeah.  They would owe us the money but it's

1  in Europe so it's not easy to get, so...
2    Q.  So IPP operates illegally, in your opinion?
3    A.  No, I didn't say they were operating
4  illegally --
5    MR. BEIK:  Form.
6    THE WITNESS:  -- but I think that they're
7  you know, costing me money where they can.  I don't
8  know for certain.  So and they -- what they do with
9  the data is not illegal when someone buys -- when
10  someone purchases, wants to find out if their IP
11  address is -- if their movies are getting stolen by
12  which IP addresses, they can provide those services.
13    And so since they can provide those
14  services, and then if you don't want to take them up
15  on their services in Europe, I wouldn't put it past
16  them to just go ahead and just accept the money
17  themselves then.
18  BY MR. KHAZEN:
19    Q.  And it's your belief that they are
20  collecting money that is owed to you illegally in
21  Europe; is that correct?
22    A.  Yeah, I don't want to testify to that
23  because I haven't investigated it far enough, but I
24  do have one lawyer that has been telling me that and,
25  and maybe one or two others and so it's very -- I

1  just haven't had time to handle this yet.  So I don't
2  feel like this has anything to do with what we're
3  talking about, and I don't want to say something
4  about someone until we've gone to court.
5    Q.  Yes or no, in your opinion IPP is operating
6  illegally and enforcing your copyrights in Europe?
7    MR. BEIK:  Objection, form.
8    THE WITNESS:  I don't know.  I don't know.
9  BY MR. KHAZEN:
10    Q.  You don't have an opinion?  I'm asking for
11  your opinion.
12    A.  I can't give an opinion on something like
13  that, but that's a legal -- that's a very serious
14  legal thing to give an opinion on.
15    Q.  So yes or no, do you suspect that IPP is
16  illegally enforcing your patents in Europe?
17    MR. BEIK:  Object to form.
18    THE WITNESS:  I'm not going to give that on
19  the record, I'm sorry.
20  BY MR. KHAZEN:
21    Q.  I need you to answer my question.
22    A.  I don't know.  I'm not going to say on the
23  record that what I think IPP is doing or not doing in
24  Europe.  I just can't know that.  I can't know for
25  sure until I have a lawyer investigate, tell me for

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

sure.
Q. I need to know your, what your -- that's not my question. I asked -- my question is what do you think. So I need -- you need to answer my question. In your opinion is IPP operating illegally by enforcing your patents in Europe?
MR. BEIK: Objection, form.
THE WITNESS: I don't know. I do not know whether they're doing that. I can't answer that. I'm not IPP. I'm not the lawyers that may or may not be giving them money. I do not have those answers. All I -- all I can do is suspect it. So I can -- there's no answer I can give you.
BY MR. KHAZEN:
Q. Do you suspect that IPP is enforcing your patents illegally in Europe?
MR. BEIK: Object to form.
THE WITNESS: I'm not putting that on the record.
BY MR. KHAZEN:
Q. That's not -- I'm asking again. Do you suspect that IPP is enforcing your patents illegally in Europe?
MR. BEIK: Objection, form. Ramzi, she answered it three times. She said she does not know.



That is an answer.
THE WITNESS: I do not know. I cannot know that to a point where I can put it on a legal form, unless I have actually taken them to court and verified it.
BY MR. KHAZEN:
Q. I didn't ask if you know for sure, so I'm going to ask the question again. This is getting to the point where you're just refusing to answer my questions. So do you suspect that IPP is illegally enforcing your copyrights in Europe?
MR. BEIK: Objection, form.
THE WITNESS: I'm not going to answer whether I suspect something or not. That's -- it's not okay to do that, because if they're not, I'm not going to slander them and say they are. I'm going to go to court and do it correctly.
BY MR. KHAZEN:
Q. You're refusing to answer my question?
A. No, I'm not refusing to answer your question. I'm refusing to slander someone when I don't have all the information.
Q. You testified earlier that you, that you suspected that they stole $400,000 from you by illegally enforcing your patents from Europe. Were



you lying then?
A. No.
Q. Has your testimony changed?
A. That wasn't a direct testimony, that was just a little bit of color as to why we -- things weren't working out between IPP and us.
Q. A little bit of color? So it wasn't truthful?
A. I don't know. It's not a fact. It's something that has to be investigated. And when you're investigating something like that, you might not, you know, you might not work with the person on something else.
Q. Where did you come up with the number 400,000?
A. I estimated over how many months it's been and how much they had been paying themselves from one lawyer.
Q. So wouldn't that give them incentive to seed the internet with your, with your copyrights if they're making money off of it?
A. Well, they're not now --
MR. BEIK: Form.
THE WITNESS: -- for sure, so. I mean, they are -- we would never let them seed the internet. I

Page 253

1       And then Lorri left with us a bunch of bills
2   so it was very, you know, it was eaten up pretty
3   quickly. And then, you know, going through cases
4   like this with you, I have to pay for that, too.
5       So and then I said I didn't how much we
6   have -- that made -- with that sheet you were given
7   is all the infringements on the movies that we're
8   alleging that your client has downloaded. Those are
9   just how many times those movies have been downloaded
10  so is what you asked for.
11      Q.  Did that include the legal fees for against
12  the Lomnitzer firm?
13      A.  Does that include legal fees against the
14  Lomnitzer firm?
15      Q.  The Lomnitzer firm?
16      A.  I don't recall, but it was -- those fees
17  were minimal.
18      Q.  Does it include the legal fees in the suits
19  with Warmblood and Genova?
20      A.  No.
21          (Thereupon Defendant's Exhibit 10
22          was marked for identification.)
23  BY MR. KHAZEN:
24      Q.  I'm marking as Exhibit 10 a document.
25      A.  It's already 5:00. I really need to...

