```
1                    UNITED STATES DISTRICT COURT
                      WESTERN DISTRICT OF TEXAS
2                       SAN ANTONIO DIVISION

3    MALIBU MEDIA, LLC,          )
                                 )
4         Plaintiff,             )
                                 )
5            v.                  )    Docket No. 5:19-cv-00834-DAE
                                 )
6    JOHN DOE, infringer using   )    San Antonio, Texas
     IP address 70.121.72.191,   )    February 23, 2021
7                                 )
          Defendant.             )
8    _____)

9              TRANSCRIPT OF MOTION HEARING (BY VIDEO)
               BEFORE THE HONORABLE RICHARD B. FARRER
10                  UNITED STATES MAGISTRATE JUDGE

11   A P P E A R A N C E S:

12   FOR THE PLAINTIFF:
     Paul Stephen Beik
13   Beik Law Firm, PLLC
     8100 Washington Avenue, Suite 1000
14   Houston, TX 77007

15   FOR THE DEFENDANT:
     JT Morris
16   JT Morris Law, PLLC
     1105 Nueces St.
17   Austin, TX 78701

18   COURT RECORDER:  FTR Gold

19   Proceedings reported by electronic sound recording.  Transcript
     produced by computer-aided transcription.
20

21

22

23

24

25
```

1      *(2:34 p.m.)*

2           THE COURT:  Next up before the Court is case number

3      SA:19-CV-00834-DAE, Malibu Media, LLC, versus John Doe.  Let's

4      see.

5         Counsel, would you please introduce yourselves.

6           MR. MORRIS:  JT Morris on behalf of defendant John

7      Doe.

8           MR. BEIK:  Paul Beik on behalf of plaintiff Malibu

9      Media, LLC.

10           THE COURT:  Okay.  All right.  We're here in

11      connection with a motion requesting sanctions that's filed by

12      defendant John Doe.  I'll just refer to John Doe as "Mr. Doe"

13      or "defendant" just for ease of -- or convenience in terms of

14      talking about -- talking about the defendant.  Obviously, I

15      don't know anything about the identity of defendant any more

16      than anybody would from reading the papers, where it's kept

17      pretty scrubbed clean.

18         So, Mr. Morris, why don't you just start us off here and

19      just outline for me why we're here today and just a brief

20      background on how we got here.  And in particular, you know, we

21      had you all set up with respect to a motion to compel, and then

22      there was an advisory that was filed.  That seemed to alleviate

23      the need to have a hearing on that motion, and we didn't need

24      to take it up.

25         But now it seems like some of those issues have come back.

So maybe we need to just sort of back up and talk about that a bit, too.  So why don't you go ahead.

MR. MORRIS:  Thank you, Your Honor.

And as you say, we're here on Doe's motion for sanctions, something we don't file lightly, but we felt that essentially we had no other option.

John Doe, the defendant here, was sued by Malibu Media for copyright infringement over BitTorrent.  And in response, he filed affirmative defenses and counterclaims, including a counterclaim for abuse of process, in which he alleges that Malibu sued him and has been suing others for a long time on methods it knows is faulty, essentially to extract settlement payments from anonymous defendants because they're being sued for infringing pornographic films.

And part of those allegations center in large part on Malibu's relationship with IPP, its German consultant and had a relationship with for eight years, from which it obtained all of its information, its infringement evidence and from which it obtained affidavits to use to ask courts, including this one, to subpoena defendants' internet service providers so they can unmask those defendants.

So, in effect, the methods IPP uses, its relationship with Malibu, what Malibu knows about IPP's methods, all of those things are going to be embodied in communications between Malibu and IPP and about IPP.

1   Now, this isn't -- again, this isn't a situation where it's
2   a one-off consultant Malibu has used.  Malibu has an eight-year
3   relationship with IPP.  At the very least, as Malibu's
4   representative even admitted in their declaration in opposition
5   here, they expected IPP to send them evidence and send them
6   affidavits from Germany.  So in this day and age, one would
7   expect that those would be in emails or some other sort of
8   written communication.  We haven't received any of those except
9   for one single email.