Page 254

1       Q.  I'm sorry?
2       A.  I just -- I just -- there's so much I still
3   need to do today. I mean, is there any way that we
4   can -- is there...
5       Q.  We can take a break any time you'd like.
6       A.  No, not a break, it's just it's already 5:00
7   and I had some really important calls I had to make
8   today. I didn't realize this would take the whole
9   day.
10      Q.  Yeah, I just -- well, if you need to take a
11  break, we can take a break.
12      A.  How much longer do you think?
13      Q.  I'm not sure. It depends on the answers you
14  give me. I've been getting long minute, many several
15  minute long answers to very straightforward
16  questions, so this is taking --
17      A.  I kept -- I keep --
18          MR. BEIK:  Hang on. Hang on. Do we want to
19  go off the record here or...
20          THE WITNESS:  I think we should go off the
21  record.
22          MR. KHAZEN:  Well, regardless, do you need
23  to take a break, because I just -- I'm not exactly
24  sure. We can maybe take a break and discuss it.
25          MR. BEIK:  Let's take a break.

Page 255

1           THE VIDEOGRAPHER:  Okay. Everyone agrees?
2   Off the record at 5:02.
3           (A recess was taken.)
4           THE VIDEOGRAPHER:  We are going back on the
5   record at 5:15 p.m.
6           THE WITNESS:  Okay.
7   BY MR. KHAZEN:
8       Q.  So can you take a look at Exhibit 10,
9   please?
10      A.  10. Yes, I see it.
11      Q.  Do you recognize this?
12      A.  Yes.
13      Q.  What is it?
14      A.  It's a Twitter post.
15      Q.  Is it your Twitter post?
16      A.  It's either mine or one of the guys who does
17  Twitter for us.
18      Q.  So how many people control your Twitter, XR
19  Twitter account?
20      A.  We have three people who work on -- there's
21  actually multiple Twitter accounts. XR Europe.
22  There's -- we don't have to get into it, but there's
23  multiple. There's maybe ten social media accounts
24  for XR.
25      Q.  Who controls this particular XR Twitter

Page 256

1   account in Exhibit 10?
2       A.  Seb.
3       Q.  Do you have any control over this?
4       A.  I have control over this as well.
5       Q.  Do you -- do you -- do you monitor it to
6   make sure that it's accurate?
7       A.  I do.
8       Q.  Do you see here it says "while we prepare a
9   massive plan to protect our content"?
10      A.  Yes.
11      Q.  What is -- what is this massive plan that
12  it's referring to here?
13      A.  I guess -- I guess I was sending out a
14  little warning to MindGeek.
15      Q.  What is that? What is -- why would you be
16  sending a warning to MindGeek?
17      A.  They own tube sites and they post our videos
18  illegally there.



Pages 253 to 256

Page 257



Page 258

1   even pay attention, and so that's -- that was part of
2   the problem.  So and we do -- and we do it to be a
3   deterrent for the people on the torrents, because if
4   they think they're going to get sued for taking an XR
5   movie, they might think twice and they might actually
6   join the site instead of stealing a movie.
7        Q.   Has it been effective?
8        A.   I can't -- we can't really tell right now
9   with COVID and with MindGeek.  I wouldn't want to
10  stop.  I'd be scared to stop and see what would
11  happen because our movies are stolen much more than
12  any other movies, even with -- but a lot of people,
13  they post online, on Twitter, and all the trolls post
14  that, you know, that they will -- people will get in
15  trouble if they steal our movies.  And so when we
16  file, it's definitely effective just when they know
17  we filed that we get more sign-ups because people
18  don't go to the torrents.
19       Q.   On what basis do you -- on what basis do you
20  have to claim that your stole, that your IP is
21  allegedly stolen more than other people's?
22       A.   If you have more than five movies that
23  you've downloaded in full from our site, I would say
24  that that shows a habitual offender definitely.  Even
25  just -- even just two.  Even just one is still

Page 259

1   stealing.  I mean, content is, you know, it's up to
2   150,000 for a judge for not using -- for your
3   personal use up to 250,000 for using -- stealing it
4   and selling it.
5        Q.   How much did it -- well, let me -- that
6   didn't -- please let me restate my question because I
7   don't think you addressed the correct question.  I
8   said on what basis do you, is it that you came to the
9   conclusion that your IP is allegedly stolen more than
10  other people's, more than others?
11       A.   We've done research on that like throughout
12  the years with different lawyers.  And for some
13  reason if you Google them, like there's almost no
14  other address that's stolen as much as ours is.  It
15  says, you know, XR.org, XR hunter.  I mean, on the
16  torrents they have more XR movies than, than any
17  other, you know, single, single site.
18       So it's -- and there's just so many UDOP
19  cases, too, where they actually make websites and
20  then they send you to the torrents to go download the
21  movies for free.  So if you search XR free, you'll
22  just see so many of the free sites it's just, it's
23  just ridiculous.
24       So I've -- I've actually been holding off on
25  putting up new movies until we can get filing again

Page 260

1   and suing the -- because our really loyal people will
2   stay, and because there's, you know, 2,000 movies for
3   them to watch.  And when I put up a new movie right
4   now, it just gets immediately stolen off the torrent.
5        Like as you saw that first movie I looked up
6   with Kaisa in it, it was on the -- it was stolen the
7   day I put it up.  And this happens with, within two
8   minutes of it being put up.  It's -- it's on the
9   torrents and then within two hours it's on the tubes
10  as well.
11       And both the torrents and the tubes are
12  impossible to DMCA.  They just throw it in the
13  garbage.  The tubes you can't even reach because
14  they're out of the country, and, I mean, the
15  torrents, I'm sorry, you can't reach because they're
16  out of the country, so the DMCA notices does nothing.
17  That's our only legal line of defense if we don't
18  actually go this route and actually file a lawsuit.
19  And on the tubes they don't list that DMCA notices at
20  all.  They're also mostly based out of the country.
21       Q.   Do you have any data to back up your claims?
22       A.   Yeah, I have lots of data.
23       Q.   Have you produced that data?
24       A.   No, we haven't produced it yet.
25       Q.   Why not?