10   So from those perspective -- and, again, we asked for those
11   in the motion to compel.  Malibu represented in a joint
12   advisory they wound send all communications about IPP.  We got
13   one.

14   Now, in Ms. Pelissier's deposition, who was Malibu's
15   corporate representative, she testified she's been -- she's
16   been trying to communicate with IPP recently, that IPP sent her
17   a series of communications seven months before her deposition.
18   And so they've been recently communicating with IPP.  There's
19   evidence of that.  And we don't have any of those logs, the
20   text messages between Ms. Pelissier and her employees about
21   IPP, none of that.

22   So when Malibu represented in its -- in the joint advisory
23   that we'd get those communications, we waited, and we asked and
24   we asked and we asked again, and we didn't get them.  And
25   that's why we're here today, Your Honor.

1      And the bigger reason we're here today, obviously, is

2  because it prejudices Doe's ability to develop the affirmative

3  defenses and really his abuse of process counterclaim.  We just

4  don't see a justification for Malibu for why they haven't

5  produced those.  Really, you have this eight-year relationship,

6  and there's one single email.  That just defies reason.

7      So from Doe's perspective, it's one of two things.  It's

8  either that Malibu's obscuring those emails and other

9  communications or they spoliated them.  Either way, that's

10  sanctionable behavior.  And that's really why we're here today,

11  Your Honor.

12          THE COURT:  Okay.  So what specifically do you know

13  that there must be but that hasn't been produced?

14          MR. MORRIS:  So, for example, the one email we have is

15  a email from IPP to Malibu's former general counsel

16  transmitting some data packet.  We don't even have the

17  underlying data packet, which is another issue.  We haven't

18  seen any more of those.

19      And the issue here I think that -- from Malibu's

20  perspective, it thinks it only had to produce any email from or

21  to IPP about this case.  But that ignores the scope of the

22  abuse of process counterclaim, which is looking at IPP's

23  methods in general, both in this case and the thousands of

24  others they've helped Malibu file.  Those are the emails we're

25  looking for, the emails they transmitted affidavits in, the

1  data packets, the actual attached data files that IPP's

2  sending.

3      We know -- so we can't assess what actually IPP is sending

4  Malibu and whether Malibu knows whether or not the information

5  IPP is sending is something they can legitimately file a

6  copyright infringement claim on.  That's the core of the abuse

7  of process counterclaim.

8          THE COURT:  Got it.  Okay.  Is there -- is there --

9          MR. MORRIS:  And I'll add to that as well, Your Honor.

10  And, again, going back to Ms. Pelissier's deposition, logs of

11  Skype and WhatsApp chats, calls with IPP.  She testified also

12  she had texted with a Malibu representative about IPP and

13  getting documents for this case.  We don't have those texts

14  either.  Those came after this lawsuit was filed.  From our

15  perspective, IPP -- I mean, Malibu had an obligation to

16  preserve those.  They didn't do it, because they haven't

17  produced them to us.

18          THE COURT:  Okay.  So certain texts.  And then logs

19  of -- so what is this?  This is underlying data from these

20  applications that records that there was a video or a -- let's

21  call it a telephone.  You know what I mean.  An audio

22  conversation.  Because over WhatsApp and Skype, right, a lot of

23  people, especially internationally, use those in lieu of a

24  telephone.

25      And is a transcript made or generated?  Is the call

 1  recorded, or what is it that you're asking for?

 2      And I think maybe at the core here, so maybe you can

 3  address this, too, in answering this question, is the -- you

 4  know, the agreement or the stipulation in the advisory doesn't

 5  seem to be as precise as you're describing it to me now.  And

 6  so, you know, if it turns out that the Court needs to take a

 7  charitable view of this, maybe it's just in that there wasn't

 8  adequate communication between counsel about what it is that

 9  was being agreed to in that advisory in terms of what was going

10  to be handed over.