Pages 257 to 260

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

A. Well, we haven't started a lawsuit yet. It's going to be very expensive.
Q. Have you produced that data -- why haven't you produced that data to, to us?
A. To you?
Q. Yeah.
A. What data?
Q. The --
A. I haven't even sorted the data out for my own attorneys yet. It's just in the infancy of that lawsuit. Basically we want to protect ours, our copyrights on the torrents and on the tubes. So the tubes stealing the data is a little different than the torrents, and that lawsuit is in its infancy so I don't really have anything to produce to you yet. It needs to be organized.
Q. You claim that you have data showing that you -- that XR content is stolen at a higher rate than other sites, and I'm wondering why you've not produced that data if you're in possession of it?
A. I don't -- I don't have specific data that I could produce at the moment.
Q. Is there some reason that that data has been withheld?
MR. BEIK: Object to form.





but the thing is it's -- it doesn't -- go ahead. I'm sorry. Ask the question. But it's -- it would be just my, my husband. And I believe that it was set up to have the domain names be separate, and then I think everything was paid a price for and then sent back to XR all to be under one domain name or one IP, one IP holding company.
Q. When you say "back to XR," did you mean back to Malibu?
A. Yeah, exactly. I'm sorry.
Q. So how did the asset get from Malibu to Click Here?
A. When we started, that's why I said 2007 or 2008, I think we put in the trademarks and the, the domain names and Click Here and then the copyrights into Malibu, just because we -- I don't know, I guess we thought if someone -- some lawyer told us it was a good idea, and then we decided it would be better to have, to have everything, to have the adult things under one roof and other things that aren't under another roof.
Q. When did you found Colette Productions?
A. That was I think -- I actually didn't do it. The lawyer who was at the point stealing from us, he actually went and opened up in the bank account, put



my name on it, and so we kept the -- we paid for productions for the harder core website that, that's still in existence that my friend Francisco mostly did the producing and directing on, but I was there as well.
And so that was -- that -- and so that guy wanted to invest in that business, so we made a separate company, and then he turned out to be not a good guy and so they kind of all came together, these guys, and so that business is no longer.
Q. Were you -- were you a CEO of Colette Productions?
A. Yes.
Q. From what date to -- from what dates?
A. I don't know, from whenever that 2016 or '17 until like September of this year or something.
Q. And were you working for Colette Productions when you were, when you were making some of these, some of these works, your pornographic works?
A. Of what? Say again.
Q. When you were making these pornographic movies, were you working for Colette Productions?
A. Was I working for Colette Productions? That was just basically an expense account. I was doing the same work.

Page 265

```
 1        Q.   What about Colette Holdings.  When did
 2    you -- when did you create Colette Holdings?
 3        A.   That lawyer -- that lawyer set it up for us
 4    around the same time.  He actually knew the person at
 5    the bank and had the bank sign my name.  And that --
 6    and that money got transferred into there and then he
 7    cleaned that account out, and that's when we found
 8    out he was kind of a bad guy as well.
 9             He was kind of involved with Genova and that
10    was a whole, just a whole mess I'm hoping to have
11    over soon and so we can just move forward and make
12    content and protect out content and that's it.
13        Q.   Were there ever any contracts between any of
14    these companies, Colette Productions, Colette
15    Holdings, Colette Properties, Click Here, or Zo
16    Digital with Malibu?
17        A.   Oh, with Malibu?  Zo Digital -- Zo Digital
18    maybe but nothing else, and Click Here probably.
19        Q.   So Colette Productions, Colette Holdings,
20    Colette Properties never had any agreements with
21    Malibu?
22        A.   No.
23        Q.   Did you -- did you personally have any
24    agreements with these companies?
25        A.   No.
```

Page 266

```
 1        Q.   What was the purpose of Colette Properties?
 2        A.   That was we were going to buy a property
 3    together, and we did actually, and he stiffed me out
 4    of half of it, so when he went to jail.  So -- so I
 5    used it to pay some of my properties, rental
 6    properties and things like that, and like pay the
 7    mortgage payment, receive the rent.  And so that, it
 8    really didn't have anything to do with XR or anything
 9    like that.  It was actually I had properties in there
10    that I've owned for 15 years.
11        Q.   Now, did Warmblood ever invest $400,000 in
12    Malibu?
13        A.   No, I don't believe so.
14        Q.   Did they ever invest anything in Malibu?
15        A.   I believe they stole money from Malibu.
16        Q.   Did they ever give Malibu any money?
17        A.   They -- no, they did not.
18        Q.   So I'm just wondering why, why do you think
19    that, I mean, do you think that -- so what's behind
20    this?  Is this all just made up that Malibu, that the
21    allegations from Warmblood that Malibu Media agreed
22    to split 50/50, quote, net recovered fees generated
23    from protecting copyrights as to restitution efforts
24    to recovered losses, unquote?  Is this all fabricated
25    or?
```