11      So just explain to me why it is that the things that you're

12  saying should have been included are things that were agreed to

13  be handed over in that advisory.

14          MR. MORRIS:  Sure.  And I'll start with the first

15  question, Your Honor.

16          THE COURT:  Okay.

17          MR. MORRIS:  Our understanding is, at least when I use

18  WhatsApp on my phone, I get a log of who I called, when I

19  called them and, you know, whether it was text, chat --

20          THE COURT:  [Inaudible] communication; right?  That's

21  a log of a communication; right?

22          MR. MORRIS:  It's still -- it's still an evidence of a

23  communication.  From our perspective, it is -- it's evidence of

24  that communication.  It's discoverable information about the

25  communication.  Even if -- and even if it wasn't in that joint

advisory, Malibu, at least the way our request for productions

are structured, had an obligation to retain those and preserve

them.

    And going to the emails I'm talking about, when IPP is

transmitting these affidavits, transmitting these data packets,

transmitting the underlying data, which we still don't have, I

think the fact that their representation in the joint advisory

was broad shows why sanctions are warranted here.  They didn't

say -- they didn't say, "We're just going to -- we're going to

produce documents about IPP related to this case alone."  They

said "all documents."

    And they knew, from our request for production, we're

asking communications about the methods they used to identify

infringers using IP addresses, their relationship with IPP and

their other consultants they have used.  So the RFPs encompass

those.  And so I don't think their broad representation should

be viewed charitably here.  In fact, it should be viewed the

opposite way.

            THE COURT:  Okay.  And so when -- let me just look at

timing here.  Scheduling order.  So you had dispositive motions

due back in December; is that right?

            MR. MORRIS:  That's correct, Your Honor.

            THE COURT:  And so then you sort of have -- and so

discovery closed when?

            MR. MORRIS:  I believe October 20th was the last day.

1        THE COURT:  Okay.  And so you don't want the

2  information now.  You want the sanctions; is that right?

3        MR. MORRIS:  We want the information.  If you look at

4  Exhibit B to our motion for sanctions, there's an email chain

5  in there, where we're constantly needling Malibu, "Where's the

6  communications?  Where's this other information we asked for?"

7  understanding that -- you know, that the discovery obligation

8  extends beyond the date.  You still have to produce information

9  that comes into your possession, custody or control.

10     That's why I'm saying, we did not file this motion for

11  sanctions lightly.  We wanted the communications.  But we

12  haven't gotten them.  So at this point that's why we're filing

13  this motion for sanctions where we're asking for an adverse

14  jury instruction because there's no other recourse for Doe

15  here.

16        THE COURT:  When was the advisory filed?

17        MR. MORRIS:  Your Honor, the advisory was filed on

18  August 7th, 2020.

19        THE COURT:  Okay.  So a couple of months before the

20  close of discovery and sort of hoping that between then and the

21  close of discovery something -- you'd get all the stuff that

22  you were looking for?

23        MR. MORRIS:  That's correct.  And this was also under

24  our understanding of Malibu's representation that all of its

25  files were in the possession of its former general counsel who

1 it was in a lawsuit with and that it was working out

2 negotiations to get all those files back.  So we were just

3 taking Malibu at their word that they had -- they were still

4 working to get all the documents about IPP from its former

5 general counsel.

6         THE COURT:  Okay.  And when did you depose her?

7         MR. MORRIS:  October 20th, the final day of discovery.

8         THE COURT:  Okay.  And then you asked to extend

9 deadlines -- gosh.  I just had it, and now I lost it.  Here we

10 are.  Okay.  Joint motion to extend scheduling order deadlines

11 on the 20th of November.  So that's after discovery's closed.

12 And you're probably asking there to -- what?  Extend

13 dispositive motion deadlines?