Page 267



Page 268

Pages 265 to 268

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

1      A.   Yeah, which is really weird because, first
2  off, I would never write that underscore under my
3  name like that, and that's not even my handwriting,
4  and I didn't sign this.  So, like I would never sign
5  this.
6          I've seen this before.  It was just a weird
7  thing that they said that they would get 50 percent
8  of the company.  And that's what they want us to file
9  instead of when -- instead of foreclosing on our
10  house, which they actually -- again it's just -- they
11  put two deeds for 2.5 million when it wasn't even
12  their money.  They were paid back.  Then they had
13  some other hundred thousand dollars that they had
14  taken out of the account and tried to foreclose on
15  that.
16          And in California how you can do
17  nonjudicial, you just go on the courthouse steps and,
18  you know, try to, you know, sell someone, and then
19  they have to go try to get their title back, and so
20  it's a huge pain.  And so this it what they do for a
21  living.  So, yeah, I am familiar with that, and it's
22  fraudulent, obviously fraudulent.
23      Q.   You're saying that's a forged signature?
24      A.   Well, it's a DocuSign, so if you can call
25  this a signature.

1      Q.   So you're saying it's a fake DocuSign?
2      A.   I guess so.  Who else could it be?
3      Q.   So just to go back a little bit, you said --
4  you mentioned something about with respect to
5  infringement that there was a pattern that you would
6  notice from people where they would receive notices
7  and then resume again.  Did I understand that?
8      A.   Yeah, they would -- they would receive three
9  notices from -- when they get the notice from the
10  internet service provider, they would usually stop
11  and -- and then once they stopped they would, you
12  know, that would usually be it and then they would
13  either go to court or settle or end up not go back to
14  it.
15          But there's for some reason some people are
16  addicted and they'd stop for a little while and then
17  go back to it later.  And if they had enough time
18  space between the infringements, they wouldn't get
19  the three notices where their service would be turned
20  off.
21      Q.   And was that -- was that part of why your,
22  your, is that part of your alleged evidence against
23  my client?
24      A.   No, it's just truth.
25      Q.   All right.  Let's take a quick break and

1  I'll probably just do a little bit of wrap-up and
2  then I'll conclude.
3      A.   Okay.  Thank you.
4          THE VIDEOGRAPHER:  Off the record at 5:36.
5          (A recess was taken.)
6          THE VIDEOGRAPHER:  We are back on the record
7  at 5:43 p.m.
8  BY MR. KHAZEN:
9      Q.   You mentioned before that you, that you
10  thought the Lomnitzer firm was overpaying IPP; is
11  that right?
12      A.   Yes, I did at one point.
13      Q.   Before was IPP kind of, was it in with the
14  Lomnitzer firm in terms of taking money from you?
15      A.   Yeah.  Well, I think the Lomnitzer firm,
16  like they just didn't really understand the
17  technology.  And so they really wanted to get the,
18  you know, they really put paying IPP ahead of all
19  else, because she wanted to make sure to get the IP
20  addresses so she could keep filing and keep making
21  money, which we weren't making money, we were just
22  were -- we were getting the benefit of -- and I could
23  tell actually, I was thinking back, we were -- we did
24  have more traffic and more sales when she was filing.
25          So even though we weren't making any money

1  from our filings, she was paying it all to herself.
2  We did, as long as we filed and held people
3  accountable, we did do better.  So but I thought they
4  were getting paid 15 and then she raised them to 25
5  without telling me.
6      Q.   When did things start to go south with IPP?
7      A.   I think it was maybe four months from when
8  we left Lomnitzer.  I was upset about seeing an email
9  from one of the attorneys in Germany who said that he
10  was suing people on behalf of us and paying, and
11  paying -- actually they were paying Pillar, and then
12  I think they started paying Lomnitzer, then they
13  started -- no, then they were keeping the money.
14  After we left Pillar, they were keeping the money,
15  and so I was upset about that.  I asked the law firm,
16  I said, How could you keep the money.  You should be
17  giving it to us.
18      Q.   The -- when you said there was a law firm,
19  sorry, which law firm was this?
20      A.   Germany called Fareds, F-a-r-e-d-s.
21      Q.   And they were paying -- they were paying IPP
22  for collections that they made on your copyright?
23      A.   Yeah.  They were paying IPP for our data,
24  and then they were making collections on our
25  copyrights, and then they were giving incentive to

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

1  us, the distribution, they were giving it to IPP,
2  because IPP told them that that was fine, that we had
3  agreed to that as part of our, you know, as part of
4  their payment to them for the data we were getting in
5  America, and so that obviously wasn't the case.
6      Q.  Did you -- when did you get that, the email
7  indicating that?
8      A.  Well, actually they had been sending it and
9  it had been going to my junk, so the attorney at the
10 firm, he wasn't doing anything wrong, he was actually
11 just doing what he thought Pillar told him to do.
12 And so it had been going to my email box every month,
13 and one day I opened it up and I saw it in German,
14 and then I read it in German and then I saw that it
15 said in German that he was keeping the money.  And
16 so -- so that they were giving IPP the money to keep.
17     And Patrick Ashashay (phonetic) from IPP had
18 emailed it back in German and just said, okay, thank
19 you so much.  And -- and I looked at that, I said,
20 Wow, how long has this been going on?  And then I
21 emailed back the Fareds attorneys in German and I
22 said, How long have you been paying Patrick Ashashay
23 from IPP?  And he told me since 2017.
24     And so he said that Pillar told him that it
25 was okay to do.  So Pillar basically keeping the