14         MR. MORRIS:  We extended dispositive motion.  If Your

15 Honor recalls, we had a hearing on Malibu's motion to extend

16 all discovery, which the Court denied.  But during that

17 hearing, Doe made the representation that it would offer Doe's

18 deposition as a good faith gesture.  So we extended -- we asked

19 to extend dispositive motion deadlines so Malibu could depose

20 my client and have enough time to prepare summary judgment

21 papers.

22         THE COURT:  Okay.  But we didn't have another motion

23 to compel filed.  When did we -- you were just saying when you

24 had a hearing before me.  When was that, again, that last one?

25         MR. MORRIS:  Your Honor, I don't recall directly.  I

1    believe Mr. Beik might know better than me.  I think it was in

2    early October.

3            THE COURT:  Yeah.  Let's take a look.  We'll figure it

4    out.  I just --

5            MR. MORRIS:  November 16th, Your Honor.

6            THE COURT:  November 16th.  Yep.  Right.  Courtroom

7    deputy beat you to it.

8       Okay.  So -- and your motion to extend -- actually, it

9    wasn't yours.  It was Malibu's.  But I'm just looking at it

10   here on my screen.  If it looks like I'm staring blankly at

11   you, I'm just reading something.  Just bear with me.

12      Okay.  So plaintiff wanted an extra 120 days to take up

13   what it was going to do about counterclaims.  And you all

14   opposed that; right, Mr. Morris?

15           MR. MORRIS:  We did.

16           THE COURT:  Just here -- just reorienting myself here.

17   Bear with me.  Okay.  All right.  I think I'm back in.  I

18   understand the timing now.

19      Is it -- is it too late to get this information now?  I

20   guess -- I'm going to hear from Malibu's counsel in a second,

21   and I suspect he might say that, "Well, there's just nothing

22   to -- you know, there's nothing to produce.  We've given

23   everything we have."  But if there were to be more information

24   found, is that helpful at any -- at all at this point?

25           MR. MORRIS:  I certainly think it's helpful, Your

1   Honor.  As we've said, these emails were read from other --

2   where IPP's transmitting affidavits, underlying infringement

3   data in those attachments, they would be very helpful to the

4   abuse of process claim.  But what looks -- I think sanctions

5   are still in order to compensate Doe for having to bring this

6   motion and a motion to compel.  But if Malibu can produce that

7   information, absolutely, it'd be helpful.

8           THE COURT:  Okay.  Well, let me hear from Malibu and

9   just -- and get their side of the story.  But I'll give you a

10  chance to speak again.  Don't worry.  So I'll come back to you.

11     All right.  So what's -- what's the other perspective here?

12          MR. BEIK:  The other perspective, Your Honor, is

13  essentially that everything that's in Malibu's possession,

14  custody and control has been, in fact, produced.

15     It's important to give some kind of understanding.  I think

16  that potentially defendant doesn't understand what IPP does,

17  what information they actually provide.  So it might be

18  helpful -- Ms. Pelissier put it in her declaration in support

19  of this response to this motion.

20     But IPP essentially -- you know, Malibu has a contract with

21  IPP.  In terms of, you know, the veracity of what IPP does,

22  that's been barring -- that's been challenged, and that's been

23  through the ringer in terms of courts.  Courts have brought the

24  folks from Germany over into the district court in New York to

25  go through the entire process and so forth.  So this is the

1    first that I'm understanding that that's actually being

2    challenged, that the fact that what IPP does is actually being

3    challenged.

4        But in any event, what IPP does is they essentially go and

5    they have a proprietary software that goes and looks for and

6    detects copyright infringement associated with companies'

7    movies.  Malibu was a small customer for IPP.  And IPP does

8    this for a lot of movie companies.  And they detect this online

9    infringement.  And then what they do is they provide that data,

10   which includes essentially an IP address.  It includes the

11   movies, the dates and the file hash that was actually detected

12   in order to identify the movies.

13       That information is then provided, in our case, once a

14   month to the client, which in this case Malibu.