1  settlements but getting out of paying IPP by doing
2  that, and then -- and then once Pillar decided to
3  still get the full amount from us but to
4  also keep the money from IPP.
5      Q.  Do you -- so you can read and write German?
6      A.  A little bit.
7      Q.  And when did you -- when did you read this?
8  Do you recall what, around what date you were able to
9  read this email?
10     A.  I think it was -- like I said, we left
11 Lorri's in August, so it would have been maybe, maybe
12 six months before that even, six months before that.
13 That's when I started getting upset about it and --
14 he didn't start anything with them basically because
15 she just wanted just to keeping everything as it was
16 so she could keep making her bills.
17     Q.  That's August of 2018?
18     A.  Correct.  Six months before that.
19     Q.  Correct.  So it would have been around
20 February of 2018?
21     A.  Right.  Sounds right.
22     MR. KHAZEN:  I think that's -- those are
23 all the questions I have for today, reserving our
24 rights.
25     THE WITNESS:  Okay.

1                EXAMINATION
2  BY MR. BEIK:
3      Q.  Hang on, Colette.  I've got a few questions
4  for you real quick.  The first one is when we started
5  this deposition, you were asked some questions about
6  COVID, and it sounded like you were giving the best
7  business answer to the questions where you mentioned
8  that you all were trying to keep the business going
9  and trying to keep --
10     A.  Right.
11     Q.  -- keep everything going on and --
12     A.  Right.
13     Q.  -- so forth.  That sounded like a good
14 business answer, but did COVID affect your business
15 in a very bad way?
16     MR. KHAZEN:  Objection, leading and form.
17     THE WITNESS:  No, it did.  I mean, I was
18 sick for months on end, and a lot of our people, like
19 our programmers, my head programmer got it as well.
20 I forgot about all this.  I mean, I was -- I was so
21 tired this morning and I didn't realize this would
22 take so long.  And so I was sick, my husband was
23 sick, and then our -- some of our best performers and
24 directors were sick.  A lot of the people we work
25 with and also our head guys in Ecuador, and our data

1  guys were sick.
2      And then Dane, who was our, actually our
3  contact with IPP and was starting a whole new
4  software system, he also got it and got sick.  And
5  I've barely spoken with him since that happened.  So
6  it was actually, it was really much more affected
7  than I did say this morning, so...
8  BY MR. BEIK:
9      Q.  Okay.  Well, it's fair to say that it
10 significantly affected you in the past seven months?
11     A.  Yeah.  Significantly, yeah.
12     MR. KHAZEN:  Objection.  Objection, form and
13 leading.
14     THE WITNESS:  Well, I mean, I'm even still a
15 little bit sick from it, so it's like it's been --
16 I've been still harder to catch my breath and
17 everything and tireder and hard to sleep, so it's --
18 I don't know if it's COVID or what, but it's just
19 been a lot's been going on, and, yeah, so but so I
20 probably didn't answer it perfectly.  I probably
21 tried to make it sound, you know, better.
22 BY MR. BEIK:
23     Q.  Okay.  And we were -- we had some
24 conversations -- I guess just to put a bow on that,
25 so whenever you were asked questions about who got

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

1 it, and you didn't -- you didn't -- you didn't
2 name --
3     A.  Right.
4     Q.  -- for example, you didn't name a lot of
5 people, that was early, whatever that was --
6     A.  Right, it was more like cheerleading
7 basically, yeah.
8     Q.  You want to clear up your testimony that you
9 later stated that that was --
10     MR. KHAZEN:  Objection, form and leading.
11 BY MR. BEIK:
12     Q.  And you were asked some questions about
13 whether the defendant distributed, as alleged in your
14 complaint, whether the defendant in this case that
15 you alleged downloaded, copied and distributed the
16 films listed in Exhibit A; is that true?
17     A.  If he downloaded them, he definitely would
18 have distributed them, because that's the way the
19 torrent client works.
20     Q.  Okay.  So -- so it's your allegations that
21 they, the films were distributed by the defendant?
22     A.  Well, he would have to because once you
23 download them from the torrent client, you have to
24 distribute it.  So if I didn't say it properly then,
25 then that's what happened, but --

1     Q.  Okay.
2     A.  Yeah, so, but, yes, he would have
3 distributed them and downloaded them.
4     Q.  There was a lot of references to 2015 to
5 2019.  And if you look back at exhibit -- if you look
6 back at Exhibit Number 3, which I believe Defendant's
7 Exhibit Number 3 was the, the complaint document 1-1.
8 So if you look at the exhibit -- if you look at the
9 Exhibit A, I guess it's Exhibit B, I'm sorry, to
10 that, can you read me where on the last title listed
11 where it shows date of publication?
12     A.  So on -- on Exhibit Number 0003 or which
13 one?  The title or which?
14     Q.  Yes, Exhibit 0003 and then Exhibit B to that
15 exhibit.
16     A.  Okay.
17     Q.  The date of first publication and then the
18 date of registration for the last title that's listed
19 on there on Exhibit B.  Do you see that?
20     A.  Okay.  So hang on.  Exhibit B, let me see.
21 Okay, so B would be -- eleven or ten?  Ten?  Ten?
22 No.  Nine.  Eight.  Six I think you said, right?  No?
23 Seven, five, four, three.  Three, right?
24     Q.  Exhibit 3, and it's the original, it's the
25 original complaint, and then it's the Exhibit B.