15             THE COURT:  How is it provided?

16             MR. BEIK:  Pardon?

17             THE COURT:  How is it provided?  Is it emailed?  Is

18   it —

19             MR. BEIK:  Yes, Your Honor.  It is email.

20       And the email that was produced is from June 2019.  And to

21   the best of our knowledge that is the email that was sent to

22   Malibu's former general counsel who — that's a big problem

23   here.  That's a gigantic problem here that I'll get to in a

24   moment.

25       But that email, all that comes through is attached as the

new data set.  And the general counsel takes that data set.
And what's in that data set is that -- the IP addresses, the
file -- all the information that's listed in Exhibit A and B to
the complaint.  So essentially everything that IPP had
contacted with us has already been produced.

They also provide additional evidence, which is -- you
know, if you look at Exhibit A to the original complaint, it
shows the date of the infringement, the file hash, the movie
and so forth.  In this case we have nine infringements,
starting in 2017, going all the way through until --

THE COURT:  How do you know that?  From this packet
that we're talking about?

MR. BEIK:  Correct.

THE COURT:  Okay.

MR. BEIK:  That's the -- that's the data that they
provide.  Okay.  When I say "data," they aren't providing a
copy of the hash.  They don't provide that.  You have to pay
extra for that in order to obtain it.  And -- but what they are
contracted to provide, which we provided the contract that
Malibu had with IPP -- is, again, they provide the IP
addresses.  They provide all the data that forms the basis for
the lawsuit, and then corresponding affidavits and then also
additional evidence, which is third-party content that was also
detected.

So like in this case there's over 2,000 others that were

1  also provided by IPP, which has also been produced to

2  defendant.  And that's what -- that's what the contract says.

3  IPP is not contracted to do anything else other than that.

4      Now, if we hire them to be -- or if the party wants to hire

5  them to come in and be an expert in the case, well, then that's

6  an additional fee, and that's a whole different -- that's a

7  whole different game.  But that wasn't done in this case.  And

8  there was -- you know, that's not -- that's not what happened.

9      It was attempted.  Obviously, as my client stated in her

10  deposition, she tried to reach out to them, tried to reach out

11  to them, you know.  And that was one of our bases to extend the

12  discovery deadline, was because of -- we thought, with the

13  coronavirus, whatever issues had happened with our previous

14  general counsel, then, you know, we were trying to get in touch

15  with them to say, "Look, we need an expert to come in and

16  provide evidence for us."

17      But in any event, let me get -- so that's kind of maybe a

18  misunderstanding of what defendant thinks IPP does and has

19  provided.  That's what they provided.  And, again, just to

20  reiterate, I've got a transcript from a hearing that took place

21  in D.C.  I believe it was already provided in discovery to

22  defendant.  But, you know, essentially is where it goes

23  through -- the judges -- I mean, this has been going on a long

24  time.  It's not like they would just let this happen for ten

25  years, all courts all across the country -- and not just

1  Malibu.  This is, again, many, many companies file BitTorrent

2  lawsuits.  This is a huge, huge [inaudible] for movie companies

3  in terms of online infringement.

4      And so this whole -- IPP's entire process and everything

5  was vetted, again, by a federal judge in New York based on

6  whether or not it's appropriate to issue a order granting the

7  third party IP company to provide the name of the -- of the

8  individual in terms of the third party subpoena that's filed at

9  the beginning of the case in order to secure the name of the

10  individual that owns the IP address.  But I think I've covered

11  that aspect of it.

12      Let me shift gears, if the Court will let me, to the issue

13  with the former general counsel and I think what has been a

14  huge part of frustration for Malibu and also for defendant in

15  this case.  The issues with the former general counsel --

16  obviously, as opposing counsel mentioned earlier, Malibu was in

17  a lawsuit with them whenever their relationship deteriorated.

18      As Ms. Pelissier stated in her deposition and in her

19  declaration, the Lomnitzer law firm was the general counsel.