1     A.  Okay.  Okay, there -- for some reason it
2 keeps going away.  There it is.  This is A.  Okay, so
3 this must be B.  Okay.  So -- so the last movie, the
4 a Fucking Hot Threesome, that one?
5     Q.  Yes.  And the date of first publication?
6     A.  It was August 7, 2015.
7     Q.  Okay.  And so my question is were you
8 referencing 2015 to 2019 because that was the range
9 of the titles that were listed in the complaint?
10     A.  Yes.
11     Q.  Okay.
12     MR. KHAZEN:  Object to form.
13 BY MR. BEIK:
14     Q.  So just to put a bow on it, if you -- if you
15 go back to Exhibit A, and the dates for the hit
16 dates, and can you tell me the years of the hit
17 dates?
18     A.  Okay.
19     Q.  Just the range from what year to what year
20 are the hit dates?
21     A.  Okay.  So the hit dates on these are --
22 okay, so the hit date from -- I'm starting from one
23 and going down it goes 12-30-2018, 12-25-2018,
24 7-29-2018, 7-24-2018, 7-7-2018, 7-6-2018, 7-26-2017,
25 so a whole year earlier, and then 7-26-2017.

1     Q.  Okay.  So the range is from 2007, which is
2 the last one, to the first one is 2019; is that
3 correct?
4     A.  Yes.
5     Q.  Okay.  So the timeframe that you reference,
6 you're talking about that three-year period between
7 2017 and 2019; that's correct?
8     A.  Correct.
9     MR. KHAZEN:  Objection to form.
10 BY MR. BEIK:
11     Q.  When we were talking about and you were
12 answering some questions about, about the Lomnitzer
13 law firm, just to clear up a little bit, was it your
14 understanding -- what was your understanding that
15 they, they were holding from you in terms of because
16 of the dispute?
17     A.  Oh, okay.  I believe they were holding our,
18 you know, our, basically our intellectual property,
19 our copyrights.  Like they were just kind of holding
20 it until we settled everything, just we were just
21 waiting to get it back.  You know, they weren't --
22 they didn't have any interest in it, they were just,
23 you know, had it in their office, and once we settled
24 everything we would get it back.  They were just --
25 they were just kind of messing with us but did not

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

Page 281

1 have an interest in anything, so...
2    Q.  So they weren't claiming -- so they weren't
3 claiming -- to your knowledge they were not claiming
4 an interest --
5    A.  They --
6    Q.  Hang on.  Hang on.  Let me ask the question
7 then you answer, okay.  So they were not claiming
8 interest in any of those copyrights or intellectual
9 property, they were, they were holding the files,
10 right?
11    A.  Right.  Correct.
12       MR. KHAZEN:  Objection to form, leading.
13       THE WITNESS:  Well, that's what I was trying
14 to answer so, like, too, he's not leading because I
15 was trying to say they were holding the file.  Files.
16       MR. BEIK:  Okay.  So, okay, I reserve the
17 rest for the time of trial.
18          EXAMINATION
19 BY MR. KHAZEN:
20    Q.  I have just follow-up on a couple things he
21 asked about.  So you mentioned that, some of the
22 COVID testimony you had forgotten a couple people,
23 your head programer.  Who else did you -- who else
24 was it?  Your head programmer and who else had COVID?
25    A.  Dane, who has actually doing all the

Page 282

1 interaction with IPP, and so that was a big issue,
2 and his friend, who was building the new system, and
3 then some of our top like performers and directors
4 over in Prague as well.  So we actually came, and
5 then they had to hold new tests for the models, so
6 they had to have COVID on it.
7       And so it's just really -- since we travel
8 so much for work, and, you know, everything just
9 really came to more of a halt then.  And then, yeah,
10 and I forgot my head programer was.  All the
11 programmers got it as well.  So we were definitely --
12 but I guess I was so sick I don't even remember,
13 remember a lot of it.
14    Q.  What, if anything, does that have to do with
15 the prosecution of this lawsuit?
16    A.  I guess I think Paul thought I was, I was
17 not really mentioning how bad that myself and a lot
18 of other people in our business had experienced
19 COVID.
20    Q.  Did your -- does your testimony change about
21 the way that it affected you, that you --
22    A.  I mean, I think it was cheerleading a little
23 bit, like Paul said giving the business answers
24 saying it wasn't so bad when it was quite a little
25 bit worse than I said.  So I guess he just wanted to

Page 283

1 make sure that was clear.
2    Q.  When you went on the break, did you discuss
3 this being a business answer?
4    A.  No.
5       MR. BEIK:  Objection, form.
6 BY MR. KHAZEN:
7    Q.  So how long were you sick with COVID?  How
8 long were you sick with COVID?
9    A.  Over two and a half months actually.
10    Q.  And that was March and April and half, and
11 half of May then?
12    A.  Yeah, basically.
13    Q.  And are there -- is there anything that you
14 would have done for this case that you weren't able
15 to do due to COVID?
16    A.  I would have had more access to data and to
17 our programmers and to being able to do scripts and
18 extract things and gotten the data back from
19 Lomnitzer faster and been able to just not have so
20 many delays and answering in having the stuff in
21 front of me that I needed to answer.
22       And I remember how frustrating that was now
23 that we couldn't get the, we couldn't get the data
24 and we didn't have the programmers to manipulate it
25 into a form that we could present to you.

Page 284

1    Q.  And you were able to prosecute your cases
2 with Lomnitzer and Genova during this time, right?
3    A.  We actually got really behind on the, on the
4 interrogatories for Genova, and I think we got
5 slapped with some sanctions on there.  I mean, I was
6 so sick.  And then with Lomnitzer, she was, she was,
7 at that point she was done.
8       So the rest of my team here were champions
9 and kept just moving forward and closing things out.
10 And but no, we had no more Lomnitzer then.  And
11 Genova, they were just burying us in discovery that
12 was just absolutely meaningless, but that was, that
13 was difficult at that point time, too, being sick and
14 so, you know, just never really catched up from all
15 that.
16    Q.  When did you file suit against Genova?
17    A.  Oh, now I can't remember.  A while back.  I
18 mean, eight months ago or something like that.  I
19 don't know how far back.
20    Q.  So at the beginning of 2020?
21    A.  Yeah.
22    Q.  How far into the beginning approximately?
23    A.  Like maybe a little bit more, like not right
24 at the beginning, so...
25    Q.  Around say March?