20  They handled the campaign, is what Malibu calls it, for the

21  piracy of online infringement for the entire country.  They

22  almost exclusively -- I mean, she put in her declaration that

23  they were the ones -- Lomnitzer is the one that contact -- that

24  communicated with IPP.

25      Now, having said that, the communications were essentially,

"Here's your data for the month," and then there'd be one other
email that says, "Here's your affidavits."

So the problem with Lomnitzer is, that we requested -- and
at the time of that joint advisory we requested Lomnitzer to
provide us with all communications with IPP because they're the
only ones that have the communications with IPP.  And we even
sent a external hard drive to Lomnitzer requesting all of this.
You know, clearly -- and all that was provided was what we
submitted.

Now, we do know -- I spoke to one of the paralegals this
morning.  We do know there is another email related to this
case, which would have been those affidavits coming -- the
affidavit coming back from Mr. Tobias Fieser.  That email, that
they clearly didn't include -- and it clearly exists because
she told me she'd be willing to provide an affidavit to the
Court basically saying that she has no access to that because
whenever Lomnitzer essentially, you know, cut everything off,
Lomnitzer controlled Smokeball.  Lomnitzer controlled all the
email addresses for everybody that was communicating with IPP
and everybody else throughout the team, also included all the
PACER account.  She cut out access to us to everything.

So, as a result, we had no access to anything and certainly
nothing that the -- that the defendant is requesting.  And we,
in absolute good faith, represented in the joint advisory that
we were going to provide the communications that were with IPP.

1    Obviously, defendant has -- as I started with this
2    presentation, there's a different idea as to what IPP was
3    actually providing versus what was actually going to be there.
4    But, again, we didn't receive anything else other than what
5    was -- what was produced.
6        But in a typical case that is exactly what -- you know,
7    everything was already provided.  So, essentially, the
8    additional evidence was provided, the list of all the
9    infringing works of a third party, which, again, that was in
10   the contract with IPP.  They provide the IP address.  They
11   provide the movies that were infringed, the date and time and
12   the file hash that identified it.  And they provide the
13   corresponding affidavits, and they provide the additional
14   evidence.  All of that was produced except for that second
15   email in this case where the affidavit would have been
16   requested and come back.
17       So, essentially, my client did -- and let me address a
18   little bit of the WhatsApp and Skype issues.  My client, when
19   asked in her deposition about WhatsApp and Skype, she used it
20   only through voice.  She didn't use it through text message and
21   those types of things.  She put that in her declaration in
22   support of the response to this motion.
23       Secondly, she did not communicate with them, as she also
24   put in the declaration.  The general counsel did, Lomnitzer law
25   firm.  Before Lomnitzer, it was another law firm named Pillar

that also was the one that would communicate.  They also
negotiated with IPP in terms of when IPP wanted more money or
if they wanted, you know, anything else.  The lawyers all
handled that, and she didn't handle that.

That's one of the issues that she had with Lomnitzer, was
because Lomnitzer agreed to pay IPP more money, and
Ms. Pelissier did not agree with that.  And so that was also
one of the other issues involved with that dispute from
association with her former general counsel.

And just -- the other -- trying to think of all the other
different things.  Yeah.  In terms of logs, everything was
searched.  She put in her -- she reviewed text messages, email
messages, any other applications, paper files, additional
communications between Malibu and IPP, and she didn't locate
anything else.

So, essentially, you could issue an order saying, you
know -- she doesn't have anything else to produce.  And it
makes sense.  And the reason it makes sense is because the
Lomnitzer law firm was the one that was communicating with IPP,
not Malibu.

And, again, we can request it from Lomnitzer.  We did
request it from Lomnitzer.  We repeatedly requested it from
Lomnitzer.  And all we got was what was produced in this case.

I'm trying to think.  There was something else I was going
to highlight, if the Court doesn't mind.

1    THE COURT:  No.  That's okay.  Take your time.

2    MR. BEIK:  Okay.  So, essentially, just to highlight

3 again that what they're requesting -- again, defendant didn't

4 send a subpoena to IPP.  They could have done that.  We

5 requested to extend discovery deadlines.  They opposed that.