Pages 281 to 284

1      A.   Yeah, probably.  Yeah.
2      Q.   And you said that you would have gathered a
3  lot of data if you hadn't had COVID.  Is that -- did
4  I understand that correctly?
5      A.   All these, all the movies, the nine movies
6  where I think you had asked for all of the sales and
7  you wanted us to prove what it was worth, and so I
8  took the whole team off of everything and I said,
9  okay, we need to, because we don't have the
10  programmers to write a script, you need to manually
11  pull out all these movies from the databases.  So it
12  made everything much, much harder.
13      Q.   Was it your contention that your failure to
14  produce documents in this case is due to you having
15  contracted COVID in March of this year?
16      A.   Yes.
17      Q.   And your failure to provide, to provide full
18  interrogatory responses, it's your contention that it
19  is because of your, that you contracted COVID earlier
20  this year?
21      MR. BEIK:  Objection, form.
22      THE WITNESS:  I mean, the thing is I think
23  that my programmers usually translate everything for
24  me weren't there to do that, so, you know, so I did
25  all the script and everything myself, and that it

1  was, you know, much more time-consuming than I ever
2  thought it would be.
3  BY MR. KHAZEN:
4      Q.   How long did your programmer have COVID for?
5      A.   He has two young children, too, and so he
6  had it I think -- he had it three and a half weeks
7  actually.  He's in Ecuador, which is, you know,
8  it's -- it's still -- it's still nice there but it's
9  definitely not the same as it is there or here or --
10  where?  You're in Texas.  So, yeah, it's a little bit
11  more third world, but they're doing okay.
12      Q.   And how long did your other programer have
13  COVID for?
14      A.   He had it for maybe a couple weeks, but he's
15  been in and out of the hospital a lot actually, so
16  he's maybe three weeks.  But I trained his -- I
17  trained his assistant and she's absolutely doing
18  awesome, so that is always good and, you know, but
19  here's that...
20      Q.   10,000 cases, why do you not have this data
21  just handy?
22      A.   That's because we have, you know, because we
23  switched from -- and I'm telling you, the lawyers
24  were doing it before, and they were hanging onto the
25  data.  I don't know what they wanted to do with it

1  later, but we do not have the data.  So lawyers were
2  hanging onto it and they were taking advantage of us,
3  because that was not our main business, still is not.
4  And we just, you know, they just incurred keeping
5  all -- like tried to make like it was their business,
6  because that's the only way they could keep
7  collecting the money.
8      Q.   So you said that once you download something
9  off of BitTorrent, you have to distribute it?
10      A.   Right.
11      Q.   Remember that testimony?
12      A.   Correct.  Yes.
13      Q.   So if you download something off of
14  BitTorrent and then uninstall the client, do you have
15  to -- do you still have to distribute it?
16      A.   If you uninstall the client, you -- I
17  think -- I don't know that it would still work,
18  but...
19      Q.   So that -- meaning it's not exactly true, is
20  it?
21      A.   Well, no, I'm not sure actually.  I would
22  need to do that when I install a client, a
23  BitTorrent client on my computer.  Yeah, I'm not
24  actually sure about that if you -- the thing is you
25  open up the highway between your computer and all

1  the others as soon as you download your first movie,
2  and then so everyone comes knocking on your door to
3  get that movie.
4      So you would definitely be -- you have to
5  share it with at least some people before you could
6  take the client off, because the minute you get it,
7  like other people start getting pieces of it from
8  your computer the second you get it.
9      Q.   When you get it you could shut off the
10  connection to the BitTorrent network; isn't that
11  correct?
12      A.   It depends on which torrent you're using.
13  And if you do that, though, you will get a really,
14  really slowly connection, and sometimes it won't even
15  allow you to download the movies.
16      Q.   But you can do that, correct?
17      A.   I don't know on which torrent you can do
18  that, but I'll definitely check.
19      Q.   Once you -- you testified that once you
20  download, once you download the content, you have to
21  distribute it, and that's just not true, is it?
22      A.   I think it really depends on where you are
23  in the world or the country and what you would agree
24  to do based on --
25      Q.   You could cut the client's connection to the

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

1  internet at that point, couldn't you?
2      A.  You know, I -- the thing is it's not that
3  easy.  They can just plug back in.  Wifi, too.  It's
4  like how are you going to cut a wifi connection?
5      Q.  So it's your testimony, you are sticking to
6  this testimony that once you download a movie, you --
7  once you download content, you have to distribute
8  that content and that is part of your contentions
9  against my client; is that your testimony?
10     A.  I'm saying once he downloaded it, he opened
11  up the door for other BitTorrent clients to take the,
12  for him to distribute it to other BitTorrent client
13  users.
14     Q.  So what you said before was false, that it's
15  not that you have to distribute it after you download
16  it, correct?
17     A.  Well, just one -- it's a different way of
18  looking at it basically, because you do have to
19  distribute it basically.  Once -- like if -- he and
20  other clients will tell you this, too, and I'm not
21  sure that there's a way to prevent it because that's
22  the whole premise that BitTorrent runs on is that
23  when you share something, then you have to share with
24  other people.  And so if you're not going to do that,
25  then you probably won't be invited back on, so...