6 We requested additional time to get an expert witness.  They

7 opposed that.  You know, again, they've opposed us on every

8 single thing.

9    You know, obviously, the Lomnitzer law firm, the former

10 general counsel has created a very difficult position for

11 Malibu to pursue and develop its case.  We already have summary

12 judgment motions on file.  Both parties worked hard to get

13 those done.  Again, opposing counsel opposed all of our

14 deadlines for extensions.

15    Then they wanted to ask the Court for another extension,

16 and we didn't oppose.  We said, "Okay.  That's fine."

17    Now, and, again, with regard to that deposition of Doe,

18 opposing counsel tried to act like they were so giving.  That

19 deposition was requested.  It was noticed months and months and

20 months and months before October 20.  And we had an email

21 agreement that basically said, we will reschedule that

22 deposition.

23    Now, I didn't make a big fuss about it at the hearing

24 because we did not -- we lost on the motion for extension of

25 the deadlines and everything else.  But, you know, they were

1  offering the defendant for the deposition, you know, basically

2  on affirmative defenses, which one of those affirmative

3  defenses was not infringement.  So I viewed it as it covered

4  everything anyway.

5      But it's just important to note that it wasn't like Malibu

6  didn't send a deposition notice, just like they did earlier,

7  but we had to agree on different schedules.  And, clearly, we

8  wanted to wait until we, you know, had a chance to get our

9  motion for extension of the discovery deadlines and expert

10  deadlines heard, which it was heard.  It was denied on both

11  counts.  And then we went forward with the deposition.

12      Now, the only other thing I wanted to mention is that, you

13  know, defendant has a little bit of unclean hands here.  Just

14  like they're talking about Malibu not producing stuff,

15  defendant's hard drives, he testified in his deposition that he

16  took those hard drives and he -- and he treated it as a

17  security event.  He's never produced them, never produced them.

18      Malibu didn't file a motion to compel.  We didn't go and

19  try and fight on it, in part because we didn't have an expert

20  to look at it.  But the end of the day is, is that you can't

21  seek equity and then also -- and not do equity.  And that's

22  just another -- just something to note, is that it's not like

23  the defendant comes here without, you know, that being an issue

24  as well.

25          THE COURT:  Okay.  All right.  Anything to say in

1 reply, Mr. Morris?

2         MR. MORRIS:  I do, Your Honor.  I'm not sure where to

3 start.  But let's just start with about -- within the four

4 corners of this motion for sanctions.  Mr. Beik just said IPP

5 sent the data sets, they sent the affidavits over emails on a

6 monthly basis.  We have one.  We don't even have the data set

7 from this case.  That alone shows that they did not meet their

8 discovery obligations here, despite their representation that

9 they would send those communications.  We don't have the other

10 emails with those other data sets.

11     So you have Malibu sitting here saying, "Well, the IP

12 address, the hash values all came from this data set that IPP

13 sent."  We don't -- we have no ability to test that because we

14 don't have those communications, and we don't have the attached

15 data sets.  That's one reason why we filed this motion for

16 sanctions.

17     Second, Your Honor, if Malibu brought IPP over here to

18 testify in court cases, where's those communications?  I mean,

19 there's no emails about -- between Malibu and IPP discussing

20 their testimony?  I mean, we know that IPP and -- Mr. Fieser

21 has been used as a testifying expert in other cases.  Where are

22 those emails?  Where are the draft expert reports?  Where's all

23 these things that we would expect?

24     Third, Your Honor, about the contract with IPP, they didn't

25 produce it.  They produced a part of it.  And we brought this

1  up in our reply.  I wrote Mr. Beik.  Said, "Hey, where's the

2  whole agreement with IPP?"  He responded, "This is all we

3  have."  It's missing at least the first page.  So there's

4  another issue of spoliation.