1      Q.  Okay.  But just to be clear, it's your sworn
2  testimony that once you download content, you have to
3  distribute it?
4      A.  Well, you won't have a choice because
5  unless --
6      Q.  Yes or no?
7      A.  I believe so.  I believe so.
8      Q.  And is it your testimony that the IP address
9  for my client's network distributed pieces of Malibu
10  Media's copyright -- copyrighted movie to IPP
11  servers?
12     A.  No.  That they would -- basically what they
13  do is they would go in there and like look around and
14  they would see who's getting Malibu Media movies.
15  They would actually act like get the movies
16  themselves.  So they would get the information, okay,
17  this IP is taking Malibu Media movies, this IP is,
18  this IP is distributing them, so on.
19     Q.  So no, that's not Malibu's contention that
20  that -- it's not Malibu's contention that my client
21  distributed Malibu's copyrighted movie materials or
22  pieces of them to IPP servers?
23     A.  No, no, that's not how they found -- they
24  would -- you might have but I don't think so.  I
25  don't believe they do work that way, but they might.

1  And -- and he would -- they were paying him like for
2  a full movie price.  Like they -- I think I just --
3  one of the movies it's like $7,000, or something like
4  that for -- and so if you're going like based on the
5  movie and like how much it would cost and how much
6  trouble it is, they get on a certain speed.
7          And so when you open up your highway by
8  installing the client, and you download that movie,
9  then so many other people need to take it back from
10  you in order for you to keep up your ranking on the
11  site.
12     Q.  So you testified just earlier that about
13  distribution.  I just want to be clear.  It's not --
14  is it or is it not Malibu's contention that my client
15  distributed pieces of Malibu's copyrighted materials
16  through IPP servers, yes or no?  Is it -- is it or is
17  it not your contention?
18     A.  It's my contention that he did do that.  I
19  don't know if he did it on purpose or not.
20         THE REPORTER:  I'm going to have to take a
21  break.
22         (Discussion off the record.)
23         MR. KHAZEN:  We can just wrap it up then.
24         THE WITNESS:  Okay.
25         THE VIDEOGRAPHER:  Go off the record wrap it

1  up or?
2          MR. KHAZEN:  I have no further questions.
3          THE WITNESS:  Okay.  Thank you very much.
4          MR. BEIK:  I have no further questions at
5  this time.
6          THE VIDEOGRAPHER:  Okay.  We are going off
7  the record at 6:10 p.m., ending the deposition.
8          MR. BEIK:  Do you have my contact
9  information to get the transcript?
10         THE REPORTER:  Yes.  I was just going to ask
11  you what you were ordering.
12         MR. BEIK:  Well, I know you said you got
13  something to do, whatever else.  Can I give you my
14  email address and we can email, that way we can go
15  offline here?
16         THE REPORTER:  I have your email.
17         Ramzi, do you know what you're ordering?  Do
18  you have a standard order?
19         MR. KHAZEN:  Yeah, I think J.T.'s been
20  communicating with you, so we should hopefully have a
21  form filled out, otherwise if I could email you.
22         MR. MORRIS:  The only thing we want, we
23  would like a rough, you know, as soon as possible.
24         THE REPORTER:  That concludes the deposition
25  proceedings.  Transcript review by the witness has

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

## Page 293

1  been waived.
2         Any exhibit marked during the proceedings
3  will be attached to the original deposition
4  transcript, with copies attached to transcripts
5  timely ordered by counsel.
6              (Thereupon the taking of the
7              deposition was concluded at
8              6:10 p.m.)
9         *    *    *    *    *
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 294

CERTIFICATE OF REPORTER

1
2  STATE OF NEVADA  )
3              SS:
4  COUNTY OF CLARK  )
5
       I, Deborah Ann Hines, RPR, Nevada CCR No. 473,
6  California CSR No. 11691, Certified Court Reporter,
   certify:
7
       That I reported the taking of the deposition
8  of the witness, Colette Pelissier, commencing on
   Tuesday, October 20, 2020, at 9:19 a.m.;
9
       That prior to being examined, the witness
10 was by me duly sworn to testify to the truth, the
   whole truth, and nothing but the truth;
11
       That I thereafter transcribed my shorthand
12 notes into typewriting and that the typewritten
   transcript of said deposition is a complete, true and
13 accurate record of testimony provided by the witness
   at said time to the best of my ability;
14
       I further certify (1) that I am not a
15 relative, employee or independent contractor of
   counsel of any of the parties; nor a relative,
16 employee or independent contractor of the parties
   involved in said action; nor a person financially
17 interested in the action; nor do I have any other
   relationship with any of the parties or with counsel
18 of any of the parties involved in the action that
   may reasonably cause my impartiality to be
19 questioned; and (2) that transcript review pursuant
   to NRCP 30(e) was not requested.
20
       IN WITNESS WHEREOF, I have hereunto set my
21 hand in my office in the County of Clark, State of
   Nevada, this 4th day of November, 2020.
22
23    _____
          Deborah Ann Hines, CCR #473, RPR
24
25

## Page 295

1            CERTIFICATE OF DEPONENT
2  PAGE  LINE  CHANGE            REASON
3  _____
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15        *   *   *   *   *
16     I, Colette Pelissier, deponent herein, do
   hereby certify and declare the within and foregoing
17 transcription to be my deposition in said action
   under penalty of perjury; that I have read, corrected
18 and do hereby affix my signature to said deposition.
19
20
21    _____
          Colette Pelissier, Deponent
22    _____
          Date
23
24
25

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078