5      And then I think you just have these little things showing

6  why Malibu just hasn't conducted themselves well through

7  discovery here.  For example, in their -- in their opposition

8  to our sanction motions they say that all communication stopped

9  with IPP in May 2019.  But then you have Mr. Beik saying that

10  the email they produced to us was dated June 2019 from IPP.

11  Those two things don't reconcile.

12      You know, and we have one email from the Lomnitzer law firm

13  that just happens to be from this case.  Again, it just doesn't

14  make any sense, Your Honor.  At the very least, Malibu had

15  custody, control, possession of its documents.  Even if they

16  were in Lomnitzer's possession, they were Malibu's.  We all

17  know that.  If your client asks for documents, you're

18  entitled -- you're obligated to hold onto them.

19      Malibu can't sit here and blame Lomnitzer for Malibu's own

20  inability to safeguard its documents when it's filing thousands

21  of copyright lawsuits, by its own admission, in federal courts.

22  It should have a -- I mean, you would imagine would have a

23  system in place for safeguarding these documents and producing

24  them in discovery.  They haven't.

25      So, again, one single email when, on a monthly basis, IPP

1  was sending these data sets and affidavits to Malibu's counsel.
2  At the very least that shows spoliation and shows why sanctions
3  are warranted here.

4      And, finally, I just want to address this unclean hands
5  issue.  They requested every hard drive in Doe's possession,
6  access to all his cloud files, access to every video game
7  console in his house in their request for production.  So we
8  responded saying, "That's overbroad, but we're willing to meet
9  and confer to try and narrow this."  They never took us up on
10  that, and we put this in our opposition to their motion to
11  extend.

12      If they didn't take us up on the -- on the offer to confer
13  about getting those hard drives and narrow those requests for
14  productions, that's not on us.  That's on Malibu.  So there's
15  no unclean hands here.  We're simply seeking -- we've simply
16  been seeking these communications from IPP that Mr. Beik all
17  but said are out there.  We haven't gotten them.  And that's
18  why sanctions are warranted here, Your Honor.

19          THE COURT:  Okay.  Well, look -- thank you, Counsel.
20  There's a lot -- a lot's been said.  There's a lot of
21  information, a lot of -- a lot of accusations flying back and
22  forth.  But at the end of the day, y'all are pretty far down
23  the road here.  You had a pretty good run at conducting
24  discovery in this case.

25      Look, the lack of information here is a concern.  The lack

1  of communications produced is a concern.  But there were --

2  there was a mechanism to address that, that, you know, wasn't

3  pursued.  Instead, we've got this motion for sanctions,

4  allegations of spoliation and bad faith.  That's a high burden

5  for me.  And notwithstanding my not insignificant concern at

6  the lack of information that was produced, I don't think that a

7  sufficient showing's been made here to warrant sanctions,

8  specifically an adverse instruction or money sanctions in this

9  case.

10      So I think this case just needs to -- just needs to get on

11  down the road.  There's not a full and complete data set here

12  in terms of discovery, I don't think for anybody in this case,

13  it looks like.  But it is what it is.  You know, it's

14  significant that a -- that a significant extension to the

15  discovery deadline was sought and was opposed by defendant, but

16  now we're sort of talking about sanctions in connection with,

17  you know, a lack of complete discovery.

18      So the motion's going to be denied on that basis.  And I'll

19  just issue a short written order that just basically sums that

20  up.  But I wanted to just provide my reasoning here on the

21  call.

22      Anything further, Mr. Morris, that I ought to take up?

23          MR. MORRIS:  Not for me, Your Honor.

24          THE COURT:  Thank you, sir.

25      Mr. Beik, anything from you?

1              MR. BEIK:  No, Your Honor.

2              THE COURT:  Okay.  All right.  I appreciate your

3     thoughtful arguments, counsel.  Thank you.  We'll be in recess.

4     * * *

5          *(3:13 p.m.)*

-oOo-

I, court approved transcriber, certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

Date:  3/3/2021        /s/ Chris Poage
                       Approved Transcriber